**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. ___1:22-cv-00581-NYW___

Colorado Montana Wyoming
State Area Conference of the NAACP,
League of Women Voters of Colorado, and
Mi Familia Vota,

      Plaintiffs,

v.

United States Election Integrity Plan, Shawn Smith,
Ashley Epp, and Holly Kasun,

      Defendants.

---

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

---

**INTRODUCTION**

Voter intimidation poses a lethal threat to democratic government. Recognizing this danger, Congress has passed two statutes—the Voting Rights Act of 1965 ("VRA") and the Ku Klux Klan Act of 1871 ("KKK Act")—creating a private right of action against individuals or entities who seek to threaten, coerce, or suppress the right to vote. Courts have been equally stalwart in protecting voters from intimidation. *See, e.g.*, *Spencer v. Blackwell*, 347 F.Supp.2d 528, 535 (S.D. Ohio 2004) ("Voter intimidation severely burdens the right to vote.") (citing *Burson v. Freeman*, 504 U.S. 191, 206 (1992)); *Reynolds v. Sims*, 377 U.S. 533, 562 (1964) ("[T]he right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and

1

political rights."). Simply put, our political and judicial institutions have long understood that free and fair elections are the lifeblood of American democracy:

> "The right to vote embodies the very essence of democracy. Absent free and fair elections uninfluenced by fear, the underpinnings of democratic rule would crumble. The United States Constitution, as enforced by Congress and the courts, enshrines these principles." *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 464 (S.D.N.Y. 2020).

The Defendants in this case are carrying out a campaign to intimidate voters. Armed with badges and weapons, they travel door-to-door to the homes of some of Colorado's most vulnerable voters, demanding to know if they participated in the 2020 election, pressing them for information on how they cast their votes, interrogating them about so-called fraudulent ballots, and taking photographs of their homes. This well-funded and sophisticated conspiracy has a clear purpose: to strike fear in the hearts of certain Colorado voters so that they do not turn out at the polls in 2022. Defendants have made it clear to certain voters that intimidation and threats will follow them home from the polling place; that voting now carries the risk that armed vigilantes may come to their homes; and that they should be afraid to vote. It is a brazen, unapologetic, and malignant strain of voter intimidation—and it must be immediately stopped.

Plaintiffs are non-profit organizations that provide a wide range of services and support in the areas of voter education, registration, and political participation and activism. Because of Defendants' unlawful actions, these organizations have been forced to divert valuable time and resources from their core missions. This work remains on hold as Plaintiffs urgently seek to restore Colorado voters' trust in the electoral system, rehabilitate their sense of personal security, and ensure that voters of color can vote without fear of post-election intimidation and threats.

48374360v4

With 2022 campaigns beginning across the state, and primary and general elections on the horizon, an immediate injunction is needed to stop Defendants' voter intimidation campaign, and the harm this campaign continues to cause Plaintiffs and the Coloradans they represent.

## BACKGROUND

**A.    USEIP Is a Militant, Aggressive Voter Intimidation Group Disguised as an "Election Integrity Plan."**

United States Election Integrity Plan ("USEIP") was formed on November 7, 2020 in response to so-called "blatant election fraud" that USEIP falsely claims took place during the 2020 presidential election.[1]  (*See* https://useip.org/about/.)  While USEIP's stated purpose—"to get a better understanding of what happened in the 2020 election, to find truth, expose the truth, and share the truth . . .  If there was fraud in 2020 let's find it, fix it, and hold those responsible accountable"—may sound innocuous, both its history and its actions are anything but benign. (*See* https://useip.org/.)

USEIP's founders and early members initially met in online chatrooms and at rallies, stoking false claims of a stolen 2020 presidential election.  (*See, e.g.*, Eric Maulbetsch, *Colorado Republican Legislators Join Election Fraud Conspiracy Panel*, COLORADO TIMES RECORDER (Mar. 9, 2021), https://coloradotimesrecorder.com/2021/03/colorado-republican-legislators-join-election-fraud-conspiracy-panel/34839/ (noting that Defendant Ashley Epp organized several post-election "Stop the Steal" rallies in Denver, which—among other things—promoted the false claim that China "funded the voting machines" used to rig the 2020 presidential election) (hereinafter "Maulbetsch, *Election Fraud Conspiracy Panel*).)  In addition, the group has clear ties

---

[1] Defendants Shawn Smith, Ashley Epp, and Holly Kasun were among the original founders of USEIP.  (Erik Maulbetsch, *Colorado Election Conspiracy Group Going Door-to-Door in Search of 'Phantom Ballots'*, COLORADO TIMES RECORDER (Aug. 17, 2021), https://coloradotimesrecorder.com/2021/08/colorado-election-conspiracy-group-going-door-to-door-in-search-of-phantom-ballots/38866/.

to QAnon, which has been linked to numerous violent acts since 2018, and which the FBI and Combating Terrorism Center at West Point have identified as a potential domestic terror threat and "novel challenge to public security," respectively.   (*See* Lois Beckett, *QAnon: a timeline of violence linked to the conspiracy theory*, THE GUARDIAN (Oct. 16, 2020), https://www.theguardian.com/us-news/2020/oct/15/qanon-violence-crimes-timeline   (describing acts of violence linked to QAnon); Erick Maulbetsch, *Colorado Election Conspiracy Group Going Door-to-Door in Search of 'Phantom Ballots*, COLORADO TIMES RECORDER (Aug. 17, 2021), https://coloradotimesrecorder.com/2021/08/colorado-election-conspiracy-group-going-door-to-door-in-search-of-phantom-ballots/38866/  (noting that USEIP has been linked to QAnon) (hereinafter "Maulbetsch, *Election Conspiracy Group Going Door-to-Door*").)

