UNITED STATES DISTRICT COURT
for the
District of Colorado

| | | |
|---|---|---|
| COLORADO MONTANA WYOMING STATE AREA CONFERENCE OF THE NAACP, LEGUE OF WOMEN VOTERS OF COLORADO, and MI FAMILIA VOTA | ) ) ) ) | Civil Action No. 1:22-cv-00581-CNS |
| | ) | |
| Plaintiffs, | ) ) | |
| -v- | ) ) | |
| | ) | |
| UNITED STATES ELECTION INTEGRITY PLAN, SHAWN SMITH, ASHELY EPP, and HOLLY KASUN | ) ) ) ) | |
| Defendants. | ) ) | |

---

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

COME NOW, Defendants, United States Election Integrity Plan ("USEIP"), Shawn Smith, Ashely Epp, and Holly Kasun (collectively "Defendants") and hereby submit the following in support of their Motion for Summary Judgement pursuant to Fed. R. Civ. P. 56, for Count I, II, and III of Colorado Montana Wyoming State Area Conference of the NAACP ("NAACP Colorado"), League of Women Voters of Colorado ("LWVCO"), and Mi Familia Vota's ("MFV") (collectively "Plaintiffs") Complaint [Docket No. 1].

### INTRODUCTION AND SUMMARY OF ARGUMENT

At the heart of this case lies the claim that Defendants have engaged in voter intimidation through their canvassing efforts in the State of Colorado. Plaintiffs filed their Complaint on March 9, 2022, alleging violations of Section 11(b) of the Voting Rights Act of 1965 (52 U.S.C.

§10307(b)) and the Ku Klux Klan Act (42 U.S.C. 1985(3)). Throughout their complaint, Plaintiffs allege that Defendants conducted door-to-door canvassing "wearing badges that identify themselves as official sounding groups" and "ask[ing] residents to confirm their address, question residents about their participation in the 2020 election and their method of voting, and either ask them about allegedly fraudulent ballots or accuse them of casting allegedly fraudulent ballots." [Docket No. 1, ¶2]. Plaintiffs further allege that during this door-to-door canvassing "USEIP agents take photos of voters' residences" and, for the purpose of threatening voters with "potentially violent confrontation, USEIP encourages its agents to carry weapons. . ." *Id.* at ¶¶ 3-4. Plaintiffs go on to state that "Defendants' objectives are clear. By planning to, threatening to, and actually deploying armed agents to knock on doors throughout the State of Colorado, USEIP is engaging in voter intimidation. . . USEIP is actively generating and spreading fear that voters can expect multiple armed and unarmed USEIP members to show up at their doors at any moment to harass and interrogate them about their voting history." *Id.* at ¶5.

Plaintiffs' allegations, on their face, seem to allege legitimate concerns regarding Defendants. However, Plaintiffs have no evidence that a Colorado voter was intimidated by Defendants' actions. Instead, Plaintiffs brought this complaint solely based on unverified articles of a political opinion columnist and vague reports by individuals completely unrelated to the Plaintiff organizations. Not only are Plaintiffs' allegations based solely on hearsay evidence; representatives of each Plaintiff organization have testified that they have no personal knowledge of a voter being intimidated by Defendants.

Without a single member of any Plaintiff organization claiming that they were intimidated, threatened, or coerced by Defendants, Plaintiffs cannot establish prudential standing to vindicate the deprivation of non-party's rights. Plaintiffs also cannot bring a claim under the Voting Rights

Act or Civil Rights Act alleging that USEIP, an unincorporated association, is a "person" who intimidated, threatened, or coerced others in violation of these statutes.

## **STANDARD OF REVIEW**

Summary judgement will be granted "only if the admissible evidence shows 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *E.E.O.C. v. Horizon/CMS Healthcare Corp.,* 220 F.3d 1184, 1190 (10th Cir. 2000) (citing Fed. R. Civ. P. 56(c)). In a motion for summary judgment where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy this burden by identifying 'a lack of evidence for the nonmovant on an essential element of the nonmovant's claim.'" *Id.* (citing *Curtis v. Oklahoma City Pub. Schs. Bd. Of Educ.,* 147 F.3d 1200, 1214 (10th Cir. 1998)). A material fact is one that, "under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

It is well settled in the Tenth Circuit that only admissible evidence may be considered when reviewing a motion for summary judgment. *See Wright-Simmons v. City of Oklahoma City,* 155 F.3d 1264, 1268 (10th Cir. 1998). And while the non-movant "does not have to produce evidence in a form that would be admissible at trial, 'the content or substance of the evidence must be admissible.'" *Adams v. American Guarantee and Liability Ins. Co.* 233 F. 3d 1242, 1246 (10th Cir. 2000) (citing *Wright-Simmons,* 155 F.3d at 1268). "Hearsay testimony that would be inadmissible at trial cannot be used to defeat a motion for summary judgment because 'a third party's description of a witness' supposed testimony is not suitable grist for the summary judgment mill.'" *Id.*

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendants consider the following facts undisputed:

1. USEIP is an unincorporated organization. [*Complaint,* Docket No. 1, ¶ 16].

2. USEIP has conducted door-to-door canvassing to confirm the information contained in the Secretary of State's voter rolls. [*Complaint,* Docket No. 1, ¶ 27].

