# EXHIBIT 1

Prescott Deposition Transcript Excerpts

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2

       Civil Action No. 1:22-cv-00581-CNS-NRN
 3

     _____
 4

 5   Colorado Montana Wyoming
     State Area Conference of the
 6   NAACP, League of Women Voters
     of Colorado, and Mi Familia
 7   Vota,
 8            Plaintiffs,
 9   v.
10   United States Election Integrity
     Plan, Shawn Smith, Ashley Epp,
11   and Holly Kasun,
12            Defendants.
13
     _____
14
15           REMOTE DEPOSITION OF PORTIA PRESCOTT
16                    November 22, 2022
17   _____
18
19
20
21
22
23
24
25

                                                        Page 1
```

```
 1         Q.    Who made the complaint?
 2         A.    That's private information.
 3         Q.    Who made the complaint, ma'am?
 4         A.    I don't recall.
 5         Q.    All right.  Have you turned over this
 6   complaint to your attorneys?
 7         A.    Yes.
 8         Q.    When did you turn that document over to
 9   your attorneys?
10               MS. STOCK:  Objection to the form --
11               THE DEPONENT:  I --
12               MS. STOCK:  Hold on, Ms. Prescott.
13               Objection to form.  Ms. Prescott did not
14   testify that she has any sort of documentation related
15   to a complaint.
16         Q.    (By Mr. Reisch)  Well, maybe I
17   misunderstood, Ms. Prescott.  I asked if you had
18   received a complaint against the United States Election
19   Integrity Plan.
20               Do you recall that question?
21         A.    I recall you asking if NAACP, the
22   conference, received a complaint, not me, specifically.
23         Q.    Okay.  Your organization -- the one that
24   you're the president of -- when did they receive a
25   complaint against the United States Election Integrity
```

Page 13

1    Plan?
2         A.    I'm not sure.
3         Q.    Who made the complaint?
4         A.    I'm not sure.
5         Q.    When did the complaint come in?
6         A.    I'm not sure.
7         Q.    What was the nature of the complaint?
8         A.    Concerns about voting.
9         Q.    What concerns about voting came in to
10   the Colorado Montana Wyoming State Area Conference of
11   the NAACP regarding the United States Election
12   Integrity Plan?
13        A.    I'm not exactly sure of the wording.
14        Q.    Well, what weren't you sure -- you
15   aren't sure of my question, or you aren't sure of the
16   nature of the complaint?
17        A.    I'm not exactly sure how the complaint
18   was worded.
19        Q.    Okay.  Was the complaint documented?
20        A.    I'm not sure.
21        Q.    Who answered the phone or received the
22   email?
23              How would this complaint have come in to
24   the Colorado Montana Wyoming State Area Conference of
25   the NAACP?

Page 14

1          A.    That's a play on words.  I'm saying a
2     member or an individual who is not a member.  Anyone
3     can make a complaint.
4          Q.    I understand.  So my question, then,
5     is -- let me ask it this way:
6                You can't point me to a member of the
7     Colorado Montana Wyoming State Area Conference of the
8     NAACP that made a complaint against the United States
9     Election Integrity plan, then what or who was the
10    non-member of the Colorado Montana Wyoming State Area
11    Conference of the NAACP who made a complaint to your
12    organization regarding the United States Election
13    Integrity Plan?
14         A.    I don't recall.
15         Q.    You don't recall, or you don't have any
16    members that made any complaint -- or non-members?
17         A.    I don't recall.
18         Q.    Well, ma'am, you initiated litigation as
19    the president of the Colorado Montana Wyoming State
20    Area Conference of the NAACP.  Correct?
21         A.    Correct.
22         Q.    You have a duty, as your attorneys do,
23    to investigate the allegations that you're making; so
24    is it fair to say that you never looked at a complaint
25    on paper, on email, somebody walking into your office,

Page 20

```
 1   delivered via carrier pigeon -- I don't know -- you
 2   never reviewed any complaint from a member or a
 3   non-member of the Colorado Montana Wyoming State Area
 4   Conference of the NAACP regarding the United States
 5   Election Integrity Plan?
 6         A.    Correct.
 7               MS. STOCK:  Objection to form.
 8               THE DEPONENT:  That question doesn't
 9   even make sense.  I've received so many complaints -- I
10   don't even understand your question.  We've --
11         Q.    (By Mr. Reisch)  Who -- who made the
12   complaint, ma'am?
13               Do you not keep track of complaints that
14   come in for litigation purposes?
15         A.    I'm the president.  I'm not a lawyer.  I
16   don't recall.
17         Q.    Okay.  You put your organization's name
18   on this document.  You did not investigate or have
19   any -- did anybody investigate, in your organization,
20   these allegations?
21         A.    I don't recall.
22         Q.    Who would be the designated person that
23   would investigate such allegations?
24         A.    I don't recall.
25         Q.    Is there a complaint department in your
```

Page 21

