# EXHIBIT 2
Hendrix Deposition Excerpts

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
 2

     Civil Action No. 1:22-cv-00581-CNS-NRN
 3

     _____
 4

 5   Colorado Montana Wyoming
     State Area Conference of the
 6   NAACP, League of Women Voters
     of Colorado, and Mi Familia
 7   Vota,
 8           Plaintiffs,
 9   v.
10   United States Election Integrity
     Plan, Shawn Smith, Ashley Epp,
11   and Holly Kasun,
12           Defendants.
13
     _____
14
15         REMOTE DEPOSITION OF BETH HENDRIX NIELAND
16                     November 23, 2022
17   _____
18
19
20
21
22
23
24
25

                                                      Page 1
```

1        Q.    Okay.  So up until you were contacted by
2   the national level representative, you had no interest
3   or desire in filing a federal lawsuit in the United
4   States District Court?
5        A.    I didn't know of the actions that were
6   taking place.
7        Q.    Okay.  What actions were you advised of
8   from the national people?
9        A.    Door-to-door canvassing by people who
10  are, at times, armed, asking -- you know, intimidating
11  voters.
12       Q.    Okay.  And what steps did you, as the
13  president of the League of Women Voters of Colorado, do
14  to investigate such a serious allegation made by
15  somebody apparently not in the state of Colorado?
16       A.    I am not the president.  I am the
17  executive director.
18       Q.    Okay.  I apologize.  So what actions did
19  you take as the executive director of the League of
20  Women Voters of the state of Colorado to investigate
21  such serious allegations of voter intimidation?
22       A.    I sent an email to our mailing list
23  asking people to let us know if they had received
24  visits.
25       Q.    Okay.  Have you turned that email over

Page 8

```
 1   to your attorneys?
 2        A.    Yes, I have.
 3        Q.    Okay.  Tell me -- since I don't have it;
 4   it hasn't been turned over in discovery -- what did
 5   that email say?
 6        A.    It was a very short email asking people
 7   if they had received visits from representatives of a
 8   group called the U.S. Election Integrity Plan asking
 9   about their voting history and --
10        Q.    Okay.  And what was the response that
11   you received?
12        A.    We heard from one member who had
13   received a visit and felt it was off.
14        Q.    Okay.
15        A.    We --
16        Q.    Okay.  Go ahead.  I'm sorry.
17        A.    And I received a couple of emails
18   supporting the actions.
19        Q.    Okay.  So let's break that down.
20              You sent out this email asking if
21   somebody had received a visit from the USEIP going door
22   to door.  Right?
23        A.    Yes.
24        Q.    You received a response -- and how many
25   members did that go to?
```

Page 9

```
 1           Q.     Sometime in the spring of 2022?
 2           A.     Yes I believe so.
 3           Q.     Do you have access -- do you have access
 4   to that email today?
 5           A.     Yes.
 6           Q.     Why don't we take a quick break so you
 7   can get that and it can be distributed to us.
 8                  MS. ERICKSON:  Scott, that email was
 9   produced to you in discovery.  It was produced.
10                  MR. REISCH:  When?
11                  MS. ERICKSON:  With the documents that
12   were produced by the League of Women Voters.
13                  MR. REISCH:  Do you have a Bates stamp
14   number on that?
15                  MS. ERICKSON:  I mean, not off the top
16   of my head, but I can certainly look for that, but we
17   did produce that email.
18                  MR. REISCH:  Okay.
19           Q.     (By Mr. Reisch)  And the other members
20   that responded were in favor of the alleged voter
21   contact by the USEIP.
22                  Is that correct?
23           A.     They said that they did not feel
24   intimidated and didn't have a problem with the visit.
25           Q.     Okay.  And did you turn those emails
```

Page 11

