EXHIBIT 1

Atiba R. Ellis

Expert Witness Report

Colorado Montana Wyoming Area State Conference of the NAACP, et. al

v. United States Election Integrity Plan, et. al.

Civ. A. No. 1:22-cv-00581-CNS-NRN

October 28, 2022

## Introduction

My name is Atiba Ellis. I am a Professor of Law at Marquette University Law School. I am a scholar of the dynamics of voter suppression in the United States. The attached CV shows that I have published and lectured extensively on this topic.

I have been retained by Plaintiffs in this matter to submit this expert witness report on the history and effects of voter intimidation, especially concerning people of color. I have also been asked to discuss the policies against voter intimidation that underlie the anti-voter intimidation laws in the United States. Finally, based upon these views, I have been asked to offer an analysis and opinion regarding the activities of the defendants United States Election Integrity Plan ("USEIP"), Shawn Smith, Ashley Epp, and Holly Kasun (collectively, "Defendants").

I have not provided any expert witness services in the past four (4) years. For this engagement, I have been compensated $7,500.00 to prepare and submit this report as well as to provide consulting services to Plaintiffs concerning issues related to this report. Additionally, I will be compensated at a rate of $350.00 per hour for services in connection to the preparation for and delivery of any live expert witness testimony in this matter. However, the compensation that will be provided has not influenced my views on the matters presented to me nor do I have a material interest in the outcome. The following opinions are mine.

Expert Report of Atiba R. Ellis                              CO NAACP v. USEIP

This report proceeds as follows: In Part I, I discuss the history of voter intimidation in the United States from the eighteenth century to the present day. In Part II, I connect that history to Congress's intent behind Section 11(b) of the Voting Rights Act of 1965 and 42 USC § 1985(3). Throughout the discussions in Parts I and II, I explain how—from the perspective of a person of color in the United States—deceptive and intimidation-driven voting practices create a particular danger of racial voter suppression.

In Part III, I use the views developed in Parts I and II to form an opinion concerning Defendants' practices. Notwithstanding Defendants stated intent to audit the 2020 election, the cumulative effect of Defendants' practices of aggressive questioning under a pretense of an official inquiry, accompanied by official-sounding names and badges, and accompanied by violent rhetoric that openly calls for the execution of anyone engaged in election fraud amount to a modern-day version of voter vigilantism reminiscent of the worst periods of racial voter suppression motivated terrorism in the United States.  This scheme had and continues to have the objective and subjective effect of intimidating voters. Their conduct disturbs the balance allowed by voter intimidation laws by depriving voters of equal dignity, as well as their trust that their votes will be counted and to rest assured about the status of their vote without it being questioned or disturbed. Their efforts to target, audit, and accuse voters of fraud amount to intimidation and attempts to intimidate voters—precisely the conduct that Congress has repeatedly sought to outlaw since Reconstruction.

To understand this conclusion, we must first briefly understand the history of voter intimidation and why that history inspired Congress to pass anti-voter intimidation laws in every major era since the Civil War. It is to this history this report now turns.

2

Expert Report of Atiba R. Ellis                                    CO NAACP v. USEIP

## Part I:  Race and Voter Intimidation in the United States

Although we envision the United States as a fully functioning democracy, the exclusion of racial minorities from the voting franchise nonetheless continues to tarnish American democratic practice.[1] Throughout its history, the United States has experienced cycles of racial exclusion from the right to vote, the expansion of that right, and then the exclusion—whether by law or by social or political forces—of racial minorities from the franchise.[2] We focus mostly on the *legal* barriers in terms of voter qualifications and registration practices that (1) served in the past as *de jure* barriers to voting (e.g., explicit racial bans on voting or felon disenfranchisement laws) or (2) arguably exist today as *de facto* barriers to voting (e.g., voter identification laws or voter purge statutes). But extralegal barriers nonetheless persist that limit the opportunity for voting rights to be fully enjoyed by all. As the United States Supreme Court acknowledged as recently as 2013 in *Shelby County v. Holder*, despite the progress towards an American right to vote protected from racial discrimination, problems around race and voting remain.[3]

Indeed, as scholar Derrick Bell has pointed out, African Americans voters have been historically subject to a dichotomy. On the one hand, they have been led to believe that they have an equal share in American democracy through their vote. Yet, on the other hand, "policies are supported or condoned which, depending on the period of history, renders exercise of the franchise by blacks a sometimes dangerous, a sometimes difficult, a sometimes impossible, and never the easy and often rewarding task it is for whites."[4] I believe this to be true for all people of color in the United States.

---

[1] *See* ALEXANDER KEYSSAR, THE RIGHT TO VOTE: THE CONTESTED HISTORY OF DEMOCRACY IN THE UNITED STATES (2000).

[2] *Id*.

[3] Shelby Cnty., Ala. V. Holder, 570 U.S. 529, 549 (2013).

[4] DERRICK BELL, RACE RACISM AND AMERICAN LAW § 6.2 "To Vote or Not to Vote" at 345 (Wolters Kluwer 6th ed. 2008).

Expert Report of Atiba R. Ellis                                        CO NAACP v. USEIP

One of the techniques of racial exclusion that makes voting dangerous, particularly for racial minorities, is voter intimidation. Throughout American history, voter intimidation has been condoned as an extra-legal practice to suppress minority votes and to threaten and attack the election system. And, as I will discuss, it is a tactic that continues to this day to coerce people of color from fully exercising their right to vote.

Voter intimidation is defined by the Department of Justice as practices of threats, coercion, deception, and violence that persuade a voter to either not to vote or to otherwise not to participate in the political process.[5] Such coercion has occurred through explicit threats so that someone might suffer a harm to their political, economic, or physical livelihood if he or she perform an unwanted political act.[6] Other threats, however, are more subtle or disguised. But whether explicit or implicit, the effect is the same: threats or coercion are used against voters who would otherwise exercise their rights as citizens. Whether implicit or explicit, an act that credibly amounts as an effort to coerce or attempt to coerce a voter from participating in the political process amounts to voter intimidation.

Voter intimidation has existed since the founding of the American Republic, even before the Civil War.[7] At its most extreme, the practice of slavery in the United States served as both a legal barrier to the rights of citizenship—as illustrated in *Dred Scott v. Sanford,* where the U.S. Supreme Court treated African Americans as property rather than citizens[8]—and as a social force that employed the violence of slavery to intimidate the enslaved and other citizens who were not part of the white, male ruling class, from venturing to exercise fundamental social and political

---

[5] U.S. Dep't of Just., Manual, *Federal Prosecution of Election Offenses* 22 (Richard C. Pilger, 8th ed. Dec. 2017) [hereinafter "DOJ Manual"]. Available at https://www.justice.gov/criminal/file/1029066/download.
[6] *Id.*
[7] *See* KEYSSAR, *supra* note 1.
[8] *See* Dred Scott v. Sanford, 60 U.S. 393 (1857).

Expert Report of Atiba R. Ellis                                    CO NAACP v. USEIP

rights. Moreover, to the extent that there were African Americans who were not enslaved in the

antebellum South, such Black residents were still excluded from political participation by the

placement of legal barriers, as well as through violence leveraged against them.

Such intimidation was not limited to the South. For example, Alexis de Tocqueville, in his

treatise DEMOCRACY IN AMERICA, documented how African Americans in pre-Civil War

Pennsylvania, who at the time unquestionably had the right the vote, were nonetheless declined

that right because they were intimidated by the white establishment.[9] Specifically, in reciting a

conversation that he had with a Pennsylvania Quaker, Tocqueville recounts:

> I said one day to an inhabitant of Pennsylvania: "Be so good as to explain
> to me how it happens that in a state founded by Quakers, and celebrated for its
> toleration, free blacks are not allowed to exercise civil rights. They pay taxes; is it
> not fair that they should vote?"
> "You insult us," replied my informant, "if you imagine that our legislators
> could have committed so gross an act of injustice and intolerance."
> "Then the blacks possess the right of voting in this country?"
> "Without a doubt."
> "How come it, then, that at the polling-booth this morning I did not perceive
> a single Negro?"
> "That is not the fault of the law. The Negroes have an undisputed right of
> voting, but they voluntarily abstain from making their appearance."
> "A very pretty piece of modesty on their part" rejoined I.
> "Why, the truth is that they are not disinclined to vote, but they are afraid of
> being maltreated; in this country the law is sometimes unable to maintain its
> authority without the support of the majority. But in this case the majority entertains
> very strong prejudices against the blacks, and the magistrates are unable to protect
> them in the exercise of their legal rights."
> "Then the majority claims the right not only of making the laws, but of
> breaking the laws it has made?"[10]

This "maltreatment" of Blacks in the 1830s—by the majority—is what we would call voter

intimidation today. This maltreatment included threats against their lives, their property, and their

---

[9] ALEXIS DE TOCQUEVILLE, DEMOCRACY IN AMERICA 242 (Harvey C. Mansfield & Delba Winthrop, eds., U. Chicago 2000).
[10] *Id.* (quoted also in BELL, *supra* note 4). Professor Bell points out that five years later, the Pennsylvania Supreme Court denied the right to vote to African Americans in Hobbs v. Fogg, 6 Watts 553, 1837 WL 3128 (Pa. 1837).

5

Expert Report of Atiba R. Ellis                    CO NAACP v. USEIP

economic prospects through the risk of losing their jobs or the ability to engage in commerce.[11] And, throughout the United States, those who resisted saw threats acted upon through murder or lynching.[12]  Intimidation made the cost of voting too high for African Americans.

The justification for enforcing a  voting color line through violence—indeed, as scholars James Gardner and Guy-Uriel Charles point out, a line meant to maintain the status defined in slavery—was premised on the notion that "some persons were not truly men."[13] This dehumanization served to exclude African Americans not only from the vote, but also from the status of being understood as a human-being. In turn, this justified—and ultimately excused—the use of violence against African Americans regarding the franchise.

This dehumanization that comes with voter intimidation makes this kind of conduct particularly offensive to communities of color. While voter intimidation generally harms one's political rights, when a person of color is confronted by voter intimidation, that confrontation carries with it an added stigma of racism due to the long history of voters of color being targeted for intimidation.

This aggression also has a character that replicates the worst patterns of White Supremacy in American history. From the point of view of the aggressor, the act of voter intimidation— whether at the polls or in their work or home—represents a motive to make people of color "less than human." The rhetoric of voter suppression is riddled with symbols and actions that symbolize the goal to make America, in the words of U.S. Senator Ben "Pitchfork" Tillman, "a White man's

---

[11] DOJ Manual, *supra* note 5, at 49-50.

[12] Ben Cady & Tom Glazer, *Voters Strike Back: Litigating against Modern Voter Intimidation*, 39 N.Y.U. REV. L. & SOC. CHANGE 173, 185 (2015) (hereinafter, "Cady & Glazer, Voters Strike Back") ("The Klu Klux Klan attacked one-tenth of the black members of the 1867-68 constitutional conventions.") (citing ERIC FONER, RECONSTRUCTION: AMERICA'S UNFINISHED REVOLUTION, 1863-1877, at 426 (1988)). ("Even the simple act of voting could provoke violence. Congress responded with . . . the Enforcement Acts.").

[13] JAMES A. GARDNER & GUY-URIEL R. CHARLES, ELECTION LAW IN THE AMERICAN POLITICAL SYSTEM 64 (Wolters Kluwer 2012).

