**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-00581-CNS-NRN

Colorado Montana Wyoming
State Area Conference of the NAACP,
League of Women Voters of Colorado, and
Mi Familia Vota,

      Plaintiffs,

v.

United States Election Integrity Plan, Shawn Smith,
Ashley Epp, and Holly Kasun,

      Defendants.

---

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT (ECF NO. 70)**

---

**INTRODUCTION**

Defendants United States Election Integrity Plan ("USEIP"), Shawn Smith, Ashley Epp,

and Holly Kasun's motion for summary judgment should be denied. Defendants seek summary

judgment on Plaintiffs' claims that Defendants engaged in a door-to-door voter intimidation

campaign in violation of the Voting Rights Act and Ku Klux Klan Act. Defendants' position rests

almost entirely on their contention that Plaintiffs have presented no evidence that Defendants

intimidated or attempted to intimidate voters. This, however, is untrue. As set forth herein,

Plaintiffs have presented evidence, not only of Defendants' threatening and intimidating public

statements, such as Mr. Smith's public exclamations that anyone involved in election fraud

"deserves to hang," but also of voters who have been contacted by USEIP and unquestionably felt

1

intimidated by their conduct. Colorado voter, Yvette Roberts, for example, describes the USEIP's agents who appeared at her doorstep as "intimidating" and their questioning as "invasive" and "personal." In fact, Ms. Roberts was so upset and concerned by USEIP's actions that she lodged a complaint with the Colorado Secretary of State. Defendants have not and cannot demonstrate that there are no genuine issues of material fact entitling them to summary judgment. Accordingly, their motion should be denied.

## RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS

1. Plaintiffs admit that USEIP is an unincorporated organization.

2. Plaintiffs admit that USEIP has conducted door-to-door canvassing. As set forth in Plaintiffs' Statement of Additional Disputed Facts, however, Plaintiffs deny that USEIP's door-to-door canvassing efforts were simply to "confirm the information contained in the Secretary of State's voter rolls."

3. Plaintiffs admit that Beth Hendrix is the Executive Director of the League of Women Voters of Colorado.

4. Plaintiffs admit that Portia Prescott is the State President of the NAACP Colorado Montana Wyoming State-Area Conference of the NAACP ("NAACP Colorado").

5. Plaintiffs admit that Salvador Hernandez is the Colorado State Director of Mi Famila Vota.

6. Plaintiffs deny that Mi Familia Vota has no personal knowledge of Defendants or Defendants' activities. Preliminarily, Defendants did not notice and have not taken an

organizational deposition of Mi Familia Vota.[1]  Further, Defendants have made their actions well-known by—among other things—publishing a Playbook with their plans regarding their door-to-door campaign and a report summarizing their activities. (*See* Exhibits A & B.)

7.  Plaintiffs admit that Mi Familia Vota has not identified a member who claims they were intimidated, coerced, or threatened by Defendants.

8.  Plaintiffs deny that Mi Familia Vota can only speculate about how its resource were diverted in response to Defendants and their activities. For example, Salvador Hernandez, testified that Mi Familia Vota spent additional time and resources training its phone banker concerning USEIP's activities. (Exhibit C ("Hernandez Dep.") 31: 14-23; *see also* Hernandez Dec. (ECF No. 10) (describing the resources diverted by Mi Familia Vota in response to USEIP's actions).)

9.  Plaintiffs deny that NAACP Colorado has no personal knowledge of Defendants or Defendants' activities. Preliminarily, Defendants did not notice and have not taken an organizational deposition of NAACP.  Further, Defendants have made their actions well-known by—among other things—publishing a Playbook with their plans regarding their door-to-door campaign and a report summarizing their activities. (*See* Exhibits A & B.)

10. Plaintiffs admit that NAACP has not identified a member who claims they were intimidated, coerced, or threatened by Defendants.

---

[1] Defendants argue that deposition testimony offered by Mr. Hernandez, Ms. Prescott, and Ms. Hendrix binds each of their organizations because a party seeking to depose a corporate may "notice a corporation by a particular officer, director or managing agents pursuant *to Rule 30(b)(6)." GTE Products Corp. v. Gee*, 115 F.R.D. 67, 68 (D. Mass. 1987) (emphasis). Defendants' contention is fatally flawed, however, because Defendants did not notice the depositions as 30(b)(6) organizational depositions and, as such, the deponents' testimony does not bind their respective organizations as a whole.  (*See* Exhibits C, D, & E.) Put another way, other representatives from Plaintiffs' organizations may also offer testimony, for example, about the impact of Defendants conduct on their members.

