# E‌XHIBIT G

## T‌O

# P‌LAINTIFFS' R‌ESPONSE TO D‌EFENDANTS' M‌OTION FOR S‌UMMARY J‌UDGMENT

Page 1

1          IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO
2

   Civil Action No. 1:22-cv-00581-CNS-NRN
3  _____
4  COLORADO MONTANA WYOMING STATE AREA CONFERENCE
   OF THE NAACP, LEAGUE OF WOMEN VOTERS OF COLORADO,
5  and MI FAMILIA VOTA,
6          Plaintiffs,
7  v.
8  UNITED STATES ELECTION INTEGRITY PLAN,
   SHAWN SMITH, ASHLEY EPP, and
9  HOLLY KASUN,
10         Defendants.
   _____
11
                30(b)(6) REMOTE DEPOSITION OF
12
           UNITED STATES ELECTION INTEGRITY PLAN
13
                           by
14
                     HOLLY KASUN
15
               APPEARING REMOTELY FROM
16
                  DILLON, COLORADO
17
                 November 29, 2022
18
   _____
19
20
21
22
23
24
25

Page 7

1    people.  We don't have any bylaws, we don't have any

2    offices, we have no official membership.

3              I guess you could liken USEIP to maybe a

4    banner.  And it is -- it simply is just a group of

5    people, free associating people.

6              Q.   And when was USEIP formed?

7              A.   In November of -- the very end of November

8    2020.  Beginning of December 2020.  It was a very loose

9    coming together.  I mean, there was no like founding, you

10   know.  It was -- it was just people talking to each

11   other.

12             Q.   Yeah.  So tell me about that.  Who found

13   whom first and how did they find each other?  I mean, so

14   let's just agree for the stake of argument that your

15   description of it as a loose banner is right.  There was

16   still something that happened.  People came up with a name

17   and -- can you just walk me through kind of who those

18   people were and how they found each other?

19             A.   Well, I don't know everybody at that --

20   remember everybody at that time because, again, it was a

21   loose group of people.  People came and left.

22             So the way they found me was through

23   internet chat forum, and they saw that I was posting on

24   subjects around Colorado and some folks reached out to me

25   and said, hey, would you like to join this, you know,

Page 12

1    me how to do it.  If it was Ashe, you know, how do I --

2    how do I get my neighbors together, you know.

3                    So basically it was Ashe and I and -- as

4    the cofounders, and then other folks with expertise would

5    pop up as being resources for different aspects of USEIP.

6                    You know, Jeff Young, he would be the data

7    guy.  If a county had a data question, they would go to

8    him.  If they had an organizational or a legal question,

9    they would go to Shawn.  And it was -- you know, it was

10   not that organized.

11                   And on the other hand, I guess, you know,

12   you could say it was akin to a book club.  Just people

13   getting together, kind of deciding what they wanted to do

14   and making it happen.  There really was not a command and

15   control structure there.

16        Q.    Okay.  So we talked a little bit about how

17   USEIP was formed and who was involved.  Can you talk to me

18   a little bit about why USEIP was formed?

19        A.    Yes.  It was a civics group.  We are

20   non-partisan, a hundred percent volunteer, we do no

21   fundraising, we have no money, that's not what we're

22   interested in.

23                   We're a civics group that is focused on

24   election integrity and finding the truth about our

25   elections, sharing the truth and fixing our elections on

Page 13

1   the most local level.

2            Q.   So there have been a lot of elections over

3   the past 30, 40, 50 years.  Was there something in

4   particular about November 2020 that acted as a catalyst or

5   prompted USEIP to form?

6            A.   Yes the range of anomalies in the

7   election.  You know, we -- we weren't exactly sure that

8   the elections were run free, fair and transparently, and

9   that's where we started looking into the process of the

10  elections.

11           And not just we, and I want to keep

12  reemphasizing the fact that was not a command and control

13  structure.

14           Folks were just looking for help in

15  understanding of where they could start digging and

16  figuring out what happened about their elections in their

17  local area.

18           Q.   So when you say anomalies, how did you, in

19  your capacity as a representative for USEIP, how did you

20  first become aware of these anomalies?

