# EXHIBIT 7

Shawn Smith Deposition Transcript Excerpts

```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO
 2
     Civil Action Number 1:22-cv-00581-PAB
 3
     Colorado Montana Wyoming
 4   State Area Conference of the NAACP,
     League of Women Voters of Colorado, and
 5   Mi Familia Vota,
 6         Plaintiffs,
 7   vs.
 8   United States Election Integrity Plan, Shawn Smith,
     Ashley Epp, and Holly Kasun,
 9
           Defendants.
10   -------------------------------------------------------
            VIDEOCONFERENCED DEPOSITION OF SHAWN SMITH
11                        August 15, 2022
     -------------------------------------------------------
12   VIDEOCONFERENCED APPEARANCES:
13   ON BEHALF OF THE PLAINTIFFS:
           DION FARGANIS, ESQ.
14         Lathrop GPM LLP
           80 South Eighth Street
15         500 IDS Center
           Minneapolis, Minnesota 55402
16         Phone: 612-632-3471
           Email: dion.farganis@lathropgpm.com
17
     ON BEHALF OF THE DEFENDANTS:
18         JESSICA LYNN HAYS, ESQ.
           The Reisch Law Firm
19         1490 West 121st Avenue
           Suite 202
20         Denver, Colorado 80234
           Phone: 303-291-0555
21         Email: jessica@reischlawfirm.com
22
23
24
25

                                                          Page 1
```

```
 1  an ability to contact them, you know, if you have the
 2  ability to speak to them or to make your voice heard,
 3  then you're not really justified in, like, throwing
 4  rocks for the same purpose.  Do you know what I mean?
 5  As a citizen, you have that same obligation that the
 6  government has.  You just have rights the government
 7  does not have.
 8                MR. FARGANIS:  We've been at it for
 9  about 90 minutes.  It's earlier for you.  It's not
10  lunchtime.  I am a little concerned about my
11  connection.  I don't want it to give the court reporter
12  trouble.  So I was going to propose, Jessica, if it's
13  okay with you, just a 10-minute pause so I can try to
14  fix the connection issue and then we can regroup?
15                MS. HAYS:  Sure.  That sounds great.
16                MR. FARGANIS:  Okay.  So I have it at 32
17  after.  So we'll aim for 42 after?
18                MS. HAYS:  Perfect.
19                MR. FARGANIS:  Okay.  Thank you.  We can
20  go off the record.  Thanks.
21                (Break from 10:32 a.m. to 10:44 a.m.)
22         Q.    (By Mr. Farganis)  So, Mr. Smith, do you
23  believe that anyone involved in voter fraud should be
24  executed?
25         A.    So I think you're referring to the
```

Page 72

```
 1   comments I made at the church in Castle Rock, and
 2   those -- my remarks have been repeatedly excerpted and
 3   edited to be taken out of context.  I think unethically
 4   and probably illegally by the press people involved, in
 5   particular Chase Woodruff and Kyle Clark.
 6              So if you go back and listen to my full
 7   remarks, what I said was that I believe in due process,
 8   and I do.  You can't spend your whole life defending
 9   the Constitution of the United States as I have spent
10   my entire adult life and then suddenly stop believing
11   in due process.  So what I said was that anyone who is
12   involved in election fraud deserves to hang, and what I
13   mean by that is that someone who has been engaged in
14   election fraud is in effect for higher offices engaged
15   in a coup against the United States.  That's treason.
16   There are punishments under U.S. Code for Treason.
17   Among them are hanging.  And in fact we have executed,
18   you know, during the Civil War and since people who
19   have committed treason through hanging.  So that's the
20   context of my remarks.
21              Voting fraud in that context is not the
22   same thing as election fraud.  Voting fraud is, you
23   know, somebody submits a ballot illegally or two or
24   something like that.  That's small scale.  It's like
25   the reason there are a difference of penalties between
```

Page 73

1   someone who pickpockets one person and someone who
2   commits, you know, billions of dollars in credit card
3   fraud.  There are differences in penalties, and there
4   should be.
5               So if you -- if you commit treason by
6   engaging in election fraud in a manner that deprives
7   the U.S. citizens of their lawful right to convey and
8   have their will, their consent honored through
9   selection of their elected officials, then I do believe
10  that you deserve punishment that's authorized under
11  federal code for treason.
12          Q.   You had --
13          A.   But not outside due process, which is
14  what I made clear before and which people keep leading
15  off, you know, for their own ends.
16          Q.   Yeah.  We'll get to that part in a
17  second, but you'd admit that those remarks were made at
18  a church.  Is that the -- is this the speech that was
19  made in affiliation with the group called FEC United?
20          A.   Well, it was an election integrity sort
21  of town hall.  So they were there, but there were a lot
22  of people there who were not FEC.  So, for example,
23  there were candidates and public officials and things
24  like that up on the stage.
25          Q.   And you were discussing there sort of

