```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2
        Civil Action No. 1:22-cv-00581-CNS-NRN
 3
     _____
 4
 5   Colorado Montana Wyoming
     State Area Conference of the
 6   NAACP, League of Women Voters
     of Colorado, and Mi Familia
 7   Vota,
 8          Plaintiffs,
 9   v.
10   United States Election Integrity
     Plan, Shawn Smith, Ashley Epp,
11   and Holly Kasun,
12          Defendants.
13
     _____
14
15          REMOTE DEPOSITION OF BETH HENDRIX NIELAND
16                     November 23, 2022
17   _____
18
19
20
21
22
23
24
25

                                                          Page 1
```

```
 1              electors for vice president, and/or
 2         members of Congress."
 3                   What evidence do you have to support
 4    your allegation in paragraph 48?
 5         A.    Well, I can say that these actions have
 6    caused the League of Women Voters of Colorado to have
 7    to divert a lot of time and resources towards striking
 8    down the misinformation that is being spread by members
 9    of USEIP and through their door-to-door canvassing and
10    allegations of voter fraud.
11         Q.    Okay.  You didn't really answer my
12    question.
13                   What evidence do you have to support
14    paragraph 48?
15                   You are talking about something totally
16    different.  I'm saying, what evidence do you have that
17    there is a conspiracy towards preventing you from
18    voicing your advocacy for the president, vice
19    president, or members of Congress?
20         A.    I would say the counter lawsuit is one
21    form of evidence.
22         Q.    Well, we'll talk about that in a minute,
23    but let's talk about, what evidence do you have to
24    support 48 -- paragraph 48?
25         A.    Well, I can say that I find, personally,
```

Page 42

```
 1   you've received, nobody was threatened with reprisal,
 2   criminal charges, or other consequences.
 3               Correct, ma'am?
 4        A.     That is correct.  We learned of those
 5   possibilities through media reports.
 6        Q.     Let's jump to -- let's jump to
 7   paragraph -- page 6, interrogatory 8.  Interrogatory 8
 8   states:
 9               "Identify and describe in detail the
10          activities you have undertaken to actively
11          monitor intimidation and related safety
12          concerns described in paragraph 36 of the
13          complaint.  Specifically address personnel
14          and financial resources that have been
15          shifted as a result of the activities of
16          USEIP."
17               Okay?  So what person -- what personnel
18   did you shift to monitor USEIP?
19        A.     Myself, my operations manager, some
20   board members.
21        Q.     And what did they do -- well, start with
22   you.
23               What did you do in regards to your
24   monitoring of USEIP?
25        A.     Monitoring what was being put out in the
```

Page 85

```
 1   media, trying to counteract any disinformation, trying
 2   to support confidence in our elections and
 3   participation in our elections.
 4           Q.    Okay.  And what information did you
 5   specifically put out in response to USEIP?
 6           A.    Well, we have published a white paper on
 7   the safety and security of Colorado's election systems.
 8   That took a committee hundreds of hours of work.
 9                 We have distributed that, and that
10   distribution, both through paper format as well as
11   presentations, has taken many, many hours as well.
12                 We regularly answer questions from the
13   public about the safety and security of Colorado's
14   elections, and it has -- it has taken my time and my
15   board's time and my staff's time.
16           Q.    Okay.  And you said you published this
17   white paper.
18                 Do you remember what the white paper was
19   called?
20           A.    "Colorado's Innovative and Stellar
21   Election System."
22           Q.    Okay.  And one of the purposes of League
23   of Women Voters is to get as many people to vote as
24   possible.  Correct?
25           A.    Correct.
```

Page 86

```
 1          A.   Yes.
 2          Q.   Okay.  You state that, "Financial
 3   resources that have been shifted as a result of the
 4   USEIP activities."
 5               Give me a breakdown of the financial
 6   resources that you've had to redirect.
 7               Which ones, specifically?  How much?
 8          A.   Namely staff time, as well as some PR.
 9   I haven't put a monetary figure on that.
10          Q.   Okay.  Well, let's talk about staff
11   time.
12               Which staff got diverted?
13          A.   As I stated earlier, myself, my
14   operations manager, and members of my board of
15   directors.
16          Q.   Okay.  Your operations manager -- what's
17   that person's name?
18          A.   Currently, it is Hannah Pogue.  Hannah
19   has only been with us a short period of time, however.
20          Q.   Okay.  What was the name of the person
21   back in March of 2020 who filed this lawsuit that you
22   all were referring to financial resources, including
23   personnel?
24               What was that person's name?
25          A.   In March of 2022, Laura Baker.
```

