```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2

     Civil Action No. 1:22-cv-00581-CNS-NRN
 3

     _____
 4

 5   Colorado Montana Wyoming
     State Area Conference of the
 6   NAACP, League of Women Voters
     of Colorado, and Mi Familia
 7   Vota,
 8          Plaintiffs,
 9   v.
10   United States Election Integrity
     Plan, Shawn Smith, Ashley Epp,
11   and Holly Kasun,
12          Defendants.
13
     _____
14
15           REMOTE DEPOSITION OF PORTIA PRESCOTT
16                    November 22, 2022
17   _____
18
19
20
21
22
23
24
25
                                                          Page 1
```

```
 1                    THE DEPONENT:  No.
 2                    MS. STOCK:  Misstates her prior
 3    testimony.
 4                    You can answer, Ms. Prescott.
 5                    THE DEPONENT:  I'm not saying that, but
 6    I'm saying I find it interesting the one year we aren't
 7    directing as much as we worked with the multiple LGBTQ
 8    organizations and funded in Colorado Springs -- I find
 9    it interesting that the one year we don't do it,
10    there's a mass shooting.
11          Q.    (By Mr. Reisch)  Okay.  How much
12    resources do -- does your organization put towards
13    mental health?
14          A.    We put resources to -- we just -- oh, my
15    god -- thousands.  We just had a big thing for mental
16    health with Master P, funding that for the college tour
17    about mental health and talking about mental health.
18                    We couldn't spend as much --
19          Q.    And that's for the --
20          A.    -- but yeah.  We deal with mental
21    health, we deal with racism, we deal with maternal
22    health -- Black women and maternal health issues, we
23    deal with financial literacy, we deal with housing, we
24    deal with homelessness.
25                    MR. REISCH:  Okay.  I believe this would
```

Page 44

```
 1              being carried out by USEIP and related
 2              parties."
 3                   Do you see that?
 4         A.   Yes.
 5         Q.   Do you recall reading that before you
 6    signed this document?
 7         A.   Yes.
 8         Q.   Okay.  What resources were redirected?
 9         A.   Everything.
10         Q.   Well, like, for what?
11         A.   Programming, money, marketing, people --
12    everything.
13         Q.   Okay.  Let's talk about programming.
14              What changed?
15         A.   Voter intimidation education, how --
16    simply what's the -- what -- what the Colorado laws
17    are, clarifying, meetings, traveling the state -- you
18    name it.  Can I --
19         Q.   Do you --
20         A.   You name it.  You name it.
21         Q.   Okay.
22         A.   I mean, just name it.  Pick one.
23         Q.   Okay.  Well, let's talk about
24    programming.  What changed?
25              Did you produce some documents?
```

Page 42

```
 1            A.      Yes.
 2            Q.      Okay.  Do you still have that document?
 3            A.      I produced documents.  We produced video
 4   content, we produced marketing, digital media,
 5   advertising -- those sort of -- yes.
 6            Q.      And you still have all that?
 7            A.      We -- I don't know if I have it all
 8   because I don't save stuff like that, but you can go to
 9   our website and go to our Facebook, Twitter, Instagram
10   and -- you can go anywhere and find it.
11            Q.      Okay.
12            A.      I don't -- I can't load my computer up
13   with everything.
14            Q.      Okay.  And so what other area was then
15   deprived because of these -- these changes in
16   marketing, programming, et cetera?
17            A.      Gun violence, health, education, LGBT
18   protections.  We had other programs that we focused on,
19   and that was in the Colorado Springs LGBT community
20   that suffered because of this -- because of this voter
21   intimidation; so there's a lot.
22            Q.      Are you saying that the shooting that
23   took place at Club Q is the result of alleged voter
24   intimidation?
25                    MS. STOCK:  Objection.
```

