IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Colorado Montana Wyoming
State Area Conference of the NAACP,
League of Women Voters of Colorado, and
Mi Familia Vota

    Plaintiff(s)

v.                                                                          Civil Action No. 1:22-cv-00581-CNS-NRN

United States Election Integrity Plan,
Shawn Smith, Ashley Epp,
and Holly Kasun

    Defendant(s)

_____

### MOTION TO REOPEN ABUSE OF PROCESS COUNTERCLAIM
_____

Defendant Ashley Epp moves the court to reopen Defendants' counterclaim for Abuse of Process (ECF No. 81), as Defendants received new evidence through government open records requests that, when considered with the totality of the record, confirm Plaintiffs' abuses of the legal process in bringing this litigation and throughout these proceedings. Plaintiffs' abuses, and their subsequent harm to the Defendants, are ongoing.

### I. LEGAL STANDARD

Abuse of process exists as a civil cause of action to discourage bad-faith litigation.[1] Abuse

---

[1] "The tort of abuse of process occurs when a party has 'wilfully misused criminal or civil process' against another party for a purpose different than the proceeding's intended purpose and thereby caused that party damage (e.g., arrest, seizure of property, economic injury). (Krashes v. White, 275 Md. 549, 555, 341 A.2d 798, 802 (1975); see also One Thousand Fleet Ltd. Partnership v. Guerriero, 346 Md. 29, 694 A.2d 952 (1997). State v. Rendelman, 404 Md. 500, 518 n.9 (Md. 2008))

1

of process does not require an overt wrongful act as an essential element; rather, a plaintiff need only demonstrate that, (1) Claims or defenses were devoid of factual support or, if supportable in fact, had no basis in law; (2) the primary purpose of these activities was to harass the claimant or to effectuate some other improper objective; and (3) the sham activities adversely affected the legal interest of the abuse of process claimant. Counterclaims are permitted if the harm "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." (Fed. R. Civ. P. 13(a)(1)(A)) Plaintiffs' abuses, and the resulting harm to the Defendants, is specific and concrete, significant and ongoing; Plaintiffs know this, yet willfully continue this litigation. "The court may permit a party to file a supplemental pleading asserting a counterclaim that matured or was acquired by the party after serving an earlier pleading." (Fed. R. Civ. P. 13(e))[2]  A district court's finding of bad faith or the absence of bad faith in a particular case is a factual determination. (Ford v. Temple Hosp.)[3] Whether Plaintiffs and their attorneys have brought this litigation in bad faith is a dispute of fact that should be heard and resolved at trial.

## II.  BACKGROUND

Plaintiffs brought this action, alleging that USEIP and the named defendants are, "Planning to, threatening to, and actually deploying armed agents to knock on doors throughout the state of Colorado," with "the purpose and effect of intimidating Coloradans from voting, trying to vote, helping others to vote, supporting or advocating for certain political beliefs, or exercising the right

---

[2] The court's consideration of Defendants' well-founded counterclaims need not prolong these proceedings. "If the court orders separate trials under Rule 42(b), it may enter judgment on a counterclaim or crossclaim under Rule 54(b) when it has jurisdiction to do so, even if the opposing party's claims have been dismissed or otherwise resolved." (Fed. R. Civ. P. 13(i)); "For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims. When ordering a separate trial, the court must preserve any federal right to a jury trial." (Fed. R. Civ. P. 42(b)); see also "When an action presents more than one claim for relief… the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." (Fed. R. Civ. P. 54(b))
[3] Ford v. Temple Hosp. 790 F. 2d 342 - Court of Appeals, 3rd Circuit 1986, citing Baker v. Cerberus, Ltd., 764 F.2d at 210; Perichak v. International Union of Elec. Radio, 715 F.2d 78, 79 (3d Cir.1983); Fed.R.Civ.P. 52(a).)

