**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-00581-CNS-NRN

Colorado Montana Wyoming
State Area Conference of the NAACP,
League of Women Voters of Colorado, and
Mi Familia Vota,

      Plaintiffs,

v.

United States Election Integrity Plan, Shawn Smith,
Ashley Epp, and Holly Kasun,

      Defendants.

---

**PLAINTIFFS' TRIAL BRIEF**

---

**Introduction**

Voter intimidation poses a lethal threat to democratic government. Recognizing this danger, Congress has passed two statutes—the Voting Rights Act of 1965 and the Ku Klux Klan Act of 1871—creating a private right of action against individuals or entities who seek to threaten, coerce, or suppress the right to vote. Courts have been equally stalwart in protecting voters from intimidation. *See, e.g.*, *Spencer v. Blackwell*, 347 F.Supp.2d 528, 535 (S.D. Ohio 2004) ("Voter intimidation severely burdens the right to vote.") (citing *Burson v. Freeman*, 504 U.S. 191, 206 (1992)); *Reynolds v. Sims*, 377 U.S. 533, 562 (1964) ("[T]he right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights."). Simply put,

63049128v2

our political and judicial institutions have long understood that free and fair elections are the lifeblood of American democracy:

> "The right to vote embodies the very essence of democracy. Absent free and fair elections uninfluenced by fear, the underpinnings of democratic rule would crumble. The United States Constitution, as enforced by Congress and the courts, enshrines these principles." *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 464 (S.D.N.Y. 2020).

Defendants Smith, Epp, and Kasun—through the founding of United States Election Integrity Plan ("USEIP") and their own words and conduct—have carried out a campaign to illegally intimidate voters. Specifically, the evidence presented at trial will demonstrate that Defendants wrote the incendiary playbook for USEIP's illegal voter intimidation and made numerous public statements suggesting that those who did not adopt their views regarding unproven election fraud in the 2020 election warrant a punishment of death. Following the 2020 election, the United States Department of Justice warned that behavior similar to that demonstrated by Defendants "can have a significant intimidating effect on qualified voters that can deter them from seeking to vote in the future."[1] As set forth in greater detail herein, Defendants' conduct violates the Voting Rights Act and Ku Klux Klan Act and must be stopped.

---

[1] E-mail from Pamela S. Karlan, Principal Deputy Assistant Att'y Gen., to Karen Fann, President of the Arizona State Sen. (May 5, 2021), https://int.nyt.com/data/documenttools/may-2021-doj-letter-to-arizona-lawmakers/d2594015d27c7fee/full.pdf (warning the Arizona State Senate that plans to use a private contractor to identify voter registrations and knock on doors to confirm if a valid voter lived at the stated address could implicate the anti-intimidation prohibitions of the Voting Rights Act).

**Background**

The evidence presented at trial will demonstrate that USEIP was founded by Defendants Ashley Epp and Holly Kasun on November 7, 2020 in response to so-called "blatant election fraud" that Defendants falsely claim took place during the 2020 presidential election. Although USEIP's stated purpose—"to get a better understanding of what happened in the 2020 election, to find truth, expose the truth, and share the truth . . . If there was fraud in 2020 let's find it, fix it, and hold those responsible accountable"—may sound innocuous, its history and actions are anything but benign. Plaintiffs will present evidence that Defendants, along with numerous other agents of USEIP, participated in the insurrection at the U.S. Capitol on January 6, 2021, resulting in the deaths of five individuals and the injuries of countless others, and demonstrating just how far Defendants are willing to go in furtherance of their campaign to hold those responsible for purported "blatant election fraud" accountable. Reminiscent of events that unfolded at the U.S. Capitol on January 6, Defendants also organized their own "stop the steal" rallies in Colorado.

USEIP's County and Local Organizing Playbook, which was created and disseminated by Defendants, sets forth USEIP's principles and goals, and makes clear that USEIP is willing to pull out all stops to uncover supposed election fraud, even if it means engaging in violent and intimidating behavior. (Pltf's Ex. 1.) The Playbook is replete with incendiary language and dog whistles encouraging acts of war and violence, which illuminates USEIP's violent and intimidating behavior. Among other things, the Playbook exclaims: "This is the fight . . . . No one is coming to save us. It's time to stand up . . . . But **we are not at a time of peace**. And everyone who values freedom and is committed to the fight for our Republic is now needed."  (Pltf's Ex. 1 at 3-7 (emphasis added).) While USEIP claims to be a group of concerned citizens exploring "the

truth" as it relates to election integrity concerns, the Playbook is best described as a county-level guide to voter intimidation.

