**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-00581-CNS-NRN

Colorado Montana Wyoming
State Area Conference of the NAACP,
League of Women Voters of Colorado, and
Mi Familia Vota,

       Plaintiffs,

v.

United States Election Integrity Plan, Shawn Smith,
Ashley Epp, and Holly Kasun,

       Defendants.

---

**PLAINTIFFS' PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

---

       Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, and Mi Familia Vota (collectively, "Plaintiffs") submit the following Proposed Findings of Fact, Conclusions of Law, and Order.[1]

**<u>INTRODUCTION</u>**

       Plaintiffs commenced this action on March 9, 2022, alleging that Defendants Shawn Smith, Ashley Epp, and Holly Kasun carried out a campaign to intimidate Colorado voters, in violation of the Voting Rights Act of 1965 and the Ku Klux Klan Act of 1871. This matter came before the Court for a trial on July 15, 2024 through July 19, 2024. Based upon all the files, records, and

---

[1] Plaintiffs respectfully submit the following Pretrial Proposed Findings of Fact and Conclusions of Law as a guide to those facts that will be adduced at trial. If permitted or requested by the Court, Plaintiffs will submit revised Proposed Findings of Fact and Conclusions of Law after the close of trial with appropriate citations to the record as developed at trial.

proceedings herein, the Court makes the following Findings of Fact, Conclusions of Law, and Order.

## PROPOSED FINDINGS OF FACT

I.    **THE PARTIES**

    **A.  Plaintiffs**

        **i.  Colorado Montana Wyoming State Area Conference of the NAACP**

1.  Founded in 1909, the NAACP is a civic engagement organization that advocates for the political, educational, social, and economic equality of rights of all persons and to eliminate race-based discrimination.

2.  The Colorado Montana Wyoming State Area Conference of the NAACP, also known as NAACP Colorado, is the regional chapter of NAACP that represents voters in Colorado, Montana, and Wyoming. It is a non-partisan, membership-based organization.

3.  NAACP Colorado works in several different project areas, including but not limited to voting rights and political representation. It engages in voter outreach and other efforts to protect democracy, enhance equity, and increase democratic participation and civic engagement by voters in Colorado, Montana, and Wyoming.

4.  NAACP Colorado has had to divert financial and human resources to address Defendants' door-to-door intimidation campaign and will have to divert additional resources both before and after the 2024 election, and future elections, absent an injunction.

        **ii.  League of Women Voters of Colorado**

5.  The League of Women Voters was founded in 1920. It is a non-profit civic engagement organization with a mission to encourage informed and active participation in government,

increase understanding of major public policy issues, and influence public policy through education and advocacy.

6.   League of Women Voters' Colorado chapter ("LWV Colorado") is a membership-based organization that has 18 local leagues and 2,200 members in the state.

7.   LWV Colorado is a nonpartisan organization. It neither supports nor opposes candidates or political parties.

8.   LWV Colorado seeks to empower voters, defend democracy, and provide fair access to the ballot. Its ordinary work includes organizing and leading local and state ballot issue education programs, organizing non-partisan candidate forums, registering new eligible voters, and providing nonpartisan Get Out the Vote (GOTV) messaging.

9.   LWV Colorado has had to divert financial and human resources to address Defendants' door-to-door intimidation campaign and will have to divert additional resources both before and after the 2024 election and future elections, absent an injunction.

### iii.  Mi Familia Vota

10. Mi Familia Vota is a civic engagement organization that unites Latino, immigrant, and allied communities to promote social and economic justice through citizenship workshops, voter registration, and voter participation.

11. Mi Familia Vota has chapters in several states, including Colorado.

12. Mi Familia Vota is non-partisan, and does not support or oppose particular candidates or political parties in Colorado.

13. Mi Familia Vota works with Coloradans to conduct civic engagement, voter engagement, and voter education programs through activities such as voter registration, phone banking, and door-to-door canvassing. It conducts door-to-door canvassing as part of its Get Out The Vote

(GOTV) work, to encourage registered and eligible voters to vote and to provide them with resources about voting, such as polling place locations and hours. In particular, Mi Familia Vota focuses on supporting, educating, and encouraging low- to mid-propensity voters, voters who have not participated in any or many prior elections.

14. In particular, Mi Familia Vota works closely with new Latino voters, including newly naturalized citizens and other Latino voters who have not yet or have rarely exercised their right to vote.

15. To educate and support these voters, Mi Familia Vota carries out engagement efforts throughout the year, culminating with a door-to-door GOTV effort in which Mi Familia Vota encourages eligible, registered voters to vote and provides them with accurate information about the voting process.

16. Mi Familia Vota has had to divert financial and human resources to address Defendants' door-to-door intimidation campaign and will have to divert additional resources both before and after the 2024 election and future elections, absent an injunction.

17. Further, Mi Familia Vota's efforts have been undermined by Defendants, whose campaign targeted these low-propensity voters and who have publicly and repeatedly asserted that low-propensity voters and precincts with high rates of low-propensity voters are associated with fraud.

### B. Defendants

#### i. Ashley Epp

18. Ashley Epp admits that she founded the U.S. Election Integrity Plan ("USEIP"), along with Defendant Holly Kasun. (Pl. Ex. 55). Defendant Epp was instrumental in developing and publicizing USEIP and its primary activity—a door-to-door campaign to interrogate voters about their voting record in the 2020 general election.

4

19. Defendant Epp participated in, organized, and spoke at marches (also known as "Stop the Steal" rallies) at the Colorado Capitol every Saturday between Election Day 2020 and through inauguration day in 2021.

20. Defendant Epp testified at trial that she was deeply involved in USEIP's efforts. Among other things, she proofread materials for local USEIP agents, organized USEIP agents, and connected them to agents and activists in other counties who were doing work similar to what USEIP was doing. She also wrote the USEIP County & Local Organizing Playbook and played a lead role in publishing and disseminating USEIP materials, including the canvassing report produced by USEIP after completing its 2021 canvass of more than 9,000 residences in Colorado.

21. Defendant Epp also participated in USEIP's door-to-door campaign in Douglas County and El Paso County.

### ii.  Holly Kasun

22. Defendant Holly Kasun admits that she founded USEIP, along with Defendant Ashley Epp.

23. Defendant Kasun also admits that she is the designated spokesperson for USEIP.

24. Defendant Kasun made numerous media appearances in which she was identified as a co-founder of USEIP, a representative of USEIP, and later as a co-founder of Cause For America, which she founded with election-denier and conspiracy theorist Mike Lindell.

