# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-00581-CNS-NRN

Colorado Montana Wyoming

State Area Conference of the NAACP,

League of Women Voters of Colorado, and

Mi Familia Vota

       Plaintiff(s)

v.

United States Election Integrity Plan,

Shawn Smith, Ashley Epp,

and Holly Kasun

       Defendant(s)

---

## DEFENDANT EPP PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW

---

This matter is coming before the Court for a five-day bench trial on July 15, 2024.

Plaintiffs brought this action, alleging that USEIP and the named defendants are, "Planning to, threatening to, and actually deploying armed agents to knock on doors throughout the state of Colorado," with "the purpose and effect of intimidating Coloradans from voting, trying to vote, helping others to vote, supporting or advocating for certain political beliefs, or exercising the right to speak, peaceably assemble, or petition the government for redress of grievances, in violation of Section 11(b) of the Voting Rights Act of 1965, 52 U.S.C. § 10307(b)." Plaintiffs further allege that Defendants are "Introducing themselves in ways that make voters believe that they are associated with government agencies…using public voter lists to target and intimidate voters,"

1

"encouraging agents to carry weapons," and "generating and spreading fear that voters can expect multiple armed and unarmed USEIP members to show up at their doors at any moment to harass and interrogate them about their voting history." Plaintiffs conclude that Defendants' conduct is "...thereby Intimidating voters and preventing Coloradans who are lawfully entitled to vote from giving their support or advocacy towards political candidates, in violation of the Ku Klux Klan Act, 42 U.S.C. § 1985." (ECF No. 01)

Defendants dispute all of plaintiffs' allegations as materially false. Evidence and witness testimony at trial will demonstrate that Plaintiffs' allegations are devoid of factual support and libelous. Defendant Epp respectfully requests that the Fact Finder, after assessing the credibility of the witnesses, evaluating all of the evidence, and considering the arguments of counsel, make the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### I. Parties

#### A. Defendants

##### i.    Ashley Epp

1. Defendant Ashley Epp is a Colorado resident and journalist. Ms. Epp is a local columnist and a credentialed member of the Colorado Press Association (as Ashe Epp). Ms. Epp received her Journalism degree from the University of Colorado at Boulder in 2001.

2. Prior to November 15, 2021, Ms. Epp was a professional management consultant in the Colorado business community, serving a variety of clients across multiple industries.

3. From November 15, 2021, to July 15, 2022, Ms. Epp was a professional change manager for the non-profit Cause of America.

4. From July 15, 2022, to the present, Ms. Epp has worked as a professional journalist, in large part due to the impact of this litigation on her professional reputation in the Colorado business

community.

5. Defendant Epp is not a member of any political party or political organization.

6. Defendant Epp co-founded the US Election Integrity Plan (USEIP) in November 2020 as a free association of individuals concerned about the security and accuracy of US elections.

     ii.    <u>USEIP</u>

7. USEIP is an unincorporated association and has been dismissed as a defendant in this case. USEIP was founded by Defendants Ashley Epp and Holly Kasun as well as other non-defendant individuals in November of 2020 in response to nationally reported irregularities in the 2020 Presidential Election.

8. USEIP's early actions included protests and marches at the Colorado Capitol as well as lobbying the Colorado legislature for a Legislative Audit Hearing, which took place in December 2020.

9. Defendant Epp met Defendant Smith at the December 2020 Legislative Audit Hearing, and the two parties exchanged contact information. (Smith Testimony)

10. Defendant Epp met Defendant Kasun online in November 2020, but the two parties did not meet in person until January 5, 2021, in Washington, D.C. They shared a hotel room. (Epp Testimony, Kasun Testimony)

11. Around late January or early February of 2021, Defendant Shawn Smith began volunteering with USEIP. Jeff Young began volunteering around the same time as Defendant Smith. (Smith Testimony, Young Testimony)

     B. **Plaintiffs**

     i.    <u>League of Women Voters of Colorado</u>

12. On August 26, 2021, Beth Hendrix sent an "Email from B. Hendrix to T. Larson regarding potential litigation." (Epp Ex. 25)

13. On August 31, 2021, Karen Sheek sent "Email requesting board votes regarding potential litigation." (Epp Ex. 25)

14. LWVCO decided to sue USEIP, according to Ms. Hendrix, not out of personal knowledge or concern, but because of pressure from outside Colorado. (Hendrix Testimony) "I was contacted by members of our national team about these actions that were happening in the state of Colorado, and in partnership with them, we agreed to file," (Hendrix Dep. 7:12-15), and "I didn't know of the actions that were taking place." (Hendrix Dep. 8:5-6)

15. On September 4, 2021, LWVCO and Beth Hendrix sent an email blast to 2,200 recipients, warning of USEIP conduct and asking for anyone visited to come forward. (Pl. Ex. 41)

16. On September 6, 2021, Colorado Times Recorder Reporter reached out to Beth Hendrix, in response to her email, and to ask if Hendrix knew anyone that had been visited by USEIP. (Pl. Ex. 47) On September 7, 2021, LWVCO began coordinating press against USEIP. (Kas. Ex. 13) LWVCO press efforts are notable because, despite claiming that reports of voters being intimidated by USEIP, these journalists made no such claims and were seeking anyone to go on the record because they had **no such reports**. Notably, even in October 2022 after Plaintiffs had generated significant coverage, these journalists had no such reports. These include:

