**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-00581-CNS-NRN

Colorado Montana Wyoming
State Area Conference of the NAACP,
League of Women Voters of Colorado, and
Mi Familia Vota,

Plaintiffs,

v.

United States Election Integrity Plan, Shawn Smith,
Ashley Epp, and Holly Kasun,

Defendants.
_____

**DEFENDANT HOLLY KASUN'S PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW**
_____

**PROPOSED FINDINGS OF FACT**

**Parties**

1.  Holly Kasun is a resident of Colorado and is a part-time journalist and tech
    entrepreneur.

2.  Kasun earned her B.A. in Political Science from the University of Wisconsin,
    Madison. Kasun earned her M.A. in Journalism and Business from the University
    of Wisconsin, Madison.

3.  Kasun worked as an election judge and volunteered as a poll watcher in Boulder
    County for the 2020 elections.

4.  Kasun's 25-year career has been focused on marketing, advertising, public
    relations, and business, working with organizations including Nike, adidas,
    Callaway, Starbucks, Intel, Motorola, Microsoft and others.

5. Kasun contends that this lawsuit's exaggerations and misstatements, and the press that has flowed from them, have impeded her ability to make a living.

6. Kasun is not part of or associated with any political party, nor has she ever campaigned for any candidate, or donated to any candidate or party.

7. U.S. Election Integrity Plan ("USEIP") is an unincorporated free association of Colorado citizens. USEIP is a non-partisan, all-volunteer civics organization focused on election integrity. The organization has no hierarchy of roles or responsibilities. The members volunteer their work without control of or by one another.

8. USEIP was conceived by Defendants Ashley Epp, Holly Kasun, and several non-defendant individuals in November of 2020 in response to concerns about irregularities in the 2020 Presidential Election.

9. Defendant Epp met Kasun online in November 2020.

10. Holly Kasun sometimes acted as a press spokesperson for USEIP.

11. Holly Kasun did not participate in other USEIP volunteers' early protests at the Colorado Capitol or their appearance at the Colorado legislature for a Legislative Audit Hearing, which took place in December 2020.

12. Kasun attended former President Trump's speech at the Ellipse on January 6$^t$, 2021, in her journalist role, advancing the freedom of the press. She peacefully and responsibly observed the events and atmosphere of the January 6 events, and, while in DC, she provided on-air interviews. Upon returning from Washington D.C., Kasun provided a local Denver television news station with a three-hour

interview and provided footage of the events, her observations, and commentary on the atmosphere in Washington D.C.

13. Of course, there is no evidence Kasun had any confrontations or interactions with law enforcement in Washington D.C. or was at the Capitol.

14. USEIP developed organically over the course of months during which volunteers interacted with each other on self-directed election integrity projects that did not initially include canvassing.

15. There is no evidence USEIP raised funding or asked for donations. There is no evidence Kasun or any other volunteer of USEIP was paid for their work.

16. Around late January or early February of 2021, Defendant Shawn Smith began volunteering with USEIP. Jeff Young began volunteering around the same time.

17. Starting in late spring of 2021 and ending around late August 2021, some citizens associated with USEIP's organizers initiated, coordinated, and conducted door-to-door canvassing to confirm the information contained in the Secretary of State's voter rolls.

18. USEIP made no public announcements or statements, nor spoke to the press about the volunteer-led canvassing project from the start of the project through its completion, from late spring 2021 to late summer 2021.

19. USEIP only made public statements, announcements, and gave interviews in the press relating to the topic of canvassing after their analysis had been completed, in early 2022. Had the members of USEIP intended or conspired to intimidate voters, it is difficult to conceive that they would have let pass the opportunity to communicate with voters for so long.

20. Kasun was employed by the Lindell Management Organization from November 15, 2021, to July 15, 2022, to establish Cause of America, a 501(c)(3). Cause of America and USEIP are separate entities.

21. Defendant Holly Kasun did not canvass any voters to verify (or survey) the accuracy of the Colorado Secretary of State's 2020 Official Voting records.

22. Beth Hendrix is the Executive Director of the League of Women Voters of Colorado, (LWVCO).

23. Portia Prescott is the President of the NAACP Colorado Montana Wyoming State-Area Conference of the NAACP.

24. Portia Prescott is the President of the NAACP Colorado Montana Wyoming State-Area Conference of the NAACP.

25. Salvador Hernandez is the Colorado State Director of Mi Familia Vota.

**Knowledge of Parties**

26. LWVCO learned of Defendants' allegedly intimidating activities and speech not through voters but through media articles.

27. Mi Familia Vota learned of Defendants through Beth Hendrix of the LWVCO.

28. No member of Mi Familia Vota had personal knowledge of Defendants or Defendants' activities or lack thereof.

29. Mi Familia Vota is aware of no member who claims they were intimidated, coerced, or threatened by Defendants.

30. No member of NAACP Colorado had personal knowledge of Defendants or Defendants' activities.

31. NAACP Colorado is aware of no member who claims they were intimidated, coerced, or threatened by Defendants.

**Diversion of Resources**

32. Mi Familia Vota can only speculate about its resources diverted in response to Defendants and their activities.

33. NAACP Colorado can only speculate about its resources that were diverted in response to Defendants or their activities.

