# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-00581-CNS-NRN

Colorado Montana Wyoming
State Area Conference of the NAACP,
League of Women Voters of Colorado, and
Mi Familia Vota,

    Plaintiffs,

v.

United States Election Integrity Plan, Shawn Smith,
Ashley Epp, and Holly Kasun,

    Defendants.

_____

## DEFENDANT HOLLY KASUN'S TRIAL BRIEF
_____

Holly Kasun submits this Trial Brief as a guide for the Court at trial.

### I. Introduction

In a case in which Kasun is alleged to have violated two voting rights statutes not through any *conduct* but solely through her exercise of rights of *speech and association*, this Court must decide whether (1) Kasun attempted to or did intimidate a voter (whose intimidation would have been reasonable) through some combination of First-Amendment-protected speech and association lacking any threats of violence or agency with others, and, if so, per *Counterman v. Colorado*, 600 U. S. 66 (2023), (2) whether she *was aware of* or *recklessly disregarded* any potential intimidation.

Yes, the Supreme Court in *Counterman* raised the bar on VRA and KKK intimidation claims — and every other attempt to abridge free speech or association that

1

fails to take into account the *mens rea* of the speaker. Plaintiffs will simply not be able to prove that Holly Kasun, a spokesperson for USEIP, engaged in speech *recklessly*.

II. **Plaintiffs Manufactured Concern in an Attempt to Bootstrap Standing**

LWVCO's own media outreach, email campaigns, and the rather alarmist language in its media campaigns created, labeled, exaggerated, amplified, and promoted the notion that intimidation had occurred and that USEIP did it and was still doing it, all of which could reasonably have been expected to make some members of Plaintiffs' audience feel intimidated, or to worry more about intimidation than they would have in the absence of Plaintiffs' alarmism. Such counter-communications campaigns, if premised on conjecture and misplaced fear, risk not just creating an issue where there may be none, but amplifying for a larger audience a feeling of intimidation that cannot fairly be attributed to the original speaker.

An organization cannot establish standing by diverting resources based on speculative fears. *City of S. Miami v. Governor of Fla.*, 65 F.4th 631 (11th Cir. 2023). Where a "hypothetical future harm" is not "certainly impending," Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). Here, when Plaintiffs filed their Complaint, there was no evidence of any harm from USEIP that was "certainly impending", nor is there any now.

III. **Plaintiffs Have Failed to Prove Kasun Caused Any Actual or Potential Impact on Any Voter Under the Voting Rights Act**

Section 11(b) provides, in relevant part, that "No person . . . shall intimidate . . . or attempt to intimidate . . . any person for voting or attempting to vote" or "for urging or aiding any person to vote or attempt to vote." Plaintiffs can show neither actual nor attempted intimidation by Kasun. More generally, Plaintiffs have never explained why the

2

Court should establish precedent that canvassing by volunteers in an informal association (unlike Plaintiffs' own canvassing) is likely to intimidate a voter specifically in the exercise of their voting rights. Some people don't like people coming to their doors. But there is nothing inherently intimidating about it, nor should precedent be set that says intimidation arises simply because the visitors ask about voting.

### A. Plaintiffs Produced No Evidence of Actual Intimidation by Holly Kasun

Plaintiffs had two and a quarter years to find a plausibly intimidated voter in any of the six or so counties in which USEIP-affiliated citizens *other than Kasun* canvassed. Yet even after Plaintiffs' email and media campaigns proclaiming far and wide that intimidation was afoot, Plaintiffs found one voter, Yvette Roberts, who claimed, in an email complaint (June 23, 2021), shortly after being visited at her home by canvassers, that they wore "homemade badges" saying "**Colorado Election** .... something or other." Eighteen months later, with the help of Plaintiffs aiming to defeat a summary judgment motion, Roberts confidently declared that the canvassers' badges had gotten a makeover, going from "homemade" to "***official-looking,***" and that the canvassers were "affiliated with ... ***United States Election Integrity Plan***". Dkt. 73 (emphases added). But the record is bereft of reliable evidence anyone associated with USEIP canvassed in Mesa County.