USEIP also actively recruited Coloradans to participate in the insurrection at the U.S. Capitol on the January 6, 2021, which resulted in the deaths of five individuals and countless other injuries.  An estimated 40 USEIP members—including Defendant Epp—participated. (Maulbetsch, *Election Fraud Conspiracy Panel* (describing USEIP's involvement in the January 6, 2021 insurrection); *Kenya* Evelyn, *Capitol attack: the five people who died*, THE GUARDIAN (Jan. 8, 2021), https://www.theguardian.com/us-news/2021/jan/08/capitol-attack-police-officer-five-deaths (describing the death of Capitol police officer Brian Sicknick, who was struck in the head by violent rioters, and noting that an additional 60 Capitol police officers were injured attempting to protect the Capitol from insurrectionists).  Further, in a chatroom that helped organize a caravan of USEIP members to Washington, D.C., members shared links to websites that sold weapons, such as stun guns, and offered strategy on ways to deal with physical confrontation, even going so far as to share a link to a manual of police foot tactics.  (Erik Maulbetsch, *CO GOP Selects Member of QAnon-Linked Conspiracy Group That Organized Jan

4

*6 Caravan As Its 'Election Integrity' Chair*, COLORADO TIMES RECORDER (Aug. 11, 2021), https://coloradotimesrecorder.com/2021/08/co-gop-selects-member-of-qanon-linked-conspiracy-group-that-organized-jan-6-caravan-as-its-election-integrity-chair/38507/.)

More than a year since the insurrection, members of USEIP continue to impliedly and explicitly threaten violence against individuals whom they allege were involved in election fraud—in other words, people involved in the election of candidates opposed by USEIP.  Indeed, the recent death threats made by USEIP founder Shawn Smith against Colorado Secretary of State Jena Griswold are examples of these continued threats of violence.  Speaking at a February 10, 2022 rally hosted by FEC United,[2] Shawn Smith said of Secretary Griswold: "I think if you are involved in election fraud then you deserve to hang. Sometimes the old ways are the best ways." (Chase Woodruff, *At 'Emergency' Meeting, CO Election Conspiracist Says Officials Involved in Fraud 'Deserve to Hang'*, COLORADO TIMES RECORDER (FEB. 12, 2022), https://coloradotimesrecorder.com/2022/02/at-emergency-meeting-co-election-conspiracist-says-officials-involved-in-fraud-deserve-to-hang/43057/.)

USEIP's "County & Local Organizing Playbook," which sets forth USEIP's principles and goals, makes clear that USEIP is willing to pull out all stops to uncover supposed election fraud, even if it means engaging in violent and intimidating behavior.  (*See* USEIP, County & Local Organizing Playbook (Aug. 2021), https://useipdotus.files.wordpress.com/2021/08/useip_playbook_aug2021.pdf. (the "Playbook").) The Playbook is replete with incendiary language that illuminates USEIP's violent and intimidating behavior.  Among other things, the Playbook exclaims: "This is the fight . . . . No one is coming to save us. It's time to stand up . . . . But we are not at a time of peace. And everyone

---

[2] FEC United's founder, Joe Oltmann, has called for the mass hanging of political opponents, including Colorado Governor Jared Polis.  FEC United also has an affiliated militia wing.

who values freedom and is committed to the fight for our Republic is now needed." (Playbook at 3-7.) The 29-page Playbook also warns USEIP volunteers to ensure that the group is not infiltrated by outsiders with ulterior motives, even pointing out how the group has altered its vetting procedures, as previous volunteers "had a criminal history of sexual misconduct." (Playbook at 9.) While USEIP claims to be a group of concerned citizens exploring the "truth" as it relates to election integrity concerns, the Playbook can be best described as a county-level guide to voter intimidation.

**B.** **USEIP Goes Door-to-Door in Colorado Intimidating Voters Under the Guise of Uncovering Alleged Election Fraud.**

Employing the Playbook and using voter rolls purchased by Defendant Smith, USEIP is now taking its threatening and intimidating behavior directly to the homes of Colorado voters. (*See* Declaration of Casey Breese Ex. A.) More specifically, in an effort to uncover purported election fraud, USEIP is going door-to-door across Colorado, interrogating Colorado voters under the pretense of seeking to uncover "phantom ballots." (Maulbetsch, *Election Conspiracy Group Going Door-to-Door* (noting that USEIP claims to have "evidence" consisting of graphs for each county that purport to show more votes cast that registered voters—a claim that has been debunked by county clerks and election experts).) Sometimes armed and often donning badges to present a false appearance of government officiality, USEIP volunteers ask voters to confirm their addresses, whether they participated in the 2020 election, and—if so—how they cast their vote. They tell voters falsely that their ballots were cast fraudulently or that election fraud was committed under their name or address. (*Id.*) USEIP also has begun to target purportedly "high-density housing" and areas where there are high numbers of registered Democrats. (Erik Maulbetsch, *Colorado Election Fraud Group is Training Conspiracists in Other States to Knock Doors in Search of 'Phantom Ballots'*, COLORADO TIMES RECORDER (Oct. 1, 2021),

48374360v4

https://coloradotimesrecorder.com/2021/10/colorado-election-fraud-group-is-training-

conspiracists-in-other-states-to-knock-doors-in-search-of-phantom-ballots/39935/ (hereinafter

"Maulbetsch, *Training Conspiracists*").)

　　　　Paving the way for further voter intimidation, USEIP is also using its canvassing efforts to

build a database of photos of voters' residences.  (Maulbetsch, *Election Conspiracy Group Going

Door-to-Door*.)  USEIP encourages its agents to arm themselves and has suggested that its armed

agents coordinate with the unarmed members to provide "security" in their operations.

(Maulbetsch, *Training Conspiracists*.) One member has even stated that it was USEIP's

canvassing actions "right after the rigged 'lections (sic)" that led him to apply for his conceal and

carry permit.  (*Id*.)  USEIP's door-to-door voter intimidation has prompted an official warning

from Colorado Secretary of State Jena Griswold, reminding voters that the State of Colorado has

not commissioned such activity and informing voters of their rights and how to respond if they

feel harassed or threatened.  (Colorado Secretary of State Jena Griswold, News Release, *In

Response to Reported Unofficial Door-to-Door Canvassing of Colorado Voters, the Colorado

Secretary of State's Office Reminds Voters of Their Constitutionally Protected Rights* (Sept. 9,

2021),

https://www.sos.state.co.us/pubs/newsRoom/pressReleases/2021/PR20210909Canvassing.html.);

*see also* Eric Maulbetsch, *Election Fraud Conspiracists Still Knocking on Colorado Voters' Doors*

(Nov. 23, 2021), https://coloradotimesrecorder.com/2021/11/election-fraud-conspiracists-still-

knocking-on-colorado-voters-doors/41178/ (noting that federal and state officials are already

investigating at least two people linked to USEIP) (hereinafter "Maulbetsch, *Election

Conspiracists Still Knocking*").)