3. Beth Hendrix is the Executive Director of the League of Women Voters of Colorado. [*Declaration of Beth Hendrix,* Docket No. 8, ¶ 1].

4. Portia Prescott is the State President of the NAACP Colorado Montana Wyoming State-Area Conference of the NAACP. [*Declaration of Portia Prescott,* Docket No. 9, ¶ 1].

5. Salvador Hernandez is the Colorado State Director of Mi Familia Vota. [*Declaration of Salvador Hernandez,* Docket No. 10, ¶].

6. Mi Familia Vota has no personal knowledge of Defendants or Defendants' activities. Exh. 3 (Hernandez Deposition Transcript at 31:10-33:15).

7. Mi Familia Vota has no member who claims they were intimidated, coerced, or threatened by Defendants. *Id.* at 55:9-14

8. Mi Familia Vota can only speculate about its resources diverted in response to Defendants and their activities. *Id.* at 43:24-44:22.

9. NAACP Colorado has no personal knowledge of Defendants or Defendants' activities. Exh. 1 (Prescott Deposition Transcript at 32:12-33:8)

10. NAACP Colorado has no member who claims they were intimidated, coerced, or threatened by Defendants. *Id.* at 24:21-25:18.

11. NAACP Colorado can only speculate about its resources that were diverted in response to Defendants or their activities. *Id.* at 42:8-44:10.

12. LWVCO has one member who was visited "by two people wearing official-looking badges, and they began questioning her about her voting record, especially in the 2020 election." Exh. 2 (Hendrix Deposition Transcript at 15:7-12). This member did not feel intimidated. *Id.* at 29:14-15.

13. LWVCO has no members who were intimidated, coerced, or threatened by Defendants or their actions.

14. LWVCO learned of Defendants through newspaper and media articles. *Id.* at 18:14-21:14.

15. Mi Familia Vota learned of Defendants through Beth Hendrix of the LWVCO. Exh. 3 (Hernandez Deposition Transcript at 22:9-23:19).

16. No Colorado voter or potential Colorado voter has been identified who was intimidated, coerced, threatened, or harassed by Defendants.

## **ARGUMENT**

I. **Plaintiffs' claims under the Voting Rights Act, 52 U.S.C. § 10307(b) and the Ku Klux Klan Act, 42 U.S.C. § 1985(3) should be summarily dismissed against Defendants.**

In order to prevail on a claim of voter intimidation under 52 U.S.C. § 10307(b), Plaintiffs "must show both an act of intimidation or attempt to intimidate, and that the act was done with specific intent to intimidate or attempt to intimidate." *Parson v. Alcorn,* 157 F. Supp. 3d 479, 498 (E.D. Va. Jan. 15, 2016) (citing *Olagues v. Russoniello,* 770 F.2d 791, 804 (9th Cir. 1985)).

Similarly, to prevail on a claim under 42 U.S.C. § 1985(3), Plaintiffs must prove, "(1) a conspiracy; (2) the purpose of which is to force, intimidate or threaten; (3) an individual legally entitled to vote who is engaging in lawful activities related to voting in federal elections." *Nat'l Coal. On Black Civic Participation v. Wohl,* 498 F.Supp.3d 457, 486-87 (S.D.N.Y. 2020).

As a threshold matter, Plaintiffs must prove that a voter was intimidated or that Defendants attempted to intimidate a voter. Plaintiffs have tendered no evidence that a voter was intimidated by Defendants. When deposed, Plaintiffs confirmed the lack of evidentiary support for their voter intimidation claims. Instead, Ms. Prescott, on behalf of NAACP Colorado, could not recall anything related to the compliant, her declaration, or her written discovery responses. Mr. Hernandez, on behalf of MFV, confirmed that no member of MFV was intimidated or even contacted by Defendants. Rather, Mr. Hernandez testified that the sole source of MFV's knowledge of the Defendants was derived from Ms. Hendrix. Finally, Ms. Hendrix testified that a single member of LWVCO has come forward, claiming that she was **not** intimidated when unidentified canvassers, which she believed were associated with Defendants, asked her voting related questions. Ms. Hendrix testified that the factual allegations giving rise to this lawsuit, instead, came from articles on the internet. Each deponent's testimony is summarized below[1].