```
 1   in voter intimidation.  Correct?
 2          A.    You -- you're directing -- like, you're
 3   playing on words.  Our job is protecting voter rights.
 4   I don't want to use the semantics of how you just
 5   coined it --
 6          Q.    And --
 7          A.    -- since we protect voter rights.
 8          Q.    Okay.  Your organization protects voter
 9   rights.
10                You are the president of this
11   organization.  Correct?
12          A.    Yes.
13          Q.    You filed a lawsuit against the United
14   States Election Integrity Plan, Shawn Smith, Ashley
15   Epp, and Holly Kasun.  Correct?
16          A.    Correct.
17          Q.    You alleged allegations of voter
18   intimidation against these individuals and that entity.
19   Correct?
20          A.    Correct.
21          Q.    And my question to you, ma'am, is, who
22   was the person intimidated allegedly by the United
23   States Election Integrity Plan, Shawn Smith, Ashley
24   Epp, or Holly Kasun?
25          A.    I don't recall.
```

Page 24

```
 1          Q.    You don't recall, or you don't have
 2   anyone that you can point to and say, "This person made
 3   a complaint to us"?
 4          A.    I don't recall.
 5          Q.    Is it accessible somewhere?  You don't
 6   recall.
 7                Is there anything that would refresh
 8   your recollection as to the identity of the name of the
 9   individual saying that they were an intimidated voter?
10          A.    Sir, I don't recall.
11          Q.    Okay.  Do you have a file regarding this
12   particular complaint that keeps the names or the
13   addresses -- names, telephone number, contact
14   information -- of people that made complaints?
15          A.    I don't recall.
16          Q.    You don't recall, or you don't have
17   anything?
18          A.    I don't recall.
19          Q.    Okay.  You said earlier, at some point,
20   you had some documentation of complaints, and that you
21   gave them to your attorneys.
22                Did I hear that incorrectly?
23          A.    You keep saying me.  There was
24   information given to attorneys, not -- not me.
25          Q.    Okay.  What information was given to
```

Page 25

```
 1   attorneys by not necessarily you, but your
 2   organization?
 3               MS. STOCK:  Objection to the extent that
 4   this question calls for attorney-client privileged
 5   information or speculation.
 6               MR. REISCH:  A complaint made by a third
 7   party to your organization is not attorney-client
 8   privileged.
 9               MS. STOCK:  As I heard the question --
10               MR. REISCH:  My question --
11               MS. STOCK:  You asked her about
12   communications with her that she passed on to her
13   attorney, but if I misheard, then I rescind the
14   objection.
15               MR. REISCH:  Very well.
16               You may answer.
17               THE DEPONENT:  What's the question?
18        Q.    (By Mr. Reisch)  What documents
19   regarding complaints of voter intimidation did you turn
20   over to your attorneys?
21        A.    I don't recall.
22        Q.    Well, did you turn over documents?
23        A.    I don't recall.
24        Q.    Did you prepare for this deposition with
25   your attorney?
```

Page 26

```
 1            A.    Uh-huh.  Yep.
 2            Q.    Okay.  And paragraph 7 there states:
 3                  "Recently, NAACP Colorado learned
 4            that United States Election Integrity Plan,
 5            (hereinafter USEIP) and other individuals
 6            connected to the United States Election
 7            integrity Plan were engaging in intimidation
 8            home visits to Colorado voters."
 9                  Do you see that sentence in paragraph 7?
10            A.    Right.  Yeah.  7, recently -- yes.  I
11   see that.
12            Q.    Okay.  When -- you dated this March 2,
13   so as of what date did you receive the information in
14   the first sentence of paragraph 7 on page 2 of your
15   declaration that was made under the pains of penalty of
16   perjury?
17            A.    I don't recall.
18            Q.    Do you remember who provided you that
19   information?
20            A.    I don't recall.
21            Q.    Okay.  "More specifically, the
22            NAACP learned that the group was going
23            door to door in Colorado, quote, 'looking
24            for fraud,' end quote; that the group
25            alleged occurred in connection with the