```
 1            A.    Yes.
 2            Q.    What did you learn from Karen Sheek?
 3            A.    That the member was in her front yard
 4   gardening when she received -- when two members of the
 5   USEIP approached her.  They were wearing lanyards with
 6   laminated nametags that she felt were trying to look
 7   governmental.
 8                  When they began questioning her, she
 9   questioned them, and they became uncomfortable and
10   left.  I believe they took a picture of her home first.
11            Q.    Okay.  So she started questioning them.
12                  Do you know what she said to these
13   individuals?
14            A.    I do not.  I -- I believe something
15   along the lines of, "Why are you asking me these
16   questions?"
17                  League members tend to have a pretty
18   strong knowledge of our election systems and election
19   procedures, and she knew that this was not a normal
20   activity, a typical activity, and so she questioned it.
21            Q.    Okay.  So she wasn't intimidated; in
22   fact, she intimidated them, because they left.
23                  Is that right?
24                  MS. ERICKSON:  Objection to form.
25   Mischaracterizes the witness's testimony.
```

Page 13

```
 1            Q.    (By Mr. Reisch)  You can answer.
 2            A.    I -- I believe that this member is in
 3   her 70s.  I highly doubt that they were physically
 4   intimidated by her.  I think they were more possibly
 5   intimidated by the fact that she understood that they
 6   were doing something atypical.
 7            Q.    Okay.  And so they left -- right? --
 8   these USEIP people.
 9                  Is that right?
10            A.    Yes.
11            Q.    They didn't flash a gun at her.  Right?
12            A.    No.
13            Q.    She didn't observe a firearm?
14            A.    No.
15            Q.    She wasn't threatened to say that she
16   must answer their questions; she understood that it was
17   completely voluntary?
18            A.    I would assume so.
19            Q.    And she refused to answer those
20   questions.  Correct?
21            A.    Correct.
22            Q.    Okay.  When you spoke -- that's -- when
23   you spoke with Barbara -- and I can't read my own
24   writing here.  Was it Whinerly?
25            A.    Whinery.
```

Page 14

```
 1          Q.     Whinery.  Did you speak to her about the
 2   allegations of Ms. Armijo?
 3          A.     Yes.
 4          Q.     And what --
 5          A.     I believe so.
 6          Q.     -- did Barbara Whinery tell you?
 7          A.     The same things that I already told you;
 8   that she was out gardening, she was approached by two
 9   people wearing official-looking badges, and they began
10   questioning her about her voting record, especially in
11   the 2020 election, and when she questioned their
12   authority, they left.
13          Q.     Okay.  And what are the names of the
14   people that -- that were in favor of what USEIP was
15   doing?
16          A.     I don't know.  They're in the emails,
17   but those are not members -- I'm not sure they're
18   members.  I am not familiar with those people.
19          Q.     Okay.  But you sent this email request
20   looking for USEIP contacts to your members list; so did
21   you have --
22          A.     To our members and non-members as well.
23          Q.     Okay.  So other than this one woman,
24   Ms. Armijo, what -- what other complaints did you
25   receive in regards to USEIP?
```

Page 15

```
 1          A.     No other direct complaints.
 2          Q.     Okay.  Did you speak with the president
 3   of the Colorado Montana Wyoming State Area Conference
 4   of the NAACP prior to filing your lawsuit?
 5          A.     We played phone tag.  I don't believe we
 6   actually spoke.
 7          Q.     Okay.  And do you know who the president
 8   of the Colorado -- the Colorado Montana Wyoming State
 9   Area Conference of the NAACP is?
10          A.     At the time of the lawsuit filing, it
11   was Rosemary Lytle.
12          Q.     Okay.
13          A.     I understand that the presidency has
14   changed hands.
15          Q.     Okay.  At the time of the filing of the
16   lawsuit in March, you never spoke with Portia Prescott,
17   the then president of the Colorado Montana Wyoming
18   State Area Conference of the NAACP?
19          A.     I did not.
20          Q.     When did you speak with the executive
21   director of Mi Familia Vota in the Denver area?
22          A.     We traded phone calls as well, and
23   emails.  I did see him briefly at an event in early
24   2021, and he told me he wanted to partner on this
25   filing.
```

Page 16

```
 1   email to all of your voters -- your members in the
 2   spring -- spring is generally March-April time frame.
 3              Is that right?
 4        A.    Yes.
 5        Q.    Okay.  And maybe I misunderstood, but
 6   I -- I thought I heard you say that you had spoken with
 7   the executive director of Mi Familia Vota sometime in
 8   January of 2022, and you all agreed that you wanted to
 9   partner on this litigation.
10        A.    Yes.
11        Q.    Okay.  So in January of 2022, you were
12   already planning this litigation against USEIP.
13        A.    Yes.
14        Q.    All right.  Did you have complaints
15   prior to your email going out?
16        A.    No.  We had media reports.
17        Q.    Media reports.  What media reports are
18   you referring to?
19        A.    Namely articles in "The Denver Times
20   Gazette."
21        Q.    Okay.  All right.
22        A.    I'm sorry.  I'm not 100 percent sure of
23   the name of the paper.
24        Q.    Okay.  Do you remember the gist of the
25   conversation -- or the gist of the article?
```

Page 18