6

Expert Report of Atiba R. Ellis                                    CO NAACP v. USEIP

country."[14] This is an obvious pattern in American history, and those who further perpetrate this targeted voter suppression against communities of color likely know or should know that they are repeating this pattern.[15]

This is not mere rhetoric or modern-day political correctness. Acts of voter suppression against people of color happen against a back drop of what Bell called "democratic domination" of people of color by white citizens. This history has its roots in the Reconstruction era, but that history affects the right to vote in America today. A brief examination of the history of voter intimidation illustrates how voter intimidation not only persisted but exploded into open episodes of terrorism across the United States.

The first period of terrorist explosions came in response to the creation of a genuine interracial democracy in the United States in the wake of Reconstruction. After the Civil War, Congress abolished slavery through the Thirteenth Amendment in 1865 and then passed the Fourteenth Amendment in 1870 to guarantee, in part, the political equality of recently freed African American men.[16] Moreover, the federal government—throughout the Reconstruction period—guaranteed the participation of African American men in the franchise and effectively—albeit temporarily—created an interracial democracy. By providing the presence of Union troops in the South, the federal government ensured that African Americans had unfettered access to the ballot box.

---

[14] Tillman often expressed such sentiments. For example, in a speech in Congress, Tillman made clear the White Supremacist motivation for actions in the south in the era: "We of the South have never recognized the right of the negro to govern the white men, and we never will. We have never believed him to be equal to the white man, and we will not submit to his gratifying lust on our wives and daughters without lynching him." Tillman Speech, Congressional Record, Fifty-Sixth Congress, First Session at 3223-3224. Available at https://teachingamericanhistory.org/document/speech-in-the-senate/
[15] It is my opinion that such a pattern of rampant voter intimidation as obvious and overtly racist as other overtly racist symbols. *Cf.* Virginia v. Black, 538 U.S. 343, 388-392 (2003) (Thomas, J. dissenting) (discussing cross burning as a symbol that almost invariably represents lawlessness and terrorism both generally and towards African Americans specifically).
[16] *See* U.S. Const. amend. XIII; U.S. Const. amend. IV.

Expert Report of Atiba R. Ellis                                    CO NAACP v. USEIP

The need for this Union troop presence coincided with the rise of organizations like the Ku Klux Klan. The Klan, founded in the wake of the Civil War, undertook a campaign of intimidation to coerce African Americans not to vote and not to participate in the civic and political life of their home states.[17] Throughout the ex-Confederate South, and eventually throughout the United States, the Klan carried out this campaign through various means.[18] Most notably, the Klan disguised themselves on the road and committed acts of terrorism—such as murders, lynching, and cross burnings.[19] Moreover, some Klan members portrayed themselves as government actors in order to overtly or covertly deny African Americans access to the ballot box.[20] In this sense, threats of physical force were augmented by threats of arrest or legal sanction. The Klan also used disguises that intimidated through the pretense of representing constituted political authority, even though some members of the Klan were not authorized by the government to do so.

The Klan spread throughout the United States and instigated its campaign of racial intimidation. For example, the Klan took root in Colorado by the early twentieth century.[21] As historian Stanley Coben notes, the Klan came to dominate the state by the mid 1920s and served for a time to organize the political life of the state around a theme of strict moral enforcement and law and order.[22] Indeed, that promise ultimately lead to its downfall as an elected political force in the 1920s since Klan members who were also in law enforcement were ultimately prosecuted for

---

[17] KEYSSAR, *supra* note 1, at 84. Keyssar has described the Klan at this time as the "military, or paramilitary, arm of the Democratic Party.".
[18] *Id.*
[19] *See id.*
[20] *Id.*
[21] See ROBERT ALAN GOLDBERG, HOODED EMPIRE: THE KU KLUX KLAN IN COLORADO (U. ILLINOIS PRESS 1981) (discussing in depth the political history of the Klan in Colorado and noting their dominance of Colorado politics in the early twentieth century).
[22] Stanley Coben, *Review of Hooded Empire*, 19 J. SOC. HIST. 172 (1985).

Expert Report of Atiba R. Ellis                                CO NAACP v. USEIP

civil liberties violations.[23] But, as historians are currently considering, the effects remain in Colorado.

Depending on the context and location, members of the Klan—and other affiliates—often participated in conspiracies to deprive African Americans of their political rights. These conspiracies coupled with the representation of state authority, shielded acts of voter intimidation from questions of their legitimacy. In doing so, some of these fake officers spoke of legal penalties that may or may not have been enforced. And even legal penalties that *were* enforced were exaggerated by conspirators who sought to dismay African Americans in the exercise of their political rights.

At times, this extra-legal, quasi-conspiratorial wave of voter intimidation directed at intimidating the African American vote turned into brutal attacks and mob violence. For example, a group of white Democratic supporters engaged in the "indiscriminate slaughter" of an interracial coalition of white and African American Republicans because the interracial group supported the Republican candidate for governor. The white men and an estimated 150 African American men died in this battle.[24][25] Several of the white men who led this racial attack were indicted on federal charges, but in *United States v. Cruikshank*,[26] many of those charges were dismissed and the perpetrators were ultimately acquitted. As scholar Gilda R. Daniels points out, Louisiana Governor William Pitt Kellogg's words best encapsulated the impression left by the dismissal of these

---

[23] *Id*. at 174.
[24] GILDA R. DANIELS, UNCOUNTED: THE CRISIS OF VOTER SUPPRESSION IN AMERICA 96–97 (NYU Press 2020).
[25] Danny Lewis, *The 1873 Colfax Massacre Crippled the Reconstruction Era*, Smithsonian Mag., April 13, 2016, https://www.smithsonianmag.com/smart-news/1873-colfax-massacre-crippled-reconstruction-180958746/.
[26] 92 U.S. 542 (1875).

9

Expert Report of Atiba R. Ellis                    CO NAACP v. USEIP

charges: African Americans felt like "no white man could be punished for killing a negro."[27] For African Americans, it is this history-based fear that accompanies acts of voter intimidation.

This Reconstruction-era voter intimidation gave way to Jim Crow-era of voter intimidation, characterized by open violence targeted at destroying the political power of racial minorities. Many of race riots of the turn of the Twentieth Century, including in Wilmington, North Carolina in 1898, Tulsa, Oklahoma in 1920, and Rosewood, Florida in 1923, were aimed at destroying coalitions—created across racial lines—which exercised multiracial political power. Many of these riots destroyed whole African American communities and eradicated the interests of African Americans in participating in American democracy. Indeed, this form of terrorism, coupled with the practice of lynching, served, as Daniels put it, "to [convince] many, if not most, southern blacks to accept their banishment from the political sphere."[28]

Even after the transformations rendered by the Voting Rights Act of 1965 (discussed in more detail in the next section) the problem of voter intimidation continues to persist. Modern-day voter intimidation doesn't look like open riots and civil unrest. It is varied and violent—or communicates the threat of violence. According to the Georgetown University Law Center's Institute for Constitutional Advocacy and Protection, voter intimidation presents itself through violent activity in or around a polling place, threats of violence against voters, confronting voters while wearing paraphernalia that makes the wearer appear to be an official, brandishing or otherwise displaying firearms in a menacing manner, spreading false information about voter fraud

---

[27] Daniels, *supra* note 24, at 97; *see also* Margot Lipin, *No White Man Could Be Punished: How the Supreme Court Promoted White Supremacy and Racial Violence in the Late Nineteenth Century*, (May 2020). Available at https://repository.wellesley.edu/object/ir1171.
[28] Daniels, *supra* note 24 at 98.

Expert Report of Atiba R. Ellis                                    CO NAACP v. USEIP

or voting requirements, aggressively approaching voter or their vehicles and documenting those

vehicles, harassing voters, or aggressively questioning voters about their qualifications to vote.[29]

Probably the most famous example of modern-day voter intimidation was carried out by

the Republican National Committee. As part of a campaign to institute ballot security measures,

to challenge voters' registration, and to engage "vote caging,[30]" the GOP directed off-duty police

officers to make their presence known at polling places in minority neighborhoods in New Jersey.[31]

These officers wore armbands that identified them as members of the "National Ballot Security

Task Force." Some of these officers carried two-way radios and others carried firearms.[32]  Rather

than face a trial around these practices and a permeant injunction of the Ballot Security Program,

the RNC entered a consent decree with the Democratic Party in 1982 that required a federal court

to review any RNC ballot security practices.[33] The consent decree ended in December 2017.[34] In

discussing the consequences of the termination of the RNC v. DNC consent decree, election law

expert Richard Hasen commented in 2017 that the repeated—and unproven—allegations of voter

fraud made by then-President Donald Trump during the 2016 election and during his term in office

---

[29] INST. FOR CONST. ADVOCACY AND PROTECTION AT GEORGETOWN LAW, FACT SHEET: PROTECTING AGAINST VOTER INTIMIDATION. Available at https://www.law.georgetown.edu/icap/wp-content/uploads/sites/32/2020/10/Voter-Intimidation-Fact-Sheet.pdf (last accessed Nov. 3, 2022).
[30] Vote caging is the practice of challenging and removing voters the voting rolls based on mailings that go unreturned to the address under which the voter registered. See VOTER CHALLENGES & CAGING, BRENNAN CENTER FOR JUSTICE, August 31, 2015, available at https://www.brennancenter.org/our-work/research-reports/voter-challenges-caging.
[31] RICHARD L. HASEN, ELECTION MELTDOWN: DIRTY TRICKS, DISTRUST, AND THE THREAT TO AMERICAN DEMOCRACY 10 (Princeton Univ. Press 2000).
[32] Id.
[33] Id.
[34] The Brennan Center for Justice summarized the history of this case and notes the litigation documents related to it in DNC V. RNC CONSENT DECREE, Nov. 5, 2016, available at https://www.brennancenter.org/our-work/court-cases/dnc-v-rnc-consent-decree.

Expert Report of Atiba R. Ellis                                    CO NAACP v. USEIP

could give rise to another wave of "activities aimed at so-called ballot security, which could be seen as suppressing the votes of minority voters."[35]

But modern voter intimidation has also taken the guise of "voter vigilante" groups who use the claim that rampant voter fraud necessitates the policing of voting by citizen groups because the government refuses to sufficiently protect election integrity. This kind of voter intimidation can happen in the context of the act of voting or in actions designed to police the vote even though they occur away from the polls themselves. My own research has analyzed how these voter vigilante groups, such as "True the Vote" serve as a rallying point for groups who believe, without evidence, the myth of rampant voter fraud. They then serve to replicate this myth through methodologically dubious investigations that fail to expose fraud, and instead serve to bully minority and low-income voters who are attempting to vote through specious challenges to low-income and minority voters.[36] These kinds of direct, in-person challenges, whether at the ballot box or in persons' homes and communities that nonetheless challenge voting activities, amount to voter intimidation.[37]

While scholars like Levitt and I were writing about voter vigilantes nearly a decade ago, the rise of the Trump-sponsored election disinformation generated a new dimension to modern

---

[35] Ari Shapiro & Richard L. Hasen, *Decades-Old Consent Decree Lifted Against RNC's 'Ballot Security' Measures*, NPR: ALL THINGS CONSIDERED, Jan. 9, 2018, available at https://www.npr.org/2018/01/09/576858203/decades-old-consent-decree-lifted-against-rncs-ballot-security-measures. While Hasen was referring to the activities of the Republican Party itself, the evidence here shows that these types of election security efforts have been undertaken by private groups like USEIP.