11. Plaintiffs deny that NAACP can only speculate about its resources that were diverted in response to Defendants or their activities. For example, Portia Prescott testified that—in response to USEIP's door-to-door campaign—NAACP Colorado was forced to change its programming to include voter intimidation education.  As a result, other NAACP programs, such as programs related to gun violence prevention, health, education, and LGBT protections suffered. (Exhibit D ("Prescott Dep.") 42:8-43:21; *see also* Prescott Dec. (ECF No. 9) (describing the resources diverted by NAACP Colorado in response to USEIP's actions).)

12. LWVCO admits that it has a member who was visited by two USEIP representatives, who began questioning her about her voting record, especially in regard to the 2020 election.  (Hendrix Dep. 13:3-7; 15:7-12.)  The member reported that the USEIP representatives "were wearing lanyards with laminated nametags that she felt were trying to look governmental."  (Exhibit E ("Hendrix Dep.") 13:3-7.)   In addition, the LWVCO member reported that the USEIP representatives took a picture of her home. (Hendrix Dep. 13:8-10.)  Although the member reported that she was not personally intimidated by USEIP's actions, she "stated that she felt such visits could be intimidating to voters who don't understand their rights."  (Hendrix Dep. 38: 8-11.)

13. Plaintiffs admit that LWVCO first learned of Defendants and their voter intimidation campaign though newspaper and other media articles.

14. Plaintiffs admit that Mi Familia Vota first learned of Defendants and their voter intimidation campaign through Beth Hendrix of LWVCO.

15. Defendants deny that no Colorado voter or potential Colorado voter has been identified who was intimidated, coerced, threatened, or harassed by Defendants. Preliminarily, Plaintiffs identified three voters in its Rule 26(a)(1) disclosures who were contacted by USEIP—Anne

Landman, Michelle Garcia, and Yvette Roberts.[2]  (*See* Exhibit F.)  By way of example, Ms.

Roberts, who is a registered Colorado voter who resides in Grand Junction, Colorado, reported

that—following the 2020 election—a man and a woman affiliated with the group United States

Election Integrity Plan came to my home and began asking me invasive and personal questions.

(Roberts Dec. ¶¶ 1-2, 5.)  More specifically, they asked a series of questions including whether

she was a resident of Colorado, whether she was a registered voter, whether she was a United

States citizen, who in the household is a citizen, whether she was the only voter of her household,

whether she had voted in the last election, and how she voted in the last election. (Roberts Dec. ¶

8.) Ms. Roberts was particularly alarmed by the questions about whether she was the only member

of her household and how she had voted in the last election.  (Roberts Dec. ¶ 9.)  Although Ms.

Roberts has had other canvassers and solicitors come to her door, this is the first time she could

recall feeling intimidated by a canvasser or solicitor who approached her home. (Roberts Dec. ¶

12.) More specifically, previous canvassers or solicitors, in contrast to the pair from United States

Election Integrity Plan, did not ask the same types of invasive personal questions such as

demanding to know who she lived with, whether she was a citizen, if she had a right to be there,

and how she turned in her ballot.  (Roberts Dec. ¶ 12.)  Ms. Roberts was so alarmed by USEIP's

actions that she lodged a complaint with the Office of the Colorado Secretary of State.  (Roberts

Dec. ¶ 14.)  Finally, Plaintiffs also identified the Colorado Secretary of State and various Colorado

County Clerks and Recorders as persons with knowledge regarding Colorado voters who were

contacted by Defendants and/or intimidated by Defendants' conduct, as voters, including Ms.

---

[2] Plaintiffs also produced records from the Office of the Colorado Secretary of State documenting
a complaint from Yvette Roberts.

Roberts, have contacted the Secretary of State and County Clerks to report Defendants' concerning

actions.  (Ex. F; Roberts Dec. ¶ 14.)

## STATEMENT OF ADDITIONAL DISPUTED FACTS

**USEIP's Stated Purpose Is Not Consistent with Defendants' Intimidating Door-to-Door
Canvassing Efforts and Otherwise Objectively Intimidating Behavior.**

1.  USEIP was formed in late November 2020. (Exhibit G ("USEIP Dep.") 7:6-8.) Its leaders

are Holly Kasun, Ashley Epp, Shawn Smith, and Jeff Young. (Exhibit H ("Kasun Dep.") 72:14-

21.) It was formed because its leaders claim to have seen "inexplicable, illogical results" in the

2020 election. (USEIP Dep. 42:6-8.)