21           A.   As an election judge in Boulder County.

22           Q.   Yeah, so go ahead.  Talk more specifically

23  about what you saw that was anomalous?

24           A.   Well, I saw rules that we were trained on

25  as election judges in our voting centers being broken,

Page 14

1    just not followed, or changed on the fly with just a

2    mandate from the Secretary of State, which apparently is

3    in her purview.  But some of these rules had an impact, I

4    believe, on voter integrity.

5                 And I saw computer systems that were

6    woefully unsecured.  And given the fact that I do have a

7    tech background, I was able to assess that on a -- you

8    know, I'm not an IT person, but I know enough about

9    computers to know what actual computer security looks

10   like and didn't believe that the security even of the

11   physical machines was all that great.

12                So that's where it started.

13        Q.   Had you been an election judge prior to the

14   2020 election cycle?

15        A.   No, but I had been a poll watcher.

16        Q.   And had you observed any anomalies prior in

17   prior elections where you have been a poll watcher?

18        A.   Yes, but I wasn't a poll watcher in this

19   state.

20        Q.   So in those prior elections where you

21   observed anomalies, is there a reason why you didn't think

22   to form an organization -- an election integrity

23   organization after seeing anomalies in prior elections?

24        A.   I didn't form the organization.  It formed

25   around me.

Page 15

```
 1              So I didn't set out to start an

 2   organization and nor did, I don't believe, any of the

 3   other folks that were initially part of USEIP.  That

 4   wasn't the intention either.

 5         Q.    Let me come at that differently.

 6              So your testimony earlier was that folks

 7   found you because you were posting online, you were

 8   participating in online forums.  I assume that based on

 9   the context of that comment that you made earlier, you

10   were posting about issues related to election -- what you

11   are calling election integrity; correct?

12         A.    Yes.  And I'm also a blogger.  I have also

13   been writing quite extensively.  I'm a journalist given

14   the fact that I have my masters in journalism.

15              I was writing about these topics for quite

16   a while.  So it's no -- that could have also been the way

17   that they found me too.  I was out and about getting

18   quite a bit of attention for my work on Colorado

19   elections.

20         Q.    So when you say you've been blogging about

21   these things for quite a while, what does that mean in

22   concrete terms, timeline?

23         A.    Timeline, I was writing about -- started

24   writing about these topics as I was an election judge.

25         Q.    So what year would that have been?
```

Page 16

1              A.    2020.

2              Q.    Okay.  So I guess what I'm asking is:  Were

3       you aware of election anomalies -- let's just use a

4       concrete example.

5                    The 2016 election cycle there would have

6       been a presidential election year, there would have been

7       Senate races, House races, were you aware of election

8       anomalies in 2016?

9              A.    Like the ones -- the League of Women

10      Voters put press releases out about saying that the 2016

11      election was rigged?

12             Q.    Yeah, I think that's sort of a nonanswer

13      answer.  I just was asking a yes or no question.

14                   Were you aware of election anomalies in

15      the 2016 election?

16             A.    No.

17             Q.    Okay.  So what was the first election where

18      you started to have concerns about election anomalies?

19             A.    Well, I did quite a bit of research for

20      some of my writing.  And as I was doing some of that,

21      that research, it became -- I -- I'm not exactly sure

22      what election since electronic voting equipment has been

23      introduced to our election system, has not had anomalies.

24                   Now, that doesn't mean that I had an ah-ha

25      moment at any given year.  But I am more convinced than

Page 17

1    ever that electronic voting equipment that's been in our

2    system since, oh, in the '70s and then moving on through

3    the '80s and '90s, there's been issues.  Absolutely.

4              And so there's been historically

5    numbers -- numerous problems with our elections going

6    back to Kennedy and Nixon in Chicago in the '60s.

7              So this is not just centered on my belief

8    in whether or not the elections have problems.  It has

9    expanded quite a bit since 2020.

10             Q.   But you didn't take any concrete steps or

11   action in response to those prior elections; correct?

12             A.   No.

13             Q.   So the first time that you took concrete

14   steps or actions in pursuit of what you are describing as

15   election integrity, was in response to the results of the

16   2020 election; correct?