Page 74

```
 1   they would use, like, a stick-on, Hello, my name is.
 2   I, at one point, had gone to, like, OfficeMax and
 3   bought some of the sort of name tag holders, like a
 4   lanyard, so you could put a little name card in there
 5   with your name and the volunteer ID number.  And the
 6   idea was the county captain was supposed to know which
 7   volunteer ID number correlated to each individual.  So,
 8   for example, in El Paso County, mine was 1776.
 9            Q.   Are you aware of anybody that deviated
10   from that and wore something that looked more like a
11   badge?
12            A.   No.  You mean like an official badge
13   of --
14            Q.   Yeah.
15            A.   No.  Not that I ever saw.
16            Q.   Did you carry a firearm with you when
17   you went?
18            A.   I don't remember exactly if I did, but I
19   probably did.  I have a concealed carry permit.  So I
20   most likely carry everywhere I go.  So I probably did
21   have a firearm on me, although I can't say with
22   certainty that I did.  I for sure never pulled a
23   firearm out.  I mean, it would have been -- it would
24   have been undetectable to anybody else around me
25   because I carry it concealed.
```

Page 218

1          Q.   Are you aware if other volunteers
2    carried firearms with them?
3          A.   I'm not aware of whether they did or
4    not.  If anybody did, I never saw one openly carried.
5    So if anyone carried a firearm that was around me or
6    that I would have been able to notice, it would have
7    been concealed.  I never saw anyone brandish a firearm.
8          Q.   If a USEIP volunteer had brandished a
9    firearm, what would your reaction to that have been?
10         A.   Well, so, I guess, it would depend on
11   the circumstances.  If they were threatened and were
12   trying to defend and protect themselves, then my
13   reaction would be, well, it's probably good that you
14   had a firearm.  But if they pulled out a firearm for
15   some other purpose that was not a -- you know, a
16   legally defensible reason for having and brandishing
17   one, then I would say that's probably not somebody that
18   needs to canvass with us anymore.
19         Q.   What would be a legally defensible
20   reason -- I mean, you're visiting people at their home;
21   right?
22         A.   Sure.
23         Q.   So the Castle Doctrine and the Stand
24   Your Ground would all apply to their home.  What would
25   the sort of legally defensible reason for brandishing a

                                                Page 219

```
 1              Q.   Okay.
 2              A.   And certainly that was our intent.
 3              Q.   Sure.  So you had indicated earlier that
 4   you didn't encounter anybody that threatened, and you
 5   weren't aware of anybody that felt threatened, either
 6   through public reporting or things you had heard from
 7   other USEIP folks.
 8              Putting that aside, can you imagine how
 9   somebody could feel threatened by two unknown
10   volunteers coming to their house to ask them questions
11   about how long they've lived there and if they voted in
12   the last election?
13              A.   No, not really.  Although, if they would
14   have concerns about that, I would guess they would also
15   have concerns about the canvassing done by Mi Familia
16   Vota.
17              Q.   Well, okay.  So -- but getting back to
18   USEIP.  So if I represented to you that there were
19   people that felt threatened by that, what would your
20   response to that be?  Would that concern you, or would
21   you say tough shit; that's just how it goes?  What
22   would your response be to that if you learned that
23   somebody did feel threatened just by the mere presence
24   of USEIP volunteers?
25              A.   Well, first of all, I would be
```

Page 235

```
 1   surprised, because our training was very clear in
 2   emphasizing that people were to be cordial and
 3   respectful and professional in their conduct.  And so I
 4   think what you're describing, then -- under the
 5   circumstances in which our volunteers were trained and
 6   asked to be professional and cordial in their conduct,
 7   I think what you're describing is what if people are
 8   afraid?  Well, I'm not in control of whether people are
 9   afraid; right?
10                 People have a whole history before
11   somebody arrives at their door.  If somebody arrives at
12   their door to sell them, you know, pest control, or if
13   somebody arrives at their door to ask them if they want
14   a new roof, should the roofers not go knock on doors to
15   ask them if they can replace their roof, because
16   somebody might be afraid?  It's sort of a
17   speculative -- and I think if there was anyone that was
18   concerned that felt in any way intimidated, I would
19   think it would be far more a function of the conduct of
20   your plaintiff organizations and the Secretary of State
21   in trying to depict the volunteers as being some kind
22   of a threat, as doing something unauthorized, as doing
23   something that was untoward.  When, in fact, the
24   opposite is true.
25            Q.   The lawsuit would have post-dated a lot
```

Page 236