Page 90

```
 1           Q.    What did Laura Baker's duties consist of
 2    prior to being diverted?
 3           A.    Database management, bookkeeping
 4    responsibilities, receptionist responsibilities -- that
 5    position answers the phone and is the -- you know, the
 6    first point of contact for the public.
 7           Q.    Okay.  So she's a receptionist and
 8    general administrative assistant.
 9                 Would that be an accurate --
10           A.    Also bookkeeper.  This is a trusted
11    position.
12           Q.    Sure.  And bookkeeper as well.  I don't
13    mean to demote her in any way.
14                 Okay.  And so what did she have to do --
15    what did you ask her to do to monitor USEIP?
16           A.    I didn't ask her to monitor.  She had to
17    respond to emails and phone calls from members and the
18    general public.
19           Q.    Do you know how many emails she had to
20    respond to?
21           A.    I'm sorry, I don't.
22           Q.    I'm assuming you all are on some sort of
23    general database system?
24           A.    Yes.
25           Q.    Okay.  And even though Laura Baker's no
```

Page 91

```
 1   longer there, you probably still have access to her
 2   emails?
 3        A.    Yes.
 4        Q.    Okay.  Did Laura Baker come up to you
 5   and say, "Man, I'm just getting bombarded with all
 6   these complaints regarding USEIP"?
 7        A.    No, she did not say that.
 8        Q.    Did you tell her to hunker down with a,
 9   "Hey, we're expecting a wave of complaints coming in
10   against USEIP"?
11              Did you tell her that?
12        A.    I told her it was possible, and we did
13   prepare a safety plan for the staff and board.
14        Q.    What was your safety plan?
15        A.    In the event of any sort of threat,
16   the -- it was a communications tree, basically, and I
17   would try to decide if a threat rose to the level of
18   law enforcement involvement.
19        Q.    Did you receive --
20        A.    We didn't -- we did not.
21        Q.    Okay.  And did you ever receive any
22   telephone, email, or any -- any other form -- any
23   threats from USEIP?
24        A.    From USEIP?  Not that I know of.
25              We did receive some negative emails.  I
```

Page 92

```
 1   don't know if those people were members of USEIP or
 2   not.
 3            Q.    Okay.  Board members.  What did your
 4   board members have to do other than contact some clerks
 5   and recorders?
 6            A.    Each board member is also a member of
 7   one of our local leagues around the state, and so they
 8   were, I believe, you know, answering questions from
 9   their local league members and --
10            Q.    Okay.
11            A.    -- that's it.
12            Q.    Okay.  And have they retained those
13   emails, to your knowledge?
14            A.    I don't know.
15            Q.    Did you ask them to retain any of those
16   emails?
17            A.    I believe all emails were retained and
18   turned over.
19            Q.    Okay.  Do you remember about when that
20   would have been?
21            A.    I -- I don't.
22            Q.    Okay.  Let's talk about -- oh, the board
23   members.  That's a volunteer position.
24                  Is that right?
25            A.    Yes.
```

Page 93

```
 1          Q.      They don't receive any financial
 2   compensation?
 3          A.      Correct.
 4          Q.      Let's talk about financial resources
 5   that were diverted.
 6                  Did you have to give Laura Baker a raise
 7   for her added responsibilities of monitoring for USEIP?
 8          A.      No.
 9          Q.      And you created your safety plan.
10                  Did that cost you any money?
11          A.      Just my time; therefore, my salary.
12          Q.      And how long did it take you to come up
13   with that safety plan?
14          A.      I would say eight hours.
15          Q.      Okay.  And that was basically, once the
16   threat came in, how it was supposed to go to you and
17   whether you were going to respond by contacting the
18   police or just ignore it?
19          A.      As well as instructing the -- you know,
20   the possibility of needing to go to a safe, neutral
21   space if there were threatening home visits.
22          Q.      All right.  And that safety plan was
23   memorialized in a book or something?
24          A.      It was written down.
25          Q.      Okay.  All right.  And do you still have
```