Page 43

```
 1            Q.    Okay.  But just because Colorado has
 2     open carry doesn't mean there's automatic voter
 3     intimidation.
 4                  I'm asking for specific instances.
 5     That's all, ma'am.  I know we're beating a dead horse
 6     here, but it's your lawsuit.
 7            A.    Okay.  Well, I don't recall.
 8            Q.    Okay.  Let's go to page 6, interrogatory
 9     number 8.
10            A.    I have a pay sheet here, so you can --
11     okay.  I forgot.  It's a formality.  I see it.
12            Q.    I'm sorry, but we have to do that for
13     the record.
14            A.    Okay.
15            Q.    So that when we go to court and you are
16     on the stand and we have to revisit these issues, we
17     need to make sure we're talking about the exact same
18     thing.
19            A.    Okay.
20            Q.    Okay?
21            A.    Uh-huh.
22            Q.    Okay.  Interrogatory number 8:
23                  "Identify and describe in detail
24            the activities you have undertaken to
25            actively monitor the intimidation and
```

Page 83

```
 1              related safety concerns described in
 2              paragraph 36 of the complaint in this
 3              action.  Specifically address personnel
 4              or financial resources that have been
 5              shifted as a result of the USEIP."
 6         A.   Okay.  I see that.
 7         Q.   Okay.  You responded that your digital
 8   media campaign, which included Twitter, Instagram,
 9   Facebook, as well as newsletters.
10              Is that right?
11         A.   Yes.
12         Q.   You said it involved:
13              "Significant resources to counter
14              USEIP actions at voters' door by
15              proactively educating voters about their
16              rights to vote in the hopes that they will
17              not be dissuaded from exercising their
18              rights to vote following a visit from
19              USEIP."
20              What -- what actually did your
21   organization do?
22              MS. STOCK:  Objection to form.  Vague.
23              THE DEPONENT:  I mean, it's real vague.
24   I mean, it's like -- it's written right here.  It's
25   this paragraph.
```

Page 84

1       Q.      (By Mr. Reisch)  Okay.  And I think your
2  answer is vague, so I'm asking specifically what you
3  did.
4               What resources did you spend?  How much
5  money did you spend?  How many people did you deploy?
6  What did you do?  Not just in general.  What can you
7  prove that you did?  Money spent.  Documents created.
8               MS. STOCK:  Objection to form.
9               THE DEPONENT:  You have -- you have
10  Twitter, Instagram -- none of this is free.  You have
11  to get companies or individuals to manage one or two
12  project -- or project managers to manage things.
13               You have to have field -- people on the
14  field -- I don't know if you know about grass roots
15  organizations where you have to have bodies, people
16  investing their time into making sure people are
17  getting the information.
18               So basically, it takes money.  None of
19  this could happen without resources and people and --
20  and it's ongoing; so it's not like it's just a one and
21  done thing.  It's ongoing.
22               We just came out of an election.  We
23  have footage everywhere of different events that we've
24  had -- Zooms, in-person events, partnerships with
25  multiple organizations for voter registration,

Page 85

1   churches, pastors that you can talk to that we did

2   voter registration and shared information for voting,

3   we did Souls to the Polls -- we did a lot of different

4   things, and that takes money, that takes time, and that

5   takes people, and that takes information.

6             So it just didn't pop up out of

7   anywhere; so basically, it became 100 percent of the

8   mission of -- to making sure that we were not -- we

9   were making sure that people had the correct

10   information, and that meant meetings and partnerships

11   and getting the correct information and -- and

12   reconfiguring it in a way -- becoming the branding so

13   that people know that, if I'm not sure and someone

14   comes knocking on my door, and if someone tells me

15   something, I know I can go to the NAACP and get the

16   correct information.

17             That takes branding.  That takes lot of

18   money.  And if you ever have to run for office, if you

19   ever have to do any digital campaign or digital

20   strategy, you have to raise money to do it, it takes

21   lot of money.

22       Q.    (By Mr. Reisch)  Okay.  But as it

23   relates to the USEIP, where do you have a breakdown as

24   it relates to this?