to speak, peaceably assemble, or petition the government for redress of grievances, in violation of Section 11(b) of the Voting Rights Act of 1965, 52 U.S.C. § 10307(b)." Plaintiffs further allege that Defendants are "Introducing themselves in ways that make voters believe that they are associated with government agencies…using public voter lists to target and intimidate voters," "encouraging agents to carry weapons," and "generating and spreading fear that voters can expect multiple armed and unarmed USEIP members to show up at their doors at any moment to harass and interrogate them about their voting history." Plaintiffs conclude that Defendants' conduct is "...thereby Intimidating voters and preventing Coloradans who are lawfully entitled to vote from giving their support or advocacy towards political candidates, in violation of the Ku Klux Klan Act, 42 U.S.C. § 1985." (ECF No. 01) Defendants dispute all of plaintiffs' allegations as materially false and will demonstrate that the complaint is devoid of factual support and libelous. In their complaint, Plaintiffs have maliciously and erroneously conflated voter intimidation with lawful canvassing. Lawful canvassing is protected by the First Amendment and "so clearly vital to the preservation of a free society that, putting aside reasonable police and health regulations of time and manner of distribution, it must be fully preserved," and restrictions on canvassing are "invalid because in conflict with the freedom of speech and press." (Martin v. City of Struthers, 319 US 141, 1943)[4]

      Defendants engaged in a lawful canvassing effort that would enable local civic groups and individuals to validate the official record of the 2020 election. The effort was designed to gather data and identify anomalies, to present the data gathered to government entities with jurisdiction,

---

[4] "Freedom to distribute information to every citizen wherever he desires to receive it is so clearly vital to the preservation of a free society that, putting aside reasonable police and health regulations of time and manner of distribution, it must be fully preserved," concluding that "that the ordinance is invalid because in conflict with the freedom of speech and press." (Martin v. City of Struthers, 319 US 141 - Supreme Court 1943) and "our precedent is clear that there must be a balance between these interests and the effect of the regulations on First Amendment rights." (Watchtower Bible & Tract Soc. of NY, Inc. v. Village of Stratton, 536 US 150 - Supreme Court 2002, quoting Martin).

3

and to encourage those entities to investigate the anomalies and remedy any defects in the official record. Defendants did, in fact, design such an effort, and many county grassroots teams canvassed their communities using the training materials, affidavit templates, walk list formats, etc. developed by the named Defendants and others associated with USEIP. None of the named Defendants directed the canvassing efforts of any county. Defendants Epp and Smith both attended training and canvassed, while Defendant Kasun never attended training or canvassed. Further, when canvassing concluded in late 2021, independent county teams analyzed and cured their canvassing records, and they delivered the records of true defects and anomalies to the government entities with jurisdiction to investigate and provide remedy, if required. Plaintiffs' claims are devoid of factual support, and they've known this since before they filed their claims in this court. There is "no legal support for the proposition that Section 11(b)'s imputes liability when a plaintiff shows that a defendant's actions merely attempted to affect a large number of the voting populace. There still must be some evidence that a defendant's otherwise lawful action intimidated or attempted to intimidate 'any voter.'" (<u>FAIR FIGHT INC. v. TRUE THE VOTE</u>, Dist. Court, ND Georgia 2024).

## ARGUMENT

"There still must be some evidence," but the record is devoid of factual support for Plaintiffs' allegations. Further, Plaintiffs' pattern of behavior in this case prove that, at multiple points prior to and during these proceedings, Plaintiffs knew (1) that their allegations were devoid of factual support and could not succeed on the merits, (2) that they had a duty to withdraw their claims per the Rules of Professional Conduct[5], and (3) that refusal to withdraw their claims would continue to harm the defendants.

### A. Plaintiffs Knew Their Allegations Were Devoid of Factual Support

---

[5] "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument" (RPC 3.1)

      *i.*      *Plaintiff Due Diligence Revealed No Intimidation*

On September 4, 2021, more than six months before Plaintiffs brought this action, Plaintiff League of Women Voters (LWVCO) sent a mass email to their members asking for anyone who had interacted with USEIP to contact the organization.[6] In another attempt to identify aggrieved parties, LWVCO sent the same call to action on September 10, 2021 (LWV00056). In response, Plaintiff's received two emails in support of their action, "So glad you are challenging these people." (LWVCO00032) and "Excellent!  I have my 2022 Annual Fund donation notice and will be sending a donation to LWVCO." (LWVCO00036) In a damning rebuke of LWVCOs allegations against USEIP, the remainder of the responses to Plaintiff LWVCO's mass communication were in opposition*.* "I was insulted and disappointed by your post about some volunteers going door to door. I found your post to be very ignorant and on the verge of threatening. I am thankful that someone is doing this job of checking the voter rolls." (LWVCO00050) To drive the point home, Ms. Hendrix acknowledged on September 9, 2021 that "people who have received visits by USEIP volunteers…stated that they did not feel intimidated at all and that the USEIP volunteers were very polite," and that "I do understand that USEIP volunteers, including yourself, are doing what they're doing to support free and fair elections."(LWVCO0000043) While these mass communications appear to be due diligence, Plaintiffs had already decided to bring this case when they sent them. Three days before Ms. Hendrix sent the first mass communication to LWVCO members, in a September 1, 2021 email exchange between LWVCO President Karen Sheek and LWVCO Executive Director Beth Hendrix, Ms. Sheek stated, "I thought I was seeing a connection between him and the organization **we will be suing."** (*Emphasis added*) (LWVCO00010)