Employing the Playbook and using voter rolls purchased by Defendant Smith, USEIP took its threatening and intimidating behavior directly to the homes of Colorado voters. In fact, the evidence presented at trial will demonstrate that USEIP agents visited over 9,000 homes across Colorado, where they took photos of voters' residences, asked and took down detailed personal information, and carried and potentially brandished firearms while doing so. When coupled with its threatening public statements, public appearances, and intentionally broad dissemination of its message, USEIP's door-to-door campaign is particularly intimidating. For example, Defendant Smith, has exclaimed that anyone proven to have been involved in election fraud "deserves to hang" (Pltf's Ex. 8.) and will testify that election fraud (which USEIP's door-to-door efforts purportedly sought to uncover) should warrant a punishment of death. Plaintiffs will also present testimony of a Colorado voter—Yvette Roberts—who was approached at her home by USEIP agents and was unquestionably intimidated by the personal and invasive questions she was asked, such as whether she was a resident of Colorado, whether she was a registered voter, whether she was a United States citizen, who in her household is a citizen, whether she was the only voter in her household, whether she had voted in the last election, and how she voted in the last election.

## Analysis

I. **Defendants Engaged in Illegal Voter Intimidation in Violation of the Voting Rights Act and Ku Klux Klan Act.**

a. **Defendants Conduct Violates Section 11(b) of the Voting Rights Act.**

Section 11(b) of the Voting Rights Act of 1965 provides a private right of action for injunctive relief against private actors who engage in voter intimidation. *Allen v. State Bd. of Elections*, 393 U.S. 544, 554–56 (1969). The relevant portion of the provision states:

> No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote, or intimidate, threaten, or coerce any person for exercising any powers or duties under [other provisions of this law].

52 U.S.C. § 10307(b) (formerly codified at 42 U.S.C. § 1973i(b)).

To succeed on a claim under Section 11(b), Plaintiffs must show that Defendants: (1) intimidated, threatened, or coerced, or attempted to intimidate threaten or coerce, another person; (2) in connection with voting, attempting to vote, or urging or aiding another to vote. 52 U.S.C. § 10307(b). The operative language of Section 11(b) is broad, is not limited to any particular act, and is not restricted to overt acts of violence or physical threats. *See* 52 U.S.C. § 10307(b).

Voter intimidation tactics violate Section 11(b) when they are undertaken by any private person, "whether acting under color of law or otherwise. . . ." 52 U.S.C. § 10307(b) (emphasis added). "Intimidation means putting a person in fear for the purpose of compelling or deterring his or her conduct." *League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Interest Legal Found.*, No. 1:18-CV-00423, 2018 WL 3848404, at *4 (E.D. Va. Aug. 13, 2018) ("LULAC") (internal quotation marks and citation omitted). There is no requirement that a plaintiff demonstrate a defendant acted with specific intent to intimidate voters, nor is there is any requirement that a plaintiff demonstrate racial animus. *League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Interest Legal Found.*, No. 1:18-CV-00423, 2018 WL 3848404, at *4 (E.D. Va. Aug. 13, 2018) ("*LULAC*"). Thus, Section 11(b) is violated by, among

other things, any actual or attempted action by any person to instill fear in connection with one's exercise of the right to vote. *See Daschle v. Thune*, Temporary Restraining Order, Case No. 04-4177 (D.S.D Nov 2, 2004) (finding that the defendants violated Section 11(b) and objectively intimidated Native American voters by following voters from polling places, copying down voters' license plate numbers, and by recording their license plates).

Section 11(b) seeks to redress actions that make voters "timid or fearful," or that "inspire or affect with fear," or "threaten" through "promise [of] punishment, reprisal, or other distress," regardless of the perpetrator's subjective intent. *Nat'l Coal. on Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500, 509 (S.D.N.Y. 2021) ("*Wohl II*") (quoting *United States v. Piervinanzi*, 23 F.3d 670, 677 (2d Cir. 1994)). In evaluating claims of voter intimidation, courts consider "[d]efendants' prior conduct and expressed goals," taken together with the context of those actions, to identify whether the natural outcome of those actions is voter intimidation. *Nat'l Coalition on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 485 (S.D.N.Y. 2020) ("*Wohl I*").