25. Defendant Kasun admits that she contributed to USEIP's training materials.

26. As a spokesperson for USEIP, Defendant Kasun has touted USEIP's campaign in Colorado. She gave interviews on KOA, Lindell TV, and Real America's Voice. (Pl. Exs. 61, 68, 69). In one interview in which she described alleged voter fraud and USEIP's efforts to address the same, she told listeners that "we showed you the crime, so what are we doing about it," and then introduced someone to talk about USEIP's door-knocking campaign. (Pl. Ex. 61).

27. Defendant Kasun was also repeatedly identified on USEIP's Basecamp forums as the person responsible for creating USEIP's communications and recruitment materials. (Pl. Ex. 25.)

28. Defendants Kasun and Epp also were tasked with creating "talking points for election integrity volunteer explanation, including some key stats to drive excitement once the stats are verified and public." (Pl. Ex. 25.)

### iii.   Sean Smith

29. Defendant Smith admits that he joined USEIP in December 2020 and took on a leadership role in the organization by March 2021.

30. Defendant Smith has attended and spoken at numerous events in Colorado that purported to focus on "election integrity."

31. Defendant Smith also admits that he helped conceive USEIP's door-to-door campaign and wrote the voter verification and captain training guides.

32. Further, he personally conducted door-to-door activities in both Weld County and El Paso County.

## II.        THE FORMATION OF U.S. ELECTION INTEGRITY PLAN

33. U.S. Election Integrity Plan (USEIP), also known as the Colorado Election Integrity Plan (*see* Pl. Ex. 10, 11), was founded by Defendants Epp and Kasun on November 7, 2020 after President Biden defeated President Trump in the 2020 presidential election.

34. As set forth above, Defendant Smith joined the organization in December 2020 and thereafter became one of its leaders.

35. USEIP's leaders claim that they saw "inexplicable, illogical results" in the 2020 presidential election and, accordingly, contend that the election results were fraudulent. (Pl. Ex. 1, at 2).

36. Defendants assert that USEIP is "a civics group that is focused on election integrity and finding the truth about our elections, sharing the truth and fixing our elections on the most local level."

37. Although USEIP presents itself as a "free association of individuals," the evidence presented a trial establishes that its decisions, training, and communications were centralized, and that Defendants were instrumental in the same.

38. For example, a USEIP training manual instructed its agents not to speak to the media, and instead told them to refer media inquiries to USEIP, where Defendant Kasun serves as the spokesperson. (Pl. Ex. 37.) Defendant Kasun admits that she was "primarily" the person who spoke on behalf of USEIP, making media appearances as a founder of the organization.

39. In addition, USEIP dictates methods for recruiting and training volunteers and maintains a website that—among other things—is used to publicize USEIP's activities and recruit volunteers.

40. Defendants Kasun and Epp admit that they serve as resources for USEIP leaders and agents, and assist them in getting media stories placed or in organizing recruits. Defendant Smith served as the resource for organizational and legal questions.

41. The evidence presented a trial demonstrates that publicizing USEIP's efforts was a critical part of Defendants' strategy, including but not limited to using the media attention as "recruiting mechanism." For example, Defendant Kasun testified that that "when we get on the press, another way that volunteers find their way to us is, you know, doing interviews and that sort of thing.

Obviously, I speak about USEIP and what's happening in the state of Colorado and, you know, across the U.S., and we say 'If you want to get involved, come to the website and find us there.'"

42. Although USEIP describes itself as non-partisan, evidence suggests otherwise. For example:

- Defendant Kasun testified that she believed there were election anomalies prior to 2020, but that she took no concrete steps or actions in response to those anomalies until the 2020 presidential election.

- Defendant Epp testified that she believed there was election fraud in 2016 and 2020, but that she did not do anything after the 2016 election, which Donald Trump won, in response to that alleged fraud. Following the 2020 election, however, Epp attended multiple rallies and was "so outraged that the will of the American people could be stolen." She was also at the U.S. Capitol on January 6, 2021.

- All of the "concrete" examples that USEIP cites as election fraud in the 2020 election were from pivotal states—Michigan, Georgia, Arizona, New Mexico, and Pennsylvania—that Donald Trump lost.

- USEIP created a PowerPoint presentation entitled, "Hitchhiker's Guide to Election Fraud Analytics," the cover of which contains images of Xi Jinping, Nancy Pelosi, Mike Pence, and, as a centerpiece, a laughing Kamala Harris standing next to Joe Biden, who is shown to be saying, "My butt's been wiped." (Pl. Ex. 6.)

- Messages collected from "Basecamp," USEIP's online members' forum, show connections between USEIP and the Republican Party.

- Defendant Smith testified that he is a registered Republican, that he travelled to Washington, D.C. to "petition [his] government for a redress of grievances" at the January 6, 2021, rally organized by Donald Trump, and that went to the U.S. Capitol grounds after Mr. Trump's speech ended.

- Smith testified that "the Democrat Party, as far as I can tell, is dead set against transparency and integrity in our elections."

- One of the individuals to whom the USEIP Playbook is dedicated is Mike Lindell, a well-known supporter of Donald Trump's claims that the 2020 presidential election was "stolen."

- Jeff Young—a key agent of USEIP—is the Director of Data and Analytics for Cause of America, the national "election integrity" organization funded by Mike Lindell.

- Defendant Epp is a co-founder of Cause of America, has appeared multiple times on the "Conservative Daily" podcast, and has had her work published on Frankspeech, Mike Lindell's "media platform."

- Defendants Smith and Kasun were also early employees of Cause of America, and Defendant Kasun also has appeared on Frankspeech and other partisan news platforms.

- A USEIP training manual states: "The government is rigged and run by liberal bureaucrats who stole the election." Defendant Smith testified that he wrote the USEIP training manuals.

## III.     USEIP'S INCENDIARY COUNTY & LOCAL ORGANIZING PLAYBOOK

43. In 2021, USEIP published a "County & Local Organizing Playbook," (the "Playbook") which sets forth USEIP's views and had been widely disseminated—among other ways—through USEIP's website and Defendant Kasun's media efforts. (Pl. Ex. 1.).

44. As set forth in more detail below, USEIP's Playbook is replete with militant and violent rhetoric.

45. The Playbook also provides direction to USEIP members on how to recruit, how its local leaders should organize teams and hold meetings, and how to conduct its door-to-door canvassing activities.