- Sep 29, 2021: Sarah Matusek, Christian Science Monitor (Kas. Ex. 06)

- Mar 25, 2022: David Gilbert, Vice (Kas. Ex. 17)

- May 20, 2022: Isabelle Chapman, CNN (Kas. Ex. 11)

- Oct 17, 2022: Andy Sullivan, Reuters (Kas. Ex. 08)

17. On September 7, 2021, LWVCO member Tara Menza contacted Beth Hendrix. In addition to being a LWVCO member, Ms. Menza is associated with USEIP, was both canvassed and engaged in canvassing. (Epp Ex. 09)

18. On September 8, 2021, LWVCO sent another email blast to their recipient list. The

4

content appears the same as the first, but it's unclear if the recipient list is the same. (Kas. Ex. 12)

19. On September 9, 2021, the Secretary of State issued a press release about canvassing and voter verification. This press release did not mention USEIP. The press release did confirm the legality of canvassing as protected First Amendment activity. (Pl. Ex. 50)

20. On September 10, 2021, LWVCO and Beth Hendrix sent another email blast to their recipient list. The content appears the same as the first, but it's unclear if the recipient list is the same. (Kas. Ex. 14)

21. Contemporaneous public responses to these communications were, according to the factual record, entirely in opposition to Plaintiffs' allegations and efforts.

- "I am a member of the Election Integrity Group and I certainly would not be part of any group that intimidates anyone. I am not sure where you are getting your information from but I just want free and transparent Elections. I have asked many questions to the county elections dept I live in (Jeffco) hoping to make myself feel better about Elections and honestly I only got more suspicious. I am a retired software engineer and have many questions and no answers." September 7, 2021 (Pl. Ex. 40)

- "I was insulted and disappointed by your post about some volunteers going door to door. I found your post to be very ignorant and on the verge of threatening. I am thankful that someone is doing this job of checking the voter rolls." September 7, 2021 (Sm. Ex. 04)

- "I received a knock on my door a few weeks ago by someone from my community who asked me about voting back in November. The person was very polite and not intimidating at all." September 7, 2021 (Epp Ex. 09)

- "The USEIP is a non-partisan group concerned with election integrity. Regardless of

who you vote for, this is a good cause. I'm not associated with USEIP but know

what they are doing. They have knocked on my door. They are simply doing voter

verification, asking a few plain questions. The idea that they are intimidating voters

is simply false information. They do not represent any party and therefore no

intimidation is possible. I like reading what the LWV are doing, but more and more,

you all seem to be simply misinformed or intentionally lying about what other

groups are doing." September 14, 2021 (Kas. Ex. 15)

22. Ms. Hendrix herself acknowledged on September 9, 2021, that "people who have

received visits by USEIP volunteers…stated that they did not feel intimidated at all and that the

USEIP volunteers were very polite," and that "I do understand that USEIP volunteers, including

yourself, are doing what they're doing to support free and fair elections." (Pl. Ex. 40)

23. Despite this response to their due diligence, Plaintiffs decided to proceed with this

lawsuit. Plaintiffs' LWVCO retainer agreement is dated September 23, 2021. (Epp Ex. 25)

24. On March 9, 2022, a few minutes after filing their case, Plaintiff LWVCO issued a press

release. "A few minutes ago, LWVCO, along with our partners the NAACP and Mi Familia Vota

and legal advocacy nonprofit Free Speech for People, filed a federal lawsuit against the U.S.

Election Integrity Plan for voter intimidation, a violation of section 11(b) of the 1965 Voting Rights

Act. The LWVCO Board of Directors voted strongly and unanimously to pursue this partnered

litigation as a foundational action to fulfill our mission to empower voters and defend democracy."

(Kas. Ex. 09)

25. In response to LWVCO's press release, Plaintiffs did not receive any responses of

specific voters; Plaintiff LWVCO did received two emails in support of their actions, including one

promise to donate:

- "So glad you are challenging these people," March 10, 2022 (Pl. Ex. 43)

- "Excellent!  I have my 2022 Annual Fund donation notice and will be sending a donation to LWVCO." March 12, 2022 (Kas. Ex. 10)

26. Plaintiff LWVCO claims diversion of resources, citing their "Safety Plan" as proof of their claim. In the final pretrial order, Plaintiffs list "League of Women Voters of Colorado, Safety Plan 2022 for Board & Staff (LWVCO0000112)" on their exhibits list for trial. (Docket 91)

27. The safety plan was represented by Beth Hendrix during deposition as diversion of resources. (Hendrix Dep. 92:8-20) The LWVCO Safety Plan does not reveal a diversion of resources in response to Defendants' conduct. (Epp Ex. 20)

28. Plaintiff LWVCO's Safety Plan is a plan for managing expected repercussions from Plaintiffs filing a lawsuit against Mike Lindell. Plaintiff LWVCO's Safety Plan is undated. Plaintiff LWVCO's Safety Plan does not mention USEIP or USEIP canvassing. (Epp Ex. 20)

29. The Defendants did not receive this document in discovery, neither was it indexed in the LWVCO export file provided by Plaintiffs during discovery. In an exhibit exchange on January 8, 2024, Plaintiff counsel produced this document for the first time. The same day, Plaintiffs attempted to claw it back, citing work product. Had this document been provided during Discovery, Defendants would likely have taken additional actions while discovery was open.

30. On January 8, 2024, Plaintiffs admitted that The 2022 Safety Plan (LWVCO112) had not been produced, despite their multiple misrepresentations to the Court that it had. During the January 23, 2024, Status Hearing, the court allowed the document into evidence.