**The Anti-Intimidation Playbook and Manufacture of Evidence of Intimidation**

34. Erik Maulbetsch, a local journalist who had been writing critical stories of USEIP for several months (with stories on December 12, 2020, March 6, 2021, and August 8, 2021) wrote a more ambitious story on August 17, 2021 (https://coloradotimesrecorder.com/2021/08/colorado-election-conspiracy-group-going-door-to-door-in-search-of-phantom-ballots/38866/). In that story,

Maulbetsch attempted to connect the USEIP to one Dr. Frank, who spoke in Mesa County, Sherronna Bishop, who organized a canvass of Mesa County, Mike Lindell, and others. Maulbetsch alleged that USEIP had canvassed in Mesa County, and his article mentioned numerous other people he alleged to be affiliated with USEIP and Mesa County who have since played no part in the evidence introduced in this case.

35. Without citing any sources or documentation, Maulbetsch irresponsibly painted a sensationalist picture of a Colorado-wide project:

> Members of a **QAnon-linked election fraud conspiracy group** — some of whom are armed — **are knocking on doors of voters across Colorado**, attempting to find evidence of voter fraud.

36. Maulbetsch reported that volunteers "are going door-to-door **all over the state**, **including Mesa**, El Paso, and Weld counties, using public voter lists to identify precincts from which they believe ballots were fraudulently cast and asking residents to confirm their addresses, whether they participated in the 2020 election, and if so how they cast their vote."

37. Maulbetsch also introduced to readers, including, apparently, the League of Women Voters, the USEIP's "County & Local Organizing Playbook", their use of what he termed "badges" as opposed to "name tags", and "a database of photos of voters' residences." Only evidence of the Playbook exists.

38. Legal counsel from LWV's national headquarters notified LWVCO Executive Director Beth Hendrix of a potential case against USEIP. Following Maulbetsch's stories and Ms. Roberts' email complaint, LWVCO on September 1, 2021 drafted

communications looking for persons willing to say they had been intimidated to be witnesses in an action against Defendants and USEIP.

39. On September 4, 2021, LWVCO and Beth Hendrix sent an email to 2,200 recipients, warning them all of what she chose to label "intimidating" conduct by USEIP and asking for anyone visited by a canvasser to come forward. (PLTF41)

40. In response to Hendrix's September 4 email, Erik Maulbetsch asked Hendrix, in an email sent on September 6, 2021, if she'd share her contacts of voters who were visited and intimidated by USEIP volunteers. PLTF47

41. On September 7, 2021, Ms. Hendrix initiated LWV's official press coordination on USEIP. (KAS 13)

42. On September 8 2021, Ms. Hendrix sent another email blast warning of USEIP going door to door, insinuating voter intimidation; soliciting for potential witnesses. (KAS12)

43. In response to Hendrix's September 9 email to subscribers, she received no information on any intimidated voters. Defendants point out that she did, however, receive at least two emails in support of USEIP's canvassing activities.

44. On September 9, 2021, at least three months after two canvassing related complaints were submitted to the Secretary of State's Office, and the complaints were investigated by the FBI, U.S. Department of Justice, the Colorado Attorney General's Office, the Mesa County DA, and the Mesa County Police and Sherriff, the CO Secretary of State issued a press release on the topic of "unofficial door-to-door canvassing".

45. The Secretary of State's press release was issued a month after USEIP's canvassing was completed.

46. Ms. Hendrix acknowledged, on September 9, 2021, that "people who have received visits by USEIP volunteers…stated that they did not feel intimidated at all and that the USEIP volunteers were very polite," and that "I do understand that USEIP volunteers, including yourself, are doing what they're doing to support free and fair elections." (PLTF40)

47. On September 10, 2021, Beth Hendrix sent another email reaching Colorado county government and election officials, again informing them that "intimidation" was occurring. (KAS14). She solicited witnesses and reports of voter intimidation to an email list including Colorado County Clerks.

48. The remaining responses to Plaintiff LWVCO's September 10 mass communication were in opposition to Plaintiffs' allegations and scare tactics. Said one: "I was insulted and disappointed by your post about some volunteers going door to door." and "I found your post to be very ignorant and on the verge of threatening. I am thankful that someone is doing this job of checking the voter rolls." (SS04)

49. On September 29, 2021, LWVCO arranged an interview with the Christian Science Monitor news outlet about an article on USEIP. (LWVCO 01)

50. On October 1, 2021, Eric Maulbetsch wrote another article (https://coloradotimesrecorder.com/2021/10/colorado-election-fraud-group-is-training-conspiracists-in-other-states-to-knock-doors-in-search-of-phantom-ballots/39935/) claiming, again without citing any sources:

In Colorado, ***USEIP's "Voter Verification" canvassing effort based on Frank's debunked algorithm conspiracy began in Mesa County,*** led by Corey Anderson, a Three Percenter militia member and husband of Mesa County GOP First Vice Chair Jacqueline Anderson.

\*\*\*

They're also taking photographs of voters' homes, ostensibly to document the residence for their "fraud" data.
(Emphasis added).

51. Employees at LWVCO also engaged in conversations about their allegations with journalists from CNN, Thomson-Reuters, the Christian Science Monitor, and Colorado Public Radio/NPR, among others, resulting in stories that amplified LWVCO's claim that USEIP was engaged in "intimidation" of voters.