### B. Kasun's Association with Others on a Canvassing Project Does Not Amount to Attempted Intimidation

Lacking evidence of actual intimidation (other than the fear Plaintiffs' emails to voters about their "intimidation" may have caused), Plaintiffs are left to construct an argument that Kasun attempted to intimidate voters through *speech* — speech about elections and speech by co-defendants with whom there is no plausible evidence of a conspiracy with an unlawful objective, *see* Plf's Findings of Fact (FOF), ¶ 22-28, 33-46,

3

89-95, as well as speech by third-party canvassers with whom there is no evidence of any agency relationship with Kasun. *Id*., ¶ 47-82.

Plaintiffs cannot show Holly Kasun herself did anything potentially intimidating in helping to promote a canvassing project about voting in Colorado. As the resident press liaison of USEIP, she had constitutionally protected phone calls with a handful of co-equal citizen-volunteers. They gave their association a name (USEIP), but no one got around to incorporating an entity, out of their Zoom calls, subject to agency relationships. Kasun had no role in designing the canvassing project itself, nor in training, materials (including the so-called playbook), or data analysis and reporting.

Make no mistake: Plaintiffs do not allege Kasun took *any* action, or uttered any speech, that could reasonably be perceived as intimidating, let alone that was heard by a voter. So, if a citizen like Kasun exercises rights of free speech and a potential voter wasn't there to hear it, has a falling tree really crushed her First Amendment rights? Plaintiffs thus decided to try to hang the speech of *other people* around Kasun's neck. (We address the accusation of intimidation, accompanied by the Supreme Court, in Section II (D)).

Nearly every allegation in this case concerns someone other than Holly Kasun. Can she be tied to her co-defendants' speech by a conspiracy allegation? Hardly. A conspiracy requires an unlawful objective. Plaintiffs will not be able to show one. That people work together on a project does not make their efforts a conspiracy unless their project has an unlawful goal. Holly Kasun's still-unrefuted goals were protected by her First Amendment rights: she wanted to express her rights to free speech and association. She wanted to do that by doing her part to promote an all-volunteer canvass of voters.

4

### C. Plaintiffs Manufactured an Intimidating Story No One Knew About but Plaintiffs and Their Email Subscribers

Plaintiffs have attempted to make much of the "Playbook" used by USEIP canvassers. We now turn to Plaintiffs' own playbook, which was drawn from successful intimidation claims, but which Plaintiffs, having chosen a weak case to file, were unable to follow. The first step of the unsuccessful playbook is to rush to file against imagined activities that *just sound awful*, well before an adequate factual investigation. A rush to judgment will make it easier to commit the various forms of confirmation bias that go into writing a complaint that writes checks the discovery process won't be able to cash.

The second step is to overheat one's claims with language that becomes as breathless as the claims become incredible. Plaintiffs' Motion for a TRO, page 2, boasts a bravura example of the fiction-writing Plaintiffs indulged in to make it appear that Defendants were "well-funded" (a risible claim) and were *personally* "interrogating" Colorado's "most vulnerable voters", apparently defined as everyone in the counties where, let us remember, it was *independent* volunteers who canvassed homes. Nearly every clause, every adjective, of the Motion for TRO lacked and still lacks any evidence:

> The Defendants in this case are carrying out a campaign to intimidate voters. **Armed with badges and weapons**, they travel door-to-door to the homes of some of **Colorado's most vulnerable voters**, **demanding** to know if they participated in the 2020 election, **pressing them** for information on how they cast their votes, **interrogating them** about so-called fraudulent ballots, and taking photographs of their homes. This **well-funded and sophisticated conspiracy** has a clear purpose: to **strike fear in the hearts of certain Colorado voters so that they do not turn out at the polls in 2022**. Defendants have made it clear to certain voters that **intimidation and threats will follow them home** from the polling place; that **voting now carries the risk that armed vigilantes may come to their homes; and that they should be afraid to vote. It is a brazen, unapologetic, and malignant strain of voter intimidation**—and it must be immediately stopped. (Emphases added).

5

The third step in the playbook is to unearth online anything that could be argued to suggest violence, by anyone in the vicinity of a defendant, *whether any voter saw it or not*. In the TRO, Plaintiffs begin this step, on page 3, with a heading that screams, "USEIP Is a **Militant, Aggressive Voter Intimidation Group...**" (Emphasis added). That's right. Militant *and* aggressive.