USEIP's reach continues to expand, now reaching at least seventeen counties in Colorado—including Jefferson, Boulder, El Paso, Douglass, Larimer, Otero, Mesa, and Weld— and coinciding with the first deadlines for the March Precinct Party Caucuses, which occurred in February 2022. (*See* Maulbetsch, *Election Conspiracists Still Knocking*; Maulbetsch, *Colorado Election Conspiracy Group Going Door-to-Door*; Secretary of State, *2022 Election Calendar*, https://www.sos.state.co.us/pubs/elections/calendars/2022ElectionCalendar.pdf.)    In addition, USEIP's actions (and the actions of similar and/or related groups) are reportedly expanding into other states across the country.   (*See, e.g.*, *Jonathan Shorman & Jeanne Kuang*, *In Missouri, 2020 election conspiracists persist as Jan. 6 attack anniversary approaches,* THE KANSAS CITY STAR (Jan. 5, 2022); Jan Wondra, *Election Conspiracy Fraud Group Expanding States in Door-to-Door Effort*, ARK VALLEY VOICE (Dec. 9, 2021) (discussing USEIP-like actions taking place across Utah).)

USEIP's door-to-door campaign intimidates voters who plan or had planned to vote in the upcoming elections. For voters, the threat posed by USEIP agents is only increased by the group's visible participation in the January 6, 2021 insurrection, its organization and publicization of "Stop the Steal" rallies, and its Playbook. USEIP's actions have created the intimidating environment in which voters must now decide whether they can safely exercise their right to vote.

## C.    USEIP's Actions Have a Chilling Effect on Civic Engagement Groups and Their Members, Who Are Colorado Voters.

In the Fall of 2021, Plaintiffs learned that USEIP was sending its members door-to-door in connection with the group's purported attempt to find evidence of voter fraud.  (*See* Declaration of Beth Hendrix ("Hendrix Dec.") ¶ 5; Declaration of Portia Prescott ("Prescott Dec.") ¶ 7; Declaration of  Salvador Hernandez ("Hernandez Dec.") ¶ 7.)  Because USEIP volunteers wear badges identifying themselves with official sounding names, such as "Voter Integrity Committee,"

possess specific information about voters, and are sometimes armed, their behavior is intimidating to Colorado voters, including Plaintiffs' members. (*See* Hendrix Dec. ¶¶ 7-9; Prescott Dec. ¶ 8; Hernandez Dec. ¶ 7.)  The door-to-door campaign is particularly intimidating for voters of color. Plaintiff groups represent members who have long experienced racial and ethnic discrimination, threats, and violence in their communities and homes, including actions to intimidate and suppress voters of color. (*See* Prescott Dec. ¶¶ 8-9; Hernandez Dec. ¶ 8.). The door-to-door campaign is "drastic and alarming in that they are showing up at the *homes* of Black (and other voters)." (Prescott Dec. ¶ 10.)  USEIP has put Plaintiffs' members on notice that voting may lead USEIP agents to their doors.

As a result, USEIP's actions are a direct assault on Plaintiffs' missions, which include ensuring that young, new, vulnerable, and minority voters in Colorado are able to safety participate in the political process on Election Day.  (*See* Hendrix Dec. ¶¶ 3-4; Prescott Dec. ¶¶ 2-6; Hernandez Dec. ¶¶ 2-6.)  Plaintiffs have been forced to redirect their resources to address USEIP's ongoing voter intimidation campaign.  (*See* Hendrix Dec. ¶ 11; Prescott Dec. ¶ 12; Hernandez Dec. ¶ 11.)  These are critical resources that could have been used elsewhere to further Plaintiffs' missions.  (*See* Hendrix Dec. ¶ 11; Prescott Dec. ¶ 12; Hernandez Dec. ¶ 11.)  By way of example, Plaintiff Mi Familia Vota will have to mobilize to disperse accurate information and respond to community concerns about voter safety in areas that have been targeted by USEIP.  (Hernandez Dec. ¶ 13.)

This diversion of resources means that Mi Familia Vota will have less resources to spend on ballot-level issues, efforts to build voter confidence and engagement, and efforts to spread awareness about upcoming elections and candidates.  (Hernandez Dec. ¶ 13.)  Likewise, Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP ("NAACP Colorado") and

League of Women Voters of Colorado ("LWVCO") have been forced to divert resources away from their core functions of educating voters on ballot initiatives and ensuring that every American has access to free and fair elections, and towards activities that combat disinformation disseminated and voter intimidation caused by USEIP and the individual Defendants.  (Hendrix Dec. ¶ 11; Prescott Dec. ¶¶ 12-14.)

USEIP's actions are a direct assault on the Voter Organizations' mission and voters' right to exercise their right to vote.  Defendants' intimidation of voters must be stopped.

## **ARGUMENT**

A party moving for an injunction must demonstrate: (1) a likelihood of success on the merits; (2) a likely threat of irreparable harm to the movant; (3) the harm alleged by the movant outweighs any harm to the non-moving party; and (4) an injunction is in the public interest.  *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1128 (10th Cir. 2013), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) (citations omitted); *see also* Fed. R. Civ. P. 65; *People's Trust Federal Credit Union v. Nat'l Credit Union Admin. Bd.*, 350 F. Supp. 3d 1129, 1138 (D.N.M. 2018) (noting that the requirements are the same for temporary restraining orders and preliminary injunction orders).  The purpose of an injunction is "to preserve the status quo pending the outcome of the case."  *Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir. 1986)).  Because Plaintiffs can demonstrate a likelihood of success on the merits, a likely threat of irreparable harm, that the balance of harms weighs in

favor of Plaintiffs, and their request for relief is in the public interest, they are entitled to an injunction enjoining Defendants from further intimidating Colorado voters.[3]

**A.      Plaintiffs Are Likely To Succeed.**

Section 11(b) of the Voting Rights Act of 1965 provides a private right of action for injunctive relief against private actors who engage in voter intimidation. *Allen v. State Bd. of Elections*, 393 U.S. 544, 554–56 (1969). The relevant portion of the provision states:

> No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote, or intimidate, threaten, or coerce any person for exercising any powers or duties under [other provisions of this law].