---

[1] The deposition testimony of Ms. Prescott, Ms. Hendrix, and Mr. Hernandez binds each Plaintiff organization despite being noticed under Fed. R. Civ. P. 30(b)(1). A party seeking to depose a corporation may either "notice the corporation by a particular officer, director or managing agent pursuant to Rule 30(b)(1)." *GTE Products Corp. v. Gee*, 115 F.R.D. 67, 68 (D. Mass. 1987). A party may also depose a corporation under Rule 30(b)(6) whereby the notice does not specifically name the person to be deposed, but must describe the matters on which examination is needed, and requires the corporation to designate a competent individual to testify on its behalf. *Id.*; Fed. R. Civ. P. 30(b)(6). The use of a Rule 30(b)(6) deposition "does not preclude taking a deposition by any other procedure authorized by the rules." Fed. R. Civ. P. 30(b)(6). During the deposition of a specific officer, director, or managing agent under Rule 30(b)(1), "the testimony is of the corporation and if the corporation is a party, the testimony may be used at trial by an adverse party for any purpose." *Id.*; Fed. R. Civ. P. 32(a)(3). Only when a corporate employee is not qualified as an officer, director or managing agent is he not subject to a deposition by notice under Rule 30(b)(1). *See U.S. v. Afram Lines (USA), Ltd.*, 159 F.R.D. 408, 413 (S.D.N.Y. 1994). It cannot be argued that Ms. Prescott, Ms. Hendrix, and Mr. Hernandez are not considered officers, directors or managing agents of the plaintiff organizations. Each individual deponent provided a sworn declaration on behalf of the Plaintiff organizations noting that each individual is the executive director, state president, or state director of their respective organizations. *See* Docket Nos. [8, ¶ 1], [9,¶ 1], [10, ¶ 1]. Furthermore, each deponent was the individual who signed answers to written discovery for the Plaintiff organizations. Plaintiffs have utilized Ms. Hendrix, Ms. Prescott, and Mr. Hernandez as the representative for their corresponding organization throughout the entire litigation. Therefore, each individual's testimony binds the Plaintiff organizations as it would under a Rule 30(b)(6) deposition of the organization itself. Such testimony may therefore be used "for any purpose" in the court proceedings under Fed. R. Civ. P. 32(a)(3), including a motion for summary judgment.

Portia Prescott, the executive director of the Colorado Montana Wyoming State Area Conference of the NAACP, testified that she could not recall any member of her organization that was intimidated by USEIP volunteers. In fact, Ms. Prescott claimed that she could not recall *any* factual basis of Plaintiffs' claims.

> Q: Okay. Your organization – the one that you're the president of – when did they receive a complaint against the United States Election Integrity Plan?
> A: I'm not sure.
> Q: Who made the complaint?
> A: I'm not sure.
> Q: When did the complaint come in?
> A: I'm not sure.
> Q: Was the complaint documented?
> A: I'm not sure.

**Exh. 1** at 13:23-14:6, 14:19-20.

> Q: You can't point me to a member of the Colorado Montana Wyoming State Area Conference of the NAACP that made a complaint against the United State Election Integrity Plan, then what or who was the non-member of the Colorado Wyoming Montana State Area Conference of the NAACP who made a complaint to your organization regarding the United States Election Integrity Plan?
> A: I don't recall.
> Q: You don't recall, or you don't have any members that made any complaint – or non-members?
> A: I don't recall.

*Id.* at 20:6-17.

> Q: Do you not keep track of complaints that come in for litigation purposes?
> A: I'm the president. I'm not a lawyer. I don't recall.
> Q: Okay. You put your organization's name on this document. You did not investigate or have any – did anybody investigate, in your organization these allegations?
> A: I don't recall.
> Q: Who would be the designated person that would investigate such allegations?
> A: I don't recall.

*Id.* at 21:13-24.

> Q: And my question to you, ma'am, is, who was the person intimidated allegedly by the United States Election Integrity Plan, Shawn Smith, Ashley Epp, or Holly Kasun?
> A: I don't recall.
> Q: You don't recall, or you don't have anyone that you can point to and say, "This person made a complaint to us"?
> A: I don't recall.
> Q: Is it accessible somewhere? You don't recall. Is there anything that would refresh your recollection as to the identity of the name of the individual saying that they were an intimidated voter.
> A: Sir, I don't recall.

*Id.* at 24:21-25:10.

    Q: What documents regarding complaints of voter intimidation did you turn over to your
attorneys?
    A: I don't recall.
    Q: Well, did you turn over documents?
    A: I don't recall.

*Id.* at 26:18-23.

Despite declaring, under oath, that "NAACP Colorado learned that U.S. Election Integrity

Plan ("USEIP") and other individuals connected to USEIP, were engaging in intimidating home

visits to Colorado voters[,]" Ms. Prescott testified as a deponent that she has no recollection of any

facts surrounding this lawsuit. [*Declaration of Portia Prescott,* Docket No. 9, ¶ 7]. Arguably, Ms.

Prescott's memory could have faded between the time of her declaration in March and her

deposition. Yet, while Ms. Prescott could not recall the facts surrounding her declaration, she, on

behalf of NAACP Colorado, submitted a response to Defendants' written discovery on October

21, 2022. Even though her interrogatory responses were signed only a month prior to the

deposition, Ms. Prescott still could not recall any of the facts surrounding her answers.

A deponent may not avoid truthfully answering questions by claiming they do not recall.

In fact, Fed. R. Civ. P. 37(a)(4) provides that "an evasive or incomplete disclosure, answer, or

response must be treated as a failure to disclose, answer, or respond." Ms. Prescott's convenient

lapse of memory eluded all factual allegations in the complaint, her declaration, and her discovery

responses. Rather than providing the basic information needed to establish her claims, or

addressing witness issues, Ms. Prescott stated the following:

Q: Okay. Well, ma'am, the reason I keep asking the same question is, when this case goes to
trial . . . you have to bring in the person that filed – that made these complaints that you are
basing your allegations upon. Thus far, no one has produced anyone who's made these
complaints. Do you see my dilemma?
A: No, I don't see your dilemma. You don't see my dilemma. You don't know what it's like
to be Black and live in an all-white neighborhood and be targeted because of your blackness.
No, you don't know. You don't see what I see. You don't know what it's like to have your
family targeted because they were Black and they – and white people didn't want us on that

block. So I'm sorry – and you be lucky with your white male privilege that you never have to experience what it's like to be targeted because of the color of your skin. So no, we're not on the same page.