                                                   Page 32
```

```
 1            November 2020 election."
 2            Do you see that paragraph?
 3       A.   Uh-huh.
 4       Q.   And in that sentence, once again, you
 5  say that your organization that you're the president of
 6  warned the group was going looking for fraud.
 7            Who did you learn that information from?
 8       A.   I don't recall.
 9       Q.   Did you recall who you learned that
10  information from when you signed this document under
11  the pains and penalties of perjury on March 2 of 2022,
12  when you initiated your federal lawsuit against the
13  four defendants?
14       A.   Can you please repeat that question?
15       Q.   Sure.  Did you recall -- because I asked
16  you where you learned this information from --
17  referring to page 2 of your declaration, paragraph 7,
18  second sentence -- I asked, when you signed this
19  declaration under the pains and penalty of perjury on
20  March 2, 2022, did you recall at that time who you
21  learned that information from?
22       A.   I can't recall.  It's so much
23  information, I can't -- I just can't recall.  Like,
24  there's a lot, so -- I wasn't the president, so I can't
25  recall.  I'm sorry.
```

Page 33

```
 1              being carried out by USEIP and related
 2              parties."
 3                      Do you see that?
 4         A.     Yes.
 5         Q.     Do you recall reading that before you
 6   signed this document?
 7         A.     Yes.
 8         Q.     Okay.  What resources were redirected?
 9         A.     Everything.
10         Q.     Well, like, for what?
11         A.     Programming, money, marketing, people --
12   everything.
13         Q.     Okay.  Let's talk about programming.
14                What changed?
15         A.     Voter intimidation education, how --
16   simply what's the -- what -- what the Colorado laws
17   are, clarifying, meetings, traveling the state -- you
18   name it.  Can I --
19         Q.     Do you --
20         A.     You name it.  You name it.
21         Q.     Okay.
22         A.     I mean, just name it.  Pick one.
23         Q.     Okay.  Well, let's talk about
24   programming.  What changed?
25                Did you produce some documents?
```

Page 42

```
 1          A.    Yes.
 2          Q.    Okay.  Do you still have that document?
 3          A.    I produced documents.  We produced video
 4   content, we produced marketing, digital media,
 5   advertising -- those sort of -- yes.
 6          Q.    And you still have all that?
 7          A.    We -- I don't know if I have it all
 8   because I don't save stuff like that, but you can go to
 9   our website and go to our Facebook, Twitter, Instagram
10   and -- you can go anywhere and find it.
11          Q.    Okay.
12          A.    I don't -- I can't load my computer up
13   with everything.
14          Q.    Okay.  And so what other area was then
15   deprived because of these -- these changes in
16   marketing, programming, et cetera?
17          A.    Gun violence, health, education, LGBT
18   protections.  We had other programs that we focused on,
19   and that was in the Colorado Springs LGBT community
20   that suffered because of this -- because of this voter
21   intimidation; so there's a lot.
22          Q.    Are you saying that the shooting that
23   took place at Club Q is the result of alleged voter
24   intimidation?
25                MS. STOCK:  Objection.
```

Page 43

```
 1                    THE DEPONENT:  No.
 2                    MS. STOCK:  Misstates her prior
 3    testimony.
 4                    You can answer, Ms. Prescott.
 5                    THE DEPONENT:  I'm not saying that, but
 6    I'm saying I find it interesting the one year we aren't
 7    directing as much as we worked with the multiple LGBTQ
 8    organizations and funded in Colorado Springs -- I find
 9    it interesting that the one year we don't do it,
10    there's a mass shooting.
11           Q.    (By Mr. Reisch)  Okay.  How much
12    resources do -- does your organization put towards
13    mental health?
14           A.    We put resources to -- we just -- oh, my
15    god -- thousands.  We just had a big thing for mental
16    health with Master P, funding that for the college tour
17    about mental health and talking about mental health.
18                    We couldn't spend as much --
19           Q.    And that's for the --
20           A.    -- but yeah.  We deal with mental
21    health, we deal with racism, we deal with maternal
22    health -- Black women and maternal health issues, we
23    deal with financial literacy, we deal with housing, we
24    deal with homelessness.
25                    MR. REISCH:  Okay.  I believe this would
```

Page 44