```
 1            A.    That a group called USEIP was sending
 2    armed -- or canvassers who were sometimes armed to
 3    interrogate voters about their voting record.
 4            Q.    All right.  Based upon that article that
 5    you were going to base your litigation upon, did you
 6    take any affirmative steps to -- I don't know -- talk
 7    to the author of that article?
 8            A.    Yes.
 9            Q.    You did.  And when did you speak with
10    the author of that article?
11            A.    I would need to look back, but that
12    email was included in discovery.
13            Q.    I don't recall seeing that one.
14                  Are you sure you turned that over to
15    your attorneys?
16            A.    Yes.
17            Q.    Okay.  Well, and what did -- what did
18    that email entail, since I don't have it in front of
19    me?
20            A.    It said that the author had been
21    researching this group for some time and had a fair
22    amount of evidence of voter intimidation and
23    suppression.
24            Q.    Okay.  And was it via email or telephone
25    call?
```

Page 19

1          A.     Email.

2          Q.     All right.  And did the -- do you

3    remember the name of the author, just for the record

4    here today?

5          A.     Erik Maulbetsch.

6          Q.     Okay.  And what did Mr. Erik Maulbetsch

7    say to you in your email -- that email that you -- who

8    responded to your email?

9          A.     What I just said, that he had been

10   researching this group for a while, and he had evidence

11   of -- that this canvassing was happening; that, by

12   USEIP's own admission, canvassers were at times armed

13   and had criminal records and were going door to door

14   interrogating voters about their voting history.

15         Q.     All right.  And what evidence did

16   Mr. Maulbetsch send to you?

17         A.     He did not.  I relied on his news

18   articles.

19         Q.     What -- well, did he tell you the

20   person -- persons that was -- he witnessed some conduct

21   by USEIP interrogate somebody?

22         A.     I don't know.

23         Q.     Did he provide you the location where he

24   personally witnessed somebody -- have USEIP come on

25   their property and threaten them or expose a firearm to

Page 20

```
 1   them?
 2         A.    No.
 3         Q.    Did you ever ask for any?
 4         A.    Ask for any what?
 5         Q.    Did you ask him for the evidence -- the
 6   name, the location, the person -- so that you could
 7   talk to them personally?
 8         A.    No.
 9         Q.    Why not?
10         A.    I'm not an investigative reporter.
11         Q.    Okay.  But you are somebody who is the
12   executive director in a federal lawsuit making some
13   serious allegations.  You relied upon a newspaper
14   report from Mr. Maulbetsch.
15               MS. ERICKSON:  Object to the form.
16               Beth, if you understand the question,
17   you can answer it.
18               THE DEPONENT:  Yes.  And other reports
19   as well as --
20               MR. REISCH:  Okay.
21               THE DEPONENT:  -- our report from our
22   member --
23               MR. REISCH:  What other --
24               THE DEPONENT:  -- which corroborated
25   what the author of the article was saying.
```

Page 21

```
 1            Q.    (By Mr. Reisch)  What other reports are
 2   you supposedly reply -- relying upon?
 3                  You said you relied upon
 4   Mr. Maulbetsch's newspaper article and other reports.
 5                  What other reports?
 6            A.    There were reports in a number of other
 7   media outlets about the same group doing the same
 8   activities.
 9            Q.    You -- was it newspaper?  Was it
10   television?
11            A.    Newspaper.
12            Q.    Did you save those articles which you
13   relied upon to base your federal litigation?
14            A.    Yes.
15            Q.    What -- do you recall what those
16   articles were, who wrote them?
17            A.    No.
18            Q.    Did you turn those over to your
19   attorneys?
20            A.    Yes.
21            Q.    Okay.  What date did you speak with
22   Mr. Maulbetsch, if you recall?
23            A.    I'm sorry.  I don't recall.  I would
24   assume --
25            Q.    In the --
```

Page 22