[36] *See* Atiba R. Ellis, *The Meme of Voter Fraud*, 63 CATHOLIC U. L. REV. 879, 908–9 (2014). Indeed, as scholar, and now presidential adviser, Justin Levitt observe, these groups effectively are engaged in a "hunt" for groups that the vigilantes believe are prone to commit fraud. *Id.* at 909 (citing Justin Levitt, *The Danger of Voter Fraud Vigilantes*, N.Y. TIMES (Oct. 29, 2012, 9:17 PM), available at http://campaignstops.blogs.nytimes.com/2012/10/29/the-danger-of-voter-fraud-vigilantes/. These groups often happen to be the poor and people of color.

[37] See also Ben Cady & Tom Glazer, *Voters Strike Back: Litigating Against Modern Voter Intimidation*, 39 N.Y.U. REV. OF LAW & SOCIAL CHANGE 173, 177–8 (2015) (describing the conduct of True the Vote and other similar "ballot security groups" as intimidating and summarizing how modern voter intimidation may consist of "aggressive poll-watching, anonymous threats of harm, frivolous and excessive voter registration challenges, and coercion by employers).

Expert Report of Atiba R. Ellis                              CO NAACP v. USEIP

voter intimidation, proving Hasen's prediction about a new wave of voter intimidation. We have

seen an uptick of violent activity directed not only at voters—and minority voters in particular—

but also at the election infrastructure necessary for a functioning democracy. These attacks have

been premised on the idea that voter fraud and election malfeasance—ideas that remain

unsubstantiated and that have been rejected by the courts in the wake of the 2020 election—have

infected the political process and must be ferreted out.

After the 2020 election, the Brennan Center for Justice at New York University Law School

reported that one-third of election workers reported feeling unsafe in their roles. Nearly 20% stated

that threats to their lives were a job concern.[38] Election workers Ruby Freeman and Shaye Moss

testified to the January 6 Congressional Committee that they had to hide in fear of their lives after

Rudy Giuliani and conservative media outlets accused the mother-daughter duo of conspiring to

commit election fraud.[39] Disproven conspiracy theories around the functioning of electronic voting

machines have not only been a target of the rhetoric of election denier activists since the 2020

election, they have elicited at least one Colorado county recorder to allegedly allow an

unauthorized person to obtain voter machine logs and forensic copies of the hard drives in Mesa

County, Colorado. These documents later emerged on the internet.[40]

Moreover, in the run-up to the 2022 midterm elections, and against the backdrop of

restrictive voting laws that arguably distort voting access in ways that disproportionately effect

minority voters, schools, churches, and other institutions that have traditionally been polling sites

---

[38] BRENNAN CENTER FOR JUSTICE AT NEW YORK UNIVERSITY, ELECTION OFFICIALS UNDER ATTACK, Jun. 16, 2021,
available at https://www.brennancenter.org/our-work/policy-solutions/election-officials-under-attack.
[39] Amy Gardner, *Election Workers Describe 'Hateful' Threats After Trump's False Claims*, WASH. POST, Jun 21,
2021 6:40 pm ET, available at https://www.washingtonpost.com/national-security/2022/06/21/ruby-freeman-shaye-
moss-jan6-testimony/.
[40] Mason Bissada, *Colorado County Clerk Indicted for Tampering with Voting Equipment*, FORBES, Mar 9, 2022
5:32 pm ET, available at https://www.forbes.com/sites/masonbissada/2022/03/09/colorado-county-clerk-indicted-
for-tampering-with-voting-equipment/?sh=5943893676e2.

Expert Report of Atiba R. Ellis                                     CO NAACP v. USEIP

are reconsidering whether to do so in light of the increase in election-related threats against such institutions. In short, these places are wondering whether it is safe to function as polling places. [41]

These threats have proven to be a present danger for voters as well. For example, in Maricopa County, Arizona, ten complaints about voter intimidation around vote drop boxes were submitted to state officials and then referred to the U.S. Justice Department. ABC News described the complaints:

> Five recorded complaints obtained by ABC News occurred between Oct. 17 and Oct. 22, outside ballot drop boxes at 501 S. 3rd Ave. in Phoenix and at the Mesa Juvenile Court, both in Maricopa County. Most described an instance of groups of individuals loitering near the drop boxes, filming and photographing voters as they returned their ballots and in some cases, taking photographs of the voters' license plates. One report described individuals dressed in "camo-clad gear" and photos from election officials show at least two armed individuals outside the Mesa drop box Friday.[42]

This history of violence at the polls from the antebellum era to the present day reveals a culture of voter intimidation that endures in the mindset of persons of color in the United States. How people of color perceive the actions of those who might look to intimidate or persuade cannot—and must not—be detached from the historical context from which these tactics stem from. As depicted, this history is one of enduring structural racism in the political process which—unfortunately—lives on today in the United States.

African Americans have had to endure another type of coercion and intimidation—that of the legitimacy of their votes being questioned, and implicitly, their rightful place in the democracy being contested. Strong rhetoric has shaped the perception of African American participation as

---

[41] Laura Romero et. al., *In Some States, Security Concerns Prompt Schools, Churches to Withdraw as Polling Places*, ABC NEWS, Sept. 20, 2022, 11:21 am, available at https://abcnews.go.com/US/states-security-concerns-prompt-schools-churches-withdraw-polling/story?id=90205062.

[42] Ali Dukakis & Libby Cathey, *Ten Cases of Alleged Arizona Voter Intimidation Referred to DOJ*, ABC NEWS, Oct. 28, 2022 8:50 pm, available at https://abcnews.go.com/Politics/cases-alleged-arizona-voter-intimidation-referred-doj/story?id=92054635.

Expert Report of Atiba R. Ellis                                      CO NAACP v. USEIP

one in which mere participation in the political process signals proof that African Americans cast illegitimate or fraudulent votes. This kind of questioning—and presumed exclusion—is often encapsulated in the phrase maintaining "the purity of the ballot box."[43] This is to say, the ballot box must be protected against those who are unworthy of the franchise as a means of protecting the integrity of elections, and oftentimes those boundaries of worthiness include race and poverty.

This is the cumulative effect of laws such as felon disenfranchisement laws, poll taxes, literacy tests, and other forms of exclusion based upon some form of status—the possession of a criminal record, the ability to pay a tax, or the ability to be educated enough to pass a reading test, all of which often implicate poverty.[44] Yet, the inability to pay or the possession of a criminal record wrongly implicate the moral worth of the individual. And unfortunately, exclusion from voting is oftentimes justified on this basis. With that exclusion comes a stigma. And despite the outlawing of many of these rules, or their effects minimized, this stigma persists.

Indeed, it is my opinion that this stigma is replicated in rhetoric that frames participation from minority—or outsider—groups as illegitimate and therefore subject to exclusion or higher stringency of evaluation in comparison to white voters. In other words, higher standards of stringency often reflect claims of protecting against those who are unworthy of voting, but that unworthiness may be more about the status of the person—their race or class—rather than their moral blameworthiness for exclusion from the franchise. In this way, by using an irrational basis

---

[43] For a recent overview of the loaded and contested nature of the phrase "purity of the ballot box," see Hannah Knowles, *A Texas Bill Drew Ire for Saying it Would Preserve 'Purity of The Ballot Box. Here's the Phrase's History.* WASH. POST May 9, 2021 at 3:02 pm EDT. Available at https://www.washingtonpost.com/history/2021/05/09/texas-purity-ballot-box-black/
[44] *See* Keyssar, *supra* note 1.

Expert Report of Atiba R. Ellis                                    CO NAACP v. USEIP

for creating a rule that raises the barriers to the franchise, one may be intimidated from the franchise.[45]

The demands for more stringent enforcement of such requirements above and beyond what the law requires or beyond what is mandated by election administrators may echo these claims of worthiness as a ground for exclusion from the franchise. This is especially true when historically, discriminatory devices were more rigidly enforced against African Americans while oftentimes, whites were exempt from or granted an exception to such bars. And this perception that African Americans, because the illegitimacy of their voting and the more searching view taken towards those voters, was encapsulated in the belief that the white establishment had to maintain the "purity of the ballot box."

Thus, modern claims around more rigid enforcement of election integrity measures absent concern for inclusion can be seen to echo "purity of the ballot box" rhetoric.[46] And given the racialized disparate treatment that African Americans suffered under such standards, modern conversations around extra-legal enforcement of election integrity encourage efforts to replicate or approximate this history of racialized suppression via a heightened standard of worthiness to exercise the vote.[47]

Given this problem of the rhetoric of worthiness around the right to vote, I think it important to clearly identify several separate senses in which voter intimidation has an effect. The

---

[45] This is not to raise questions in this report about the validity or legality of modern-day practices that may have a parallel to the Jim Crow-era practices, e.g., the continued use of felon disenfranchisement or the use of voter identification laws. These practices have been heavily litigated, but are beyond the scope of this litigation.

[46] *See* Bartlett v. Strickland, 556 U.S. 1, 25 (2009) ("Racial discrimination and racially polarized voting are not ancient history.").

[47] Prevention of Deceptive Practices and Voter Intimidation in Federal Elections: S. 453: Hearing before the Committee on the Judiciary, United States Senate, Congressional Record, One Hundred Tenth Congress, First Session (June 7, 2008) (discussing modern day tactics to deceive and intimidate voters of color).

Expert Report of Atiba R. Ellis                                    CO NAACP v. USEIP

first sense is voter intimidation by physical or personal threat.[48] The second sense is that of projected threats based on the belief one might face any irregularity in the exercise of one's right to vote and thus be subject to arrest jail or other loss of civil or political rights because of the exercise of that vote because they are not worthy of the vote.

A third sense is that of voter intimidation by deception. If the heart of voter intimidation is that manipulation may take place which persuades the voter to fail to vote or to vote in a way they would not otherwise have voted, then the use of falsehoods, misdirection, or misrepresentations may amount to intimidation.  In this sense, outright lies about the nature of the voting process, the mechanics of how one should vote, or even the shaking of one's confidence in whether one's vote may count may all amount to intimidation by deception. Indeed, while concerns about the validity of any given election may be protected speech exempt from governmental sanction by the First Amendment, the use of misinformation or disinformation to persuade a voter not to vote or to vote differently than how she may have wished to vote nonetheless amount to intimidation by deception.

The challenge in dealing with problems of voter intimidation is that intimidation by threat is oftentimes undocumented and fleeting. It is difficult to obtain testimony around voter intimidation as it often evades detection and is often based on the coded messages that are relayed around the political process and an individual's participation.[49] And it would follow from the nature of this intimidation that the person intimidated would likely not feel comfortable in reporting the threat since that may make the threat come to reality. Because of this, inference from the totality of the circumstances is necessary to provide accountability for voter intimidation.

---

[48] DOJ Manual, *supra* note 5, at 49-50.
[49] *Id*.

Expert Report of Atiba R. Ellis                                    CO NAACP v. USEIP

Additionally, voter intimidation is ever evolving alongside technology and our understandings of how voters may be manipulated. The foregoing history has sought to show that there is a range of actions that might constitute voter intimidation—from terrorism and open violence to coercion by brandishing weapons, to conduct that amounts to speaking in code, to innocent-appearing deceptions. Voter intimidation analyses are inherently fact dependent and thus require a case-by-case analysis to understand their effects.

However, one thing remains clear: acts which intimidate voters must be read for their effects on a voter's perception of what may happen if he or she votes. Moreover, voter intimidation should be understood within the historical context of how these patterns of violence, coercion, and deception may be used to manipulate and threaten voters, and especially voters of color, to the effect that they are left feeling like "less than a person."