2.  USEIP claims that it was merely a "free association of individuals" and that it was "akin

to a book club." (USEIP Dep. 30:23-24; 12:12.)

3.  USEIP describes its on-the-ground efforts as "verifying publicly available Secretary of

State voter rolls." (USEIP Dep. 47:24-35.) According to USEIP, they accomplished this

verification through door-to-door "canvassing," where two individuals, "or maybe more," would

ring a doorbell and, if somebody answered the door, introduce themselves and say that they were

citizens "interested in verifying some voter data" provided by the Secretary of State. (USEIP 50:2-

11.) The canvassers would then allegedly ask "a few questions," such as "do you live here, are you

the resident, did you vote in the last election, what is your party affiliation." (USEIP 50:14-16.)

4.  Notably, however, USEIP's "County & Local Organizing Playbook," which represents

USEIP's views (USEIP Dep. 30:8-9), contains the following statements:

- "When they stole our election, they stole our Republic. If we allow the fraud to stand,

    we become complicit in the destruction of the greatest nation in the history of the earth.

    . . . It's time to stand up." (Ex. A at 2.)

6

- "The first thing is to find other patriots concerned about election fraud – or, frankly, all the communism, and start talking." (Ex. A at 6.)

- "[C]ommunists are very good at marching in the same direction because their meals depend on it." (Ex. A at 7.)

- "Get to know your local elected official. Watch them and take notes. Find out where they line up; and don't forget." (Ex. A at 7.)

- "We will not, however, publish all our inner workings and strategies for our enemies to pour over." (Ex. A at 23.)

5.  In addition, Smith has stated publicly that anyone proven to have been involved in election fraud "deserve[d] to hang," and he testified at his deposition that election fraud should warrant a punishment of death. (Exhibit I ("Smith Dep.") 86-88.)

6.  Smith also testified that he had a "legal duty" to investigate alleged voting anomalies by canvassing voters' homes. (Smith Dep. 239-243.)

7.  USEIP carried out this "legal duty" through their door-to-door canvassing efforts, during which USEIP encouraged its canvassers to take photographs of "any house where they had a discrepancy . . . ." (Smith Dep. 215:18-19.)

8.  And Smith testified that he "probably" carried a firearm with him when he went door-to-door, and that other volunteers may have carried firearms as well.  (Smith Dep. 218:19; 219:3-7.) Smith further testified that it would have been justified for any USEIP volunteer to brandish a firearm "[i]f they were threatened and were trying to defend and protect themselves." (Smith Dep. 219:11-12.) He also stated: "I'm aware that you are allowed under U.S. law to defend yourself in all conditions and circumstances." (Smith Dep. 220:13-14.)

9.  USEIP claims that it provided "extensive training to make sure that people followed the law – that they captured data in a way that was legal but also would be statistically significant to be able to make assertions about voter rolls . . . ." (USEIP 48:10-14.) If USEIP volunteers "found an anomaly," they were trained to "ask" the voter if they wished to fill out an affidavit. (USEIP 51:8-10.) USEIP contends that the "overwhelming majority of people" were "happy about" USEIP's door-to-door activities. (USEIP 51:10-15.)

10. USEIP, however, admitted that its understanding of what its volunteers actually did when they canvassed were merely assumptions based on "anecdotal stories." (USEIP 51:23-25.) Indeed, USEIP's Kasun acknowledged that of the over 9,000 home visits that USEIP volunteers made, she personally witnessed none of them firsthand, and watched only six videos that volunteers provided to her of their home visits. (USEIP 51:23-53:8.)

11. In addition, USEIP's only "proof" that its volunteers did not intimidate voters is that "if anything were to have happened that would have broken the law," USEIP "would have gotten reports." (USEIP 53:20-54:14.)  In other words, according to USEIP, there was no way that a voter could be intimidated by their volunteers. (USEIP 61:2-6.) If voters had been intimidated, USEIP contends, "they wouldn't have answered the questions and they would have just shut the door." (USEIP 61:22-24.)

12. USEIP, however, does not publicize a phone number or maintain any other way by which a complaint about their conduct could be made.  (*See* https://useip.org/.)