17             A.   Yes.

18             Q.   If President Trump had prevailed in the

19   2020 presidential election, would you have taken the same

20   steps or actions in pursuit of what you are describing as

21   election integrity?

22             A.   I can't answer that.  I don't know.  It

23   depends on what the -- how the race worked, what the down

24   ballot tickets looked like.  There's no way to tell.

25             Q.   So is your testimony that USEIP would have

Page 30

1    possibly prepare for every possible contingency question

2    that you would ask me.

3                    So if you want me to answer this question,

4    I will go through and ensure that I have it correct.

5            Q.   Yeah.  I don't want you to do that now.

6                 I'm just asking --

7            A.   Okay.

8            Q.   -- if there are parts of the playbook that

9    do not represent USEIP's views.

10           A.   Not that I can recall specifically.

11           Q.   Does USEIP disavow any part of the

12   playbook?

13           A.   I don't know.  I can't speak for the

14   organization because, again, we're not an organization

15   even though this is my deposition today.

16                But as of right now, no, I may have to go

17   back and review my deposition to make sure I have this

18   accurate.  But no.

19           Q.   You mean you can't speak for the

20   organization at all or you just can't speak for it as to

21   this question?

22           A.   It's not an organization that has

23   leadership that I'm authorized to speak for.  It's a free

24   association of individuals.

25           Q.   Well, what do you take your role to be

Page 42

1              And so, yes, people are involved but we

2      don't know who all those people are yet.  I mean, it's

3      very, very difficult to discern -- we are still in the

4      early phases of figure out -- I mean, we've had basically

5      two years to figure out what happened.

6              We saw inexplicable, illogical results in

7      not just the 2020 election but in the 2021 election and

8      now in 2022.  We know what happened, we can tell

9      something is wrong, and we've had two years to figure out

10     where the indicators are.

11             Now we at least know that there's problems

12     with mail -- universal mail-out ballots and drop boxes

13     and ballot stuffing, and we know about data management,

14     we know about lost ballots, we know about tabulation

15     issues.  We obviously know what's happening in Maricopa

16     County, having over 40 percent of the tabulators and

17     printers and voting centers go down surprisingly in

18     unison on election day.

19             So -- so we're getting to the bottom of

20     it.  We know a lot more than we did in 2020.  But we

21     don't know exactly who.  We've got some good indicators

22     but, again, this takes time and energy to figure out what

23     is going on.

24         Q.   So those irregularities that you were just

25     describing in the 2020 election, you said happened in

Page 43

1    2020, 2021, can you give me just a concrete example, the

2    first one that comes to mind when you think, man,

3    something was rotten in the 2020 election.  What is the

4    first thing that jumps to your mind when you think about

5    that?

6              A.    Counties stopping in key swing states in

7    the middle of the night for unexplained reasons and

8    that --

9              Q.    Which -- like which states are we talking

10   about?

11             A.    Michigan, Georgia, Arizona -- I believe

12   Arizona.  There were problems in New Mexico,

13   Pennsylvania.  Yeah.  And so --

14             Q.    And so those five states -- you are talking

15   about the presidential election?

16             A.    Well, I'm just talking about the general.

17   I mean --

18             Q.    Well, I'm asking.  When you mentioned those

19   states, when you say there was ballot -- the counting of

20   ballots that were stopped, are you talking about for all

21   for -- for everybody on the ballot or was there particular

22   candidates that you are saying were disadvantaged?  I'm

23   not --

24             A.    I -- no.  You asked me what jumps out at

25   my mind about the 2020 election, and I gave you one

Page 44

1    concrete example, which is what you asked for, and I said

2    the counting stopping simultaneously in a number of

3    states in the middle of the night, that jumps out at me

4    as a big issue.

5            Q.   Yeah.  And the states that you mentioned, I

6    think you said Michigan, Arizona, New Mexico --

7            A.   Pennsylvania.

8            Q.   -- Pennsylvania, and those were all states

9    that were ultimately won by President Biden; correct?

10           A.   I can't recall.

11           Q.   Okay.

12           A.   I don't know.

13           Q.   Well, what if I were to represent to you

14   that those were all states that were all won by President

15   Biden, do you have any reason to question that?

16           A.   Yeah, I do.  I mean, and then the fact

17   that these states would not -- would not allow poll

18   watchers in during the counting and that there's been

19   blocking -- all the way down to the local level, to

20   actually inspect paper ballots just to see?