Page 94

1   a copy of that plan?
2        A.   Yes.
3        Q.   Was there a plan before your concerns
4   with USEIP?
5             I mean, in today's world, that seems
6   like something that maybe should have existed before.
7             Is there a reason why it didn't?
8        A.   I don't believe we had before dealt with
9   a -- for quite some time, at least -- a piece of
10  litigation and one involving potentially armed people.
11       Q.   Okay.  And the League of Women Voters --
12  you all have a physical location.  Correct?
13       A.   We do.
14       Q.   And during this time period at issue,
15  were you all working from home, or were you working at
16  the location?
17       A.   Both.
18       Q.   And you never had to implement this
19  safety plan.
20            Is that right?
21       A.   Correct.
22       Q.   All right.  Other than the safety plan
23  and your time, what other financial resources did
24  League of Women Voters divert as a result of USEIP,
25  Shawn Smith, Ashley Epp, or Holly Kasun?

Page 95

```
 1            A.      As I said, mainly our staff time and
 2   salary.
 3            Q.      Okay.  And I asked you what that took
 4   place of, and you said first the board members who are
 5   volunteers contacted some people and responded to some
 6   emails.
 7                    Is that right?
 8            A.      Yes.
 9            Q.      You created a safety plan and -- is that
10   correct?
11            A.      Yes.
12            Q.      Laura Baker basically did her job, but
13   was on a higher alert as it relates to any threats
14   regarding USEIP.
15                    Did I accurately state that?
16            A.      Yes.
17            Q.      Okay.  And so in terms of financial
18   resources, what -- if you had to put a dollar number on
19   it, you're talking eight hours a day, one day of work.
20                    What is your time worth?
21            A.      The creation of the safety plan was not
22   the only work involved with USEIP by me.  Of course,
23   answering emails, monitoring emails, all of which are
24   in your possession, took quite a bit of time.  There --
25   and the ongoing campaign against disinformation has
```

Page 96

```
 1   taken quite a bit of time.  I did -- I have not tried
 2   to monetize that.
 3           Q.    The emails --
 4           A.    I have tried to -- hmm?
 5           Q.    Sorry.  How many emails did you respond
 6   to?
 7           A.    I -- I would -- I don't know, but I
 8   turned them all over.
 9           Q.    Was it more than 10?
10           A.    Oh, yes.
11           Q.    It was more than 100?
12           A.    Including discussions around this
13   lawsuit?
14           Q.    I'm talking about complaints.
15           A.    No, it was not more than 100.
16           Q.    Okay.  Can you give me a ballpark on
17   that?
18           A.    Well, the emails to wit -- that I
19   received were not necessarily complaints about USEIP.
20   Some were just questions about what was going on, and
21   as I stated previously, a couple were in support of
22   these actions.  And then a number of emails offering
23   support for our trying to stop any voter intimidation
24   and suppression.
25           Q.    Okay.  And what did you do to stop voter
```

Page 97

1  intimidation and suppression?
2          What did the League of Women Voters do?
3      A.   We filed a lawsuit.
4      Q.   What else did you do to stop this
5  information that you perceived to be misinformation?
6      A.   We have put -- we have published and
7  distributed a white paper.  We have actively
8  distributed components of that white paper to combat
9  any disinformation.  We had put on presentations.
10     Q.   So it sounds like the League of Women
11 Voters is continuing to do what the League of Women
12 Voters does, which is champion the voting system here
13 in Colorado.
14          Is that a fair statement?
15     A.   The League of Women Voters' job is not
16 to champion a voting system; it is to empower voters
17 and defend democracy.  We champion the security of our
18 election system in response to disinformation.
19     Q.   And I'm not going to get into a debate
20 with you on the whole disinformation.  That's not an
21 issue here before the court -- or before this
22 particular lawsuit.
23          But I want to ask you:  So you haven't
24 put any hard numbers into this really at all.  You
25 can't give me a number.  It's the resources that were