25             I'm trying to see what money you

Page 86

1    actually spent on USEIP.
2                MS. STOCK:  Objection to form.
3                THE DEPONENT:  It is -- I can't even --
4    like, I guess you are not getting the answer.
5                If USEIP wasn't doing voter suppression,
6    we wouldn't have had to do any of this.
7                I have done voter registration for
8    decades.  I was -- I was one of the most awarded for
9    all of my community outreach, and we never talked about
10   voter suppression.  We simply talked about, you know,
11   we trusted the system.  We trusted everybody would go
12   to the Colorado.gov website.
13               There was never, never any
14   conversations, never the amount of resources and
15   marketing and branding and information share prior to
16   this lawsuit.  Never.
17               I'm a native of Colorado.  We have never
18   had to do this.
19        Q.    (By Mr. Reisch)  Okay.  Do these
20   materials exist that you talk about specifically
21   countering USEIP or any of the defendants?
22        A.    I don't understand when you mean,
23   "countering."  It exists -- go on our Facebook page.  I
24   mean, I don't understand -- I don't understand the
25   question.

Page 87

```
 1          Q.      You did not --
 2          A.      Basically, we had to get people the
 3   right information.  If someone comes knocking at your
 4   door, if someone comes -- we have to make sure that
 5   people can't be at polling with their guns, standing at
 6   the polling places, they can't be camping out,
 7   intimidating people not even wanting to walk to the
 8   polling places -- because they did that in Arapahoe
 9   County just this election.
10                  So, like, it was information.  You can
11   vote.  They don't know how you vote.  People don't want
12   to vote because they are afraid.  Like, you don't
13   understand.  Like, I don't think you get it.
14                  This is serious work, to have an
15   organization that people trust -- trust to give them
16   the correct information.  It doesn't happen because you
17   went on my LinkedIn and Portia said it.
18                  It takes every form possible, every -- I
19   mean, leaflets at churches, leaflets at Juneteenth,
20   Black Arts Festival -- I mean, you don't understand.
21   Like, we had a whole year of this.  I mean, Black
22   History Month.
23                  You know -- I mean, from the get-go, we
24   had to make sure that -- people didn't even trust the
25   state of Colorado because they were afraid  -- because
```

Page 88

1  they didn't know, because it was another non --
2  non-BIPOC organization telling them information, and
3  people needed to be able to trust the information.
4           So I -- I don't know how you interpret
5  that, but it's -- it's ongoing.  It doesn't stop now.
6  The data shows -- I mean, if you -- you know, I don't
7  think maybe you understand, like, politics.
8           When you're running, if you don't get
9  the information out there from TikTok to newsletters to
10 leaflets to commercial ads to on the radio, it doesn't
11 exist.
12          People have to constantly hear the
13 information.  People -- it's a messaging.  It is not
14 like you can just do it one time.  And when people
15 don't trust the system -- people of color, I should
16 say -- don't trust the system.
17          We have to constantly be there.  Even
18 when we have Master P in with the mental health and we
19 have over 500 people there -- the message still is
20 messaging -- a person has to be there -- don't forget
21 to vote, voter registration -- it's a constant
22 messaging and everything infused in everything that we
23 do.
24      Q.   And is filing a federal lawsuit part of
25 that messaging as well?

Page 89

1                    MS. STOCK:  Objection.  Argumentative.
2                    THE DEPONENT:  Voter suppression -- the
3    purpose of NAACP is to -- protecting the right to vote.
4    That is number one in our country.  We were denied the
5    right to vote, and many people don't want us voting
6    now.
7         Q.    (By Mr. Reisch)  Okay.  My question is,
8    is that part of the messaging, the overall message --
9         A.    The lawsuit --
10        Q.    -- does that include filing a federal
11   lawsuit?
12        A.    In this document here, the messaging
13   says specifically -- Twitter, Instagram, newsletters --
14   that's messaging.
15              A lawsuit is a lawsuit, so I disagree
16   with your question.  No.
17        Q.    Okay.  And I understand -- I am not in
18   politics, nor do I want to be.  I'm just a little old
19   attorney here.
20              But all I know is, I'm looking for facts
21   that go directly to USEIP and Ashley Epp, Shawn Smith,
22   and Holly Kasun.
23              That's it.  I'm looking for what
24   evidence you have that they did something wrong.  Not
25   the general universe and the whole political world.