As the court will recall, during the January 23, 2024 status hearing, it was confirmed that

---

[6] "In an effort to keep on top of what this group is doing in our state, we are asking LWVCO members to contact Beth Hendrix ([email redacted] or [phone redacted]) if you know of anyone who has been approached by this group." (LWVCO00002).

Plaintiffs withheld communication between Ms. Hendrix and current LWVCO Board Member Tara Menza where the two parties discussed Ms. Menza's experience with unidentified canvassers. "I received a knock on my door a few weeks ago by someone from my community who asked me about voting back in November. The person was very polite and not intimidating at all." (ECF No. 115-1) The exchange supports the Defendants' affirmative defenses, disputes Plaintiffs' allegations in this case, and it was **not** produced by Plaintiffs during discovery, despite Ms. Hendrix being the only other party to the conversation, and it explicitly relates to Ms. Hendrix's allegations in this case. Along with being a current LWVCO Board Member, Ms. Menza also canvassed the election in association with USEIP in 2021. Defendants plan to call Ms. Menza at trial.

Plaintiffs' communications prove that on September 1, 2021, Plaintiffs had decided to bring this action; and by October 5, 2021, Plaintiffs' "due diligence" (1) failed to produce any members of any of the three organizations who had been intimidated by any canvassers, and (2) failed to produce any individual who had been contacted by the defendants; and (3) did produce several members asserting personal knowledge and experiences that disputed Plaintiffs' claims. Plaintiffs have failed to provide any support for the claim they made on March 9, 2022: "The Voter Organizations' members and/or the community at large are being intimidated and will continue to be intimidated by Defendants' actions." (ECF No. 01)

    ii.    *Plaintiffs Withdrew Their TRO to Avoid an Evidentiary Hearing*

A little over a month after filing their complaint, on April 12, 2022, Plaintiffs sent an open records request to the Secretary of State (Exhibit 1 – Casey Breese Request to Colorado Secretary of State).[7] According to Plaintiffs' document production during discovery, the Secretary of State produced redacted government email exchanges about two specific complaints (ECF No. 108-

---

[7] "…please consider this an official request for government records…All documents relating to and/or referring to voter intimidation practices and/or actions by any individual or entity carrying out voter intimidation in the state of Colorado since November 2020." (Exhibit 1)

Exhibit B). While the email records produced to Plaintiffs by the Secretary of State are largely redacted, the original complaints from two Mesa County residents Yvette Roberts and Debra Powell are not. To summarize the verifiable 2022 timeline: (1) April 12: Plaintiffs Request Open Records (Exhibit 1), (2) April 15-26 (est.)[8]: Plaintiffs receive Roberts' complaint (C.R.S. § 27-72-203), (3) April 28: Plaintiffs file Motion for Limited Expedited Discovery (ECF No. 40), (4) April 29: Scheduling Order – Injunctive Hearing June 2, 2022 (ECF No. 42), (5) May 06: Order Denying LED (ECF No. 44), and (6) May 12: Plaintiffs withdraw TRO; ask to vacate June 2 hearing (ECF No. 45). In the court's May 6, 2022 order, the court confirmed that Plaintiffs failed in supporting for their claims for Limited Expedited Discovery.[9] Plaintiffs have failed to produce relevant evidence matching the court's description of what would be expected if their claims were true.