The evidence presented at trial will demonstrate that Defendants and their agents have attempted to intimidate and have intimidated voters in violation of the Voting Rights Act by, among other things: founding USEIP and equipping its agents with a Playbook for voter intimidation; broadly publicizing USEIP's efforts; and making other threatening public statements and appearances.[2] *See Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 673 F.3d

---

[2] As Plaintiff's expert witness will testify, the threat and intimidation felt when a potentially armed stranger knocks on one's door is particularly acute for those in Black and Latino communities. People of color, in Colorado and across the country, have endured a long and ongoing history of racial and ethnic violence in their homes and communities. Terror, threats, and violence—both at

192, 209 (3d Cir. 2012) (holding that a 1982 consent decree continued to be necessary "to help ensure that potential minority voters are not dissuaded from going to the polling station to vote" because, without it, RNC would likely resume intimidating "ballot security" activities, such as aggressive poll-watching).

> **b. Defendants Can be Held Liable Under the Voting Rights Act, Even If They Did Not Themselves Go Door to Door.**

Defendants, citing *Draeger v. Grand Central, Inc.*, 504 F.2d 142, 145 (10th Cir. 1974), contend that they cannot be held liable for the actions of third-party canvassers, to whom they gave the Playbook (both literally and figuratively) for their door-to-door voter intimidation campaign. Defendants' position is untenable. *Drager v. Grand Central, Inc.*, and the cases cited therein, stand only for the proposition that liability arising under a theory of *respondeat superior* does not arise in cases involving government officials. *See* 504 F.2d 142 (holding that a store cannot be held vicariously liable for an off-duty police officer's actions under the 1871 Civil Rights Act) (citing *Jennings v. Davis*, 476 F.2d 1271 (8th Cir. 1973); *Adams v. Pate*, 445 F.2d 105 (7th Cir. 1971); *Ashenhurst v. Carey*, 355 F. Supp. 1101 (N.D. Ill. 1973); *Barnes v. Dorsey*, 354 F. Supp. 179 (E.D. Mo. 1973); *Boyden v. Troken*, 352 F. Supp. 722 (N.D. Ill. 1973)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (reasoning only that "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondent superior").

---

polling places and at voters' own homes—have been tools used to suppress the Black and Latino vote.

63049128v2

The Voting Rights Act, as applied between private individuals, contains no limitation for third-party liability aside from a causal link between Defendants' behavior and the intimidation that was or could have been experienced. As the court in *Fair Fight v. True the Vote* explained, Section 11(b) requires "(1) that Defendants' actions directly *or through means of a third-party in which they directed*, (2) caused, or could have caused, (3) any person to be reasonably intimidated, threatened, or coerced from voting or attempting to vote." No. 2:20-CV-00302-SCJ, 2024 WL 24524, at *38 (N.D. Ga. Jan. 2, 2024) (emphasis added). Foreclosing third-party liability in Section 11(b) claims would betray the VRA's "ambitious aims of encouraging true enforcement of the Fifteenth Amendment's promise of unencumbered access" to the franchise. *Wohl I*, 498 F. Supp. 3d at 476.

Put simply, Section 11(b) makes clear that—even if Defendants did not directly engage in USEIP's door-to-door canvassing efforts—they may nonetheless be held liable under the Voting Rights Act because they caused USEIP agents to go door-to-door for the purpose of interrogating and intimidating Colorado residents. Defendants' own words and actions, standing alone, also caused or could have caused any person to be reasonably intimidated from voting or attempting to vote. *See Fair* Fight, No. 2:20-CV-00302-SCJ, 2024 WL 24524, at *38.

### c.   Defendants Conduct Violated the Ku Klux Klan Act.

Passed as part of the Civil Rights Act of 1871, the Ku Klux Klan Act creates a cause of action against those who "conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy" to a candidate for national office. *See* 42 U.S.C. § 1985(3). To prevail on a claim under the Ku Klux Klan Act, a plaintiff must

show: (1) a conspiracy of two or more,[3] (2) to prevent by force, intimidation, or threat any citizen from giving his or her "support or advocacy" to a candidate—in this instance, by voting—for federal office, and (4) an "overt act" act in furtherance of that conspiracy. *See LULAC*, 2018 WL 3848404, at *1, 5–6; *Nat'l Coalition on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 487–488 (S.D.N.Y. 2020). "A conspiracy 'need not be shown by proof of an explicit agreement.'" *Nat'l Coalition on Black Civic Participation*, 498 F. Supp. 3d at 487 (quoting *Cine Sk8, Inc. v. Town of Henrietta*, 507 F.3d 778, 792 (2d Cir. 2007)).