46. Defendant Epp admits that she drafted the Playbook, and Defendant Kasun admits that she edited and finalized the Playbook.


## IV.     USEIP DOOR-TO-DOOR CAMPAIGN

47. Defendants, via USEIP and with the assistance of USEIP agent Jeff Young, developed, orchestrated, and organized a door-to-door "voter verification" campaign in multiple counties in Colorado. (Pl. Ex. 1 at 17, 19).

48. Defendant Kasun described USEIP's on-the-ground efforts as "verifying publicly available Secretary of State voter rolls." According to Defendant Kasun, the verification canvassing process involved two or more USEIP agents ringing doorbells and, if someone answered the door, introducing themselves and saying that they were citizens "interested in verifying some voter data" provided by the Secretary of State." Despite this innocuous-sounding description, the evidence presented at trial demonstrates that USEIP's canvassing efforts were not carried out as described.

49. First, although the door-to-door campaign was purported to be a fact-finding mission, Defendants approached the campaign as if the fraud were already proven:

- The Playbook described the organization as starting "in response to the November 2020 *fraudulent* election." (Pl. Ex. 1 at 2 (emphasis added).)

- Jeff Young testified that he was convinced starting on election night and no later than mid-November 2020 that the 2020 election was stolen from Mr. Trump.

- Mr. Young testified that USEIP canvassed "to show that there were, indeed, anomalies between what the Secretary of State's data said and what voters were saying."

50. Second, Defendants encouraged USEIP agents to photograph voters' houses, residents themselves, or locations where the agents thought there was a discrepancy between what the resident reported, what the volunteer found, and what was on the Secretary of State records. USEIP maintained a database of the photographs it collected through its canvassing efforts. USEIP also trained its volunteers—via training manuals written by Defendant Smith—to audio record their conversations with voters.

51. Third, the evidence presented a trial demonstrated that USEIP leaders encouraged its agents to carry weapons and, in fact, carried weapons while going door-to-door.

52. Defendant Smith, for example, testified that he "probably" carried a firearm with him when he went door-to-door, and that other volunteers may have carried firearms as well. Smith further testified that while canvassing voters' homes, it would have been justified for any USEIP volunteer to brandish a firearm "[i]f they were threatened and were trying to defend and protect themselves," even on the doorstep of a voter whose house he or USEIP agents approached without warning or

invitation. He also stated: "I'm aware that you are allowed under U.S. law to defend yourself in all conditions and circumstances."

53. Further, on Basecamp, the forum used by USEIP to share information and documents and to coordinate its volunteers, canvassers were informed that leaders were "attempting to line up security," and told volunteers: "anyone who carries protection might want to let us know so we can offer your cell phone numbers to those who are concerned." (Pl. Ex. 25 (July 23, 2021 Basecamp posting)).

54. Fourth, USEIP's method of selecting which precincts to canvass makes clear that they set out to target minority voters in particular.

55. More specifically, USEIP's methods involved ranking voters by what it dubbed a "voter opportunity score," which "takes the voter history from the Secretary of State's voter history file and it takes the age of the person to determine how many elections could they have been involved in, and then it looks at how many were they actually involved in." Precincts were selected for canvassing by identifying those precincts in the county with lowest VOS scores and those with the highest, and Defendants presumed that the lowest VOS score precincts were going to be likely sources of fraudulent behavior.

56. The voter opportunity scores admittedly did not account for variables such as a person becoming naturalized and therefore recently eligible to vote, or recently moving into Colorado. (Pl. Ex. 25 ("Given how we are sorting precincts based on the voter opportunity score, we may inherently bias our collection effort, which then leads to a possible issue of claiming statistical significance in our findings[.] Given that the VOS actually has an inherent randomness to it given that it can't differentiate between someone who should have a longer voter history in Colorado versus someone who was older and just moved to Colorado."))

57. Further, USEIP produced an Election Analytics Guide that informed readers that "target" voters include those who were assigned a low voter opportunity score because "low propensity voters who hadn't voted and then all of a sudden voted in 2020, there was a theory that they may be phantom voters; so basically, people who either don't exist or don't live there anymore are getting ballots cast in their name." Mr. Young confirmed that "between ballots cast by low VOS voters, ballots allegedly cast by low VOS voters and ballots allegedly cast by high VOS voters," that the low VOS group was "of more concern."

58. Although USEIP canvassed voters with high voter opportunity scores, Mr. Young testified that he did not consider these voters likely to have committed fraud.

59. Based upon the voter opportunity scores, USEIP volunteers were given "walk lists" that determined what homes they should visit.

60. USEIP's canvassing efforts also admittedly targeted high-density households, which were more likely that non-high-density households to be populated by persons of color. (*See* Pl. Ex. 25 (explaining that in Weld County, "the voters they had targeted were people living in Weld County with 5 or more people in the household.").)

61. Fifth, USEIP's agents were instructed by Defendants and other USEIP leaders to ask invasive questions of the voters whom they contacted.

62. More specifically, for example, USEIP agents conducting the door-to-door campaign were instructed to question voters about their voting activity as well as the activity of other voters or members of the household.

63. In addition, Defendants, via instructions set forth in the Playbook and training manuals, directed USEIP agents to ask a voter to sign an affidavit, witnessed by the USEIP agent, if the USEIP agent thought there was an "anomaly" between the information obtained from the voter

and information contained on the Secretary of State's voter list.  If the voter declined to complete the affidavit, the USEIP agents were instructed to complete and sign the affidavits themselves as "witness" to what the voter allegedly reported to them.

64. Sixth, not all USEIP volunteers are vetted. In fact, USEIP did not vet *any* volunteers in the beginning and, as a result, individuals with sex offense criminal histories were found to be volunteering with USEIP. Eventually, Defendants began to vet some volunteers in a limited manner. Defendant Kasun testified that when volunteers sign up through the USEIP website, she or another USEIP agent will call that person and introduce themselves, look at their social media history, and run a simple background check. But individuals who did not volunteer through the USEIP website, such as individuals who became agents on the county level, were not vetted.

65. And, contrary to their contentions, Defendants have no proof that USEIP canvassers did not intimidate voters.

66. In fact, Defendants' knowledge of what volunteers actually did when they canvassed are merely assumptions based on "anecdotal stories." For example, of the over 9,000 home visits that USEIP volunteers made, Defendant Kasun testified that she personally witnessed none of them firsthand, and watched only six videos that volunteers provided to her of their home visits, all of which were included in a publicity video about the door-to-door campaign.