31. Plaintiff League of Women Voters of Colorado and Beth Hendrix have no personal knowledge of USEIP or conduct associated with USEIP. (Hendrix Testimony, Pl. Ex. 40-47)

32. Plaintiff League of Women Voters of Colorado and Beth Hendrix do not have personal knowledge of Defendant Epp or Ms. Epp's conduct. (Hendrix Testimony, Pl. Ex. 40-47)

33. Plaintiff League of Women Voters of Colorado and Beth Hendrix did not produce

factual support for their salacious allegations that USEIP, Ms. Epp, or the other named defendants sent armed agents to intimidate voters, represented themselves as government officials, wore official looking badges, or otherwise engaged in unlawful conduct as alleged in this case. (Hendrix Testimony, Pl. Ex. 40-47)

34. Plaintiff League of Women Voters of Colorado and Beth Hendrix did not produce factual support for their claims that they diverted resources as a result of the conduct of USEIP, Ms. Epp, or the other named defendants. (Hendrix Testimony, Epp. Ex. 20)

ii.    Plaintiff Mi Familia Vota

35. On September 7, 2021, Salvador Hernandez emailed Beth Hendrix, "Email thread between S. Hernandez and B. Hendrix regarding Mi Familia Vota potential involvement in litigation, attaching Confidential Memorandum from FSFP regarding potential litigation." (Epp Ex. 25)

36. September 24, 2021, Plaintiff counsel John Bonifaz emailed Plaintiff LWVCO members, "Email thread regarding Mi Familia Vota joining litigation." (Epp Ex. 25)

37. Mr. Hernandez admitted that he did not know about the Defendants until Beth Hendrix told him. "I told them that, you know, I've heard from the League of Women Voters about this voter intimidation group, you know, that's going, you know, potentially armed, you know, in Colorado, going door to door, but I told them that -- you know, that I heard about that, and, you know, that Beth had told me, you know, if there's a potential for a lawsuit, would you be interested." (Hernandez Testimony, Hernandez Dep. 34:13-24)

38. Plaintiff Mi Familia Vota and Salvador Hernandez brought this action based on the allegations of Beth Hendrix. (Hernandez Testimony, Hernandez Dep. 22:13-15)

39. Plaintiff Mi Familia Vota and Salvador Hernandez do not have personal knowledge of USEIP or conduct associated with USEIP. (Hernandez Testimony)

40. Plaintiff Mi Familia Vota and Salvador Hernandez do not have personal knowledge of Defendant Epp or Ms. Epp's conduct. (Hernandez Testimony)

41. Plaintiff Mi Familia Vota and Salvador Hernandez did not produce factual support for their salacious allegations that USEIP, Ms. Epp, or the other named defendants sent armed agents to intimidate voters, represented themselves as government officials, wore official looking badges, or otherwise engaged in unlawful conduct as alleged in this case. (Hernandez Testimony)

42. Plaintiff Mi Familia Vota and Salvador Hernandez did not produce factual support for their claims that they diverted resources as a result of the conduct of USEIP, Ms. Epp, or the other named defendants. (Hernandez Testimony)

43. Plaintiff Mi Familia Vota and Salvador Hernandez did not produce any responsive documents in this case. (EPP024, KAS2, Hernandez Testimony)

   iii.  <u>Plaintiff Colorado Montana Wyoming State Area Conference of the NAACP</u>

44. On February 22, 2022, Plaintiff counsel John Bonifaz emailed "Email thread between LWVCO, FSFP, and LGPM regarding lawsuit." This email distribution list includes an email for the Colorado Montana Wyoming State Area Conference of the NAACP This is the first mention of NAACP in this case. (Epp Ex. 25)

45. Colorado Montana Wyoming State Area Conference of the NAACP President Portia Prescott does not recall who told her about the defendants or the lawsuit. "I just became the president towards the end of February. I talk to literally hundreds of people, so I cannot -- and I work a full-time job and I'm a mom, and I'm a single mom, and I have my own house I have to maintain. I can't remember -- once I was elected, there was press, there was people, there was lawyers, there was -- I can't remember it all, and I -- I just can't. It was overwhelming." (Prescott Testimony, Prescott Dep. 67:22-68:5)

46. CO/MT/WY NAACP and Portia Prescott do not have personal knowledge of USEIP or conduct associated with USEIP. (Prescott Testimony)

47. CO/MT/WY NAACP and Portia Prescott do not have personal knowledge of Defendant Epp or Ms. Epp's conduct. (Prescott Testimony)

48. CO/MT/WY NAACP and Portia Prescott did not produce factual support for their salacious allegations that USEIP, Ms. Epp, or the other named defendants sent armed agents to intimidate voters, represented themselves as government officials, wore official looking badges, or otherwise engaged in unlawful conduct as alleged in this case. (Prescott Testimony)

49. CO/MT/WY NAACP and Portia Prescott did not produce factual support for their claims that they diverted resources as a result of the conduct of USEIP, Ms. Epp, or the other named defendants. (Prescott Testimony)

50. CO/MT/WY NAACP and Portia Prescott did not produce any responsive documents in this case. (Kas. Ex. 03, Epp Ex. 23, Prescott Testimony)

**II. Evidence**

    **A. USEIP Canvassing**

51. On April 23, 2021, Dr. Douglas Frank visited Mesa County, met with grassroots volunteers, and spoke about canvassing, which had already begun in Mesa County. USEIP was not a part of the programming of this event. The Defendants did not attend this event.