52. Plaintiffs filed their Complaint against Defendants and USEIP on March 9, 2022, repeating the allegations in Maulbetsch's reporting. Plaintiffs also issued a press release on the same day, announcing their lawsuit against Defendants and USEIP. Plaintiff LWVCO received two emails in support of their actions, including one promise to donate: "So glad you are challenging these people," (PLTF43) and "Excellent!  I have my 2022 Annual Fund donation notice and will be sending a donation to LWVCO." (KAS10)

53. Plaintiffs were unable to produce sufficient evidence of their Complaint's claims to prevail on their Motion for a TRO and in fact withdrew it.

**Holly Kasun Did Not Canvass or Interact With Any Canvassers**

54. Kasun did not herself engage in any canvassing.

55. Kasun never directed any person to engage in canvassing activity, nor did she direct anyone as to how to engage in such activity.

56. Kasun did not have any role in the development of the so-called Playbook certain USEIP volunteers created for use by other volunteers.

57. Kasun never developed or wrote any canvassing training materials and never trained any canvassers. Kasun did not direct the canvassing training or activities of any county.

58. Kasun did not design, create or supervise others in USEIP's canvassing project or the related study, walk lists, or affidavits.

**Mesa County Canvassing**

59. A separate group of canvassers in Mesa County began their own canvassing project before USEIP organizers had conceived of their own canvassing project.

60. Canvassers in Mesa County, whoever they may be, used a different dataset, canvassing program methodology, training, and data gathering methods.

61. There is no evidence in the record, including in USEIP's records of homes canvassed, that any USEIP canvassing took place in Mesa County.

62. On June 23, 2021, Mesa County resident Yvette Roberts sent an email to the Secretary of State's Public Election address stating she had been visited at her home by "two people" who "wore homemade badges reading Colorado Elections ... something or other." Ms. Roberts said she was "interested in taking any legal action" and "I will press charges." (KAS05)

63. Though she said the pair of visitors had "introduced themselves", Ms. Roberts' complaint did not mention United States Election Integrity Plan, USEIP, or any of the named defendants. (KAS05)

64. Eighteen months later, as Plaintiffs' attorneys attempted to defeat a motion for summary judgment, they assisted Ms. Roberts with a Declaration, which she signed on December 22, 2022, in which Ms. Roberts changed her story. Eighteen months after her initial statement that the canvassers wore "homemade" nametags saying "Colorado Election", she now confidently declared the man and a woman were "affiliated with the group United States Election Integrity Plan." Dkt. 73, ¶ 5. What's more, the "homemade badges" had gotten a makeover, becoming "official-looking badges". *Id*.

65. There is no evidence in the record, aside from Ms. Roberts' statement developed against a motion for summary judgment and lacking any foundation, to link the people at her door to USEIP.

66. Numerous witnesses at trial spoke convincingly about USEIP's lack of canvassing in Mesa County. The Court finds it not credible that USEIP could have left no trace from canvassing an entire rural county — no trace save for Ms. Roberts. The Court finds that her initial identification, on June 23, 2021, of her visitors as wearing "Colorado Election" name tags, when the event was most fresh in her memory, the testimony of several other witnesses, and the dearth of any evidence of canvassing in Mesa County are most persuasive.

67. In any event, there is no evidence those canvassers, who remain unknown, or any others volunteering as part of USEIP's all-volunteer effort, were acting as agents of Kasun.

**USEIP Canvassing**

68. USEIP volunteers from several counties worked together with the goal of developing a canvassing effort that would enable local civic groups and individuals to validate the official record of the 2020 election. This process was collaborative across counties, but also varied from county to county. (PLTF02, PLTF03, PLTF36, KAS22, KAS23)

69. The USEIP canvassing effort was designed to (1) gather data and identify anomalies, (2) to present the data gathered to government entities with jurisdiction, and (3) to encourage those entities with jurisdiction to investigate the anomalies and remedy any defects in the official record. (PLTF02, PLTF03, PLTF36, KAS22, KAS23)

70. USEIP volunteers of several counties designed the effort, and many county grassroots teams canvassed their communities using the training materials, affidavit templates, walk list formats, etc. developed by volunteers associated with USEIP.

71. The canvassers worked from state-provided voter rolls that lacked any information about voters' race. No evidence has been presented tending to indicate that the canvassers targeted any particular areas of the relevant counties, nor that they targeted, or even knew about, areas where minorities may have resided at disproportionate rates.

72. Kasun did not participate in the creation of the USEIP Playbook used by some volunteers.

73. Kasun did not develop, write or approve USEIP's voter verification training materials or other volunteer training materials, nor did she make decisions about how to canvass, analyze any canvassing data, affidavits, or develop, write, or edit the analytics guide provided by Jeff Young.

74. When canvassing concluded in late 2021, independent county teams analyzed and cured their canvassing affidavits, and volunteers within the counties delivered the records of true defects and anomalies to the government entities with jurisdiction to investigate and provide remedy, if required. (PLTF22, PLTF26, PLTF32). Kasun did not participate in the analysis or data curing process for any county.

75. USEIP volunteers also developed and published a Colorado Canvassing Report based on data and findings of four counties: Douglas, El Paso, Pueblo, and Weld. (PLTF30, PLTF05). Kasun did not develop or review before publication, the Colorado Canvassing Report.