The evidence? Here, Plaintiffs' lawyers followed not any evidence taken from voters but *news articles* that unearthed chatroom discussions about guns and security, by people other than Holly Kasun, that no voter is even alleged to have seen, nor that any canvasser articulated to a voter. Plaintiffs also tossed into their Complaint and Motion for a TRO the now-obligatory references to Qanon and the January 6 riot, which, Plaintiffs want us to remember, "resulted in the deaths of five individuals." *Id.* at 3-4. Perhaps, Plaintiffs reasoned, misusing Capitol officers' deaths in the service of a smear by association could end up helping Plaintiffs prove a conspiracy.

The fourth step in an ineffectual voting rights complaint is to stir in unsupportable insinuations of racial bias. Witness Plaintiffs' reference to "the most vulnerable voters," or the bootstrapped-standing claim that Plaintiffs, having come to believe their own email campaigns crying about the wolf of "intimidation", were "forced" to "ensure that **voters of color** can vote." *Id*. at 2 (emphasis added); *see also id*. at 2, 9, 11 n.3, 23 (complaining Plaintiffs were "forced" to divert resources). But there remains no evidence that the canvassers, working from *state-provided voter rolls that lacked any information about voters' race*, targeted geographies where they somehow knew minorities resided. Playbook-plaintiffs must also produce a report from a historian that concerns itself not

6

with facts relevant to any Defendant but that summarizes, as if federal courts were denied Wikipedia access, the tragic history of *real* voter suppression.

Fifth, a playbook-plaintiff that has jumped to conclusions will fail, given (1) over two years' time, (2) the names of every voter who was visited by a canvasser associated with defendants, and (3) notes of each interaction with a voter, to produce a single plausible claim of actual intimidation.

Finally, if no voter will say the defendants' acts were "intimidating", playbook-plaintiffs can simply label them as such. Then, based on speculation, they can begin to divert resources by amplifying the "intimidation" label to their email list and promoting their still entirely speculative narrative to media outlets that construct news articles whose key allegations are based on ... plaintiffs' speculations. In short, if there was intimidation in this case, it was created through the agency of Plaintiffs themselves, who then *unreasonably* chose to divert resources based purely on their own alarmism.

But since March 2022, key facts have remained undisturbed. Holly Kasun did not knock on any voter's door or ask any voter a question about their voting history or concerns; stand over voters, yell at them, block their way, keep them from entering or leaving a room, follow them, talk about them within earshot, or even glare at them; initiate robocalls, mailings, or emails hinting darkly at the consequences — of law or violence — the recipient could suffer if they exercised their core rights; threaten any voter with eviction, a loss of government benefits, a lawsuit, deportation, arrest, or prosecution; or hang around a polling place or ballot box with weapons on display. Nor did any agent acting at her direction.

**D. Plaintiffs May Not Restrict Core Speech on the Basis of Claims of Intimidation-by-Speech Unless that Speech was Reckless**

Plaintiffs have thus come to the end of this adventure empty-handed. The Supreme Court in *Counterman* required not just that a plaintiff's alleged intimidation as a consequence of objectionable speech be reasonable, but that a defendant accused of intimidating *speech* was reckless.

The evidence here does not support it. Voter intimidation cannot be proven by such a low and vague bar as a voter's *discomfort* or *annoyance,* which is a more accurate term for what Ms. Roberts says she experienced when unrelated third parties canvassed her home, or for Plaintiffs' extraordinary attempt to paint canvassers' lack of Spanish skills as "objective intimidation". Plfs' FOF, ¶ 73 The constitutional difficulty with using such a loose, vague standard, based on parroting words from a statute, is not just that it invites witness coaching, but that it makes the speaker's *mens rea* irrelevant. Under *Counterman*, that is no longer permissible. And Kasun's testimony was persuasive that she did not believe what she was doing could be intimidating.

1. ***Counterman* Addressed Potentially Intimidating or Distressing Speech**

In *Counterman*, the defendant was charged under a Colorado statute making it unlawful to communicate with another person in "a manner that would cause a reasonable person to suffer serious emotional distress." The Court in *Counterman* thus considered a statute employing the same objective "reasonable plaintiff" standard, without regard to the defendant's awareness or *mens rea*, that Plaintiffs advance here. In *Counterman*, the plaintiff "never noticed" the defendant engaging in action beyond speech. 600 U. S. at 71 n.1. Thus, the charge against Counterman was based solely on his "speech". *Id*. The same is true here, with the addition of Plaintiffs' attempt to attribute the speech of co-

8

Defendants and the *still-unspecified* speech of *unidentified* canvassers to Kasun.