52 U.S.C. § 10307(b) (formerly codified at 42 U.S.C. § 1973i(b)).

To succeed on a claim under Section 11(b), Plaintiffs must show that Defendants: (1) intimidated, threatened, or coerced, or attempted to intimidate threaten or coerce, another person;

---

[3] NAACP Colorado, LWVCO, and MFV have standing to bring this action because they have had to and/or will be forced to divert significant resources from their core activities to combat Defendants' voter intimidation. (*See* Prescott Dec. ¶¶ 12-14; Hendrix Dec. ¶¶ 11-12; Hernandez Dec. ¶¶ 11-21.)   The actual diversion and likely future diversion of resources by these organizations, caused directly by Defendants' wrongful conduct, confers direct organizational standing upon them to pursue this case. *See Pavek v. Simon*, No. 19 Civ. 3000 (SRN/DTS), 2020 WL 3183249, at *10 (D. Minn. June 15, 2020) (holding that Plaintiff political organizations had standing because they were forced to divert resources to counteract the effects of the statute being challenged in the litigation); *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 464 (S.D.N.Y. 2020) (same).   In addition, as a non-profit civic engagement organizations with missions that include encouraging informed and active participation of its members in government, many of whom have been intimidated by Defendants' actions from exercising their right to vote, Plaintiffs have standing on behalf of their members to seek an injunction. *See Sierra Club v. Young Life Campaign, Inc.*, 176 F.Supp.2d 1070 (D. Colo. 2001) (holding that Sierra Club established standing to sue on behalf of its members by alleging that Defendant's failure to comply with the Clean Water Act caused injury to the past, present, and future interests of the Sierra Club and its members).

(2) in connection with voting, attempting to vote, or urging or aiding another to vote.  52 U.S.C. § 10307(b).

The operative language of Section 11(b) is broad, is not limited to any particular act, and is not restricted to overt acts of violence or physical threats.  *See* 52 U.S.C. § 10307(b). Voter intimidation tactics violate Section 11(b) when they are undertaken by any private person, "whether acting under color of law *or otherwise*. . . ." 52 U.S.C. § 10307(b) (emphasis added). "[T]he language 'or otherwise' indicates Congressional intent to reach both government and private conduct under § 11(b)." *League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Interest Legal Found.*, No. 1:18-CV-00423, 2018 WL 3848404, at *3 (E.D. Va. Aug. 13, 2018) ("*LULAC*"). Moreover, as the *LULAC* court observed, "[i]ntimidation means putting a person in fear for the purpose of compelling or deterring his or her conduct." 2018 WL 3848404, at *4 (internal quotation marks and citation omitted). Thus, Section 11(b) is violated by, among other things, any actual or attempted action by any person to instill fear in connection with one's exercise of the right to vote. *See Daschle v. Thune*, Temporary Restraining Order, Case No. 04-4177 (D.S.D Nov 2, 2004) (finding that the defendants violated Section 11(b) and objectively intimidated Native American voters by following voters from polling places, copying down voters' license plate numbers, and by recording their license plates).

Passed as part of the Civil Rights Act of 1871, the Ku Klux Klan Act creates a cause of action against those who "conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy" to a candidate for national office. *See* 42 U.S.C. § 1985(3). To prevail on a claim under this section of the Act, a plaintiff must show: (1) a conspiracy of two or more, (2) to prevent by force, intimidation, or threat, (3) any citizen from giving his or her "support or advocacy" to a candidate—in this instance, by voting—for

federal office, and (4) an act in furtherance of that conspiracy.  *See LULAC*, 2018 WL 3848404, at *1, 5–6; *see also Kush* v. *Rutledge*, 460 U.S. 719, 724 (1983) (noting that Section 1985(3) "proscribe[s] conspiracies that interfere with" among other things "the right to support candidates in federal elections").

The "support or advocacy" clause protects civil rights in two separate ways.  First, it reflects Congress' "power to protect and enforce" the constitutional right to vote.  *See The Ku Klux Cases*, 110 U.S. 651, 665 (1884) (recognizing that the Fifteenth Amendment "confer[s] . . . the right to vote").  Second, it creates an independent cause of action to protect voters, which is both separate and complementary to its ability to vindicate the constitutional right to vote.  *See LULAC*, 2018 WL 3848404 at *1, 5–6; *see also Paynes v. Lee*, 377 F.2d 61, 64 (5th Cir. 1967) ("By the sometimes called Ku Klux Act, a Federal right was created to recover damages for interfering with Federal voting rights.").  A violation of Section 1985(3) does not require state action. *Griffin* v. *Breckenridge*, 403 U.S. 88, 96 (1971) ("On their face, the words of [§ 1985(3)] fully encompass the conduct of private persons.").  Nor is there an intent requirement. *Kush*, 460 U.S. at 726.

1.      **Plaintiffs Are Likely to Succeed Under Section 11(b) of the VRA**

Defendants have engaged in actions to intimidate, threaten, and coerce voters, and have publicly admitted plans to continue their door-to-door voter intimidation campaign.  Defendants' conduct—whether or not they intend for their acts of intimidation, threats, and coercion to deter voters—violates the Voting Rights Act.

The words "intimidate," "threaten," and "coerce" have a broad meaning under Section 11(b). The Supreme Court has recognized that Congress intended to give the Voting Rights Act "the broadest possible scope." *Allen*, 393 U.S. at 567. Section 11(b) protects people who are "voting," "attempting to vote," or "urging or aiding any person to vote or attempt to vote." These

phrases have been interpreted expansively, as "voting" under the Voting Rights Act "includes 'all action necessary to make a vote effective.'" *Allen*, 393 U.S. at 566; *see also U.S. by Katzenbach v. Original Knights of Ku Klux Klan,* 250 F. Supp. 330, 353 (E.D. La. 1965) (stating that Section 131(b) "may be extended against interference with any activity having a rational relationship with the federal political process"); *United States v. McLeod*, 385 F.2d 734, 734 (5th Cir. 1967) (voter registration meetings protected by Section 131(b)); *Willingham v. Cnty. of Albany*, 593 F. Supp. 2d 446, 462-64 (N.D.N.Y. 2006) (filling out blank absentee ballots and ballot applications that were collected from eligible voters via questionable methods could give rise to a Section 11(b) claim).

So long as there is a sufficient nexus between the alleged intimidation and voting-related activity, the intimidation violates Section 11(b). *See United States v. Robinson*, 813 F.3d 251, 259 (6th Cir. 2016) ("That [the victim] had desired to vote for [a different mayoral candidate] but did not leave his house because of the presence of [defendants] amounted to intentional intimidation and oppression of voting rights."). The threat of an armed member of USEIP knocking on a voter's door to interrogate them about an alleged fraudulent ballot or perceived claims of voting fraud, or to accuse them or their family members of casting fraudulent ballots, is intimidating and threatening to even the most experienced voters. This is particularly true given the organization's Playbook, which pointedly declares that "we are not in a time of peace." (Playbook at 7.) The threat is also inescapable; USEIP's campaign means that, regardless of the method by which voters cast their ballots, voters risk having to face intimidating, armed agents showing up at their homes and taking photographs of their residences.