Q: Well—

A: Enjoy your privilege. Enjoy your white male privilege, because we're not on the same page. You don't know what it's like to be a minority and targeted and hated and called a nigger because – as a child at school because they didn't want niggers in their school in Colorado.

**Exh. 1** at 73:15-74:20

Q: Are you aware that if you cannot produce the names of the individuals that supposedly were intimidated by the U.S. Election Integrity Commission, Shawn Smith, Ashley Epp, or Holly Kasun, that you are going to lose your lawsuit?

Ms. Stock: Objection. Calls for a legal conclusion.

A: And I'm not a lawyer, so no, I don't under – I don't know. But do you understand that Colorado is an open carry state? Do you understand that we had to pass legislation just earlier this year to make sure people weren't standing at polls with their guns in their pockets?

*Id.* at 75:15-76:4.

Beth Hendrix, the executive director of the League of Women Voters of Colorado, testified that a single member of LWVCO was approached by supposed USEIP volunteers, but was not intimidated. She further testified that while other members may have received visits from USEIP volunteers, they were generally supportive of USEIP's efforts. Ms. Hendrix could not point to a single Colorado voter who claims they experienced intimidation, coercion, or threats by Defendants. Ms. Hendrix testified:

Q: So what steps did you take as the executive director of the League of Women Voters of the State of Colorado to investigate such serious allegations of voter intimidation?

A: I sent out an email to our mailing list asking people to let us know if they had received visits.

Q: Okay. And what was the response that you received?

A: We heard from one member who had received a visit and felt it was off. . . And I received a couple of emails supporting the actions.

Q: And the other members that responded were in favor of the alleged voter contact by the USEIP. Is that correct?

A: They said that they did not feel intimidated and didn't have a problem with the visit.

**Exh. 2** at 8:18-24, 9:10-18, 11:19-14.

Regarding the voter who stated the visit felt off, Ms. Hendrix testified to the following:

A: That the member was in her front yard gardening when she received – when two members of the USEIP approached her. They were wearing lanyards with laminated nametags that she felt were trying to look governmental. When they began questioning her, she questioned them, and they became uncomfortable and left. I believe they took a picture of her home first.

9

Q: Okay. So she started questioning them. Do you know what she said to these individuals?

A: I do not. I – I believe something along the lines of, "Why are you asking me these questions?" League members tend to have a pretty strong knowledge of our election systems and election procedures, and she know that this was not a normal activity, a typical activity, so she questioned it.

Q: Okay. So she wasn't intimidated; in fact, she intimidated them, because they left. Is that right?

A: I – I believe that this member is in her 70s. I highly doubt that they were physically intimidated by her. I think they were more possibly intimidated by the fact that she understood that they were doing something atypical.

Q: Okay. And so they left – right? – these USEIP people. Is that right?

A: Yes.

Q: They didn't flash a gun at her. Right?

A: No.

Q: She didn't observe a firearm?

A: No.

Q: She wasn't threatened to say that she must answer their questions; she understood that it was completely voluntary?

A: I would assume so.

Q: Okay. So other than this one woman, Ms. Armijo, what – what other complaints did you receive in regards to USEIP?

A: No other direct complaint.

*Id.* at 13:3-14:18, 15:23-16:1.

Q: But this is not a political campaign; this is a court of law, and you, in your lawsuit, have to have somebody to come to court and state under oath in front of a federal district court judge and jury that they were intimidated, and I, as a defendant – or representing defendants in this case, am entitled to know the name of the person that was intimidated, not the one that you said wasn't intimidated. I want to know the name of the person that was intimidated so that I can interview them and bring them to court and have them state that under oath. What is their name, ma'am?

A: I don't know.

*Id.* at 29:24-30:12.

Throughout this litigation, Defendants have highlighted the issue that political opinion columnist, Erik Maulbetsch, appears to be the source of all allegations made by Plaintiffs. *See generally* Docket No. 35. Plaintiffs relied on nothing but unreliable, unverified, third-party opinions of Defendants' canvassing efforts. This was confirmed by Ms. Hendrix's deposition testimony.

Q: All right. Did you have complaints prior to your email going out?

A: No. We had media reports.

Q: Okay. Do you remember the gist of the conversation – or the gist of this article?

10

A: That a group called USEIP was sending armed – or canvassers who were sometimes armed to interrogate voters about their voting record.

Q: All right. Based upon that article that you were going to base you litigation upon, did you take any affirmative steps to -- I don't know—talk to the author of that article?

A: Yes.

Q: Okay. Well, and what did – what did that email entail, since I don't have it in front of me?

A: It said that the author had been researching this group for some time and had a fair amount of evidence of voter intimidation and suppression.

Q: All right. And did the—do you remember the name of the author, just for the record here today?

A: Erik Maulbetsch.

Q: Okay. And what did Mr. Erik Maulbetsch say to you in your email – that email to you – who responded to your email.

A: What I just said, that he had been researching this group for a while, and he had evidence of – that this canvassing was happening; that, by USEIP's own admission, canvassers were at times armed and had criminal records and were going door to door interrogating voters about their voting history.