```
 1            Q.     You understand, as a plaintiff in a
 2   lawsuit --
 3            A.     Yeah.
 4            Q.     -- filed in the United States District
 5   Court --
 6            A.     And you understand that Colorado is an
 7   open carry state.  You understand that we take voter
 8   suppression extraordinarily seriously.
 9                   MS. STOCK:  Ms. Prescott, let Mr. Reisch
10   ask his question, and then respond to his question once
11   he's finished speaking.  Okay?
12                   THE DEPONENT:  Okay.  I'm responding,
13   but he keeps asking the same question.  I keep trying
14   to tell him, I don't recall.
15            Q.     (By Mr. Reisch)  Okay.  Well, ma'am, the
16   reason I keep asking the same question is, when this
17   case goes to trial --
18            A.     Okay.
19            Q.     -- you have to bring in the person that
20   filed -- that made these complaints that you are basing
21   your allegation upon.
22                   Thus far, no one has produced anyone
23   who's made these complaints.
24                   So you see my dilemma?
25            A.     No, I don't see your dilemma.
```

Page 73

```
 1                    You don't see my dilemma.  You don't
 2   know what it's like to be Black and live in an
 3   all-white neighborhood and to be targeted because of
 4   your blackness.
 5                    No, you don't know.  You don't see what
 6   I see.  You don't know what it's like to have your
 7   family targeted because they were Black and they -- and
 8   white people didn't want us on that block.
 9                    So I'm sorry -- and you be lucky with
10   your while male privilege that you never have to
11   experience what it's like to be targeted because of
12   your color of your skin.
13                    So no, we're not on the same page.
14         Q.    Well --
15         A.    Enjoy your privilege.  Enjoy your white
16   male privilege, because we're not on the same page.
17                    You don't know what it's like to be a
18   minority and targeted and hated and called a nigger
19   because -- as a child at school because they didn't
20   want niggers in their school in Colorado.
21                    MS. STOCK:  I think that right now might
22   be a good time for a ten-minute break.
23                    MR. REISCH:  No, I think we can keep
24   going.
25         Q.    (By Mr. Reisch)  Ms. Prescott, do you
```

Page 74

```
 1   understand that if you don't have any proof to present,
 2   that our abuse of process claim and defamation claims
 3   are all but proven against the Colorado Montana Wyoming
 4   State Area Conference of the NAACP?
 5          A.    People shouldn't try and --
 6                MS. STOCK:  Objection.
 7                Ms. Prescott, please wait.
 8                Objection.  Calls for a legal
 9   conclusion.
10                Ms. Prescott, you can answer to the
11   extent that you are able to answer the question.
12                THE DEPONENT:  I don't even remember
13   what the question is.
14                Ask the question again, please.
15          Q.    (By Mr. Reisch)  Are you aware that if
16   you cannot produce the names of the individuals that
17   supposedly were intimidated by U.S. Election Integrity
18   Commission, Shawn Smith, Ashley Epp, or Holly Kasun,
19   that you are going to lose your lawsuit?
20                MS. STOCK:  Objection.  Calls for a
21   legal conclusion.
22                THE DEPONENT:  And I'm not a lawyer, so
23   no, I don't under -- I don't know.
24                But do you understand that Colorado is
25   an open carry state?
```

Page 75

```
 1                    Do you understand that we had to pass
 2   legislation just earlier this year to make sure people
 3   weren't standing at polls with their guns in their
 4   pockets?
 5           Q.   (By Mr. Reisch)  Okay.  Do you also
 6   understand, ma'am, that we -- the United States
 7   Election Integrity Plan, Shawn Smith, Ashley Epp, and
 8   Holly Kasun -- have counter-sued you -- or the Colorado
 9   Montana Wyoming State Area Conference of the NAACP --
10   for defamation and abuse of process?
11           A.   One, I know how to read.  Two, I have a
12   Ivy League education.  I graduated with honors.  So
13   yes, I'm aware.
14           Q.   Okay.
15           A.   I'm aware.
16           Q.   What does that mean to you that you are
17   being sued for defamation?
18           A.   What do you mean, what does it mean to
19   me?
20                    What do you want it to mean to me?
21           Q.   Well, do you know that it means that
22   we're suing you saying that you made false allegations
23   without investigating any of these --
24           A.   Okay.  You can say that, but you know,
25   you can lie, too.  I've been sued by a person who lied.
```

Page 76