```
 1   your lawsuit, you -- you and your attorneys made an
 2   allegation that you had members -- that you're here
 3   trying to represent members that were, in fact,
 4   intimidated.
 5             And I'm here as an officer of the court,
 6   asking you questions under oath, under the pains and
 7   penalties of perjury.
 8             I'm asking you, what is the name of the
 9   person of your organization that was intimidated so
10   that I can go talk to them?
11             MS. ERICKSON:  Object to the form.
12   Asked and answered.  Argumentative.
13        Q.    (By Mr. Reisch)  You may answer.
14        A.    As I told you, we had one member come
15   forward who was not intimidated.
16        Q.    And --
17        A.    I have seen multiple reports through the
18   media and from various county clerks that they have
19   received complaints of voters being intimidated.
20             The League of Women Voters doesn't just
21   serve its membership.  We serve the general voting
22   public.
23        Q.    And ma'am, I understand that.  I truly
24   understand that.  But this is not a political campaign;
25   this is a court of law, and you, in your lawsuit, have
```

Page 29

1  to have somebody come to court and state under oath in
2  front of a federal district court judge and a jury that
3  they were intimidated, and I, as a defendant -- or
4  representing defendants in this case, am entitled to
5  know of the name of the person that was intimidated,
6  not the one that you said wasn't intimidated.
7             I want to know of the name of the person
8  that was intimidated so that I can interview them and
9  bring them to court and have them state that under
10 oath.
11            What is their name, ma'am?
12      A.    I don't know.
13      Q.    You don't know?
14            You don't want to tell me, or you don't
15 have anyone?
16      A.    As I told you, I know of one member --
17      Q.    Who was intimidated --
18      A.    -- who received a visit.
19            Yes.  We heard reports from multiple
20 media outlets and multiple county clerks around the
21 state of Colorado who received calls from voters who
22 felt intimidated.
23      Q.    Ma'am, I understand that, but that's not
24 legal evidence in a court of law.
25            MS. ERICKSON:  Object to the form.

Page 30

```
 1                    Is there a question?
 2                    MR. REISCH:  Yes.  Yes.
 3          Q.    (By Mr. Reisch)  What other
 4    complaints -- who else have you talked to that you've
 5    independently talked to and said that they were
 6    intimidated by USEIP?
 7          A.    I haven't spoken with anyone else.
 8          Q.    All right.  You said clerks and
 9    recorders have received complaints.
10                    Who are the clerks?
11          A.    It's my understanding that the clerks
12    and recorder -- the clerks of Weld County and La Plata
13    County and Pueblo Counties all received voter
14    complaints.
15                    I believe there were other counties as
16    well, but I'm not sure on that, as well as the
17    secretary of state.
18          Q.    Did you go to those clerks and recorders
19    and the secretary of state and get a copy of those
20    complaints?
21          A.    No.
22          Q.    Did you call any of the clerks and
23    recorders or the secretary of state and speak with her
24    or them about these complaints?
25          A.    I did not, but members of my board did.
```

Page 31

```
 1            Q.     And what did your members or board
 2    members receive back from these clerks?
 3            A.     That they had all received multiple
 4    complaints of visits by people, seemingly wanting to
 5    represent a governmental entity, asking strange
 6    questions and intimidating people enough that they
 7    would make a call to their county clerk or secretary of
 8    state.
 9            Q.     Okay.  So did your board members receive
10    a copy of those complaints identifying those
11    individuals that made a complaint to the, let's say,
12    clerk or recorder of Weld County?
13            A.     I don't know.  I don't believe so.
14            Q.     Why not?
15            A.     Because we believed them.
16            Q.     And I understand, but like I said,
17    somebody doesn't get to come in to court and say what
18    somebody else said.  They -- the person actually -- and
19    I'm using air quotes here -- being intimidated has to
20    come to court and say, "I was intimidated."
21                   So you don't -- nobody collected, from
22    your board -- the then 11 board members of the League
23    of Women Voters -- not a single one of them said, "Hey,
24    I should get a copy of these complaints that were made
25    so I can go speak with those individuals.  We may need
```

Page 32