### Part II: Anti-Voter Intimidation Policy in the United States

Since Reconstruction, Congress has sought to address the problem of voter intimidation.[50] And although Congress created civil and criminal remedies against voter intimidation, the elusive nature of intimidation renders many of these remedies unenforceable. Yet, it is my opinion that a generous application of understanding the facts and circumstances around voter intimidation actions will help courts accomplish the goals of the law.[51]

As the history discussed above shows, the ability to intimidate voters lies in the fact that civil and criminal conspiracies which deploy manipulation, deception, and violence dominated the Reconstruction period as means of depriving African Americans of the vote. Since Reconstruction,

---

[50] DOJ Manual, *supra* note 5, at 19.
[51] As a scholarly expert in this matter, I seek to offer an informed policy perspective to the parties and the court around these issues and I seek to interpret the actions of Defendants in that specific light. This opinion does not seek to replicate the legal arguments and directed applications of the law offered by counsel, nor has counsel asked me to create such arguments.

18

Expert Report of Atiba R. Ellis                          CO NAACP v. USEIP

Congress has sought to address these problems by pronouncing national policy against voter intimidation, as well as forbidding civil and criminal conspiracies directed at depriving fundamental rights.

Congress passed the Third Force Act which authorized the federal government to deploy troops to address the violence endemic to voting rights in that period. The Third Force Act, also known as the Ku Klux Klan Act of 1871, contained language now enforced under 42 U.S.C. § 1985(3). Section 1985(3) expressly outlaws private conspiracies to interfere with the right to vote. It makes it unlawful for "two or more persons to conspire to prevent by force, intimidation, or threat," any citizen from casting a ballot for the candidate of their choice.[52] This statute was designed to allow private citizens to vindicate their rights against conspiracies of private citizens that were directed at interfering with the rights of the plaintiffs.[53]

As noted above, the Klan and law enforcement had acted in the Reconstruction period to subvert the African American right to vote. Moreover, state governments were unwilling or unable to enforce their own laws equally on behalf of all citizens.[54] As such, Congress created the remedy in Section 1985(3) to provide for such protection via the federal courts. Indeed, as one member of Congress commented, by targeting the Klan, Section 1985(3) was meant to let private citizens address the actions of the Klan and other groups who were directly interfering with their constitutional rights—like the right to vote.[55] In this way, as Professor Stephanie Wildman put it,

---

[52] 42 U.S.C. § 1985(3).

[53] *See* Cady and Glazer, *supra* note 12, at 186-87 (demonstrating that the absence of debate over the anti-voter intimidation provisions illustrates that "Congress never doubted its authority to directly regulate interference in federal elections.")

[54] Stephanie M. Wildman, *42 U.S.C. § 1985(3)—A Private Action to Vindicate Fourteenth Amendment Rights: A Paradox Resolved*, 17 SAN DIEGO L. REV. 317, 321 (1979).

[55] *Id*. at 322 (quoting the Congressional Record and comments of Representative Garfield: "[I]t appears that in some of the southern States there exists a widespread secret organization whose members are bound together by solemn oaths to prevent certain classes of citizens of the United States from enjoying these new rights conferred upon them by the Constitution and laws; that they are putting into execution their design of preventing such citizens from enjoying

19

Expert Report of Atiba R. Ellis                                    CO NAACP v. USEIP

"the federal government would *assist* the states in meeting their constitutional obligations, rather than interfere with the states' attempts to enforce their own laws."[56] To the extent that this policy position was in doubt, those doubts were put to rest in *Griffin v. Breckenridge*[57] where the Court makes clear that the scope of 1985(3) reaches private conduct that interferes with the exercise of the fundamental rights protected under the Constitution. Moreover, *Griffin* made clear that racial animus falls squarely within the protections provided as well. Thus, to the extent that the record bares out a conspiracy to deprive Plaintiffs of their right to vote based on race, or on any deprivation of the right to vote via a conspiracy, Section 1985(3) is apt for this dilemma.

Additionally, Congress, during the Jim Crow era, found that voter intimidation continued to persist despite enforcement mechanisms created. Therefore, Congress added protections aimed at frustrating the act of voter intimidation specifically. For example, in 1957, Congress passed a Civil Rights Act that included measures to authorize the attorney general to pursue litigation against violations of the Fifteenth Amendment and other federal laws designed to prevent voter intimidation.[58] Specifically, Section 131(b) of the 1957 Civil Rights Act outlawed voter intimidation by private persons and by persons acting under color of state law.[59] While the claims in this case are now brought under this section, it does nonetheless exemplify the Congressional commitment to outlawing voter intimidation.

The criminal prosecution of voter intimidation schemes offers additional light on the national policy against voter intimidation. The Department of Justice's Manual on Election

---

the free right of the ballot box and other privileges and immunities of citizens, and from enjoying the equal protection of the laws.").
[56] *Id*. at 323.
[57] 403 U.S. 88, 105 (1971).
[58] *See* Cady and Glazer, *supra* note 12, at 188.
[59] *Id*. at 189.

Expert Report of Atiba R. Ellis                                    CO NAACP v. USEIP

Offences[60] makes clear that voter intimidation is an act designed "to deter or influence voting activity through threats to deprive voters of something they already have, such as jobs, government benefits, or, in extreme cases, their personal safety."[61] Additionally, intimidation is amorphous, largely subjective in nature since it lacks concrete evidence, and oftentimes lacks witnesses.[62] And while ordinarily witness testimony is necessary to convict one of a voter intimidation crime, one may also raise an alternate theory that a vulnerable population—such as one that is economically depressed or socially vulnerable—is being manipulated by the offensive conduct.[63] And this theory does not require witness corroboration for support.

Additionally, Congress sought to promote this anti-voter intimidation policy as part of Section 11(b) of the Voting Rights Act of 1965. This act serves as a separate provision from Section 1985(3), which contains both civil and criminal penalties for the act of voter intimidation, and in particular, addresses concerns around race. This provision, like the others outlined above, is designed to prevent private parties from blocking voters from exercising their voting rights, as well as forbidding behavior that could be fairly construed as seeking to prevent participation. It is meant to prevent behavior that could be fairly construed as intimidation, either in the run up to elections or for penalizing voters for their behavior after the voter has cast their ballot.

The scope of Section 11(b) is intentionally broad. Indeed, as drafter of the provision Attorney General Katzenbach explained, this provision was intended to be truly broad in its scope. Specifically, no intent or "purpose" need to be shown under Section 11(b):

> Under [the VRA] no subjective 'purpose' need be shown, in either civil or criminal proceedings, in order to prove intimidation under the proposed bill. Rather, defendants would be deemed to intend the natural consequences of their acts. This

---

[60] DOJ Manual, *supra* note 5.
[61] *Id*. at 49.
[62] *Id*.
[63] *Id*. at 50-51.

variance from the language of [the 1957 Act] is intended to avoid the imposition on
the Government of the very onerous burden of proof of 'purpose' which some,
district courts have—wrongfully, I believe—required under the present law.[64]

Congress adopted Attorney General Katzenbach's position regarding the law.[65]

The anti-voter intimidation provisions in Sections 1985(3) and 11(b) represent a policy of

preventing voter intimidation and ensuring free participation in the political by all individuals. In

other words, Congress has promoted through these statutes, a desire that every American would

not be subject to intimidation by domination, physical threat or deception by their fellow citizens.

There should be no penalty for rightly contemplating their vote, nor should there be one for casting

their vote. This policy is fundamental to the assurance of a democratic society. Each citizen should

not only be treated equally by the state, but also—and more importantly—by fellow citizens. And

unless we protect potential voters against these threats, the right to vote will be routinely called

into question.

It is my opinion that these laws that protect against voter intimidation—and ultimately

ensure that each citizen will be treated with equal dignity—stand for the proposition that citizens

cannot resort to "self-help" in order to correct what they might perceive as an irregularity within

the political process. The problems raised by the Ku Klux Klan and other social and political

actors—and indeed by political parties that sought to intimidate voters from voting—are

representative of a failure of American democratic social order. It is a direct attack upon the basic

principle of democracy that each citizen will be treated fairly by the government and that citizens

will treat each other with equal dignity and respect. It is an important corollary to that idea, that

voters then cannot undertake an effort to police the vote themselves in response to such

---

[64] Cady and Glazer, *supra* note 12, at 188 (quoting Voting Rights, Part 1: Hearings on S. 1564 Before the S. Comm.
on the Judiciary, 89th Cong. 16 (1965)).
[65] *Id.*

irregularities. They should instead leave it to the properly constituted government to address such irregularities.

Put simply, since Reconstruction, Congress has outlawed individual and conspiratorial conduct that could be fairly called "voter vigilantism." Voter vigilantism is any conduct by an individual or a group that would interfere by force or through cultivating fear with the process of voting, intimidate a voter for their vote or their decision to vote, use disinformation to question a vote cast, or otherwise persuade a voter not to vote or not to vote in a manner they would otherwise choose, goes against the long policy of protecting the right of each individual to cast a vote in the United States.

### Part III: Defendants' Conduct and Voter Intimidation

Based on the foregoing historical and policy background, this report will now turn to evaluating the allegations against the Defendants and the evidence adduced to date in discovery to opine as to the propriety of Defendants' conduct. It will address the Defendants' stated purpose for their conduct, but then analyze that purpose considering the evidence on the record to demonstrate that Defendants' conduct actually constitutes voter intimidation.

**Defendants' Stated Purpose**

My understanding is that the Defendant organization USEIP and the individuals Shawn Smith, Ashley Epp, and Holly Kasun claim to be engaged in a project of independently verifying voter activity through comparing data obtained from the Colorado Secretary of State's Office against data obtained through house-to-house canvassing designed to verify the identities of voters at a particular residence. They claim to gather information from voters about whether they state

Expert Report of Atiba R. Ellis                                    CO NAACP v. USEIP

that they voted in the 2020 election, their residency, and other data Defendants feel pertinent to

their independent election audit.

They state that their focus is on obtaining on-the-ground data that might help prove that

there were irregularities in either the Secretary of State's data or irregularities in the administration

of the 2020 election itself, which would serve to substantiate their allegations of voter fraud and/or

election fraud.[66] While the individual defendants explain that this is their approach, which on its

face may sound innocuous, their conduct and rhetoric suggests that they are engaged in

impermissible voter intimidation.

Defendants' beliefs and self-representations notwithstanding, the question here is whether

Defendants engaged in acts of voter intimidation through their statements and their canvassing

acts. My opinion is that Defendants engaged in a scheme of voter vigilantism that had the objective

and subjective effect of intimidating voters through their rhetoric and their aggressive canvassing.

Their conduct runs the risk of disturbing the balance allowed by voter intimidation laws by

depriving voters equal dignity, as well as their trust that their votes will be counted.

**The Playbook**

By its own terms, the "County & Local Organizing Playbook" published by USEIP

articulates the purpose for and approaches to their organizing and canvassing efforts.[67] The

"Playbook" states their motivations for this and would suggest that their goal isn't to simply alert

the public to election fraud and create evidence—their motivation is to engage in struggle and

---

[66] Despite the evidence that the election of 2020 was legitimately run and unimpacted by systemic or individual level fraud, Defendants nonetheless have the right to voice their concerns about election fraud. But the evidence in this matter would suggest that Defendants' voter vigilante scheme was something far different than a campaign to persuade the marketplace of ideas about the problem of election fraud. Their scheme transformed an argument about the integrity of American elections into a campaign to intimidate and generate fear about voting and an effort to make voters afraid to vote.