13. USEIP dismissed the possibility that there were "bad actors" among its volunteers because "[w]e went in pairs to hold each other accountable." (USEIP 71:8-9.) But USEIP was unable to point to any concrete example of a volunteer calling out another volunteer for not following

8

USEIP's training (USEIP 71:23-72:5.) Likewise, when asked how USEIP was sure no intimidation occurred, Kasun responded, "we took every precaution not to intimidate," citing as her lone example the fact that when they visited homes, USEIP members wore "Hello My Name Is" nametags. (USEIP 70:21-25.)

14. At the time it was training volunteers and sending them out to private homes in Colorado, USEIP also appears to have been unaware of what conduct the Voting Rights Act prohibits. During its Rule 30(b)(6) deposition, when first asked what activities were unlawful under the Voting Rights Act, USEIP's Kasun answered: "You can't prohibit anybody from voting." (USEIP 57:23-25.) When asked to elaborate, Kasun stated, "I'm not a lawyer. I can't say." (USEIP 58:5.) After a break in the deposition, during which she reviewed "notes" and "looked at the intimidation statute," Kasun defined intimidation as "attempting to interfere with somebody's ability to vote" and to "make their own decisions in terms of who they vote for or how they vote . . . ." (USEIP 65:111-19.) Kasun then attempted to expand that definition further to include "being aggressive in questioning . . . to make timid, to fill with fear, to coerce, to threaten." (USEIP 69:24-70:1.)

15. USEIP describes itself as non-partisan (USEIP Dep. 12:20), but evidence suggests otherwise. For example:

- Kasun testified that she believed there were election anomalies prior to 2020, but that she took no concrete steps or actions in response to those anomalies until the 2020 presidential election (USEIP Dep. 13:2-17:12.)

- Epp testified that she believed there was election fraud in 2016 and 2020, but that she did not do anything after the 2016 election, which Donald Trump won, in response to that alleged fraud. (Exhibit J ("Epp. Dep.") 50:23-25.) Following the 2020 election,

however, Epp attended multiple rallies and was "so outraged that the will of the American people could be stolen." (Epp. Dep. 52.) She was also at the U.S. Capitol on January 6, 2021. (Epp. Dep. 58:14-18.)

- All of the "concrete" examples that USEIP cites as election fraud in the 2020 election were from pivotal states—Michigan, Georgia, Arizona, New Mexico, and Pennsylvania—that Donald Trump lost. (USEIP Dep. 43-44.)

- USEIP created a PowerPoint presentation entitled, "Hitchhiker's Guide to Election Fraud Analytics," the cover of which contains images of Xi Jinping, Nancy Pelosi, Mike Pence, and, as a centerpiece, a laughing Kamala Harris standing next to Joe Biden, who is shown to be saying, "My butt's been wiped." (Ex. K.)

- Messages collected from "Basecamp," USEIP's online members' forum, show connections between USEIP and the Republican Party. (Exs. L-N.)

- Smith testified that he is a registered Republican, that he travelled to Washington, D.C. to "petition [his] government for a redress of grievances" at the January 6, 2021, rally organized by Donald Trump, and that went to the U.S. Capitol grounds after Mr. Trump's speech ended. (Smith Dep. 50-72; 100-101.)

- Smith testified that "the Democrat Party, as far as I can tell, is dead set against transparency and integrity in our elections." (Smith Dep. 101:24-102:1.)

- One of the individuals to whom the USEIP Playbook is dedicated is Mike Lindell, a well-known supporter of Donald Trump's claims that the 2020 presidential election was "stolen." (Ex. A.)

- Young is the Director of Data and Analytics for Cause of America, the national "election integrity" organization funded by Mike Lindell. (Ex. O ("Young Dep.") 24:17-19.)

- Epp was a co-founder of Cause of America, has appeared multiple times on the "Conservative Daily" podcast, and has had her work published on Frankspeech, Mike Lindell's "media platform." (Epp Dep. 14:25; 12:18-13:9; 11:20-25.)

## STANDARD OF REVIEW

Summary judgment is only appropriate where the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party." *Doshay v. Globale Credit Collection Corp.*, 796 F.Supp.2s 1301, 1303 (D. Colo. 2011) (citations omitted). A fact is 'material' if, under the applicable substantive law, it is 'essential to the proper disposition of the case. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).) An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248). Defendants have not and cannot demonstrate that there is no genuine issue of material fact entitling them to judgment as a matter of law and, as such, their motion for summary judgment should be denied.