21                You know, and Maricopa County did have the

22   audit but there were many problems with that, given the

23   Secretary of State and the legislature would not allow

24   the auditors to get access to all available data that

25   would actually paint an entire picture of what happened

Page 47

1    up?  Do you want to take a break?

2                    THE COURT REPORTER:  I'm good.  An hour

3    and a half, two hours are where I like my breaks.

4                    MR. FARGANIS:  Yeah, I feel like we are

5    kind of approaching an hour and half, aren't we?

6                    THE COURT REPORTER:  We are at 1 hour and

7    10 minutes.

8                    MR. FARGANIS:  Yeah.  So let's try to go

9    another 15, 20 and then if I forget, just do your thing

10   and I will -- you dictate when we take the breaks so...

11                   THE COURT REPORTER:  Thank you.

12        Q.   (By Mr. Farganis)  Sorry, folks.  Just bear

13   with me here.  Yeah, actually let's -- I will pull the

14   exhibit up in a moment.  Let me ask a couple of questions

15   first so the exhibit makes more sense.

16                   So in terms of what USEIP actually did on

17   this on-the-ground activity, you mentioned the word

18   canvassing, and I know -- I'm generally familiar with what

19   you mean by that because I, you know, deposed Shawn and

20   Jeff and -- but I wonder if you could just, sitting here

21   now in your capacity as a representative of USEIP, just

22   describe for me what canvassing means in the context of

23   USEIP's activities?  What is it, actually?

24        A.   It's verifying publicly available

25   Secretary of State voter rolls.  Going door to door,

Page 48

1    verifying publicly available data.

2              Q.    And how did USEIP go about doing that?

3              A.    Well, the first step was a county wanted

4    to assess their local area to see whether or not the

5    election results synced up with what they believed was

6    happening and this was mostly spurred by very, very local

7    races, not so much the presidential.  But it wasn't -- it

8    wasn't specific to any race.  That was just the impetus

9    for it.

10             And then USEIP had extensive training to

11   make sure that people followed the law; that they

12   captured data in a way that was legal but also would be

13   statistically significant to be able to make assertions

14   about the voter rolls, especially in Colorado, and to

15   make sure that there was -- and the way to do that was to

16   canvass entire precincts to make sure that there was no

17   bias within the data.

18             Just like an academic study, you have to

19   be very careful about, you know, inherent biases with

20   your data.

21             And then there was local organization for

22   training and then there was the door-to-door efforts.

23             Which I would like to emphasize, there was

24   never any complaints, there were no police reports, there

25   were no issues raised to USEIP.  In fact, we canvassed

Page 50

1    as you can about that.

2              A.    Okay.  So a pair of individuals, or maybe

3    more, we definitely didn't have people going individually

4    up to doors, knocking.  They would knock on the door and

5    if -- then they would ring the doorbell, they would back

6    away from the door, and if somebody answered, they would

7    introduce themselves and explain what they were doing

8    saying, hey, my name is Holly, I'm from US Election

9    Integrity Plan, I'm a citizen interested in verifying

10   some voter data provided by -- publicly available voter

11   data provided by the Secretary of State and I was

12   wondering if I could ask you a few questions.  Usually

13   people would say yes.

14             And they would ask are you -- do you live

15   here, are you the resident, did you vote in the last

16   election, what is your party affiliation.  These are all

17   line items on the Secretary of State -- Secretary of

18   State voter registration database and, you know, they

19   would just log the results.

20             And they would also ask, you know, if

21   other voters listed there were still living at that

22   residence, if they could talk to them.  And a lot of

23   times we found -- you know, there were anomalies that

24   kind of fell into a few categories.

25             One was party affiliation was incorrectly

Page 51

1    cited, that had been changed, and I had experienced that

2    myself.  There were people who said they were people

3    registered to vote at an address they did not know.  They

4    had no idea who that person was.

5              Then there were anomalies about cast a

6    vote, but it wasn't recorded in the database.  You know,

7    issues like that.