Page 98

```
 1   do you have that somebody didn't vote because of USEIP,
 2   proof that you can bring to court.
 3          A.      I do not have that.
 4          Q.      All right.  Let's jump to paragraph 11
 5   on the next page, page 3, please.
 6                  Do you see that?
 7          A.      Yes.
 8          Q.      You state in your declaration, under the
 9   pains and penalties of perjury, that:
10                  "USEIP's activities also materially
11             damaged the League of Women Voters Colorado
12             mission by forcing the LWVCO to divert
13             resources away from its core function and
14             towards activities that combat
15             disinformation disseminated and voter
16             intimidation caused by USEIP."
17                  Do you see that?
18                  Did I read it correctly?
19          A.      Yes.
20          Q.      Okay.  You put in there, "Materially
21   damaged."
22                  What did you mean by, "Materially
23   damaged the League of Women Voters Colorado"?
24          A.      As I've stated earlier, we have had to
25   divert strong staff time away from educating voters to
```

Page 111

```
 1    combating disinformation and working to combat voter
 2    intimidation by informing voters of their rights.
 3          Q.     Well, we talked about that.  That's
 4    already the role of the League of Women Voters, to
 5    inform people of their voting rights.  Correct?
 6          A.     In cases of suppression and
 7    intimidation, absolutely.
 8          Q.     The League of Women Voters has done that
 9    in the past.  Correct?
10          A.     Yes.
11          Q.     And will continue to do that in the
12    future.  Correct?
13          A.     We sure hope to put ourselves out of
14    that part of the business, but yes.
15          Q.     And you currently do it today.  Correct?
16          A.     Yes.
17          Q.     As we talked about earlier, there always
18    seems to be some sort of disagreement as it relates to
19    voting or how it should be done, for example, in the
20    state of Colorado.
21                 Also correct?
22          A.     I would say that's correct, though I do
23    believe that the large majority of both Colorado's
24    elected officials and voters really like our election
25    system and believe it is safe and effective.
```

Page 112

```
 1   executive director when this lawsuit was initiated, and
 2   if a judgment is entered, you will still be the
 3   executive director, possibly.  Correct?
 4            A.     Possibly.
 5                   MR. REISCH:  I think that's all the
 6   questions I have for you.  I wish you a happy
 7   Thanksgiving.
 8                   Ms. Erickson may have a couple questions
 9   for you before we end.
10                   MS. ERICKSON:  I don't have any
11   questions for Ms. Hendrix.
12                   MR. REISCH:  I don't know if now would
13   be a good time, or if we could be -- maybe now is as
14   good as any.
15                   We need to communicate, because based
16   upon these last three depositions, I intend to move for
17   sanctions under Rule 11.
18                   I want to be able to state your position
19   clearly, because --
20                   THE STENOGRAPHER:  I'm sorry.
21                   MS. ERICKSON:  Hold on.
22                   THE STENOGRAPHER:  Somebody is making
23   noise in the background, and I just admitted Mr. Smith.
24                   If you could mute yourself?
25                   There was a lot of noise, and I wasn't
```

Page 139

```
 1   getting the last part of what Mr. Reisch said.
 2              MR. REISCH:  I want to be able to state
 3   your position clearly in our motion, because we are
 4   going to be moving for sanctions regarding discovery
 5   issues, and frankly, motion for summary judgment.
 6              MS. ERICKSON:  So I don't know that I
 7   understand the specific question you are asking me, but
 8   if we want to talk offline after this, I'm happy to
 9   have a conversation.
10              MR. REISCH:  We should probably do that.
11              MS. ERICKSON:  Okay.
12              MR. REISCH:  Because I think, based upon
13   the last three days, I don't think you'd prevail on a
14   motion for summary judgment, and I think I'd get
15   sanctions, so we should probably talk real soon.
16              MS. ERICKSON:  Okay.  I understand.  I'm
17   willing to have a conversation with you, which is what
18   I just said.  I don't think --
19              MR. REISCH:  Okay.
20              MS. ERICKSON:  -- we need to do this on
21   the record at the deposition.
22              If you would like to set a time to talk
23   or even chat now, we can go off the record and have a
24   conversation.
25              MR. REISCH:  Okay.  Why don't you give a
```

Page 140