Page 90

```
 1                    What did that entity and those three
 2    individual defendants do?  That's what I keep asking,
 3    and you keep saying you don't recall.
 4                    So I'm asking, what evidence do you have
 5    to support your lawsuit as to these individuals and
 6    that entity, ma'am?
 7                    MS. STOCK:  Objection to form.  Asked
 8    and answered.  Vague.
 9                    THE DEPONENT:  I have thousands of
10    emails.  I have thousands of messages.  I don't recall.
11    I don't recall.
12           Q.    (By Mr. Reisch)  Is it you don't recall,
13    or you don't have any evidence; otherwise, you would
14    have turned it over, ma'am?
15                    MS. STOCK:  Objection.
16                    THE DEPONENT:  No.
17                    MS. STOCK:  Asked and answered.
18                    THE DEPONENT:  I have thousands of
19    stuff -- I don't recall.  I don't -- I don't know.
20           Q.    (By Mr. Reisch)  Certainly your
21    attorney -- ma'am, let me ask my question.
22           A.    Let me just say -- can I just -- I'm
23    answering your question.  I'm answering it.
24           Q.    Ma'am, certainly you were instructed by
25    your attorney that you had the legal obligation to go
```

Page 91

```
 1    through these 40,000 emails that you have unread to
 2    find information related to your claims.
 3                   Have you not been asked to do that?
 4         A.        We don't have --
 5                   MS. STOCK:  Objection to --
 6                   Ms. Prescott, please.
 7                   Objection to the extent that it calls
 8    for communications that Ms. Prescott has had with her
 9    attorneys.
10                   I'm instructing her not to reveal that
11    information.
12                   Otherwise; Ms. Prescott, you can answer
13    the question.
14                   THE DEPONENT:  I guess my question -- my
15    answer is, I don't -- like, there's so much
16    information.  I just don't recall.
17                   I'm one person.  I'm not a staff.  I'm a
18    single mom, and I work a full-time job for a Global ERP
19    company; so I have a full-time job, and I have a staff
20    and a -- that depend on me in the role that I -- that
21    I -- I have; so I don't --
22         Q.        (By Mr. Reisch)  And I --
23         A.        I don't recall.
24         Q.        And I appreciate that, but that doesn't
25    relieve you of your duties under the Federal Rules of
```

Page 92

```
 1   Evidence and court orders in this particular case,
 2   ma'am.
 3           A.      Okay.
 4           Q.      Do you understand that?
 5           A.      I would think attorneys understand it a
 6   lot better than me.
 7           Q.      Interrogatory number 9, page 6 of the
 8   documents which are Plaintiff's Montana Wyoming State
 9   Area Conference of the NAACP's Response to Defendants'
10   Written interrogatory.
11                   Interrogatory number 9 states:
12                   "Specifically identify the communities
13           or the neighborhoods that have been targeted
14           by the USEIP operation as claimed in paragraph
15           27 of your complaint."
16                   Do you see that question, ma'am?
17           A.      Yes, I do.
18           Q.      What communities and neighborhoods were
19   targeted by USEIP or any of the defendants individually
20   in this particular case?
21           A.      Colorado is such a huge state, and this
22   is such an inundation of information, I -- I mean, I --
23   I don't know.  I can't remember.
24                   MR. REISCH:  It looks like we've been
25   going right about an hour again.  Why don't we take
```

Page 93