It is important for the court to understand that, on May 12, 2022, Plaintiffs possessed the original complaints of Yvette Roberts and Debra Powell. If those complaints implicated the defendants, they likely would have been enough to secure the injunctive relief that Plaintiffs sought and continue to seek. These original complaints do not implicate the Defendants in any way, nor do they indicate that the complainants, Roberts and Powell, were themselves intimidated. The record reflects that Plaintiffs knew these complaints did not support their claims as, on May 22, 2022, they withdrew their motion and asked the court to vacate the June 2 hearing. "There still must be some evidence," but this case's record of evidence has not materially changed since May 2022.

    iii.    NEW EVIDENCE: Plaintiffs Misrepresented Yvette Roberts

---

[8] As Plaintiffs made their request on Tuesday, April 12, 2022, the state was required by statute to fulfill the request within three business days, or April 15, 2022, per the standard, or three plus seven business days, or April 26, 2022, if the state invoked a statutory extension (C.R.S. § 27-72-203).

[9] "Moreover, plaintiffs have not supported their motion with a specific showing of good cause… Plaintiffs, therefore, should be aware of much of the information that they seek. Plaintiffs' members, for instance, could provide information on what both defendants and the members said, which would help provide evidence regarding requests 5 and 7. Plaintiffs' members could also report whether defendants photographed their homes or cars, which would provide evidence regarding request 3. Plaintiffs, however, do not explain why they cannot obtain at least some of this information from their members or whether they have even tried." (Brimmer, ECF No. 44 at 6, ¶ 2)

Plaintiffs had possession of Ms. Roberts' original complaint in April 2022. Discovery closed on December 2, 2022. Today, in March of 2024, Yvette Roberts remains Plaintiffs' only witness alleging that defendants caused harm under Section 11B of the Voting Rights Act and the Ku Klux Klan Act. Ms. Roberts did not make any allegations of harm in her original complaint, nor did she make any assertions that implicate the Defendants. Those allegations came on December 22, 2022. In that declaration, Plaintiffs withheld from the court that Ms. Roberts' original complaint was reviewed by five county, state, and federal government entities which, based on newly discovered evidence, were "unable to prove any crime."

While the documents produced by the Colorado Secretary of State's Office contain significant redactions, recent Colorado Open Records produced to Defendants by the Mesa County District Attorney's Office are unredacted and shed new light on Ms. Roberts' original complaint. The Mesa County Senior Investigator for Elections Investigations James Cannon stated, "I found a report in our local records where it appears that Grand Junction Police have already investigated this as a suspicious incident, but were unable to prove any crime." (Exhibit 2) Open records requests to Grand Junction Police (Exhibit 3), and the Mesa County Sheriff's Office (Exhibit 4) produced no such reports, and Mr. Cannon cannot recall the local record to which he referred in the email exchange. (Exhibit 5) In the entire exchange across five government entities, the Defendants and USEIP are not mentioned a single time.[10] This exculpatory evidence should have been provided to Defendants in discovery. It's unclear why it wasn't. Plaintiffs claim the evidence was produced to them by State in its redacted form, but this is a disputed fact that should be left to the

---

[10] The new evidence renews Defendants challenges to Plaintiffs' standing. [A]n "organization has standing to sue on its own behalf if the 'defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts,'" Common Cause of Colo. v. Buescher, 750 F. Supp. 2d 1259, 1269 (D. Colo. 2010) (quoting Fla. State Conference of NAACP v. Browning, 522 F.3d 1153, 1165 (11th Cir. 2008)), or "when a defendant's conduct makes it difficult or impossible for the organization to fulfill one of its essential purposes or goals." Id. (citing Charles H. Wesley Educ. Found., Inc. v. Cox, 408 F.3d 1349, 1353–54 (11th Cir. 2005)).

fact finder (more below, see p. 11 at ¶ 2). Newly produced records from the Colorado Secretary of State's office to the Defendants are unredacted and reveal that the Colorado State Department's Caleb Thornton investigated Ms. Roberts' complaint (Exhibit 8). Who redacted the documents as an exhibit in this case is a question for the fact finder. If Plaintiffs withheld this exculpatory evidence, then Plaintiffs intentionally deprived Defendants of due process, as this highly relevant, admissible and critical evidence is the kind that may have both prevented this needless litigation and prevented the unimaginable consequences Defendants have had to endure from the false and malicious narrative derived from the insidious use of the Ku Klux Klan Act by Plaintiffs; it is akin to falsely being labeled a racist.