The evidence presented at trial will demonstrate that Defendants conspired to found USEIP and recruit and train USEIP agents to go door-to-door across Colorado, carrying out an illegal campaign of voter intimidation.

## II. Defendants Are Liable for Plaintiffs' Attorneys' Fees.

The Voting Rights Act provides that the Court "may allow the prevailing party, other than the United States, a reasonable attorney's fee, reasonable expert fees, and other reasonable litigation expenses as part of the costs." 52 U.S.C. § 10310(e). Attorneys' fees are likewise awardable under the Ku Klux Klan Act. *See* 42 U.S.C. § 1988.

"Although awarding fees pursuant to [the VRA] is discretionary, the legislative history makes clear that a prevailing party usually should recover fees . . .." *Donnell v. United States*, 682 F.2d 240, 246 (D.C. Cir. 1982). The VRA and KKK Act create private rights of action for individuals to enforce their civil rights. Awarding reasonable attorneys' fees in such

---

[3] Under federal law, a conspiracy is: (1) an agreement between two or more persons to commit an unlawful act; (2) knowingly engaging in the conspiracy intending to commit those offense that were the object of the conspiracy; and (3) commission of an "overt act" by one or more members of the conspiracy in furtherance of the conspiracy. *U.S. v. Reyes*, 302 F.3d 48, 53 (2 d Cir. 2002).

circumstances furthers the goals of the statutes and incentivizes the robust enforcement of civil rights. *Id.* at 245 ("The purpose of [the attorney's fees provision of the Voting Rights Act] . . . is the familiar one of encouraging private litigants to act as private attorneys general in seeking to vindicate the civil rights laws.") (citation omitted). The effectiveness of the VRA and KKK Act would be severely diminished "[i]f successful plaintiffs were routinely forced to bear their own attorneys' fees." *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402 (1968) (discussing the attorneys' fees provision of the Civil Rights Act of 1964). Attorneys' fees do not "simply penalize litigants who deliberately advance arguments they know to be untenable but, more broadly . . . encourage individuals" to seek relief under civil rights statutes. *Centennial Archaeology, Inc. v. AECOM, Inc.*, 688 F.3d 673, 679 (10th Cir. 2012).

If Plaintiffs prevail on their claims, the Court should award  reasonable attorneys' fees to best effectuate the aims of the Voting Rights Act and Ku Klux Klan Act and encourage voters to continue vindicating their civil rights.

### Conclusion

In sum, Plaintiffs will present evidence at trial more than sufficient to demonstrate that Defendants engaged in illegal voter intimidation. Plaintiffs respectfully request that—after hearing the relevant evidence—the Court enter an order finding that Defendants violated the Voting Rights Act and Ku Klux Klan Act and awarding Plaintiffs reasonable attorneys' fees and costs.

63049128v2

Dated:  June 18, 2024

LATHROP GPM LLP

By */s/Amy Erickson*
Casey Breese (#51448)
Casey.breese@lathropgpm.com
Jean Paul Bradshaw
Jeanpaul.bradshaw@lathropgpm.com
Brian A. Dillon
Brian.dillon@lathropgpm.com
Amy Erickson (#54710)
Amy.erickson@lathropgpm.com
Kristin Stock
Kristin.Stock@lathropgpm.com
675 15th St. Suite 2650
Denver, CO 80202
Telephone: (720) 931-3200

Courtney Hostetler
chostetler@freespeechforpeople.org
John Bonifaz
jbonifaz@freespeechforpeople.org
Ben Clements
bclements@freespeechforpeople.org
Amira Marcella Mattar
amira@freespeechforpeople.org
FREE SPEECH FOR PEOPLE
1320 Centre Street, Suite 405
Newton, MA 02459
Telephone: (617) 249-3015

*ATTORNEYS FOR Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, and Mi Familia Vota*

11

63049128v2

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing has been electronically served through ECF this 18th day of June, 2024, to all counsel of record.


*/s/Amy Erickson*

63049128v2