67. Defendants' only "proof" that its volunteers did not intimidate voters is their testimony that "if anything were to have happened that would have broken the law," USEIP "would have gotten reports." In other words, according to USEIP, no voter could be intimidated by their volunteers because if voters had been intimidated, "they wouldn't have answered the questions and they would have just shut the door."

68. Further, Defendant Kasun dismissed the possibility that there were "bad actors" among its volunteers because "[w]e went in pairs to hold each other accountable." But she could not point to any concrete example of a volunteer calling out another volunteer for not following USEIP's training Likewise, when asked how USEIP was sure no intimidation occurred, Defendant Kasun responded, "we took every precaution not to intimidate," citing as her lone example the fact that when they visited homes, USEIP members wore "Hello My Name Is" nametags.

69. When Defendants and other USEIP agents became aware of articles and a public statement from the Office of the Secretary of State that detailed voters' complaints about USEIP agents' behavior, they did not investigate these claims. Instead, they presumed the complaints were false. (*See* Pl. Ex. 25 (Basecamp post, Sept 15, 2021).)

70. In fact, testimony elicited at trial demonstrate that some of the agents engaged in objectively intimidating behavior when interacting with voters.

71. For example, Defendants sent agents into neighborhoods with significant Spanish-speaking populations without verifying whether the agents assigned to those walk lists could speak Spanish and without obtaining reliable translations of their affidavits. One agent explained on Basecamp that they had already interacted with at least one Spanish-speaking voter without having a Spanish-speaking volunteer or translator, "who had no idea what we were saying. If I could have handed her a page to read we might have gotten answers from her." (Pl. Ex. 25 (Basecamp post, May 28, 2021).)

72. Rather than pausing canvassing in these neighborhoods until appropriate means of communication might be established, Defendants carried on with their canvass assignments. They allowed a USEIP agent to translate the documents without verifying translation accuracy. And instead of assigning Spanish-speakers to engage Spanish-speaking voters, Defendant Epp

15

supported Mr. Young's recommendation that the agents use Google translate. Another agent offered to teach other agents a few words in Spanish, not to be understood but to "sound more caring": "I can train you guys with a few works. If you speak Spanish you will sound more caring than the way Media's gas made you and me sound." (Pl. Ex. 25 (Basecamp post, May 28, 2021).) But the result was that USEP agent were assigned and expected to interrogate Spanish-speaking voters in English.

73. These actions amount to objective intimidation of non-native English speakers, particularly those who were selected for canvassing because they were identified as low-VOS voters and were therefore already suspected by Defendants of being a source of voter fraud.

## V.   DEFENDANTS HAVE UTILIZED INTIMIDATING, THREATENING, AND VIOLENT RHETORIC WHILE PROMOTING USEIP AND THEIR THEORIES OF ELECTION FRAUD.

74. The County & Local Organizing Playbook asserts that the country is not at peace, and positions USEIP volunteers as "patriots" who are pitted against those with whom they disagree, who are labeled "enemies" and "communists":

- "So, in times of peace, we are much keener to disagree and debate . . . . But **we are not in a time of peace**. And everyone who values freedom and is committed to the fight for our Republic is now needed." (Pl. Ex. 1, at 7 (emphasis added).).

- "We knew then [after the November 2020 election] that **this is the fight**." (Pl. Ex. 1, at 2 (emphasis added).)

- "When they stole our election, they stole our Republic. If we allow the fraud to stand, we become complicit in the destruction of the greatest nation in

the history of the earth. We become complicit in their crime. No. **No one is coming to save us. It's time to stand up**." (Pl. Ex. 1, at 2 (emphasis added).)

- "[Y]ou cannot save America from behind a keyboard. . . . This work is in real life. It is local and collaborative and challenging and messy." (Pl. Ex. 1, at 5.)

- "The first thing is to find other patriots concerned about election fraud—or, frankly, all the communism, and start talking." (Pl. Ex. 1, at 6.)

- "[C]ommunists are very good at marching in the same direction because their meals depend on it." (Pl. Ex. 1, at 7.)

- "Get to know your local elected official. Watch them and take notes. Find out where they line up; and don't forget." (Pl. Ex. 1, at 7.)

- "We will not, however, public all our inner workings and strategies for our enemies to pour over." (Pl. Ex. 1, at 23.)

75. In their speeches and writings, Defendants Kasun, Epp, and Smith have publicly directed and endorsed USEIP's views.

76. In a public speech, to applause and laughter from his audience, Sean Smith stated that: "**I think if you're involved in election fraud, then you deserve to hang. Sometimes the old ways are the best ways**." (Pl. Ex. 8 (emphasis added).).

77. Defendant Epp echoed these ideas on her blog, Ashe in America. In one blog entry and in large font, she called on her readers to "**fetch me some feathers and a vat of tar**." She explained "In a big picture sense, this means offense. There is a tangible shift in the momentum—we can all feel it. . . . . Our American identity was founded on tar and feathering people for this kind of

behavior," (Pl. Ex. 12 at 7 (emphasis added).). Though she hastily claimed that she was "not calling for angry mobs," her writing belied her claim. (*Id*.)

78. Further, in a long blog entry about Eric Coomer, Defendant Epp called the Black Lives Matter protests "the burn/loot/murder era," and asserted to her readers that "George Floyd died of fentanyl overdose while resisting arrest." (Pl. Ex. 18 at 12.) She further claimed that Black Lives Matter protesters were "comrades [who] burned down the country." (Pl. Ex. 18, at 13.) In a separate blog post, she equated images of Black Lives Matter protests with antifa and claimed the latter is a "domestic terrorist organization." (Pl. Ex. 19, at 18.)

79. Defendant Epp told her readers that Denver is "communist-controlled," and that "her" movement is under attack. (Pl. Ex. 19.)

80. Defendant Epp also told her readers that "Denver is an obvious **war zone**." (Pl. Ex. 20, at 7 (emphasis added).)

81. Further, and notably, Defendants Kasun, Epp, and Smith all attended and widely publicized their attendance at, the events at the Capitol on January 6, 2021.

82. Defendant Epp described her purpose in attending the events on January 6, 2021, writing: "[W]ith hundreds of Coloradans and hundreds of thousands of Americans to protest the obvious fraud in the November 3, 2020 election. We all knew it was stolen." (Pl. Ex. 20.) She told her readers that she "never hid the fact that I was at the US Capitol in Washington D.C. on January 6th. I've actually gone out of my way to make my story of the alleged insurrection well known among my personal and professional contacts. I have nothing to hide. I did nothing wrong." (*Id.*)

83. Defendant Kasun, too, confirmed that she listened to Donald Trump speak, and later went to the Capitol itself in the late afternoon. She has provided her public accounting of her

participation in the events of January 6 in several interviews, including one with One America news and one with a local Denver station.