52. The following day, on April 24, 2021, Dr. Frank spoke to a Republican Study Council of Colorado (RSCC) meeting in Denver. Defendants Ashley Epp and Shawn Smith, along with non-defendant, recently deceased volunteer Dennis Haugh, were at the same meeting location and gave a presentation to the RSCC on voting system vulnerabilities. The defendants were not a part of Dr. Frank's presentation. Defendant Epp watch Dr. Frank's presentation.

53. At this RSCC meeting, after Mesa County canvassing was conceived and had begun,

Defendant Epp met Cory Anderson and other grassroots volunteers in Mesa County, CO for the first time. The two parties had previously spoken on the phone.

54. After the RSCC meeting grassroots groups from Mesa County held their own event where they spoke about their canvassing efforts. Dr. Frank spoke at this event, too. USEIP was not a part of the programming of this event. Defendant Epp did not attend this event. (Pl. Ex. 63)

55. Following the RSCC on April 24, 2021, after hearing what was happening in Mesa County, several volunteers in front range counties wanted to canvass the election, and many sought guidance from USEIP on how to carry out the effort. Defendant Epp does not recall being personally approached by volunteers wanting to canvass, but she *does* recall canvassing being discussed at that time.

56. Defendant Epp recalls USEIP volunteers from several counties working together to develop a lawful canvassing effort that would enable local civic groups and individuals to validate the official record of the 2020 election. This process was collaborative cross counties, but also varied from county to county. (Pl. Ex. 02, Pl. Ex. 03, Pl. Ex. 36, Kas. Ex. 22, Kas. Ex. 23)

57. The USEIP canvassing effort was designed to (1) gather data and identify anomalies, (2) to present the data gathered to government entities with jurisdiction, and (3) to encourage those entities with jurisdiction to investigate the anomalies and remedy any defects in the official record. (Pl. Ex. 02, Pl. Ex. 03, Pl. Ex. 36, Kas. Ex. 22, Kas. Ex. 23)

58. USEIP volunteers of several counties designed the effort, and many county grassroots teams canvassed their communities using the training materials, affidavit templates, walk list formats, etc. developed by volunteers associated with USEIP.

59. Defendant Epp did not design USEIP canvassing.

60. Defendant Epp did not direct the canvassing activities of any county.

61. Defendant Epp *did* proofread some training materials as well as the analytics guide.

62. Defendant Epp *did* include an outline of canvassing materials in the USEIP Playbook.

63. Defendant Epp *did* attend canvassing training Douglas County.

64. Defendant Epp *did* canvass three times in June and/or July of 2021 – once in Douglas County and twice in El Paso County.

65. Defendant Epp did not canvass in any other counties than Douglas and El Paso.

66. When canvassing concluded in late 2021, independent county teams analyzed and cured their canvassing affidavits, and volunteers within the counties delivered the records of true defects and anomalies to the government entities with jurisdiction to investigate and provide remedy, if required. (Pl. Ex. 22, Pl. Ex. 26, Pl. Ex. 32)

67. USEIP volunteers also developed and published a Colorado Canvassing Report based on data and findings of four counties: Douglas, El Paso, Pueblo, and Weld. (Pl. Ex. 30, Pl. Ex. 05)

68. Defendant Epp did not participate in the analysis or curing process for any county.

69. Defendant Epp did not deliver any canvassing records to any government entity.

70. Defendant Epp did not develop the Colorado Canvassing Report.

71. Defendant Epp *did* review the Colorado Canvassing Report before it was published and provide feedback and edits for style and format.

72. Defendant Epp *did* participate in the making of the video for the Colorado Canvassing Report.

**B.  USEIP County & Local Organizing Playbook (The USEIP Playbook)**

73. The USEIP Playbook was developed in August 2021. (Pl. Ex. 01)

74. The intention of the USEIP Playbook was to document and share the experiences and lessons learned in Colorado. (Pl. Ex. 01)

75. The primary audience of the USEIP Playbook was grassroots activists in other states. (Pl. Ex. 01, Epp Testimony)

76. The USEIP Playbook was printed and announced Mike Lindell's Cyber Symposium in South Dakota, August 11-13, 2021. This event was attended by groups and individuals from all 50 states.

77. The USEIP Playbook was published to the USEIP website following this event, in mid-August 2021.

78. Defendant Epp wrote the USEIP Playbook in collaboration with other volunteers around the state of Colorado.

79. Defendant Epp did not write the Appendix document on Voter Verification. This was provided to Ms. Epp by another volunteer who was developing the Voter Verification process.

80. The Appendix document is just an outline of USEIP canvassing. It is very high level.

81. The USEIP Playbook is not a training document.

82. The USEIP Playbook is not a recruiting document.

83. Plaintiffs claim that the USEIP Playbook calls for intimidation. "you know, their playbook calls for intimidation." (Hendrix Dep. 127:12-13), but Plaintiffs have provided no factual support for this assertion. The language characterized by Plaintiffs is political speech.

84. Plaintiffs do not allege that any voter read the USEIP Playbook.

85. Plaintiffs do not allege that any voter was intimidated by the USEIP Playbook.

86. The USEIP Playbook is a knowledge sharing document intended for the audience of grassroots activists in other states.