76. Kasun did not deliver any canvassing records to any government entity.

77. Though it is not possible to determine what individual canvassers may have actually said during their visits, canvassers, who did not include Holly Kasun, were supplied by members of USEIP (who did not include Kasun) with the following script:

   a. Did you vote in the November 3, 2020 election?

   b. If so, by what means did you return your ballot (mail-in, drop box, or in-person)?

   c. Did you receive any extra ballots at this address?

d. Is your voter information accurate (i.e., name, address, party affiliation, etc.)?

e. Are there any other experiences you would like to share?

**Holly Kasun Interaction With Voters**

78. Plaintiffs do not allege Kasun took any action or engaged in any speech that could reasonably be perceived as intimidating.

79. Plaintiffs do not allege Kasun took any action known to any voter.

80. Plaintiffs presented no evidence that Holly Kasun, directly or through a third party acting at her direction, communicated with a voter.

81. Holly Kasun did not knock on any voter's door.

82. Holly Kasun did not ask any voter a question about their voting history or concerns.

83. Neither Holly Kasun nor any agent acting at her direction stood over voters, yelled at them, blocked their way, kept them from entering or leaving a room, or even glared at them.

84. Neither Holly Kasun nor any agent acting at her direction threatened any voter with eviction, a loss of government benefits, a lawsuit, deportation, arrest, or prosecution.

85. Neither Holly Kasun nor any agent acting at her direction visited a polling place, ballot drop box, mailbox, or post office, with or without guns on display.

86. Neither Kasun nor any agent acting at her direction brandished, mentioned, or alluded to a weapon in the presence of any voter.

87. Neither Kasun nor any agent acting at her direction initiated robocalls or mailings hinting darkly at the consequences — of law or violence —the recipient could suffer if they exercised their core rights.

88. Plaintiffs do not allege any voters were deterred or prohibited from voting, or supporting any candidates by any speech or conduct of Holly Kasun.

**Specific Allegations of the Complaint**

89. No agent acting at Kasun's direction was ever armed with "an official-looking badge" or weapon. Some canvassers did choose to wear name tags.

90. No agent acting at Kasun's direction intentionally targeted the homes of Colorado's most vulnerable voters.

91. No agent acting at Kasun's direction "demanded" anything of the voters to whom they spoke.

92. No agent acting at Kasun's direction took photographs of people, their homes, or their license plates. Some canvassers appear to have taken photos of properties, often vacant, which featured what they believed to be "anomalies" in an effort to document such anomalies.

93. The people who associated within USEIP for the purpose of canvassing voters were volunteers, and had no funding.

94. There is no evidence Defendants intended to, or did, strike fear in the hearts of any Colorado voters, including so that they would not turn out at the polls in 2022.

95. There is no evidence Defendants intended to, or did make it clear to certain voters that intimidation and threats would follow them home from the polling place.

96. There is no evidence Defendants intended to, or did make it clear to certain voters that voting would carry the risk that armed vigilantes might come to their homes; and that they should be afraid to vote.

97. There is no evidence in the record that Kasun selected or directed any of the canvassers, nor that she ever met with any canvassers (other than in non-canvassing contexts her co-defendants). There is no evidence in the record that Kasun solicited any particular fellow volunteer to act as her agent or that such fellow volunteer assented to be Kasun's agent.

**PROPOSED CONCLUSIONS OF LAW**

**Standing**

98. LWVCO's own media outreach, email campaigns, and the rather alarmist language in its media campaigns created, labeled, exaggerated, amplified, and promoted the notion that intimidation had occurred. LWVCO also promoted the claim that USEIP was still engaged in intimidation, all of which could reasonably have been expected to make some members of Plaintiffs' audience feel intimidated, or to worry more about intimidation than they would have in the absence of Plaintiffs' alarmism. When plaintiff organizations engaged in lawfare pursue counter-communications campaigns, and they're rooted in conjecture and misplaced fear, they risk not just concocting an issue where there may be none, but amplifying for a larger audience a feeling of intimidation that cannot fairly be attributed to the original speaker.

99. An organization cannot establish standing by diverting resources based on *speculative* fears. *City of S. Miami v. Governor of Fla*., 65 F.4th 631 (11th Cir. 2023). "Where a 'hypothetical future harm' is not 'certainly impending,' plaintiffs 'cannot manufacture standing merely by inflicting harm on themselves.'" *Id*. (citing *Muransky v. Godiva Chocolatier, Inc*., 979 F.3d 917, 931 (11th Cir. 2020) (en banc) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). Here, when Plaintiffs filed their Complaint, there was no evidence of any harm from USEIP that was "certainly impending". Courts may reject "the argument that plaintiffs have standing based on their 'subjective fear of . . . harm' and its 'chilling effect.' *Id*.

(citation omitted). Their "self-imposed harms do not create a cognizable injury sufficient to support Article III standing." *Id*.

100. An organization lacks standing if it "manufacture(s) the injury by incurring litigation costs or simply choos[es] to spend money fixing a problem that would otherwise not affect the organization at all. It must instead show that it would have suffered some other injury if it had not diverted resources to counteracting the problem." *Valle del Sol, Inc. v. Whiting*, 703 F.3d 1006, 1018 (9th Cir. 2013).