### 2. A Defendant Accused of Problematic Speech Must Be Aware of or Recklessly Disregard Her Speech's Impact

The defendant in *Counterman* argued that the First Amendment required that his statements were not only objectively threatening, *but also that he was aware of (or recklessly disregarded) their threatening nature*. The Supreme Court agreed, even as it acknowledged that insistence on a "subjective element" in unprotected speech cases could come at a cost: "It will shield some otherwise proscribable (here, threatening) speech" because it's difficult to prove "what the defendant thought." *Id.* at 75. But the Court balanced the competing rights at issue in favor of more speech, holding that a subjective standard for the alleged perpetrator is still required lest legal action chill too much protected expression. *Id*. at 75, 78, 80.

Thus, the Supreme Court held that in cases of speech alleged to be problematic, the minimum required *mens rea* is recklessness—*i.e.,* that a person "consciously disregards a *substantial and unjustifiable risk* that the conduct will cause harm to another." *Id.* at 79 (citation omitted; cleaned up). "[R]ecklessness is morally culpable conduct, involving a 'deliberate decision to endanger another.'" *Id*. at 79. "In the threats context, it means that a speaker is aware 'that others could regard his statements as' threatening violence and 'delivers them anyway.'" *Id*. (citation omitted). In the voting intimidation context, it would mean that a defendant accused of intimidating speech was aware at the time of each act of speech that relevant voters could regard the speech as intimidating with respect to voting — and the defendant delivered it anyway.

9

### IV. Plaintiffs' KKK Act Claim Suffers From Additional Weaknesses of Lack of Specific Intent to Intimidate and Lack of Evidence of Conspiracy

Plaintiffs' Section 1985(3) claim faces an even more uphill battle, because that section requires particularized allegations – entirely missing here – that the Defendants intended to intimidate a voter regarding their voting specifically, and that Defendants conspired specifically to do so. "The operative language in the KKK Act targets those who 'conspire to prevent by force, intimidation, or threat, any citizen' from voting. The description of a conspiracy to prevent voting suggests a deliberate attempt to interfere with voting rights." Ben Cady & Tom Glazer, "Voters Strike Back: Litigating against Modern Voter Intimidation," 39 N.Y.U. Rev. L. & Soc. Change 173 (2015). "Thus, KKK Act claims require a level of intentionality greater than section 11(b)." *Id*.; s*ee also Arizona All. for Retired Americans v. Clean Elections USA*, No. CV-22-01823-PHX-MTL, 2022 WL 15678694, at *6 (D. Ariz. Oct. 28, 2022).

In such claims, courts apply principles of conspiracy law, looking to the elements of civil conspiracy. *See, e.g., Bush v. Butler*, 521 F. Supp. 2d 63, 68 (D.D.C. 2007). Plaintiffs must establish both (1) the existence of a conspiracy and (2) the conspiracy's plan to use "force, intimidation, or threat" toward the plaintiff. The key elements are an "agreement" or meeting of the minds between the parties to inflict a wrongful injury and an "overt act" in furtherance of the agreement. *See Caldeira v. County of Kauai*, 866 F.2d 1175, 1181 (9th Cir.1989), *cert. denied*, 493 U.S. 817 (1989).

Plaintiffs' threadbare claim, in their Trial Brief, that they will prove at trial such a specific conspiracy is destined for failure.

Kasun requests an award of her attorneys fees' per 52 U.S.C. § 10310(e).

Dated: June 19, 2023

By: /s/ Michael J. Wynne
Michael J. Wynne
TX Bar No. 785289
mwynne@gwafirm.com
Cameron Powell
CO Bar No. 22016
cpowell@gwafirm.com
GREGOR WYNNE ARNEY, PLLC
4265 San Felipe, Suite 700
Houston, TX 77027
P: (281) 450-7403

*Counsel for Defendant Holly Kasun*

## **CERTIFICATE OF COMPLIANCE**

I HEREBY CERTIFY that the foregoing document was prepared in Arial, 12-point font, as approved by Civ. Practice Standard 10.1.

By: /s/ Michael J. Wynne
Michael J. Wynne

## **CERTIFICATE OF SERVICE**

This is to certify that I have filed a true and correct copy of the foregoing with the Clerk of the Court via the CM/ECF system, which will automatically serve electronic notification of same upon all counsel of record and pro se parties.

Respectfully submitted this 19th day of June, 2024.

By: /s/ Michael J. Wynne
Michael J. Wynne

11