The threat and intimidation felt when a potentially armed stranger knocks on one's door is particularly acute for those in Black and Latino communities represented by Plaintiffs NAACP

Colorado and MFV.  People of color, in Colorado and across the country, have endured a long and

ongoing history of racial and ethnic violence in their homes and communities.[4] Terror, threats, and

violence—both at polling places and at voters' own homes—have been tools used to suppress the

Black and Latino vote.[5]

Defendants' conduct clearly falls within the scope of voting related activity under Section

11(b).  Defendants cannot escape injunctive relief, or ultimate liability, by claiming they are merely

having conversations with voters. According to the Department of Justice, voter intimidation

includes a broad range of conduct "intended to force prospective voters to vote against their

preferences, or refrain from voting, through activity reasonably calculated to instill some form of

fear."[6]  The Ninth Circuit, in interpreting California's analogue to Section 11(b), noted that

intimidation under that law "is not limited to displays or applications of force, but can be achieved

through manipulation and suggestion." *United States v. Nguyen*, 673 F.3d 1259, 1265 (9th Cir.

2012) (finding a letter sent to Hispanic voters warning of incarceration or deportation resulting

from illegal voting could have "constituted a tactic of intimidation" under California's voter

---

[4] For example, in the early twentieth century, Black Coloradans who attempted to move into predominantly white neighborhoods faced violence from the Klu Klux Klan in their own homes; Black people were threatened, confronted with burning crosses, and at least three homes owned by Black people were bombed, with housing discrimination and police brutality continuing for decades thereafter. *See, e.g.,* Richard Delgado & Jean Stefancic, *Home-Grown Racism: Colorado's Historic Embrace—And Denial Of—Equal Opportunity in Higher Education*, 70 U. Colo. L. Rev. 703, 733-737 (1999). Colorado just last year experienced a record high number of reported hate crimes, after trending upward annually since 2017 and increasing 22% from 2019 to 2020. Crimes against Black and Latino people motivated by hatred against their race or ethnicity spiked significantly. Elise Schmelzer, *Record Number of Hate Crimes Reported to Colorado Law Enforcement in 2020*, Denver Post Sept. 1, 2021, https://www.denverpost.com/2021/09/01/colorado-hate-crimes-2020/.

[5] Brad Epperly et al, *Rule by Violence, Rule by Law: Lynching, Jim Crow, and the Continuing Evolution of Voter Suppression in the U.S.*, 18 Perspectives on Politics 756 (2020) (examining use of violence, threats, and lynchings to terrorize potential voters and suppress the vote in the American South); *see also Paynes v. Lee*, 377 F.2d 61,63 (5th Cir. 1967) (men visited a Black potential voter at his home and threatened to "annihilate" him if he attempted to register to vote again).

[6] U.S. Department of Justice, *Federal Prosecution of Election Offenses,* 8th Ed., Dec. 2017, at 52, https://www.justice.gov/criminal/file/1029066/download.

intimidation statute)*; see also Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 673 F.3d 192, 209 (3d Cir. 2012) (holding that a 1982 consent decree continued to be necessary "to help ensure that potential minority voters are not dissuaded from going to the polling station to vote" because, without it, RNC would likely resume intimidating "ballot security" activities, such as aggressive poll-watching and reporting registered minority voters as ineligible for having undeliverable addresses); Consent Decree, *United States v. N.C. Republican Party, et. al.*, No. 91-161-CIV-5-F (E.D.N.C Feb. 27, 1992) (entering a consent agreement under Section 11(b) prohibiting "ballot security" measures, after party sent thousands of postcards to registered African-American voters warning that it was a federal crime, "punishable by up to five years in jail," to give false information to an election official).

Defendants ostensibly claim they are investigating "fraud" in the 2020 election, but they are in fact coordinating their actions with the goal of intimidating certain groups of voters.  Setting aside the fact that claims of "fraud" have been overwhelmingly rejected and discredited, Defendants' underlying goal has little to do with "fraud" but instead targets certain groups for intimidation under the guise of "fraud" in the election process.  In a dangerous repetition of history, Plaintiffs and their voting members have become a target of Defendants' voter intimidation. *See Republican Nat'l Comm.*, 673 F.3d at 196 (describing "ballot security" measures that in fact targeted racial and ethnic minority voters for voter challenge list, and staffed minority precincts with intimidating off-duty law enforcement officers); *Council on American-Islamic Relations— Minnesota v. Atlas Aegis, LLC*, 497 F. Supp. 3d 371, 379 (D. Minn. 2020) (finding likelihood of success on the merits and acknowledging targeting of organizations and voters with a "known political orientation" as part of intimidating conduct).  Defendants' convenient cover story does not excuse them from liability under Section 11(b).

Section 11(b) reaches any *objectively* intimidating act. Conduct that has the "inevitable effect" of discouraging, intimidating, threatening, or coercing people seeking to exercise their right to vote is prohibited. *United States v. Clark*, 249 F. Supp. 720, 728 (S.D. Ala. 1965). Likewise, Section 11(b) does not include an intent requirement. *See* 52 U.S.C. § 10307(b) ("No person . . . shall . . . *attempt* to intimidate, threaten, or coerce any person for voting or attempting to vote") (emphasis added). Courts have consistently protected voters from objectively intimidating behavior without examining defendants' intent.  In *LULAC*, the court found that plaintiffs stated a viable intimidation claim under § 11(b) (and the Ku Klux Klan Act), where defendants allegedly published and publicized reports that falsely accused Virginia voters of committing felony voting fraud by registering to vote and/or voting. 2018 WL 3848404, at \*1. The Court rejected the defendants' argument that the publication of the reports could not amount to intimidation under Section 11(b), finding that "[p]laintiffs have alleged, plausibly, that the [] reports put them in fear of harassment and interference with their right to vote" and, on that basis, stated a cognizable Section 11(b) claim. *Id.* at \*4.  In granting plaintiffs' preliminary injunction motion in *Council on American-Islamic Relations—Minnesota v. Atlas Aegis, LLC*, 497 F. Supp. 3d 371 (D. Minn. 2020), the court held that the defendants' plan to staff privately hired armed agents at certain polling places allegedly to "protect the polls from 'antifa,'" was "certainly likely to intimidate voters." *Id.* at 379. And in *Daschle v. Thune*, the court found that recording potential Native American voters' license plates was objectively intimidating. In granting a temporary restraining order to block defendants from copying or recording the license plates of Native American voters and from following voters from the polling places, the court explained that preventative measures were required to protect voters regardless of the defendants' intent: "Whether the intimidation was intended or simply the result of excessive zeal is not the issue, as the result was the intimidation

of prospective Native American voters in Charles Mix County. This is a small Native American population within which word travels quickly." *Daschle v. Thune*, Temporary Restraining Order, Case No. 04-4177 (D.S.D Nov 2, 2004).