Q: All right. And what evidence did Mr. Maulbetsch send to you?

A: He did not. I relied on his news articles.

Q: What – well, did he tell you the person—persons that was – he witnessed some conduct by USEIP interrogate somebody?

A: I don't know.

Q: What other reports were you supposedly relying upon? You said you relied upon Mr. Maulbetsch's newspaper article and other reports. What other reports?

A: There were reports in a number of other media outlets about the same group doing the same activities.

**Exh. 2** at 18:14-16, 18:24-19:8, 19:17-23, 20:2-22, 22:1-8.

Ms. Hendrix further noted that she received information from clerk and recorders about

USEIP's canvassing efforts  prior to filing suit, but failed to investigate or verify it.

A: As I told you, we had one member come forward who was not intimidated. I have seen multiple reports through the media and from various county clerks that they have received complaints of voters being intimidated.

Q: Did you go to those clerks and recorders and the secretary of state and get a copy of those complaints?

A: No.

Q: Did you call any of the clerks and recorders or the secretary of state and speak with her or them about these complaints?

A: I did not, but members of my board did.

Q: And what did your members or board of members received back from these clerks?

A: That they had all received multiple complaint of visits by people, seemingly wanting to represent a governmental entity, asking strange questions and intimidating people enough that they would make a call to their county clerk or secretary of state.

Q: Okay. So did your board members receive a copy of those complaints identifying those individuals that made a complaint to the, let's say, clerk and recorder of Weld county?
A: I don't know. I don't believe so.
Q: Why not?
A: Because we believed them.
*Id.* at 29:14-19, 31:18-32:15.

At best, Ms. Hendrix was able to provide limited hearsay testimony regarding complaints from voters who received visits from unidentified canvassers. Ms. Hendrix's testimony unequivocally demonstrates that she has no personal knowledge of Defendants' alleged intimidation tactics, no member of LWVCO was intimidated, and all of the complaints upon which Plaintiffs' base their allegations are inadmissible hearsay and fail to identify whether Defendants were the people or entity that caused the complaint.

Finally, Salvador Hernandez, the state director of Plaintiff, Mi Familia Vota, testified in deposition that MFV learned of Defendants' canvassing efforts *only* through unverified information by Beth Hendrix. Mr. Hernandez testified:

Q: In the fall of 2021, MFV learned that U.S. Election Integrity Plan and individuals connected to USEIP were engaging in intimidating home visits to Colorado voters. Is that correct?
A: Yeah, that's what it says.
Q: How did MFV learn of what is referenced in paragraph 7? (Read into the record above)
A: We first learned about it through the League of Women Voters.
Q: How did you learn about it through the League of Women Voters?
A: That's who called me -- Beth called me and told me about this group that was going door to door, and that's basically how I learned about it.
Q: And were there any other sources that you learned of USEIP's canvassing efforts?
A: No.
Q: Did you do any research into USEIP after Beth had this call with you?
A: Yeah, I mean, I go on to one of their website to see what they were about.
Q: So the only information you got regarding USEIP was Beth's claims? Is that true?
A: Well, that's what we heard, like, how we found out about it. Right? But we didn't hear from anyone else, I guess.
**Exh. 3** at 21:21-22:21. 23:16-19, 32:21-33:1.
Q: Exhibit number 3, page 4, you testified today that you have not spoken with members of MFV who are concerned of Defendants' past and potential future actions. So is your answer to interrogatory number 2—has it changed?
A: Yep. I'm not sure, like, though – what you mean by that? I mean, we've spoken to other groups – right? – the League of Women Voters being one of them. They heard about, you

know, the USEIP going to doors. We haven't heard directly from community members about
experiencing this on a firsthand basis, if that's – I don't know if that's clear

*Id.* at 55:1-5, 55:9-14.

Mr. Hernandez further testified that no member of MFV has voiced a concern regarding

USEIP, its volunteers, or the individual Defendants. Specifically, no member of MFV has confused

the Defendants with a government official, nor does MFV have any knowledge of Defendants

carrying or brandishing a firearm during their canvassing efforts. Plaintiffs' entire complaint rests

on the contention that Colorado voters were obviously intimidated because of these "armed

agents," who are seemingly associated with the government, knocking on doors. [Doc. 1, ¶¶ 2-5].

Yet, neither Mr. Hernandez, nor the other Plaintiffs, could identify a single instance of this

allegation.

> Q: In MFV's experience, many Latino immigrant and other voters have difficulty
> differentiating between government officials and USEIP agents. Do you see that?
> A: Uh-huh.
> Q: What do you mean, "in MFV's experience" in this paragraph?
> A: From what we've heard. You know, there were – you know, the groups that were going out
> there, or the people that were going door to door, have, like, official sounding names like voter
> committee or stuff like that, making it, I guess, like, hard for people, like, voters to distinguish
> – right? – if they are government officials or a separate organization who was asking them
> questions.
> Q: So did any MFV member state that to you?
> A: No.
> Q: Are you just assuming that they have a difficulty differentiating between USEIP and a
> government official?
> A: That's what we've heard. Right? We've heard about this group going door to door.
> Q: But not from personal knowledge from your – your members.
> A: Yes.