[67] U.S. Election Integrity Plan, *County & Local Organizing Playbook* (August 2021), https://useipdotus.files.wordpress.com/2021/08/useip_playbook_aug2021.pdf. [hereinafter "Playbook"].

24

Expert Report of Atiba R. Ellis                                    CO NAACP v. USEIP

violence to that end. In their own words, their efforts to engage the scourge of election fraud amount to a fight.

Specifically, the Playbook begins with a preamble that announces how "they crossed a line" by stealing "our election," and that by doing so, "they stole our Republic."[68] The "they" in this rhetoric is, presumably, the system—and all those involved in the system—of elections in Colorado—a broad, almost conspiratorial term. This belief is conveyed with certainty—the election, in their view, was—as a matter of fact—stolen. Moreover, this rhetoric signals that the stakes of USEIP's election integrity fight are high.

The Playbook states that "[i]f we allow the fraud to stand, we become complicit in the destruction of the greatest nation in the history of earth. We become complicit in their crime. No. No one is coming to save us. It's time to stand up."[69] Indeed, they emphasize that this fraud must be opposed openly, and consequences must be administered. "Until the truth of November 2020 comes to light, and the consequences felt those complicit realize [sic], we can have no confidence in government installed by them. And we do not consent to be governed by those elected through fraud."[70] In other words, those who participate in the fraudulent scheme must be made to feel the consequences of having stolen the election. They must pay for their crime, which is another way of saying that the wrongdoers must be punished. And the legitimacy of the government, and presumably, the rule of law, are able to be disregarded given the illegitimacy of the "fraud."

Defendants further develop this theme in the rhetorical flourishes scattered throughout the playbook. For example, the Playbook encourages its readers to think that this task of ensuring

---

[68] Playbook, *supra* note 67, at 2.
[69] *Id*.
[70] *Id*.

Expert Report of Atiba R. Ellis                                CO NAACP v. USEIP

election integrity is a literal fight over the state of American democracy that must be thought of in

warlike terms:

> But we are not in a time of peace. And everyone who values freedom and is
> committed to the fight for our Republic is now needed. If we can agree on the Bill
> of Rights, we can debate everything else later. The secret our enemy doesn't want
> you to know is that pretty much everyone agrees on the Bill of Rights.[71]

This rhetoric frames the strategies and plan of action laid out within the Playbook—this is the plan

to oppose the enemy since we are not in a time of peace.[72] In short, this rhetoric can be read as a

near declaration of war.

**Defendant Smith's Rhetoric**

While this rhetoric by itself may amount to bluster protected by the First Amendment, it

must be understood against the backdrop of exactly *how* Defendants propose to make "them"

suffer the consequences—that is, to pay for the crime of election fraud. Defendant Smith's public

statement about how to address election fraud makes it clear: "I think if you're involved in election

fraud, then you deserve to hang. Sometimes the old ways are the best ways."[73]

Smith's "old ways" of hanging all those involved in election fraud clearly evoke the tactics

of voter intimidation through threat, violence, and fear. This rhetoric echoes the history of

insurrection and lynching. Indeed, in the same remarks, he specifically directed this intent towards

---

[71] Playbook, *supra* note 67, at 7.

[72] Further, at least one reporter notes that this rhetoric and the phrase in the playbook, "We are the plan," are linked to the conspiracy group QAnon. *See* Erik Maulbetsch, *Colorado Election Conspiracy Group Going Door-to-Door in Search of 'Phantom Ballots,'* COLORADO TIMES RECORDER, Aug. 17, 2021, available at https://coloradotimesrecorder.com/2021/08/colorado-election-conspiracy-group-going-door-to-door-in-search-of-phantom-ballots/38866/.

[73] *See, e.g.,* Chase Woodruff, *Far-right election deniers gather for 'emergency' Castle Rock meeting after Tina Peters' arrest*, COLORADO NEWSLINE, Feb. 11, 2022 9:32 am, available at https://coloradonewsline.com/2022/02/11/far-right-election-deniers-gather-for-emergency-castle-rock-meeting-after-tina-peters-arrest/ (quoting Defendant Smith).

Expert Report of Atiba R. Ellis                                    CO NAACP v. USEIP

the Colorado Secretary of State herself.[74] This is the rhetoric of the "purity of the ballot box"—but instead of an open war against voters explicitly because of their race, this rhetoric represents a coded war against unworthy voters and the election system itself because they allegedly participate in election fraud.

### The Voter Intimidation Scheme

Smith's call to "return to the old ways" would appear to inform Defendants' voter intimidation campaign and provide context for their conduct. And the conduct, understood through the lens of their rhetoric, amounts to a campaign of pressuring and near terrorization that amounts to voter intimidation.

The evidence produced suggests that USEIP operatives have approached voters in their homes in an aggressive manner, and made inquiries about how voters voted—both in terms of the vote that they casted and the procedures that they engaged in. Although in their testimony the leaders of the group claim that they have been respectful, the evidence also suggests that members of their group have engaged in intimidating behavior.

News reports demonstrate that voters who were questioned by USEIP operatives were treated to a demanding inquiry about their address, their length of residency, their voting history, and, in effect, their legitimacy as voters.[75] According to these reports, this took place with a menacing attitude. Voter Michelle Garcia described her experience as demanding a lot of information about "who I voted for, who I supported." [76] Moreover, she described how the USEIP

---

[74] *Id.* (noting Defendant Smith's allegations that the Secretary of State was complicit with election fraud). This, of course, leaves the inference that the threat of violence towards election fraudsters is directed specifically at the Secretary herself. The article notes that the Secretary responded to this rhetoric as such via Twitter. *Id.* ("This video may be tough to watch, but I am sharing it so we can all see clearly: The threats against election officials like me are happening every day,' [Secretary of State] Griswold wrote.").

[75] Miles Parks, *The election denial movement is now going door to door*, NPR NEWS, July 21, 2022 5:00 am ET, available at https://www.npr.org/2022/07/21/1107023599/colorado-canvassing-election-integrity-plan.

[76] *Id.*

Expert Report of Atiba R. Ellis                                   CO NAACP v. USEIP

canvassers "would not stop until you answered their questions," according to the media report.[77]
Ms. Garcia also said, "There was no boundaries with their ethics or with civility. They will push
until you give an answer. They are very intimidating."[78]

     Moreover, given their premise of election fraud, it is likely that USEIP operatives have
spoken at length in these intimidating contexts about false information around the election itself.
Moreover, according to USEIP's own statements, they have reached out to over 10,000 homes in
Colorado.[79]And by doing so in a voter's home, that person would likely feel – and have objective
reason to feel – intimidated. This is impossible to verify, since, as the Department of Justice
recognizes, witness evidence of such intimidation is often difficult to obtain. But it seems
reasonable to infer that the rhetoric of the vigilante acting in the name of ferreting out crime
through home-grown investigation, coupled with the act of investigating by intimidating and quasi-
inquisition like behavior, would leave the target of such an investigation left with the impression
that they are suspected and at risk for doing what they have the constitutional right to do—vote.

     The record shows that USEIP operatives have badgered and pestered while wearing badges
that state their name and possibly their affiliation with USEIP. While it is not entirely clear what
those nametags said, given the evidence presented, the name "United States Election Integrity
Project" would at least suggest an official inquiry, possibly even by a governmental officer. This
would mark the kind of deceptive practice that would open the door for the kind of voter
intimidation by deception and disguise.

     Moreover, none of the internal policies stated any clear pronouncement that the canvassers
identify themselves as a private group as opposed to a governmental agency. There seems to be a

---

[77] Id.
[78] *Id.*
[79] *Id.*

Expert Report of Atiba R. Ellis                                    CO NAACP v. USEIP

high risk of confusion on the part of a respondent who could then predictably become afraid of an inquiry by someone they perceive to be a governmental agent. It would also seem likely that these discussions could then become focused on why this inquiry is being made—to evince voter fraud—which could reasonably be predicted to create apprehension among voters. Indeed, I would be concerned that an average voter who suffered through such inquiries would feel that the entire goal of such an inquiry would make them feel both doubtful about the validity of their own vote and of the election system. When done in a context of forceful menace, as the record here would suggest, the risk is high that such a voter would feel that they should avoid voting altogether—or suffer again from the threat turning into violence.

        This air of threat becomes even more dangerous when it is accompanied by firearms. The record shows that some number of USEIP operatives engaged in their canvassing while armed and felt it imperative to use arms while conducting USEIP business.[80] It also shows that USEIP canvassers were communicating with each other to "line up security," that is, ensure that there are armed USEIP members participating in the canvassing, and to ensure that USEIP members can communicate with each other to the extent that members might need to summon armed members while canvassing.[81]

---

[80] *See* Erik Maulbetsch, *Training Conspiracists in Other States to Knock Doors in Search of 'Phantom Ballots'*, COLORADO TIMES RECORDER, Oct. 1, 2021, available at https://coloradotimesrecorder.com/2021/10/colorado-election-fraud-group-is-training-conspiracists-in-other-states-to-knock-doors-in-search-of-phantom-ballots/39935/. (documenting how armed participants should communicate that fact with other USEIP members as they canvass). Reporter Maulbetsch also documents in this report how obtaining arms became a focus of USEIP and that at least one member of the group was motivated to get a concealed weapons permit because of the "rigged election that brought this group together." *Id.*; *see also* Maulbetsch, *Colorado Conspiracy Group Goes Door-to-Door*, *supra* note 72. ("Members of a QAnon-linked election fraud conspiracy group—some of whom are armed—are knocking on doors of voters across Colorado, attempting to find evidence of voter fraud.").

[81] *Id.*

> **Charity M,** USEIP Captain El Paso County
> 🟣 Deborah See above
>
> Thanks so much Pam.  That  is fantastic!!
>
> And we are attempting to line up security.  However, anyone who carries
> protection might want to let us know so we can offer your cell phone
> numbers to those who are concerned.
>
> *Jul 23*

(Image captured from cited article.) Moreover, Defendant Smith admitted in his deposition that he likely carried a firearm while engaged in canvassing.[82] Thus, to the extent that a voter would have seen these weapons while being questioned, or even if USEIP canvassers showed those weapons while making their queries, the risk of threat becomes extreme.

Thus, in my opinion, the record leaves the impression that USEIP operatives see themselves as a voter vigilante campaign. They have framed their campaign as a fight for the democracy from the forces of election fraud, engaged in a campaign of bullying and intrusion to ferret out the truth of election fraud that they believe exists, despite the lack of evidence of such a systemic threat. This then gives Defendants license to use intimidation as a means to bully voters in their homes and coerce the truth from them—through pushy tactics, through official-seeming names and badges, and through the carrying and possible brandishing of firearms.

Admittedly, this is not the grand marches of the Klan in robes and the use of burning crosses. But what it does represent is a public campaign that seeks to assert by intimidation and accountability of not only the State of Colorado, but also the voters of Colorado as to how they cast their votes and the legitimacy of their election process. Indeed, as reporter Erik Maulbetsch

---

[82] Defendant Smith in his deposition stated he probably carried a firearm as he canvassed. Smith Deposition at 218 ("I don't remember exactly if I did, but I probably did. . . . So I probably did have a firearm on me, although I can't say with certainty that I did.")

Expert Report of Atiba R. Ellis                                    CO NAACP v. USEIP

documented in his reporting, this group is motivated by an unequivocal conviction that the 2020 election was rigged.[83] This represents, in the words of another commentator, Quentin Young, a selection bias that runs the risk of making Defendants obsess over finding results that prove their claims,[84] which would make them prone to undertake intimidation to seek what they believe is the truth.