## ARGUMENT

### I.    Defendants' Motion for Summary Judgment on Plaintiffs Claims Under the Voting Rights Act and Ku Klux Klan Act Should Be Denied.

Section 11(b) of the Voting Rights Act of 1965 provides a private right of action for injunctive relief against private actors who engage in voter intimidation. *Allen v. State Bd. of Elections*, 393 U.S. 544, 554–56 (1969). The relevant portion of the provision states:

> No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote, or intimidate, threaten, or coerce any person for exercising any powers or duties under [other provisions of this law].

52 U.S.C. § 10307(b) (formerly codified at 42 U.S.C. § 1973i(b)).

To succeed on a claim under Section 11(b), Plaintiffs must show that Defendants: (1) intimidated, threatened, or coerced, or attempted to intimidate threaten or coerce, another person; (2) in connection with voting, attempting to vote, or urging or aiding another to vote. 52 U.S.C. § 10307(b). There is no requirement that a plaintiff demonstrate a defendant acted with specific intent to intimidate voters, nor is there is any requirement that a plaintiff demonstrate racial animus. *League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Interest Legal Found.*, No. 1:18-CV-00423, 2018 WL 3848404, at *4 (E.D. Va. Aug. 13, 2018) ("*LULAC*").

The operative language of Section 11(b) is broad, is not limited to any particular act, and is not restricted to overt acts of violence or physical threats. *See* 52 U.S.C. § 10307(b). Voter intimidation tactics violate Section 11(b) when they are undertaken by any private person, "whether acting under color of law *or otherwise*. . . ." 52 U.S.C. § 10307(b) (emphasis added).[3] Moreover, as the *LULAC* court observed, "[i]ntimidation means putting a person in fear for the purpose of compelling or deterring his or her conduct." 2018 WL 3848404, at *4 (internal

---

[3] "[T]he language 'or otherwise' indicates Congressional intent to reach both government and private conduct under § 11(b)." *See LULAC*, 2018 WL 3848404, at *3.

quotation marks and citation omitted). Thus, Section 11(b) is violated by, among other things, any actual or attempted action by any person to instill fear in connection with one's exercise of the right to vote. *See Daschle v. Thune*, Temporary Restraining Order, Case No. 04-4177 (D.S.D Nov 2, 2004) (finding that the defendants violated Section 11(b) and objectively intimidated Native American voters by following voters from polling places, copying down voters' license plate numbers, and by recording their license plates).

Passed as part of the Civil Rights Act of 1871, the Ku Klux Klan Act creates a cause of action against those who "conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy" to a candidate for national office. *See* 42 U.S.C. § 1985(3). To prevail on a claim under this section of the Act, a plaintiff must show: (1) a conspiracy of two or more, (2) to prevent by force, intimidation, or threat, (3) any citizen from giving his or her "support or advocacy" to a candidate—in this instance, by voting—for federal office, and (4) an act in furtherance of that conspiracy. *See LULAC*, 2018 WL 3848404, at *1, 5–6; *see also Kush* v. *Rutledge*, 460 U.S. 719, 724 (1983) (noting that Section 1985(3) "proscribe[s] conspiracies that interfere with" among other things "the right to support candidates in federal elections"). A violation of Section 1985(3) does not require state action. *Griffin* v. *Breckenridge*, 403 U.S. 88, 96 (1971) ("On their face, the words of [§ 1985(3)] fully encompass the conduct of private persons."). Nor is there an intent requirement. *Kush*, 460 U.S. at 726.

As set forth below, there is ample evidence that Defendants have intimidated or attempted to intimidate voters in violation of the Voting Rights Act and the Ku Klux Klan Act and, as such, their motion for summary judgment should be denied.

### a. Defendants Have Intimidated or Attempted to Intimidate Voters.

Defendants claim that Plaintiffs have "no evidence that Defendants intimidated or attempted to intimidated voters." (ECF No. 70 at 14.) This could not be further from the truth. Preliminarily, Defendants have admitted that they engaged in a widespread door-to-door effort, knocking on over 9,000 doors across Colorado. (USEIP 51:23-53:8.) In addition, evidence in the record demonstrates that, while going door-to-door, USEIP agents: (a) carried and potentially brandished firearms (Smith Dep. 218:19; 219:3-7; 11-12 (stating, among other things, that it would have been justified for a USEIP volunteer to brandish a firearm at a voter's door if they felt threatened); (b) took photographs of voters' homes (Smith Dep. 215:18-19.); and (c) represented or implied to voters that they were associated with the government, as Plaintiffs have alleged. (Roberts Dec. ¶¶ 6-7; Hendrix Dep. 13:3-7.)