8              And so once that -- once we found an

9    anomaly, we would ask the voter if they wanted to fill

10   out an affidavit.  The overwhelming majority of people

11   did, they were happy about it, they really were thankful

12   that citizens, their neighbors -- a lot of times, you

13   know, people knew each other going door to door and they

14   were very happy about the activities that they were doing

15   just to check.

16             And that was about it.  We'd go door to

17   door.

18        Q.   And what you just described, all of that,

19   the scenario that you just described, is that a

20   description of how USEIP trained these and planned for

21   these engagements to happen, or is that a description of

22   how they actually happened?

23        A.   I'm assuming that everybody from USEIP

24   followed the training.  I did not canvass myself, so I

25   heard anecdotal stories from many, many people, I

```
                                                          Page 52
 1    reviewed videos of voter -- or excuse me -- volunteers

 2    explaining their experience and -- yeah, so I'm speaking

 3    from the most experience that I have as a representative

 4    of USEIP that, yes, that is what happened.

 5              Q.   Well, how many doors were knocked on in

 6    total?

 7              A.   Oh, thousands.

 8              Q.   Like what does that mean?  2,000, 9,000,

 9    400,000?

10              A.   I don't know exactly.

11              Q.   Well, can you ballpark that for me?

12              A.   Less than 10,000.

13              Q.   More than 5,000?

14              A.   I can't say exactly because what I -- I

15    didn't know is -- I haven't reviewed all of the numbers

16    on that.  I'm sorry.  It's in the Colorado Canvassing

17    Report.

18              Q.   So let's just say -- you are going to say

19    thousands plural; correct?

20              A.   Yep.  Yep.

21              Q.   And how many -- you described it a minute

22    ago as anecdotes.  You said this is based on anecdotes

23    that I heard from people and videos that I watched.  How

24    many anecdotes did you hear from people that have done the

25    canvassing?
```

Page 53

1           A.    Dozens.

2           Q.    And how many videos did you watch?

3           A.    I reviewed probably six videos and those

4     were used in the Colorado Canvassing Report video that we

5     produced that's on our website.

6           Q.    You said six, like one, two, three, four,

7     five, six?

8           A.    Uh-hmm.  Yes.

9           Q.    Now, a moment ago you spoke very, I will

10    say passionately and persuasively about the importance of

11    having reliable data.  I think you even invoked social

12    science, something very near and dear in my heart and I

13    really appreciate that.

14                How do you square that set of views about

15    the importance of reliable data with the numbers that you

16    just presented to me, meaning, we have thousands of

17    individuals knocking on doors, maybe it's 9,000, and you

18    have viewed or heard secondhand accounts of a total of

19    about 18.

20                Now, in what way would you consider your

21    personal knowledge of those 18 canvassing incidents to be

22    anything remotely resembling reliable statistical data

23    about what happened at the remainder of the 9,000 or

24    8,000 or 7,000 visits?

25           A.    I would rely on official reports, and I

Page 54

1    would rely on the fact that if anything were to have

2    happened that would have broken the law, that would have

3    turned -- if there was any issues whatsoever from the

4    police, from county clerks -- I have a good relationship

5    with many of the county clerks as do many of our members.

6    If there were any problems whatsoever with our

7    canvassing, we would have gotten reports, not just from

8    the counties but from law enforcement officials who we

9    all talk to quite a bit and with local government with

10   county clerks.

11              So I feel very confident given our network

12   that we would have had access to any sort of information

13   that detracted from anything other than positive

14   experiences, and we would have known about it right away.

15         Q.   Well, not any problem whatsoever; right?

16   So, I mean, what you are describing is a very limited

17   subset of problems where people have actually engaged law

18   enforcement to file some sort of official report or have

19   sued you or something like that.

20              Wouldn't you agree that it's possible that

21   some of the folks who lived at these houses had very

22   negative experiences in one way or another but didn't

23   report them?

24         A.   Not according to what we've heard and in

25   Beth Hendrix's own words, that we were polite, that there

Page 57

1    that just in general.

2              Q.   Is it?

3              A.   Yes.

4              Q.   Tell me -- tell me more about that.  What

5    law are you thinking of exactly that makes it unlawful to

6    just intimidate someone?