The court will recall that Ms. Roberts' post-discovery declaration was the only question of material fact that remained, per the court's denial of Defendant's Motion for Summary Judgment (ECF No. 84). In that order, the court found that, "Defendants deny that the voters identified by Plaintiffs were contacted by USEIP members and claim that they did not conduct canvassing efforts in Mesa County. (ECF No. 76, p. 2). Accordingly, there is a genuine dispute as to any material facts and the issue should be left to the factfinder. Accordingly, the Court denies Defendants' motion for summary judgment on this issue." Defendants will prove at trial that (1) the material dispute of fact only arose due to plaintiffs' representation of Ms. Roberts' sworn declaration on December 22, 2022, (2) that Ms. Roberts' sworn declaration may rise to the level of perjury given her original complaint and the investigative record of her original complaint, and (3) plaintiffs knew Ms. Roberts' sworn declaration was a misrepresentation to the court, in violation of Fed.R. Civ. P. 11(b) and RPC 3.1, but they made the misrepresentation, without regard of their duty to the court, on December 22, 2022 to prevail on Summary Judgement. At least six months prior to filing their original complaint, Plaintiffs knew that their claims were factually unsupported. They brought this litigation anyway. At multiple points in the two years of these proceedings,

Plaintiffs became aware of facts and witnesses, including their own members, that disproved their own claims. Plaintiffs ignored these documented facts and witnesses and continue pursuing this litigation for improper purposes, causing great harm to defendants.

### B. **Plaintiffs Brought This Litigation For Improper Purposes**

Plaintiffs have alleged harm due to the diversion of resources, but they have failed to produce relevant evidence in support of their allegations (ECF No. 128 - Defendant Kasun Sanctions). Following the Court's order in the January 23, 2024 status hearing, Defendant Epp received a full copy of discovery from prior counsel and has now reviewed the entire record. "There still must be some evidence," yet it remains true that, prior to the close of discovery, Plaintiffs failed to produce a single piece of evidence that Defendants intimidated anyone directly or indirectly or caused anyone to be intimidated." (ECF No. 108) Plaintiffs have brought this litigation for improper purposes.

### i. *Plaintiffs' Litigation is Intended to Harass Defendants*

Plaintiffs tried this case in the court of public opinion before Defendants were ever served with this lawsuit, and they did so despite having their allegations disproven by their own members by October 2021. The harm to Defendants has and continues to be cataclysmic, both to Defendants' reputations and financially. Plaintiffs viciously defamed the Defendants to destroy their reputations and frustrate their lawfully protected behavior, and they knew their allegations were false months before they brought this case. Plaintiffs have failed to substantiate their own allegations, and it appears that the Plaintiffs themselves don't believe parts of their own legal theory in this case as, (a) in another state's court they're arguing the opposite of the claims they bring in this court, and (b) they have surreptitiously removed their compensatory damages in their requests for relief – and now attempt, again, to mislead the court that they never asserted a claim for damages, despite the Plaintiffs' pretense before the Court of financial damages, critical to the foundation of their

standing as plaintiffs.

To be clear, there is no reliable witness testimony or other evidence that shows that anyone engaging in USEIP canvassing wore "official-looking badges," or represented themselves as an official or associated with a government entity; Defendants deny all such allegations. However, if there was such a record, Plaintiff League of Women Voters is currently arguing before the Kansas Supreme Court that, "As organizers well know, sometimes, even when they explicitly state that they are not elections officials, voters nevertheless come to the erroneous conclusion." (<u>League et al v. Schwab et al</u>, State Court of Kansas District Court of Shawnee County (2021-CV-000299), Docket 01 at 3 ¶ 1). That is, at the same time Plaintiffs are making the assertion before this court that Defendants should be held liable if voters potentially – not actually, but potentially – mistake Defendants for "officials," Plaintiffs are arguing in a Kansas court that they themselves cannot be held liable for the exact same conduct they falsely claim about Defendants in this matter. These contradictory statements reveal Plaintiffs' bad faith in these proceedings, as Plaintiffs' position on rights preserved by law appears to change based on political context and venue. Plaintiffs know their claims about USEIP canvassers representing themselves as officials are false; they also appear to believe that those claims should not impute liability. Plaintiffs make these assertions in these proceedings to harass the defendants and bolster their libelous lawsuit.