84. Defendant Smith attended the January 6 insurrection and twice had to be removed by Capitol police from the Capitol steps.

85. Defendant Epp also organized and spoke often to crowds at rallies to protest the election results in Colorado every Saturday between the November 2020 election and January 16, 2021.

86. The Defendants' door-to-door canvassing plan—and the way it is reasonably perceived by voters who need to decide whether voting is worth the risk that USEIP agents may show up at their door—is directly related to the January 6, 2021 insurrection at the U.S. Capitol and to the Defendants' public involvement in those events.

87. On January 6, 2021 one mile from the U.S. Capitol, then-President Donald Trump gave a speech in which he—like Defendants—claimed that the 2020 election results were fraudulent and called on Vice President Mike Pence to refuse to certify certain electoral voters, thereby overturning the 2020 election. Thereafter, President Trump's supporters descended on the Capitol, where they ransacked and destroyed government property, caused members of Congress to evacuate, and assaulted and killed members of law enforcement.

88. Before and since January 6, 2021, Defendants have continued to claim—through their door-to-door campaign and other actions—that the 2020 election results were fraudulent and that violence is an appropriate and necessary response to election results and to individual election officials and voters with whom they disagree.

## VI.    DEFENDANTS HAVE WIDELY REPORTED USEIP'S EFFORTS

89.    Defendants' actions demonstrate that it was their intent to publish and disseminate their actions as widespread as they could.

90.    Among other things, Defendants intentionally made the decision to public a widely disseminate canvassing report. Mr. Young testified that the intended audience was the public and law enforcement officials, including the police, district attorneys, and the Attorney General.

91.    The canvassing report boasted that in the four counties included in the report, USEIP agents knocked on 9,472 doors and interacted with 4,601 residents. (Pl. Ex. 5, at 2). It claimed that between 5% and 11% of voters in the four counties were "affected by unexplained irregularities in Colorado's voter rolls and voting records." (*Id.*). It further claimed that canvassing just 4,601 residents could be used "as a proxy for the entire state," and that 7-12% of all election races and measures in the 2020 election "may be questionable." (*Id.*)

92.    The canvassing report detailed the methodology chosen by Defendants, specifically its use of the "voter opportunity score" (VOS) metric developed by Mr. Young, as discussed herein. The canvassing report emphasized that both high and low VOS precincts were to be targeted by the campaign looking for "behavioral changes." (Pl. Ex. 5, at 6).

93.    In other words, in the case of low VOS precincts, the Defendants publicly asserted that *voting*—and increased voter turnout at a precinct-level—is suspicious when it occurs in certain neighborhoods and precincts.

94.    USEIP also produced a video about the canvassing results, which features Defendants and remains prominently posted on the USEIP webpage.

95.    Defendants, particularly Defendant Kasun, gave multiple interviews, speeches, and wrote about the purported fraud, the canvassing campaign, and canvassing results, which it used to fuel

calls for more volunteers, more canvassing, and investigations. They obtained coverage by conservative media outlets, including Lindell TV and Real America's Voice, but were interviewed, videotaped, or quoted by mainstream journalists as well. (*See* Pl. Ex. 61 (Holly Kasun interview by KOA radio station); Pl. Ex. 68 (Holly Kasun interview on Lindell TV); Pl. Ex. 69 (Holly Kasun interview by Real America's Voice); Pl. Ex. 60 (Miles Park, NPR story and article covering USEIP and the canvassing report); Pl. Ex. 65 (Erik Maulbetsch, Oct. 1, 2021 Colorado Times Recorder article); Pl. Ex. 70 (Apr. 2022 Reuters article).)

## VII.    THE HISTORY OF VOTER INTIMIDATION IN COLORADO

96. Defendants intimidating and violent rhetoric, coupled with their involvement in USEIP must be considered against the backdrop of historic voter intimidation in Colorado.

97. Colorado, like the rest of the United States, has a long history of voter intimidation that targets Black voters and other voters of color. Plaintiffs' expert, Professor Attiba Ellis, traced the long history of voter intimidation from the 1800s to the present day. He testified that voter intimidation is dehumanizing, and carries with it an added stigma of racism due to the long history of voters of color being targeted for intimidation.

98. In the aftermath of the Civil War and Reconstruction, the Ku Klux Klan and other similar associations formed to intimidate and coerce Black citizens not to vote or participate in the civic and political life of their states. Klan members portrayed themselves as government actors while intimidating voters, augmenting the threat of physical force by threats of arrest or legal sanction. And Black voters were left fearful and without recourse, even when intimidation swelled into mob violence against Black would-be voters.

99. Professor Ellis further testified that in the aftermath of the Voting Rights Act of 1965, modern-day voter intimidation became to evolve. Instead of "open riots and civil unrest," it is "varied and violent—or communicates the threat of violent."

100.      Professor Ellis opined that USEIP's door-to-door campaign is best understood as a new type of voter intimidation, noting that modern voter intimidation has also taken the guise of "voter vigilante" groups who use the claim that rampant voter fraud necessitates the policing of voting by citizen groups because the government refuses to sufficiently protect "election integrity."

101.      Professor Ellis explained that these groups exploit "\methodologically dubious investigations that fail to expose fraud, and instead serve to bully minority and low-income voters who are attempting to vote through specious challenges to low-income and minority voters.

102.      Voter intimidation of this type can happen at the polls or in persons' homes and communities, but is particularly intimidating when it is brought directly to voters' doorsteps.

103.      During such campaigns, Professor Ellis testified that voters of color are precisely whose votes get challenged.

104.      Professor Ellis noted that deception is a common form of voter intimidation, explaining that manipulation, which persuades the voter to fail to vote or to vote in a way they would not otherwise have voted, then the use of falsehoods, misdirection, or misrepresentations, may amount to intimidation. He distinguished between voicing concerns about the validity of any given election—which is constitutionally protected speech—and the use of misinformation or disinformation to persuade a voter not to vote or to vote differently, which can amount to intimidation by deception.