### C. County Documents

87. Plaintiffs produced documents from several counties during discovery, and they may call representatives from those counties to authenticate these documents at trial. The record of these documents shows USEIP engagement with counties and the state legislature on several areas of election integrity. (Pl. Ex. 51, Pl. Ex. 52, Pl. Ex. 53)

88. Few of these documents are relevant to canvassing and the matter before the court.

89. Other county and state documents confirm the legality of USEIP canvassing. (Pl. Ex. 50, Epp Ex. 04)

90. The Secretary of State confirmed the legality of USEIP canvassing. (Pl. Ex. 50)

91. The county documents, and witness testimony at trial, will confirm that individuals associated with USEIP were civically engaged within their local communities, and that they were redressing grievances and working to find solutions with their local governments. (Pl. Ex. 51, Pl. Ex. 52)

### D. Firearms

92. Plaintiffs provided no factual support for their allegations that Defendants were "deploying armed agents" as part of their canvassing.

93. Defendant Epp has never carried a firearm while canvassing.

94. Defendant Epp has no personal knowledge of anyone associated with USEIP (or otherwise) carrying a firearm while canvassing.

95. Defendant Smith testified that he may have concealed-carried his firearm during canvassing because he usually does, but he cannot recall and certainly never brandished it. (Smith Testimony)

96. The record is devoid of any factual support for Plaintiffs' allegations about "armed agents" and USEIP canvassers carrying or brandishing firearms.

### E. Yvette Roberts

97. On June 23, 2021, Mesa County resident Yvette Roberts was approached by two unidentified and still unknown individuals at her home in Grand Junction. (Kas. Ex. 05)

98. Ms. Roberts filed a complaint with the Colorado Secretary of State, reporting the activity and expressing interest in "taking any legal action that can prevent this behavior." (Kas.

Ex. 05)

99. Ms. Roberts' June 23, 2021 complaint alleged that the people at her door were a tall older man and short older woman. (Kas. Ex. 05)

100. Ms. Roberts' June 23, 2021 complaint alleged that they wore homemade badges that said "Colorado Election something or other." (Kas. Ex. 05)

101. Ms. Roberts' June 23, 2021 complaint did not state that she was intimidated. (Kas. Ex. 05)

102. Ms. Roberts' June 23, 2021 complaint did not mention United States Election Integrity Plan, USEIP, or the named defendants. (Kas. Ex. 05)

103. On June 23, 2021, a woman named Cheryl sent Ms. Roberts' complaint to Colorado Secretary of State employees Caleb Thornton and Matt Domboski. (Epp Ex. 18)

104. On June 25, 2021, Caleb Thornton emailed unknown recipients asking for permission to contact Ms. Roberts. "I would also like to reach out to this individual to try to gather additional information. Please let me know if you all are ok with that initial course of action." (Epp Ex. 13)

105. On July 6, 2021, Colorado Deputy Attorney General – Criminal Justice Section Janet Drake emailed Mesa County District Attorney Dan Rubenstein with Ms. Roberts' June 23, 2021 complaint. (Epp Ex. 13)

106. In this email, Ms. Drake says, "Melissa will be able to provide additional information." Per this communication, we can deduce that Ms. Kessler reached out to the AG's office between June 23, 2021 and July 6, 2021. (Epp Ex. 13)

107. Just 19 minutes later, Mesa County District Attorney Rubenstein responded by email and refers the matter to James Cannon, a local investigator with the Mesa County DA's Office. (Epp Ex. 13)

108. Ms. Kessler did not respond, as on July 21, 2021, James Cannon sent a follow-up

email, confirming that she had not responded:

> "I am checking in with you, I have not seen any info come over on
> this yet. I can tell you I found a report in our local records where it
> appears that Grand Junction Police have already investigated this as
> a suspicious incident, but were unable to prove any crime."
>
> (Epp Ex. 13)

109. Ms. Kessler responded later that morning, July 21, 2021, stating in part, "We've heard
that this was not an isolated incident but haven't received any other direct reports. We'll let you
know if we do." (Epp Ex. 13)

110. On July 29, 2021, Mesa County resident Debra Powell, sent a complaint to the
Secretary of State. Ms. Powell is not a witness in this case. (Epp Ex. 13)

111. On July 30, 2021, Department of State Legal Analyst Matt Domboski sent an email to
the Secretary of State "Exec Team" about referring the complaints of Ms. Powell and Ms. Roberts
to the Department of Justice, specifically for voter intimidation under the Voting Rights Act of
1965. (Epp Ex. 13)

112. Later that day, still July 30, 2021, Ms. Kessler sent the complaints, along with the back
and forth between state and local agencies, to Aaron Teitelbaum of the US Attorney's Office. Mr.
Teitelbaum responded the same day and confirmed that he would discuss Ms. Kessler's email with
the FBI. (Kas. Ex. 05)

113. A few days later, on August 2, 2021, Ms. Kessler sent Mr. Teitelbaum a local news
article:

> "'Needle Nazis'–Who's Going Door To Door Now? -
> Colorado Pols (Sorry for the inflammatory title! The
> information appears reliable. The publication itself… who

knows?)" (Kas. Ex. 05)

114. On August 13, 2021, Mr. Teitelbaum emailed Ms. Kessler in response to a phone call from her. This is their final communication in evidence. (KAS05)

115. Between June 23, 2021 and August 13, 2021, Ms. Roberts' complaint was investigated by Local, State, and Federal government entities; these investigations were unable to prove any crime.