101. If an organization "seek(s) to do no more than vindicate their own value preferences through the judicial process" that organization generally cannot establish standing. *Sierra Club v. Morton*, 405 U.S. 727, 740 (1972); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). For example, where "Plaintiffs' allegations . . . are based only on speculation, conjecture and their seemingly sincere desire for their 'own value preferences' . . ., Plaintiffs fail to establish substantial risk of harm." *Shelby Cnty. Advocates for Valid Elections v. Hargett*, No. 2:18-cv-02706-TLP-dkv, at *13-14 (W.D. Tenn. Sep. 13, 2019).

102. "[A]n organization's diversion of resources to litigation or to investigation in anticipation of litigation is considered a 'self-inflicted' budgetary choice that cannot qualify as an injury in fact for purposes of standing." *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011)

103. "[A]n organization cannot "spend its way into standing. . . by expending money to gather information and advocate against a defendant's action. An organization cannot manufacture its own standing in that way" *FDA v. Alliance for Hippocratic Medicine*, *et al*., No. 23-235, slip op. at 22 (U.S. June 13, 2024).

**Section 11(b) Intimidation in Voting Rights**

104. Section 11(b) provides, in relevant part, that "No person . . . shall intimidate . . . or attempt to intimidate . . . any person for voting or attempting to vote, or intimidate . . . or attempt to intimidate . . . any person for urging or aiding any person to vote or attempt to vote." To succeed on their 11(b) claim against Kasun, Plaintiffs must show that through some combination of First-Amendment-protected speech and association, but without any threats of violence, (1) Kasun directly (or by directing a third party) caused or attempted to cause a reasonable, objective person to be intimidated, and, if so, (2) that speech was recklessly made, per *Counterman v. Colorado*, 600 U. S. 66 (2023). As the League of Women Voters is aware, "[t]he particular *mens rea* required in order to establish the requisite gravamen of falsity or fraud [or other speech not protected by the First Amendment] may be intentional, knowing, or even reckless." *League of Women Voters of Kan. v. Schwab*, 539 P.3d 1022, 1031 (Kan. 2023) (citing *Counterman v. Colorado)*.

105. USEIP was a name given to a project that Defendants and others worked on. USEIP was not a hierarchical or command-and-control entity capable of creating agency relationships with third parties.

106. On or about the day Plaintiffs filed their Complaint, they embarked on an ambitious press campaign. Plaintiffs sent emails to their subscribers, warning them of ongoing "intimidation". Shortly after Plaintiffs filed their Complaint, the LWV was contacted by reporters from CNN, Thomson-Reuters, the Christian Science Monitor, NPR, and others. The LWV's staff spoke with these reporters about their

suspicions, resulting in the reporters publishing articles echoing the same claims of intimidation for which no evidence had, as of publication, been discovered.

107. Plaintiffs' own activities and language in its numerous email and media campaigns created a risk of labeling speech and association they disagreed with, exaggerating and amplifying it, and manufacturing the notion that intimidation had occurred and was still occurring and that Holly Kasun was somehow responsible. Plaintiffs' activities could reasonably have been expected to make some members of Plaintiffs' audience feel intimidated, or to worry more about intimidation than they would have in the absence of Plaintiffs' alarmism, which created a legitimate potential for arousing a sense of victimization (and coaching potential witnesses on how they should feel).

**Law of Agency**

108. "[T]he party asserting the existence of an agency relationship . . . has the burden of establishing its existence by clear and convincing evidence." *Coreslab Structures (Tulsa), Inc. v. Nat'l Labor Relations Bd*., No. 23-9502, at *16 (10th Cir. Apr. 24, 2024).

109. Actual authority requires the agent's "reasonabl[e] belie[f], in accordance with the principal's manifestations to the agent, that the principal wishes the agent to so act." *Id.* (quoting Restatement (Third) of Agency § 2.01). Here, there is no evidence in the record of Kasun manifesting a belief to any canvasser that she wished the person to act. Apparent authority turns on a third party's reasonable belief that the agent "has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." Id. (quoting Restatement (Third) of Agency § 2.03);

*see also In re Pan-Oston Co.*, 336 N.L.R.B. 305, 305-06 (2001) ("Apparent authority results from a manifestation by the principal to a third party that creates a reasonable belief that the principal has authorized the alleged agent to perform the acts in question. Either the principal must intend to cause the third person to believe the agent is authorized to act for him, or the principal should realize that its conduct is likely to create such a belief." (citation omitted)). *Coreslab Structures (Tulsa), Inc. v. Nat'l Labor Relations Bd.*, No. 23-9502, at *17 (10th Cir. Apr. 24, 2024). No evidence in the record reveals any relationship between Kasun and any third party that would cause the latter reasonably to believe canvassers acted on her behalf.