The courts' reasoning in *LULAC, Daschle*, and *CAIR-Minnesota* apply with equal force here. Defendants' conduct—including but not limited to armed canvassers going door-to-door targeting groups of voters, photographing their homes, and inquiring about perceived claims of voter fraud—is objectively intimidating and threatening. Voters should not have to face the threat of privately armed agents at their polling places or on their doorsteps. And, like false accusations of voter fraud in Virginia or the RNC's intimidating "ballot security" measures, Defendants' door-to-door canvassing constitutes an attempt at intimidation, placing Colorado voters in fear of harassment, interference with their right to vote, and overt acts of violence, especially given the armed nature of the visits.

Regardless of why Defendants claim they are going door to door, their methods are objectively intimidating and threatening. Plaintiffs are highly likely to succeed on their claim that Defendants violated Section 11(b).

### 2.   Plaintiffs Are Likely to Succeed Under the Ku Klux Klan Act

To prevail on a claim under the Ku Klux Klan Act, a plaintiff must show: (1) a conspiracy of two or more,[7] (2) knowingly engaging in the conspiracy intending to commit those offense that were the object of the conspiracy; and (3) commission of an "overt act" by one or more members of the conspiracy in furtherance of the conspiracy. *U.S. v. Reyes*, 302 F.3d 48, 53 (2 d Cir. 2002).

---

[7] Under federal law, a conspiracy is: (1) an agreement between two or more persons to commit an unlawful act; (2) knowingly engaging in the conspiracy intending to commit those offense that were the object of the conspiracy; and (3) commission of an "overt act" by one or more members of the conspiracy in furtherance of the conspiracy. *U.S. v. Reyes*, 302 F.3d 48, 53 (2 d Cir. 2002).

48374360v4

"A conspiracy 'need not be shown by proof of an explicit agreement.'" *Nat'l Coalition on Black Civic Participation*, 498 F. Supp. 3d at 487 (quoting *Cine Sk8, Inc. v. Town of Henrietta*, 507 F.3d 778, 792 (2d Cir. 2007)).  Plaintiffs can demonstrate a substantial likelihood of success on the merits of their claim under the Ku Klux Klan Act.

Plaintiffs have pleaded that Defendants Smith, Epp, and Kasun have engaged in the intimidating conduct and coordinated their activities through USEIP and its agents.  Further, Defendants Smith, Epp, and Kasun founded USEIP.  Defendants' private and public conduct shows the likely existence of a conspiracy of two or more, if not several conspiracies of two or more individuals, that work to support USEIP's illegal voter intimidation.

The remaining elements of the claim—intimidation and threats and an "overt act" in furtherance of the conspiracy—have been discussed at length above in support of Plaintiffs' claims for violations of the Voting Rights Act.  *See Nat'l Coalition on Black Civic Participation*, 498 F. Supp. 3d at 488 (reasoning that "threat or intimidation" have the same meaning under the KKK Act as under the VRA).  There is no question that Defendants have intimidated and threatened Colorado voters, thereby preventing or hindering them from giving support or advocacy to candidates for public office. While abiding by a playbook that asserts that "[t]his is the fight," and that tells its agents and anyone reading its publicly available manual that "we are not at a time of peace," and while proactively and publicly seeking armed agents to join their door-to-door campaign, USEIP is going to voters' residences, recording their homes, interrogating voters about their votes, and accusing voters of having cast fraudulent ballots. These acts threaten the right to vote, intimidate voters, and violate the KKK Act as well as the VRA.

Further, Defendants' canvassing actions constitute individual acts of an unknown number in furtherance of their conspiracy aimed at threating and intimidating voters as they go door-to-

door throughout the state.  Any message that makes a Coloradan fearful of voting—whether by mail or in person at the polls—is unlawful under the KKK Act. *See Nat'l Coalition on Black Civic Participation*, 498 F. Supp. 3d at 488; *Paynes v. Lee*, 377 F.2d 61, 64 (5th Cir. 1967) (construing the right to vote broadly as "[t]he right to be free from threatened harm and the right to be protected from violence for an attempted exercise of a voting right are no less protected than the right to cast a ballot on the day of the election").

Section 1985(3) entitles Plaintiffs to the relief they seek, including injunctive relief, compensatory damages, and punitive damages. *See Mizell v. N. Broward Hosp. Dist.*, 427 F.2d 468, 473 (5th Cir. 1970) (injunctive relief available); *Freeman & Bass, P.A. v. N.J. Comm'n of Investigation*, 359 F. Supp. 1053, 1059 (D.N.J. 1973) (same); *see also* 42 U.S.C. § 1985(3); *Great Am. Fed. S. L. Assn. v. Novotny*, 442 U.S. 366, 376-77 (1979) (rejecting Title VII as predicate for Section 1985(3) claim citing in part the availability of compensatory and punitive damages); *Forsberg v. Pefanis*, 634 Fed. App'x 676, 680 (11th Cir. 2015) (holding that § 1985 permits punitive damages, even in the absence of compensatory damages); *see also Paynes*, 377 F.2d at 64-65 (permitting plaintiff to seek damages against defendants who had allegedly attempted to intimidate the plaintiff from registering to vote). Plaintiffs are likely to succeed on their claims under the KKK Act.

## B.    Plaintiffs Face Irreparable Harm.

"To show a threat of irreparable harm, a plaintiff must demonstrate 'a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages.'" *Fish v. Kobach*, 840 F.3d 710, 751 (10th Cir. 2016) (quoting *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009)).  "Irreparable harm also occurs 'if the district court cannot remedy [the injury] following a final determination on the merits.'"  *Id.* (quoting *Prairie Band of*

*Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001)).  Here, Plaintiffs will be irreparably harmed absent preliminary relief.