**Exh. 3** at 24:12-25:13.

> Q: Okay. So I know you've referenced in your testimony today the possibility of USEIP having
> armed agents going door to door.
> A: Yes.
> Q: How are you aware of USEIP having armed agents?
> A: That's what we've heard – right?—when we first learned about it, that there were potentially
> armed folks going door to door, and that's basically how they learned.
> Q: Is that from Beth Hendrix?
> A: Yes, From the League of Women Voters.

Q: Have you received any information from MFV members that a USEIP volunteer was armed
during their visit?
A: No. No.
*Id.* at 27:1-17.

Mr. Hernandez's testimony further illustrates the lack of evidence that Plaintiffs have in
support of their claims. MFV has no independent knowledge of a voter being intimidated; much
less a *member* of MFV who was intimidated. Instead, MFV relies only on statements by Beth
Hendrix that voters were intimidated. Beth Hendrix testified that she acquired this information
through political columns and unsubstantiated reports from unidentifiable third-parties. Neither
MFV nor LWVCO took any steps to corroborate these allegations.

**A. Defendants have no evidence that Defendants intimidated or attempted to intimidate
voters**

As detailed above, Plaintiffs have no evidence that any of the Defendants intimidated, coerced,
threatened, or attempted to intimidate, coerce or threaten Colorado voters. Each Plaintiff testified
to inadmissible hearsay that some unidentified Colorado voter was intimidated by Defendants'
actions. Mr. Hernandez of MFV testified that the only knowledge MFV had of Defendants'
organization was through reports from Beth Hendrix and information from Google. Portia Prescott
of NAACP Colorado testified that she could not recall whether any complaints of voter
intimidation have been made. Finally, Beth Hendrix of LWVCO testified that the basis of the
Complaint was from articles of a political columnist whose claims were "corroborated" by the
single member who was **not** intimidated by USEIP. **Exh. 2** at 21:5-25.

The quintessential element to all three counts of Plaintiffs' complaint is a voter who was
intimidated, threatened, or coerced. 52 U.S.C. § 10307(b); 42 U.S.C. § 1985(3). Plaintiffs, who,
notably, bear the burden of persuasion at trial, fail to present a single piece of admissible evidence
in support of this element. "If a party that would bear the burden of persuasion at trial does not
come forward with sufficient evidence on an essential element of its prima facie case, all issues

concerning all other elements of the claim and defenses become immaterial." *Alder v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670-671 (10th Cir. 1998) (internal citations omitted). Summary judgment may be granted "simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Id.*

Even though "[t]he burden then shift[s] to [Plaintiffs] to go beyond their pleadings by setting forth facts, in the form of affidavits, deposition transcripts, or other documents listed in Fed. R. Civ. P. 56[,] [t]hose facts must not only be admissible as evidence, but must reveal a genuine dispute as to a material fact." *Breen v. Black,* 709 Fed.Appx. 512, 513 (10th Cir. 2017) (citing *Alder,* 144 F.3d at 671). Plaintiffs cannot produce admissible evidence to meet this burden. Each Plaintiff deponent can only produce hearsay evidence in support of any possible voter contact by Defendants. The substance of this hearsay testimony would be inadmissible at trial and therefore inadmissible to sustain plaintiff defense of summary judgment. *See Wright-Simmons,* 155 F.3d at 1268.

**B. Plaintiffs cannot produce any admissible evidence to support the remaining elements of a 52 U.S.C. § 10307(b) or 42 U.S.C. § 1985(3) claim.**

Although the most essential element of Plaintiffs' claims fails, Plaintiffs also fail to produce evidence in support of the remaining elements under their claims.

In order to prove a voter intimidation claim under 52 U.S.C. § 10307(b), Plaintiffs must demonstrate that Defendants' act was done with the intent to intimidate voters. *See Parson,* 157 F.Supp. 3d at 479. Without any evidence that a voter was intimidated, Plaintiffs necessarily cannot prove that the "act of intimidation" was committed with an intent to intimidate voters.

Similarly, in order to prevail on the claim under the KKK Act, 42 U.S.C. § 1985(3), Plaintiffs show: (1) a conspiracy; (2) the purpose of which is to force, intimidate or threaten; (3) any individual legally entitled to vote; (4) an act in furtherance of the conspiracy; and (5) an injury

or deprivation resulting therefrom. *Wohl,* 498 F.Supp.3d at 486-87; *Tilton v. Richardson,* 6 F.3d 683, 686 (10th Cir. 1993). Moreover, "Section 1985(3) provides no substantive rights itself; it merely provides a remedy for violation of the rights it designates." *Great American Federal Sav. & Loan Ass'n v. Novotny,* 442 U.S. 366, 372 (1979). Plaintiffs fail to establish any of these essential elements. Plaintiffs' testimony confirms that there was no force, intimidation or threat by Defendants. Further, Plaintiffs cannot show any action by Defendants in furtherance of their alleged conspiracy to intimidate voters. Finally, without a single voter who can claim they were intimidated, threatened, or forced by Defendants, there can be no injury or deprivation of the voter's rights. Each element required by the KKK Act fails.

## II.    Plaintiffs do not have Prudential Standing to bring the claims

Defendants have raised concerns about Plaintiffs' standing in two motions to dismiss. [*See* Docket Nos. 27, 54]. Defendants' first motion to dismiss on standing grounds was denied on the basis of sufficient Article III organizational standing. [*See* Docket No. 39]. The second motion addressing prudential standing has not yet been ruled on by the Court. [Docket No. 54].