In my opinion, this kind of campaign can have the same chilling effect on a voter's desire to vote as a campaign of open marauders. While Defendants seek to mask the campaign as an innocuous search for the truth, the reality is that their efforts are public, they are announced as a "return to the old ways" of intimidation and threat, and that, according to the publicly available evidence of their bullying and pushiness, they seek to intimidate and coerce the truth about voting. This kind of behavior reasonably appears to a voter who suffered from it—especially if they are a voter of color—as if a voter vigilante squad is out there that will question their vote and threaten them if they cast their vote. This would then reasonably make that voter to think that they would vote despite this threat or, not to vote at all. That voter may feel that the threats and badgering evoke the "old ways" of lynching, bullying, and the exclusion from the political process by their neighbors—on threat of violence. This is the kind of intimidation that anti-voter intimidation laws were meant to prevent.

Further, it is not surprising that the record is not replete with evidence of this bullying around the votes cast in the 2020 election by USEIP. The threatening behavior of Defendants may not only chill voters from voting, but it may also chill the reporting of the behavior by those who

---

[83] Maulbetsch, *Colorado Conspiracy Group Goes Door-to-Door*, *supra* note 72. ("The group, called the U.S. Election Integrity Plan (USEIP), states unequivocally that the 2020 election was stolen and that members "do not consent to be governed by those elected through fraud."").

[84] Quentin Young, *Election deniers reveal themselves as charlatans*, Colorado Newsline, March 18, 2022 9:10 am, available at https://coloradonewsline.com/2022/03/18/election-deniers-reveal-themselves-as-charlatans/.

Expert Report of Atiba R. Ellis                                CO NAACP v. USEIP

have most suffered from it. The same ramifications for participating in the political process may also come if the voter visited reports the intimidating behavior. Rather than confront a threat presented by persons who are armed, assertive, and intimidating, the average person of color would simply endure it without reporting it because it is in their interest to protect their safety. And the voter of color who suffered this intimidation would reasonably believe that they are a particular target of this abuse and would suffer the same kind of threat that befell those who sought to vote in the worst violence of the Reconstruction and Jim Crow eras. After all, Defendants seek to bring back "the old ways."

Moreover, these inquiries run the risk of causing voters to believe that their votes may well have been illegitimate or that these voters would be perceived as being part of a conspiracy of casting illegitimate voters. Such inquiries into potential voter fraud—by alleged state actors— creates a possible chilling effect on voter participation, as potential voters may believe that they have—or will—break the law. In other words, voters subject to such an inquiry may question the legitimacy of their votes, thus in turn raising concerns about whether they should vote in future elections. This is chilling the right to vote by deception, which is no less voter intimidation than cajoling someone from voting by violence.

Whether it is feeling that their vote is worthless, or feeling that they should stay away from voting, when accompanied by a threat or a deception, voter intimidation statutes seek to allay this kind of threat. And if this veil of wrongfulness is laid upon a potential voter, these voter intimidation statutes provide a means for clarifying—and ultimately unveiling—one's proper role in a functioning democracy. To the extent that voters are not protected against campaigns of intimidation and deception, they may continue to question the legitimacy of their political rights.

Expert Report of Atiba R. Ellis                              CO NAACP v. USEIP

As this report has demonstrated, African American voters have been routinely subjected to acts of voter terrorism. This history, therefore, should inform the way voters of color perceive any encounter with investigating USEIP members. I believe it is fair to conclude that Latino voters also understand such conduct as threats and intimidation around the exercise of the right to vote. Latinos in this country have been the target of legal doctrines that imply that such voters are illegitimate by virtue of their lack of citizenship, and therefore should not be subject to the exercise of their rights. Latino voters have been mindful of the heightened proof of citizenship laws — passed in several states—and that these laws coupled with the rhetoric of violence like that of African Americans, leaves them equally vulnerable to acts of intimidation. In this sense, USEIP operatives who approach homes of voters of African American or Latino descent, and then are questioned with regard to their voting practices, may well be the subject of voter intimidation in violation of the United States Code.

## Conclusion

It is my view that the actions by the USEIP must be read within the context of the long history of voter intimidation in the United States, given that the practices described on the record fit within the historic patterns of violence, coercion, and threat. Defendants' actions raise the larger concern that voters without regard to their race or their voting activity have full, free, and fair access to the franchise.

Defendants' tactics of voter vigilantism appear to replicate the voter intimidation activities that have happened in every era of American history, including our own, and therefore should be subject to the heightened scrutiny of this Court as it assesses whether this organization and its leaders have violated 42 U.S.C § 1985(3) and Section 11(b) of the Voting Rights Act.

# ATTACHMENT B

# Atiba Rondell Ellis
**Professor of Law**
Marquette University Law School
Eckstein Hall | P.O. Box 1881
Milwaukee, WI  53201-1881
(414) 288-5372 | atiba.ellis@marquette.edu
http://www.atibaellis.com

# EDUCATION

**Duke University School of Law**
- Juris Doctor, May 2000
- William Louis-Dreyfus Scholar

**Duke University Graduate School of Arts and Sciences**
- Masters of Arts, History, May 2000
- Thesis (unpublished): *The Veil of Neutrality: The Poll Tax in Virginia 1903-1966*

**Duke University Trinity College of Arts and Sciences**
- Bachelor of Arts, *cum laude*, with Distinction in History, May 1996
- Honors Thesis: *The Rhetoric of Liberty: John Wesley and the Political Rhetoric of the American Revolution*

# ACADEMIC EMPLOYMENT

**Marquette University School of Law**, Milwaukee, WI
*Professor of Law*, August 2018 to present
*Boden Visiting Professor of Law*, Fall 2017

## Courses

- Election Law and Policy
- Civil Rights Litigation (Section 1983)
- Race Racism and American Law
- Race and the Constitution
- Voting Rights Seminar
- Race, Representation and Democracy
- Trusts and Estates
- Property

## Major Service

- Chair, Law School Diversity Committee (2019 to present)
- Member, Appointments Committee (2018-19; 2021-present)
- Member, University Academic Senate (2020 to present)
- Member, University Committee on Research (2019 to present)
- Member, Executive Committee, AALS Section on Election Law (2018 to present) (committee chair 2019)
- Member, New Scholar Committee, Southeastern Association of Law Schools (2014 to present)
- Member, Provost's Task Force on University Tenure Buyout Policy (Spring 2021)
- Race Ethnicity and Indigenous Studies Program, participating faculty
- Latina and Latino Critical Legal Theory, Inc., Board Member (2014 to present)

**West Virginia University College of Law**, Morgantown, WV
*Professor of Law,* June 2015 to July 2018
*Associate Professor of Law*, July 2009 to June 2015

### Courses

- Election Law and Policy
- Civil Rights Litigation (Section 1983)
- Race Racism and American Law
- Trusts and Estates
- Estate Planning
- Property
- WVU Law in Brazil Study Abroad

### Committees

- Advisory Committee, West Virginia University Humanities Center (2017 to 2018)
- Diversity and Inclusion Committee (2012 to 2018) (Co-Chair 2012-2016)
- WVU Law Alumni Magazine Editorial Board (2013-18)
- Promotion and Tenure Reporting Committee (2015-16)
- WVU Law Dean Search Committee (2014-2015)
- Faculty Appointments Committee (2010-2012)
- Subcommittee on Compliance and Assessment, Diversity Working Group for the 2020 Strategic Plan, West Virginia University (Chair) (2010)
- *Ad hoc* Committee on Policies and Procedures, West Virginia University Black Faculty Association (Chair) (2010)

### Community Activities

- West Virginia State Advisory Committee to U.S. Commission on Civil Rights (2015 to 2019) (Chair, Project Planning Committee)
- Advisory Board, J.R. Clifford Project, Charleston, W.V. (August 2010 to 2019)

**Howard University School of Law**, Washington, D.C.
*Legal Writing Instructor*, August 2006 to June 2009 (full time member of the governing faculty)

### Courses

- First-year Legal Reasoning Research and Writing
- Appellate Advocacy

### Major Professional Activities

- Co-Designed and Co-Taught *Star Trek and the Law Enrichment Series* (with Okainer Christian Dark and Andrew Taslitz)
- Co-directed (with Professor Josephine Ross) Alternative Spring Break Program for law students to provide volunteer legal assistance in New Orleans, LA.

# RESEARCH

## Books and Book Chapters

RACE RACISM AND AMERICAN LAW (with the late Derrick Bell, Cheryl Harris, Justin Hansford, Amna Akbar, and Audrey MacFarlane) (Aspen Publishing 7th ed. forthcoming 2023).

*Voter Registration and Election Litigation* in THE OXFORD GUIDE TO AMERICAN ELECTION LAW (E. Mazo, ed. Oxford University Press) (forthcoming 2024).

*It Ain't My Fault: Hip Hop, Confrontation, and Contemplation from the Jazz Perspective* in HIP HOP AND THE LAW (Pamela Bridgewater, et. al, eds., Carolina Academic Press 2015).

## Articles and Essays

*"This Lawsuit Smacks of Racism": Disinformation, Racial Coding, and the 2020 Election*, 82 LA L. REV. 453 (2022)

*The Voting Rights Paradox: Ideology and the Incompleteness of American Democratic Practice*, 55 GA. L. REV. 1553 (2021)

*Bug or Feature: The Long-Intertwined Legacy of Disinformation, Voting, and Race,* 100 B.U. L. REV. ONLINE 238 (2020)

*Voter Fraud as an Epistemic Crisis for the Right to Vote*, 71 MERCER L. REV. 757 (2020)

*The Dignity Problem of American Election Integrity*, 62 HOW. L. J. 739 (2019).

*Normalizing Domination*, 20 CUNY L. REV. 493 (2017)

*When Political Domination Becomes Racial Discrimination:* NAACP v. McCrory *and the Inextricable Problem of Race in Politics*, 68 S.C. L. REV. 517 (2017).

*Economic Precarity, Race, and Voting Structures,* 103 KY. L. J. 607 (2016).

*The Star Trek Enrichment Series: An Exploration in Teaching and Learning*, 58 HOWARD L. J. 557 (2015) (with Okianer Christian Dark).

*Reviving the Dream: Equality and the Democratic Promise in the Post-Civil Rights Era*, 2014 MICHIGAN ST. L. REV. 789 (2015).

*Tiered Personhood and the Excluded Voter: The Jurisprudence of Disenfranchisement in Twenty-First Century America*, 90 CHICAGO-KENT L. REV. 463 (2015).

*Race, Class, and Structural Discrimination: On Vulnerability in the Political Process*, 28 ST. JOHN'S J. CIV. RTS. & ECON. DEV. 35 (2015).

*A Price Too High: Efficiencies, Voter Suppression, and the Redefining of Citizenship*, 43 SW. L. REV. 549 (2014).

*The Meme of Voter Fraud*, 63 CATH. U. L. REV. 879 (2014).

Polley v. Radcliffe: *A New Way to Address an Original Sin,* 115 W. V. L. REV. 777 (2012).

Citizens United *and Tiered Personhood*, 44 JOHN MARSHALL L. REV. 717 (2011).

*The Cost of the Vote: Poll Taxes, Voter Identification Laws, and the Price of Democracy*, 86 DENVER L. REV. 1023 (2009).