When coupled with its threatening public statements and public appearances, USEIP's door-to-door campaign becomes particularly intimidating. For example, Smith—a founder and public face of USEIP—has exclaimed that anyone proven to have been involved in election fraud "deserves to hang." (Smith Dep. 86-88.) In addition, he testified at his deposition that election fraud (which USEIP's door-to-door efforts purportedly sought to uncover) should warrant a punishment of death. (Smith Dep. 86-88.) USEIP's Playbook it also riddled with threats and insinuations of violence. For example, the Playbook exclaims: "When they stole our election, they stole our Republic. If we allow the fraud to stand, we become complicit in the destruction of the greatest nation in the history of the earth. . . . It's time to stand up." (Ex. A at 2.) Likewise, the Playbook states: "Get to know your local elected official. Watch them and take notes. Find out where they line up; and don't forget." (Ex. [Playbook] at 7.) Notably, Defendants also admitted to being at the U.S. Capitol on January 6, 2021 and being involved with Cause of America—an

14

organization that has promoted the thoroughly debunked and dangerous narrative that Donald Trump won the 2020 presidential election.  (*See, e.g.,* Smith Dep. 50-72; 100-101; Epp Dep. 14:25.)

Defendants deny that they engaged in intimidating conduct, alleging that their actions could not have been intimidating because they "took every precaution" not to intimidate. When pressed for examples, however, USEIP could only state that they wore nametags so as not to be intimidating.  (USEIP 70:21-25.)  USEIP also argued that voters would have just shut the door if they had felt intimidated.  (USEIP 61:22-24.)  USEIP's attempts to downplay their intimidating actions, however, are in direct contrast with the experiences of voters who were actually contacted by USEIP.  First, although the LWVCO member who was contacted by USEIP stated that she did not *personally* feel intimidated by the USEIP agents who came to her door, she also "stated that she felt such visits could be intimidating to voters who don't understand their rights."  (Hendrix Dep. 38: 8-11.)  Second, Yvette Roberts, who was approached at her home by two USEIP agents was unquestionably intimidated by Defendants actions. (Roberts Dec. ¶¶ 12-13.)   More specifically, Ms. Roberts was intimidated by the personal and invasive questions that USEIP's agents were asking, including whether she was a resident of Colorado, whether she was a registered voter, whether she was a United States citizen, who in her household is a citizen, whether she was the only voter of my household, whether she had voted in the last election, and how she voted in the last election. (Roberts Dec. ¶¶ 8-9.)

In short, the evidence presented to date supports Plaintiffs' position that Defendants have attempted to intimidate or have intimidated voters in violation of the Voting Rights Act and Ku Klux Klan Act. Accordingly, Defendants' motion for summary judgment should be denied.

II.     **Plaintiffs Have Standing to Bring Claims Under the Voting Rights Act and KKK Act.**

The Court has already held that Plaintiffs have organizational standing to sue, each having established that they were injured when they were forced to divert resources from their core missions to counter Defendants' conduct. (ECF No. 39.)  Unable to overcome this obstacle, Defendants now try a different approach, arguing that the Court should decline to adjudicate Plaintiffs' claims on "prudential standing" grounds. (*See* ECF 70 at 16-18.)

As the Supreme Court has explained, prudential standing encompasses "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Lemark Intern., Inc. v. Status Control Components, Inc.* 572 U.S. 118, 126 (2014) (quoting *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1 (2004)).

Defendants here focus on the first of these prudential limitations. But this argument is a non-starter. Plaintiffs are not asserting the rights of third parties, but rather alleging harm to the organizations themselves, thus negating any application of the third-party prudential standing principle to the Plaintiffs.  *See Vandeusen v. Bordertown Investors, LLC*, No. 08-3207 (NLH), 2009 WL 235551, at * 3 (D. N.J. Jan. 29, 2009) (declining to apply third party prudential standing limitations when organizational standing exists); *see also Pennsylvania Protection and Advocacy, Inc. v. Houston*, 136 F.Supp.2d 353, 363-64 (E.D. Pa. 2001).  As cited above, Plaintiffs have presented evidence that each of their organizations diverted resources as a directly result of Defendants' actions.