7              A.   Well, you can't go into a -- into a

8    7-Eleven and say you are going to rob them.  I think that

9    that's intimidation.  Say I have a weapon under my coat

10   pocket, maybe I do, maybe I don't, say give me all your

11   money, that's intimidation.

12             Q.   Well, yeah, I don't want to get into sort

13   of a legal debate here.  So, I mean, those would be --

14   those -- that conduct would not, under the law, be

15   described as intimidation.

16             A.   Okay.

17             Q.   Yeah.  That would generally be described as

18   assault.

19                  But the question I wanted to ask you is

20   from USEIP's perspective, what is voter intimidation?

21             A.   It's as the law states.  You can't

22   prohibit anybody from voting.

23             Q.   Well, that's not what the law states.  It

24   doesn't say you can't prohibit anyone from voting.  It

25   says you can't intimidate, threaten or coerce.

Page 58

1             A.    Okay.

2             Q.    So I'm asking from USEIP's perspective,

3    what conduct falls under that prescription, that

4    prohibition?

5             A.    I am not lawyer.  I can't say.  I would

6    just say that USEIP fundamentally absolutely, believes in

7    the law.

8             Q.    Yeah, but you were sending people out to

9    homes; right?

10            A.    Yes.

11            Q.    And you testified that you never -- nobody

12   ever intimidated anybody.

13            A.    That's right.

14            Q.    Part of my concern with that testimony is

15   you don't know; right?  I mean, the organization seems to

16   be built around the concept of anomalies.  It's entirely

17   possible that the data -- the anecdotes that you heard are

18   anomalies and that the overwhelming majority of the time

19   that they were out there, is totally different.  That's

20   possible, you have to acknowledge -- that, at least, is

21   possible.

22            The second problem is, I'm not sure that I

23   understand what USEIP's perspective is on what

24   intimidation means.

25            So I know you are not a lawyer, but you

Page 61

1   understand.

2              Your testimony is there's no way that a

3   voter could be intimidated by the questions that your

4   volunteers were asking?  Am I understanding that

5   correctly?

6         A.   Yes.

7         Q.   So it's inconceivable, impossible that a

8   voter could have felt intimidated and not filed a police

9   report.  Is that your testimony?

10        A.   If a voter felt intimidated, they didn't

11  have to answer any of the questions.  They could -- it

12  was a hundred percent voluntary and they could have just

13  shut the door and left and told -- and --

14              (Cross-talk.)

15        Q.   That's not what I asked, though.  That's

16  not what I'm asking.

17              I'm asking, is it possible that folks in

18  these homes felt intimidated by two strangers coming up

19  to their house and asking them questions about what

20  political party they were registered in?  Is it possible

21  that they felt intimidated?

22        A.   No, because if they did, they wouldn't

23  have answered the questions and they would have just shut

24  the door.

25        Q.   Okay.  Thank you.

Page 65

1    me to ballpark.  I just reviewed those numbers.

2                     We visited 9,472 homes and we spoke to

3    4,601 folks at their home.

4                     And as far as denouncing anything, the

5    USEIP absolutely denounced violence of any sort.

6                     And you were asking me if there was

7    anything in the playbook that we would denounce, and I

8    know for a fact there's no violence in -- written about

9    in the playbook but that would be something that we would

10   denounce.

11                    And as far as the federal law goes in

12   terms of intimidation and what we -- our understanding,

13   and I'm speaking, you know, as a spokesperson for USEIP,

14   it's -- I just took some notes here.  It's --

15   intimidation is -- is someone attempting to interfere

16   with somebody's ability to vote or exercise their --

17   their right to vote and make their own decisions in terms

18   of who they vote for or how they vote, that sort of

19   thing.

20                    So that's -- that's what I would say our

21   definition of intimidation is.

22                    Q.   Was that the definition of intimidation

23   that you were using when you were training people?

24                    A.   Yes, absolutely, that we would not

25   interfere with anybody's right to vote, choosing

Page 69

1            A.    What I'm saying is we took measures during

2    our training in our canvassing to follow our training

3    that had nothing to do with voter intimidation, we didn't

4    single out any individuals, we -- we did not engage in

5    voter intimidation.