Regarding Plaintiffs' deceptive damages claims, in response to Defendant Kasun's motion for sanctions, Plaintiffs claim, "…although Plaintiffs seek to recover their attorneys' fees under applicable law, they are not seeking compensatory damages. Plaintiffs have no obligation to produce documents to support a damages claim they have not asserted." (ECF No. 128 at 6). Plaintiffs have requested compensatory damages since the beginning of these proceedings, "WHEREFORE, Plaintiffs respectfully request that this Court: (f) Award Plaintiffs compensatory damages." (ECF No. 1, 14 at 'f'). In fact, Plaintiffs only stopped asserting this claim in the May 5,

11

2023 Final Pretrial Order, where the compensatory damages (and item "f" generally) are missing. (ECF No. 90 at 5) Plaintiffs never noticed Defendants or the Court that they were amending their claims and prayers for relief. (See Fed. R. Civ. P. 15(a)(2))[11] Now Plaintiffs inexplicably and falsely state they haven't asserted those claims.

      *ii.*     *Plaintiffs' Litigation is Intended to Drive Headlines and Fundraising*

Plaintiff LWVCO brought this case to drive headlines and raise funds, with the intention of enjoining myPillow CEO Mike Lindell. In the Exhibits List in the May 15, 2023 Final Pretrial Order, Plaintiff LWVCO represented to the court that LWV0000112 had been produced to Defendants (ECF No. 95). On January 8, 2024, Plaintiffs admitted that this document had not been produced despite their multiple misrepresentations to the Court that it had. The document, titled the "2022 Safety Plan," does not implicate defendants or address Defendants' conduct in any way. Defendants will show at trial that Plaintiff LWVCO's intent in bringing this lawsuit was not to seek relief for the alleged conduct of the Defendants, but to file a lawsuit against Mike Lindell to enjoy the press coverage, fundraising, and potential awards of such an endeavor. Plaintiffs anticipated significant headlines, warned their leadership about such headlines, issued a press release to help drive these headlines, and intended to raise funds off this lawsuit. Indeed, Plaintiffs and their attorneys did, and continue to, raise funds in association with their false claims. Plaintiffs are within their rights to generate headlines and raise funds on a legitimate lawsuit, but they cannot fabricate claims to achieve that end.[12]

      *iii.*     *Plaintiffs' Litigation Implies State Action*

---

[11] "Other Amendments. In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." (Fed. R. Civ. P. 15(a)(2))

[12] In fact, such behavior is a crime. (Title 18 U. S. C. § 1001(a): "…knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact; [or]makes any materially false, fictitious or fraudulent statement or representation; or makes or uses any false writing or document knowing the same to contain any materially false, fictitious or fraudulent statement or entry…")

The courts have been restrictive on the issue of when private acts constitute state action. (Langston v. ACT, 890 F. 2d 380 - Court of Appeals, 11th Circuit 1989, quoting NBC v. Communications Workers of America, AFL-CIO, 860 F. 2d 1022 - Court of Appeals, 11th Circuit 1988)[13] Plaintiffs represent that they have maintained their claims in this case. (ECF No. 129) If true, and Plaintiffs are not again withholding evidence, the record is devoid of factual support for their allegations and has not materially changed since they withdrew their TRO on May 22, 2022. (ECF No. 45) Plaintiffs' case comprises inadmissible news articles, other hearsay, and academic theory. The only witness produced by Plaintiffs who claims harm in line with the allegations in this case, is Yvette Roberts. The foundation of Yvette Roberts' testimony is an official complaint she made to the Colorado Secretary of State's Office. In that complaint, Ms. Roberts did not assert injury or harm or make any assertions that implicate the Defendants whatsoever. Those assertions were first made on December 22, 2022, 20 days after the close of discovery, 18 months after the original complaint, and in Plaintiffs' response to Defendants' Motion for Summary Judgement. (ECF No. 72) The contemporaneous, unredacted emails (Exhibits 6a-6b), show that Ms. Roberts' complaint was reviewed by the State Department, discussed with the CO Attorney General's Office, referred to and investigated by the Mesa County DA's Office, and shared with the US Attorney's Office and the FBI. The redacted content shows that, through all this activity, the government was "unable to prove any crime." Further, Defendants USEIP, Ashley Epp, Holly Kasun, and Shawn Smith were never even mentioned.