105.      Professor Ellis testified that intimidation by threat, which is oftentimes undocumented and fleeting can evades detection and is often based on the coded messages that are

relayed around the political process and an individual's participation. He further testified that the person intimidated would likely not feel comfortable in reporting the threat since that may make the threat come to reality.

106.     Mr. Ellis opined that Defendants engaged in a scheme of voter vigilantism that had the objective and subjective effect of intimidating voters through their rhetoric and their aggressive canvassing. Their conduct runs the risk of disturbing the balance allowed by voter intimidation laws by depriving voters equal dignity, as well as their trust that their votes will be counted.

107.     Further, the rhetoric used by Defendants must be understood against the backdrop of exactly *how* Defendants propose to make "them" suffer the consequences—that is, to pay for the crime of election fraud. Defendant Smith's public statement about how to address election fraud makes it clear: 'I think if you're involved in election fraud, then you deserve to hang. Sometimes the old ways are the best ways.'" Professor Ellis testified that this language about "'old ways of hanging" clearly evokes the tactics of voter intimidation through threat, violence. This rhetoric echoes the history of insurrection and lynching.

108.     Professor Ellis testified that to voters, and especially to voters of color, the campaign organized by the Defendants reasonably appears to a voter  as if a voter vigilante squad is out there that will question their vote and threaten them if they cast their vote.


VIII.   **PLAINTIFFS PRESENTED EVIDENCE THAT COLORADO VOTERS HAVE BEEN INTIMIDATED BY DEFENDANTS' CONDUCT**

109.     Plaintiffs also presented evidence at trial that numerous voters were intimidated by Defendants' conduct.

110.     One voter in particular, Ms. Yvette Roberts, testified that she received a visit from two USEIP agents and was intimidated by their actions, specifically by the personal and invasive

questions that the agents asked her, including questions that would force her to reveal the fact that she was a retired woman living alone. She had to ask them to leave her property. She later reported the incident to local law enforcement to ensure that there would be a record in case the agents later returned to retaliate against her for asking them to leave; she also reported the incident to the Office of the Colorado Secretary of State. Ms. Roberts has previously received visits from canvassers or solicitors, but this was the first visit that left her feeling intimidated and concerned about her safety.

111.    A member of the League of Women Voters Colorado also reported that she received a visit from USEIP. Although she was not intimidated herself, this was because she was well-versed in her rights as a voter. Nonetheless, she was uncomfortable with the actions and believed they could be seen as intimidating by people who don't know their rights.

112.    The Colorado Office of the Secretary of State, individual county election offices, and journalists also reported receiving reports from voters who were intimidated, threatened, upset, or otherwise concerned about receiving visits from USEIP. (*See* Pl. Ex. 50.)

113.    Deputy Secretary of Secretary of State Chris Beall testified that the Office of the Secretary of State received reports from voters who were concerned, upset, and intimidated after being confronted in their homes by USEIP agents. Further, these reports prompted the Secretary of State to issue a public statement that warned voters about the door-to-door campaign, explain that the USEIP agents are not the government officials they were holding themselves out to be, and inform voters of their rights.

## IX.    PLAINTIFFS' INJURIES

114.    In the midst of this election year, NAACP CO, LWV-CO, and MFV have had to divert scant financial and human resources to address Defendants' campaign of voter intimidation.

115.     Diversion has occurred in at least two ways. First, plaintiffs have had to divert resources toward correcting the Defendants' misinformation about the election and educating voters about post-election intimidation campaigns in their homes. Second, plaintiffs have had to reserve resources during an important election year so that they have sufficient resources to respond to and protect voters from any post-election intimidation campaign that the Defendants may elect to again carry out.

## **CONCLUSIONS OF LAW**

### I.      **SECTION 11(B) OF THE VOTING RIGHTS ACT**

1.   Section 11(b) of the Voting Rights Act of 1965 provides a private right of action for injunctive relief against private actors who engage in voter intimidation. *Allen v. State Bd. of Elections*, 393 U.S. 544, 554-56 (1969).

2.   In relevant part, Section 11(b) of the Voting Rights Act provides that:

> No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote, or intimidate, threaten, or coerce any person for exercising any powers or duties under [other provisions of this law].

52 U.S.C. § 10307(b) (formerly codified at 42 U.S.C. § 1973i(b)).

3.   To succeed on a Section 11(b) claim, Plaintiffs must show that Defendants: (1) intimidated, threatened, or coerced, or attempted to intimidate, threaten, or coerce, another person; (2) in connection with voting, attempting to vote, or urging or aiding another to vote. 52 U.S.C. § 10307(b); *See National Coalition on Black Civic Participation v. Jacob Wohl*, 498 F. Supp. 3d 457, 477 (S.D.N.Y. 2020) (hereinafter *Wohl I*).

4.   *Wohl I* defined these terms:

> The words "intimidate," "threaten," and "coerce," have familiar and somewhat overlapping definitions. To "intimidate" means to "make timid or fearful," or to "inspire or affect with fear," especially "to compel to action or inaction (as by threats)." To "threaten" means to "utter threats against" or "promise punishment, reprisal, or other distress." And to "coerce" means to "restrain, control, or dominate, nullifying individual will or desire (as by force, power, violence, or intimidation).

498 F. Supp. 3d at 477 (citations omitted).

5. There is no requirement that a plaintiff demonstrate that a defendant acted with specific intent to intimidate voters, or demonstrate racial animus. *League of United Latin Am. Citizens— Richmond Region Council 4614 v. Public Interest Legal Found.*, No. 1:18-cv-00423, 2018 WL 3848404, at *4 (E.D. Va. Aug. 13, 2018) ("*LULAC*"); *National Coalition on Black Civic Participation (NCBCP) v. Jacob Wohl*, 661 F. Supp. 3d 78, 116 (S.D.N.Y. 2023) ("*Wohl II*").

6. Congress deliberately omitted an intent requirement from Section 11(b) to prohibit voter intimidation regardless of the actor's motives. *See* Voting Rights, Part 1: Hearings on S. 1564 Before the S. Comm. on the Judiciary, 89th Cong. 16 (1965) (Attorney General Nicholas Katzenbach, a drafter of § 11(b), testifying before the Senate Judiciary Committee that, "Under [the VRA] no subjective 'purpose' need be shown … in order to prove intimidation under the proposed bill. Rather, defendants would be deemed to intend the natural consequences of their acts.").