116. During these investigations, neither USEIP nor the named defendants are mentioned.

117. USEIP did not canvass in Mesa County.

118. USEIP did not canvass Ms. Roberts.

119. Defendant Epp did not canvass in Mesa County.

120. Defendant Epp did not canvass in Mesa County.

121. On December 8, 2021, Plaintiff Counsel Casey Breese directed a Research Librarian employed by Lathrop GPM, LLP "to contact the Colorado Secretary of State's office for purposes of obtaining the identity of individuals who had purchased voter rolls at some point during 2021 through the Colorado Secretary of State's Election Cycle Subscription service list." (Epp Ex. 21, Epp Ex. 21-1) Mr. Breese entered his appearance as counsel in this case on March 22, 2022.

122. The original complaint of Ms. Roberts was produced to Defendants in November 2022.

123. On December 22, 2022, Plaintiffs filed Ms. Roberts sworn declaration in response to Defendants' motion for summary judgment. This declaration makes numerous allegations that are disputed by Ms. Roberts' original complaint as well as the investigative record of Ms. Roberts' original complaint. (Epp Ex. 19, Epp Ex. 13) There are four material contradictions with Ms. Roberts' December 22, 2022 Sworn Declaration (Epp Ex. 11):

- Colorado Election something or other (June 23, 2021) vs. US Election Integrity

Plan (Dec 22, 2022)

- Not Officials (June 23, 2021) vs. Represented as Officials (Dec 22, 2022)

- Homemade Badges (June 23, 2021) vs. Official Looking Badges (Dec 22, 2022)

- Not intimidated (June 23, 2021) vs. Intimidated (Dec 22, 2022)

124. The record is void of factual support for Plaintiffs' salacious and libelous allegations against the defendants. As a result, Defendant Epp respectfully requests that the Fact Finder come to the following conclusions of law.

## CONCLUSIONS OF LAW

### A. The Law

125. The KKK Act establishes the basis for an individual to bring legal action against any individuals or organizations conspiring "to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote."

126. Section 11(b) of the Voting Rights Act of 1965 states, "No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote."

127. Lawful canvassing is protected by the First Amendment and "so clearly vital to the preservation of a free society that, putting aside reasonable police and health regulations of time and manner of distribution, it must be fully preserved," and restrictions on canvassing are "invalid because in conflict with the freedom of speech and press." (Martin v. City of Struthers, 319 US 141 - Supreme Court 1943)

128. Martin was affirmed by the Supreme Court in 2002 in Watchtower Bible, "our precedent is clear that there must be a balance between these interests and the effect of the regulations on First Amendment rights." (Watchtower Bible & Tract Soc. of NY, Inc. v. Village of Stratton, 536 US 150 - Supreme Court 2002, quoting Martin).

18

129. "The First Amendment protects [one's] right not only to advocate their cause but also to select what they believe to be the most effective means for so doing…" And, " ...the circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as `core political speech." <u>Meyer v. Grant</u>, 486 US 414 - Supreme Court 1988.

130. The ACLU also affirms the rights of canvassers, "A federal appeals court in Pennsylvania has made it crystal clear that you cannot be asked to register, get a permit or even to notify local officials about your canvassing plans" <u>S.E.I.U. v. Municipality of Mt. Lebanon</u>. (EPP03)

**B. <u>Plaintiffs Have Failed to Prove Injury</u>**

131. Plaintiffs have the burden to prove their harm. "Ultimately, plaintiffs have '[t]he burden of establishing subject matter jurisdiction' because they are 'the part[ies] asserting jurisdiction.' <u>Port City Props. v. Union Pac. R.R</u>. Co., 518 F.3d 1186, 1189 (10th Cir. 2008). Plaintiffs have made extraordinary claims of harm in the public square and before this Court. In their original complaint, Plaintiffs alleged that, (1) "Because USEIP's actions are threatening to NAACP Colorado's core mission, NAACP Colorado has diverted time and other resources from its vital civic engagement and election support programs in order to address Defendants' voter intimidation campaign," (2) "LWVCO has diverted time and other resources from its civic engagement and election support programs in order to address Defendants' voter intimidation campaign," and (3) MFV has diverted time and other resources from its civic engagement and election support programs in order to address Defendants' voter intimidation campaign." (ECF No. 01)

132. Further, in their April 18, 2022 response to Defendant's Motion to Dismiss, Plaintiffs alleged that (1) "NAACP Colorado has already exhausted resources actively monitoring this voter

intimidation and related safety concerns and strategizing about how to combat USEIP's actions…
This diversion of resources is a distraction from key programs that NAACP Colorado would
otherwise support, such as voter outreach aimed at protecting democracy, enhancing equity, and
increasing democratic participation and civic engagement," (2) USEIP's activities have forced
Plaintiff LWVCO to divert resources away from its core functions to counteract USEIP's
detrimental impact to current and future voters," and (3) "MFV has had to reallocate resources to
combat USEIP's actions, educate voters about their rights when confronted by false accusations of
voter fraud in their own homes, and develop a plan for monitoring and responding to Latino voters'
safety concerns." (ECF No. 33).