110. "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Geman v. SEC*, 334 F.3d 1183, 1189 (10th Cir. 2003) (quoting Restatement (Second) of Agency, § 1(1) (1958)). "An 'agent' is generally one who acts for, or in place of, another, or is entrusted with the business of another. The control a principal exercises over the manner of work performed by an agent is evidence that an agency relation exists." *Moses v. the Diocese of Colorado*, 863 P.2d 310 (Colo. 1993). There is no evidence Kasun exercised any control over another party, nor has the Court seen any such party consenting to Kasun's control. "Under such a relationship, an agent is charged to act primarily for the benefit of the principal. *Id.* However, there is no evidence Kasun pursued any goals primarily for her own benefit, as a principal would. At

times a principal can be liable for the actions of an independent contractor. Specifically,

> when a principal authorizes its contractor agent to conduct and conclude a transaction with third parties on the principal's own behalf, and the principal benefits from the contracts, the principal will be liable

*1-800 Contacts, Inc. v. Lens.com, Inc.*, 755 F. Supp. 2d 1151, 1183 (D. Utah 2010) (citations omitted). Again, there is no evidence Kasun experienced any benefit, unique to her, that did not flow to all of the co-equal volunteers of USEIP. "An agent has a fiduciary duty to act with the utmost faith and loyalty in behalf of, and to act solely for, the benefit of his principal." *Brunner v. Horton*, 702 P.2d 283, 284 (Colo. App. 1985). Similarly, Plaintiffs introduced no evidence that any canvasser had a fiduciary duty to act solely for the benefit of Kasun or any other member of USEIP.

111.  USEIP was not an entity, but a name given to a project or a free association of individuals without hierarchy. Thus, the law applicable to members of non-profits is instructive in demonstrating that Kasun may not be vicariously liable for the acts of USEIP. Under Colorado law, Section 7-30-106 - Liability in contract and tort, Colo. Rev. Stat. § 7-30-106:

(1) A nonprofit association is *a legal entity separate from its members* for the purposes of determining and enforcing rights, duties, and liabilities in contract and tort.

(2) *A person is not liable for a breach of a nonprofit association's contract* merely because the person is a member of the nonprofit association, is authorized to participate in the management of the affairs of the nonprofit association, or is a person considered to be a member by the nonprofit association.

(3) *A person is not liable for a tortious act or omission* for which a nonprofit association is liable merely because the person is a member of the nonprofit association, is authorized to participate in the management of the affairs of the nonprofit association, or is a person considered to be a member by the nonprofit association.

(4) *A tortious act or omission of a member or other person for which a nonprofit association is liable is not imputed to a person* merely because the person is a member of the nonprofit association, is authorized to participate in the management of the affairs of the nonprofit association, or is a person considered to be a member by the nonprofit association.

112. USEIP was the name given to a canvassing project by several of its organizers. There is no evidence in the record that it or its members had any agents or directed any activities of third parties.

113. USEIP "is not an artificial person, and has no existence independent of its members." *Martin v. Curran*, 303 N.Y. 276, 280 (N.Y. 1951). "No agency of one member for another is implied." *Id*.

114. Each member of an unincorporated nonprofit association is "liable only so far as he has personally assented to the transaction in question". 2 SAMUEL WILLISTON, WILLISTON ON CONTRACTS § 308, at 450-51 (3d ed. 1959).

115. Defendants are not responsible for canvassed voters' beliefs about who the canvassers were. *See League of Women Voters of Kan. v. Schwab*, 539 P.3d 1022, 1025 (Kan. 2023) (agreeing with argument of appellant, League of Women Voters). A "listener's mistake—whether innocent or in fact entirely unreasonable—[cannot] turn otherwise honest speech into fraud[.] . . . Because, in this context, in order to fall outside constitutional protections, the speech at issue must be deceptive, fraudulent, or otherwise false, at its heart." *League of Women Voters of Kan. v. Schwab*, 539 P.3d at 1031.

**The KKK Act Claim**

**Plaintiffs Fail to Allege with Specificity the KKK Act's Requisite Agreement to Conspire to Violate Voters' Rights.**

116. Plaintiff's Section 1985(3) claim faces an even more uphill battle, because that section requires particularized allegations – entirely missing here – that the Defendants got together to conspire specifically to intimidate a voter regarding his voting.

117. To prevail on a claim under the Support and Advocacy Clause of the KKK Act, a plaintiff must show: (1) a conspiracy of two or more; (2) to prevent by force, intimidation, or threat, (3) any citizen from giving his or her "support or advocacy" to a candidate for federal office, and (4) an act in furtherance of that conspiracy. *See League of United Latin Am. Citizens—Richmond Region Council 4614 v. Public Interest Legal Found*., No. 1:18-cv-00423, 2018 WL 3848404, at *1, 5-6 (E.D. Va. Aug. 13, 2018); *see also Kush v. Rutledge*, 460 U.S. 719, 724 (1983) (Section 1985(3) "proscribe[s] conspiracies that interfere with" among other things "the right to support candidates in federal elections").

**The Support and Advocacy Clause of Section 1985(3) Requires an Intent to Intimidate and Interfere with Voting Rights Not Proven Here.**

118. "The operative language in the KKK Act targets those who 'conspire to prevent by force, intimidation, or threat, any citizen' from voting. The description of a conspiracy to prevent voting suggests a deliberate attempt to interfere with voting rights." Ben Cady & Tom Glazer, "Voters Strike Back: Litigating against Modern Voter Intimidation," 39 N.Y.U. Rev. L. & Soc. Change 173 (2015). "Thus, KKK Act claims require a level of intentionality greater than section 11(b)." *Id*.; s*ee also*

*Arizona All. for Retired Americans v. Clean Elections USA,* No. CV-22-01823-PHX-MTL, 2022 WL 15678694, at *6 (D. Ariz. Oct. 28, 2022). It is not enough that a conspiracy "has an *effect* upon a protected right," as Plaintiffs' narrative would have it. Rather, "its impairment must be a *conscious objective of the enterprise.*" *Bray*, 506 U.S. at 275 (emphases added).