If Defendants' misconduct is not stopped immediately, the irreparable harm will result in an "injury inflicted upon Plaintiffs' and other members of the electorate's right to vote free of intimidation." *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 474 (S.D.N.Y. 2020). "This is an injury of constitutional significance, and . . . interference with or abridgment of the right to vote gives rise to a finding of irreparable injury." *See also Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016) (citing *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) ("When an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." (citing *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (quoting 11A Charles Allen Wright et. al., Federal Practice and Procedure § 2948.1 (2d ed. 1995)); *id.* ("Because there can be no 'do-over' or redress of a denial of the right to vote after an election, denial of that right to vote weighs heavily in determining whether plaintiffs would be irreparably harmed absent an injunction.").

Plaintiffs also will continue to suffer irreparable harm in the form of diverted resources. More specifically, NAACP Colorado, LWVCO, and MFV have had to and/or will have to divert resources from their core activities to take new steps to address Defendants' acts of voter intimidation, including actively monitoring the voter intimidation and its members' safety concerns, strategizing about how to combat Defendants' actions, and dispersing information and responding to community concerns.  Absent Defendants' ongoing voter intimidation campaign, NAACP Colorado, LWVCO, and MVF would be spending these resources on activities central to their missions such as voter education, voter registration, and advocacy.  (*See* Prescott Dec. ¶¶ 12-14; Hendrix Dec. ¶¶ 11-12; Hernandez Dec. ¶¶ 11-21.). A *post hoc* damages award will not enable

Plaintiffs to undue the harm that their voter education, registration, and advocacy efforts will suffer if they are required to continue to divert resources away from those efforts.

For these reasons, "[c]ourts routinely deem restrictions on fundamental voting rights irreparable injury." *League of Women Voters of N.C. v. N. Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)); *see also Flores v. Town of Islip*, 382 F. Supp. 3d 197, 228 (E.D.N.Y. 2019) (collecting cases) (holding that "that there would be irreparable harm if the upcoming elections were permitted to proceed under a framework that violated the VRA."); *United States v. Berks Cnty., Pa,,* 250 F. Supp. 2d 525, 540 (E.D. Pa. 2003) (collecting cases) ("[T]he holding of an upcoming election in a manner that will violate the Voting Rights Act constitutes irreparable harm to voters."). Further, courts have repeatedly made clear that plaintiffs "would certainly suffer irreparable harm if their right to vote were impinged upon." *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) ("A restriction on the fundamental right to vote . . . constitutes irreparable injury."). *Obama for Am. v. Husted,* 697 F.3d 423, 436 (6th Cir. 2012) (citing *Williams,* 729 F.2d at 326). Indeed, individuals deprived of the right to vote in violation of the Voting Rights Act have no post-deprivation remedy to redress the violation. *See Casarez v. Val Verde Cnty.*, 957 F. Supp. 847, 864–65 (W.D.Tex.1997) (granting preliminary injunction because monetary damages could not redress Voting Rights Act violation); *see also Democratic Nat'l Comm. v. Bostelmann*, 447 F. Supp. 3d 757, 770 (W.D. Wis. 2020) (citing *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006)) ("[T]raditional legal remedies would be inadequate, since infringement on a citizen's constitutional right to vote cannot be redressed by money damages."). For this reason, courts often grant preliminary injunctions and temporary restraining orders against voter intimidation prohibited under Section 11(b). *See, e.g., Ariz. Democratic Party v. Ariz. Republican Party*, No. 16 Civ. 03752 (PHX/JJT), 2016 WL 8669978 (D. Ariz. Nov. 4, 2016); *Daschle*, *supra*; *see also*

*Joyner v. Browning*, 30 F. Supp. 512 (W.D. Tenn. 1939) (pre-VRA case enjoining planned deployment of armed troops on election day).

Here there is irreparable harm both because Defendants' actions have intimidated voters and are continuing to intimidate voters, and because Defendants' misconduct has forced Plaintiffs to divert resources. *See Ariz. Democratic Party*, 2016 WL 8669978, at *11 ("[I]f some potential voters are improperly dissuaded from exercising their franchise, it is unlikely those voters can be identified, their votes cannot be recast, and no amount of traditional remedies such as money damages would suffice after the fact."); *Fish*, 840 F.3d at 752 (enjoining the enforcement of the elimination of the same-day registration provision and prohibition on counting out-of-precinct ballots because failure to enjoin the provisions prior to an election would result in irreparable harm). This harm cannot be rectified by monetary relief after the fact. *League of Women Voters of N.C. v. North Carolina,* 769 F.3d 224, 247 (4th Cir. 2014) (collecting Second, Third, and Sixth Circuit cases and noting that "once the election occurs, . . . [t]he injury to [] voters is real and completely irreparable if nothing is done to enjoin [the discriminatory voting process]").

Defendants must be enjoined immediately to prevent irreparable harm to Colorado voters, including Plaintiffs' members, and to Plaintiffs' voting rights efforts. Being denied the right to vote through intimidation is an irreparable harm; the voter permanently loses that opportunity to vote.

**C.    The Balance of Harms and Public Interest Favor Injunctive Relief.**

The final preliminary injunction factors require the Court to balance the harms of granting or denying the requested injunction and consider whether the injunction is in the public interest. *Fish v. Kobach*, 189 F. Supp. 3d 1107, 1148-50 (D. Kan.) (citing *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 9 (2008)), *aff'd*, 691 F. App'x 900 (10th Cir. 2016), and *aff'd*, 840 F.3d 710 (10th Cir.

2016). "When considering the balance of harms, a court must balance 'the competing claims of injury and must consider the effect on the granting or withholding of the requested relief.'" *Colo. Christian Univ. v. Sibelius*, 51 F.Supp.3d 1052, 1064 (D. Colo. 2014) (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)); *see also Doubleclick v. Paikin*, 402 F.Supp.2d 1251, 1260 (D. Colo. 2005) (reasoning that under the balance of harms factor, a plaintiff is required "to demonstrate that the balance of harms weighs in their favor, and that denying the injunction will cause more harm than granting it"). Here, the balance of harms and consideration of the public interest both weigh in favor of an injunction to maintain the status quo and prevent Defendants from intimidating Coloradans at their doorsteps.