Generally, a plaintiff may not make a claim "to vindicate the constitutional rights of some third party." *Barrows v. Jackson,* 346 U.S. 249, 255 (1953). Only when a plaintiff makes two additional showings can he assert the constitutional rights of a third party. "First, Plaintiffs must show that the party asserting the right has a close relationship with the person who possesses the right. Second, Plaintiffs must show that there is a hinderance to the possessor's ability to protect his own interests." *Aid for Women v. Foulston,* 441 F.3d 1101, 1111-1112 (10th Cir. 2006) (internal citations and quotations omitted).

Plaintiffs seek to vindicate the constitutional right to vote for certain unidentified individuals. In a similarly situated case, the Sixth Circuit, analyzed a voter organization's prudential standing:

> Even if AMOS [plaintiff] were to demonstrate it has Article III standing, it would confront the additional barrier of the long-recognized limit on plaintiffs asserting the rights of third-parties. The plaintiffs are organizations and cannot vote; instead they assert the right to vote of individuals not even presently identifiable. . . There are exceptions to this limit – such as where a 'close relationship' exists between the party asserting the right and the party possessing it or where a 'hinderance' exists to the possessor's ability to protect the right, -- but none applies here. The relationship between AMOS and the persons whom it seeks to help – unidentified, future late jailed voters—does not resemble the close relationship of the lawyer-client or doctor-patient relationships recognized by the Supreme Court.

*Fair Elections Ohio v. Husted,* 770 F.3d 456, 461 (6th Cir. 2014) (citing *Kowalski v. Tesmer,* 543 U.S. 125, 129 (2004)).

As the *Fair Elections Ohio* case notes, in order for Plaintiffs to demonstrate proper prudential standing, they must show a close relationship with the party possessing the right to vote and a hinderance to that person's ability to protect his interests. *See Foulston,* 441 F.3d at 1111-1112.

Plaintiffs' testimony is clear that no member, person associated with a plaintiff organization, or even a Colorado voter was intimidated or threatened by Defendants. Without an individual who is even loosely associated with the plaintiff organizations, there can be no close relationship between the Plaintiff and the person whose right to vote was abridged.

Although Plaintiffs cannot even satisfy the first prong to confer prudential standing on behalf of others, Plaintiffs would also have to demonstrate some hinderance to the true plaintiff's ability to protect his own interests. Plaintiffs have attempted to evade this issue since April 25, 2022, in their *Reply in Support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction,* [Docket No. 37]. In this Reply, Plaintiffs claim that Defendants' concern for the lack of evidence is unfounded and only an "attempt to shirk responsibility for their unlawful conduct because Plaintiffs do not support their claims, at least at this juncture, with affidavits of intimidated voters." *Id.* at 3. Plaintiffs state to this Court: "To be clear, however, Plaintiffs have had contact

with voters who were intimidated by encounters with USEIP representative on their own doorsteps. The fact that these voters reasonably fear retaliation by USEIP if they do come forward—which is exactly the result USEIP set out to achieve—does not preclude the Court from entering the Preliminary Injunction. . ." *Id.* Despite representing to this Court, seven months ago, that there were witnesses who were intimidated by Defendants, not a single witness has been produced. Apart from this conclusory statement claiming that the key piece of evidence is being withheld because of fear of retaliation, no corroborating statements or evidence indicate that a voter fears retaliation or any misconduct by USEIP. Either Plaintiffs' representation to the Court was untruthful, or Plaintiffs deposition testimony was untruthful. Nevertheless, Plaintiffs cannot hide behind these unsupported claims of retaliation when it is their burden to prove these serious allegations. Furthermore, discovery has closed and plaintiff can no longer defer disclosure.

### III.   USEIP is an unincorporated association, not a person, and cannot be sued under 52 U.S.C § 10307(b) or 42 U.S.C § 1985(3)

From the outset, Plaintiffs acknowledge that USEIP is an unincorporated association. [Docket No. 1, ¶ 16] ("USEIP is an unincorporated organization and is not registered to conduct business in the State of Colorado, or any other state.")[2].  Plaintiffs, however, ignore the statutory language that "[no] *person*, whether acting under color of law or otherwise, shall intimidate, threaten, or

---

[2] Moreover, even if an unincorporated association has the capacity to sue or be sued, the association must actually exist. Colorado state and federal courts explain that characteristics of an unincorporated association include "by-laws governing its organization and operation, a stated purpose for its existence, and providing for its continuity though membership may change. There should also be responsible officers elected according to the by-laws, whose duties and responsibilities may be ascertained and upon whom valid process may be had." *Johnson v. Chilcott*, 599 F.Supp. 244, 228 (D. Colo. 1984); *Hidden Lake Development Co. v. District Court*, 515 P.2d 632, 634-35 (Colo. 1973). The procedural mechanism which permits filing suit against an unincorporated association "does not, however, grant the right to sue a loosely formed group. The status of an unincorporated association must be founded on more than a bald allegation." *Hidden Lake*, 515 P.2d at 634-35 (internal citations omitted). Filing suit against "an unincorporated association in name only is insufficient. Such legal entity must in fact exist." *Id.* at 635. (internal citations omitted). USEIP is a loosely formed group, which may have a stated purpose, but has no other attributes necessary to be considered an unincorporated association capable of being sued.

coerce . . . any person for voting. . .” 52 U.S.C. § 10307(b) (emphasis added). Likewise, the language of § 1985(3) provides: “if two or more *persons* conspire to prevent by force, intimidate, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy . . .the party so injured or deprived may have an action for the recovery of damages. . .”  42 U.S.C. § 1985(3) (emphasis added).