## Works in Progress

*Voter Fraud and Election Gamesmanship*

*The New Election Intimidation*

INVENTING THE VICIOUS VOTER: THE METHODS AND RHETORIC OF AMERICAN VOTE SUPPRESSION (book proposal in progress)


# SELECTED BLOG POSTS AND OPINION WRITING

"Race, the Epistemic Crisis of Democracy, and the First Amendment." KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY BLOG (Invited contribution for "Lies and the Law" symposium) (October 12, 2021) https://knightcolumbia.org/blog/race-the-epistemic-crisis-of-democracy-and-the-first-amendment

"The Great Dissent: Justice Ruth Bader Ginsburg and Shelby County v. Holder", OXFORD HUMAN RIGHTS HUB BLOG, April 2021, https://ohrh.law.ox.ac.uk/the-great-dissent-justice-ruth-bader-ginsburg-and-shelby-county-v-holder/.

"President Trump has committed crimes in plain sight. Use the 25th Amendment to remove him." MILWAUKEE JOURNAL SENTINEL (January 8, 2021) https://www.jsonline.com/story/news/solutions/2021/01/08/remove-president-trump-using-25th-amendment/6589460002/

"Trump is lying about election fraud. It's distorting the 2020 presidential election." Milwaukee Journal Sentinel (November 6, 2020) https://www.jsonline.com/story/news/solutions/2020/11/06/trump-lying-election-fraud-its-distorting-2020-election/6187963002/

"What We Owe the Democracy: Martin Luther King, Jr., the Right to Vote, and the Call to Civic Duty," CANOPY FORUM ON THE INTERACTIONS OF LAW AND RELIGION AT EMORY UNIVERSITY (November 3, 2020) https://canopyforum.org/2020/11/03/what-we-owe-the-democracy/

"This Fourth of July is Yours, Not Mine," (July 2, 2020) https://atibaellis.com/2020/07/02/this-fourth-of-july-is-yours-not-mine/

"When Diversity is At the Bottom of the List," RACE AND THE LAW PROF BLOG (March 6, 2019) https://lawprofessors.typepad.com/racelawprof/2019/03/when-diversity-is-at-the-bottom-of-the-list-1.html

"The Mirror of Racial Tyranny in the Civil Rights Cases," RACE AND THE LAW PROF BLOG (October 19, 2018) https://atibaellis.com/2018/10/19/the-mirror-of-racial-tyranny-in-the-civil-rights-cases/

"Give Us the Ballot: On the Alabama Special Senate Election, Voter Suppression, and the Black Vote," (December 14, 2017) https://atibaellis.com/2017/12/14/give-us-the-ballot-on-the-alabama-special-senate-election-voter-suppression-and-the-black-vote/

"Teaching *Dred Scott* in the Era of Trump," (September 7, 2017) https://atibaellis.com/2017/09/07/teaching-dred-scott-in-the-era-of-trump/

"On Overstating the Case for Confederate Monuments," (August 23, 2017) https://atibaellis.com/2017/08/23/on-overstating-the-case-for-confederate-monuments/

"Trump, the Meme of Voter Fraud, and the Risk to American Democracy," (November 29, 2016) https://atibaellis.com/2016/11/29/trump-the-meme-of-voter-fraud-and-the-risk-to-american-democracy/

October 2022 CV                                    Professor Atiba R. Ellis, page 5 of 11

"Antonin Scalia's Voting rights Legacy: Weakening the Franchise for Minorities," OXFORD HUMAN RIGHTS HUB BLOG, (March 3, 2016) http://ohrh.law.ox.ac.uk/antonin-scalias-voting-rights-legacy-weakening-the-franchise-for-minorities/

Editor, Alternative Constitution Day Online Symposium, RACE AND THE LAW PROF BLOG, (January 30 to February 16, 2016) http://lawprofessors.typepad.com/racelawprof/2016/01/coming-soon-alternative-constitution-day.html et. seq.

"The Limits of Diversity-As-Tolerance," RACE AND THE LAW PROF BLOG, (October 8, 2015) http://lawprofessors.typepad.com/racelawprof/2015/10/does-the-content-of-celebrating-diversity-defeat-equality.html

"Missing Black Men, the Baltimore Uprising, and the Language Oppression," AMERICAN CONSTITUTION SOCIETY BLOG (May 1, 2015) http://www.acslaw.org/acsblog/missing-black-men-the-baltimore-uprising-and-the-language-of-oppression

"Voter Identification, Ideology, and the Voter Fraud Meme," AMERICAN CONSTITUTION SOCIETY BLOG (Nov. 3, 2014) http://www.acslaw.org/acsblog/voter-identification-ideology-and-the-voter-fraud-meme

"The Constitution, Re-Invention and Equality," AMERICAN CONSTITUTION SOCIETY BLOG (Sept. 19, 2014) http://www.acslaw.org/acsblog/the-constitution-re-invention-and-equality

"Seeing Ferguson through the Lens of Structural Racism," AMERICAN CONSTITUTION SOCIETY BLOG (Aug. 21, 2014) http://www.acslaw.org/acsblog/seeing-ferguson-through-the-lens-of-structural-racism

"*Shelby Co. v. Holder:* The Crippling of the Voting Rights Act," AMERICAN CONSTITUTION SOCIETY BLOG (June 27, 2013) http://www.acslaw.org/acsblog/shelby-co-v-holder-the-crippling-of-the-voting-rights-act


# SELECTED PRESENTATIONS[1]

Speaker, panels on "Narrowing of the Voting Rights Act" and "Election Gamesmanship," <u>Election Law Issues in the Past, Present, and Posterity</u>, University of Toledo Law Review Symposium, October 14, 2022.

"Race, Equity, & Law: A Lecture by Professor Atiba Ellis," Woman's Clube of Wisconsin, Milwaukee, WI, October 7, 2022.

"Free Speech and Student Grievance: The Decline of *Tinker v. Des Moines* and the Future of Protest," Keynote Address, Virgin Islands Bar Association 28th Annual High School Moot Court Competition, April 7, 2022.

"Race, Voting, and the Future of Democracy," CLE Program for the Wisconsin African-American Lawyers Association, March 26, 2022.

"Inventing the Vicious Voter," Faculty Workshop, St. Louis University School of Law, March 23, 2022 (in person).

"Inventing the Vicious Voter," Faculty Workshop, Case Western Reserve University School of Law, March 15, 2022 (in person).

---

[1] Unless otherwise noted, all presentations listed from April 2020 to April 2022 were virtual.

October 2022 CV                                Professor Atiba R. Ellis, page 6 of 11

Featured Guest, "Tea Time with the Jackson Center" Online Series <u>Democracy on Trial</u>, Robert H. Jackson Center, Jamestown, NY February 24, 2022.[2]

Panel Chair, "Critically Interrogating the Twin Promises of American Democracy: Politics, Economics, and the Struggle for Full Equality," for <u>Critical Race Theory: Truth, Lies & the Law</u> Conference, University of Memphis Cecil C. Humphreys School of Law and Memphis Bar Association, February 4, 2022.

Panelist, "The Evolution of Voter Suppression," for <u>The Aftermath of the 2020 Presidential Election: Voter Suppression, Misrepresentation, and Electoral Reform</u>, Cardozo Law Review 2022 Symposium, January 27, 2022.

"A Conversation on Voting with Professor Atiba Ellis," Creighton University School of Law and Creighton Black Law Students Association, January 14, 2022 (in person).

Panelist, "On the Issues: Changes to Election Laws—Is Your Right to Vote Secure?" Lubar Center for Public Policy at Marquette University Law School, October 20, 2021

"The Battle for the Ballot Box: A Comprehensive Analysis of Voting Challenges in America," Center for Excellence in Decision-Making, University of Memphis Cecil C. Humphreys School of Law, October 19, 2021

Panelist, "Election Lies and the First Amendment," <u>Lies and the Law Series</u>, Knight Foundation for the First Amendment, Columbia Law School, October 13, 2021 https://knightcolumbia.org/events/lies-and-elections

Panelist, "Race and Redistricting — Wisconsin's Maps and the Voting Rights Act," North Shore Fair Maps Monthly Meeting, October 11, 2021

Featured Speaker, "Protect the Vote," Dane County League of Women Voters Meeting, October 5, 2021

Panelist, "Voting Rights Past, Present, & Future: Constitutional, Legal, and Historical Context" Missouri Bar Association Annual Meeting Plenary, Sept. 24, 2021

Plenary Keynote, "Facts and Fiction on Critical Race Theory," West Virginia Conference of Chapters of the NAACP Annual Meeting, August 13, 2021

Discussant of paper by Charlton Copeland, "Race, the Republican Party, and the Marketing of Voter Fraud," John Mercer Langston Legal Scholarship Conference, July 8, 2021

Panelist, "State of Play: Voter Suppression Bills in the Wake of the 2020 Election," American Constitution Society, April 29, 2021

"The Voting Rights Paradox," University of Kentucky College of Law Faculty Colloquy, April 7, 2021

"The Voting Rights Paradox," <u>150 Years of Voting in America</u>, Georgia Law Review Symposium, March 25, 2021

---

[2] The Center promotes the legacy of Robert H. Jackson—Nuremburg Chief Prosecutor, Solicitor General, and Supreme Court Justice—and educates on the principles of justice and the rule of law by exploring ideas around law, democracy, and fairness.

"This Lawsuit Smacks of Racism: Racial Coding and the Litigation of the 2020 Election," The Impact of the 15th and the 19th Amendments on the 2020 Presidential Election, Louisiana Law Review Symposium, March 5, 2021

Panelist, "The Political Economy of Inequality, Democracy, and Oligarchy," Law and Political Economy Project, Yale Law School, November 13, 2020. https://lpeproject.org/events/inequality-democracy-oligarchy/

Panelist, "The Jurisprudence and Legacy of Justice Ginsburg," Florida International University School of Law, October 30, 2020.

Panelist, "2020 U.S. Presidential Election Preview," Northern Virginia Community College, October 27, 2020.

Panelist, "Fair Representation in an Increasingly Diverse America," Voting and Representation Symposium, NYU Law Review and Brennan Center for Justice, NYU School of Law, October 9, 2020. https://youtu.be/T-fg-buuxX0

Panelist, "Critical Race Theory, the 2020 Election and Structural Reform," Democracy Reform for the 21st Century, California Law Review Symposium, UC Berkeley School of Law, September 14, 2020. https://youtu.be/bj1wmEtOEXU

Discussant, "The Future of Inclusivity" Discussion Group, Southeastern Association of Law Schools Annual Meeting, August 2, 2020.

"The Voting Rights Paradox: Ideology and the Incompleteness of Democratic Practice," Colorado Law School 2020 Rothgerber Conference, Women's Enfranchisement: Beyond the Nineteenth Amendment, Justice Byron R. White Center for Constitutional Law, April 3, 2020. https://youtu.be/_NR_fParT3k

Moderator, "The Present and the Future of the Right to Vote," Joint Program of the Sections on Constitutional Law and Election Law, Divergent Legacies – The Constitution and the Modern Right to Vote, Association of American Law Schools Annual Meeting, Washington, DC, January 2, 2020.

Moderator, New York University Law Review Lunchtime Series on The Anatomy of Racism and Inequality: Race and an Exclusionary American Democracy, NYU Law School, November 4, 2019.

Participant, "Critical Voices: Impeachment and Beyond," CUNY School of Law, November 4, 2019.

"Integrity, Equality, and the Fragility of the Right to Vote" Constitution Day Lecture, University of Puget Sound, September 20, 2018.

"Integrity, Equality, and the Fragility of the Right to Vote" Constitution Day Lecture, Penn State University School of Law, University Park, September 18, 2018.