Moreover, contrary to Defendants' assertion that "no member, person associated with a plaintiff organization, or even a Colorado voter was intimidated or threatened by Defendants," there is record evidence establishing that the opposite is in fact true. (ECF 70 at 17.)  (*See, e.g.*, Hendrix Dep. 38: 8-11 (discussing the LWVCO member who was contacted by Defendants); Roberts Dec. (describing Defendants' intimidating conduct).)

Finally, while the Court need not address the application of the third-party prudential standing principle to Plaintiffs as each has established organizational standing, Plaintiffs NAACP and LWVCO satisfy this principle through their respective associational standing.  In the Tenth Circuit, this principle is satisfied if Plaintiffs can "show that 'the party asserting the right has a close relationship with the person who possesses the right'" and that 'there is a hindrance to the possessor's ability to protect his own interests.'" *Aid for Women v. Foulston*, 441 F.3d 1101, 1111-1112 (10th Cir. 2006) (quoting *Kowalsi v. Tesmer*, 543 U.S. 125, 130 (2004). NAACP and LWVCO are both asserting the rights of their organizational members, individuals who have been exposed to Defendants' illegal canvassing activities.  Plaintiffs clearly possess a close relationship with each of these individuals.  *See American Tradition Institute v. Colorado*, 876 F.Supp. 1222, 1234 (2012) (confirming that organizations may bring suit for its members who "have themselves suffered the injuries alleged").  In short, prudential standing limitations do not bar Plaintiffs' claims under the Voting Rights Act and the Ku Klux Klan Act.

**III.    USEIP Can Be Sued in Its Capacity as an Unincorporated Association.**

USEIP contends that as an unincorporated association, it is not a "person" for purposes of Voting Rights Act or the Ku Klux Klan Act, attempting to apply (with little analysis) the Tenth

Circuit's narrow holding in *Lippoldt v. Cole*, 468 F.3d 1204 (10th Cir. 2006) to the statutes at issue here. The holding in *Lippoldt*, however, is readily distinguishable from the present case.

First, in *Lippoldt*, the Tenth Circuit held that an unincorporated association was not a "person" under 42 U.S.C. § 1983. 468 F.3d at 1213-14. USEIP argues that this Court should adopt the *Lippoldt* court's reasoning and conclude that an unincorporated association is not a "person" under the Voting Rights ACt and Ku Klux Klan Act—entirely differently statutes. Second, the court in *Lippoldt* considered whether an unincorporated association was a "person" that sought to *enforce* its rights under 42 U.S.C. § 1983—it did not consider the question of whether an unincorporated association could be found to have violated the statute. Third, the *Lippoldt* court adopted a three-prong test articulated by the Supreme Court in *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). In *Monell*, however, the Court analyzed whether a *municipality* was a "person" for purposes of 42 U.S.C. § 1983 and decided that municipalities *could be* considered "persons" for purposes of the statute.

Further, and notably, the Tenth Circuit is alone in refusing to treat unincorporated associations as a persons for purposes of section 1983. *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1283 (11th Cir. 2021) ("The Tenth Circuit, which holds that unincorporated associations cannot sue under § 1983, stands alone against the trend of treating unincorporated associations as 'persons'."); *see also Jund v. Town of Hempstead*, 941 F.2d 1271, 1279-80 (2d Cir. 1991) (determining unincorporated committees could bring suit under § 1983); *Citizens Against Tax Waste v. Westerville City School*, 985 F.2d 255 (6th Cir. 1993) (permitting unincorporated association to seek attorneys' fees related to claim brought under § 1983).

18

As to the Voting Rights Act and the Ku Klux Klan Act, federal courts have routinely permitted actions brought by or against unincorporated associations to be pursued. *See, e.g., Perez v. Pasadena Ind. School Distr.*, 165 F.3d 368 (5th Cir. 1999) (acknowledging that an unincorporated association brought suit under the Voting Rights Act); *Allen v. City of Graham*, 1:20-CV-997; 1:20-CV-998, 2021 WL 2223772 (M.D.N.C. June 2, 2021) (permitting unincorporated association to assert claims under section 11(b) of Voting Rights Act and under § 1985(3), the Ku Klux Klan Act); *Action v. Gannon*, 450 F.2d 1227 (8th Cir. 1971) (determining plaintiffs prevailed on claims under the Ku Klux Klan Act, against two unincorporated associations).