6            And we know that because there are no

7    reports, there's no evidence, there's no police reports.

8    And in Beth Hendrix own words, which she said well after

9    we were done canvassing, there were no problems, USEIP

10   was polite, she had no reports of voter intimidation.  So

11   there's no reason for us to believe that there was any

12   intimidation whatsoever in any of our activities.

13            Q.    And, again, just so that -- because we keep

14   dancing around this, and I'm not sure we're getting an

15   answer.

16            When you are using the word intimidation,

17   let's just agree part of intimidation would be physically

18   interfering; right?  So I assume that USEIP agrees that

19   physically blocking somebody from like leaving their

20   house would be voter intimidation.  Let's not -- let's

21   just agree that we agree that's intimidation.

22            What other things fall into the bucket of

23   intimidation in USEIP's view?

24            A.    Well, being aggressive in questioning, you

25   know, to make timid, to fill with fear, to coerce, to

Page 70

1    threaten.  Those are -- those are all types of things

2    that are associated with intimidation and that none of

3    those issues were raised officially.  There's no proof

4    that anybody from USEIP engaged in any threats.  We

5    didn't coerce anybody.  It was -- there's just no proof

6    of people --

7              Q.   And so -- no, that's helpful.  Thanks for

8    providing that definition of intimidation.

9              And, again, just to make sure I'm tracking

10   your testimony correctly, your position is that the way

11   that we know that there -- there was no intimidation,

12   defined the way that you just defined it broadly, was

13   that nobody made an official report to the police or to

14   the State or to the County; is that correct?

15             A.   Well, we took every precaution to not

16   intimidate.

17             I mean, one of the things with

18   intimidation is that in the case you say that we

19   presented ourselves as political officials from a

20   political office, and that's absolutely false.

21             At best, we had, Hello My Name is nametags

22   with our -- with our ID numbers on them.  We did not

23   present ourselves as a governmental agency.  That could

24   be a form of intimidation, by misrepresenting yourself,

25   and we never did that.

Page 71

1          Q.   Or you never trained people to do that.

2          A.   We never did it.

3          Q.   Well, how can you testify that you never

4    did it if you weren't part of the 9,000 -- other than the

5    videos you saw, you have no first-hand knowledge about the

6    9,400 some odd home visits; correct?

7          A.   Well, I do know because accountability was

8    banked into our training system.  We went in pairs to

9    hold each other accountable.

10         Q.   What if you had two bad actors?

11         A.   Accountability was built into our system.

12              We had people going in pairs.  We had

13   people holding each other accountable for -- on the

14   county level, with the county captains, with a network of

15   individuals, and that's how we did it.

16              I mean, look, our -- our election system

17   as an election judge has bipartisan teams, two people.

18   You can have two bad seeds there.  It's highly unlikely.

19              It just -- we held ourselves accountable

20   because we were very serious about verifying publicly

21   available data in the most professional, straight up,

22   straightforward way possible according to our training

23   that was built with accountability into it.

24         Q.   Can you point to any concrete examples of a

25   USEIP volunteer calling out one of their fellow volunteers

Page 72

1    that they went on a home visit with and saying, so and so

2    didn't follow the script?

3             A.    I personally can't, no.

4             Q.    Are you aware of any?

5             A.    No.

6             Q.    Okay.  Let's shift our focus to how USEIP

7    decided which homes to visit; right?

8                  So I can imagine a world where it's like,

9    well, we are really worried about election anomalies in

10   Colorado.  Let's just randomly pick 9,000 houses and go.

11                 My limited understanding based on what

12   I've read in the deposition with your -- with your

13   colleagues, is that that is not exactly how it worked,

14   but I'm still not entirely sure from USEIP's perspective

15   what the system looked like.  So I would like to just try

16   to understand that as best I can.

17                 So how did USEIP decide which 9,400 some

18   odd homes to visit?

19             A.    Well, it was first initiated by the

20   counties.  So the counties would come to USEIP, mainly

21   Jeff, and say, hey, we want to canvass.

22                 And so -- I believe you deposed Jeff and

23   so this -- his methodology was clearly explained.

24                 But what happened is they -- he would take

25   the publicly available voter data and run some math over