While her original complaint does not allege a crime, Ms. Roberts' sworn declaration alleges *multiple* crimes, against USEIP, and the redacted information is exculpatory to those

---

[13] The NBC Court distilled three tests for state action from Supreme Court precedent: (1) the public function test, (2) the state compulsion test, and (3) the nexus/joint-action test. Id. at 1026. "private conduct is fairly attributable only when the state has some affirmative role, albeit one of encouragement short of compulsion, in the particular conduct underlying a claimant's civil rights grievance.'"

allegations. It's unclear why this information was redacted in Plaintiff LWVCO's production (COSOS00002-10), but during the January 23, 2024 status hearing, Plaintiffs' counsel represented to the Court that the redactions came from the Colorado State Department. On July 30, 2021, Matt Domboski of the Secretary of State's Office forwarded the complaints to the SOS executive team, and wrote, "The DOJ, in their guidance on post-election audits and voter intimidation, highlighted recent court cases in which the activity mentioned may have constituted voter intimidation under the Voting Right Act of 1965, the National Voter Registration Act of 1993, and Section 131 of the Civil Rights Act of 1957." (Exhibit 7) One month after this email was sent, the Plaintiffs had decided that they were going bring this action, per the September 1, 2021 exchange between Beth Hendrix and Karen Sheek (page 5 of this motion). Plaintiffs maintain that they brought this case due to the concerns of themselves and their members yet have failed to produce factual support for those assertions. The Colorado Department of State is a witness in this case. The Colorado Department of State is the origination of Yvette Roberts' as a witness. The Colorado Department of State is the purported source of the redactions – which are exculpatory to the Defendants, and further tie State to the inception of this case.

"There still must be some evidence" for Plaintiffs to prevail on their claims, but the preponderance of the evidence at trial will show that Plaintiffs knew their claims were devoid of factual support, and they brought them anyway for multiple improper and interrelated purposes. Plaintiffs have enjoyed significant benefits by harming the Defendants.

### C. Plaintiffs' Sham Activities Harmed Defendants' Legal Interests

Plaintiffs tried this case in the court of public opinion, enjoyed extensive media coverage and raised funds – before Defendants were served – and Plaintiffs' libelous actions with respect to this case, and to Defendants, continue. Defendants will show at trial that they have endured over two years of reputational damage, loss of income, psychological harm, and threats of physical harm

because of Plaintiffs' abusive and extra-governmental efforts to deter Defendants' lawful canvassing behavior. The harm arising from Plaintiffs' false allegations concrete and specific, and Defendants will prove their harm, and that it has resulted from Plaintiffs' conduct before this Court.

## CONCLUSION

Plaintiffs were in possession of Ms. Roberts' complaint in April 2022, and the unredacted emails and other evidence prove that Ms. Roberts' sworn declaration is false and may amount to perjury. The court relied upon this false declaration and misrepresentation for its decision on Defendants' Motion for Summary Judgement (ECF No. 84). New evidence, when combined with the full record and pattern of behavior, supports Defendants' counterclaim that Plaintiffs' allegations have been misrepresentations to the court since day one. "There still must be some evidence," yet Defendants will show at trial that (1) Plaintiffs knew their claims were devoid of factual support, and they had a duty to withdraw them at multiple points in these proceedings; (2) instead, Plaintiffs continued to pursue these claims to harass defendants, to generate headlines, to raise funds and punish Defendants' constitutionally protected behavior; and, (3) these sham activities have harmed the Defendants. Whether or not the harm caused by Plaintiffs is due to a bad faith abuse of this process is a genuine dispute of fact. Leaving this dispute unresolved favors the Plaintiffs, materially prejudices the Defendants and leaves them without a remedy for specific and cnoncrete harm. Defendant Epp urges the court reopen Defendants' Abuse of Process counterclaim considering this new evidence and serve as a fact finder for the truth of the matter asserted by both Plaintiffs *and* Defendants.

Dated: March 20, 2024

/s/*Ashley* Epp

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been electronically served through ECF this 20th day of March 2024, to all counsel of record.

/s/*Ashley* Epp

_____

Ashley Epp

asheinamerica@protonmail.com