7. The Voting Rights Act in general, and Section 11(b) in particular, should be read expansively and is not limited to any particular act. *Allen*, 393 U.S. at 567 (Congress intended "to give the [Voting Rights] Act the broadest possible scope"); *Wohl I*, 498 F. Supp. 3d at 476 ("Section 11(b)'s reach is extensive, in accordance with the VRA's ambitious aims of encouraging true enforcement of the Fifteenth Amendment's promise of unencumbered access to the vote, regardless of race."); *Jackson v. Riddle*, 476 F. Supp. 849, 859 (N.D. Miss. 1979) (explaining that

even where a court finds "no case precisely on point," Section 11(b) should "be given an expansive meaning").

8.   Section 11(b) is violated by, among other things, any actual or attempted action by any person to instill fear in connection with one's exercise of the right to vote. *See Daschle v. Thune*, Temporary Restraining Order, Case No. 04-4177 (D.S.D. Nov. 2, 2004) (finding that the defendants violated Section 11(b) and objectively intimidated Native American voters by following voters from polling places, copying down voters' license plate numbers, and by recording their license plates).

9.   "[U]nlawful threats or intimidation under the statute need not be violent or physical, and may include communications inspiring fear of legal consequences, economic harm, dissemination of personal information, and surveillance." *Wohl II*, 661 F. Supp. 3d at 113; *see also United States v. Nguyen*, 673 F.3d 1259. 1265 (9th Cir. 2012) (in analyzing a criminal provision prohibiting voter intimidation, concluding that the prohibition "is not limited to displays or applications of force, but can be achieved through manipulation and suggestion").

10. Plaintiffs need not show that the intimidation campaign has or will prevent a voter from voting. "an *attempt* to intimidate, threaten, and coerce others—regardless of race—for exercising their right to vote, even if ultimately unsuccessful, still violates Section 11(b)." *Wohl II*, 661 F. Supp. 3d at 115-16; *see also United States v. Clark*, 249 F. Supp. 720, 728 (S.D. Ala. 1965) ("The success or failure of intimidate, threats or coercion, is immaterial, since 'attempts' are equally proscribed.").

11. Defendants violated the Section 11(b) of the Voting Rights Act by intimidating, threatening, or coercing, or attempting to intimidate, threatening, or coercing another person in connecting with voting or attempting to vote; or by attempting to vote, or intimidate, threaten, or

coerce, or attempt to intimidate, threaten, or coerce another person in connection with voting or attempting to vote.

12. By orchestrating, recruiting for, and widely publicizing their door-to-door campaign to challenge the legitimacy of voters' ballots in their home, having obtained voters' address from voting records, while indicating that the canvassers are or may be carrying concealed weapons, encouraging the surveillance of these voters via recordings and photographs, and publicly utilizing rhetoric that evokes lynchings, other forms of violence, and the idea that the canvassers and the voter are on opposite sides of a war, Defendants have intimidated, threatened, or attempted to intimidate or threaten voters who know now that voting puts them at risk of receiving a similar post-election visit after the 2024 general election or any subsequent election whose results the Defendants dislike.

## II.   SECTION 1985(3) OF THE KU KLUX KLAN ACT OF 1871

13. Passed as part of the Civil Rights Act of 1871, the Ku Klux Klan Act created a cause of action against "two or more persons" who "conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support and advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States." *See* 42 U.S.C. § 1985(3).

14. To prevail on a claim under this section of the Act, a plaintiff must show: (1) a conspiracy of two or more; (2) to prevent by force, intimidation, or threat, (3) any citizen from giving his or her "support or advocacy" to a candidate for federal office, and (4) an act in furtherance of that conspiracy. *See LULAC*, 2018 WL 3848404, at *1, 5-6; *see also Kush v. Rutledge*, 460 U.S. 719,

724 (1983) (Section 1985(3) "proscribe[s] conspiracies that interfere with" among other things "the right to support candidates in federal elections").

15. A violation of Section 1985(3) does not require state action. *Griffin v. Breckenridge*, 403 U.S. 88, 96 (1971) ("On their face, the words of [§ 1985(3)] fully encompass the conduct of private persons.").

16. Section 1985(3) also does not have an intent requirement. *Kush*, 460 U.S. at 726 ("The statutory provision dealing with these categories of conspiratorial activity contain no language requiring that the conspirators act with intent to deprive their victims of the equal protection of the laws.").

17. The "support and advocacy" clause of Section 1985(3), distinct from the "equal protection" clause of Section 1985(3), "does not require allegations of a race or class-based, invidiously discriminatory animus or violation of a separate substantive right." *LULAC*, 2018 WL 3848404, at *6; *see also Federer v. Gephardt*, 363 F.3d 754 (8th Cir. 2004) (plaintiff "is not required to show class-based animus as part of his support and advocacy claim").

18. Plaintiffs have established that Defendants Smith, Epp, and Kasun conspired to prevent by intimidation or threat certain citizens—namely, those who live in precincts adjudged by Defendants to be likely sources of fraudulent voting—from giving their support or advocacy to candidates for federal office, and Defendants acted in furtherance of that conspiracy by orchestrating and initiating a door-to-door campaign to question voters, publicizing their methodology to alert the public about which voters and precincts they are targeting and are likely to target in future door-to-door campaigns, and broadly disseminating their "findings" in a manner that baselessly identified certain precincts and voters as being likely sources of fraud.

## III.    STANDING

19. In general, a plaintiff has standing to bring suit when "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*, 21 F.4th 1229, 1241 (10th Cir. 2021) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 180-81 (2000)).

20. "An organization has standing to sue on its own behalf if the 'defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts.'" *Common Cause of Co. v. Buescher*, 750 F.Supp.2d 1259, 1269 (D. Colo 2010) (quoting *Florida State Conf. of NAACP v. Browning*, 522 F.Supp.3d 1153, 1165 (11th Cir. 2008)); *see also Wohl I*, 498 F.Supp.3d at 464. An organization also has standing to sue "when a defendant's conduct makes it difficult or impossible for the organization to fulfill one of its essential purposes or goals." *Buescher*, 750 F.Supp.2d at 1269 (citing *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1353-54 (11th Cir. 2005)).

21. A membership-based organization "may also have standing to sue on behalf of its members '(1) when its members would otherwise have standing to sue in their own right, (2) the interests at stake are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Utah Physicians*, 21 F.4th at 1241 (quoting *Laidlaw*, 528 U.S. at 181).

22. Plaintiffs' testimony at trial is sufficient to establish standing. All three plaintiffs have established that they have had to divert resources from their projects to counteract illegal, post-election voter intimidation being carried out at voters' homes by or as orchestrated by Defendants.