133.  Again, in their December 23, 2023 response to Defendant's Motion for Summary
Judgement, Plaintiffs further reiterated this diversion of resources, claiming, (1) "Plaintiffs are not
asserting the rights of third parties, but rather alleging harm to the organizations themselves," and
(2) Plaintiffs have presented evidence that each of their organizations diverted resources as a
directly result of Defendants' actions." (ECF No. 72)

134. There is no such evidence in the record. "The facts necessary to establish standing . . .
must not only be alleged at the pleading stage, but also proved at trial.' Jacobson v. Fla. Sec'y of
State, 974 F.3d 1236, 1246 (11th Cir. 2020) (quoting Gill v. Whitford, 138 S. Ct. 1916, 1931
(2018))). Standing requires Plaintiffs show an injury in fact (that is both 'concrete and
particularized' and 'actual and imminent'), as well as a causal connection between the injury and
conduct at issue, and that the injury can be redressed by a favorable decision. Lujan v. Defs. of
Wildlife, 504 U.S. 555, 560-61 (1992)."

135.  The only representation of a diversion of resources in response to Defendants'
conduct, by *any* of the three Plaintiffs, is the LWVCO's "2022 Safety Plan." This document does
not implicate defendants or address Defendants' conduct in any way. Rather, the document

suggests Plaintiff LWVCO's intention at the inception of this lawsuit enjoin Mike Lindell into litigation through Defendants, to enjoy the press coverage, fundraising, and potential awards of such an endeavor. Plaintiffs anticipated significant headlines, warned their leadership about such headlines, issued a press release to help drive these headlines, coordinated with the press directly, and intended to raise funds off this lawsuit. Indeed, Plaintiffs and their attorneys did, and continue to, raise funds off this litigation.

136. Plaintiffs have the burden to prove their injury as the factual record is devoid of any such proof.

### C. <u>Plaintiffs Have Failed to Prove Harm</u>

137. In bringing this case, Plaintiffs have erroneously conflated lawful canvassing with voter intimidation, and they have failed to provide factual support for their allegations against the defendants. No such factual support is in the record.

138. The record is devoid of factual support for Plaintiffs' allegation that the Defendants targeted voters, individually or as groups.

139. The record is devoid of factual support for Plaintiffs' allegation that the Defendants intended to, conspired to, or attempted to intimidate any voters.

140. The USEIP Playbook is not evidence of voter suppression or voter intimidation, coercion or threats. The USEIP Playbook is not evidence of attempted voter suppression or voter intimidation, coercion or threats. The USEIP Playbook is not evidence of conspiracy to commit voter suppression or voter intimidation, coercion or threats.

150. The county documents and witness testimony from county representatives are not evidence of voter suppression or voter intimidation, coercion or threats. The county documents and witness testimony from county representatives are not evidence of attempted voter suppression or voter intimidation, coercion or threats. The county documents and witness testimony from county

representatives are not evidence of conspiracy to commit voter suppression or voter intimidation, coercion or threats.

151. The record is devoid of factual support for the allegation that USEIP sent armed agents to voters' homes. The record is devoid of factual support for the allegation that USEIP volunteers carried firearms while canvassing.

152. The record is devoid of factual support for the allegation that USEIP volunteers represented themselves in an official capacity.

153. The record is devoid of factual support for the allegation that USEIP volunteers wore official looking badges.

154. The record is devoid of testimony from any voter who was approached by the Defendants. The record is devoid of testimony from any voter who was intimidated, threatened, or coerced by the Defendants. The record is devoid of factual support for Plaintiffs' allegation that the Defendants intimidated any voters.

155. The record is devoid of factual support for Plaintiffs' allegation that intimidation of any voter was intended, planned, or carried out. The record is devoid of factual support for Plaintiffs' allegation that intimidation of any voter occurred.

D.  Plaintiffs Have Failed to Prove a Causal Connection

156. Plaintiffs failed to connect USEIP, Ashley Epp, Shawn Smith or Holly Kasun with any voter in this case.

157. Plaintiffs fail to connect the actions of the Defendants to any voter.

158. Plaintiffs fail to connect the speech of the Defendants to any voter.

159. The record is devoid of factual support for the allegation that Defendants engaged in conduct that would require Plaintiffs to divert resources.

160. The record is devoid of factual support for the allegation that Plaintiffs did divert

resources as a result of their allegations about Defendants' conduct.

161. The record is devoid of factual support that Plaintiffs were even aware of Defendants' activities prior to being pressured by forces outside Colorado to bring this lawsuit.

### E.   Plaintiffs Present No Evidence of Voting or Voting Activity

162. Plaintiffs failed to produce a witness that was canvassed by the Defendants.

163. Plaintiffs represent that Yvette Roberts from Mesa County was canvassed by the Defendants.

164. The investigative record proves that Ms. Roberts was not canvassed by the Defendants.

165. Ms. Roberts was canvassed by people in Mesa County on June 23, 2021. There was no voting or voting activity taking place in June 2021.

166. Additionally, Defendants were validating the voting record of a past election, not a future one. Plaintiffs fail to produce a voter that was impacted in their voting, voting activity, or support and advocacy as a result of the Defendants' alleged conduct.

### F.   Plaintiffs Litigation was Brought in Bad Faith

167. The court enjoys broad discretion to ensure the ends of justice can be met, and the court holds the authority to sanction parties for bringing frivolous action, and parties also have a right to action under the claim of malicious prosecution or abuse of process. A district court's finding of bad faith or the absence of bad faith in a particular case is a factual determination. (Ford v. Temple Hosp. 790 F. 2d 342 - Court of Appeals, 3rd Circuit 1986, citing Baker v. Cerberus, Ltd., 764 F.2d at 210; Perichak v. International Union of Elec. Radio, 715 F.2d 78, 79 (3d Cir.1983); Fed.R.Civ.P. 52(a).).