119. In short, Plaintiffs "must show proof that the purpose or intent of Defendants' conspiracy was to intimidate or threaten voters" about engaging in voting in federal elections. *Id.* Here, Plaintiffs have neither proven nor even alleged that Defendants engaged in a conspiracy. Nor have Plaintiffs shown Defendants specifically intended to interfere with voting or support of a candidate.

**Because Plaintiffs Failed to Allege Specific Facts that the Defendants Had a Meeting of The Minds About Impairing Voters' Rights, Their KKK Act Conspiracy Claim Must Fail.**

120. In a KKK Act claim, courts apply general principles of conspiracy law, often looking to the elements of civil conspiracy for guidance. *See*, *e.g.*, *Bush v. Butler*, 521 F. Supp. 2d 63, 68 (D.D.C. 2007). Plaintiffs seeking relief under the Support or Advocacy Clause must establish both (1) the existence of a conspiracy and (2) the conspiracy's plan to use "force, intimidation, or threat" toward the plaintiff. The most important elements are an "agreement" or meeting of the minds between the parties to inflict a wrongful injury and an "overt act" in furtherance of that agreement's objective. *See Caldeira v. County of Kauai,* 866 F.2d 1175, 1181 (9th Cir.1989), *cert. denied,* 493 U.S. 817 (1989); *see also Lenard v. Argento,* 699 F.2d 874, 882–83 (7th Cir.1983), *cert. denied,* 464 U.S. 815 (1983).

121. Plaintiffs may not make "threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). But Plaintiffs here presented exactly the sort of "threadbare claim" that "fails to allege enough facts to make a conspiracy plausible instead of just possible." *Knieper v. Forest Grp. USA, Inc.*, No. 4:15-CV-00222-HLM, 2016 WL 9449794, at *7 (N.D. Ga. Sept. 12, 2016), *order clarified*, No. 4:15-CV-00222-HLM, 2017 WL 3449601 (N.D. Ga. Jan. 23, 2017) (addressing Georgia civil conspiracy claims). "It is not enough to simply aver . . . that a conspiracy existed." *Fullman v. Graddick,* 739 F.2d 553, 556–57 (11th Cir.1984); *Shell v. U.S. Dep't Of Hous. And Urban Dev.,* 355 Fed. App'x 300, 307 (11th Cir.2009).

122. There is no evidence in the record of any agreement by Defendants (1) to form a conspiracy (2) about voters (3) to intimidate voters specifically into not exercising their right to vote or not supporting a candidate.

123. Defendants worked together on a project. That does not make their efforts a conspiracy unless their project had an unlawful goal. Holly Kasun's goals, unrebutted a trial, constituted protected First Amendment activity of expressing her rights to free speech and association. She offered her communications skills in service of a small part of an all-volunteer canvass of voters that was intended to verify the Secretary of State's voter rolls, to analyze the data, and to report on the results.

**Plaintiffs Do Not Allege with Required Particularity a Plan to Intimidate Voters.**

124. Plaintiffs here do not plead a true agreement, by each of the Defendants, to intimidate a voter. *Cf. Wohl*, 498 F. Supp. 3d at 486-87. There is no evidence any

of the alleged conspirators "knew of the conspiracy" to interfere with anyone's voting rights and adopted a goal or objective of engaging in unlawful intimidation. "Although an express agreement is not necessary, the participants in the conspiracy *must share the general conspiratorial objective*. It simply must be shown that there was a single plan, the *essential nature and general scope of which [was] known to each person* who is to be held responsible for its consequences." *Simmons v. Poe*, 47 F.3d 1370, 1378 (4th Cir. 1995) (citations omitted); *see also Porter v. Bainbridge,* 405 F.Supp. 83, 91 (D.Ind.1975). Where is the "single plan" here?

125. Here, Plaintiffs plead nothing that would indicate a shared "conspiratorial objective" of interfering with Plaintiffs' rights. Plaintiffs merely plead an association among the Defendants as three among many co-equal volunteers on a civic project. But in the absence of specific evidence of conspiratorial agreement, the fact that defendants are associated in some manner cannot be used to prove the existence of a conspiracy. *See Moss v. Perkins,* 682 F.Supp. 395, 396 (N.D.Ill.1988); *see also Scott v. Greenville County,* 716 F.2d 1409, 1424 (4th Cir.1983) (rejecting the allegation that private citizens were liable for section 1985(3) conspiracy simply because they wrote letters and spoke at public meetings in opposition to low-income housing in an effort to influence the County Council's actions, because there was "no joint plan of action"); *Ballinger v. North Carolina Agricultural Extension Service,* 815 F.2d 1001, 1006–07 (4th Cir.1987), *cert. denied,* 484 U.S. 897 (1987) (dismissing a section 1985(3) claim alleging conspiracy on the basis of

age, because there was no direct or indirect proof of participation in any conspiracy).