Plaintiffs and the public face significant hardship if an injunction is not issued. "[T]he public has a strong interest in exercising the fundamental political right to vote. That interest is best served by favoring enfranchisement and ensuring qualified voters' exercise of their right to vote is successful." *Fish*, 189 F.Supp.3d at 1150 (citing *Obama for American v. Husted*, 697 F.3d 423, 436-7 (6th Cir. 2012)) (internal quotations omitted). In fact, "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). The Supreme Court has held that "voting is of the most fundamental significance under our constitutional structure." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quotation marks and citations omitted). Because the right to vote is "preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964). The public interest "favors permitting as many qualified voters to vote as possible." *Obama for Am.,* 697 F.3d at 437. And the Supreme Court has recognized that states

have "a compelling interest in protecting voters from confusion and undue influence." *Burson v. Freeman*, 504 U.S. 191, 199 (1992).

The public interest in favor of an injunction is particularly strong here because the right to vote freely is "the essence of a democratic society." *Reynolds,* 377 U.S. at 555.  It is clear that the public has a strong interest in all eligible voters being able to vote, because "it is always in the public interest to prevent the violation of a party's constitutional rights." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1147 (10th Cir. 2013) (citing *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10 the Cir. 2012), *aff'd sub nom,* 573 U.S. 682.  For well over a century, the Supreme Court has viewed the right to vote as a "fundamental political right, because [it is] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). The interest in "protecting voters from confusion and undue influence" is "compelling," *Burson* v. *Freeman*, 504 U.S. 191, 199 (1992) (plurality opinion; Blackmun, J), and indeed the "right . . . regardless of political persuasion, to cast [] votes effectively" is voters' "most precious" right. *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968).

Courts have similarly recognized that "[t]he right to vote is among the most important benefits of citizenship." *See*, *e.g.*, *Kemler v.  Poston*, 108 F. Supp. 2d 529, 542 (E.D. Va. 2000). That overwhelmingly strong interest in protecting the unimpaired right to vote, free of intimidation, is vindicated by the injunctive relief requested here.  Indeed, "courts of equity may go to greater lengths to give 'relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.'" *E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 826 (4th Cir. 2004) (quoting *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937)); *see also Gallagher v. N.Y. State Bd. of Elections*, No. 20 Civ. 5504 (AT), 2020 WL 4496849, at *21 (S.D.N.Y. Aug. 3, 2020) (enjoining New York State Board of Elections to tally mail-in ballots that

were improperly invalidated after recognizing the substantial burden to plaintiffs "fac[ing] disenfranchisement through no fault of their own.").

By contrast, Defendants face *no* legally protectable burden from the proposed injunction, which seeks only to enjoin their illegal activity. *See CAIR-Minnesota*, 497 F. Supp. 3d at 379-80 ("although Defendants have an interest in conducting their business as contracted, there can be no legally-protectable interest in intimidating voters, as the Voting Rights Act makes such conduct unlawful").  And the public interest would clearly be advanced by the injunction sought here, as Defendants should not be permitted to engage in conduct that impedes and threatens the exercise of the most basic right fundamental to American democracy.  Further, Plaintiffs' requested injunction is narrowly tailored to prevent Defendants from violating the law by threating to and intimidating voters at their doorsteps (including with weapons), and to assure voters that Defendants will not illegally intimidate or harass Colorado voters.  Enjoining Defendants from engaging in conduct that Congress and the Colorado Legislature specifically barred and has no public benefit is crucial to restoring Coloradans' trust that they can vote and participate in the electoral process without intimidation, and it is an appropriate use of the Court's injunctive powers. Plaintiffs' motion should be granted.

### D.     Waiver of the Bond Requirement Is Appropriate.

Federal Rule of Civil Procedure 65 provides: "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  Notably, however, "[t]rial courts have wide discretion under Rule 65(c) in determining whether to require security." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1215 (10th Cir. 2009) (internal quotation marks omitted); *Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir.1987) ("A trial court decision

to waive a Rule 65(c) bond is subject to an abuse of discretion test on appeal.").  A court may waive the bond requirement based on the strength of a plaintiff's case and the minimal damages that would be suffered as a result of the injunction.  *See, e.g.*, *Adams By & Through Adams v. Baker*, 919 F. Supp. 1496, 1505 (D. Kan. 1996).

In addition, courts frequently waive bond requirements in public interest cases involving the fundamental rights of citizens. *See* 11A Charles Alan Wright et al., Federal Practice & Procedure § 2954 n.29 (3d ed., Apr. 2017 update) (citing public rights cases where the bond was excused or significantly reduced); *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Engineers*, 826 F.3d 1030, 1043 (8th Cir. 2016) (reasoning that the court has discretion "to waive the bond requirement based on its evaluation of public interest in this specific case").  In *Denver Homeless Out Loud v. Denver*, for example, the Court held that waiver of the bond requirement was appropriate in a civil rights dispute brough by a non-profit organization against the City of Denver and several of its officials, citing to public interest cases in which the bond requirement was waived.  514 D.Supp.3d 1278 (D. Colo. 2021).

In light of the importance of the right to be vindicated and the fact that Plaintiffs are not-for-profit public interest entities, Plaintiff respectfully requests that the Court waive Rule 65's bond requirement in this matter.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion and enter the proposed temporary restraining order and preliminary injunction enjoining Defendants from engaging in its door-to-door voter intimidation campaign or from engaging in other actions that may intimidate voters or interfere with voter access to the polls.

Dated:  March 9, 2022                        LATHROP GPM LLP

By /s/ Amy Erickson
Casey Breese (#51449)
Casey.breese@lathropgpm.com
Jean Paul Bradshaw
Jeanpaul.bradshaw@lathropgpm.com
Dion Farganis (Admission Pending)
Dion.farganis@lathropgpm.com
Reid Day
Reid.day@lathropgpm.com
Brian A. Dillon
Brian.dillon@lathropgpm.com
Amy Erickson (#54710)
Amy.erickson@lathropgpm.com
1515 Wynkoop Street, Suite 600
Denver, CO 80202
Telephone: (720) 931-3200

Courtney Hostetler
chostetler@freespeechforpeople.org
John Bonifaz
jbonifaz@freespeechforpeople.org
Ben Clements
bclements@freespeechforpeople.org
Ron Fein
rfein@freespeechforpeople.org
FREE SPEECH FOR PEOPLE
1320 Centre Street, Suite 405
Newton, MA 02459
Telephone: (617) 249-3015

*ATTORNEYS FOR Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, and Mi Familia Vota*

28