The Tenth Circuit has squarely addressed this issue in the context of the Civil Rights Act, where a complaint alleged an unincorporated association was deprived of its constitutional rights under 42 U.S.C. § 1983. *Lippoldt v. Cole,* 468 F.3d 1204 (10th Cir. 2006). Reflecting the language in 42 U.S.C. § 1985(3), the statute at issue in *Lippoldt,* states in relevant part: “Every person who . . . subjects, or causes to be subjected, any citizen of the United States *or other person* . . . to the deprivation of any rights . . . shall be liable to the party injured. . .” *Id.* at 1212; 42 U.S.C. § 1983 (emphasis in original). To determine whether an unincorporated association is considered a “person” under the Civil Rights Act, the court looked to “(1) the legislative history of section 1983, (2) the general understanding, as of 1871, regarding the legal personality of unincorporated associations, and (3) the Dictionary Act of 1871.” *Id.* at 1213. This exact analysis can be applied to Plaintiffs’ claim under § 1985 of the Civil Rights Act, as this section was, likewise, enacted in 1871[3].

The court found that in each context, the language and legislative history make no indication that congress intended an unincorporated association to be considered a “person” for purposes of the Civil Rights Act. Rather, the legislative extension of the word “person” may “be applied to bodies of politic and corporate. . . Because an unincorporated association, is, by definition, not a

---

[3] Act of April 20, 1871, ch. 22, § 2, 17 Stat. 13 (1971) (codified in part at 42 U.S.C §§ 1983, 1985, 1986 (1976)).

corporation, it is therefore also not a 'body politic or corporate.'" *Id.* at 1214. (internal citations and quotations omitted).

The Court held that "the Dictionary Act of 1871, the common understanding of unincorporated associations in 1871, and the legislative history . . .of the Civil Rights Act of 1871 fail to indicate a congressional intent to include unincorporated associations within the ambit of the term 'person'. . .", reversing the district court's ruling allowing an unincorporated association to bring a claim under Section 1983. *Id.* at 1216. This analysis can be applied directly to Plaintiffs' claim under 42 U.S.C. § 1985(3), and their attempt to sue USEIP, an unincorporated association, as a "person." A reading of the Voting Rights Act, 52 U.S.C. § 10307(b), requires the same result. The legislative history of the Voting Rights Act and the definition of "person" make no indication that a "person" includes an unincorporated association. *See also, U.S. v. Doe,* 572 F.3d 1162 (10th Cir. 2009) (finding that unincorporated associations are not considered persons under 18 U.S.C § 1153). Plaintiffs cannot avoid the language of the statues under which they chose to bring their claims. Therefore, USEIP cannot be sued in its capacity as a loosely formed unincorporated association.

## **CONCLUSION**

Plaintiffs have completely failed to substantiate their claims of voter intimidation. Plaintiffs' testimony has revealed that not a single voter, much less a member of Plaintiffs' organizations, has been intimidated, threatened, harassed, or coerced by Defendants. The Plaintiffs cannot step into the shoes of unknown persons to vindicate their rights. Prudential standing requires Plaintiffs to demonstrate close relationship and a legitimate hinderance keeping the true party from asserting his rights in court. Plaintiffs can prove neither, and therefore, fail to establish prudential standing to bring this lawsuit. Further, USEIP, an unincorporated association, is an improper party under the Voting Rights Act or Civil Rights Act.

In bringing this suit, Plaintiffs bear the burden of proof at trial. As discovery has now closed and no person has been identified as a potential witness to testify to these claims, there is <u>no</u> feasible way Plaintiffs can satisfy this burden. Plaintiffs relied upon unsubstantiated hearsay and conjecture; they may no longer do so at this juncture. Plaintiffs may believe online articles which cite no supporting evidence, but they cannot ask this court to do likewise. In the court of public opinion, Plaintiffs claims may succeed, but in the court of law, Plaintiffs' claims necessarily fail.

WHEREFORE, Defendants respectfully request that this Honorable Court summarily dismiss Counts I, II, and III of Plaintiffs' Complaint and any other relief the Court deems proper[4].

Dated December 2, 2022.

THE REISCH LAW FIRM, LLC

*Jessica L. Hays*
R. Scott Reisch, #26892
Jessica L. Hays, #53905
1490 W. 121st Avenue, #202
Denver, CO 80234
(303) 291-0555
Email: scott@reischlawfirm.com
jessica@reischlawfirm.com
cassandra@reischlawfirm.com
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing DEFENDANTS' MOTION FOR SUMMARY JUDGMENT has been electronically served through ECF this 2nd day of December, 2022, to all counsel of record.

*s/ Jessica L. Hays*
Jessica L. Hays

---

[4] Defendants intend to move this Court for attorneys' fees and costs pursuant to the Federal Rules of Civil Procedure, applicable local rules, and Civil Rights Act.