Participant, "The Perils and Possibilities of Election Commissions," American Constitution Society, National Press Club, Washington, D.C., January 18, 2018. https://youtu.be/7-oBVrXB924

Participant, On the Issues with Mike Gousha: Voting Rights, Marquette University Law School, Eckstein Hall, November 16, 2017.

"Using Memes to Break out of Voter Fraud Talk," TEDxOshkosh, Grand Opera House, Oshkosh, WI, November 4, 2017. https://youtu.be/ekwzu0hIvYI

Participant, National Constitution Center Debate on Voter Identification Laws. Chicago, Il. October 5, 2016. https://constitutioncenter.org/blog/video-are-state-voter-id-laws-unconstitutional/.

Panelist, "Reality Check! Voting Rights Are LGBT Rights!" LGBT Bar Association Lavender Law Annual Conference, Keynote Panel, Washington, D.C. August 4, 2016.

"The Ideological Content of Election Integrity Laws." Marquette University School of Law (Faculty Colloquy) April 18, 2016.

"The Meme of Voter Fraud." Northeastern University School of Law (Law Journal Symposium on Accessing Democracy: How Law Shapes and Influences Our Elections) March 11, 2016.

"Give Us the Ballot: Martin Luther King, Jr. and the Ongoing Project of Voting Rights." Washington and Lee University School of Law (Martin Luther King, Jr. University Holiday Celebration Panel on Voting Rights) January 18, 2016.

"The Constitutional, Institutional, and Interpersonal Imperatives of Diversity." Crowell and Moring, LLC, Washington, DC (Diversity Speaker Series) October 14, 2015.

"The Voting Rights Act at 50: Past Successes, Future Challenges." West Virginia University College of Law (Constitution Day Program 2015) September 17, 2015.

"Transforming the Second Reconstruction: The Right to Vote after *Shelby County*." United States Department of Justice (Lecture Series on 50th Anniversary of the Voting Rights Act, Washington DC) June 9, 2015.

"Shared History as Reparations: *Polley v. Radcliffe* As Path Towards a Public Understanding of Slavery." Mansfield College, Oxford University (First Global Conference: Slavery: Past, Present and Future, Inter-Disciplinary.Net) July 9, 2015.

"Race, Class and Voter Suppression: Structural Inequality and the Political Underclass." Tulane Law School (Forum on the Future of Law and Inequality) November 7, 2014.

"Voting Rights in West Virginia: Hanging by a Thread." Testimony to the National Commission on Voting Rights, Nashville Regional Hearing, Nashville, TN. May 8, 2014.

"A Price Too High: Efficiencies, Voter Suppression, and the Redefining of Citizenship." Southwestern Law School (Classcrits VI) November 16, 2013.

"The Political Economy of Disenfranchisement: Towards a Systemic View." Law and Society Association Conference, Honolulu, HI. June 5, 2012.

"Old Exclusion in a New Guise: Voter Identification Laws and the Risk of Disenfranchisement." Duke University School of Law (Federalist Society Debate Series) February 7, 2012.

"The Judicial Underpinnings of Disenfranchisement." Race, Law and Voting—Was Creating West Virginia a Good Idea? (featured presenter) Continuing Legal Education Program sponsored by J. R. Clifford Project of West Virginia, Charleston, WV. October 19, 2011.

"*Citizens United* and the Concept of Personhood." John Marshall Law School, Chicago, IL. (John Marshall Law Journal Symposium, The Impact of *Citizens United*: Corporate Speech in the 2010 Elections) March 4, 2011.

"From *Dred Scott* to *Citizens United*: Political Personhood and the Future of the Political Process." Capital Law School (Ohio Area Legal Scholarship Workshop) February 5, 2011.

"The Diversity Rationale: What it Means and Why It Matters." West Virginia University (University Diversity Week Address) October 2010.

"Political Power, Personhood and Property: Defining the Political Economy of American Democracy." University of Kentucky College of Law (Developing Ideas Conference) May 2010.

"Yield not to Temptation:  Post-Racialism, Civil Rights and the Obama Moment."  Southern University Law Center. (SULC Journal of Race, Gender, and Poverty symposium: State of the Union:  The Progress Report) February 2010.

## SELECTED RECENT NEWS MEDIA

Hansi Lo Wang, "Who counts as Black in voting maps? Some GOP state officials want that narrowed," MORNING EDITION, NATIONAL PUBLIC RADIO, October 18, 2022 5:04 AM ET
https://www.npr.org/transcripts/1126287827

"The Voting Rights Act," ALL SIDES WITH ANN FISHER, WOSU 89.7 FM, June 22, 2022 (NPR affiliate-discussion panel exploring history and future of the VRA) https://news.wosu.org/show/all-sides-with-ann-fisher/2022-06-22/the-voting-rights-act

Bridgit Bowden and Shawn Johnson, "With the help of two Supreme Courts, Republican map prevails" MAPPED OUT PODCAST, WISCONSIN PUBLIC RADIO, June 1, 2022 https://www.wpr.org/mappedout/help-two-supreme-courts-republican-map-prevails

Matt Mencarini, "'Blurring of lines': Private lawyer plays starring role in taxpayer-funded Wisconsin election probe" WISCONSIN WATCH, April 23, 2022, https://wisconsinwatch.org/2022/04/private-lawyer-plays-starring-role-in-taxpayer-funded-wisconsin-election-probe/

Susan Davis and Carrie Johnson, "The Rise and Fall of the Voting Rights Act of 1965" NPR POLITICS PODCAST, July 29, 2021, https://www.npr.org/transcripts/1022343670 (featured guest)

Courtney Gerrish, "Expert Says Trump Campaign's Lawsuit Will be 'Uphill Battle'" SPECTRUM NEWS WISCONSIN, December 2, 2020 https://spectrumnews1.com/wi/madison/news/2020/12/02/marquette-university-law-school-professor-trump-wisconsin-lawsuit

"Here and Now" Weekly News Magazine, "Presidential Recount and Marginalized Communities," PBS WISCONSIN, November 27, 2020. https://pbswisconsin.org/watch/here-and-now/presidential-recount-and-marginalized-communities-o3oe1k/

Mary Spicuzza and Alison Dirr, "In suspicions raised about validity of Milwaukee's vote, leaders see harmful racial undertones," MILWAUKEE JOURNAL SENTINEL November 18, 2020.
https://www.jsonline.com/story/news/politics/elections/2020/11/18/suspicions-raised-validity-milwaukees-vote-leaders-see-harmful-racial-undertones/6252705002/

"'Embarrassing for Texas': Wisconsin AG slams Texas for suing over Wisconsin election," CBS 58 NEWS, December 8, 2020 https://www.cbs58.com/news/texas-attorney-general-sues-wisconsin-3-other-states-over-election-results

Scott Hurley and Charlee Rubesky, "Green Bay mayor, clerk named as defendants in latest Trump lawsuit," FOX 11 NEWS (Green Bay, WI) December 3, 2020.
https://fox11online.com/news/election/green-bay-mayor-clerk-named-as-defendants-in-latest-trump-lawsuit

Brendan Cullerton, "Experts see Trump legal strategy to win White House as a longshot," CBS 58 News, November 6, 2020. https://www.cbs58.com/news/experts-see-trump-legal-strategy-to-win-white-house-as-a-longshot

Kay Burley, "How will Trump's court challenges work?" SKY NEWS, November 5, 2020
https://twitter.com/KayBurley/status/1324239434330624000?s=20

RTE News (Ireland) at 9 Interview, Litigation regarding the 2020 Election, November 5, 2020

BBC TV (London, England) Challenges around the 2020 Election, November 4, 2020

Gerald Owens, "Professor: Efforts to interfere with vote counting amount to 'desperation'" WRAL-TV November 4, 2020. https://www.wral.com/professor-efforts-to-interfere-with-vote-counting-amount-to-desperation/19371227/

Sarah Matusek, "Poll watching: Democratic safeguard or intimidation" CHRISTIAN SCIENCE MONITOR October 23, 2020 https://www.csmonitor.com/USA/Politics/2020/1023/Poll-watching-Democratic-safeguard-or-intimidation

Caroline Reinwald, "On 'Loving Day' experts point out many things have not changed since Civil Rights movement," WISN-TV, June 13, 2020. https://www.wisn.com/article/on-loving-day-experts-point-out-many-things-have-not-changed-since-civil-rights-movement/32856122

# REPRESENTED ADVOCACY

*Moore v. Harper*, BRIEF OF *AMICI CURIAE* BOSTON UNIVERSITY CENTER FOR ANTIRACIST RESEARCH AND PROFESSOR ATIBA R. ELLIS IN SUPPORT OF RESPONDENTS, (United States Supreme Court, No. 21-1271, October 26, 2022).

*Jones v. DeSantis, Governor of Florida, AMICI CURIAE* BRIEF OF VOTING RIGHTS SCHOLARS PROFESSORS JOSHUA A. DOUGLAS, ATIBA ELLIS, LUIS FUENTES-ROHWER, BERTRALL ROSS, DAVID SCHULTZ, AND FRANITA TOLSON IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE, (U.S. Court of Appeals for the Eleventh Circuit, No 20-12003, August 3, 2020).

*Shelby County v. Holder*, BRIEF OF GABRIEL CHIN, ATIBA ELLIS, CHRISTOPHER S. ELMENDORF, JANAI S. NELSON, BERTRALL ROSS, DANIEL TOKAJI, AND FRANITA TOLSON AS *AMICI CURIAE* IN SUPPORT OF RESPONDENTS (United States Supreme Court, No. 12-96, February 1, 2013).

# OTHER PROFESSIONAL AFFILIATIONS

**Colorado Area NAACP et. al v. United States Election Integrity Project et. al**
Expert Witness for Plaintiffs in Voter Intimidation Lawsuit, August 2022 to present

**Duke University School of Law**, Durham, NC
*Visiting Scholar*, Spring 2017

**Akin Gump Strauss Hauer & Feld, LLP**, Washington, D.C.
*Associate*, October 2002 to May 2006
*Summer Associate*, May 1999 to August 1999

**The Honorable Theodore A. McKee**
United States Court of Appeals for the Third Circuit
*Law Clerk*, September 2001-September 2002

**The Honorable James A. Beaty, Jr.**
United States District Court, Middle District of North Carolina
*Law Clerk*, September 2000-July 2001

**Professor James E. Coleman, Jr.**, Duke University School of Law
*Research Assistant*, 1998-2000

**The Honorable Willis P. Whichard**,
Associate Justice, Supreme Court of North Carolina, Raleigh, N.C.
*Judicial Intern*, May 1998-August 1998

# SOCIAL MEDIA PLATFORMS

**Professional Blog (linking to research, public scholarship, and authored commentary)**

- http://www.atibaellis.com/

**Co-Edited Blog**

- Editorial Board Member, Race Rights and the Law Blog (formally Race and the Law Prof Blog) https://www.civilrights.pitt.edu/blog (Recognized in ABA Blawg 100 in 2016, 2017)

**Twitter**
- @atibaellis

# HONORS

Living the Dream Award, West Virginia Martin Luther King, Jr. State Holiday Commission, January 2015 (in recognition of research and lecturing on voting rights)

Outstanding Faculty Contribution Award, West Virginia Law Review, April 2015

Frances Bounds Excellence in Leadership Award, North Carolina Association of Student Councils, March 2008.

# COURT AND BAR ADMISSIONS

North Carolina State Bar, November 2002
District of Columbia Bar, September 2003
U.S. District Court, District of Columbia, February 2004