Further, the language of the Ku Klux Klan Act itself demonstrates that the drafters intended an unincorporated association, or group of people, to be encompassed by the Act. Each of the three sub-provisions of the Ku Klux Klan Act states: "If two or more persons in any State or Territory conspire . . . ." 42 U.S.C. § 1985(1)-(3). And 1 U.S.C. § 1 (the "Dictionary Act") states that "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise—the words "person" or "whoever" includes corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals."

The legislative history of the Voting Rights and Ku Klux Klan Acts (the Ku Klux Klan Act in particular) also provides insight into how "person" should be defined. The Ku Klux Klan Act was promulgated "in direct response to the terror wrought by the Ku Klux Klan and intended to provide a federal remedy and jurisdiction over that association against which the state authorities and courts were powerless." *Gay-Straight Alliance of Okeechobee High School v. School Bd. Of Okeechobee County*, 477 F.Supp.2d 1246, 1250 (S.D. Fla. 2007). A loosely formed group of

individuals, such as UESIP, is exactly the type of defendant that the drafters of the Ku Klux Klan Act contemplated when drafting the Act. Adopting Defendants' narrow definition of "person" would frustrate the purpose of the Acts, as it would permits entities such as USEIP to simply form unincorporated associations when pursuing illegal conduct in order to avoid the clutches of federal law.

Finally, USEIP relies on *Hidden Lake Development Co. v. District Court*, 515 P.2d 632 (Colo. 1973) and *Johnson v. Chilcott*, 599 F.Supp.224 (D. Colo. 1984) for the idea that an unincorporated association must have formalities such bylaws, a stated purpose for existence, and officers in order to be sued. This reliance is misguided. First, *Hidden Lake* concerned a question of state law and interpreted an outdated version of Colorado's Rule 17. *See Pulse v. Larry H. Miller Grp.*, No. Civ.A.03CV2073WDMPAC, 2005 WL 2453091 (Sept. 30, 2005). Both the Federal and Colorado Rule 17 permit an unincorporated association to sue or be sued. *See* Colo. R. Civ. P. 17 ("A partnership or other unincorporated association may sue or be sued in its common name for the purpose of enforcing for or against it a substantive right."); Fed. R. Civ. P. 17(b)(3)(A) ("A partnership or other unincorporated association with no such capacity under that state's law may sue or be sued in its common name to enforce a substantive right existing under the United States Constitution or laws.") Second, the *Chilcott* court stated that unincorporated associations are "usually" characterized by formalities such as bylaws, but concluded that the entity at issue was an unincorporated association even though it did not have bylaws. 599 F.Supp.224 at 229. USEIP unquestionably has a common purpose, as evidenced by its Playbook and the facts that it recruits, trains, and maintains members. In short, the applicable law is clear that USEIP may be sued in its capacity as an unincorporated association.

20

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants'

Motion for Summary Judgment.


Dated:  December 23, 2022                              LATHROP GPM LLP

                                                      By */s/Amy Erickson*_____
                                                      Casey Breese (#51448)
                                                      Casey.breese@lathropgpm.com
                                                      Jean Paul Bradshaw
                                                      Jeanpaul.bradshaw@lathropgpm.com
                                                      Dion Farganis
                                                      Dion.farganis@lathropgpm.com
                                                      Reid Day
                                                      Reid.day@lathropgpm.com
                                                      Brian A. Dillon
                                                      Brian.dillon@lathropgpm.com
                                                      Amy Erickson (#54710)
                                                      Amy.erickson@lathropgpm.com
                                                      1515 Wynkoop Street, Suite 600
                                                      Denver, CO 80202
                                                      Telephone: (720) 931-3200

                                                      Courtney Hostetler
                                                      chostetler@freespeechforpeople.org
                                                      John Bonifaz
                                                      jbonifaz@freespeechforpeople.org
                                                      Ben Clements
                                                      bclements@freespeechforpeople.org
                                                      Ron Fein
                                                      rfein@freespeechforpeople.org
                                                      FREE SPEECH FOR PEOPLE
                                                      1320 Centre Street, Suite 405
                                                      Newton, MA 02459
                                                      Telephone: (617) 249-3015

                                                      *ATTORNEYS FOR Plaintiffs Colorado Montana*
                                                      *Wyoming State Area Conference of the NAACP,*
                                                      *League of Women Voters of Colorado, and*
                                                      *Mi Familia Vota*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 23, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

s/Claudia Neal