They have limited human and financial resources to carry out critical voter education and Get Out The Vote programs as well as their non-election-related programming, which they have had to divert in order to educate voters about their rights when confronted with intimidation in their homes, and to prepared to implement response plans for post-election intimidation campaigns, absent an injunction that would bar the Defendants from orchestrating these campaigns after the 2024 election or after any future election.

23. Mi Familia Vota's Get Out the Vote and voter education programs are particularly undermined by Defendants' campaign, which targets precisely those voters who Mi Familia Vota seeks to engage. Mi Familia Vota works with low-propensity voters to educate, encourage, and support their decision to vote and become active members of Colorado's political community. Defendants' methods involved targeting low-propensity voters in their door-to-door campaign and publicizing their belief that these precincts were likely sources of voter fraud.

24. Furthermore, both NAACP CO and LWV CO have members who would have standing to sue in their own right, to protect themselves against being targeted by Defendants' door-to-door campaigns. Both organizations are committed to educating and supporting eligible voters, so the interests at stake are germane to their purpose, and the relief requested does not require participation of individual members of either organization. *See Utah Physicians*, 21 F.4th at 1241.

## IV.    ATTORNEY FEES

25. The Voting Rights Act provides that the Court "may allow the prevailing party, other than the United States, a reasonable attorney's fee, reasonable expert fees, and other reasonable litigation expenses as part of the costs." 52 U.S.C. § 10310(e).

26. Attorneys' fees are likewise awardable under the Ku Klux Klan Act. *See* 42 U.S.C. § 1988.

27. "Although awarding fees pursuant to [the VRA] is discretionary, the legislative history makes clear that a prevailing party usually should recover fees . . .." *Donnell v. United States*, 682 F.2d 240, 246 (D.C. Cir. 1982). The VRA and KKK Act create private rights of action for individuals to enforce their civil rights. Awarding reasonable attorneys' fees in such circumstances furthers the goals of the statutes and incentivizes the robust enforcement of civil rights. *Id.* at 245 ("The purpose of [the attorney's fees provision of the Voting Rights Act] . . . is the familiar one of encouraging private litigants to act as private attorneys general in seeking to vindicate the civil rights laws.") (citation omitted).'

28. The effectiveness of the VRA and KKK Act would be severely diminished "[i]f successful plaintiffs were routinely forced to bear their own attorneys' fees." *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402 (1968) (discussing the attorneys' fees provision of the Civil Rights Act of 1964). Attorneys' fees do not "simply penalize litigants who deliberately advance arguments they know to be untenable but, more broadly . . . encourage individuals" to seek relief under civil rights statutes. *Centennial Archaeology, Inc. v. AECOM, Inc.*, 688 F.3d 673, 679 (10th Cir. 2012).

29. Because Plaintiffs have prevailed on their claims, they are entitled to reasonable attorneys' fees, which are appropriate to effectuate the aims of the Voting Rights Act and Ku Klux Klan Act.

**WHEREFORE, THE COURT DECLARES THAT:**

A.  That Defendants carried out an unlawful campaign of voter intimidation in violation of Section 11(b) of the Voting Rights Act.

B.  That Defendants carried out an unlawful conspiracy in violation of Section 42 U.S.C. § 1985(3) of the Ku Klux Klan Act.

**WHEREFORE, THE COURT ISSUES THE FOLLOWING ORDER:**

A.  Defendants shall cease and desist going uninvited to voters' homes in order to question voters or household members about mail-in ballots, alleged voter fraud, or to intimidate votes from voting (including by mail).

B.  Defendants shall cease and desist coordinating or organizing visits to voters' homes in order to question voters or household members about mail-in ballots, alleged voter fraud, or to intimidate votes from voting (including by mail).

C.  Defendants shall to cease and desist advising other individuals, including but not limited to USEIP agents, to carrying out door-to-door campaigns to question voters or household members about mail-in ballots, alleged voter fraud, or to intimidate votes from voting (including by mail).

D.  Defendants shall not to maintain databases of voters, their residences, or their vehicles, and will make no attempt to access or use copies of existing photographs or databases of voters, their residences, or their vehicles.

E.  Defendants who speak with voters are to: (i) clearly state the organization with whom they are affiliated; (ii) inform voters that they are not required to speak with Defendants; (iii) desist any claim that they are affiliated with any government entity; (iv) not make any threat of consequences, reprisals, or criminal charges to voters; and (v) otherwise not threaten or intimidate voters.

F.  Defendants shall not carry weapons when going to voters' homes to speak with voters or the voters' household members, and Defendants shall cease and desist instructing or encouraging anyone to carry weapons during USEIP-related interactions with voters.

G.  Defendants shall not to engage in any action to threaten voters for having voted in 2020, for voting in 2024, or for voting in any future election.

H.  Defendants are jointly and separately liable for the plaintiffs' reasonable attorney fees.

I.   This Court retains jurisdiction to ensure Defendants' ongoing compliance with the foregoing orders.


Dated:  June 18, 2024                              FREE SPEECH FOR PEOPLE


                                   By */s/Courtney Hostetler*
                                   Courtney Hostetler
                                   chostetler@freespeechforpeople.org
                                   John Bonifaz
                                   jbonifaz@freespeechforpeople.org
                                   Ben Clements
                                   bclements@freespeechforpeople.org
                                   Amira Marcella Mattar
                                   amira@freespeechforpeople.org
                                   FREE SPEECH FOR PEOPLE
                                   48 N. Pleasant Street, Suite 304
                                   Amherst, MA 01002
                                   Telephone: (617) 244-0234

                                   Casey Breese (#51448)
                                   Casey.breese@lathropgpm.com
                                   Jean Paul Bradshaw
                                   Jeanpaul.bradshaw@lathropgpm.com
                                   Brian A. Dillon
                                   Brian.dillon@lathropgpm.com
                                   Amy Erickson (#54710)
                                   Amy.erickson@lathropgpm.com
                                   Kristin Stock
                                   Kristin.Stock@lathropgpm.com
                                   675 15th St. Suite 2650
                                   Denver, CO 80202
                                   Telephone: (720) 931-3200


                                   *ATTORNEYS FOR Plaintiffs Colorado Montana*
                                   *Wyoming State Area Conference of the NAACP,*
                                   *League of Women Voters of Colorado, and*
                                   *Mi Familia Vota*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been electronically served through ECF this 18TH day June 2024, to all counsel of record.

s/ Courtney Hostetler