168. Whether Plaintiffs and their attorneys have brought this litigation in bad faith is a dispute of fact that should be heard and resolved at trial.

169. The absence of factual support for Plaintiffs' allegations, after the arguments are heard and the evidence is presented at trial, warrants the Court's consideration as to:

(1) if Plaintiffs, at any point, had factual support for their claims;

(2) whether Plaintiffs suborned perjury with Ms. Roberts' sworn declaration; and

(3) if Plaintiffs enjoyed financial and reputational benefits from this litigation at the expense of the Defendants.

### G. Plaintiffs' Requested Relief is Presumptively Invalid

170. Plaintiffs are asking the court to grant injunctive relief that amounts to the court placing a content-based or idea-based restriction on the First Amendment. This cannot survive the court's scrutiny. (Epp Trial Brief; See also: Reed v. Town of Gilbert, Ariz, 135 S. Ct. 2218 - Supreme Court 2015 "We hold that these provisions are content-based regulations of speech that cannot survive strict scrutiny." See also, Simon & Schuster, Inc. v. Members of N. Y. State Crime Victims Bd., 502 U. S. 105, 115 (1991) "Content-based regulations are presumptively invalid." The rationale of the general prohibition, after all, is that content discrimination "raises the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace," Simon & Schuster, 502 U. S., at 116; Leathers v. Medlock, 499 U. S. 439, 448 (1991); FCC v. League of Women Voters of Cal., 468 U. S. 364, 383-384 (1984); Consolidated Edison Co., 447 U. S., at 536; Police Dept. of Chicago v. Mosley, 408 U. S., 388*388 at 95-98.

### CONCLUSION

171. Plaintiffs tried this case in the court of public opinion before Defendants were ever served with this lawsuit. On March 9, 2022, Ms. Epp learned of this litigation from Ms. Kasun after a national reporter called her for comment. It was not until five days later on March 14, 2022, that Ms. Epp was finally served and able to assess the full complaint – following dozens of local and national news stories repeating Plaintiffs baseless and defamatory allegations. These news reports

have continued since the case was filed, more than two years ago.

172. While Defendant can only speculate about the benefits that Plaintiffs – and their counsel – have enjoyed from years of unopposed press coverage and fundraising, Defendants have endured years of reputational damage, psychological damage, loss of income, harassment, and threats of physical harm because of Plaintiffs' abusive and extra-governmental efforts to deter Defendants' lawful behavior. The record of evidence proves that Plaintiffs were unable to provide factual support for their allegations, but that they decided to bring this case anyway.

173. Prior to the inception of this case, Ms. Epp was a respected member of the Denver business community, the Women in Technology Leader for a celebrated local consultancy, and a recognized leader in the people and business sides of large-scale technology transformation programs. Ms. Epp's thought leadership has been published locally and nationally. Plaintiffs' salacious and libelous allegations have resulted in significant and ongoing harm against Ms. Epp and her family.

174. Ms. Epp was not afforded the opportunity to present evidence of the harm that has resulted from Plaintiffs' public conduct, and their conduct before this Court, due to, as Ms. Epp understands it, a procedural mistake by former counsel. "Defendants had the opportunity to file a motion to dismiss under Rule 12(b)(6) and failed to do so; they cannot litigate the issue of whether Plaintiffs have stated a claim for relief under the guise of abuse of process." (ECF No. 81)

175. Ms. Epp understands that this Court has dismissed Defendants' compulsory counterclaims for defamation and abuse of process, and that the Court further denied Ms. Epp's Motion to Reopen (ECF No. 131) and pleaded complaint (ECF No. 134). Ms. Epp must have some remedy for the harm inflicted due to Plaintiffs' salacious and libelous allegations – to restore her name, reputation, and livelihood, and for her and her family to begin to heal from Plaintiffs' two plus years of public character assassinations and incalculable damage. "In the normal civil suit

where [the preponderance of the evidence] standard is employed, `we view it as no more serious in general for there to be an erroneous verdict in the defendant's favor than for there to be an erroneous verdict in the plaintiff's favor.' In re Winship, 397 U. S. 358, 371 (1970) (HARLAN, J., concurring). In libel cases, however, we view an erroneous verdict for the plaintiff as most serious…the possibility of such error, even beyond the vagueness of the negligence standard itself, would create a strong impetus toward self-censorship, which the First Amendment cannot tolerate." Rosenbloom v. Metromedia, Inc., 403 US 29 - Supreme Court 1971.

176. Defendant Epp respectfully requests that the Court enter judgement for the Defendants. Defendant Epp further requests that the Court exercise appropriate skepticism and discretion in determining factual findings to preserve the ends of justice, and to avoid, "…the possibility of such error" that "would create a strong impetus toward self-censorship, which the First Amendment cannot tolerate." Rosenbloom, 403 US 29 - Supreme Court 1971.

177. Defendant Epp requests that the court award reasonable attorney's fees to the Defendants in the event they prevail at trial, as well as any other relief the Court determines appropriate.

*/s/ Ashley Epp*

Dated: June 19, 2024

_____

Ashley Epp

asheinamerica@protonmail.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been electronically served through ECF this 19th

day of June 2024, to all counsel of record.

*/s/Ashley Epp*

_____

Ashley Epp
asheinamerica@protonmail.com