**Plaintiffs Have Proven No More Than Lawful "Parallel Actions" by Defendants That Had "Obvious Alternative Explanations".**

126. At trial, Plaintiffs presented evidence of parallel association activities (canvassing, analysis, reporting, communications) with obvious alternative explanations – a citizens' group working on a project — and no plausible inference of coordinated conduct.

*A Conspiracy Claim May Not be Based on Merely "Parallel Action" by Defendants.*

127. The Supreme Court's standard for pleading a conspiracy, set forth in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007), is fatal to Plaintiffs' evidence consisting merely of Defendants' parallel actions, because merely "lawful parallel conduct fails to bespeak unlawful agreement." *See also Am. Dental Ass'n v. Cigna Corp.,* 605 F.3d 1283, 1294 (11th Cir. 2010). The plaintiffs in *Twombly* had alleged a conspiracy among certain regional telecommunications providers. Like Plaintiffs' Complaint here, their complaint contained only speculation that a meeting of the minds must have happened, somehow. They simply attempted to *infer* a conspiracy through allegations of the defendants' parallel behavior. The Supreme Court upheld the dismissal of the complaint.

128. Here, Plaintiffs fail to establish a context "that raises a suggestion" that a "preceding agreement" must have happened. *See Twombly*, 550 U.S. at 557. Instead, Plaintiffs list the sorts of activities any party would engage in if they were volunteering on a project in a public-facing mission. That is, Plaintiffs plead

conspiracy via the exercise of no fewer than three First Amendment rights: speech, assembly, association.

129. The Court in *Twombly* went on, describing exactly Plaintiffs' proofs, saying parallel conduct, even where such conduct is "consciously undertaken" – *i.e.,* the full extent of Plaintiffs' claims about Defendants' speaking and canvassing activities – is not enough without "some setting suggesting the agreement necessary" and that merely parallel conduct is "much like a naked assertion of conspiracy" in that "it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of "entitle[ment] to relief." *Twombly*, 550 U.S. at 557 (emphasis added).

*The Defendants' "Obvious, Alternative Explanation" for Their Activities Defeats Any Mere Inference of Collective Conduct.*

130. Where, as here, there is an "obvious alternative explanation" for the collective actions alleged, one that suggests lawful, independent conduct, no unlawful conspiracy may be *plausibly* inferred. *See Twombly,* 550 U.S. at 568; *Iqbal,* 129 S.Ct. at 1951–52 (finding that though some of the plaintiff's allegations were "consistent with" purposeful discrimination, the complaint as a whole supported a plausible and legitimate motive by law enforcement officers to protect the nation from "suspected terrorists"); *Gibbs v. United States*, 865 F. Supp. 2d 1127, 1146 (M.D. Fla. 2012), *aff'd,* 517 F. App'x 664 (11th Cir. 2013); *see also Am. Dental Ass'n,* 605 F.3d  at 1295 (rejecting conspiracy allegations of parallel conduct where there is an "obvious alternative explanation").

131. Plaintiffs plead, in essence, a "conspiracy", or agreement, to organize to discuss and address election issues, to canvass fellow voters, and to produce a report.

The activities of which Plaintiffs complain, in short, are what citizens do when they are lawfully exercising their rights of association and speech. Defendants have an obvious alternative explanation for their actions, other than unlawfully harming voting rights.

WHEREFORE, THE COURT DECLARES THAT:

- Kasun was not reckless in any of her speech or association activities.

- Kasun solicited no agents among the canvassers, nor did any assent to her solicitation. Accordingly, she may not be held liable for any of their alleged activities, legal or otherwise.

- There is no evidence Kasun carried out an unlawful campaign of voter intimidation in violation of Section 11(b) of the Voting Rights Act.

- There is no evidence Kasun or any other Defendants conspired to carry out an unlawful campaign of voter intimidation as proscribed by Section 42 U.S.C. § 1985(3) of the KKK Act. In particular, there is insufficient evidence of a conspiracy with the specific goal of interfering with any voters' rights.

WHEREFORE, THE COURT ISSUES THE FOLLOWING ORDER:

- Plaintiffs are jointly and separately liable for Defendants' reasonable attorney fees.

- This Court retains jurisdiction to ensure Plaintiffs' ongoing compliance with the Court's order.

Dated: June 19, 2023

By: /s/ Michael J. Wynne
Michael J. Wynne
TX Bar No. 785289
mwynne@gwafirm.com
Cameron Powell
CO Bar No. 22016
cpowell@gwafirm.com
GREGOR WYNNE ARNEY, PLLC
4265 San Felipe, Suite 700
Houston, TX 77027
P: (281) 450-7403

*Counsel for Defendant Holly Kasun*

## CERTIFICATE OF COMPLIANCE

I HEREBY CERTIFY that the foregoing document was prepared in Arial, 12-point font, as approved by Civ. Practice Standard 10.1.

By: /s/ Michael J. Wynne
Michael J. Wynne

## CERTIFICATE OF SERVICE

This is to certify that I have filed a true and correct copy of the foregoing with the Clerk of the Court via the CM/ECF system, which will automatically serve electronic notification of same upon all counsel of record and pro se parties.

Respectfully submitted this 19th day of June, 2024.

By: /s/ Michael J. Wynne
Michael J. Wynne