1                   IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF COLORADO

3    Civil Action No. 22-cv-00581-CNS-NRN

4

     COLORADO MONTANA WYOMING STATE AREA
5    CONFERENCE OF THE NAACP, et al.,          (Pages 1 - 303)

6          Plaintiffs,

7          vs.

8    SHAWN SMITH, et al.,

9          Defendants.

10   -------------------------------------------------------------
                       REPORTER'S TRANSCRIPT
11                     Bench Trial - Day 1
     -------------------------------------------------------------

12
     Proceedings before the HONORABLE CHARLOTTE N. SWEENEY, Judge,
13    United States District Court for the District of Colorado,
     commencing on the 15th day of July, 2024, in Courtroom A-702,
14            United States Courthouse, Denver, Colorado.

15                           APPEARANCES

16   For the Plaintiffs:
     AMY E. ERICKSON and BRIAN A. DILLON and KRISTIN M. STOCK,
17   Lathrop GPM LLP, 80 South Eighth St., Ste. 500, Minneapolis,
     MN 55402
18   COURTNEY M. HOSTETLER, Free Speech for People, 48 North
     Pleasant St., Ste. 304, Amherst, MA 01002
19   CASEY C. BREESE, Lathrop GPM LLP, 675 15th St., Ste. 2650,
     Denver, CO 80202
20
     For Defendant Smith:
21   R. SCOTT REISCH and JESSICA L. HAYS, Reisch Law Firm, LLC,
     1490 W. 121st Ave., Ste. 202, Denver, CO 80234
22   For Defendant Kasun:
     MICHAEL J. WYNNE and CAMERON C. POWELL, Gregor Wynne Arney
23   PLLC, 4265 San Felipe St., Ste. 700, Houston, TX 77027
     For Defendant Epp:
24   PRO SE

25      Sarah K. Mitchell, RPR, CRR, 901 19th Street, Room A252,
                   Denver, CO 80294, 303-335-2108
            Proceedings reported by mechanical stenography;
                transcription produced via computer.

22-cv-00581-CNS-NRN   Bench Trial - Day 1        07/15/2024   2

1                            I N D E X

2
   OPENING STATEMENTS                                        PAGE
3
   By Ms. Erickson                                             8
4  By Mr. Powell                                              18
   By Ms. Hays                                                30
5  By Ms. Epp                                                 33

6

   PLAINTIFFS' WITNESSES                                     PAGE
7
   SHAWN ALLEN SMITH
8     Direct Examination By Mr. Dillon                        41
      Cross-Examination By Mr. Reisch                        129
9     Cross-Examination By Mr. Wynne                         176
      Cross-Examination By Ms. Epp                           177
10    Redirect Examination By Mr. Dillon                     183
      Recross-Examination By Mr. Reisch                      196
11    Recross-Examination By Mr. Wynne                       197
   ASHLEY EPP
12    Direct Examination By Mr. Breese                       201
      Cross-Examination By Mr. Wynne                         284

13

14
                     EXHIBITS                 RECEIVED
15
                      1                         7
16
                      3                         7
17
                      5                         7
18
                      11                      256
19
                      15                      247
20
                      17                      238
21
                      25, page 47            106
22
                      25, page 90            278
23
                      74                        7
24
                      75                        7
25
                      76                        7

                     Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1         07/15/2024   3

 1
                        77                                    7
 2
                        78                                    7
 3
                        80                                    7
 4
                        84                                    7
 5
                        85                                    7
 6
                        86                                    7
 7
                        90                                    7
 8
                        91                                    7
 9
                        92                                    7
10
                       103                                    7
11
                       108                                    7
12
                       110                                    7
13
                       111                                    7
14
                       115                                    7
15
                       118                                    7
16
                       119                                    7
17
                       120                                    7
18
                       121                                    7
19
                       122                                    7
20
                       123                                    7
21

22

23

24

25

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1        07/15/2024    4

1                 *        *        *        *        *

2       (The proceedings commenced at 8:32 a.m.)

3             THE COURT:  Good morning.  Please have a seat.  We

4    are here for the trial in 22-cv-581, Colorado Montana Wyoming

5    State Area Conference of the NAACP, et al. v Shawn Smith,

6    Ashley Epp, and Holly Kasun.  May I have entries of

7    appearance, starting with the plaintiff.

8             MS. ERICKSON:  Amy Erickson on behalf of plaintiffs,

9    Your Honor.

10            MS. STOCK:  Kristin Stock on behalf of plaintiffs.

11            MR. DILLON:  Brian Dillon, Your Honor.

12            MR. BREESE:  Casey Breese, Your Honor.

13            THE COURT:  Good morning.

14            MS. RATHNAYAKA:  Hashini Rathnayaka here.

15            THE COURT:  Say that again?

16            MS. RATHNAYAKA:  Hashini Rathnayaka.

17            THE COURT:  Good morning.

18            MS. HOSTETLER:  Courtney Hostetler.

19            THE COURT:  Good morning to you all.  And on behalf

20   of the defendants, we'll start in the back.

21            MR. REISCH:  Good morning, Your Honor.  Scott Reisch

22   and Jessica Hays with Shawn Smith who's present seated here at

23   counsel table.

24            THE COURT:  Good morning.

25            MR. WYNNE:  Michael Wynne and Cameron Powell on

22-cv-00581-CNS-NRN   Bench Trial - Day 1        07/15/2024   5

 1   behalf of Holly Kasun.

 2           THE COURT:  All right.

 3           MS. EPP:  Ashley Epp on behalf of myself.

 4           THE COURT:  All right.  Good morning.

 5           MS. MARTINEZ:  I'm Heather Martinez.  I'm the

 6   paralegal.

 7           THE COURT:  Good morning to you.  Sorry you all had a

 8   bit of panic thinking it started at eight.  I'm pretty sure I

 9   said 8:30, but at any rate, that gave you a little adrenaline

10   boost to get going for the morning.  Any questions before we

11   begin?  All good?

12           MR. REISCH:  Your Honor, just briefly, if I may.

13           THE COURT:  Yes, go ahead.

14           MS. REISCH:  Your Honor, just if there's an issue as

15   it relates to any appellate issues, on behalf of Mr. Smith, I

16   would renew our motion under Docket 121.  That was the motion

17   to recuse that we filed before Your Honor.  I understand the

18   Court will more than likely deny it, but for the record and to

19   make sure that issue is preserved, I renew that motion this

20   morning.

21           THE COURT:  All right.  That's completely

22   unnecessary, but it's denied again.

23           MR. REISCH:  Thank you.

24           MR. WYNNE:  Michael Wynne on behalf of Ms. Kasun.

25   Ms. Kasun invokes the rule.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1            07/15/2024    6

 1          THE COURT:  I assume you mean the rule of

 2   sequestration?

 3          MR. WYNNE:  Not necessarily sequestration, but at

 4   least not to be in the courtroom during the testimony of any

 5   other witnesses.  Outside of the courtroom, don't have an

 6   issue with that, but certainly not in the courtroom during

 7   testimony with the exception of Ms. Ashe -- or Ms. Epp who

 8   clearly has to be here to represent herself.

 9          THE COURT:  So yes.  Yes, you're seeking to invoke

10   Rule 615 on sequestration.  Does anybody have an objection to

11   having witnesses who have not testified remaining outside the

12   courtroom?

13          MS. ERICKSON:  Just a clarification on that, Your

14   Honor.  I presume the defendants will remain in the courtroom,

15   as well as a representative from each of plaintiffs'

16   organizations.

17          THE COURT:  Yes.  That is the only way I would

18   consider it, yes.

19          MS. ERICKSON:  Okay.  Thank you.

20          THE COURT:  With that, there being no objection, so

21   that will be a rule.  Anything else on behalf of either party

22   -- any party?

23          MS. ERICKSON:  Your Honor, I think we had all

24   understood that we maybe just -- we had filed some

25   stipulations to exhibits on our exhibit list, and so just

22-cv-00581-CNS-NRN   Bench Trial - Day 1        07/15/2024    7

1    wanted to cover with the Court and on the record which

2    exhibits have been stipulated to at this time.

3            THE COURT:  All right.  And those are reflected on

4    your final list?

5            MS. ERICKSON:  That is correct, Your Honor.

6            THE COURT:  Do you want those admitted at this time?

7            MS. ERICKSON:  Yes, Your Honor.  We would ask for

8    those to be admitted.

9            THE COURT:  Why don't I just read what I have and you

10   verify.  So at this time the Court will admit Exhibits 1

11   through 3, 5.  Is that it?

12           MS. ERICKSON:  No, Your Honor.  If you continue on --

13           THE COURT:  I'll keep going.

14           MS. ERICKSON:  -- to page 9.

15           THE COURT:  Exhibits 74 through 78, 80, Exhibits 84

16   through 86, Exhibits 90 and 92, Exhibits 103, 108 and 110.

17   Exhibit 111, Exhibit 115, Exhibits 118 through 123, and I

18   believe that's it.

19           MS. ERICKSON:  That's correct.

20           THE COURT:  Those exhibits are admitted.

21      (Exhibits 1, 3, 5, 74, 75, 76, 77, 78, 80, 84,

22      85, 86, 90, 91, 92, 103, 108, 110, 111, 115,

23      118, 119, 120, 121, 122, 123 received.)

24           THE COURT:  Anything else on behalf of any party?

25   Let's begin with our opening statements.  On behalf of the

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1          07/15/2024    8

1   plaintiffs.

2          MS. ERICKSON:   Thank you, Your Honor.   Amy Erickson

3   on behalf of the plaintiffs.   The question before the Court

4   today is whether Defendants Ashley Epp, Holly Kasun, and Shawn

5   Smith have engaged in objectively intimidating conduct in

6   violation of Section 11(b) of the Voting Rights Act or the Ku

7   Klux Klan Act of 1871.   The evidence presented at trial will

8   demonstrate that they have.

9          Following the election in November of 2020,

10  defendants came to believe that the election was stolen from

11  President Trump, and they founded United States Election

12  Integrity Plan, or USEIP, to carry out a coordinated

13  door-to-door campaign purportedly aimed at uncovering

14  fraudulent ballots.   The evidence will demonstrate at the

15  doors of unsuspecting homeowners and residents defendants

16  interrogated voters about whether they voted in the 2020

17  election, how they voted, suggested they were part of an

18  official inquiry, and took photographs of voters' residences.

19         USEIP's door-to-door campaign coupled with its

20  violent rhetoric and widespread attempts to suggest that

21  Colorado's elections are neither safe nor secure constitutes

22  objectively intimidating conduct that violates Section 11(b)

23  of the Voting Rights Act, as well as the KKK Act, and it must

24  be stopped.   At the close of trial, plaintiffs will request

25  that the Court enter an order finding that defendants

                    Sarah K. Mitchell, RPR, CRR

1    violated the KKK Act and Section 11(b) of the Voting Rights

2    Act, enjoining them from future intimidating actions, and

3    awarding plaintiffs reasonable attorneys' fees and costs.

4         I'd like now, Your Honor, to talk just a bit about

5    the applicable law, and then I'll move on to some background

6    information that we intend to establish at trial, and then

7    talk about the application of those facts to the law.  With

8    respect to the applicable law, there are two statutes at issue

9    in this case, the Ku Klux Klan Act and the Voting Rights Act

10   of 1965.  Both statutes are written broadly to protect one of

11   the most important components of our democratic system, access

12   to the ballot box.  The Ku Klux Klan Act prohibits groups of

13   two or more individuals from conspiring to prevent lawful

14   voting activity through force, threat, or intimidation.

15        Section 11(b) of the Voting Rights Act prohibits

16   individuals from intimidating or coercing, and even from

17   attempting to intimidate, threaten, or coerce, any person for

18   the purpose of interfering with their right to vote.  The

19   actions prohibited by Section 11(b) are not limited to

20   particular acts or restricted to overt acts of violence or

21   visible threats.  Instead, when it passed the Voting Rights

22   Act, Congress sought to curb voting intimidation in any form.

23        Under the Voting Rights Act, defendants' conduct must

24   be judged by an objective standard.  In other words, would a

25   reasonable voter be intimidated by defendants' conduct.  The

22-cv-00581-CNS-NRN    Bench Trial - Day 1        07/15/2024    10

1    Voting Rights Act does not require proof that defendants acted

2    with a specific intent to intimidate voters, nor does it

3    require them to have acted with racial animus in their

4    activities.

5        Finally, it's important to note that in evaluating

6    Section 11(b) claims, courts often look to a defendant's prior

7    conduct, as well as their express goals, and consider whether

8    they would naturally result in voter intimidation.

9        Now to discuss a bit of background with respect to

10    what we intend to establish at trial.  First, the evidence

11    will show a direct connection between defendants' beliefs

12    regarding the November 2020 election, the January 6th

13    insurrection, and the founding of USEIP.  In November 2020,

14    when it became clear that President Biden had won the election

15    and that President Trump had lost, defendants begin claiming

16    publicly that the results of the election were fraudulent.

17    Soon after on November 7th, 2020, Defendants Epp and Kasun

18    founded USEIP to mobilize other like-minded Coloradoans to

19    spread the false narrative that the election had been rigged

20    or stolen.

21        The evidence will show that over the next few months

22    defendants planned and participated in Stop the Steal rallies

23    in Colorado, before setting their sights on Washington D.C.

24    On January 6th, 2021, each of three defendants were in D.C.

25    and attended Mr. Trump's speech just a few blocks from the

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    11

1  U.S. Capitol where he claimed repeatedly, as the defendants

2  have also claimed in their own public statements, that the

3  election was rigged and stolen, and encouraged a crowd not to

4  concede or give up.

5         The connection between the rhetoric of January 6th

6  and defendants' public words and actions afterwards is

7  unmistakable.  The evidence will also demonstrate that

8  defendants were part of the crowd that then marched to the

9  United States Capitol.  As we all know, the activities of the

10 crowd on that day caused the death of several individuals and

11 delayed the peaceful transfer of presidential authority.

12        Defendants' participation in the January 6th

13 insurrection and their many public statements regarding a

14 rigged or fraudulent election, their dog whistles about an

15 assault on our country, and their calls for a strong action in

16 response is precisely the type of prior conduct that the

17 Voting Rights Act instructs the Court to consider when

18 determining if actions rise to the level of voter

19 intimidation.

20        Second, the evidence will show that defendants and

21 USEIP adopted violent rhetoric in connection with its

22 canvassing campaign.  After founding USEIP in the days

23 following the November 2020 election, Defendants Epp and Kasun

24 quickly began recruiting others to their cause, including

25 Defendant Smith.  Having made up their mind that President

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1        07/15/2024    12

1    Biden's win over Mr. Trump in the 2020 election could only be

2    the result of one thing, election fraud, defendants set about

3    to collect evidence of what they had already concluded to be

4    true.

5            In order to do so, they developed a coordinated and

6    wide-reaching campaign to knock on the doors of voters across

7    Colorado and interrogate them about their participation in the

8    2020 election.  Defendant Epp for her part was the chief

9    architect of the playbook, which, as plaintiffs will

10    demonstrate through this trial, is the handbook for

11    defendants' voter intimidation campaign.  The playbook

12    expressly invokes images and sentiments of wartime, stating

13    that our country is not at peace, and that agents of USEIP are

14    patriots pitted against those who disagree with their views

15    who are referred to as enemies and communists.

16            The playbook also instructs its readers to fight the

17    enemy, stating, When they stole our election, their stole our

18    republic.  If we allow fraud to stand, we become complicit in

19    the destruction of the greatest nation in the history of

20    Earth.  We become complicit in their crime.  No one is coming

21    to save us.  It's time to stand up.  Such language when

22    considered alongside defendants' door-to-door campaign to

23    question voters about the 2020 election is objectively

24    intimidating.

25            Third, the evidence will show that USEIP's canvassing

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1         07/15/2024    13

1  efforts intentionally targeted those who did not consistently

2  vote prior to 2020.  Jeff Young, a USEIP volunteer who

3  developed the methodology they use to select which homes and

4  voters in Colorado to canvass, will testify that USEIP was

5  primarily concerned with what they dubbed low voter

6  opportunity score voters who might otherwise be known as low

7  propensity voters.

8         Defendants' theory was that these voters, voters who

9  did not vote consistently before the 2020 election, were the

10  most likely to have had a fraudulent ballot cast in their

11  name.  Mr. Young's testimony will establish the defendants'

12  methodology, which was neither peer-reviewed nor tested before

13  USEIP canvassers took it to voters' doorsteps, specifically

14  targeted low propensity voters and failed to account for any

15  valid reason why an individual voter may have voted for the

16  first time in Colorado in 2020.  For example, it does not

17  account for individuals who recently became citizens or who

18  had strong feelings about the candidates, Mr. Trump's four

19  years in office, of Mr. Trump's handling of the COVID-19

20  pandemic, for example.

21         Fourth, the evidence will demonstrate that USEIP's

22  intimidating canvassing efforts were widely publicized.

23  Defendant Kasun for her part created USEIP's communications

24  and recruitment materials, was a primary spokesperson for

25  USEIP, and frequently spoke publicly to promote their efforts

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1        07/15/2024    14

1    and to recruit individuals.

2          Defendant Smith, likewise, was a spokesperson for

3    USEIP, and his public statements in particular reflect the

4    violent rhetoric around which USEIP was built.  Defendant

5    Smith is expected to testify that he made the following

6    statement at a public event:  I think if you're involved in

7    election fraud, then you deserve to hang.  Sometimes the old

8    ways are the best ways.  This is the mindset the defendants

9    took to voters' doorsteps.

10         Fifth, USEIP's own work product demonstrates the

11   intimidating activities of this organization were widespread.

12   Defendants' canvassing report summarizes the scope of USEIP's

13   canvassing efforts.  The report demonstrates that volunteers,

14   who the defendants recruited, trained, and motivated into

15   action, knocked on more than 9,000 doors and reached over

16   4,000 voters in just four counties in Colorado, and the

17   canvassing report does not reflect the full scope of their

18   efforts, which as the evidence presented at trial will

19   demonstrate, took place across numerous other counties,

20   including Mesa, Boulder and Jefferson.

21         Six, the evidence will demonstrate that USEIP's

22   activities were intimidating to many voters.  During this

23   trial, plaintiffs will present testimony from Yvette Roberts,

24   a Colorado voter who personally found USEIP's door-to-door

25   canvassing campaign to be intimidating.  Ms. Roberts will

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024   15

 1   recount her experience with USEIP agents and their attempts to

 2   interrogate her at her doorstep about her past voting behavior

 3   and future voting intentions.  She will also testify that the

 4   agents who appeared at her door were wearing official looking

 5   badges and falsely -- that falsely suggested a connection to

 6   the government.

 7        In addition to her firsthand account, plaintiffs will

 8   present evidence that USEIP leaders encouraged its agents to

 9   carry weapons while going door to door and asked its agents to

10   take photographs of any residents for which it identified an

11   anomaly.  Deputy Secretary of State Chris Beall too will

12   testify that USEIP's actions were intimidating to Colorado

13   voters.  In fact, the Secretary of State's Office received so

14   many complaints concerning USEIP's conduct, that it was

15   compelled to issue a warning to Colorado voters about illegal

16   acts of voter intimidation.

17        It is clear that defendants' conduct amounts to

18   modern day intimidation and violates the Voting Rights Act and

19   KKK Act.  As plaintiffs' expert Professor Atiba Ellis will

20   testify, modern day voter intimidation has primarily taken the

21   form of voter vigilante groups who claim that rampant voter

22   fraud must be policed by citizen groups because the government

23   refuses to sufficiently protect the integrity of our

24   elections.  Voter vigilante groups often purport to uncover

25   voter fraud through flawed investigations that instead serve

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1          07/15/2024   16

1    to intimidate voters and dissuade them from voting.

2          Here, defendants have perpetuated the myth that the

3    2020 election was stolen from Mr. Trump.  They have taken

4    their campaign directly to the doors of Colorado voters and

5    have publicly disseminated the message that Colorado's

6    elections are unsafe and insecure.  Defendants' message is

7    coupled with violent rhetoric -- this is the fight.  I think

8    if you're involved in election fraud, then you deserve to hang

9    -- that is reminiscent of historic voter intimidation tactics

10   such as lynching.

11         When Congress adopted the KKK and the Voting Rights

12   Act, it did so to prevent private parties from engaging in

13   behavior that could fairly be construed as intimidation and to

14   ensure participation in the franchise by all eligible

15   individuals.  Defendants' conduct is exactly the type of

16   conduct the VRA and the KKK were designed to prevent.

17   Defendants may suggest at trial that they did not intend to

18   intimidate voters and that they engaged only in protected

19   speech.  Both of those arguments miss the point.

20         First, plaintiffs need not show that defendants

21   intended to intimidate voters.  Rather, they need only show

22   that defendants' tactics were objectively intimidating.

23   Second, courts have rejected the contention that parties are

24   entitled to disseminate misinformation under the guise of the

25   First Amendment and that the First Amendment does not protect

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1        07/15/2024    17

 1    intimidating and threatening speech.  This is particularly

 2    true when such speech is related to the fundamental right to

 3    vote.

 4            Defendants will also urge the Court to believe that

 5    their involvement with USEIP was limited.  This is verifiably

 6    false.  As previously discussed, each of the defendants was

 7    intimately involved in USEIP's efforts.  Defendants Kasun and

 8    Epp founded USEIP.  Defendant Epp authored the playbook.

 9    Defendant Smith trained its volunteers, and Defendant Kasun

10    was the chief spokesperson.  After USEIP was founded,

11    defendants also invested their time and resources into

12    continuing its mission and recruited new members to join its

13    ranks.

14            Finally, plaintiffs expect that defendants will

15    criticize their case because plaintiffs will present testimony

16    from only one voter who claimed to be intimidated by

17    defendant's actions.  This argument has no relevance to the

18    questions before the Court.  The law does not require

19    plaintiffs to parade intimidated voters before the Court to

20    prove some critical mass of those who are affected by

21    defendants' conduct.

22            The law requires only that plaintiff show that the

23    activities of defendants were objectively intimidating.  By

24    definition, voter intimidation spreads fear among voters that

25    their participation in our democratic system will cause them

                        Sarah K. Mitchell, RPR, CRR

1    harm.  Of course, such fear also serves to dissuade affected

2    voters from coming forward with personal experiences of

3    intimidation.

4            Plaintiffs will show through the course of trial that

5    voters were intimidated, and that defendants' conduct was

6    objectively intimidating, and that their behavior is a natural

7    continuation of our nation's troubling history of voter

8    intimidation and disenfranchisement.  As courts have made

9    clear, the right to vote embodies the very essence of our

10   democracy.  Absent free and fair elections uninfluenced by

11   fear, the underpinnings of democratic rule would crumble.

12           Defendants' conduct through USEIP and otherwise

13   violates the KKK Act and Section 11(b) of the Voting Rights

14   Act.  The Court has an opportunity to send a message.  To

15   ensure that voters in the upcoming election and beyond are

16   protected from intimidation, the Court should enter an

17   injunction to prevent defendants from engaging in any future

18   acts of voter intimidation.

19           THE COURT:  All right.  Thank you.  Who is speaking

20   first on behalf of defendants?

21           MR. POWELL:  May it please the Court, Your Honor,

22   Cameron Powell for Holly Kasun.

23           THE COURT:  All right.

24           MR. POWELL:  Plaintiffs tell us in their trial brief

25   they'll prove, quote, defendants and their agents, unquote,

1    violated two voting rights acts.  How?  First, somehow by

2    starting an association of citizens, USEIP.  Second,

3    plaintiffs complain that defendants engaged in speech, most of

4    which, critically, no voter is alleged to have heard in the

5    first place.  Third, plaintiffs argue that the association,

6    USEIP, participated in the equivalent of a high school civics

7    project that saw coequal volunteers of middle and elderly ages

8    fan out in pairs to ask their neighbors a standardized set of

9    questions indistinguishable from those high schoolers would

10   ask in a civics project.

11        Plaintiffs face at least five hurdles in trying to

12   make protected political speech and civics projects sound

13   dangerous.  Each one of those hurdles has to end this race.

14   Right out of the starting blocks they first fail standing

15   because they cannot show that hearsay media reports and their

16   own speculation caused their decision to prematurely divert

17   resources to combat anything Holly Kasun actually said or did.

18        Second, plaintiffs face the critical fact that Holly

19   Kasun's speech here was nothing that could have reasonably

20   intimidated a voter.  Third, there's no evidence any voter was

21   aware of the defendants' speech or even conduct here.  That no

22   voter is alleged to have known about most of what you'll hear

23   this week fails critical elements of both causation and due

24   process, and let me drill down on this third failure.  We will

25   hear of no voter who heard or even read at a distance any

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1        07/15/2024    20

1    allegedly intimidating words.  We will hear from no voter who

2    witnessed any allegedly intimidating conduct.

3            What we are seeing lately, Your Honor, are attempts

4    to stretch the two voting rights acts at question here beyond

5    recognition.  Unlike in this case, the anti-intimidation case

6    law all involves voters who were aware of the allegedly

7    intimidating conduct toward them.  There was a clear victim.

8    When someone stood over a voter at a polling booth or

9    threatened them with violence or arrest or eviction or sent

10   them a threatening robocall we could see that a voter was

11   aware of the defendants' activity, of what had just happened

12   to them.

13           But lately we've been seeing plaintiffs here digging

14   things up in obscure corners of the Internet which no voter is

15   alleged to have seen and then presumptuously asking us to

16   assume some voters somehow saw those things.  That speculation

17   about what voters were aware of means we lack causation here,

18   and presuming such causation would be a violation of due

19   process.

20           But back to plaintiffs' hurdles, the fourth one is

21   that plaintiffs can't make Holly Kasun liable for others'

22   speech and actions.  Plaintiffs will produce here not a single

23   agent to testify to any agency relationship Ms. Kasun had with

24   canvassers, nor will plaintiffs prove a conspiracy with either

25   the specific intent required by the KKK Act to deprive any

                    Sarah K. Mitchell, RPR, CRR

1   voter of their rights or the required agreement with others to

2   do so.

3          Fifth, neither Holly Kasun's exercise of her free

4   speech rights, nor canvassers' exercise of their right to

5   expressive speech was in any way reckless, which is actually

6   the standard for allegedly intimidating speech under

7   *Counterman vs. Colorado*.  First, standing.  In the recent

8   *Hippocratic Medicine* decision, the Supreme Court said, quote,

9   to establish standing, a plaintiff must demonstrate she has

10  suffered an injury in fact, unquote, that was, quote, likely

11  caused by the defendant, unquote.  Why must there be an injury

12  in fact, Your Honor?  To, quote, screen out plaintiffs like

13  this who might have only a general legal, moral, or

14  ideological objection, unquote, and prevent the federal courts

15  from becoming, quote, a vehicle for the vindication of value

16  interests of concerned bystanders.

17         Chief Judge Brimmer has already rejected plaintiffs'

18  attempt to rely on speech directed toward people other than

19  voters or even plaintiffs saying in his order denying

20  plaintiffs' motion for a TRO, quote, alleged threats to

21  Secretary Griswold are not relevant to the purported harms

22  that plaintiffs face, unquote.  I would add that a statement

23  about election fraud which refers to election workers has

24  nothing to do with what we might call voter fraud that might

25  allege that voters had done something wrong.  They're two very

22-cv-00581-CNS-NRN    Bench Trial - Day 1          07/15/2024    22

1    different things.

2              Here's the problem.  If a bystander who wishes to sue

3    another person jumps to fact-free conclusions based on hearsay

4    and speculation, such as canvassers are aggressive in

5    brandishing weapons, or the sky is falling, does the bystander

6    get standing by reacting to their own false excited

7    statements?  Should a bystander really get standing for

8    diverting resources to build a shelter against a sky that's

9    not really falling?

10             The Supreme Court in *Clapper vs. Amnesty*

11   *International USA* made clear that a, quote, highly speculative

12   fear, unquote, drawn from media reports and other hearsay is

13   not enough to show causation.  *Clapper* tells us, quote, the

14   threatened injury from the defendant must be certainly

15   impending.  *Hippocratic Medicine* rejected a causation argument

16   by the medical association there that's just like the one

17   plaintiffs are advancing here.  The association there said we

18   are having to spend money on speech, including to educate our

19   members, to counter things we disagree with.

20             The Court said, quote, an organization that has not

21   suffered a concrete injury caused by a defendant's action

22   cannot spend its way into standing simply by expending money

23   to gather information and advocate against the defendant's

24   action, which is exactly what happened here.  An organization

25   cannot manufacture its own standing in that way.  By that way,

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1        07/15/2024    23

1    the Court meant gathering information and advocating against

2    speculative USEIP activity such as brandishing weapons or

3    going off script to say threatening things to voters.

4           In *Hippocratic Medicine*, the doctors there claimed

5    they needed to divert resources caused by their speculation

6    that the abortion drug they were challenging might cause,

7    quote, more individuals to show up in emergency rooms and

8    require care.  Here, plaintiffs say they were forced to divert

9    resources because of their speculation about hearsay regarding

10   USEIP that plaintiffs actually didn't bother investigating.

11          But plaintiffs here went further weaponizing their

12   speculation by sending out alarmist e-mails to their base

13   informing them they were being intimidated.  That effort

14   yielded no one coming forward to plausibly say they were

15   intimidated by a USEIP canvasser as opposed to any of the

16   other groups acting in Colorado around the time, but it's

17   still pure bootstrapping.  To reward it would create just the

18   precedent the Supreme Court has rejected.

19          Now, moving to the merits, Holly Kasun did nothing

20   but associate and speak, and she can't be tied to other speech

21   and actions by agency or conspiracy.  Holly Kasun didn't

22   herself do anything that could even potentially be

23   intimidating other than founding a loose and decentralized

24   group of coequal citizens and using her speech to promote its

25   canvassing goals, canvassing that she was not personally

 1    involved with.  She showed up on no one's door.

 2            So plaintiffs are trying to make the canvassers her

 3    agents, but they'll put no agent on the stand this week that

 4    would support such a finding under the law of agency, which

 5    requires evidence that an identifiable USEIP volunteer who

 6    interacted with an identifiable voter believed Holly Kasun

 7    wished her to act as her agent or consented to act as her

 8    agent or believed they had some kind of authority from her or

 9    acted subject to her control.

10            Plaintiffs' conspiracy argument is even weaker

11    because it requires that plaintiffs prove Holly Kasun had the

12    specific intent to intimidate or interfere with the exercise

13    of the protected right, and that she agreed to that very

14    specific goal with others.  Specific intent is a much higher

15    bar than mere negligence or even recklessness because it

16    involves purposeful conduct aimed at achieving a particular

17    unlawful objective.  You won't hear about it this week, making

18    the KKK Act claim easy to dispose of.  But if even there were

19    a valid agency or conspiracy argument here, Your Honor, the

20    expressive speech of third-party canvassers just wasn't

21    intimidating, recklessly or otherwise.

22            Let's talk about the cornerstone of plaintiffs'

23    complaint, the canvassing project.  As you may know,

24    canvassing occupies a proud place in the history of American

25    equality, freedom, and empowerment.  It's part of the civil

1  rights, labor rights, women's rights movements, suffrage

2  movements, but especially in the civil rights era when

3  canvassers showed up on African-American doorsteps not to

4  intimidate them, but to enfranchise them.

5        So imagine, Your Honor, as you're looking out a

6  window one sunny day and you see two senior citizens

7  approaching your house.  They're wearing sensible walking

8  shoes.  The man is in shorts.  The woman wears a skirt.  One

9  of them might be carrying a clipboard.  She may have a lanyard

10 just like at a conference.  Both of them have homemade

11 nametags where they've scrawled their first name inside a

12 frame preprinted on a rectangular piece of sticky paper.  One

13 canvasser stands back, and one walks up and rings your

14 doorbell, as they were advised to do.  And if the canvasser at

15 your door says, Hello, my name is Cameron, is Ms. Charlotte

16 Sweeney here, would that make you feel fearful?

17        And if the canvasser then says, I'm here with a

18 nonpartisan volunteer organization talking to Colorado voters,

19 we want to confirm whether your county's voting records are

20 accurate, would you be reasonable in feeling afraid now?  Now,

21 if you said no to my request to confirm records, I was

22 instructed to leave, and there's no evidence that anyone

23 didn't leave.  And if you said yes, I was trained by my county

24 captain in this decentralized organization to ask something

25 like, During 2020, did you vote in person or by mail or with a

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1          07/15/2024    26

1    drop box?

2              Then I'd finish with, Is there anything else you

3    would like to share about your voter experience?  And are you

4    now intimidated, Your Honor?  We know the answer to this

5    question is no.  You would not be reasonable in feeling

6    fearful and afraid, even if activities had happened in

7    Washington D.C. by other people.  Plaintiffs will go on about

8    how defendants can't be sure whether volunteers stayed on

9    script, but, of course, the burden is on plaintiffs to show

10   they didn't, and they won't be bearing that burden here.

11             What we can say is that going off script would have

12   made the data they were trying to collect nonuniform and

13   completely useless for analysis, so there was no point from

14   USEIP's perspective in anyone asking questions outside of the

15   script that I just relayed to you.  So the canvassing I just

16   described simply cannot fit in any case law of intimidation.

17   But even if you felt you were intimidated by the civics

18   questions I just asked you, perhaps after you got an e-mail or

19   a press release from the League of Women Voters assuring you

20   that you had been intimidated, the Supreme Court's

21   clarification in *Colorado vs. Counterman* means plaintiffs must

22   prove I was aware you would be intimidated or I knew of the

23   risk and proceeded recklessly.

24             You'll hear no evidence this week that Holly Kasun

25   recklessly did PR for people who knocked on doors and asked

 1    questions from high school civics.  It's not much of a case,

 2    so plaintiffs know they need to dirty up the simple act of

 3    civic engagement I've described so that it sounds nefarious,

 4    even dangerous.  Let's talk about what happened at the Capitol

 5    and somehow at least by rhetorical association smear the

 6    defendants with the deaths of five officers.  Let's latch on

 7    to various statements allegedly made by people other than

 8    Holly Kasun, hearsay that critically no voter is alleged to

 9    have heard.  Or let's find a resident, Yvette Roberts, in a

10    county canvassed by a group other than USEIP, a county not on

11    any USEIP walk list that plaintiffs will be able to produce.

12         And let's find this resident turning her

13    contemporaneous reference to whoever showed up at her door

14    having homemade badges to official looking badges in the

15    declaration 18 months later assisted by attorneys, or having

16    changed her two on-the-spot recollections, one of them that

17    the canvassers were with an organization called Colorado

18    election something or other, quote/unquote, or Colorado

19    voting, turning that into the very different United States

20    Election Integrity Plan.  You'll hear why her story is not

21    likely true by a preponderance of the evidence.

22         Third, plaintiffs have fashioned an argument that

23    Jeff Young's canvassing analysis somehow improperly targeted,

24    quote, vulnerable, unquote, voters.  Now, plaintiffs have

25    thrown the kitchen sink at this one alleging defendants

                        Sarah K. Mitchell, RPR, CRR

1  targeted variously vulnerable voters, Democrat voters,

2  minority voters, and even voters in high-density housing, none

3  of which you'll hear proven this week.

4       And we know plaintiffs can't prove any of that,

5  first, because they've brought in no expert statistician to

6  even try to argue there was targeting.  They'll badger

7  Mr. Young about why he decided to use a technique called

8  stratified random sampling where he wanted to take the

9  20 percent of the lowest voter opportunity scores and the

10 20 percent of the highest voter opportunity scores and make

11 that the sample, to cut out the middle and balance the edges,

12 and to -- he also verified that the resulting sample was in

13 very close alignment with the actual larger sample in the

14 state and the county.

15      But the point is he had reasons that made sense to

16 him, and Ms. Kasun had nothing to do with it anyway.  She knew

17 nothing about his methodology, and he's not her agent, so why

18 does it even matter?  Now, second, far from there being any

19 targeting, and this is important, targeting meaning a

20 selection of counties by defendants, the counties that were

21 canvassed here were based exclusively on where enough

22 volunteers stepped forward to go out and actually walk around

23 and canvass them.

24      Let me make that lack of causation clear.  Neither

25 USEIP, nor the codefendants here selected the counties

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    29

1   canvassed.  The volunteers did.  They voted with their feet.

2   And the Court may take judicial notice from the U.S. Census

3   Bureau that among the counties that USEIP volunteers tried to

4   canvass or succeed in canvassing, Douglas County has the

5   highest median household income in the entire state, Jefferson

6   is fifth, Boulder is eighth, and Weld is 12th.

7          Finally, plaintiffs will present the obligatory essay

8   by Professor Atiba Ellis that dutifully summarizes a history

9   of voter suppression this Court could find on Wikipedia, and

10  Professor Ellis will try to shoehorn hearsay reports about

11  defendants into that sordid history.  It will be a pointless

12  exercise in opining on hearsay and speculation that he has

13  been spoon fed, topped off with a raft of improper legal

14  conclusions, none of which will be relevant under the law and

15  thus helpful to this Court.

16         So the question here is whether one member of a group

17  of citizens acting in good faith coming together as coequal

18  volunteers is exactly the kind of grassroots initiative that

19  our founders cut their teeth on can have their First Amendment

20  rights of free speech and association violated by a plaintiff

21  who wields to mere media reports to argue that these citizens

22  are not in an association but a conspiracy, and their speech

23  has somehow transformed from being a fundamental right to a

24  kind of tort entirely because plaintiffs disagree with it or

25  consider it false.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    30

1        So to summarize, there's no standing in reacting to

2   hearsay and speculation by diverting resources.  There's no

3   intimidation recklessly committed for mere speech as opposed

4   to conduct.  There's no causation of connecting an actual

5   identifiable USEIP volunteer and their conduct to an actual

6   identifiable voter.  Keep in mind, USEIP did not do statewide

7   canvassing.  They managed to complete canvassing in four

8   counties.

9        Next, there's no agency that Holly Kasun has for the

10  speech or conduct of others.  There's certainly no conspiracy

11  specifically to interfere with voters' rights.  Your Honor,

12  there are close cases of intimidation in voting, but Holly

13  Kasun's speech and association are not one of them.  Thank

14  you.

15        THE COURT:  All right.  Thank you.

16        MS. HAYS:  Good morning, Your Honor.  May it please

17  the Court.

18        THE COURT:  Good morning.

19        MS. HAYS:  Before we start today, I'd like to adopt

20  defendants' opening just to save some time this morning.  Your

21  Honor, this is a simple case that boils down to a sheer lack

22  of evidence and political rhetoric.  Mr. Smith was sued by

23  plaintiffs for violating the Voting Rights Act and the KKK

24  Act.  To prevail under the Voting Rights Act, it is

25  plaintiffs' burden to show through legal and competent

22-cv-00581-CNS-NRN    Bench Trial - Day 1          07/15/2024    31

1    evidence that Mr. Smith intimidated, threatened, or coerced a

2    voter, or attempted to do so.  Plaintiffs can present no

3    evidence of this.

4          Similarly, under the KKK Act, it is, again,

5    plaintiffs' burden to show through legal and competent

6    evidence that Mr. Smith conspired with others to intimidate or

7    threaten voters.  Plaintiffs can present no evidence of this.

8    You will hear that plaintiffs simply have no evidence beyond

9    pure speculation of actual or attempted voter intimidation by

10   Mr. Smith.  Rather, the evidence will show that Mr. Smith was

11   nothing but kind, courteous, and polite to voters.  And he

12   took steps to ensure that this message of courtesy was relayed

13   to all other volunteers with whom he canvassed.  The training

14   materials explicitly state, Be polite and honest, do not argue

15   with anyone, do not misidentify yourself, and to conduct

16   canvassing in a professional and lawful manner.

17         As the Court knows, this case was brought in 2022,

18   over two years ago.  Throughout these two years and despite

19   discovery, plaintiffs were able to find a single witness,

20   Yvette Roberts, who's able to come to testify that she felt

21   intimidated when canvassers were at her home in Mesa County.

22   However, the evidence will show that Mr. Smith was never in

23   Mesa County, nor did he direct other canvassers in Mesa

24   County, and had no association with canvassers in Mesa County.

25         During this trial the Court may hear testimony

Sarah K. Mitchell, RPR, CRR

1    regarding statistical analysis, voting data, targeting of

2    certain groups, and political affiliations and beliefs.  But

3    we cannot lose focus that this case still requires the

4    plaintiffs prove by the preponderance of the evidence that

5    Mr. Smith actually or attempted to intimidate voters, and that

6    Mr. Smith conspired with others, the purpose of which was to

7    intimidate voters.  Plaintiffs have no evidence of these

8    allegations, and without such evidence, plaintiffs' case must

9    fail.

10        As much as you may hear testimony regarding the

11    political beliefs of the parties, politics has no place in

12    this courtroom, but the First Amendment does.  We must keep

13    the spirit of the First Amendment in mind as we hear this

14    testimony.  Courts have long recognized that dissenting

15    political speech and debate on public issues should be

16    uninhibited, robust, wide open, and, most importantly,

17    protected, even if it includes unpleasantly sharp attacks on

18    public officials.

19        We will hear that Mr. Smith's statements are

20    undoubtedly protected, and this protected speech cannot fill

21    the void of plaintiffs' lack of evidence.  When you hear the

22    admissible evidence in this case, Your Honor, you will see

23    that plaintiffs simply cannot meet their burden of proof and

24    that there is no evidence that Mr. Smith violated the Voting

25    Rights Act or the KKK Act.  Thank you.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1        07/15/2024    33

1           THE COURT:  Thank you.

2           All right.  Ms. Epp.

3           MS. EPP:  Good morning, Your Honor.

4           THE COURT:  Good morning.

5           MS. EPP:  If it pleases the Court, I concur with

6    Defendant Smith's assessment of the severe lack of factual

7    support for plaintiffs' allegations.  Plaintiffs have made

8    many allegations before this Court about the defendants'

9    intent, purpose, and mission and conduct.  The record is

10   devoid of such factual support to support these allegations as

11   the presentation of evidence and witnesses will show.

12           I further concur with Ms. Kasun, particularly as it

13   relates to our stated intent and purpose and the execution of

14   the canvassing effort.  The record will confirm that the

15   defendants' only intention was to verify the record, the

16   official record through an entirely lawful, citizen-led

17   canvassing effort to ensure the integrity of Colorado

18   elections.  I also adopt the five hurdles Ms. Kasun's counsel

19   laid out.

20           As I laid out in my trial brief, canvassing is a long

21   protected First Amendment activity.  It's well litigated in

22   our great nation.  The courts have repeatedly upheld the

23   people's right to canvass.  Canvassing is, as the Supreme

24   Court determined in *Meyer vs. Grant* in 1988, the type of

25   interactive communication concerning political change that is

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1        07/15/2024    34

1   appropriately described as core political speech.

2          In the current matter, the plaintiffs are asking the

3   Court to provide injunctive relief that amounts to a

4   content-based restriction on the defendants' core political

5   speech.  Under the guise of fighting hypothetical and future

6   voter suppression and intimidation, plaintiffs attempt to

7   suppress the defendants' First Amendment rights, as well as

8   their support and advocacy for political change.  That is,

9   plaintiffs contend that the purpose and stated intent of

10  defendants' canvassing, the content of the canvassing, is not

11  protected.  There must be a very high bar for the Court to

12  grant such a remedy.

13         I adopt my codefendants' arguments, and per the

14  Court's direction I won't recap them, but I do want to focus

15  on a few additional areas with regards to plaintiffs' case and

16  allegations against me specifically.  First, I did not design

17  USEIP canvassing, data analysis, or training processes.  I did

18  not direct the canvassing of any USEIP volunteer.  I did

19  canvass three times, once in Douglas County and twice in El

20  Paso County.  When I canvassed, I followed the canvassing

21  script.  Contrary to plaintiffs' unfounded allegations, I had

22  lovely experiences meeting voters in the Centennial State.

23         Second, the plaintiffs have made many representations

24  to this Court about the USEIP county and local organizing

25  playbook.  This document has been referred to as a training

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1        07/15/2024   35

1    document, and we heard Ms. Erickson say in her opening that it

2    calls for intimidation.  Plaintiffs' representatives have also

3    said this as well.  This is a fabrication and a

4    misrepresentation.

5            The playbook was a knowledge-sharing document created

6    for a specific event with a specific audience.  The playbook

7    was created in August of 2021 to document the experiences and

8    lessons learned of USEIP volunteers at that point, nine months

9    after USEIP formed as a free association.  The timing of the

10   document's creation and publication was tied to a specific

11   event in August 2021 where like-minded individuals from around

12   the nation were expected to attend.

13           The playbook was created for this event with the

14   intention of sharing the knowledge and experiences of Colorado

15   volunteers with individuals and groups in other states doing

16   the same kinds of work.  The playbook is not a training

17   document, and this will become exceedingly apparent as we

18   review both the playbook and USEIP actual training documents

19   during this trial.

20           The playbook is a knowledge-sharing document intended

21   to share our experiences.  Importantly, the playbook is not

22   specifically a canvassing document.  It is a community

23   organizing document, and, again, knowledge sharing about

24   community organizing.  Voter verification or canvassing info

25   within the playbook was included as an appendix.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1        07/15/2024    36

1            The second area I want to briefly touch on is my blog

2    posts from AsheinAmerica.com.  Ashe in America is my moniker

3    for the content I create, both my writing and my podcast.  I

4    do not ever use my full government name.  I'm a mom of three

5    sons, and my writing earns me a lot of vitriol from both sides

6    of the political aisle.  I have the proud distinction of

7    triggering everyone when it comes to my writing.

8            And I want to be clear.  At no point was my site, my

9    social media, or my opinions in any other domain anything

10   other than my own.  AsheinAmerica.com was and remains a small

11   site with a modest following and limited reach.  The audience

12   of the site is like-minded individuals.  At no time did USEIP

13   exercise editorial control over my content, have approval

14   rights over my statements, or otherwise create content on

15   AsheinAmerica.com.

16           I concede that I make strong statements and present

17   the truth as I see it in a way that my political or

18   idealogical opponents may find distasteful or even offensive.

19   Such is often the case with political speech.  But the record

20   is devoid of factual support for any of my speech rising to

21   the level of voter suppression, intimidation, coercion, or

22   threats.  During this trial plaintiffs will attempt to admit a

23   cherry-picked narrow set of my writing.  Almost all the blog

24   posts identified by plaintiffs are irrelevant to the matter

25   before the Court.  In fact, only one of these articles

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1        07/15/2024    37

1   explores USEIP canvassing, and it's largely quotes from

2   others, not my speech.  It's hearsay within hearsay.

3           Plaintiffs do not claim that any individual read my

4   writing or heard my podcast, let alone that anyone anywhere

5   was intimidated by my core political speech.  Let me state

6   that again.  No one heard, no one read my core political

7   speech.  Additionally, plaintiffs do not attempt to produce my

8   dozens of opinions criticizing Republicans.  Why?  I have been

9   a columnist for the Glendale Cherry Creek Chronicle since

10  2022, and my monthly column was incepted as a critical

11  examination of Colorado Republicans.

12          While several of these columns deal with elections,

13  plaintiffs predictably don't mention my Glendale column before

14  this Court.  I am not Republican, and I have not been

15  affiliated with any political party for over a decade.  I have

16  not received any official support from the Republican Party

17  for this litigation publicly or privately.  In fact, I have a

18  sneaking suspicion that Colorado Republicans are pleased that

19  my individual speech, support, and advocacy has been limited

20  by having to fight this case.  It takes quite a bit of heat

21  off of them.

22          Likewise, I have been the target of vitriol from the

23  left.  I have been targeted by Colorado media outlets, many of

24  whom publish provable lies about me without ever reaching out

25  for comment.  Local journalists put me on lists.  They

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1        07/15/2024    38

1   fantasized about my whereabouts, published those fantasies,

2   and then had to retract their reporting.  They assassinated my

3   character repeatedly, and as a female journalist with a

4   minority political viewpoint in a triple majority state, I

5   have been dehumanized to such an extent that the most

6   well-respected civil rights organizations in the nation and

7   possibly in the world feel entitled and justified in

8   attempting to separate me from my rights.

9           While I am being accused of voter intimidation,

10  coercion, and threats by plaintiffs, the record will show that

11  the plaintiffs collaborated with local journalists to produce

12  reportings that supports their allegation, and they now

13  attempt to admit that collaborative reporting as evidence

14  before this Court.  As I said, my writing has learned me a lot

15  of -- earned me a lot of caustic criticism, but at no point

16  have I received the kind of directed threats of personal harm

17  and violence as I did in the wake of plaintiffs' filing this

18  lawsuit.

19          A false narrative spread far and wide upon the filing

20  of this case in March of 2022.  This experience has radically

21  reshaped my life, impacted my professional reputation,

22  inflicted psychological damage on me and my family, and

23  frustrated my support and advocacy for political change.  The

24  Internet is forever, and because of the plaintiffs, my name is

25  forever attached to the Ku Klux Klan.  Plaintiffs maintain

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1        07/15/2024    39

1    that they are justified in inflicting this specific and

2    concrete harm onto me based on some hypothetical future harm

3    that they inflicted upon themselves.  The witness testimony

4    and evidence will make this clear.

5            Plaintiffs have maliciously inflicted this harm not

6    just on me, but on all defendants, and due to unfortunate

7    events in this litigation, our only remedy for this harm is a

8    fair hearing before this Court and a determination of the

9    findings and conclusions based solely on the facts, the

10   evidence, and the law.

11           Your Honor, the final point I will make is about the

12   laws under which plaintiffs are bringing their case.  There is

13   much reporting and there are several current legal actions

14   around private rights of action.  Plaintiffs repeatedly

15   contend that their action here is justified because of the

16   private right of action afforded under these laws.  Yet, they

17   spend the majority of their time discussing all of the things

18   they don't have to prove.

19           Like plaintiffs, I appreciate respect and want to

20   preserve this private right of action.  That being said, there

21   must be safeguards against abuse of this private right, or it

22   may be stripped from all of us.  If such a right is abused, as

23   it repeatedly has been in our current moment, the Congress and

24   the courts may take these laws in a different direction.  And

25   if the private right of action is abused without consequence

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024   40

1   by the most well-respected civil rights organizations in the

2   world, it can be abused by anyone, and likely will be.

3         I don't want that to happen, Your Honor.  I believe I

4   should have a right to seek remedy for the suppression of my

5   civic and political support and advocacy and for the

6   intimidation and coercion that I have experienced throughout

7   the two and a half years of this litigation.

8         In closing, if we are equal under the law and our

9   inalienable rights are still intact, then the Court must find

10  in favor of the defense and strongly rebuke plaintiffs'

11  attempt to circumvent the First Amendment under the guise of

12  fighting voter suppression and saving democracy from their

13  hypothetical and self-inflicted future harm.  Thank you.

14        THE COURT:  Thank you.  All right.  With that, we

15  will begin.  Would plaintiffs like to call their first

16  witness, please.

17        MR. DILLON:  Yes, Your Honor.  Plaintiffs call Shawn

18  Smith.

19                    SHAWN ALLEN SMITH

20  was called as a witness and, having been duly sworn, was

21  examined and testified as follows:

22        THE COURTROOM DEPUTY:  Please have a seat.  Please

23  state your name.

24        THE WITNESS:  My name is Shawn Allen Smith.

25        THE COURT:  All right.  You may proceed.

                   Sarah K. Mitchell, RPR, CRR

1                        DIRECT EXAMINATION

2   BY MR. DILLON:

3   Q.  Good morning, Mr. Smith.

4   A.  Good morning.

5   Q.  My name is Brian Dillon.  I'm one of the attorneys

6   representing the plaintiff organizations in this matter.

7   You've stated your name for the record.  Could you please tell

8   the Court where you reside.

9   A.  Woodland Park, Colorado.

10  Q.  Are you currently employed, sir?

11  A.  It's debatable.  I'm not employed.  I'm the president of a

12  nonprofit, but it's an unpaid position.

13  Q.  What is the name of that nonprofit?

14  A.  Cause of America.

15  Q.  Okay.  And what does Cause of America do?

16  A.  Cause of America was formed to help grassroots get to the

17  truth about their elections and to share that truth with their

18  fellow citizens and to restore citizen control over their

19  elections.

20  Q.  So does it have an election integrity mission similar to

21  USEIP?

22  A.  Well, I wouldn't say exactly the same.  I mean, Cause of

23  America was expressly formed to help grassroots across the

24  country.  So there were lessons that could be learned from

25  different groups, and we tried to bring those together and

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1        07/15/2024    42

1   then share those tools and then connect grassroots citizens

2   that were trying to get to facts about election integrity and

3   to engage with their -- with their public officials so that

4   they would be well equipped to do that.

5   Q.  Okay.  For how long have you served as the president of

6   this organization?

7            MR. REISCH:  Objection, relevance.

8            THE COURT:  Overruled.  You may answer.

9   A.  I believe since we stood it up in November.  I didn't want

10  to be president.  We voted.  It was -- I trust to vote.  I

11  voted, and they picked me.  I wanted everybody else to be the

12  president.  So November of 2021, I believe.

13  Q.  (By MR. DILLON) Okay.  You are a veteran of the U.S.

14  military, correct?

15  A.  That's correct.

16  Q.  The Air Force, I believe?

17  A.  Correct.

18  Q.  And you retired from active duty in 2017?

19  A.  That's correct.

20  Q.  And you've been on inactive reserve status since then?

21  A.  That's correct.

22  Q.  And before you went on inactive reserve status in 2017,

23  you were on active military duty for 25 and a half years; is

24  that right?

25  A.  Correct.

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    43

1   Q.  How old are you, sir?

2   A.  54.

3   Q.  So you were -- you've been on active duty for

4   approximately half your life, roughly?

5   A.  Pretty much my whole adult life.

6   Q.  Okay.  And you were an officer and a commander in the

7   military?

8   A.  That's correct.

9   Q.  What was your highest rank?

10  A.  O-6 Colonel.

11  Q.  Thank you for your service.

12  A.  It's my privilege.

13  Q.  As an officer and a commander in the U.S. military, you

14  swore an oath to support and defend the Constitution of the

15  United States, correct?

16  A.  Correct.

17  Q.  And you spent most of your adult life defending the

18  Constitution and fulfilling that oath, correct?

19  A.  All of it.

20  Q.  And while on active duty for those 25 and a half years,

21  you've stated that you are consumed by that duty, correct?

22  A.  That's correct.

23  Q.  You have very strong beliefs about what the Constitution

24  requires, do you not?

25  A.  I do.

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    44

1   Q.  And you formed those beliefs based on your own personal

2   study of the Constitution itself, as well as the

3   contemporaneous writings of the Founding Fathers, correct?

4   A.  That's correct.

5   Q.  And based on your self-study, if you were to conclude that

6   a federal law or practice were to violate the U.S.

7   Constitution, isn't it true that it's your position that you

8   have no obligation to comply with that law or practice?

9           MR. REISCH:  Your Honor, I object.  Relevance.

10          THE COURT:  Overruled.

11  A.  I don't believe I've stated that you have no obligation to

12  comply.  I believe what I've said is that you at all times

13  cannot be divorced from your own moral responsibilities and

14  authority.  So as an individual you have to choose -- and this

15  is true even in the military.  Military commanders never are

16  allowed to lay down that mantle of responsibility to consider

17  whether the orders that they're being asked to execute or

18  convey are both legal and moral.  And so there are

19  circumstances under which you might be given an order or asked

20  to comply with something, and you have to consider the

21  morality of it.

22          I mean, for example, you know, if a police officer is

23  asked to use excessive force by their commanders, do they

24  really have the authority or responsibility to do that?  If

25  you're a military officer and you're asked to do something

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1         07/15/2024   45

1   that violates laws of war or the U.S. Constitution, do they

2   have a responsibility to do that?  And my argument and my

3   training are that, no, you do not.  You are responsible as an

4   individual to exercise your own judgment about morality and

5   ethics and about law.

6           And so if you find yourself in a circumstance where

7   you're being asked to comply with something that is unethical

8   or immoral or illegal -- for example, maybe there's a statute

9   or a code, an administrative requirement that violates the

10  Constitution, and certainly this has happened multiple times

11  in our history, and responsible upright citizens have

12  exercised their own moral authority to defy what have been

13  illegal and immoral laws, and this is I think why even the

14  Supreme Court has overturned some of its own rulings.

15  Q.  Okay.  That was a long answer to I think a simpler

16  question.

17  A.  My apologies.

18  Q.  My question was if you believe that a federal law or

19  practice violates the U.S. Constitution, you believe you do

20  not have an obligation to comply with that law or practice,

21  correct?

22  A.  No.  I believe you have an obligation not to comply.  Not

23  that you don't have an obligation to comply, but that you have

24  an obligation not to.

25  Q.  Fair enough.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1        07/15/2024    46

1    A.  It's either a fundamental law of our land or it's not.

2    Q.  I think maybe we were getting turned around in semantics,

3    but I think you just answered my question.  Thank you.

4    A.  Okay.

5    Q.  Now, while you were in the military, you developed some

6    experience working with complex computer-based machines,

7    correct?

8    A.  That's correct.

9    Q.  And analyzing the threats that complex computer-based

10   machines face, correct?

11   A.  Correct.

12   Q.  And you currently consider yourself an expert in the

13   testing of complex computer-based machines, correct?

14   A.  I don't consider myself an expert.  The U.S. Government

15   considers me an expert.

16   Q.  Okay.  But do you disagree with the U.S. Government?

17   A.  Well, I worked with a lot of people who are just

18   exceedingly confident.  You know, I could spend another

19   20 years or 30 years and not catch up to them, so it's a

20   little bit like talking about cyber expertise.  If I talk to

21   the average person, then I'm an expert.  But when I'm in the

22   presence of people who I consider to be exquisitely qualified,

23   then I'm really just learning from them the whole time.

24   Q.  Do you remember when you were deposed in this case?

25   A.  I do.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    47

1  Q.  Okay.  Do you remember testifying that you believe you

2  were an expert in the testing of complex computer-based

3  systems?

4  A.  I don't believe I said that I believe anything about it.

5  Q.  Okay.

6     MR. DILLON:  Well, Hashini, let's call up page 40 of

7  Mr. Smith's deposition transcript.

8     THE COURT:  Do you have his original transcript?

9     MR. DILLON:  We do, Your Honor.

10    THE COURT:  If you could hand that to Ms. Dynes.

11 Q.  (By MR. DILLON) So, Mr. Smith, you were deposed

12 August 15th, 2022.  Do you recall that?

13 A.  I recall being deposed.  I don't recall the exact date.

14 Q.  Fair enough.  And you swore an oath to tell the truth that

15 day, correct?

16 A.  Correct.

17 Q.  And you did tell the truth that day, correct?

18 A.  Correct.

19 Q.  Let me turn your attention to page 40 of your deposition

20 transcript.

21 A.  Okay.  I'm there.

22 Q.  Okay.  And your transcript -- you're a very articulate

23 witness.  Your transcript reads very well, but some of your

24 answers are long and in paragraph form, so I would like to

25 just direct your attention to the bottom of page 40 and it

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1        07/15/2024    48

1    carries on to page 41.  And I'm not going to read the whole

2    answer because I want to try to move this along, but there was

3    -- the paragraph at the very bottom of page 41 states, quote,

4    I had read the test reports from those voting systems, comma,

5    and so my background is as an operational tester, period,

6    closed quote.  Do you see that?

7    A.  I do.

8    Q.  And that's your background in the military as a tester of

9    computer-based machines, correct?

10   A.  Among other qualifications.

11   Q.  Fair enough.  And then the next line you say, quote, I am

12   an expert in testing of complex computer-based systems,

13   period, closed quoted.  Did I read that correctly?

14   A.  You did.

15   Q.  Okay.  Thank you.  You can set that aside, but I'm sure

16   we're going to come back to it.

17   A.  Okay.

18   Q.  Do you consider yourself an expert in computer-based

19   machines that are used in today's modern election systems?

20          MR. REISCH:  Objection, relevance.

21          THE COURT:  Overruled.

22   A.  Do I consider myself an expert in computer-based machines

23   broadly or the ones used in U.S. elections?  I've developed

24   expertise about the computer-based voting systems in use in

25   the United States, particularly the largest five vendors.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1        07/15/2024   49

1    Q.   (By MR. DILLON) And do you consider yourself an expert as

2    it relates to those systems?

3    A.   Again, compared to -- other people have described me as an

4    expert.  Compared to some people, yes.  Compared to others,

5    when you compare me to someone like Clay Parikh who tested

6    them for nine years for security for the labs, I'm not an

7    expert compared to him.

8    Q.   Okay.  Now, speaking of elections and voting systems and

9    voting machines, you had not done much independent study on

10   these issues prior to the November 2020 presidential election;

11   is that true?

12   A.   None.

13   Q.   Okay.  Your interest in election integrity, et cetera, was

14   sparked immediately after the November 2020 election, true?

15   A.   No.  That's false.

16   Q.   Okay.  Well, I believe you've explained that your interest

17   was triggered by an article that you read about voter turnout?

18   A.   On election day, before there were any results.

19   Q.   Okay.  And you don't recall the -- the outlet that

20   published this article; is that correct?

21   A.   I don't.  I'm certain it was a Colorado news outlet, and

22   it was an article about turnout and not machines.

23   Q.   Fair enough.  And the message of this article didn't

24   square with what you personally experienced at the polls; is

25   that correct?

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    50

1    A.  It wasn't a message.  It was assertions about the levels

2    of turnout.

3    Q.  Right.  So the article made some assertions about great

4    enthusiasm and high turnout, correct?

5    A.  Something to that effect.  I don't remember the exact

6    words.  It struck my curiosity.  That was the issue.  I was

7    curious about it.

8    Q.  Did the message about great enthusiasm and high turnout

9    square with your personal experience at the polls when you

10   voted?

11   A.  No.

12   Q.  And that -- that disconnect between what the article was

13   representing and your personal experience sparked your

14   interest?

15   A.  It wasn't just the polls.  It was what I had seen leading

16   up to the election in terms of enthusiasm and participation.

17   The claims the article was making about turnout and enthusiasm

18   didn't -- I couldn't reconcile them with what I had seen.

19   Q.  So after reading this article, you started doing more of

20   your own research; is that correct?  On election-related

21   issues?

22   A.  Well, no.  I initially started just looking at the voter

23   registration and turnout data from the Colorado Secretary of

24   State's site.

25   Q.  So that's one piece of information that you started

Sarah K. Mitchell, RPR, CRR

1    studying, the information that was available on the Secretary

2    of State's website?

3    A.  Correct.  But specifically the voter turnout registration

4    data.

5    Q.  Okay.  And those statistics were available to you back to

6    2010; is that correct?

7    A.  I think there were some available before then, but that

8    was the data I pulled down, because I was interested in

9    comparing like elections to like elections, and then doing

10   some statistical correlation with population growth and

11   changes.

12   Q.  Right.  And you observed some trends that you found

13   confusing; is that fair?

14   A.  I wouldn't call them trends.  I think the proper term

15   would be like punctuated equilibrium where there's a kind of

16   stasis or a very gradual change, and then suddenly there are

17   significant changes.

18   Q.  Right.  So you saw -- you observed in the data an

19   extraordinary increase in voter registrations in Colorado --

20   A.  And turnout.

21   Q.  -- compared with a less extraordinary increase in the

22   overall population numbers during the same time period; is

23   that fair?

24   A.  Yes.  Completely disconnected actually.

25   Q.  Meaning registrations were increasing faster than the

Sarah K. Mitchell, RPR, CRR

1   overall population, correct?

2   A.   Yes.   Three to four times the rate of population growth.

3   Q.   And that triggered some questions and concerns in your

4   mind about our election systems, correct?

5   A.   No.   I would say at first it triggered concerns about the

6   validity of the data, the registration data.   Again, when I

7   began, I wasn't looking at the voting systems at all.   I

8   didn't know anything about them.

9   Q.   Did you become concerned about whether we as citizens have

10  proper visibility into how our elections were being conducted?

11  A.   Yes.

12  Q.   And those concerns were triggered within days of the

13  November 2020 election; is that true?

14  A.   Probably within the first 24 hours.   It wasn't --

15  actually, it was during Election Day.   So, again, it was

16  before I had any idea what the turn -- or what the results of

17  the election would be in any location, let alone overall.   It

18  was about what I was seeing in that data.   And it wasn't just

19  turnout and registration numbers.   It was things like large

20  numbers of voters being moved out of some counties into

21  others.   I'm talking about tens of thousands of voter names

22  being moved --

23  Q.   Okay.

24  A.   -- in the months prior to an election.

25  Q.   And isn't it true that within one or two days of the

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024   53

1    election you also started reading up on the election machines

2    or the voting machines and voting systems that were used in

3    the Colorado elections in 2020?

4    A.   That's correct.

5    Q.   You read the technical data package manual for those

6    voting systems, correct?

7    A.   Well, there are multiple manuals in the technical data

8    packages, but, yes.

9    Q.   Did you read all of the manuals?

10   A.   All of them.

11   Q.   And you read test reports from those voting systems,

12   correct?

13   A.   And the plans and the testing standards and the statutes

14   and the code and the voluntary voting systems guidelines and

15   the EAC program manuals for voting system testing labs.

16   Q.   A very deep dive into these issues it sounds like.

17   A.   Once I'm interested, I read everything I can find.

18   Q.   And after reading all of these materials, you immediately

19   concluded that our processes for testing the security of our

20   voting systems are inadequate, correct?

21   A.   Grossly.

22   Q.   And you determined that we are in trouble, right?

23   A.   That's correct.

24   Q.   And you came to the immediate conclusion that our

25   standards for testing our voting machines were insufficient to

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    54

1    determine the vulnerability of our election systems to

2    unauthorized interference, right?

3    A.   That's correct.

4    Q.   Meanwhile, at the same time you were reading media reports

5    suggesting that our 2020 election processes were safe and

6    secure, correct?

7    A.   Correct.

8    Q.   And you disagreed with those reports?

9    A.   I do.

10   Q.   And you had -- because you began to have grave concerns

11   about the transparency of our elections and the claims being

12   made about the high level of security integrity in our

13   election systems, correct?

14   A.   Correct.

15   Q.   And this is all in a matter of days after the

16   November 2020 election before the results of that election

17   were determined, correct?

18   A.   Well, I think it was evolving.  I mean, I never saw

19   anything -- and I've been at this now for several years.  I

20   have yet to see anything that restores any kind of confidence

21   or faith for me that we are protected in our voting rights,

22   that our franchise is protected by what are being purported as

23   the safeguards.  So it wasn't that it just immediately was

24   formed.  It's that I first was surprised by what I saw and

25   then alarmed, and then the more I've read, the worse that's

1    gotten.

2    Q.   Well, I want to talk about some of the conclusions that

3    you've reached regarding our election systems.

4    A.   Okay.

5    Q.   And the 2020 election in particular.

6    A.   Okay.

7    Q.   I want to --

8              MR. REISCH:   I object, relevance.

9              THE COURT:   Overruled.

10   Q.   (By MR. DILLON) I want to confirm that you believe there

11   was election fraud during the 2020 presidential election.

12   A.   At this point -- at the time of the deposition and back in

13   '21, I wasn't 100 percent sure.  So, you know, if I see

14   somebody obstructing and trying to prevent me from getting to

15   evidence and data, which I did see repeatedly, if I see

16   somebody trying to interfere in particular with my ability as

17   a citizen to get to something like that, then, you know, I

18   have suspicions.  But at this point so much evidence has

19   accrued, and now I've seen, you know, forensic reports from so

20   many different voting systems and looked at data from them,

21   and now I understand a great deal more about how the state of

22   those systems and the purported safeguards has been

23   misrepresented to the public.

24          As an example, in Colorado there are 104 Dominion

25   Voting System image cast central tabulators that are

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    56

1    registered -- the computers for them are registered to an

2    entity in Australia, which if you understand anything about

3    the way Dell handles that kind of enterprise management means

4    that Dell would allow that entity in Australia to remotely

5    access and control hardware on those Dell computers.

6    Q.  Sir, I don't mean to interrupt you.  I asked you a very

7    simple question about what you have concluded regarding the

8    November 2020 election.

9    A.  Sure.

10    Q.  And I want to confirm that you have concluded there was

11    election fraud during the 2020 presidential election.

12    A.  I think that's true.

13    Q.  And you had reached that conclusion on the date that you

14    were deposed, on August 15th, 2022, correct?

15    A.  I don't think I had reached it at that point.

16    Q.  Well, let me turn your attention to page 106 of your

17    deposition transcript.

18    A.  Okay.

19    Q.  I'll start at line 11.  I'll wait for you to get there.

20    A.  106.  Okay.

21    Q.  Start at line 11.

22    A.  Okay.

23    Q.  The question was, Have you concluded that there was

24    election fraud during the 2020 presidential election?

25    A.  I see that.

1  Q.  And your answer was, That's a good question.  So I would

2  say, I would say yes.  Right?  That was your answer?

3  A.  Yes.  I think that -- I think that was the first time

4  somebody had actually asked me that way, but...

5  Q.  So sometime prior to August 15th of 2022, you had made

6  that conclusion?

7  A.  Sure.

8  Q.  Okay.

9  A.  Well, actually at that moment.  Like I said, I think that

10  was the first time somebody had asked me that way.

11  Q.  Okay.  And you've also concluded that there has been a

12  very deliberate effort to corrupt our elections; is that true?

13  A.  That is true.

14  Q.  And that the 2020 election result was determined based on

15  incomplete information by design, correct?

16  A.  That is true.

17  Q.  And that many votes cast and counted during the 2020

18  election were done so in an unconstitutional manner?

19  A.  That's correct.

20  Q.  And you reached these -- did you reach these conclusions

21  before the end of 2020?

22  A.  No.

23  Q.  Okay.  These were evolving conclusions or conclusions that

24  you reached before you were deposed in August of -- in August

25  of 2022, though, correct?

                         Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1        07/15/2024    58

1    A.  Yeah, I'm sorry.  I didn't mean to -- for example, after

2    reading the Wisconsin Supreme Court ruling in *Teigen vs. WEC*,

3    that the unintended drop boxes, you know, had not been

4    constitutional when they were used in 2020 election.

5    Therefore, votes that were cast through them and counted were

6    not constitutional because they violated the proscription for

7    manner of voting by the Wisconsin legislature.

8    Q.  After the 2020 election you began speaking publicly about

9    your research and your findings and your conclusions, correct?

10   A.  Well, sort of.  Not exactly.  I was asked to come and

11   speak to the Colorado General Assembly.  That was the first

12   time I ever spoke publicly about what I had researched.

13   Q.  Okay.  And when was that, do you recall?

14   A.  December 15th, 2020.

15   Q.  So a little more than a month after the November 2020

16   election you spoke at the Colorado legislature about your --

17   A.  I was requested by Lori Saine who was the minority I think

18   chair of the legislative audit committee to come and speak to

19   them.

20   Q.  And how did you know Representative -- how did you know

21   this representative?

22   A.  I was introduced to her on a phone call by Representative

23   Williams -- well, actually they tried to arrange the phone

24   call.  I actually ended up on the phone call because I was

25   talking to -- I want to say it was Peg Cage, and she and I

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    59

 1    were on the phone with Harvey Branscum, who's like a 20-year

 2    registered Democrat election integrity activist.  He and I had

 3    been talking back and forth.  I had found his name because he

 4    was in an article from 2013 with somebody that I worked with

 5    with Convention of States, and so I had asked for an intro.

 6    And then because he downloads data and looks at elections

 7    constantly, he and I were exchanging information.  So that's

 8    why Lori Saine -- Representative Saine asked he and I to be on

 9    a panel together, and we were.

10    Q.  Got it.  So you've spoken at the legislature.  You've also

11    spoken at various rallies, correct?

12    A.  At this point, yes.  At that point, no.

13    Q.  And you've spoken at churches, correct?

14    A.  Correct.

15    Q.  Before groups of as many as 100 people?

16    A.  I don't have the numbers, but sure.

17    Q.  Okay.  And we are now four years removed from the 2020

18    election, and I just want to confirm that you are still

19    unwilling to acknowledge that President Biden won that

20    election, correct?

21            MR. REISCH:  Objection, relevance.

22            THE COURT:  Overruled.

23    A.  I'm still unwilling to acknowledge that anybody has enough

24    information to know who won that election.

25    Q.  (By MR. DILLON) You're aware of lawsuits -- you referred

 1   to the Wisconsin lawsuit as an example -- that were filed in

 2   various courts around the country attempting to challenge the

 3   results of the 2020 election, correct?

 4   A.  That's not what that lawsuit was.

 5   Q.  Okay.  Well, are you presently aware of lawsuits around

 6   the country attempting to challenge the results of the 2020

 7   election?

 8            MR. REISCH:  Objection, relevance.

 9            THE COURT:  Sustained.

10   Q.  (By MR. DILLON) Do you believe that those like you who

11   believe that the 2020 election process was flawed have had the

12   -- a fair opportunity to have the merits of their claims

13   judged by our courts?

14            MR. REISCH:  Objection, relevance, speculation,

15   hearsay.

16            THE COURT:  Sustained as to relevance and

17   speculation.

18   Q.  (By MR. DILLON) Mr. Smith, yourself a registered member of

19   the Republican Party, correct?

20   A.  I am now.  I was not I think until maybe early '22.

21   Q.  And when it comes to elections, election integrity,

22   transparency, isn't it true that you have no faith in the

23   Democratic Party?

24   A.  I have no faith in either.

25            MR. REISCH:  Objection, speculation.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    61

1          THE COURT:  Overruled.  And he answered.

2          THE WITNESS:  Sorry, Your Honor.

3          THE COURT:  No, it's fine.

4  Q.  (By MR. DILLON) Isn't it true that you believe the

5  Democratic Party on these issues has committed itself to a

6  lack of transparency?

7  A.  I believe that is true demonstrably.

8  Q.  And is dead set against transparency in our elections?

9  A.  From what I've seen.

10  Q.  And is committed to depriving citizens of their rightful

11  authority to control their own elections?

12  A.  Yes, I would say that's true.  Even in their own

13  primaries.

14  Q.  And you're frustrated by that, correct?

15  A.  I never said that.

16  Q.  Are you frustrated by that?

17  A.  I don't know if frustrated is the right word.  I've sworn

18  an oath to the Constitution.  I meant it.  So when I see

19  something that appears to undermine or frustrate that or try

20  to deprive citizens of their authority, then naturally I'm

21  opposed to it.

22  Q.  And as a private citizen now on inactive status, you feel

23  like your duty compels you to do something about it, correct?

24  A.  I do.  I think citizens have that duty.

25  Q.  You do not agree with those who claim that the 2020

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1        07/15/2024    62

1    election was the most secure in U.S. history, correct?

2    A.  It depends on who's saying it, but no, especially not the

3    joint memorandum signed in November of 2020.

4    Q.  And you dispute the expertise of any person who may have

5    reached that conclusion, correct?

6    A.  Well, you'd have to identify a specific expert and the

7    basis for their conclusion, but I have looked -- explicitly

8    looked at all the signatories of that memorandum, as well as

9    looked at Chris Krebs' credentials and Chad Wolf's

10   credentials, and Chad Wolf was the first one to say it on the

11   3rd, November.  And I'm familiar with what they claim is their

12   credentials and what data would have been available to them,

13   and it would have been impossible for them to draw that

14   conclusion on the basis of data.

15   Q.  You believe that conclusion was a narrative that was

16   preplanned and rolled out through the media following the 2020

17   election, correct?

18   A.  I'm certain it was.

19   Q.  And rolled out by very partisan organizations, correct?

20   A.  Yes.  I think also ostensibly through government

21   organizations, but they can act in a partisan manner and

22   certainly have.

23   Q.  Also organizations that you've described as leftist?

24   A.  Yes.

25   Q.  Like the plaintiffs in this case, which you described as

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024     63

1    leftist organizations, correct?

2    A.  Demonstrably.

3    Q.  I want to talk about your January 6th experience.

4          MR. REISCH:  Objection, Your Honor.

5          THE COURT:  Let me interrupt you.  We're going not to

6    have any laughing.  If I hear it again, you're going to be

7    asked to leave.  This is a serious proceeding with serious

8    charges, so I'd ask folks in the gallery to keep an eye on

9    their behavior.

10         Go ahead.  And sorry, Mr. Reisch.

11         MR. REISCH:  Objection, 401, 403, Your Honor, as

12   relates to anything January 6th.  There's no relevance.

13         THE COURT:  I'll allow -- overruled.  I'll allow a

14   brief exploration of that to see where Mr. Dillon is going

15   with it.

16         MR. DILLON:  Thank you, Your Honor.

17   Q.  (By MR. DILLON) So, Mr. Smith, you traveled to Washington,

18   D.C. to be present during the January 6th gathering, correct?

19   A.  Correct.

20   Q.  And you claim that that rally was all about following the

21   Constitution, correct?

22   A.  I do believe that.

23   Q.  The same Constitution you swore a duty to defend and

24   protect?

25   A.  Correct.

22-cv-00581-CNS-NRN   Bench Trial - Day 1       07/15/2024   64

1    Q.  And you listened to President Trump's speech while at the

2    rally on January 6th, correct?

3            MR. REISCH:  Objection, relevance.

4            THE COURT:  Overruled for the same reason.  And even

5    though you're way back there, I'll still have you stand when

6    you object.  It helps me hear better.

7            MR. REISCH:  Yes, Your Honor.  I apologize if I did

8    not.

9    A.  To some extent.  Where I was standing during the speech

10   was sort of behind the Ellipse, in between the Ellipse and the

11   Washington Monument, and it was really cold, and it was windy,

12   and there was a lot of crowd noise.  So I didn't go to hear

13   President Trump's speech, and I didn't hear all of that.  It

14   began very late.  I was more interested in talking with the

15   people around me, and there were people from all over the

16   country and all over the world, and we were meeting them

17   standing there kind of learning where they'd come from and

18   that kind of thing.

19   Q.  (By MR. DILLON) You're a man of self-study.  Have you

20   since read the text of the speech?

21   A.  No.  I've seen parts of it.  I've seen excerpts from it.

22   Q.  Okay.  Do you think it's fair to say that your beliefs and

23   concerns regarding the 2020 election align with many of the

24   concerns raised by President Trump during his January 6th

25   speech?

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1        07/15/2024    65

1              MR. REISCH:  Objection, relevance, speculation,

2    hearsay.

3              THE COURT:  Overruled.

4    A.  Could you identify something specific that you want me to

5    identify whether my views align with them?

6    Q.  (By MR. DILLON) I would be happy to.  Do you believe the

7    election was stolen from the American people?

8    A.  I believe it's possible.

9    Q.  Do you believe the election was rigged?

10   A.  I believe that's possible.  I mean, our government does

11   that in other countries.  I've been part of trying to ensure

12   specific election outcomes in other countries.

13   Q.  Do you believe that there was fraud in the 2020 election

14   on a scale never seen before?

15   A.  I don't know about never seen before, but I believe there

16   was fraud on a large scale.

17   Q.  Do you believe that those involved in the 2020 election

18   fraud were engaged in a criminal enterprise?

19   A.  Yes.

20   Q.  Do you believe that the 2020 election fraud which you've

21   just described as a criminal enterprise constitutes a

22   comprehensive assault on our democracy?

23   A.  I don't know that I would describe it exactly that way.

24   I'm not certain that all of the fraud has been perpetrated by

25   the same people or in coordination with one another.  I

                      Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024   66

1    believe it's entirely possible that there are different

2    competing factions that are competing for control of various

3    election outcomes.  But at this point I have seen so much

4    evidence from both voting systems and in terms of the

5    providence of ballots and in terms of manipulation of voter

6    rolls, I mean, the evidence that's been brought forth just in

7    the last two weeks to the state election board in Georgia is

8    very damning.  And the fact that continually government

9    officials do not want to surrender to public scrutiny the

10   records that are necessary to establish the providence of the,

11   you know, voting record that they claim contributed to the

12   outcome, I think that is also damning.  You have to look at

13   the totality of conduct.

14   Q.  Okay.  And the sentiments that we've just discussed about

15   beliefs over the election being rigged or rife with fraud,

16   those sorts of -- have you made those statements publicly?

17   A.  I don't know that they're sentiments as much as they're

18   conclusions based on study of evidence.

19   Q.  Fair enough.  Have you shared those conclusions publicly?

20   A.  I have.

21   Q.  Before groups of people, correct?

22   A.  Sure.  People have asked me to come talk to them about

23   that exact topic.

24   Q.  Okay.  At the end of his speech do you recall President

25   Trump encouraging the crowd to walk down to the Capitol?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    67

1   A.  I don't think I've heard that.  I've heard or seen the

2   excerpt peacefully and patriotically make your voices heard.

3   I've heard that excerpt, but I don't think I heard it at the

4   moment.

5   Q.  But you did that, correct?  You did walk down to the

6   Capitol?

7   A.  Yeah, I did.  Well, it's like the end of a concert.  The

8   crowd just starts moving.  It's not a few blocks.  It's like a

9   mile.

10  Q.  And you ended up on the Capitol steps, correct?

11  A.  I did.

12  Q.  And you witnessed a fist fight on the Capitol steps?

13  A.  Several.

14  Q.  You believe that that was instigated by Antifa or some

15  leftist provocateur, correct?

16  A.  I heard them arguing with one another and observed the

17  differences between the two individuals, so I came to a

18  conclusion about, you know, association or affiliation of the

19  individuals who were in the physical altercation.

20  Q.  Correct.  You've concluded that they were affiliated with

21  Antifa or some leftist --

22  A.  One of them.

23  Q.  And I'm speaking quickly.  You're speaking quickly.  For

24  the court reporter, I'm just going -- I'll do my best.  You do

25  your best.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    68

1    A.  I'm sorry.

2    Q.  Okay.

3    A.  Sure.

4    Q.  You rendered first aid to someone who was experiencing

5    thermal or chemical burns, right?

6    A.  I did.

7    Q.  And you did that using a first aid kit that you had the

8    foresight to bring with you?

9    A.  That's correct.

10   Q.  You witnessed people running out of the Capitol reporting

11   that someone had been shot and murdered inside, correct?

12   A.  I don't think that they were running, but I did see them

13   exiting the door.  There was in particular one individual who

14   was repeatedly stating things like, They shot her, they shot

15   her, they murdered that girl, just over and over again.

16   Q.  And you remained on the Capitol steps, correct?

17   A.  I did.

18   Q.  And around that time you saw Capitol Police in riot gear

19   assembling, correct?

20   A.  I'm not sure if it was around that time.  I think it was

21   later on.

22   Q.  Fair enough.  You saw police in riot gear assembling,

23   correct?

24   A.  I did.

25   Q.  And you claim you went to try to talk to the Capitol

1    Police in a very rational and gentle way, correct?

2    A.  I don't claim it.  I did it.  It's on video.

3    Q.  Okay.  Rational and gentle is how you would describe --

4    A.  I don't think I said gentle.

5    Q.  Do you disagree with that or do you want me to get out

6    your transcript?

7    A.  Well, I don't think I've ever used the word gentle to

8    describe my own speech.  But it was rational and calm.  I

9    would say that's how I would describe it.

10   Q.  You told them rationally and calmly that the Capitol is

11   the people's house, correct?

12   A.  That's correct.

13   Q.  And you encouraged them not to push citizens off of the

14   people's house?

15   A.  Correct.

16   Q.  And you told them that we're just here doing what we're

17   authorized to do?

18   A.  I don't think I said authorized, but I think I would have

19   said something like entitled.  But if I said authorized during

20   the deposition, I'd be surprised, but...

21   Q.  Authorized or entitled.

22   A.  I don't think the government authorizes the people to

23   express their rights.  I think the government was told these

24   are our rights and you're won't infringe on them.

25   Q.  After this exchange with the Capitol Police in riot gear

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1        07/15/2024   70

1    you got hit in the back of a head with a baton, right?

2    A.  At some point during the -- once the Capitol Police or

3    whoever the police were in riot gear started moving, there was

4    no place for me to go.  I was kind of turned around, and I was

5    hit from behind by a baton.

6    Q.  And you only decided to leave the Capitol area or the

7    Capitol grounds as darkness was approaching, right?

8    A.  Are you talking about timing or are you talking about

9    reason?

10   Q.  Timing-wise.

11   A.  That's right.  Yeah, it was twilight.

12   Q.  And the reason is that you were concerned that Antifa or

13   other leftist provocateurs might instigate violence, correct?

14   A.  I think I gave a more full explanation in the deposition.

15   Q.  Is that a correct --

16   A.  Well, that's part it.

17          THE COURT:  Let me get in here.  You have to not talk

18   over one another.  It is impossible for Ms. Mitchell to take

19   down your testimony.  So wait until he's done.  You wait until

20   he's done answering.  I understand he may not be giving the

21   exact answer you want at any given time.  You may redirect

22   him, but please let him finish.  Start over.

23   Q.  (By MR. DILLON) I was just asking for the reason that you

24   left, and I believe the reason is that you were concerned that

25   Antifa or other leftist rioters might instigate violence; is

22-cv-00581-CNS-NRN    Bench Trial - Day 1        07/15/2024    71

 1    that true?

 2    A.   That's part of the reason.  As I described in the

 3    deposition, you know, I had seen that there were individuals

 4    there that look to me like they were Antifa or some other

 5    leftist group that were infiltrating.  They didn't look like

 6    the rally goers.  They weren't dressed for the weather.  If

 7    they had any sort of patriotic gear on it looked absolutely

 8    brand new and unblemished.  And I was -- you know, we expected

 9    because there had been so much violence here prior like the

10    shooting here in Denver, the shooting in Portland, I expected

11    us to be attacked.  I was wearing body armor underneath my

12    anorak.  I didn't carry a weapon, but I was wearing body

13    armor.

14            And -- but it was also that the event just looked

15    like it was so disorganized.  When we had come, I thought we

16    were going to sort of go around the Capitol and, you know,

17    sing the national anthem and sort of present to Congress this

18    impression of a citizenry that were interested in the outcome

19    and wanted them to fulfill their duty to investigate all these

20    irregularities and anomalies, but we got over there, and it

21    was just chaos.  And I had already seen, you know, just things

22    that I didn't anticipate, you know, around the Capitol.  And

23    now there was in the front of the Capitol I guess on the west

24    side there was all this -- because of the temperature

25    inversion, all this sort of tear gas and stuff hanging in the

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    72

1    air.

2          You couldn't see things.  You couldn't see who people

3    were.  It was getting dark, and I thought what is the purpose

4    for me being here?  Nobody's listening to us.  There's too

5    many people around here doing things I don't understand what

6    they're doing, and it doesn't look organized, so there's

7    nothing left for me to do.  At that point if I stayed, it

8    would just be exposing myself to risk.

9          THE COURT:  Let me interject here.  I've given you a

10   limited rope on this.  What is the relevance of what we're

11   doing here?

12         MR. DILLON:  I'm moving on, Your Honor.  I can

13   explain the relevance if you'd like me to, but I'm moving on.

14         THE COURT:  Yes, do.

15         MR. DILLON:  The rhetoric used during January 6th and

16   rhetoric that Mr. Smith has acknowledged using in his own

17   public speeches is exactly the kind of rhetoric that is

18   littered in USEIP's playbook and in their other public

19   statements, and those public statements are relevant and

20   should be considered by the Court in considering the totality

21   of the evidence and the Voting Rights and KKK Act claims at

22   issue in this case.

23         THE COURT:  All right.  Well, you've established some

24   of that, but by and large he didn't hear most of Trump's

25   comments, as he's testified.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    73

1            MR. DILLON:  No, and he asked me if I would go

2    through some of the claims made by President Trump, and he

3    adopted those, many of them, as his own and has confirmed that

4    he has shared those conclusions and his belief in public

5    forums.

6            THE COURT:  Well, that he heard them and agrees with

7    them does not make the tie that you're trying to establish.

8    So as long as you're moving on, that's fine.  But we are not

9    here to try January 6th.  We are here to talk about what

10   happened in Colorado after the election.

11           MR. DILLON:  Fair enough.

12           THE COURT:  All right.

13   Q.  (By MR. DILLON) So let's talk about what happened in

14   Colorado after the election, after January 6th.  You got

15   involved in USEIP activities in early 2021, correct?

16   A.  The end of February.

17   Q.  End of February.  So month and a half after the events of

18   January 6th, roughly?

19   A.  Yes.

20   Q.  And USEIP was founded by your codefendants, Ms. Epp and

21   Ms. Kasun, correct?

22   A.  Among others.

23   Q.  Among others.  Shortly after the 2020 election, right?

24   A.  I believe that's correct.

25   Q.  Okay.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1        07/15/2024    74

1   A.  I didn't know them at the time.

2   Q.  You've described USEIP as a free assembly of citizens

3   trying to promote and advance election integrity, right?

4   A.  Correct.

5   Q.  And you ultimately became a spokesperson for USEIP?

6   A.  I don't think it was that official.  I think what we

7   talked about was the likelihood based on what we saw of

8   leftist lawfare groups attacking citizens who were trying to

9   question or ask questions about election integrity, and we

10  were trying to protect, you know, other citizens from that

11  kind of lawfare and sort of vitriol.

12  Q.  Were you identified as somebody who would speak, go out

13  and speak on behalf of USEIP?

14  A.  Sure.

15        MR. REISCH:  Object as to foundation; date, time,

16  location.

17        THE COURT:  Well, I'll sustain.  If you can put a

18  timeframe on it.

19  Q.  (By MR. DILLON) Were you ever identified as someone who

20  would go out and speak on behalf of USEIP?

21        MR. REISCH:  Same objection, Your Honor.

22        THE COURT:  Overruled.

23  A.  Yes, I suppose.  I mean, when you say identified, we

24  talked about it, about who was going to go talk to various

25  groups.  Like I think it was maybe the 24th of April, 2021, we

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1        07/15/2024    75

1    were asked by former State Senator Kevin Lundberg to speak to

2    a Republican study group somewhere in Denver, and so we had

3    put together a presentation that sort of summarized what we

4    had seen, our concerns, evidence.  At that point I had done a

5    significant amount of research into the voting equipment in

6    Colorado, and so we documented, you know, a lot of the

7    thousands and thousands of unaddressed vulnerabilities in the

8    systems and that kind of thing.

9    Q.  (By MR. DILLON) And did you say that was April of 2021?

10   A.  That's correct.

11   Q.  So that's roughly a month after you became affiliated with

12   the organization?

13   A.  I think -- yeah, I think April is actually about two

14   months after February, but...

15   Q.  Fair enough.  You also became a member of USEIP's core

16   team, correct?

17   A.  It wasn't that formal, but that's what we called

18   ourselves, because it was the people that kept showing up to

19   phone calls.

20   Q.  The core team, as you've described it, you would

21   acknowledge you were a member of that core team?

22   A.  I suppose, yes.  That's not -- so to explain how I became

23   involved, our friend Dennis Haugh knew Jeff Young, and they

24   had the analytics group.  And so first Dennis asked me to go

25   talk to the analytics group on one of their phone calls.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1        07/15/2024    76

1    That's what I thought I was doing.  I didn't even realize at

2    first that Ashe Epp who I had met in December at the

3    legislative audit committee hearing, because they made me

4    stand outside the hearing room for like eight hours, I met

5    Ashe standing out in the hallway, and I didn't realize that

6    USEIP was the group that she was part of, because we hadn't

7    had really contact, you know, after that point, after

8    December.  So I first was engaged with USEIP because I thought

9    I was talking to the analytics group because Dennis Haugh,

10   former computer scientist and mathematician, had asked me to

11   talk to them.

12   Q.  Going back to my question, my question related to the core

13   team, and I just want to -- you've acknowledged you became a

14   member of the core team as you understand that term, right?

15   A.  Yes.  I would say, if it helps, little C core, not big C

16   core.  It wasn't a title.  It was just these are the people

17   that show up on the weekly phone calls.

18   Q.  Fair enough.  And is it the case that Ms. Epp and

19   Ms. Kasun were also part of a core team?

20   A.  Yes.

21   Q.  And Jeff Young as well?

22   A.  Yes.

23   Q.  Okay.  And you participated along with Ms. Epp, Ms. Kasun,

24   and Mr. Young in regular meetings of the core team; is that

25   true?

22-cv-00581-CNS-NRN    Bench Trial - Day 1        07/15/2024    77

1    A.  I would say weekly.

2    Q.  Okay.  And you also paid expenses for USEIP's benefit; is

3    that true?

4    A.  I did.  But at that point I wasn't paying for anything.

5    It was only I think much later, maybe six or maybe even a year

6    later.  It wasn't initially that I paid for anything.  I mean,

7    I think I had started paying for the data.  You know, the

8    Secretary of State's voter registration data, even though it's

9    public and belongs to the public and was generated with

10   government funds, it's not free to the public.  You have to

11   pay for it, and so citizens didn't have access to that because

12   the costs are exorbitant, and so I paid for the annual

13   subscription for it so we could get access to all of that

14   data.

15   Q.  So you paid for data available from the Secretary of

16   State.  How much would you say you paid for that data?

17   A.  It's about $1,000 a year.  And then I also -- Harvey

18   Branscum needed it.  He was doing analysis all the time, and

19   so I shared the data with him.

20   Q.  Sure.  And how many years, how many annual subscriptions

21   did you pay for?

22   A.  Well, you pay for them one at a time, but I think I'm on

23   my third year.

24   Q.  So $3,000 for access to data?

25   A.  So far.  I've paid a lot more in CORA costs, Colorado Open

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    78

1    Records requests costs.

2    Q.  How much would you say you've spent in connection with

3    CORA-related --

4    A.  $11,000.

5    Q.  And you also paid for USEIP's access to the Basecamp

6    communication platform, correct?

7    A.  Eventually I did.  At that time I was not.

8    Q.  Okay.  And how much did you pay for access to that system?

9    A.  I don't remember what the --

10           MR. REISCH:  Objection, relevance as to timeframe,

11   Your Honor.

12           THE COURT:  Well, sustained.  Can you get a timeframe

13   on it?

14   Q.  (By MR. DILLON) When did you pay Basecamp-related expenses

15   for USEIP?

16   A.  I don't remember.  It would have been sometime between

17   2021 and 2023, but I don't remember the exact time.

18   Q.  Do you remember how much you paid for access to the

19   Basecamp platform?

20   A.  I don't.

21   Q.  A few thousand dollars?

22   A.  I don't think it was that much.

23           MR. REISCH:  Objection, speculation.

24   Q.  (By MR. DILLON) What is Basecamp?

25           THE COURT:  Overruled.  Let me rule on the objection

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1        07/15/2024    79

1  before you move on.  Overruled.

2  Q.  (By MR. DILLON) What is Basecamp?  Can you explain it for

3  the Court?

4           MR. REISCH:  Objection, relevance.

5           THE COURT:  Overruled.

6  A.  Basecamp is -- I think it's actually a software tool and

7  site that's put out for the use of software development teams.

8  So it's, you know, like sort of an interaction tool.  So it

9  lets you establish affinity groups or groups to share

10 information, post documents, that kind of thing.  The USEIP

11 team, the people were using it to support coordination between

12 volunteers, both within their own counties and then without

13 their counties, and then to be able to sort of provide a

14 persistent place to provide information to them, like the

15 stuff we were getting back from open records requests.

16 Q.  (By MR. DILLON) Okay.  Was access to USEIP's Basecamp

17 platform, was it controlled?

18 A.  Well, when you say USEIP's Basecamp, it was like USEIP had

19 a site on -- I mean, it's used by thousands of organizations

20 and tens of thousands or millions of people, I don't know how

21 many.  But I believe it was controlled -- like you had to be

22 given access by somebody who already was an administrator or

23 something like that.  But I don't know how it was early on.  I

24 only know how -- I was given an invitation with a link, and

25 that's how I got into it, but I don't know if everybody who

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1     07/15/2024    80

1   was in it came in the same way because I wasn't administering

2   it.

3   Q.  Do you know who had privileges to admit people to Basecamp

4   for USEIP?

5   A.  I don't.  I could speculate, but I don't know.

6   Q.  Who gave you access?

7   A.  I think Jeff Young sent me a link.  I don't remember

8   whether he gave me access, per se, or just sent me a link.

9   Like, here's how we're going to -- this is what we're going to

10  use for the discussion on the phone call.

11  Q.  Do you know if Ms. Epp was given access to the Basecamp

12  platform for USEIP?

13  A.  I know she had access.  I don't know if she was given

14  access or --

15  Q.  Sure.  And how about Ms. Kasun?

16  A.  She was on the site.  I don't know whether she was given

17  access or was in control of giving -- I don't know who the

18  administrators were at that point.

19  Q.  Okay.  I would like to show you -- we'll come back to

20  Basecamp.  Let's look at briefly Trial Exhibit Number 1.  This

21  has already been stipulated to and admitted into evidence.

22  A.  Okay.

23  Q.  Is it up on your screen?

24  A.  It is.

25  Q.  And do you recognize this document?

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    81

1   A.  I do.

2   Q.  What is it?

3   A.  Well, it's titled the County and Local Organizing

4   Playbook.

5   Q.  Okay.  That's USEIP's -- is that a logo that has been used

6   for USEIP?

7   A.  Yes.

8   Q.  So this is USEIP's County and Local Organizing Playbook,

9   correct?

10  A.  Correct.

11  Q.  Okay.  And it's dated August of 2021?

12  A.  Correct.

13  Q.  And others will get into the playbook with other

14  witnesses, but I just want to turn to what is marked as

15  page 1.  It's actually the -- you've got to turn past the

16  cover.  This playbook, it's dedicated to various individuals,

17  including you, correct?

18  A.  Yeah.  I didn't know -- until I got it, I didn't know that

19  they had done that.  It was really nice.

20  Q.  Okay.  Let's talk about USEIP's voter verification

21  canvassing efforts.  You're familiar with those efforts,

22  correct?

23  A.  Yes.

24  Q.  And the purpose of those efforts -- and you can correct me

25  if I'm wrong -- was to test the accuracy of voter registration

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    82

1   and voter history records that you were able to obtain from

2   the Colorado Secretary of State; is that true?

3   A.  I think that's an incomplete description.  There's a

4   description right in the playbook.  Should we just read it?

5   Q.  If that would help you, that's fine.  Do you know what

6   page?

7   A.  Oh, I'm sorry.  I don't know how to work this.

8          THE COURTROOM DEPUTY:  You can't.  You don't have

9   control of it.

10         THE WITNESS:  Okay.  I'm grateful for that.

11         THE COURT:  In the notebook, though, next to you, the

12  black notebook, there should be an Exhibit 1, and you can flip

13  through the hard copy.

14  A.  So I think maybe page 19; is that right?

15  Q.  (By MR. DILLON) And so I think you said my description of

16  the purpose of the voter verification canvassing effort was

17  incomplete.

18  A.  Right.

19  Q.  Do you want to describe the purpose of the effort?

20  A.  Can I just read it?

21         THE COURT:  Mr. Smith, our exhibit page 19 is

22  different.  What is it?

23         THE WITNESS:  I'm sorry.  It's numbered page 19 at

24  the bottom.

25         THE COURT:  So one more page, whoever is controlling

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1        07/15/2024    83

 1  this.

 2              THE WITNESS:  That's it, Your Honor.

 3              THE COURT:  All right.

 4  A.   So why voter verification?  To ensure free and fair

 5  elections, to restore the people's confidence in our election

 6  system.  We have to undertake citizen -- or we must undertake

 7  citizen audit activities to either refute or confirm serious

 8  allegations of electronic malfeasance.  Voter verification

 9  efforts are structured and executed to support future legal

10  action should that action be necessary.  Additionally, voter

11  verification results, regardless of outcome, are valuable in

12  ensuring the people's trust in future election cycles.  So

13  just exactly as it reads, our intent was to find out what was

14  true, because it was important to the people, and we could not

15  find out what was true without doing it ourselves.

16  Q.   (By MR. DILLON) And what was true -- when you refer to

17  what was true, isn't it the case that part of what you were

18  trying to verify, the truth or accuracy, was the data that the

19  Secretary of State maintained regarding the activities of

20  Colorado voters?

21  A.   Well, not just the activities, but the registration

22  information itself, as well as voting history and now provably

23  inaccurate.

24  Q.   Okay.  And the method by which you went about gathering

25  that information was door-to-door canvassing by USEIP's

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1        07/15/2024    84

1    citizen volunteers?

2    A.  We had previously tried to look at other methods.  I mean,

3    we had tried to go through the data and do analysis of the

4    data, but we concluded that if you want ground truth, you have

5    to go and see, especially because we had a lot of anecdotal

6    evidence.  And you've heard it, other people have heard it

7    about people getting extra ballots or people getting ballots

8    for people who didn't live at the houses or people who were

9    not sure if their ballot was counted or anything like that.

10   We thought let's just go collect the data.  We canvassed just

11   like all three plaintiff organizations canvass.  We all

12   canvass.  That's how you get truth.

13   Q.  I appreciate the extra detail.  I'm just simply asking you

14   to confirm that the method by which USEIP and its volunteers

15   went about testing the accuracy of the election-related data

16   --

17   A.  I wouldn't call it testing, but -- I'm sorry.  I did it

18   again.  I wouldn't call it testing.  We were just trying to

19   verify whether the Secretary of State's data was accurate.

20   Q.  Fair enough.  And you did that -- the method by which you

21   did that was door-to-door canvassing, questioning Colorado

22   residents, voters about the data personal to them?

23   A.  Exactly.

24   Q.  Okay.  Thank you.  And the work product of this effort

25   consisted of, among other things, affidavits that were

22-cv-00581-CNS-NRN   Bench Trial - Day 1        07/15/2024    85

1   prepared to document purported anomalies or irregularities in

2   the data, correct?

3   A.  I wouldn't say purported.  They were what we observed.

4   The volunteers observed disparities between the Secretary of

5   State's data and what they could either observe themselves or

6   were told by their residents that they visited that were

7   correlated to the records in the Secretary of State's data.  I

8   mean, I guess you could say the affiants were purporting,

9   but...

10  Q.  I'm trying to be simpler.  The work product, though, were

11  affidavits?

12  A.  In the walk -- in the walk data.  So the affidavits were

13  just where there were irregularities, but there were also the

14  logs of all of the houses that they contacted, including which

15  questions they asked, what they got responses to, and if they

16  were given any additional information.

17  Q.  Okay.  That's helpful.  Back to the affidavits, my

18  understanding is that those affidavits were signed either by

19  the voter themselves, correct?  That's one way?

20  A.  The resident.  So in some cases it wasn't the voter.  It

21  was a resident who stated, for example, that the individual

22  named in the Secretary of State's data didn't live there and

23  had never lived there.

24  Q.  Or, alternatively, one of the citizen canvassers if the

25  citizen was uncomfortable signing the affidavit?

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1        07/15/2024    86

1    A.  That's correct.  Well, not necessarily uncomfortable.

2    Just didn't for some reason.  Like, sometimes there was a

3    language barrier or sometimes the individual they were talking

4    about wasn't present.

5    Q.  Citizen canvassers were also advised to take photographs

6    of residents where discrepancies were identified?

7    A.  Did you say residents or residences?

8    Q.  Residences.  Let me restate the question so that the

9    record is clear.  Citizen canvassers were also advised to take

10   photographs of the residences where discrepancies were

11   identified, correct?

12   A.  I think it's a little bit more detailed than that.  It was

13   more a matter of where the discrepancies were associated with

14   the residence itself.  It wasn't like here's a white house and

15   inside that is somebody who didn't vote or whatever.  It was

16   more like there's an address listed, and instead of being a

17   residential address, it's a storage location or it's an empty

18   lot or it's a commercial, you know, establishment from where

19   someone would not be permitted to, you know, be registered as

20   a voter.  Or it's -- you know, it's literally a street corner

21   that somebody is purported to have received and sent an

22   absentee ballot from.  So I think it was a -- I don't remember

23   the exact wording in the training, but I think it wasn't just

24   any anomaly.  It was about specifically where there was

25   something about the location that they wanted to document.

                         Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1        07/15/2024    87

1   Q.  Did USEIP maintain photographs that were taken by

2   canvassers?

3   A.  Well, again, USEIP is a -- you know, it's an affiliation

4   of an assembly of citizens.  We didn't have any kind of

5   central repository.  I never asked for photographs.  I don't

6   know how many were taken by the volunteers that did the

7   canvassing.  We never asked.  It wasn't important to the

8   report.  It was more a matter for them to sort of document

9   where they'd been.  Just like we had recommended that they

10  keep photos of the walk lists that they had completed so that

11  they could show if they were challenged or asked where they

12  had been and where they had not been.

13  Q.  What understanding do you have, if any, about where the

14  photographs taken by canvassers may be today?

15  A.  I don't know if any photographs were --

16          MR. REISCH:  Objection, speculation.

17          THE COURT:  Overruled.

18  A.  I don't know if any photographs were actually taken.  I

19  never asked anyone, so I don't understand -- I don't know if

20  there are photos and where they are, if there are any.

21  Q.  (By MR. DILLON) Okay.  What about audio recordings or

22  conversations between canvassers and folks who answered the

23  door when canvassers came knocking?

24  A.  Same answer.  And for the same reason, we recommended that

25  because Colorado's a one-party state and people can record if

                    Sarah K. Mitchell, RPR, CRR

1   they want to do that to protect their own interests and the

2   fidelity of the conversation, that canvassers would record

3   audio.  I think I started off saying you could record video,

4   and I thought people might be uncomfortable with that.  You

5   can just record audio if you want to with your phone or

6   whatever, and that way if somebody said that person, you know,

7   called me an epithet or that person threatened me or

8   something, then you could prove that you didn't do that.

9   Q.  But as you sit here today, you don't know if any audio

10  recordings were taken or where they might be if they were

11  taken?

12  A.  Correct.  They weren't important to what we were trying to

13  do with canvassing.  It was more that we wanted canvassers to

14  protect themselves.

15          THE COURT:  Mr. Dillon, is this a good time for a

16  break?

17          MR. DILLON:  Sure, Your Honor.

18          THE COURT:  Let's take a 15-minute break, and we'll

19  come back.  We'll be in recess.

20          THE COURTROOM DEPUTY:  All rise.  Court is in recess.

21      (Break was taken from 10:27 a.m. to 10:43 a.m.)

22          THE COURT:  Please be seated, and we'll continue.

23  Q.  (By MR. DILLON) Mr. Smith, I'd like to continue by

24  referring you to Exhibit 22.

25  A.  Okay.  22.

22-cv-00581-CNS-NRN   Bench Trial - Day 1       07/15/2024    89

1   Q.  Do you see the first page of Exhibit 22, at the bottom

2   it's got what we lawyers refer to as a Bates stamp.  It says

3   USEIP_000930.

4   A.  I do.

5   Q.  Okay.  I'll just represent to you that this is a set of

6   documents that were produced by your counsel in this case.

7   A.  Okay.

8   Q.  Do you recognize these documents and particularly the

9   photographs that are included in this Exhibit 22?

10  A.  The first photograph I do not.  The second page with the

11  four photographs I do not.  The third page is not a

12  photograph, but an affidavit.  It's from Pueblo it says.  I

13  don't recognize that.  And then there are three photos on the

14  next page.  I don't recognize any of the photographs.  The

15  next page is another affidavit from Pueblo.  And then the

16  following page has two photographs, and I don't recognize

17  either of them.  Do you want me to keep going?

18  Q.  Well, let's turn back to the page with the Bates stamp

19  USEIP_000932.

20  A.  Okay.

21  Q.  And that's one of the affidavits that's in this set of

22  materials?

23  A.  Okay.

24  Q.  And in this affidavit a couple lines from the bottom it

25  says, quote, photos taken for this affidavit, period, closed

Sarah K. Mitchell, RPR, CRR

 1   quote.

 2           MR. REISCH:  Objection, hearsay, lack of foundation,

 3   lack of personal knowledge.

 4           MR. WYNNE:  Join the objection, Your Honor.

 5           THE COURT:  Sustained.

 6   Q.  (By MR. DILLON) Let me just back up.  You've testified

 7   already this morning that you're not sure if any volunteers

 8   took photographs when they were out canvassing or whether

 9   those photographs were maintained by anyone, correct?

10   A.  Correct.

11   Q.  Does this document refresh your recollection as to whether

12   any photographs were taken or maintained?

13   A.  Well, I didn't have a recollection.  I didn't realize that

14   these photos were included.  I don't know if these were part

15   of the data that was given to the Pueblo DA with the

16   affidavits or if these were solicited for the case and then

17   obtained and provided to counsel.  So it doesn't refresh

18   anything.  I didn't know that there were photos in it.

19   Q.  So your testimony remains unchanged.  You don't know if

20   volunteers took any photos and you don't know if any photos

21   were maintained?

22   A.  Well, this indicates --

23           MR. REISCH:  Your Honor, I'm going to ask him to not

24   to respond.  It's nonresponsive.

25           MR. WYNNE:  The question asked to elicit hearsay, so

22-cv-00581-CNS-NRN   Bench Trial - Day 1        07/15/2024    91

1    we object.

2            THE COURT:  The objection is sustained.  He hasn't

3    seen the photos.  He's not familiar with them, so he can't

4    possibly answer any questions about them.

5            MR. DILLON:  Okay.  We'll move on.

6    Q.  (By MR. DILLON) Mr. Smith, you personally participated in

7    USEIP's canvassing, efforts, correct?

8    A.  I did.

9    Q.  You did three days of door-knocking work, correct?

10   A.  I think that's correct.

11   Q.  And you knocked on 70 to 75 doors, correct?

12   A.  Roughly.

13   Q.  And that was in two counties, correct, Weld and El Paso

14   County?

15   A.  That's correct.

16   Q.  And in your work you canvassed in at least two mobile home

17   parks, correct?

18   A.  Correct.

19   Q.  And collectively you're aware that USEIP volunteers

20   knocked on more than 9,400 doors?

21   A.  Correct.

22   Q.  And talked to more than 4,600 residents?

23   A.  Correct.

24   Q.  And all of that work was in Colorado, correct?

25   A.  Correct.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024   92

1    Q.  Let's turn your attention to Exhibit No. 3.  That's also

2    been stipulated and admitted into evidence already.  Do you

3    recognize this document?

4    A.  I do.

5    Q.  What is it?

6    A.  Well, it's titled Voter Verification Volunteer Training.

7    It's voter verification volunteer training.

8    Q.  And can you help put this into context?  How was this

9    document used?

10   A.  I'd have to look at the back of it to know which version

11   this was, but this might be the first version that I had

12   drafted and sent out to the other volunteers for comment and

13   feedback.  Yeah, so it still says -- you can see like on page

14   USEIP_0055 where it says insert affidavit graphic, because it

15   was a draft, and so we didn't yet have the examples.  I think

16   we hadn't built the templates for some of the things.  So the

17   intent of this was to provide to county captains and to be

18   used for voter verification or canvassing volunteers to help

19   them understand the purpose, the structure, the method for how

20   they should approach canvassing.  You know, what we wanted to

21   achieve, how we wanted people to conduct themselves, that kind

22   of thing .

23   Q.  Okay.

24   A.  It was essentially, like a lot of other things, it was

25   like a tool that we were giving a county captain so if they

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1        07/15/2024    93

1    were executing or conducting voter verification, that they

2    could have the tool for that use, and we could get

3    standardized, you know, canvassing which was really important

4    to be able to aggregate the data.

5    Q.  Are you the principal drafter of this voter verification?

6    A.  I am.  I'm sorry.  I am.

7    Q.  And so you are -- and did you personally train volunteer

8    canvassers?

9    A.  Earlier I was going to say no, but there were a couple of

10   people when I showed up for the third -- we call them walks --

11   when we showed up for the third walk, there were some

12   volunteers who had arrived there who had not gone through the

13   training, which I only found out when we were getting ready to

14   go out, and so I just sat down with them and walked through

15   it.  But other than them, I didn't train anyone else.

16   Q.  Did you train any volunteers on how to train others, train

17   the trainer model?

18   A.  No.  There was a captain's guide that was really meant

19   more for the captains themselves, but other than that, no.  I

20   mean, we talked a little bit, but when I went to the first

21   training up in Boulder, at least the first training that I can

22   remember, the person who was giving the training was a

23   professional corporate trainer, and so I thought, well, you

24   know, my work here is done.  I don't need to do anything more

25   with this.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    94

1  Q.  And was this professional trainer -- did that person use

2  your training guide here to train the canvassers?

3  A.  I think a version -- so the intent always was for the

4  county captains to tailor whatever tools to what they had

5  chosen to do and their circumstances, and that's what

6  happened.  In fact, there was a lot of experimentation with

7  what forms they would have used and things like -- so much I

8  didn't like, but they ended up adopting anyway.  So the intent

9  was to provide them with the tool, but with the understanding

10 they were their own county, and they were going to tailor it

11 to however they wanted to do it.

12 Q.  Did you personally follow the training -- this training

13 guide when you were doing your canvassing for USEIP?

14 A.  I would say for the most part.  I didn't record any audio,

15 and -- but I think for the most part I did.

16 Q.  And is it your understanding that other USEIP citizen

17 volunteers were instructed to follow this training as well in

18 their efforts?

19       MR. REISCH:  Your Honor, I object as to foundation

20 and hearsay, vague and speculative.

21       THE COURT:  Well, overruled.  Let me see if he can

22 answer.

23 A.  Could you repeat the question?

24 Q.  (By MR. DILLON) Is it your understanding that other USEIP

25 volunteers were trained in the manner that is described in

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1        07/15/2024    95

 1    this document that we're looking at, Exhibit No. 4?

 2    A.  Or some version of it.  Like I said, this is a very early

 3    draft, the first draft.  You can tell I did it, because it's

 4    totally artless.  It's just pure text.  So what they used to

 5    train them -- the important parts to us were that they would

 6    be asking them the same questions, and they were following the

 7    guidance about being, you know, professional and courteous.

 8    Because nobody had to talk to us, right?  That's why we asked

 9    them if they were willing to talk, and if they said no, then

10    we left.  And if they said yes, then we asked questions.

11    Q.  Well, let's page through the document.  At the bottom,

12    again, Bates numbers, let's direct your attention to

13    USEIP_0048.

14    A.  Okay.

15    Q.  And the title of this page is Purpose of Voter

16    Verification, correct?

17    A.  Correct.

18    Q.  And this document describes voter verification as a

19    process by which an independent audit of election records and

20    results would be obtained, correct?

21    A.  Correct.

22    Q.  And is this -- does this document accurately describe the

23    purpose of the voter verification efforts?

24    A.  Okay.

25    Q.  Let's turn your attention to the next page, and the title

22-cv-00581-CNS-NRN    Bench Trial - Day 1          07/15/2024    96

1   of this page is Safety.  Do you see that?

2   A.  Yes.

3   Q.  Is it your understanding that citizen canvassers were

4   trained on safety-related issues?

5   A.  I hope they were.  We recommended that they be.  That's

6   why it was in the slide deck.

7   Q.  That was your intention, certainly, as the drafter of the

8   training materials?

9   A.  Correct.  We wanted people to be safe.

10  Q.  And you recognized that canvassing activity like this

11  carried some safety risk, correct?

12  A.  Any time you go to somebody else's house or go out

13  walking, I mean, people get hit crossing the street in their

14  neighborhood, so...

15  Q.  Let's turn to page USEIP_0056.

16  A.  Okay.

17  Q.  These are some frequently asked questions that you thought

18  trainers should be prepared to address, correct?

19  A.  Correct.

20  Q.  And one of those questions was what to do if approached

21  aggressively or attacked, correct?

22  A.  Yes.

23  Q.  So you recognized on the front end that was certainly

24  possible?

25  A.  It's always possible.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    97

1    Q.  While you were canvassing for USEIP, isn't it true that

2    you carried a firearm?

3    A.  As I said in the deposition, I don't know for sure.  It's

4    likely because I typically carry concealed, but I don't

5    remember for sure.

6    Q.  Okay.

7    A.  I certainly never withdrew it from the holster, and it

8    wouldn't have been evident to anyone else because I carry

9    concealed.

10   Q.  Are you aware that other USEIP volunteers carried firearms

11   while they were canvassing?

12           MR. REISCH:  Objection, speculation.

13           MR. DILLON:  Your Honor, I'm asking what he is aware

14   of.

15           THE COURT:  Well, why don't you rephrase?  Sustained.

16   Q.  (By MR. DILLON) Are you aware that other USEIP volunteers

17   also carried firearms while they were canvassing?

18           MR. REISCH:  Objection, speculation.

19           THE COURT:  Well, it's the same question.  You need

20   to establish some foundation for why he would know one way or

21   the other.

22   Q.  (By MR. DILLON) Did you have conversations with other

23   USEIP volunteers about whether they were carrying firearms

24   when they were canvassing?

25           MR. REISCH:  Objection, calls for hearsay.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024   98

 1              THE COURT:  Overruled.

 2   A.  No.

 3   Q.  (By MR. DILLON) None whatsoever?

 4   A.  No.

 5   Q.  Okay.  Do you recall any conversations on the Basecamp

 6   platform about trying to coordinate canvassers who were

 7   carrying firearms with those who are concerned about their

 8   safety?

 9   A.  I remember a conversation --

10              MR. REISCH:  Objection, hearsay.

11              THE COURT:  Well, what's the response to the hearsay

12   objection?

13              MR. DILLON:  The response here, Your Honor, is that

14   this is not being offered for the truth of the matter

15   asserted.  It is being offered to lay some foundation for what

16   he understands about the extent to which other USEIP

17   volunteers like himself were potentially carrying firearms

18   while they were doing their canvassing activities.  It's not

19   being offered for the truth.  It's being offered for what he

20   understands.

21              THE COURT:  Mr. Reisch, anything further without a

22   long speaking objection?

23              MR. REISCH:  If it's not being offered for the truth

24   of the matter asserted, it's not relevant, Your Honor.

25              THE COURT:  Overruled.  You can answer.

                    Sarah K. Mitchell, RPR, CRR

 1  A.  Could you repeat the question, please?

 2          MR. DILLON:  It's been a while.  Now I don't

 3  understand exactly what the question was.  Would you mind

 4  reading it back?

 5          THE COURT:  Do you recall any conversations on the

 6  Basecamp platform about trying to coordinate canvassers who

 7  were carrying firearms with those who were concerned about

 8  their safety?

 9          THE WITNESS:  Thank you, Your Honor.

10  A.  I don't recall conversations from Basecamp, but I recall

11  reading Basecamp excerpts that I think were produced as

12  exhibits and maybe also were removed.  So there was a point

13  where the reporter that's being cited, Erik Maulbetsch, had

14  under false pretenses kind of infiltrated the site and had

15  done some excerpts, some very creative excerpts, and I think

16  he was addressing those.  And I think I saw those, but I don't

17  remember seeing them on Basecamp, if that's your question.

18  Q.  (By MR. DILLON) Why don't you take a look at Exhibit 25.

19  A.  Did you say 25?

20  Q.  2-5.

21  A.  Okay.

22  Q.  I'll just represent to you and for the record this is a

23  document that was produced by Jeff Young in response to a

24  subpoena in this case.  You can -- it's a fairly thick

25  document.  You can take some time to familiarize yourself with

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1     07/15/2024    100

1  it.  I've got some questions for you about it.

2  A.  You want me to just read through it?

3  Q.  It's a long -- just familiarize yourself generally with

4  the content of it.

5  A.  Just all excerpts from Basecamp conversations?

6  Q.  I believe that's what this is, and I would like you to

7  confirm that.

8  A.  I don't know if this is from that or not.  I mean, I'd

9  have to go back and look.  If they had my name on them like I

10  was one of the recipients or sent it, and you'll see it -- I

11  think it would just be Shawn, then I might have seen it, but

12  --

13        MR. REISCH:  Your Honor, I object as nonresponsive.

14  There's not a question pending.

15        MR. WYNNE:  And I'll object to any question along

16  these lines based on hearsay.  Even if in the rare event he

17  were able to authenticate it under 901, 902 as his own, it

18  would still be hearsay.

19        THE COURT:  Well, we haven't done anything with the

20  document yet, so I'll allow him to try and establish

21  familiarity with it.

22        MR. WYNNE:  Understood.  Just trying to save time.

23  Q.  (By MR. DILLON) Mr. Smith, do you recall when you were

24  first allowed access to the USEIP Basecamp page ?

25  A.  Not specifically, but it would have probably been the end

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    101

1    of February, beginning of March of 2021.

2    Q.  So let's turn your attention then to page 20.  You can see

3    in the lower right-hand corner we've added some page numbers?

4    A.  I think that's only in your book, but if you want to tell

5    me what's at the top of it, I'll try to get to it.

6           MR. DILLON:  Your Honor, may I approach so I can see

7    --

8           THE COURT:  Yeah.  At the bottom, Mr. Smith, you

9    don't have any Exhibit 25 dot something?

10          THE WITNESS:  No, Your Honor.

11   A.  Okay.  What was the page number?

12   Q.  (By MR. DILLON) Page 20.

13   A.  Exhibit 25.020?

14   Q.  Correct.

15   A.  Okay.

16   Q.  So let's -- at the top of this page you can see there's a

17   reference to canvassing?

18   A.  Yes.

19   Q.  Okay.  And there's a reference there to the date

20   August 4th, 2021, correct?

21   A.  Yes.

22   Q.  And so by this time you had been granted access to the

23   USEIP Basecamp platform, correct?

24   A.  Correct.

25   Q.  Okay.  There's some conversation there, and you can read

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    102

1   it for yourself.  I'm not going to read it into the record.

2   But it seems as though there is conversation here about

3   volunteers needed in Weld County?

4        MR. REISCH:  Your Honor, I'm going to object.  The

5   exhibit has not been admitted.  It's hearsay.

6        THE COURT:  Well, it's sustained.  I don't know what

7   we're doing, but the document's not in.  You may not read from

8   it.  But you can -- he can read it to refresh recollection, if

9   it may, but we can't read from the document.

10  Q.   (By MR. DILLON) Do you recall discussions on Basecamp

11  about recruiting volunteers for the Weld County canvassing

12  efforts?

13  A.   Not specifically.  There were -- so there were different

14  sort of subsites or groups formed for each county, and there

15  would be, you know, dozens of conversations between different

16  people taking place all over the site.  I wasn't in most of

17  those.  I wasn't reading most of those or seeing most of

18  those.  So if they were -- I don't know if this was on the

19  general site or under county captains or under Weld.  And if

20  it wasn't my county or they hadn't asked me to look at

21  something, I wouldn't have been looking within a specific

22  county subsite within the group.  So I don't specifically -- I

23  recall people talking about recruiting volunteers all over.  I

24  don't recall specifically this conversation or specific

25  discussions about Weld.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    103

1    Q.  Do you recall that that was the sort of thing --

2    recruiting volunteers was the sort of thing that was discussed

3    on the Basecamp platform?

4            MR. REISCH:  Objection, hearsay.

5            THE COURT:  Overruled.

6            MR. REISCH:  Lack of foundation and speculation.

7            THE COURT:  Overruled.

8    A.  Among other things.  There were all kinds of things

9    discussed on -- in fact, we had a problem with people talking

10   about stuff that wasn't election integrity.  At one point we

11   had to make a separate area for them to talk about all those

12   separate grievances because it wasn't election.  It was just

13   filling up the space, so...

14   Q.  (By MR. DILLON) Is that a yes?

15   A.  Sort of.  It was among the things people would talk about.

16   Recruiting, sure.  Letting other people know, sure.

17   Canvassing, absolutely.

18   Q.  Let's turn to page 25 of this exhibit.

19   A.  Okay.

20   Q.  There's a reference to a May 5th, 2021, captain's meeting

21   --

22   A.  Okay.

23   Q.  -- correct?  And I believe you're identified as an

24   attendee of that meeting?

25   A.  Yes.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    104

1  Q.  Did you attend a captain's meeting on May 5th, 2021?

2  A.  I have no idea.

3  Q.  Is that the sort of meeting that you would typically

4  attend?

5  A.  Captain's meetings, no.  So the captain's meetings were

6  also recurring, and I didn't always attend those.  Those were

7  the county captains themselves.  I was more likely to be on a

8  core meeting than a captain's meeting.

9  Q.  Okay.  Did you update the captain's manual?

10  A.  For voter verification?

11  Q.  In the middle of this page it says, Shawn will be updating

12  the captain's manual.  Did you do that?

13         MR. REISCH:  Objection.

14         THE COURT:  Hold on.  What's the objection?

15         MR. REISCH:  It's an improper question.  It's not

16  impeachment, and the evidence -- the document has not been

17  admitted.  It's hearsay.

18         THE COURT:  Sustained.  I think you could ask him all

19  these questions without a reference to a document that has not

20  been admitted.  So let's try that.

21         MR. DILLON:  Fair enough.

22  Q.  (By MR. DILLON) On or around May 5th, 2021, did you update

23  a captain's manual?

24  A.  I have no idea about the timing.  I did update the county

25  captain's manual for voter verification.  I drafted it just

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    105

 1  like the voter verification training, and then I had feedback

 2  from other volunteers, including the people who had started

 3  trying to use the materials that, Hey, you know, you explained

 4  this wrong or whatever.  So there wasn't one update.  There

 5  wasn't one draft.  And then there were versions in the various

 6  counties.

 7  Q.  When did USEIP start its canvassing efforts?

 8  A.  That's a great question.  I don't remember the exact date

 9  when I was up in -- I think -- I think that was one of the

10  first walks up in Weld County.  That was certainly the first

11  training that was using some version of what I had drafted,

12  and that's why I went to attend it, but I don't remember the

13  exact date.  It would have been in the -- you guys have all of

14  the walk list records, so if you see walk lists records for

15  me, it would have been the first one.

16  Q.  Was USEIP canvassing in May of 2021?

17  A.  Probably.  Probably in Weld County.

18  Q.  Okay.  Was it canvassing in Mesa County?

19  A.  No.  USEIP never canvassed in Mesa County, not a single

20  door.

21  Q.  Can I turn your attention to Exhibit 25, page 47?

22  A.  Okay.

23  Q.  The top half of that page seems to be a message posted by

24  you.  Is that what it appears to be to you?

25  A.  Yes.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    106

1   Q.  Okay.  And this is a message that was posted on Basecamp;

2   is that correct?

3   A.  Correct.

4   Q.  And you posted that message on Basecamp?

5   A.  I do -- I believe I did.

6   Q.  And this document accurately captures what you posted?

7   A.  Give me a moment to read it.

8   Q.  Sure.

9   A.  I suspect it does, but I'll know if it looks like my kind

10  of writing.  Yes, I believe this is what I wrote.

11          MR. DILLON:  Your Honor, I'd like to offer

12  Exhibit 25, page 47 into evidence.

13          THE COURT:  Any objection?

14          MR. REISCH:  Your Honor, lack of foundation, hearsay.

15          MR. WYNNE:  I'm going to object based on hearsay to

16  the extent that they're trying to elicit the truth of any

17  matter.  It is an out-of-court statement.  The witness is on

18  the stand.

19          THE COURT:  A response?

20          MR. DILLON:  Party opponent, Your Honor.

21          THE COURT:  All right.  The objections are overruled.

22  Exhibit 25, page 47 is admitted.

23      (Exhibit 25, page 47 received in evidence.)

24          MR. WYNNE:  Your Honor, one other thing.  I'd ask

25  normally for an instruction this be admitted only as to this

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    107

1    witness because it is not my client's statement.

2            THE COURT:  Well, I understand that.

3            Proceed, please.

4            MR. DILLON:  Thank you, Your Honor.

5    Q.   (By MR. DILLON) Mr. Smith, this entry into Basecamp is

6    dated April 12th of 2021, and it -- there's a line in here

7    that refers to folks, quote, getting ready to begin VV in Mesa

8    County, period, closed quote.  VV, is that a reference to

9    voter verification?

10   A.   It is.

11   Q.   And who is the reference to they?  Who is getting ready to

12   do voter verification in Mesa County?

13   A.   I can't remember the name of their group.  There were some

14   people that we had connected to.  We realized that they were

15   going to do some -- they were wanting to do some of the same

16   kinds of things, and so we were sharing information back and

17   forth.  And one of their individuals in that group was USEIP's

18   county captain for Mesa, but they began their voter

19   verification using different procedures and a different data

20   set.  They were using an app called Sidekick or something like

21   that, and they used county data.  We never used county data.

22   We only used Secretary of State data.  So they never got our

23   data and canvassed with our data, and it wasn't USEIP people

24   doing it, although we were in contact with the people who were

25   organizing it.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1     07/15/2024    108

1   Q.   Okay.  So when you used the word we in that answer, you're

2   referring to USEIP?

3   A.   Yes.

4   Q.   And as you sit here today, you don't remember what is the

5   name of this other organization that was canvassing in Mesa

6   County?

7   A.   Not exactly.  I want to they said maybe Colorado Concerned

8   Citizens or something like that.  I'm not even sure it was

9   just one group.

10  Q.   Do you know if they were using USEIP methods, not in terms

11  of data or what doors to knock on, but in terms of the

12  questions that were being answered at voters' doors and that

13  sort of thing?

14  A.   I don't think I had --

15          MR. REISCH:  Objection, foundation, hearsay.

16          THE COURT:  Overruled.  You may answer, if you know.

17  A.   I don't think I had it at that time.  We were still

18  drafting ours.  We wanted to get it to them in case they could

19  use it, but I don't think I saw their questionnaires or a

20  script or anything like that, so I don't think I knew.  So no.

21  Q.   (By MR. DILLON) Let's look at page 49.  Exhibit 25,

22  page 49.  And about halfway down the page there are -- there's

23  a reference to April 17th of 2021.  Do you see that?

24  A.   I see that.

25  Q.   Okay.  And there's references under that date to both

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    109

1    Holly and to Shawn.  Do you see that?

2    A.  I do see that.

3    Q.  Okay.  And can you put this exchange into -- did you write

4    this entry into Basecamp?

5    A.  No.

6    Q.  Do you know who did?

7          MR. WYNNE:  If I may interrupt, the paper copy I have

8    doesn't have page numbers on it, so I'd ask for convenience,

9    if there's a way that I can tell what page.

10          THE COURT:  I don't know why one set of exhibits has

11    page numbers and the other doesn't.

12          MR. DILLON:  I don't have an answer to that, and I

13    apologize for the inconvenience.  I can certainly slow down.

14    I know we added page numbers toward the end of our trial prep

15    work, Your Honor, in order to avoid any confusion like we have

16    here.  I apologize for that inconvenience.  I'll do my best to

17    go slow and direct you.  I'm glad that the witness certainly

18    has page numbers.

19          THE COURT:  All right.  Well, maybe -- why don't we

20    -- would it be helpful to you -- we can display it on your

21    screen?

22          MR. WYNNE:  Yes, Your Honor, like the last one was.

23          THE COURT:  So if you can put up page 49 for

24    Mr. Wynne and maybe zoom in a bit.

25          MR. DILLON:  Is that better, Counsel?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    110

1              MR. WYNNE:  Yes.  Thank you very much, Counsel.

2   Q.  (By MR. DILLON) So my question was do you know who entered

3   this particular entry into Basecamp based on what you see

4   here?

5   A.  No.  Shawn doesn't refer to himself in the third person,

6   so I didn't write it.  I don't know who did.

7   Q.  Did you participate in training or organizing volunteers

8   in Boulder County?

9   A.  No.  When you say participate in training, I did not

10  train.  I was present for training conducted in Boulder

11  County, but it was for the canvassing that was taking place in

12  Weld.

13  Q.  Is this entry in Basecamp, does it refer to that training

14  that you just described?

15             MR. REISCH:  Your Honor, I object.  Referencing a

16  document that he didn't write.  Relevance, hearsay, lack of

17  foundation.

18             THE COURT:  Sustained as to relevance.  Again,

19  Mr. Dillon, you could ask him these question.  There's no need

20  to refer to this document.

21             MR. DILLON:  Your Honor, I don't think my last

22  question -- well, let me rephrase it then.

23             THE COURT:  All right.

24  Q.  (By MR. DILLON) Were -- the training that you referred to

25  in Boulder, Colorado, was there a concerted effort to include

                     Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    111

1    some liberal-friendly phrases that would help fly under the

2    radar?

3         MR. REISCH:  Objection, lack of foundation, hearsay,

4    speculation.

5         THE COURT:  Overruled.

6    A.  I have no idea.  That -- I think what you're -- I saw -- I

7    remember seeing something like what you're referring to in the

8    exhibits, but I don't remember that being part of the

9    discussion prior to the Boulder training that took place to

10   train volunteers to walk in Weld, and that's what I was

11   present for.

12   Q.  (By MR. DILLON) As a general matter, was there an effort

13   by USEIP to include liberal-friendly phrases in their training

14   efforts?

15   A.  I don't think --

16        MR. REISCH:  Objection, speculation.

17        THE COURT:  Overruled.  I'll allow it, if he knows.

18   A.  I don't think it's a general matter.  I think at some

19   point there was discussion specifically about training

20   volunteers and walking in Boulder County, and whoever that was

21   had talked about using verbiage --

22        MR. REISCH:  Objection, hearsay, nonresponsive.

23        THE COURT:  Overruled.  You can continue.

24   A.  There were some discussion about like what phrases you use

25   to describe the activities, that it might be more or less -- I

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024   112

1   don't know -- that the people there might be more or less

2   receptive because it was considered a very liberal

3   environment.

4   Q.  (By MR. DILLON) And so messaging was tailored to that

5   environment?

6   A.  I don't know if it was.  I remember there was some

7   discussion, but I think I remember it from the excerpts

8   presented as exhibits for the trial.  I don't remember it from

9   Basecamp.  It may have -- I'm not saying it didn't happen.  I

10  just don't know.  Like I said, Boulder County is not where I

11  lived.  I wasn't directly involved in a lot of the

12  county-level planning.  That was what county captains did.

13  Q.  Let me turn your attention to page 103 of Exhibit 25.

14  A.  Okay.

15       MR. DILLON:  And, Hashini, can you pop that up for

16  counsel, page 103.

17  Q.  (By MR. DILLON) In the middle of this page, Mr. Smith, do

18  you recognize a May 12th, 2021, entry by yourself into the

19  Basecamp platform?

20  A.  No, I don't recognize it.  But, again, it was a long time

21  ago, and that -- no, that wouldn't have been written by me,

22  because, again, see the statement where it says, And will get

23  the data to Jeff and Shawn.  Again, Shawn doesn't refer to

24  himself in the third person.  I wouldn't have written that.

25  Q.  Did you favor a more aggressive approach in canvassing

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    113

1  after meeting with folks in Mesa County?

2  A.  No.  What do you mean by aggressive?  I didn't favor

3  anything aggressive.

4  Q.  Okay.  Did you write the word excellent in the middle of

5  page 103, Exhibit 25 with a thumbs up emoji?

6        MR. REISCH:  Objection, hearsay, lack of foundation.

7        THE COURT:  Overruled.  I'll allow the question.

8  A.  I don't remember writing it, but I do say excellent a lot.

9  Q.  (By MR. DILLON) Is that your entry, the thumbs up emoji?

10  A.  Probably, yes.

11  Q.  And was that in reference to whoever wrote the prior

12  message favoring a much more aggressive approach in Mesa

13  County?

14  A.  Well, it was -- it would have been a response to that

15  post, but it could have been about getting the data to Jeff

16  and Shawn.  If you look at the second line down where it says

17  and will get the data to Jeff and Shawn, so I would be very

18  happy if they got data to Jeff and Shawn.

19  Q.  Got it.  So is it your testimony that your response there

20  doesn't relate anything to the aggressive approach?

21  A.  I have no recollection of it, but, again, I've never

22  recommended an aggressive approach and certainly didn't.  If

23  you look at the voter verification training manuals from the

24  first draft through the last version used, I never saw anybody

25  aggressive.  We didn't recommend aggressive.  We explicitly

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    114

1    wanted people to be professional and courteous.  Also, just

2    looking at that it looks like --

3            THE COURT:  Let me stop you there.  You have to wait

4    for a question to be asked, even though you might have thought

5    of something else.

6            THE WITNESS:  Yes, ma'am.  I was trying to continue

7    the response.  Sorry.

8            THE COURT:  That's okay.  You can ask him a

9    follow-up, if you want.

10   Q.  (By MR. DILLON) Let's look at page 63, Exhibit 25.  And

11   before we look at the document, I asked you a question

12   previously if you were aware of efforts to -- for volunteers

13   who were concerned about their safety, sort of pairing them up

14   with other canvassers who were armed.  Do you recall that?

15   A.  I do.

16   Q.  And refresh my memory here.  Are you aware of those

17   discussions?

18   A.  I don't believe I was aware of them at the time.  I

19   believe I've read about them in the excerpts from Basecamp

20   that were provided as exhibits for -- in the course of the

21   case.

22   Q.  Okay.  And is this Exhibit 25, page 63, an example of

23   that.  Look at the bottom entry.

24           MR. REISCH:  Objection, relevance, lack of

25   foundation, hearsay.

                          Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    115

1          THE COURT:  Overruled.

2          MR. REISCH:  Speculation.

3          THE COURT:  Overruled.

4   A.  What was your question again?

5   Q.  (By MR. DILLON) My question is the line -- the few lines

6   of text on the bottom of page 63 of Exhibit 25 an example of

7   the effort to -- that you're now aware of to pair voters up --

8   or pair canvassers up who are armed with those who were not?

9          MR. REISCH:  Objection, lack of foundation.

10         MR. DILLON:  That's a bad question.

11         THE WITNESS:  It's a terrible question.

12         THE COURT:  Sustained.  He's going to try again.

13  Q.  (By MR. DILLON) Is the last two lines on Exhibit 63 --

14  Exhibit 25, page 63, is this indicative of the correspondence

15  on Basecamp that you had indicated you were aware of of an

16  effort to try to pair canvassers who were concerned with

17  safety with other canvassers who were armed?

18         THE COURT:  Don't even say anything.  Sustained.

19  Let's -- you've got to stop referring to documents he's not a

20  part of.  If he's read it after the fact, it doesn't matter.

21  Let's ask him about his awareness at the time, and if he has

22  one, you don't need to refer to the document.  He's already

23  said he's read about it.  It has limited relevance.  If you

24  can ask him a follow-up about what he knew at the time, that

25  would have relevance.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    116

1    Q.   (By MR. DILLON) Well, what did you know at the time about

2    any effort to pair up canvassers who were concerned with

3    safety with other canvassers who were carrying firearms?

4    A.   Nothing.

5    Q.   And after the fact have you become aware of any such

6    efforts?

7            MR. REISCH:  Objection, relevance.

8            THE COURT:  Sustained.

9    Q.   (By MR. DILLON) Are you aware of any unpleasant

10   interactions between USEIP volunteers and homeowners during

11   canvassing efforts?

12           MR. REISCH:  Your Honor, I object to foundation.

13           THE COURT:  Overruled.  When he asks are you aware,

14   that's establishing some sort of attempt to do foundation, so

15   let's let him at least ask those original questions.  He said

16   no, so I assume we're moving on now.

17   Q.   (By MR. DILLON) Are you aware of any unpleasant

18   interactions between USEIP volunteers and residents of Boulder

19   County?

20   A.   No.  If I could go back, I think we originally thought

21   there was something, but it turned out to be like one

22   volunteer was going to another volunteer's house or something

23   and got part of their finger bitten off, so by time we heard

24   the rest -- not by the volunteer, by a dog.  And so that was

25   the only one I can remember hearing about.  But that's not

                         Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024   117

 1   like unpleasant.  I think it was more anticipatory.  Like,

 2   they thought we're going to the mouth of the beast into very

 3   liberal Boulder County, and they're going to be really upset.

 4   But I don't remember hearing any actual bad interactions, and

 5   I certainly didn't see any myself.  People were pretty warm.

 6   Q.  Okay.  Let's look back at Exhibit 3 briefly.  That's the

 7   voter verification training guide.

 8   A.  Okay.

 9   Q.  And I'll direct your attention to the Bates number

10   USEIP_0052.

11   A.  Okay.

12   Q.  And does this document accurately describe -- this is a

13   document that you authored, right?

14   A.  Correct.

15   Q.  And does this document accurately describe the process

16   that canvassers were trained to follow when knocking door to

17   door in connection with USEIP's canvassing efforts?

18   A.  I don't know, because I didn't do the training.  So it

19   approximates what all the canvassers were trained to do, and

20   you can tell that because the data they collected follows the

21   sequence of questions.  But the exact details I couldn't

22   attest to because I wasn't present for the overwhelming

23   majority of the training.

24   Q.  Okay.  Well, let's look at 6F in this document.

25   A.  Okay.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    118

1    Q.  And it talks about proceeding with questions.

2    A.  Okay.

3    Q.  Do you see that?

4    A.  I see that.

5    Q.  Is it your understanding that USEIP volunteers when they

6    were knocking on doors, they had some understanding who

7    resided at these particular addresses?

8    A.  No, I wouldn't say that.  They had the data from the

9    Secretary of State which had been, you know, parsed out into

10   walk lists, and it would show an excerpt of the records, and

11   so they expected to see what was in the record, but I don't

12   know what they anticipated.

13   Q.  So if the Secretary of State's records indicated that

14   Shawn Smith, for example, lived at 101 First Street, and I'm a

15   canvasser, and I knock on a door, was it your expectation that

16   a canvasser would say, Hi, I'm here to -- or I'd like to talk

17   to Mr. Smith?

18   A.  Well, they'd follow -- there was a script that the county

19   captains developed, and so they would kind of follow that

20   script.  You know, Hi, this is who I am.  This is what I'm

21   doing.  Are you this person?  I'm a volunteer trying to verify

22   this information.  Is this information accurate?

23   Q.  Okay.

24   A.  That's the gist of it.

25   Q.  And so one of the questions would be are you this person,

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    119

1    someone whose name was reflected on the Secretary of State's

2    --

3    A.   Correct.  Or is that person here, you know, do they live

4    here?

5    Q.   And then you would proceed, per Section 6F, to confirm the

6    address, whether the person was an eligible voter, whether

7    they were a registered voter, whether they voted in the last

8    election, and by what method?

9    A.   That's correct.

10   Q.   Okay.  And then that -- the responses would be logged

11   somehow?

12   A.   Right.  They had log sheets and clipboards, and they would

13   mark down what they got answered that confirmed, and if there

14   was a discrepancy, then that was a cause for them to create an

15   affidavit.

16   Q.   Got it.  And then 6J advises to take photographs of any

17   location or address where a discrepancy was noted, correct?

18   A.   That's what it says.  But, again, this was a first draft

19   of the training.  I don't think it was necessarily used that

20   way in all of the county training, but I don't know because I

21   never saw all the county training.  I wasn't present for it.

22   Q.   Do you know whether -- when folks were asked to sign an

23   affidavit, do you know whether they were advised why they were

24   being asked to sign an affidavit, what the affidavits would be

25   used for?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    120

1           MR. REISCH:  Objection, foundation, speculation,

2    hearsay.

3           THE COURT:  Overruled.  I'll allow him to answer, if

4    he knows.

5    A.  I don't.  I would expect that the individuals doing the

6    canvassing would say we're trying to verify this data is

7    incomplete.  We were telling people we're going to provide

8    this to Colorado authorities, and we did, right?  We've never

9    released like all the walk list collected data or the

10   affidavits.  We've only given them to district attorneys for

11   the respective counties and to the Attorney General.  We gave

12   the Attorney General of Colorado a complete copy of

13   everything.  And other than USEIP volunteers, they're the only

14   people that have them.  And you guys.

15   Q.  (By MR. DILLON) And when you refer to everything, what are

16   you referring to?

17   A.  The walk lists -- so my original plan was to have sort of

18   the walk lists and then a log separately.  It was a stupid

19   plan.  It didn't work.  The county captains changed it into a

20   single document so you were verifying off the same sheet --

21   and collecting data on the same sheet that you were reading

22   off of.  So the only real documentation from the canvassing

23   was the affidavits and the walk lists, or logs, which became

24   the same thing.  And so when I say everything, I'm talking

25   about those documentations.  So those were attached to copies

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1      07/15/2024    121

1    of the report and given under a separate original affidavit to

2    the four -- or to the -- I think it's three district attorneys

3    -- to the district attorneys responsible for these counties,

4    and then all of it was given to the Attorney General of

5    Colorado.

6    Q.  Was it also all given to the Colorado Secretary of State?

7    A.  I don't know if we -- I think we did send an electronic

8    copy to the Secretary of State.

9    Q.  And you understand that the Secretary of State is

10   Colorado's top election official?

11   A.  That's correct.

12   Q.  And do you understand that she, like you, swore an oath to

13   support and defend the Constitution?

14   A.  Boy, do I.

15   Q.  And that she's charged with enforcing Colorado's election

16   laws?

17   A.  Yes.

18   Q.  You believe that Ms. Greenwald (sic), Colorado's Secretary

19   of State, has the moral and legal duty to conduct the type of

20   voter verification work that USEIP's citizen volunteers,

21   including you, have done, correct?

22          MR. REISCH:  Objection, relevance and compound.

23          THE COURT:  Overruled.  You can answer.

24   A.  Griswold, and, yes, I do.

25   Q.  (By MR. DILLON) Okay.  And you believe Ms. Griswold has

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    122

1    utterly failed to satisfy her duties, correct?

2    A.  That's correct.

3    Q.  You believe she's failed to, number one, ensure the

4    integrity of elections in Colorado, correct?

5    A.  Correct.

6    Q.  That she's failed to investigate allegations of election

7    fraud?

8    A.  Correct.

9    Q.  And that she has failed to be transparent regarding

10   election-related data?

11   A.  Correct.  She hasn't even complied with her own rules.

12   Q.  Even worse, you contend that she has destroyed election

13   records that she is required by state and federal law to

14   preserve, correct?

15   A.  That's a matter of evidence in courts.

16   Q.  You believe she and her staff have engaged in criminal

17   conduct; is that true?

18   A.  That's correct.  And I've provided affidavits to that

19   extent to the Attorney General of Colorado.

20   Q.  You believe she has stonewalled and fed propaganda to you

21   and others regarding Colorado's elections, correct?

22   A.  Correct.

23   Q.  You believe you were lied to by the Secretary of State or

24   her staff, correct?

25   A.  I was lied to.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1   07/15/2024   123

1   Q.  Do you believe that Ms. Griswold's violations have

2   deprived the citizens of Colorado of their right to

3   self-determination at that ballot box?

4   A.  Yes.  Certainly they've interfered with the transparency

5   necessary for citizens to be able to verify that for

6   themselves, which -- without which what evidence do they have?

7   Q.  Do you believe the Secretary of State has engaged in

8   election fraud?

9   A.  Election fraud?

10          MR. REISCH:  Objection, relevance.

11          THE COURT:  Sustained as to that.

12          MR. WYNNE:  I'll add another objection.  That calls

13   for a legal conclusion for which this witness is not qualified

14   to make.

15          THE COURT:  All right.  I've sustained the objection.

16   Q.  (By MR. DILLON) Mr. Smith, are you affiliated with a group

17   called FEC United?

18   A.  No.  I know many members, but I'm not affiliated.

19   Q.  Have you spoken at FEC United events?

20   A.  Yes.

21          MR. REISCH:  Objection, relevance.

22          THE COURT:  I don't know the group or what the --

23   what is the relevance?

24          MR. DILLON:  I'm laying some foundation for the

25   relevance, Your Honor.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    124

1              THE COURT:  I'll give him a short rope.  Overruled.

2              MR. DILLON:  Thank you.  Can you read back the

3    question, please?

4         (The requested portion was read back.)

5    Q.  (By MR. DILLON) And at those events you've talked about

6    election integrity issues, correct?

7    A.  That's correct.  That's why I was invited to speak.

8    Q.  And isn't it true that at this event you stated publicly

9    that you had in your possession evidence of criminal conduct

10   by the Secretary of State and her staff?

11             MR. REISCH:  Objection, relevance, 401, 403.

12             THE COURT:  Well, 403 really doesn't come into play

13   with a trial to the Court.  I'll allow a short rope to explore

14   what this is about.

15             MR. DILLON:  Thank you.

16   A.  Could you repeat the question, please?

17   Q.  (By MR. DILLON) Isn't it true at this event you stated

18   publicly that you have in your possession evidence of criminal

19   conduct by the Secretary of State and her staff?

20   A.  Which event?

21   Q.  At this FEC United event that we've been discussing.

22   A.  I've been to several.  Are you talking about specifically

23   at The Rock in Castle Rock?

24   Q.  That probably is the one, yes.

25   A.  Okay.  Yes .

                          Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    125

1   Q.  Okay.  When was that event?

2   A.  I believe February of '22.

3   Q.  Of '22?

4   A.  Correct.  So long after canvassing was completed.

5   Q.  Okay.  And at this event you also stated that you believe

6   anyone involved in election fraud deserves to hang, correct?

7          MR. REISCH:  Objection, relevance.

8          THE COURT:  Overruled.

9          MR. WYNNE:  I'm going to object based on hearsay.

10          THE COURT:  Overruled.  You may answer.

11   A.  I believe what I stated was much more extensive than that.

12   Q.  (By MR. DILLON) Did you say --

13   A.  Do you have a full quote?

14          MR. DILLON:  Look, Your Honor, we have the video.  I

15   would like to play the video so that Your Honor and the Court

16   can hear Mr. Smith's own words at this event.  I think it's

17   incredibly important, and I think that video should be entered

18   into evidence.

19          THE COURT:  Is there an objection?

20          MR. WYNNE:  Yes.  I object based on hearsay as to

21   both Ms. Kasun and Ms. Epp since it's not a statement by them

22   as parties.

23          THE COURT:  All right.  Mr. Reisch?

24          MR. REISCH:  I would object as to lack of foundation,

25   authenticity.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    126

1          THE COURT:  All right.  I don't know anything about

2     the video.  Why don't we try asking him what he said?

3          MR. DILLON:  Well, that is what I've been doing.

4     Q.  (By MR. DILLON) So did you say --

5          THE COURT:  No, let's just ask him what he said.

6          MR. DILLON:  Sure.

7     Q.  (By MR. DILLON) Did you say that anyone involved in

8     election fraud --

9          THE COURT:  Mr. Dillon, you're not hearing me.  Ask

10    the witness what he said.  I'm not allowing you to show me the

11    video.  It seems to me he remembers what he said, so let's

12    just ask him.

13    Q.  (By MR. DILLON) What did you say at this February 2022 FEC

14    United event?

15    A.  Well, I said a lot, but what I think you're asking about

16    is I specifically said I have in my possession evidence of

17    violations of election law by Secretary of State Griswold,

18    which I did and which I provided to the Colorado Attorney

19    General under sworn affidavit, my own sworn affidavit.  I

20    stated I am in favor of due process.  I stated I've been

21    accused of advocating violence.  I'm not advocating violence.

22    And I stated that I believe that anybody who is involved in

23    election fraud -- not voter fraud -- election fraud deserves

24    to hang .

25          And I said that because if you're involved in

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    127

 1    election fraud, then you are usurping the will and consent of

 2    the people, and that is an act of treason, and there are

 3    punishments under federal statute for treason, which have been

 4    enacted by the federal government.  Hanging is one of the

 5    methods of execution when treason has been found in a court of

 6    law through due process.

 7            But what your clients and now you repeatedly have

 8    tried to do apparently is excerpt one aspect of that comment

 9    from my statement.  My statement was intact.  It involved the

10    entirety of it.  I believe in due process.  I've supported

11    that my whole life.  So the idea that I would advocate for

12    some kind of extrajudicial action is a fantasy on the part of

13    your clients, and they helped create that with the media,

14    which did the same thing.  That was Kyle Clark.  That was Erik

15    Maulbetsch.  That was Quentin Young.  All deliberatively

16    excerpting my comments out of the context that surrounded them

17    and which was available to them and which is available to you.

18    Q.  So it's your testimony that your statements were taken out

19    of context?

20    A.  When you excerpt just that part and leave out that I

21    stated I am in favor of due process and I'm not advocating for

22    violence, yes.

23    Q.  Okay.

24    A.  And obviously.

25    Q.  After stating that anyone -- anyone involved in election

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    128

1    fraud deserves to hang, is it true that you also stated

2    sometimes the old ways are the best ways?

3    A.   That's correct.  And I was talking about accountability,

4    which we apparently lack in our state.

5    Q.   Are you aware of anyone in the United States being

6    executed by hanging for being found guilty of election fraud?

7    A.   No.  I think the last hanging in the United States was in

8    '96.

9    Q.   Okay.  You're aware there's a fairly dark history in the

10   United States of hanging and lynching Native and

11   African-American persons?

12           MR. REISCH:  Objection, relevance.

13           THE COURT:  Sustained.

14           MR. DILLON:  Your Honor, I have no further questions.

15           THE COURT:  All right.  Cross-examination,

16   Mr. Reisch.

17           MR. REISCH:  Yes, Your Honor.  Thank you.  If I can

18   have just a moment to get set up here, please.

19           THE COURT:  Mr. Reisch, I assume you're doing your

20   full examination?

21           MR. REISCH:  That was my understanding from the

22   Court's order.

23           THE COURT:  Yes, okay.

24           MR. REISCH:  That I should respond and ask questions

25   I would have asked if he was my witness.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    129

1           THE COURT:  Perfect.

2                        CROSS-EXAMINATION

3  BY MR. REISCH:

4  Q.  Good morning, Mr. Smith.  All right.  I'd ask you to

5  listen to the question, all right?  And then answer the

6  question that I've asked, all right?

7  A.  Yes, sir.

8  Q.  Okay.  You were asked questions on examination by the

9  plaintiffs in this case about your work.  Do you recall that

10 question?

11 A.  About my work?

12 Q.  Yes.  What you --

13 A.  Like what I'm employed --

14 Q.  Yes.

15 A.  Okay.

16 Q.  And your response was that you were retired, and that was

17 from the Air Force; is that right?

18 A.  That's correct.

19 Q.  All right.  And how many years did you serve honorably in

20 the United States Air Force?

21 A.  25 and a half.

22 Q.  Now, you said at one point that you had taken an oath to

23 support and defend the Constitution since the age of 17.  Was

24 that when you enlisted, enrolled in an officer program?  Is

25 that what you meant by that?

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    130

1    A.  That's right.

2    Q.  And when you do, in fact, enroll or become part of an

3    officer program as a cadet, something to that effect, you do

4    take the oath as though you are swearing in to the military

5    service; is that right?

6    A.  That's correct.  You're under -- they call it under

7    contract.

8    Q.  Okay.  But they have you swear in upon that time, and they

9    renew that when you're promoted as well at ceremonies for

10   promotion; is that right?

11   A.  That's correct.

12        MR. DILLON:  Your Honor, I want to raise an

13   objection.  I've allowed some leading.  There's been a lot of

14   testifying going on by counsel.  I'll allow it for the

15   preliminaries, but I want to say this is a direct examination

16   and leading is not allowed.

17        MR. REISCH:  I understand.

18        THE COURT:  You may proceed.

19   Q.  (By MR. REISCH) Sir, let's go through some -- I mean, you

20   seem like a very data-driven type of person.  Would that be a

21   fair statement?

22   A.  It is fair.

23   Q.  Okay.  What is your educational background?  What is your

24   undergraduate degree in?

25   A.  Political science.  I began in aeronautical science, and

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    131

1    then finished in political science.

2    Q.  And where is that degree from?

3    A.  Cal State Polytechnic University at Pomona.

4    Q.  And have you gone on to obtain any graduate degrees?

5    A.  Two.

6    Q.  What are those in?

7    A.  I have one master's degree in aeronautical science and one

8    master's degree in national security affairs.

9    Q.  All right.  Now, were those all obtained while you were on

10   active service?

11   A.  They were.

12   Q.  I want to talk a little bit about your military service.

13   What was your initial assignment?

14   A.  As a intercontinental ballistic missile launch officer.

15   So I was in a crew for ICBMs first at Ellsworth Air Force Base

16   and then at Malmstrom Air Force Base.

17   Q.  And so if you're a missileman at an Air Force base, where

18   did you go to work on that particular day?

19   A.  Typically underground out in a missile field.  Oh, where

20   did I go to work when I wasn't?

21   Q.  No.  Where would you go if you were a missileman for work?

22   A.  I would go into the launch control center.

23   Q.  And what were you responsible as an officer as -- as it

24   relates to being a missileman, what were you ultimately

25   responsible for if you received an order to, I don't know,

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    132

1    push the button?

2    A.   To launch nuclear weapons.

3    Q.   Okay.

4    A.   Against assigned targets.

5    Q.   Okay.  And the reason I ask you that is you were asked

6    questions about lawful orders and whether you agree with the

7    law or something to that effect.  Do you recall that

8    conversation?

9    A.   I do.

10   Q.   Okay.  As an officer, with on an oath to the Constitution,

11   what does that say you do, just as it relates to support and

12   defend the Constitution?

13   A.   Well, it requires that you give full faith and fidelity to

14   it.  That you support the Constitution against all enemies

15   foreign and domestic.

16   Q.   What about as to lawful orders, are you supposed to follow

17   those?

18   A.   Yes.

19   Q.   What about to unlawful orders?

20   A.   No.

21   Q.   Okay.  But it was an order?

22   A.   The order can only be made lawful by being moral and

23   within the context of constitutional authorities.

24   Q.   Okay.  Now, at some point in your military career did you

25   change your occupational specialty from working in missiles

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1      07/15/2024    133

1    and being responsible for the launching of nuclear weapons to

2    something else in the Air Force?

3    A.  I did.

4    Q.  What was that?

5    A.  I switched first into space operations generally, but

6    space control or space control and negation specifically,

7    which is offensive and defensive activities to protect U.S.

8    and allied space assets and forces and to negate or attack and

9    nullify space capabilities of other nations.

10   Q.  Okay.  Now, that sounds pretty technical, but was that

11   based upon training and experience that you had received in

12   the Air Force?

13   A.  Yes, primarily.

14   Q.  Okay.  And did you -- involves a lot of research and data

15   in your job working in space operations?

16   A.  At various times, yes.  Most of my assignments involved a

17   great deal of research.

18   Q.  And did you hold any clearances, national security

19   clearances when you were on active duty, sir?

20   A.  I did.

21   Q.  What was the highest security clearance you held?

22   A.  Top secret special compartment information, and then I was

23   cleared for in particular special access programs at various

24   times, in some cases the entirety of the portfolio.  Special

25   access programs are sensitive capabilities in the Department

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    134

1    of Defense.

2    Q.   What is required to obtain those types of top secret

3    clearances and special access clearances?

4    A.   Background checks are conducted for top secret, and then

5    there are additional background checks with interviews of, you

6    know, friends, family, associates, neighbors, financial

7    disclosure, financial review, review of assets that you've

8    owned, reviews of -- at that time it wouldn't be called social

9    media, but social contacts.  And then when you get into

10   special access programs in particular, you start having to

11   take two different kinds of polygraph.  One of them is about

12   your fidelity to the nation and its values and purpose, and

13   one of them is called lifestyle where they're looking for any

14   sort of compromising information that could be used against

15   you.

16   Q.   And who conducts those background investigation for the

17   United States Air Force?

18   A.   Well, there are special investigators.  It depends on

19   who's asking.  Sometimes they're under defense intelligence

20   agencies.  Sometimes they're a service asset that are working

21   for somebody like Air Force Office of Special Investigations.

22   Q.   Okay.  How about FBI?

23   A.   Sometimes.

24   Q.   Okay.  And that includes not only yourself disclosing and

25   reporting things, but also other investigation that these

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    135

1    other agencies do which can include going to talk to

2    neighbors, friends, family; is that right?

3    A.   That's right.

4    Q.   Now, you were asked a question on examination by

5    plaintiffs that -- whether you were an expert as an

6    operational tester, and you responded no, and in your

7    deposition you maybe said yes.  First of all, what's an

8    operational tester?

9    A.   In the military there are various kinds of testing for

10   weapons systems and modifications.  They begin with what's

11   called developmental testing.  First contractors do testing.

12   Then developmental testing is like the program offices that

13   are responsible for curing them.  Operational testing is the

14   last line of defense really for the troops and the nation.  So

15   operational testing is intended to subject weapons systems and

16   modifications to an environment that closely as possible

17   replicates their wartime environment, including the people

18   operating the systems and the threats that are being employed

19   against them.

20        And the purpose is to make sure that you understand

21   the limitations of the system in terms of its offensive

22   capability, if it has any, survivability, lethality, and

23   maintainability, including whether the typical crews that are

24   supposed to use the system understand it and are capable with

25   the technical data of employing the system.  So operational

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    136

1    testing is required before systems are allowed to go into full

2    rate production, or where they're not a production kind of

3    system where they're maybe a one-off or unique system, they're

4    required before the system is allowed to be fielded.

5    Q.  Okay.

6    A.  I was doing it because the military uses operators, people

7    out of that community that the weapons systems is going into

8    because they know you will be faithful, because if you don't

9    do it right, it's your people that you trained and worked with

10    that are going to be stuck with that system.

11    Q.  Okay.  So when you were asked in your deposition as it

12    relates to being an expert in complex computer-based systems,

13    was that referring to operational testing or was it referring

14    to USEIP databases?

15              MR. DILLON:  Objection, leading.

16              THE COURT:  Overruled.  You can answer.

17    A.  Operational testing.

18    Q.  (By MR. REISCH) Okay.

19    A.  And also the systems themselves.  I mean, I helped with

20    the design and development of the weapons systems.  I helped

21    employ them.  I directed their employment.  I had to be

22    intimately familiar with technical data.  That's why I was

23    brought in to do oversight of operational testing is because I

24    had that background.

25    Q.  And as part of this job, obviously it required you to be

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    137

 1  somewhat thorough and pay attention to detail?

 2  A.  Excruciatingly.

 3  Q.  Okay.  And let's jump back real quick to your military

 4  career.  You were asked what was the highest rank you had

 5  achieved in the United States Air Force.  What was that?

 6  A.  O-6 Colonel.

 7  Q.  And just so we're clear and for the record -- people may

 8  not know -- what was the rank that you were commissioned as in

 9  the Air Force?

10  A.  A second lieutenant.

11  Q.  What's the rank after that?

12  A.  First lieutenant.

13  Q.  After that?

14  A.  Captain.

15  Q.  And then?

16  A.  Major.

17  Q.  And then?

18  A.  Lieutenant colonel.

19  Q.  And then colonel?

20  A.  And then colonel.

21  Q.  And then what is the rank above colonel?

22  A.  Brigadier-general.

23  Q.  During that time with some 25 years of honorable service

24  in the United States Air Force, did you hold any command

25  position, sir?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    138

1    A.  I did.  I was a flight commander and then a squadron

2    commander.

3    Q.  All right.

4    A.  And an installation commander.

5    Q.  Okay.  What's a flight commander?

6    A.  The flight -- this is in Air Force structure.  The flight

7    is the lowest level of sort of commanded organization within

8    unit structure.  So you have, you know, commands numbered Air

9    Forces, wings, groups and squadrons, and below the squadron

10   level you have flights.

11   Q.  And you said you were a squadron level as well?

12   A.  I was a squadron and installation commander.

13   Q.  And what's an installation commander?

14   A.  Installation commander is essentially the base owner.  So

15   you're responsible for the security of the facility,

16   maintenance of the facility, civil engineering, interaction

17   with civil authorities, your relationships with other

18   supporting and supported bases.

19   Q.  Okay.

20   A.  It's like being a mayor sort of.

21   Q.  I was going to say, you're being a little modest.  But if

22   you were the installation commander of let's say a base,

23   Peterson Air Force Base, you'd be responsible for the base,

24   right?  All the people on the base, construction, maintenance.

25   What else?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    139

1          MR. DILLON:  Objection, leading.  Counsel is not

2     allowed to testify, Your Honor.

3          THE COURT:  This is still background evidence in my

4     mind.  I'll allow it.

5     A.  What else on the base?  Everything.  I had -- I lost track

6     of meetings I had with Massachusetts officials over like EPA

7     and environmental rules on whether we could run our backup

8     generators and under what circumstances and how far we could

9     clearcut vegetation around our outer fence line so my security

10    forces had clear lines of sight.  I had fire drills.  I was

11    trained as a disaster response coordinator in national

12    incident management system in the Air Force called Air Force

13    Incident Management System so I could be a site commander.  I

14    never did that.  My maintenance officer was much more

15    qualified, and he always did it, but -- and I think he

16    regretted it.  But just everything you could imagine in

17    sustaining a small city, that's what our base was.

18    Q.  And where were you that installation commander?

19    A.  It was Cape Cod Air Force Station, Massachusetts.

20    Q.  And how many people did you have under your command?

21    A.  At various times between 115 and 130.

22    Q.  All right.  Now -- and I asked that, but when you get into

23    something, do you go in it half stepping or do you go 100

24    percent?

25    A.  100 percent.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024   140

1    Q.  Okay.  Now, you were also asked questions on direct,

2    questions by the plaintiff in this particular case, about how

3    you came to be interested or concerned in election integrity.

4    Do you recall that question?

5    A.  I do.

6    Q.  Now, when did it come to your first light that you thought

7    this is interesting, I want to learn more about it?

8    A.  It was Election Day in 2020 reading the article about

9    turnout.  It didn't match what I had seen.  I was curious

10   about it, so I went and started downloading from the Secretary

11   of State website and then started doing analysis on it.

12   Q.  Now, it sounds like an interesting hobby, but what would

13   make you say I think I want to look at the Secretary of

14   State's data that's available?

15   A.  So I had retired in 2017 with the full intention of

16   staying retired and never doing anything else even closely

17   affiliated or associated with the government.  So -- but that

18   left me a lot of time, and I could -- if I was interested in

19   something, you know, I have a background in research.  I've

20   done an immense amount of reading for my duty.  I would just

21   go follow, you know, whatever I was curious about.  It was

22   great.  And then I made the mistake of following this and

23   found a mission I didn't want.

24   Q.  Okay.  And so you get this data.  Well, actually when did

25   you get this data?

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    141

 1   A.  I started on the 3rd of November.  So I found that -- I

 2   had never looked at the Secretary of State's website before.

 3   I didn't know it was available there.  I found the election's

 4   page, and then there were subpages, and one of them was on

 5   results and data.  And I found that I could download datasets.

 6   They had another program, I think they called it Aces or

 7   something like that, and you could get data there, but it

 8   wasn't complete data.  If you went and downloaded the data

 9   files yourself, you could get the complete data, and then you

10   could analyze it however you wanted to, so that's what I

11   started doing on the 3rd.

12   Q.  So you started looking at the data, and there was a word

13   that was used in one of the questions by plaintiffs, the word

14   audit.  What does the word audit mean to you?

15   A.  Well, from an audit and professional standpoint it's kind

16   of a comprehensive examination.  You can have internal

17   auditing, but internal auditing is like the stories you tell

18   yourself.  It doesn't matter -- once you see any kind of

19   discrepancy, your internal auditing and any kind of

20   responsible organization, certainly in fiduciary matters, is

21   done.

22   Q.  When you were the installation commander, did the

23   inspector general ever come audit something on your base?

24   A.  In two years I think I had 11 inspections from external

25   auditors.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    142

1   Q.  And what's the key to an audit?

2   A.  Multiple -- so first, it's independent.  Those individuals

3   cannot have any conflict of interest.  They have to be

4   independent of the organization or processes that they're

5   auditing.  Second is that they must have complete unfettered

6   access to information in order to properly assess the state of

7   whatever it is they're looking at.

8   Q.  And when you say unfettered access, is that also sometimes

9   referred to as transparency?

10  A.  Yes.

11  Q.  And when you were starting to look into this new hobby of

12  yours, was it your belief that you were getting all of the

13  information?

14  A.  I didn't know at first.  When I was looking at the voter

15  registration data, for all I knew it was complete.  I didn't

16  have any indication that it wasn't complete or that the voter

17  histories were incomplete or inaccurate.  But when I started

18  looking at the technical data package manuals and then the

19  test plans and reports for the voting systems, at first I was

20  sure there must have been other testing conducted because it

21  was -- with my background and the kind of awareness and

22  exposure I had in particular cyber threats, there was no

23  possible way that the testing they described and the findings

24  they reported were sufficient to evaluate the vulnerabilities

25  of the systems against the threat that they were facing.

Sarah K. Mitchell, RPR, CRR

1   Q.   Okay.  And so when you're looking at this information,

2   you're saying based upon my experience working in space

3   command down in Colorado Springs, you're using your training

4   and experience that you had protecting American national

5   assets, their space command, to look at and see is this safe

6   what they're using as relates to election information; is that

7   right?

8   A.   That's right.  I also after I retired spent a year back in

9   D.C. at the request of my former supervisor supporting a

10  program called Adversarial Assessment where we were working

11  with the FBI's combined Joint Interagency Task Force to look

12  at what data had been exfiltrated from national security

13  organizations, including contractors and subcontractors over a

14  period of years prior to the inception of that team.  And our

15  job was to look and see what our foreign adversaries had

16  exfiltrated, what they had had access to, what conclusions and

17  information would have been available to them for the

18  information they had access to, and what effect that would

19  have on their own development and on the combat capability of

20  our weapons systems.

21          In the course of that, I've been exposed to extreme

22  levels of detail about adversary tactics, both successful and

23  attempted, about the nature of the organizations, what they

24  were pursuing, how they had been successful.  In light of

25  that, when I looked at our voting systems and how they had

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    144

 1    been tested or not tested and the assumptions being made by

 2    election officials, I was extraordinarily concerned.

 3    Q.  So this concern -- I mean, let's just call it the elephant

 4    in the room, this concern that you had came based upon your

 5    training, experience, and your technical abilities, not

 6    because you're some right wing whack-a-doo.  Would that be a

 7    fair statement?

 8    A.  That's a fair statement.

 9            MR. DILLON:  Objection, leading.

10            THE COURT:  You need to object quicker.  You are now

11    leading, and we're at the substance of the matter.  I thought

12    you were going to object to whack-a-doo.

13            MR. REISCH:  That's the elephant in the room, so to

14    speak, Your Honor.

15            THE COURT:  All right.  Let's object quicker.  Stand

16    up as soon as you hear him going in that direction, but let's

17    watch the leading now that you're in the --

18            MR. REISCH:  Yes, Your Honor.

19    Q.  (By MR. REISCH) So let's kind of move on here, okay?  So

20    at this point, you start to grow concerned, right?

21    A.  Yes.

22    Q.  You were asked questions -- and I'm only going into it

23    briefly, but you went to Washington D.C. for January 6th; is

24    that right?

25    A.  I did.

                       Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    145

1    Q.  Okay.  And you've never been charged with anything related

2    to January 6th, have you, sir?

3    A.  That's correct.

4    Q.  Okay.  Now, you had -- you were asked questions about one

5    of the reasons why you left was you thought it was rather

6    unorganized.  Do you recall that?  What was unorganized?

7    A.  Everything.  Nothing about -- not the police, not the

8    rally goers, not the other people who didn't appear to be

9    rally goers who were active around the Capitol at that time.

10   Everything about it was disorganized.

11   Q.  All right.

12          MR. REISCH:  Is the Court going to stop for lunch at

13   12:00?  Is this a good stopping point?

14          THE COURT:  We can stop now.  You can go another

15   15 minutes if you want because we took a little late break.

16          MR. REISCH:  I'll defer to the Court.  If you'd like

17   me to keep going, I will.

18          THE COURT:  Let's go another 15 minutes.

19          MR. REISCH:  Yes, Your Honor.

20   Q.  (By MR. REISCH) All right.  So at some point back in

21   February of 2021, at some point do you start to get involved

22   with what is -- what then later becomes known as USEIP?

23   A.  That's correct.

24   Q.  Okay.  And you had mentioned that you were actually

25   invited to at some point speak to some state legislators; is

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    146

1   that right?

2   A.   That's correct.

3   Q.   And that was where?

4   A.   It was in a hotel in the Denver area.  I don't remember

5   exactly where.  I'd recognize it if I saw it, but I don't

6   remember the location.

7   Q.   What was your purpose or what were you asked to speak

8   about?

9   A.   To explain what we had found in our research, what our

10  concerns were about Colorado's election systems and voting

11  systems.

12  Q.   And these were legislators and they wanted to be educated?

13  A.   That's correct.  I don't know what they wanted.  I know

14  what former State Senator Lundberg asked us to do.

15  Q.   Okay.  And at some point you also testified at the state

16  legislature; is that right?

17  A.   In December of 2020.

18  Q.   And in December of 2020, who did you meet standing in the

19  hallway?

20  A.   I met Ashe Epp, and I met Senator Lundberg.  That's where

21  I met him actually.

22  Q.   And you met Ms. Epp, but you hadn't really known her or

23  been able to put two to two together as to any involvement --

24  A.   I didn't know her prior to that point.  I hadn't been

25  involved with any kind of groups or -- other than Convention

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    147

1   of States, no election integrity work.  I didn't know anybody

2   else who was doing anything.

3   Q.  Okay.  And at some point how did you all keep having this

4   conversation going?

5   A.  Well, so one of the other speakers there that was invited

6   was Dennis Haugh, another retired Air Force colonel and

7   mathematician and computer scientist, had helped design -- he

8   sat next to Andy Grove writing the original BIOS for the x86

9   processor.  He's a very bright man.  He's passed now.  But he

10  was supposed to speak.  We were six feet apart in the room,

11  and he was so mad at the delays, because we were asked to come

12  speak, and then we waited -- I think I waited eight and a half

13  hours before I spoke to the committee.

14          He left pretty angry, but he and I talked before

15  then, and so I contacted him because we had exchanged contact

16  information.  Then he asked me to speak to some other people

17  he knew in El Paso County, and that's how I came to be

18  introduced to Jeff Young electronically, and it was Jeff and

19  Dennis that asked me to speak at the analytics meeting that

20  Jeff would chair or run or schedule or whatever.

21  Q.  What was going to be -- what was the general nature of the

22  analytics meeting?

23  A.  Well, I don't know what they normally did.  I didn't go to

24  them normally.  But at that particular analytics meeting

25  Dennis wanted me to explain to Jeff and the rest of the team

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    148

1   what I was seeing from a perspective of the capabilities of

2   the voting systems and what might -- how they might be used in

3   an unauthorized manner.  So I had seen at that point some of

4   the configuration.  I had seen that the telecommunications

5   were not being tested at all by the voting system testing

6   labs.

7          I had seen that they were not mitigating known

8   vulnerabilities to the systems, and we saw some of these

9   effects from anecdotal reports from voters about things they

10  saw that they didn't expect.  We had heard about UOCAVA, the

11  uniformed and overseas civilian where they're allowed to do

12  remote voting.  We had heard about very high -- actually we

13  heard that from Senator Lundberg -- very high proportions of

14  those votes being cast for specific candidates that didn't

15  seem to make sense, to have a certain -- like a large number

16  of votes sequentially for a specific candidate.  It's just

17  unusual.

18  Q.  So when you're looking into all this information early on

19  back in 2020, had you come to this conclusion that there was

20  some sort of fraud, or were you still investigating this?

21  A.  In 2020 I was still investigating.  In 2021 I was still

22  investigating, although I became more and more suspicious the

23  more -- like we would send open records requests to the

24  Secretary of State and the Attorney General, and they would

25  play games with us.  Like we got a quote from the Attorney

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    149

1   General of Colorado for an open records request for

2   $4 million, which I came to understand that when they really

3   didn't want us to have something they would just put a high

4   price tag on it.  So then I started asking them for the basis

5   of their estimates, and no agency has ever provided me one or

6   even really responded to that.  They just say nothing is

7   available.

8   Q.  Okay.  And you were asked questions about expenses that

9   you have put forth to look into these issues; is that right?

10  A.  That's correct.

11  Q.  And there was a cost associated with the Secretary of

12  State's public information?

13  A.  That's correct.

14  Q.  What was that amount?

15  A.  Well, it was various amounts.  I've made a lot of open

16  records requests.  I would start off with one question, and

17  then sometimes get responsive documents.  Like, we got a big

18  stack back from the Secretary of State's Office.  That's where

19  I found out that they had given my name to the general counsel

20  for Dominion Voting Systems with their warm regards, or they

21  had provided transcripts of radio interviews I had done.  But

22  we would get the responsive documents back, and then get other

23  questions generated from those responsive documents.

24      I think I probably have made at this point maybe 200

25  open records requests.  Some of those have no fee where the

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    150

1  responding office said that they completed the response within

2  an hour, which was the statutory limit before they start

3  charging you.  And then others, I've got quotes -- like, I

4  asked the Secretary of State's Office for one day of e-mail

5  from Secretary of State Griswold.  And I asked for that day

6  because I had sent her an e-mail, because every other time we

7  never got an e-mail back from their office when we requested

8  it, and I knew she had gotten at least one because I sent it,

9  and they gave me back a quote for that response of $1,500.

10  Q.  And so when you're requesting this data, these e-mails,

11  what's your purpose?  What are you looking for?

12  A.  Information.  I want to know what's true.

13  Q.  So you go straight to the source?

14  A.  Correct.

15  Q.  Okay.  Now, at some point USEIP, I think you were asked

16  questions about a core team.  Do you recall that?

17  A.  I do.

18  Q.  How did that kind of come about?  Tell the Court.

19  A.  Well, I think it was just whoever was willing to show up

20  every week on the calls.

21  Q.  And was this, you know, some sort of -- was there an ad

22  put in the paper or were these people that had somehow voiced

23  similar concerns or inquiring minds as it relates to these

24  issues?

25  A.  I don't know how anybody else arrived on Basecamp.  And we

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024   151

1    hadn't even -- I had met Ashe, but I don't even remember how

2    long it took before I met Jeff in person.  Most people you've

3    never -- you would work with them, and you've never met them

4    in person.  Sometimes I didn't meet them until canvassing.  So

5    I don't know how everybody got there.

6    Q.  So when you all met and started having these ongoing

7    conversations, I think it was described as this core group,

8    when, if ever, did you conspire with the two other

9    codefendants to force or intimidate or threaten voters?

10           MR. DILLON:  Objection, leading, calls for legal

11   objection.

12           THE COURT:  Sustained.

13           MR. REISCH:  I asked when, if ever, Your Honor.

14           THE COURT:  Well, yes, but then you went on to give a

15   leading portion to the question.  So let's try again.

16   Q.  (By MR. REISCH) When, if ever, did you conspire with the

17   codefendants to violate the Ku Klux Klan Act?

18           MR. DILLON:  Same objection.

19           THE COURT:  Sustained.

20   Q.  (By MR. REISCH) Have you ever formed a conspiracy to

21   violate the Ku Klux Klan Act?

22           MR. DILLON:  Same objection.

23           THE COURT:  I'll allow you to answer that question.

24   A.  No.

25   Q.  (By MR. REISCH) Have you ever engaged in conduct that

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    152

1   would be a violation of the Voting Rights Act?

2        MR. DILLON:  Same objection, Your Honor.

3        THE COURT:  Sustained as to that basis.

4   Q.  (By MR. REISCH) Have you ever engaged in conduct to

5   intimidate a voter?

6        MR. DILLON:  Same objection, Your Honor.  It calls

7   for a legal conclusion.

8        THE COURT:  I'll allow him to answer.  Overruled.

9   A.  No.

10  Q.  (By MR. REISCH) Okay.  Let's talk about a couple of

11  things, all right?  Let's take a look at Exhibit 1.  It should

12  be a stipulated exhibit, so it should be in evidence.  Let's

13  see if we can move along here as quickly as possible.  Now,

14  were you solely responsible for the drafting of this document?

15  A.  I wasn't responsible at all.  I don't think I even knew it

16  was being written.  But I like it.

17  Q.  And when -- do you know when it was actually finalized, if

18  you know?

19  A.  I don't.  I think it might actually have been at the event

20  where it was being handed out, just like right before it was

21  handed out.

22  Q.  And what was the purpose of the county and local

23  organizing playbook dated August 20th, 2021?

24        MR. DILLON:  Objection, Your Honor, foundation.

25        THE COURT:  Sustained.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    153

1           MR. REISCH:  Okay.

2   Q.  (By MR. REISCH) Well, did you teach from this document?

3   A.  No.

4   Q.  Okay.  You were asked questions about it.  If we can go to

5   page 19 of that document.  It's been previously admitted into

6   evidence by stipulation.

7   A.  Okay.

8   Q.  Is it up on the screen or do you have it?

9   A.  I have it.

10  Q.  And you were asked questions about why voter verification,

11  do you recall that?

12  A.  I do.

13  Q.  Okay.  What does that first paragraph say so it can read

14  into the record?

15  A.  To ensure free and fair elections, and to restore the

16  people's confidence in our election system, we must undertake

17  citizen audit activities to either refute or confirm serious

18  allegations of election malfeasance.

19  Q.  Okay.  And let's kind of break that down a little bit.

20  All right.  To ensure free and fair elections, right?  What

21  does that mean?

22          MR. DILLON:  Objection, Your Honor, foundation.

23  Q.  (By MR. REISCH) What does it mean to you?

24          THE COURT:  Well, sustained.  Now you may answer that

25  latter question.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    154

1    A.  Yes, ma'am.  To ensure free and fair elections means to

2    ensure that the will of the citizens is being respected as

3    they express their consent to be governed by the form of

4    government by the individuals that are representing them.

5    Q.  (By MR. REISCH) Okay.

6    A.  And that requires transparency into all of that election

7    operation.  Just like the rest of the government, but more

8    importantly -- most importantly, into those elections, because

9    that's the entire basis of credibility and authority for our

10   government.

11   Q.  Okay.  And where it says we must undertake citizen audit

12   activities, what does that mean to you?

13   A.  That means the citizens have the right to that

14   information, to transparency, to verify it for themselves.

15   Citizens have responsibility, and I would argue according to

16   the Founding Fathers, a distinct positive responsibility not

17   to trust their government, but instead to be vigilant.  That

18   was Jefferson's exact word, to be vigilant, in safeguarding

19   their liberty.

20   Q.  And it says to either refute or confirm serious

21   allegations of election malfeasance, correct, sir?

22   A.  Correct.

23   Q.  What does refute or confirm, what does that mean to you?

24   A.  Well, it means that we didn't know at that time exactly

25   what we were looking at.  We didn't have the data.  We didn't

1    have access to the data.  I've spent my entire adult life

2    making decisions on the basis of evidence and reason, and you

3    have to know when you don't have enough information, and you

4    have to know when you have enough.  If you don't have access

5    to it, then you don't have enough.  You know, at that point

6    you're speculating.  It might be accurate, but the way to find

7    out is to go look at the ground truth, to look at the

8    evidence.  This is why I go read the voting system manuals for

9    myself.

10   Q.  Okay.  Then it says -- next paragraph -- voter

11   verification efforts are structured and executed to support

12   future legal action, should that action be necessary; is that

13   right?

14   A.  That's right.

15   Q.  Who is that referring to, or if there's any legal action,

16   what does it mean to you?

17   A.  Well, if citizens find discrepancies, then at that time --

18   I haven't found this to be the case, but I expect that if we

19   identified these issues of noncompliance with the law or

20   deviations where the data is inaccurate or something like

21   that, that we would bring them to elected officials and

22   responsible, you know, law enforcement agencies, and that they

23   would act on them to investigate them to determine what was

24   true for themselves.  That I see as kind of the beginning of

25   due process.

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024   156

1   Q.  Okay.  And how many jurisdictions have you provided these

2   discrepancies to, you personally?

3   A.  In Colorado?

4   Q.  Yes.  Only in Colorado.

5   A.  Three.

6   Q.  Okay.

7   A.  Well, not counting -- to law enforcement.  I've spoken to

8   many more clerks about issues with their specific systems and

9   processes, but just three in terms of law enforcement.  Hold

10  on a second.  Yes, three.

11  Q.  Okay.  And then it says, Additionally voter verification

12  results, regardless of outcome, are valuable to ensuring the

13  people's trust in the future election cycles.  What does that

14  mean to you as it relates to regardless of outcome?

15  A.  Well, it means that citizens would have a basis for trust,

16  instead of just being told over and over again that they had

17  to trust something they didn't have insight into or understand

18  that they didn't have the data before them that they weren't

19  allowed to access.  So if we found no discrepancies in the

20  voter registration and voting history data, that's what we

21  would report.  That's why our report didn't say there was a

22  50 percent discrepancy level or a 30 percent.  We were

23  extraordinarily conservative in taking the data that we had,

24  analyzing it, and presenting it.

25          That's why -- Jeff Young is a professional data

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    157

1    analyst, right?  He's doing it for a major company.  That is

2    his business.  I'm a professional tester.  We do not speculate

3    about things.  We don't make wild hypotheses.  If we think

4    something might be true, we go find out, and then we tell the

5    truth about it no matter what.

6    Q.  And what do you need to be able to make your analysis?

7    A.  Data and evidence.  Same thing that any other auditor

8    does.

9            THE COURT:  Let's stop there since we're at 12:15.

10           MR. REISCH:  Thank you.

11           THE COURT:  We'll be in recess for an hour.  I have

12   an appointment I need to run to.  I should be back timely, so

13   let's plan on 1:15.  Let me just say one thing, because this

14   has turned into a bit of a broader matter than it needs to be.

15   This hearing isn't about January 6th.  This hearing isn't

16   about the Colorado Secretary of State.  It's not even really

17   about the validity of the election, so --

18           MR. REISCH:  I agree.

19           THE COURT:  -- I want you all to focus in on what

20   we're talking about, which is whether these three individuals

21   intimidated voters.  And let's get there sooner rather than

22   later, because we're spending a lot of time on matters that

23   aren't before me.  So with that, I'll give you a chance to

24   think about your next examinations, and we'll be in recess.

25           MR. REISCH:  Thank you, Your Honor.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024   158

1          THE COURTROOM DEPUTY:  All rise.  Court is in recess.

2     (Break was taken from 12:16 p.m. to 1:20 p.m.)

3          THE COURT:  Please have a seat.  Let's continue.

4          MR. REISCH:  And, Your Honor, based upon the Court's

5   comments afterwards, I'm going to try to be super focused

6   here.

7          THE COURT:  Excellent.  Okay.  Thank you.

8   Q.  (By MR. REISCH) All right.  Mr. Smith, you understand

9   you're still under oath?

10  A.  Yes, sir.

11  Q.  All right.  Let's talk about what you did -- what you did,

12  -- not everybody else -- but what you did as it related to

13  canvassing, all right?

14  A.  Okay.

15  Q.  How many homes did you canvass?

16  A.  Around 75, I think.

17  Q.  Okay.  What jurisdictions did you canvass?

18  A.  They were in Weld County and El Paso County, so they were

19  parts of the precincts where we were trying to collect all of

20  the doors or go to all the doors and collect the data.

21  Q.  Okay.  Now, you were asked questions on direct

22  examination, examination by the plaintiffs in this case, about

23  you filling out any discrepancies or anything along that line;

24  is that right?

25  A.  Yes.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1   07/15/2024   159

1   Q.  Okay.  And you didn't take any personal photographs or

2   make any notations as relates to discrepancies?

3   A.  No, I did.  I didn't take photographs, but I did -- I

4   think -- I'm trying to -- I think I did three or four

5   affidavits, and they would have been in the materials that

6   were turned over to the plaintiffs and what we submitted to

7   the DA and the Attorney General.

8   Q.  Now, you were also asked questions -- if we could pull up,

9   please, Exhibit 2, which has been admitted via stipulation.

10  If we can go to page USEIP identified page 37, please.

11  A.  37?

12  Q.  Yes, sir.  Do you have it, sir?

13  A.  I do.  Sorry.

14  Q.  The safety, what was your understanding as it relates to

15  safety?  Why would you work in a pair of -- teams of two?

16  A.  It's just easier to have one person able to observe what's

17  happening from a little bit more of a distance.  You know, one

18  person focused on questions, and one person kind of supporting

19  them.  And also they could switch off, because for somebody

20  like me, it gets exhausting.  I'm highly introverted.  I don't

21  like talking that much, so about the 30th person you've talked

22  to, you're kind of done.

23  Q.  And as it related to -- you were asked questions about

24  whether you can audio-record or video-record.  What was the

25  purpose of that?

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    160

1    A.  For the purpose of the canvassers sort of safeguarding

2    against being falsely accused of things.

3    Q.  Okay.  So that was more for the canvassers' own

4    protection?

5    A.  Correct.

6    Q.  Your protection when you were canvassing?

7    A.  Correct.

8    Q.  What about doing it to intimidate voters?

9    A.  What about --

10   Q.  Is that what it was for?

11   A.  No.  I don't think the voters or the residents we were

12   speaking to would have even been aware.

13   Q.  Okay.  You said -- in this document it talks about one

14   approach, the other one remains on the sidewalk.  Why would

15   you do that when you were canvassing?

16   A.  So that the person who was further away could see the full

17   field of view.  Like, if you had a dog come around a corner or

18   something like that.  In the first day I was canvassing up in

19   Weld County, there was a house with a -- it was like a whole

20   sled team of huskies.  Like, if you were in an area they could

21   get to, they could come up behind you or something like that.

22   So it was for the safety of the volunteers.  And also I think

23   if you have a couple people right up in the door, that could

24   be a little bit alarming to somebody, and we didn't want

25   people to be alarmed.  We wanted them to talk to us.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024   161

1  Q.  Okay.  We'll talk about that.  You also said -- what would

2  you do if you saw a no trespass sign or no soliciting sign?

3  Would you go to that house?

4  A.  Well, no.  You would never enter that area, and we told

5  people not to do that.  Don't put yourself in that position.

6  Don't violate any laws.

7  Q.  The next one here is why would you want to be polite to

8  people when you went to their front door?

9  A.  Because you're asking them to talk to you.  We were trying

10 to gather data and verify the Secretary of State's data.  If

11 they didn't talk to you, then you couldn't verify the data.

12 And also you don't want to be perceived as, you know, somehow

13 threatening to people.  That wouldn't -- everybody there are

14 people who care about their country trying to find the truth.

15 Q.  And, once again, why would you want to be honest with the

16 people if you were going to go talk with them at the door?

17 A.  Well, in the first place, you know, you should be honest.

18 Everybody ought to be.

19 Q.  Okay.

20 A.  But in the second place, what we were doing required that

21 we be credible, that, you know, we present ourselves as we

22 were, and that we be honest about our purposes, so that when

23 we presented the data, people would have confidence that it

24 was collected under conditions that they could trust what we

25 were asserting.

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    162

1    Q.  Okay.

2    A.  Or verify it for themselves.

3    Q.  Okay.  And you have in the safety document training it

4    says don't argue with anyone.  Why would that be in there?

5    What would you do if somebody argued with you?

6    A.  Thank them for their time.  It's their house.  So just

7    walk away.  That's not -- we don't need any data badly enough

8    that we need to argue with people, and at that point if you're

9    in an argument with them, are you going to get accurate data?

10   Are they really going to be honest with you?  Probably not, if

11   they're hostile or they've taken some kind of offense.  Then

12   your whole purpose there is to verify the data.

13   Q.  Also it says don't argue, don't debate.  Did you engage in

14   debate with anybody while you were canvassing?

15   A.  No.

16   Q.  Okay.  What about dress?  What did you do as far as dress?

17   What did you do?  What did you wear?

18   A.  I believe I wore like a nondescript polo shirt and -- I

19   don't remember.  I'm not crazy about shorts.  I probably would

20   have worn pants.  I do wear shorts like at home, but I think

21   if you're doing some kind of meeting, I don't do that in

22   shorts, so...

23   Q.  Then let's take a look at page 40 of the same document,

24   please.

25   A.  Okay.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    163

1    Q.  Let's take a look there.  There's a procedure there under

2    paragraph 6, subparagraph E.  Do you see that, sir?

3    A.  I do.

4    Q.  Why would you introduce yourself as related to the --

5    you're a concerned citizen with the Election Integrity

6    Project.  Why would you do that?

7    A.  Why would you introduce yourself or state the

8    organization?

9    Q.  It says if the occupant answers, introduce yourself,

10   correct?

11   A.  Yes.

12   Q.  If you walked up to a door, what would you say when you

13   were canvassing, sir?

14   A.  I would have said, I'm Shawn Smith.  I'm with U.S.

15   Integrity Election Plan.  We're doing citizen volunteer

16   canvassing to verify the Secretary of State's data.  Would you

17   be willing to answer a few questions, something like that.

18   Q.  And if they agreed, then what would you ask them?

19   A.  Then we would say -- sometimes we'd show them the data,

20   especially if they showed interest, because we would have an

21   excerpt from the state's data on the clipboard.  That's how

22   you got your walk list, was it was excerpted.

23   Q.  And where did that excerpt come from?  What database?

24   A.  The Secretary of State's database.  It was directly --

25   directly out of the Secretary of State's database.

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    164

1   Q.  Okay.  So if they agree to answer questions to you?

2   A.  Then you would ask are you this individual?  Is this

3   individual at home?  Sometimes there would be multiple names

4   listed at an address, and if you said are you John Smith, and

5   they said no, are you Mark Smith, whatever names were on the

6   list.  And if they're none of those people, you know, then you

7   ask them, well, do those people live here?  Did they live

8   here?  You know, how long have you lived here, that kind of

9   thing.  Because if they say they're not there or don't live

10  there, then you were trying to find out, well, did they live

11  there, how long has this individual lived there.  Sometimes

12  they say we don't know or we just moved in or whatever.

13  Sometimes they say, no, I've lived here since 1984, and that

14  person has never been there.  Or that was my son, they died

15  six years ago.  Or that's my daughter, she moved to Utah three

16  years ago, that kind of thing.

17  Q.  When you were canvassing, did you go to residences and

18  nobody answered the door?

19  A.  Yes, many.

20  Q.  When you're canvassing, were there people that didn't

21  speak with you?

22  A.  With me, no.  I don't remember any that wouldn't speak to

23  us.

24  Q.  Okay.  Were there any memorable people when you were

25  canvassing, memorable experiences when you were canvassing?

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    165

1   A.   Just the ones I talked about during the deposition.  There

2   was the lady -- I think she was probably lonely.  She was

3   really sweet -- followed us around trying to give us hard

4   candy in one of the mobile home parks.  She was great.  There

5   was an older veteran, and he was giving me a hard time about

6   being young.  He was a Vietnam era veteran.  I told him I was

7   retired, and he was giving me a hard time about being young,

8   you know, how little I knew, that I was Air Force, et cetera,

9   et cetera.  He was Army.

10  Q.   Little inner military rivalry kind of thing?

11  A.   Right.

12  Q.   All right.  And did you have occasion to have interactions

13  with somebody that spoke Spanish when you were canvassing?

14  A.   Nobody spoke Spanish to me.  I could hear some accents

15  that I recognized as native Spanish speakers' accents, but no

16  one -- I don't remember encountering anyone who only spoke

17  Spanish or spoke Spanish with me.

18  Q.   If you had encountered somebody that spoke only Spanish to

19  you, would you have been able to communicate with them?

20  A.   Yes.

21  Q.   Why is that?

22  A.   Spanish is my first language.

23  Q.   Let's talk -- you were asked questions on -- questions by

24  the plaintiffs' counsel about Mesa County, all right?

25  A.   Yes.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    166

1    Q.  When did you go to Mesa County to do any canvassing?

2    A.  Never.

3    Q.  When were you controlling any organization that was doing

4    an audit in Mesa County?

5    A.  Never.

6    Q.  What were the individuals in Mesa County doing differently

7    as it relates to the database than USEIP was doing?

8              MR. DILLON:  Objection, foundation.

9              THE COURT:  Sustained.

10   Q.  (By MR. REISCH) All right.  Sir, where did USEIP get their

11   database -- their information from?

12   A.  Directly from the Secretary of State's secure file

13   transfer protocol site.

14   Q.  Okay.  To your knowledge, and if you know, do you know

15   where the individuals that were doing this information

16   collection in Mesa County, do you know what database they were

17   using their information from?

18             MR. DILLON:  Object, foundation.  He's testified he

19   doesn't know anything about Mesa County.

20             THE COURT:  Overruled.  I'll let him answer.

21   A.  I don't think I said I don't know anything about Mesa

22   County.  They stated they were using an app called Sidekick

23   and that they were using county data, presumably from the

24   county clerk and recorder, but I don't know exactly what the

25   source was.  I only know what they stated.  I know that they

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    167

1    didn't have our data.  I wanted them to use our data, because

2    we knew it was from the Secretary of State's Office, and

3    that's what we were trying to verify.

4    Q.  (By MR. REISCH) Okay.  All right.  You were asked a

5    question about carrying a firearm, or possibly carrying a

6    firearm when you, in fact, went canvassing; is that right?

7    A.  That's correct.

8    Q.  And I think your response was that you may have on some

9    occasions had a firearm with you; is that right?

10   A.  That's right.

11   Q.  Okay.

12   A.  I think I said probably.  And I probably would have been

13   carrying.  I just don't remember.

14   Q.  Okay.

15   A.  But it would have been concealed.

16   Q.  And when you mean concealed, I know it sounds obvious, but

17   for the record, what do you do when you conceal carry?

18   A.  Like the method or are you asking me what -- what happens

19   when you conceal carry?  It's not visible.  It's not an open

20   carry.  It's typically underneath my garments.

21   Q.  Okay.  So it's -- so it's hidden; is that right?

22   A.  That's right.

23   Q.  Okay.

24   A.  You wouldn't notice.  I mean, you'd really have to look to

25   see whether or not I was carrying.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    168

1   Q.  Okay.  When you were canvassing, did you ever, you know,

2   throw your jacket open or shirt open or something to let them

3   know that you were carrying a firearm?

4   A.  No.  I usually carry it at the small of back.  Somebody in

5   front of me would never see it or know.

6   Q.  Okay.  When you were canvassing, did you ever show it to

7   anybody to intimidate anybody?

8           THE COURT:  Hold on.  Mr. Wynne, what are you doing?

9           MR. WYNNE:  I'm sorry.  I was just checking a piece

10  of evidence to cut time down.

11          THE COURT:  Let's stay at counsel table.  It's

12  distracting.

13          MR. WYNNE:  I was just trying to save time in the

14  future.

15          THE COURT:  Can you ask your question again?

16          MR. REISCH:  I will try to, Your Honor.

17  Q.  (By MR. REISCH) Mr. Smith, when you were there canvassing

18  and you had a weapon, did you ever take your weapon out for

19  anything other than self-defense or was it to intimidate?

20          MR. DILLON:  Objection, compound.  And the last part

21  of the question calls for a legal conclusion.

22          THE COURT:  Overruled.  You may answer.

23  A.  I carried for the purpose of self-defense.

24  Q.  (By MR. REISCH) Okay.  And while you were canvassing, did

25  you ever have to draw your weapon for self-defense reasons in

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    169

1    any way?

2    A.   No.  For no reason did I ever draw my weapon while

3    canvassing.

4    Q.   All right.  Did you -- when you went to canvass, did you

5    have a badge or anything on?

6    A.   I had a name tag.  We had picked up some lanyards at like

7    Staples or something and had our first name and then a

8    discrete number so that if somebody had an issue of complaint

9    they could identify, you know, John 0125 came to my door and

10   he said my windows were dirty or whatever.

11   Q.   Okay.  Describe -- you said lanyard.  How big was it?

12   A.   Probably two-by-three.

13   Q.   Okay.  And did you keep that displayed?

14   A.   Yes.

15   Q.   All right.  And were the numbers and your name and the

16   numbers, so to speak, big enough that somebody could actually

17   see it, or was it very large print?

18   A.   It was large.  Intentionally large.

19   Q.   And that was -- well, what was the purpose of that?  For

20   example, if there was a complaint, you would know who went to

21   the door?

22   A.   Right.  We didn't want somebody to be able to say somebody

23   came to my door and did this, and then if they couldn't

24   identify or didn't have any information, if they either

25   described something that didn't sound -- because we didn't

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    170

1    have uniforms or anything.  It was just citizens going door to

2    door.  We didn't have anything in common.  It's not like we

3    coordinated on a color or anything like that.  And so we

4    thought, well, if citizens have this available to them, and

5    they have a complaint, we can say, okay, who was the person,

6    right?  What did their name tag say?  And if they said there

7    was no name tag, then we would know it's probably not our

8    person.  If they said it was one person instead of two -- so

9    that's what we were trying to do is make sure, one, our people

10   were accountable to themselves, to each other, and that they'd

11   be able to be identified.

12   Q.  All right.  So can you tell the Court when the canvassing

13   began you were involved with and when did it end?

14   A.  I don't know the exact dates.  The rough timeframe was

15   about August 2021, but, again, it was being conducted and led

16   in the counties by the county captains or whoever their walk

17   leader was or their canvassing coordinator.  And so it wasn't

18   like we directed them to start and stop.  It was whenever they

19   had enough volunteers, they would go out and do it.  When they

20   got enough of the doors knocked, then they were done.

21   Q.  So roughly August of 2021 your canvassing activities are

22   complete?

23   A.  I think that's about right.

24   Q.  And that's when -- what did you do with the data I guess

25   at that point?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    171

1    A.  At that point, nothing.  We were so busy.  I was -- I was

2    at the symposium in South Dakota.  I don't think we did

3    anything for about a month, and we said we better collect the

4    data, and then there was a curing process.  So we collected

5    the data and then went back out to the counties.  They cured

6    the data, verified that everything was correct, that there

7    weren't like misprints and things like that, they had a

8    complete list.

9         So if they had -- on their walk list they would

10   indicate when they were collecting that data if they had an

11   affidavit.  We had to make sure there was an affidavit for

12   every time they had said there was an affidavit, that we

13   weren't missing any of those, that kind of thing.  And that

14   whole process, we were busy with so much trying to do things

15   in Colorado and at that point help other states that --

16   Q.  All right.

17   A.  -- it took months.

18   Q.  When you say you had data and you cured it, that was

19   basically just trying to make sure your data was complete; is

20   that right?

21   A.  Complete, that there weren't -- you know, some of the

22   volunteers well-meaning would write up things that were not

23   actually discrepancies, or sometimes there were things we

24   hadn't anticipated that we didn't have a process for dealing

25   with.  You know, like the voter said that there's ten people

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024   172

1    next door that are, you know, all secretly voting and things

2    like that, and so the volunteers sometimes, you know,

3    well-meaning, would write something up.  We would be like we

4    don't have a conduit for this.  It's not a statute.  We don't

5    know what to do with it, so...

6    Q.  Now, you were also asked questions about a speech that you

7    gave in February of 2022, right?

8    A.  Correct.

9    Q.  Okay.  And that's obviously after the canvassing; is that

10   right?

11   A.  Yes.

12   Q.  Okay.  And in that, I don't know, less than three-minute

13   conversation that you had, what did you say about due process?

14          MR. DILLON:  Objection, Your Honor.  Assumes facts

15   not in evidence about a three-minute conversation.  He can ask

16   him questions about what he said, but I think he's assuming

17   facts.

18          THE COURT:  All right.  Sustained.  Would you reword

19   that?

20   Q.  (By MR. REISCH) How long was your speech that you gave?

21   A.  I don't know.  There were a number of panelists.  It was

22   probably on the order of two to three minutes.  That's

23   probably -- if you took -- I think they took the whole video,

24   but I don't know.

25   Q.  Okay.  What did you say about some evidence that you had?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024   173

1   A.  I said I have in my possession evidence of the violation

2   of Colorado election laws by the Secretary of State.

3   Q.  Okay.  What did you say about due process?

4   A.  I said I'm for due process.

5   Q.  What did you say about justice?

6   A.  Did I say anything about justice?  I mean, I don't

7   remember exactly.  I don't remember saying justice, but I'm in

8   favor of it.

9   Q.  Okay.  All right.  And when you talked about election

10  fraud and if someone had been involved in it, what did you

11  think would be the potential charge if that was found to be

12  true?

13  A.  Well, I said I think that anybody involved in election

14  fraud deserves to hang, and that's a reference, you know, as

15  the result of due process, someone who's convicted of election

16  fraud, which is, you know, usurping citizens' authorities and

17  right to a government of their choosing, and that to me is,

18  you know, treason.

19  Q.  Okay.  When you say that if somebody does that, you know,

20  that takes place and they're found guilty and things of that

21  nature, that they should hang, you never mentioned anyone in

22  specific, did you?

23  A.  Correct.

24  Q.  At one point you were asked a question on examination by

25  plaintiff that the old ways are the best ways.  What did you

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    174

1   mean about that?

2   A.  Accountability.  That, you know, people are actually

3   responsible for their conduct.

4   Q.  Was that some sort of dog whistle or subliminal code for

5   lynching?

6   A.  No.

7           MR. DILLON:  Objection, leading, Your Honor.

8           THE COURT:  Overruled.

9   A.  No.  It's -- at that point I was disgusted with the lack

10  of response from Colorado officials that we had presented

11  evidence to, and I just couldn't believe that nobody was

12  actually going to investigate.

13  Q.  (By MR. REISCH) Okay.  And what did you say about violence

14  in that --

15  A.  I said I've been accused of calling for or advocating

16  violence, and I'm not.  I'm not advocating violence.

17  Q.  All right.  A couple more questions here, sir.  Did USEIP

18  have any sort of office space anywhere?

19  A.  I'm sorry?

20  Q.  Did USEIP have any office space anywhere?

21  A.  No.

22  Q.  Was there a payroll?

23  A.  No.

24  Q.  Could you force -- could you force anyone to do anything

25  with USEIP?

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    175

1    A.  No.

2    Q.  Why?

3    A.  It's volunteer organizations associating -- that

4    individuals were associating with each other on a voluntary

5    basis.  It's just citizens trying to get something done

6    together.

7    Q.  Okay.  Have you had an opportunity to review the endorsed

8    expert in this particular case?  Mr. Ellis's report?

9    A.  Yes, I have.

10   Q.  And in that report there's a characterization that

11   canvassing is the same as a KKK march.  Do you agree with that

12   statement?

13   A.  No.  All the plaintiffs' organizations also canvass.  I

14   don't think they would agree with it either.

15   Q.  Okay.  Sir, what did you do to intimidate, threat, or

16   coerce a voter, in your opinion?

17       MR. DILLON:  Objection, foundation.  He's also not an

18   expert.

19       THE COURT:  Overruled.

20   A.  Nothing.

21   Q.  (By MR. REISCH) What did you do to conspire with the two

22   other codefendants here at counsel table or anybody else to

23   prevent someone from voting, sir?

24   A.  Nothing.

25       MR. REISCH:  If I can have just one moment, Your

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    176

1    Honor?

2         THE COURT:  Sure.

3         MR. REISCH:  Thank you, Your Honor.  I'm done.  I

4    will collect my things and return to my seat.  Thank you.

5         THE COURT:  All right.  Mr. Wynne.

6                    CROSS-EXAMINATION

7    BY MR. WYNNE:

8    Q.  Mr. Reisch has deftly covered most of the things I was

9    going to ask, so I'm going to limit this.  Sir, the two- or

10   three-minute speech that has been discussed in your testimony

11   so far, when -- was that February of 2022?

12   A.  I believe that's right.

13   Q.  Okay.  And the canvassing by USEIP was -- tell me if I'm

14   correct -- approximately April of '21 through August of '21;

15   is that right?

16   A.  Yes, sir.

17   Q.  So the speech was about five months after the canvassing

18   ended?

19   A.  Yes, sir.

20   Q.  So as an expert in mathematics, is it fair to say that

21   anyone who might have been canvassed by USEIP would not have

22   heard something that took place five months after the

23   canvassing ended?

24   A.  That's how I see it, yes.

25        MR. WYNNE:  Thank you.  No further questions.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    177

1            THE COURT:  Ms. Epp.

2                    CROSS-EXAMINATION

3    BY MS. EPP:

4    Q.  Good afternoon, Mr. Smith.

5    A.  Good afternoon.

6            MS. EPP:  This is direct, right?  I can ask questions

7    other than what they asked?

8            THE COURT:  Yes.  Because we're just calling him up

9    to the stand once, you're allowed to cover the matters that

10   Mr. Dillon did, but you had him on your list, so you may cover

11   other matters.

12   Q.  (By MS. EPP) Mr. Smith, I want to go back to the immediate

13   aftermath of the 2020 election.  From your experience, what

14   you witnessed, was there misinformation spreading?

15   A.  Yes.

16   Q.  And did you take any personal action, if you were

17   confronted with misinformation, to dispute that

18   misinformation?

19   A.  Initially, no.  I mean, not on the day of.  When I first

20   saw, for example, the most-secure-election-ever statements, I

21   had no idea, you know, what they were referring to or basing

22   it on.  But once I saw the joint memorandum, once I had read

23   about and understood what the sector and government

24   coordinating councils were and their backgrounds and

25   investigated their organization, their training, their

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    178

1    education, who their employers were, other statements they had

2    made, the data sources available to them, voluntary voting

3    system guidelines and testing procedures --

4         THE COURT REPORTER:  I'm sorry.  Can you slow down,

5    please?

6         THE WITNESS:  I'm so sorry.

7    A.   Once I had done significant research, which didn't take me

8    very long because I -- you know, I pursue, you know,

9    diligently, within a week I understood that some of the

10   statements that had been made were just absolutely untrue or

11   completely unsupported by any evidence that would have been

12   available to them.

13   Q.   (By MS. EPP) What about statements on the -- kind of your

14   idealogical ally side for the purposes of this case, was there

15   misinformation spreading at the time after the 2020 election?

16   A.   Among like constitutionalists?

17   Q.   Watermarked ballots, things that were -- the direct

18   aftermath of 2020.

19   A.   Well, I don't know, because I wasn't -- I wasn't really in

20   contact with anybody else doing election integrity work.  I

21   didn't know I was doing election integrity work.  I was just

22   following my nose, if you will, at that point.  The first time

23   -- it was early December the first time that I actually spoke

24   to anyone -- any other human being about what I was seeing in

25   my research, and that was on a Convention of States volunteer

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1   07/15/2024   179

1   call, and that's how the whole thing snowballed for me is I

2   was told -- we were just waiting for the call to start, and I

3   told them, Look, these are the things I'm seeing.

4        The risk-limiting audit software was written by this

5   group, and the only security testing was done by a Canadian

6   company with Iranian engineers at Sharif University in Tehran.

7   And knowing what I know about those countries and how they

8   handle ex-patriots with technical capabilities, I said this is

9   all wrong.  Those should never be anywhere near any kind of

10  significant critical infrastructure of national security.

11       And so at that point I had these -- all these red

12  flags were coming up for me, but I still wasn't talking to

13  anybody else.  I didn't know anybody else doing election

14  integrity.  The first time that I spoke to anybody else doing

15  election integrity was early December with Harvey Branscum,

16  and at the legislative audit committee hearing I found out

17  suddenly there were other people in Colorado and -- you know,

18  self-organizations of citizens that were working on it, so...

19  Q.  And over the time of your involvement in election

20  integrity efforts since the 2020 election, have you worked

21  with Mr. Branscum at other times?

22  A.  I have.  We're still in contact.  We disagree about

23  everything except election integrity.

24  Q.  Did you ever ignore misinformation because it came from an

25  idealogical ally?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    180

1   A.  No.

2   Q.  Did you ever ignore misinformation because it confirmed

3   your biases?

4   A.  Not that I know of.

5   Q.  Mr. Dillon asserted that canvassing was the method used to

6   verify the official results of the election.  Was canvassing

7   the only method that you used to verify?

8   A.  No.  We attempted electronic verification, looking at

9   records that way.  There were some people who tried doing

10  telephonic verification.  The problem with telephonic

11  verification is you don't know -- with portable cell phone

12  numbers and things like that, you don't know who you're

13  talking to at the other end.  They could tell you they're

14  sitting on Johnson Street in Weld County, and, in fact,

15  they're sitting in Bangladesh.  You just don't know.

16  Q.  Okay.  You mentioned that Mr. Maulbetsch infiltrated

17  Basecamp at some point, and then the exhibit was raised of

18  statements about security.  Do you believe that anybody ever

19  would have seen those statements -- were they intended for the

20  public, would anybody have seen them if it were not for

21  Mr. Maulbetsch?

22  A.  I don't know.  Probably not anybody outside of Basecamp.

23  Not anybody who wasn't, you know, a volunteer with USEIP.  You

24  know, I didn't have -- at that time in November -- let's see,

25  November through probably May of 2021, I was still doing

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    181

1    Convention of States, and I was a regional captain for

2    Convention of States, so I was kind of spending time -- I was

3    not reading everything on Basecamp.  I barely had time to keep

4    up with the stuff that mentioned me, let alone things that did

5    not.  I didn't go into all the subgroups to read them.  And if

6    I didn't, then I doubt any member of the public would have

7    been remotely aware if it hadn't been for the media taking

8    those excerpts out and then trying to represent them as

9    something they weren't.

10   Q.  And it was discussed about your remarks at the Rock Church

11   in February 2022.  Did you publish those remarks?

12   A.  No.

13   Q.  Did you intend those remarks for anybody outside of the

14   room?

15   A.  No.  I wasn't against it, but I guess you can say

16   Pollyanna, I didn't expect them to excerpt them to change the

17   meaning and exclude the context.

18   Q.  And when those remarks were published -- strike that.  One

19   more question.  It was mentioned that you were -- the playbook

20   was dedicated to you.  When did you receive the playbook, see

21   it for the first time?

22   A.  I saw it for the first time -- I think you gave me a copy.

23   It was in August up in South Dakota.  I had a vague idea that

24   -- I mean, everybody was working on trying to develop tools

25   and collect lessons learned and things like that, but I didn't

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    182

1    know that document was in that state, that state of like

2    preparedness or readiness.  And so you handed it to me, and it

3    was only later on that I looked and saw that it was dedicated,

4    among other people, to me.  It was really kind.

5    Q.  And there are other names on that dedication.  Do you have

6    any knowledge as to why those other names are there?

7    A.   Like Doc Frank and Phil Waldren and Mike Lindell.  I mean,

8    Mike Lindell had brought everybody together from the state, so

9    it was the first time that the -- a lot of people who had been

10   doing this kind of work in their own state or locality met

11   other people doing the work, and they got to crosstalk, share

12   lessons learned, and also I think feel that sense of community

13   that they weren't alone in trying to pursue this, because

14   there was a lot of opposition and vitriol against them, and so

15   I guess that would be for Mike.

16          Colonel Waldren was doing something very similar --

17          THE COURT:  Do you have an objection?

18          MR. DILLON:  Yeah, I object, move to strike.  I don't

19   think he has a foundation to explain how any of these people

20   showed up in the dedication page of the playbook if he himself

21   doesn't know how he showed up.

22          THE COURT:  Sustained.  Go ahead.

23          MS. EPP:  I can ask it a different way.

24   Q.  (By MS. EPP) Are all of the people listed on the

25   dedication of the playbook, were they at the symposium?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024   183

1   A.  I'd have to look at it.  I think they were.  I'm going to

2   look on Exhibit 1 -- yes.

3           MS. EPP:  No further questions.

4           THE COURT:  All right.  Mr. Dillon, redirect.

5                    REDIRECT EXAMINATION

6   BY MR. DILLON:

7   Q.  Colonel Smith, you've testified that you're not aware of

8   anyone who felt intimidated by your canvassing efforts, or I

9   think you've said the canvassing efforts of USEIP.  Is that a

10  fair recollection?

11  A.  Yes.

12  Q.  Okay.  You agree it's possible that there may have been

13  people who did feel intimidated by USEIP's activities or your

14  canvassing activities and didn't communicate those feelings to

15  you?

16          MR. REISCH:  Objection, speculation.

17          THE COURT:  Overruled.  You may answer.

18  A.  Can you repeat the question, please?

19  Q.  (By MR. DILLON) Do you agree it's possible that someone

20  may have felt intimidated by your canvassing activity or

21  USEIP's canvassing activity and those concerns were not

22  communicated to you?  Do you at least allow for the

23  possibility that that happened?

24  A.  Sure.  Yeah, I imagine it's possible.  You don't know what

25  kind of psychological standing somebody's got, so...

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    184

1   Q.  And that doesn't matter to you, how people may have

2   reacted to your canvassing?

3   A.  I'd say it's not that it doesn't matter.  It's that we

4   were very deliberate about trying to be courteous and

5   professional towards people.

6   Q.  Right.

7   A.  And that overwhelming what we experienced was people who

8   were glad to talk to us and were warm about it.  And if

9   somebody felt something based on some other issue that wasn't

10  how we conducted ourselves, and especially not how we intended

11  to conduct ourselves, then I think that's kind of a personal

12  responsibility for the other person.

13  Q.  That's on them, right?

14  A.  Yeah.  There are skyrocketing levels of mental illness in

15  the country, right?

16  Q.  There are.  And there's a highly polarized electorate out

17  there, isn't there?

18          THE COURT:  I can't hear the objection.

19          MR. REISCH:  Objection, argumentative.

20          THE COURT:  Well, overruled.  You may answer.

21  A.  Is there a highly polarized electorate, is that your

22  question?

23  Q.  (By MR. DILLON) Yes.

24  A.  I think so.

25  Q.  And you understand there's a highly polarized electorate

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    185

1   on these particular issues, correct?

2   A.  I think that's deliberate on the part of the media, and

3   your plaintiffs, so yes.

4   Q.  And you understood that there was a highly polarized

5   electorate when USEIP and yourself were engaging in these

6   canvassing activities, correct?

7   A.  You mean when we exercised our First Amendment rights and

8   engaged in the same kind of canvassing that your clients do,

9   yes.

10  Q.  You talked about the name tags and that they had

11  identification numbers on them in case there were complaints,

12  right?

13  A.  Not in case there were complaints, but so that we could

14  identify the individuals associated with them, and also

15  whether a complaint was actually pertaining to our volunteers.

16  Q.  Did USEIP have a system for tracking complaints or

17  concerns that were raised by folks who received some

18  door-knocking?

19  A.  A lot of the systems -- so the short answer is no, because

20  a lot of the systems that were developed were in response to

21  what we experienced as opposed to anticipated, and we didn't

22  get complaints.

23  Q.  Okay.

24  A.  So there was no need for a system to deal with the

25  complaints we didn't get.  The first time we heard about

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    186

1  complaints was after your client solicited them, and then the

2  Secretary of State said they had a bunch, and I heard the

3  clerks -- several of them which we had some acrimonious

4  exchanges with -- referring to complaints but never producing

5  the complaints.

6  Q.  We've talked about the voter verification guides.  We

7  don't need to get back into those.  Those are in evidence.

8  You've testified about those.  You were the principal drafter

9  of those guides, correct?

10  A.  The initial versions of them, yes.

11  Q.  Had -- prior to your association with USEIP, had you done

12  any door-to-door canvassing?

13  A.  No.  I had gone door to door, but not canvassing.  Like,

14  volunteer efforts of various kinds.

15  Q.  Had you ever prepared a document to train people on how to

16  go about canvassing efforts?

17  A.  Not canvassing.  I have prepared probably hundreds of

18  training documents.

19  Q.  But nothing on canvassing?

20  A.  Correct.

21  Q.  Okay.

22  A.  Yeah.

23  Q.  When you went door to door, did you ask voters who you

24  spoke with to present you with any form of identification?

25  A.  Never.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    187

1    Q.  So there's no way for you to know as you sit here today

2    whether the people who gave you affidavits are even the people

3    who purported to sign those affidavits?

4    A.  Oh, no, there's a way.  You can go back and verify.  And

5    that's why we gave them to the Attorney General so they could

6    go investigate and verify them, but they won't do it.

7    Q.  Right.  So somebody else needs to follow up and make sure

8    that the work that you did was accurate?

9    A.  You mean the people with the sworn responsibility to

10   investigate under Colorado statute the affidavits that they

11   received?  Yes, them.

12   Q.  Those same people who you believe have engaged in criminal

13   conduct related to the 2020 election?

14   A.  The same people who I can prove have engaged in illegal

15   conduct.

16   Q.  Okay.  You would agree with me that the questions

17   canvassers asked -- USEIP canvassers asked related to past

18   voting activity, correct?

19   A.  No.  Not all the questions related to --

20   Q.  Not all the questions.  But as it relates to the 2020

21   election, canvassers were asking questions in 2021 related to

22   voting activity from 2020, correct?

23   A.  So, again, incorrect.  Some of the questions were related

24   to the voting history.  Some of the questions related to

25   information that would have been also present on voter

                         Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    188

1    registration, their name, their address, their registration

2    status, and their party affiliation.

3    Q.  Right.  And as it relates to any voting activity, all of

4    the questions related to voting activity related to past

5    voting activity, right?

6    A.  For the third time, Counsel, not correct.  The

7    registration, their name, and their address are not about

8    their voting activity.  They're about their status on the

9    rolls.

10   Q.  I don't want to get turned around in semantics.  Did you

11   ask -- was there a question asking folks how they voted --

12   whether they voted in the 2020 election?

13   A.  Yes.

14   Q.  Okay.  That's past voting activity, correct?

15   A.  That was one of the five questions, yes.

16   Q.  Okay.  Were any questions asked about their -- the voters'

17   future intention, whether they planned to vote again?

18         MR. REISCH:  Your Honor, I'm going to object.  Beyond

19   the scope of cross or direct.  I didn't get into any line of

20   future questioning.

21         THE COURT:  Well, I'm going to allow it just because

22   we've gone into a detailed amount about the questioning that

23   Mr. Smith asked, so I'll allow it.  You may answer.

24         THE WITNESS:  Thank you, ma'am.

25   A.  No, we didn't care.  We were asking about the Secretary of

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN  Bench Trial - Day 1    07/15/2024    189

 1   State's data.

 2   Q.  (By MR. DILLON) Okay.  And we talked about the Mesa -- the

 3   canvassing that was going on in Mesa.  I just want to confirm,

 4   you were one of the people communicating with others who were

 5   doing canvassing work in Mesa, correct?

 6   A.  Correct.

 7   Q.  Okay.  And you were sharing information with the people in

 8   Mesa about USEIP's canvassing activity, correct?

 9   A.  Yes, although they had begun canvassing before we had our

10   procedures.

11   Q.  Fair enough.  But you were sharing information with the

12   people on the ground in Mesa, correct?

13   A.  In a much less formal way than you and I are even talking

14   right now.  Like we're doing this.  We think this is going to

15   be ready.  We're going to prep this.  Have you got this?  That

16   kind of --

17   Q.  I believe you've testified that you were trying to

18   persuade the folks in Mesa to use the same sorts of data that

19   the USEIP canvassers were following in doing their canvassing

20   efforts; is that right?

21   A.  I think what I said is I would have liked them to use and

22   tried to get them to use the USEIP data which was the

23   Secretary of State's data because we wanted to be able to

24   aggregate the results.

25   Q.  Do you know if any of the folks doing canvassing in Mesa

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    190

1   were allowed into the USEIP Basecamp site?

2   A.  Yes.  I'm sure that at least one was, but I don't know how

3   many.

4   Q.  Okay.  And so that person would have had access to all the

5   communication on the Basecamp site for USEIP; is that true?

6   A.  No.  Because of the way the Basecamp site was organized,

7   because there were different -- I forget what they were called

8   -- groups, rooms, but there were different ones for counties

9   and a separate one for analytics.  So you might be in the Weld

10  County group, but not in the analytics group or not in the

11  captain's group.  In the captain's group they would talk

12  amongst themselves, so I don't know -- so I don't know what

13  the Mesa County captain would have had access to other than

14  the general sort of front page and the county room and then

15  the captain's room.

16  Q.  When you say Mesa County captain, what does that mean?

17  What is the Mesa County captain?

18  A.  That's the individual who had volunteered to be sort of a

19  coordinator for activities within their county.  So that's

20  somebody identifying other volunteers, trying to identify

21  people to fill specific roles.  Like, we continually had

22  trouble with people who wanted to do analytics, but didn't

23  really have the background to do analytics, or want to do

24  analytics in a method that wouldn't have worked because of the

25  size of the datasets.  Like, the Secretary of State's datasets

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    191

1    are huge.  You can't use Excel to look at them.

2    Q.  And was this Mesa County captain a USEIP captain?  Is that

3    a USEIP role?

4    A.  The Mesa County captain for USEIP is what I'm referring

5    to.

6    Q.  Okay.  Great.  And just a few more questions.  On the

7    statements you made about anyone having engaged in election

8    fraud deserving to hang, you've said those statements were

9    made in February of '22, right?

10   A.  Correct.

11   Q.  Is that the first time you ever made that statement?

12        MR. REISCH:  Objection, relevance, lack of

13   foundation.

14        THE COURT:  Overruled.

15   A.  To my knowledge, yes.  It's possible I would have said it

16   before, but I don't really prepare remarks in advance.

17   Q.  (By MR. DILLON) So that was totally off the cuff?

18   A.  Probably.

19        MR. DILLON:  Okay.  No further questions, Your Honor.

20        THE COURT:  All right.  I actually have a question

21   for you on that last topic.  So describe for me -- I thought

22   you said USEIP didn't do any canvassing in Mesa County,

23   correct?

24        THE WITNESS:  Yes, ma'am.

25        THE COURT:  Then why did they have a Mesa County

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    192

1   captain?

2          THE WITNESS:  Well, USEIP wasn't just about

canvassing.  So in -- you know, I think Ashe and Holly will

testify and they have documented and their through depositions

they did a lot of rallies and things like that.  We would go

-- because I had technical expertise, I would go with citizens

when they wanted to engage with their clerks.  So I had

already been up to talk to like Carly Koppes in Weld County.

I had been to talk to Clerk Broerman in El Paso County.

Sometimes we would get on the phone or Zoom calls.

11         So we were doing a lot of activities trying to engage

-- like the April 2024 briefing that we gave to the Republican

subcommittee where Senator Lundberg had asked us to come, that

was a good example of where we were trying to present

information.  So we had already tried to present information

and engage with public officials, and it was just going

nowhere.  There was no -- they were very well buttressed

against citizen concerns.  And we were getting sort of active

opposition from Colorado county clerks.  And so the canvassing

was something that we thought, okay, maybe this is the next

thing we need to do, because there obviously have been

concerns about the voter rolls, about duplicate ballots, about

things like that, so let's find out what's true.

24         And in that same timeframe, it was either April or

May, I had been down to Maricopa -- we haven't really talked

22-cv-00581-CNS-NRN   Bench Trial - Day 1   07/15/2024   193

1    about this publicly, but Senator Fann from Arizona -- State

2    Senator Fann had some people that she was asking about how to

3    proceed with some of the audit decisions there, and Dennis

4    Haugh, the gentleman that I said had brought me sort of into

5    USEIP by asking me to go meet with Jeff Young in the analytic

6    session, Dennis was connected through somebody else to Senator

7    Fann.  So I ended up in this bizarre world where I ended up on

8    the phone with Senator Fann trying to answer questions about

9    who they should have do the audit of their ballots.

10            THE COURT:  Let me interrupt you, because I want to

11   stay on Mesa County.  Who was the Mesa County captain, if you

12   remember?

13            THE WITNESS:  I can't remember.  His first name is

14   Cory.  I can't remember his last name.

15            THE COURT:  Did you have any conversations with Cory

16   about canvassing?

17            THE WITNESS:  I don't remember if I did.  I knew that

18   they were going to do canvassing, but I didn't know when.  At

19   some point -- I did for sure at some point after they had

20   begun canvassing, but before we had any of our training

21   materials or anything like that ready.  And then it was only

22   much later, maybe the end of -- maybe in May when I figured

23   out that they weren't using -- I remember being really

24   surprised when I found out they weren't using the data from

25   the Secretary of State's data, they were using county data

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    194

1    when they said that.  I remember being surprised about that.

2         THE COURT:  All right.  So you said they didn't have

3    the training materials from USEIP when they began canvassing.

4    Did you ever or do you know if they ever received those

5    training materials?

6         THE WITNESS:  I don't know if they did, Your Honor.

7    They were posted in the county captains and the voter

8    verification rooms on Basecamp, but I don't know if they

9    downloaded them, and I don't know if they used them.  But I

10   know when they began their canvassing, they weren't using

11   them, and I suspect that -- at the end we couldn't use their

12   data because they had not asked the same questions or used the

13   same dataset to begin with, so we couldn't aggregate it.

14        THE COURT:  And when you say they didn't ask the same

15   questions, do you know offhand what the differences were in

16   the questions asked?

17        THE WITNESS:  No, ma'am.  I remember speaking I think

18   to Jeff about it, because the way it worked is that the

19   analytics people were pretty specialized.  They were the ones

20   doing the data analysis.  They would get the downloads or the

21   county excerpt.  They would go through the work of trying to

22   figure out how to parse it up into walk lists, because when

23   you get it it's not organized by neighborhood.  If you don't

24   organize it by neighborhood, your volunteers will be all over

25   the place all day long.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    195

1           And so Jeff was talking to those people, the

2    analytics people, and I remember Jeff saying that he didn't

3    think we would be able to use the data.  And I maybe had one

4    conversation -- I maybe had one conversation after that with

5    the person who was trying to organize their analytics.  But it

6    was a little bit different process where I think they had

7    begun their canvassing without starting necessarily with the

8    end in mind the way we had.

9           We wanted something that we could present to

10   officials that would then be adequate predicate for them to go

11   do the rest of the research.  Because you probably know, you

12   know, there are things that even in the Secretary of State's

13   data that are not provided to the public.  Like, the public is

14   not allowed to be told who's responsible for voter

15   registration of different voters.  And maybe if you had a

16   pattern of voter names that were not, you know, legitimate, or

17   information that was bad, you might find that there was some

18   organization connected to them, and so that was part of the

19   reason we wanted to make sure we gave that to law enforcement

20   officials.

21           THE COURT:  All right.  Thank you.

22           THE WITNESS:  Yes, ma'am.

23           THE COURT:  Any follow-ups based on the questions I

24   asked?

25           MR. REISCH:  Just briefly.  Just a mild

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    196

1   clarification.

2                       RECROSS-EXAMINATION

3   BY MR. REISCH:

4   Q.  Sir, when you said that there was a USEIP captain in Mesa

5   County by the name of Cory, to your knowledge, there was no

6   canvassing on behalf of USEIP in Mesa County?

7   A.  That's correct.  Just like I was -- I was both with USEIP

8   and Convention of States, those are two separate

9   organizations.  They weren't related to each other.

10  Q.  And although maybe USEIP had somebody that was there,

11  sounds like they were doing rallies or something to that

12  effect, no canvassing authorized or requested?

13  A.  Well, There's no such thing as authorization.  We would be

14  basically providing tools to citizens in counties who had

15  stepped up to do it.  And what we said is, Look, you have to

16  ask these questions for us to be able to aggregate the data.

17  You have to start with the Secretary of State's data.  You

18  have to ask these questions.  If you don't do that, that's on

19  you, but we can't use the data, because we're trying to

20  aggregate across the state.

21  Q.  And so any data that USEIP collected, none of it came from

22  Mesa County, correct?

23  A.  Correct.

24          MR. REISCH:  Thank you, sir.

25          THE COURT:  All right.  Yes.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1   07/15/2024   197

1                        RECROSS-EXAMINATION

2    BY MR. WYNNE:

3    Q.  A couple of very, very quick questions.  When you said

4    that you would be encouraged or pleased if Mesa County used

5    the Secretary of State's data, would it be more accurate to

6    say that you hoped that they used the same data points?

7              MR. DILLON:  Objection, leading.

8              MR. WYNNE:  Your Honor, this is cross-examination.

9              THE COURT:  Overruled.

10   Q.  (By MR. WYNNE) Data points meaning name, address.  Those

11   are data points, static things?

12   A.  No, I really meant the dataset.  So we were downloading

13   these datasets.  There are particular files.  There's an

14   Exo 2, an Exo 3.  These are the file names in a secure FTP

15   site.  We wanted them to use the same exact dataset to go

16   canvass from, because that's what we were trying to verify.

17   Q.  Okay.  So you're trying to make sure to verify the same

18   set of records so that the two efforts can be merged so that

19   you have Secretary of State records on the one hand and county

20   records on the other?

21   A.  We did not want to merge county and Secretary of State

22   records.  We didn't have anything to do with county records.

23   We wanted to verify the Secretary of State -- so bringing in

24   any other dataset would have been apples and oranges.  We

25   wanted an apples-and-apples verification across the state as

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024   198

1   much as possible, and we didn't know which counties citizens

2   would step up in.  It wasn't like we could direct people to do

3   it.  No force on earth could force volunteers to do something

4   they don't want to do.

5   Q.  Okay.  There was a question about -- maybe it's a

6   misphrasing -- a Mesa County captain.  Given what you've

7   testified about today, would it be more precise to say that

8   was a USEIP contact in Mesa County rather than a captain?

9          MR. DILLON:  I'm going to object, Your Honor.  He's

10  now testifying for a witness who's already testified, asking

11  him to change his prior testimony.

12         THE COURT:  Overruled.  I think Mr. Smith can handle

13  the question.  Go ahead.

14  A.  Captain is just what we called them.  We were trying to

15  distinguish between the roles and make sure there was somebody

16  who understood they were sort of the person -- not me, but

17  most of the people who were volunteering that were core team

18  -- again, little C core -- were working full time at other

19  things.  People were devoting their free time to this, nights

20  and weekends, and you don't have time to talk to 70 people in

21  a county.  You need somebody in that county to organize.

22  Plus, you don't organize the conditions there.

23         And so we called it a captain, just like we picked

24  the name, you know, chief of analytics so we would understand

25  what that person -- that's the person who makes analytics

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    199

 1    decision, right?  This is the person who makes whatever kind

 2    of decision.  The county captain was a point of contact, but

 3    they also, if they wanted to have volunteers, they had to

 4    recruit.  And sometimes people would come to them, but

 5    sometimes they would recruit by just telling people what they

 6    were doing and hoping they could come join them.

 7    Q.  Thank you initially for your service, but I gather from

 8    your testimony earlier that you're quite familiar with a chain

 9    of command?

10    A.  I am.

11    Q.  And it's true then that the title conferred on whoever it

12    was, I guess Cory, does not suggest that he was a USEIP

13    caption (sic) for the purpose of USEIP's canvassing mission;

14    is that correct?

15    A.  Correct.  The canvassing -- in most places because a

16    county captain would be busy with other things we would

17    recommend that they actually have a canvassing or voter

18    verification coordinator separate from themselves.  But in

19    that case, again, Mesa County didn't do USEIP canvassing.  It

20    was a different organization that had self-organized, like

21    USEIP, was doing canvassing.  We were sharing information.  We

22    shared information with all kinds of groups.  In fact, there

23    was a group in California we shared information with, and then

24    we found out they said they're going to sue us if we didn't

25    change our name.  So it wasn't all friendly, but it was with

                         Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    200

1    Mesa County.  They just weren't using our method or data.

2    And, again, it wasn't our data.  It was the Secretary of

3    State's data.  So that was the whole point.

4    Q.  Have you ever heard of an organization called Stand for

5    the Constitution?

6    A.  I'm vaguely familiar.

7    Q.  What context?

8    A.  In talking to different groups and individuals over the

9    last three years, I've probably heard the names of 1,000 or

10   more organizations.  That sounds like one of them.  It sounds

11   like one I would join actually.

12   Q.  That you would join?

13   A.  That's correct.

14   Q.  But to your knowledge you have not joined?

15   A.  That's correct.

16           MR. WYNNE:  No further questions.

17           THE COURT:  Mr. Dillon, did you have some follow-up?

18           MR. DILLON:  No.

19           THE COURT:  Ms. Epp, anything?

20           All right.  You are excused, Mr. Smith.  Thank you.

21           THE WITNESS:  Thank you, ma'am.

22           THE COURT:  Plaintiffs, would you call your next

23   witness.

24           MR. BREESE:  Plaintiffs call Ashley Epp to the stand.

25           MS. EPP:  Your Honor, am I allowed to take notes?

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    201

1                    THE COURT:  Yes, you are.

2                              ASHLEY EPP

3    was called as a witness and, having been duly sworn, was

4    examined and testified as follows:

5                    THE COURTROOM DEPUTY:  Once you're seated, if you can

6    state your name again, please.

7                    THE WITNESS:  Ashley Epp.

8                         DIRECT EXAMINATION

9    BY MR. BREESE:

10   Q.  Good afternoon, Ms. Epp.

11                   THE COURT:  Before you begin, Mr. Reisch, I don't

12   mean to call you out, but why Ms. Dynes waits until people are

13   paying attention for the oath is because I happen to think the

14   oath is one of the key parts of somebody's testimony, so I

15   rather you aren't talking to your client when an oath is being

16   given.

17                   MR. REISCH:  My apologies, Your Honor, and it will

18   not happen again.

19                   THE COURT:  Thank you.

20                   You may proceed.

21   Q.  (By MR. BREESE) Good afternoon, Ms. Epp.

22   A.  Good afternoon.

23   Q.  You reside in Douglas County, Colorado, correct?

24   A.  I do.

25   Q.  And are you currently employed?

                         Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    202

1    A.   Yes.

2    Q.   Who are you employed by?

3    A.   I'm self-employed.

4    Q.   What's that business?

5    A.   So I create content for a number of different platforms.

6    I work in a contractual relationship with Badlands Media,

7    Creative Destruction Media, the Glendale Cherry Creek

8    Chronicle, Colorado Free Press, an independent content

9    creator.

10   Q.   Some of that content you create is posted on a blog called

11   Ashe in America, correct?

12   A.   It's not any longer.  I moved it to

13   AsheinAmerica.substack.com, but AsheinAmerica.com is still up

14   as an archive.

15   Q.   So when you -- you currently blog, correct?

16   A.   Yes.

17   Q.   And one of the topics that you discuss is politics.  Is

18   that fair to say?

19   A.   That's correct.

20   Q.   Colorado politics?

21   A.   That's correct.

22   Q.   National politics as well?

23   A.   That's correct.

24   Q.   Politics on a local Colorado level like county levels?

25   A.   That's correct.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    203

1    Q.  So when you post a blog currently under the Ashe in

2    America moniker, where does that blog go?  You said Substack?

3    A.  Yes.  It's on Substack, although I will say the only

4    content right now -- because I am producing content for so

5    many different channels, the only content that's really up on

6    AsheinAmerica.substack.com is show notes for one of my

7    podcasts.

8    Q.  What is that?

9    A.  Culture of Change.

10    Q.  And similarly on Culture of Change do you discuss Colorado

11    politics?

12    A.  No.

13    Q.  No.  So for all times -- for purposes of talking about the

14    Ashe in America blog, when did you transition to the Substack

15    model?

16    A.  Oh, it would have been late 2022, early 2023.  And I'm

17    totally speculating, because I don't recall the exact date.

18    Q.  Fair.  But so prior to that, so prior to late 2022, you

19    just were on AsheinAmerica.com, correct?

20    A.  For my blog, yes.

21    Q.  Okay.  And that blog and that website is accessible at

22    that point in time to anybody that typed AsheinAmerica.com --

23    A.  That's correct.

24    Q.  -- into the Internet, correct?  You used to be employed by

25    -- and I hope I get this right -- Slalom Consulting?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    204

1    A.  That's correct.

2    Q.  And you were a senior consultant focusing on business

3    transformation enabled by cloud technology, right?

4    A.  That's correct.

5    Q.  As part of that you were employed at

6    PricewaterhouseCoopers as a consultant, correct?

7    A.  That's correct.

8    Q.  And I think we pretty much covered this, but you consider

9    yourself a writer and an activist, right?

10   A.  I do.  My background is much more complicated than that.

11   I'm a writer and activist kind of -- it was -- a nights and

12   weekend hobby kind of thing up until July of 2022.

13   Q.  And what happened in July of 2022?

14   A.  I was let go.

15   Q.  From?

16   A.  From Cause of America.

17   Q.  And we'll get into Cause of America in just a little bit,

18   but is it fair to say you also have a background in

19   large-scale organizational change management?

20   A.  I do.

21   Q.  And what's that?

22   A.  So large-scale organizational change is helping

23   organizations get their people through significant change

24   events.  So when I was at PricewaterhouseCoopers one of the

25   large-scale change events that I did was moving people from

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    205

1    IBM Lotus Notes onto Google Suite.  So very different

2    platforms, different ways of working, there's training,

3    there's groups of connecting people, or I should say, you

4    know, affinity-group type efforts, to make the change the

5    least painful on the organization and its people as possible.

6    Q.  And you're a founder of the United States Election

7    Integrity Plan, correct?

8    A.  That's correct.

9    Q.  How does that background in change management --

10   large-scale organizational change management apply to what

11   you've done with USEIP?

12   A.  That was my focus area and orientation was to connect

13   people for change.

14   Q.  And I'm sure your background as a writer probably plays

15   into that as well, correct?

16   A.  I would -- sure.

17   Q.  And USEIP was officially founded on November 21st of 2020,

18   right?

19   A.  That's the day that we say it was founded.  What that

20   meant I think was that Ms. Kasun decides to buy a Basecamp

21   license.  We as a group of like five people decided to be more

22   organized.  We weren't setting out to build an organization.

23   We didn't have a name.  We didn't have any -- I was, hey,

24   let's get more organized, and the November 21st date I believe

25   is the date that Holly bought the Basecamp license.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1   07/15/2024   206

1  Q.  And USEIP has a website, correct?

2  A.  That's correct.

3  Q.  And is it USEIP.org, I believe?

4  A.  That's correct.

5  Q.  And you purchased the domain name for that website,

6  correct?

7  A.  Originally, yes.

8  Q.  Okay.  Is it fair to say that one of the primary goals of

9  USEIP is to find the truth, expose the truth, and to restore

10  election integrity?

11  A.  Absolutely.

12  Q.  And to enable people to take their self-governance back,

13  correct?

14  A.  Absolutely.

15  Q.  Which implies that it's been stolen, right?

16  A.  I don't know how to -- I'm not implying that.

17  Q.  Well, if it has to be taken back, doesn't it mean it had

18  to be taken from them?

19  A.  It could also have been forfeited and could also have

20  never been initiated in the beginning.

21  Q.  And one of the -- and the individuals involved with USEIP,

22  they seek to accomplish that goal, so that goal to find the

23  truth, expose the truth, restore election integrity, by

24  engaging in various activities to address election integrity

25  concerns, correct?

22-cv-00581-CNS-NRN   Bench Trial - Day 1     07/15/2024    207

1   A.  That's correct.

2   Q.  One of those is to expose election fraud, correct?

3   A.  To expose the truth about elections.

4   Q.  And one of the activities that USEIP has engaged in

5   furtherance of this goal is that door-to-door canvassing

6   campaign to conduct voter verification in counties across the

7   State of Colorado, correct?

8   A.  One of many activities, yes.

9   Q.  And one of the events -- or maybe the event that spawned

10  the inception of USEIP was your belief that election fraud

11  took place in the 2020 presidential election, correct?

12  A.  Correct.

13  Q.  Election fraud caused at least in part by data

14  manipulation?

15  A.  At least in part.

16  Q.  And election fraud, in your view, renders the results of

17  the 2020 election unclear, correct?

18  A.  That's correct.

19  Q.  And Election Day was November 3rd, 2020, correct?

20  A.  That's correct.

21  Q.  You woke up on the morning of November 4th, and you felt

22  confused and angry about the election fraud that occurred in

23  the election, didn't you?

24  A.  That's correct.

25  Q.  You believe that voter fraud existed in the 2016 election,

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    208

1   though, too, didn't you?

2   A.  I do.

3           MR. REISCH:  Objection, relevance.

4           THE COURT:  I'll allow a limited inquiry.  You may

5   answer.

6   A.  Yes.

7   Q.  (By MR. BREESE) But despite that belief, you did not found

8   or otherwise participate in any groups focused on election

9   integrity after the 2016 election, correct?

10  A.  I did not.

11  Q.  So USEIP was founded in late November of 2021.  I'd just

12  like to discuss a few of the events preceding that.  You

13  participated in numerous protests and marches in Colorado

14  beginning on November 7th, 2020, correct?

15  A.  Correct.

16  Q.  You also helped organize some of these protests, correct?

17  A.  Loosely, yes.

18  Q.  And November 7th was the Saturday after the election,

19  right?

20  A.  That's correct.

21  Q.  And similar to the founding of USEIP, these protests were

22  organized in response to the belief that election fraud had

23  occurred in the 2020 presidential election, right?

24  A.  Yes.

25  Q.  I believe the first protest -- I believe you testified in

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    209

1    your deposition the first protest you participated actually

2    wasn't in Denver.  It was in Colorado Springs, right?

3    A.  That's correct.

4    Q.  And you attended that protest because you were outraged

5    that the will of the American people could be stolen, right?

6    A.  Yes.

7    Q.  And you continued to participate and help organize

8    protests every Saturday thereafter through January 6th, right?

9    A.  Through Inauguration Day.

10   Q.  And what was the date?

11   A.  January 20th is the date.  I'm not sure of the Saturday.

12   Q.  So from November 7th until that date in late January you

13   were protesting somewhere in Colorado?

14   A.  That's correct.  Actually, no.  Two of those days I was in

15   Washington D.C.

16   Q.  Okay.  Do you recall the dates of that?

17   A.  One was I want to say December 12th, but I don't know if

18   that's the right date.  But it was in December -- that was a

19   march in Washington D.C. in December, and the other date was

20   January 6th.

21   Q.  Okay.  And you spoke at some of these protests that you

22   attended at the Colorado State Capitol during this time

23   period, right?

24   A.  That's correct.

25   Q.  And I don't intend to discuss this too much, but on

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    210

1    January 6th, 2021, you were protesting in Washington D.C.,

2    correct?

3            MR. REISCH:  Objection, relevance.

4            THE COURT:  Overruled.  I'll allow limited

5    questioning.

6    A.  I was attending the President's speech January 6th, and I

7    did go to the Capitol compound on January 6th.

8    Q.  (By MR. BREESE) And many other individuals, to your

9    knowledge, involved with USEIP's efforts participated in these

10   protests as well, correct?

11           MR. REISCH:  Objection relevance.

12           THE COURT:  Overruled.

13   A.  There were many people involved in election integrity at

14   January 6th, yes.

15   Q.  (By MR. BREESE) I'm asking specifically about USEIP.

16   A.  Yes.

17   Q.  Including both your codefendants, correct?

18   A.  Yes.

19           MR. REISCH:  Objection, relevance.

20           THE COURT:  Overruled.

21   Q.  (By MR. BREESE) In fact, that's the first time -- I

22   believe you testified at your deposition that's the first time

23   you met Ms. Kasun in person, right?

24   A.  On January 5th.

25   Q.  January 5th.  So the day before.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    211

1    A.    Yes.

2    Q.    So USEIP is not the only group that you founded that

3    focuses on election integrity, correct?

4    A.    Founded or cofounded.

5    Q.    Founded.

6            MR. REISCH:    I'm going to object.    Relevance, lack of

7    foundation.

8            THE COURT:    Overruled.    I'll allow her to answer.

9    A.    Can you ask the question again?

10    Q.    (By MR. BREESE) Sure.    USEIP is not the only organization

11    that you founded or cofounded that focuses on election

12    integrity efforts, correct?

13    A.    That's correct.

14    Q.    You're also a founder of Cause of America, correct?

15    A.    That's correct.

16    Q.    And the purpose of Cause of America is to enable the

17    grassroots organizations around the country focused on

18    election integrity concerns, correct?

19    A.    That was the purpose at the time that we founded it.    I

20    have not been involved with Cause of America since July of

21    2022, so I cannot speak to what their purpose is today.

22    Q.    When did you found Cause of America?

23    A.    November of 2021.

24    Q.    And apologies.    I didn't hear you.    When did you say you

25    were no longer with Cause of America?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    212

1    A.   July of 2022.

2    Q.   And between -- during your approximately eight-month

3    involvement, you were employed as a director of partnerships;

4    is that correct?

5    A.   That's correct.

6    Q.   And Cause of America was also founded by Mike Lindell; is

7    that correct?

8    A.   That's correct.

9         MR. REISCH:  Objection, relevance.

10        THE COURT:  Overruled.

11   Q.  (By MR. BREESE) And an example of a grassroots

12   organization that Cause of America enabled would be USEIP,

13   correct?

14        MR. WYNNE:  I'm going to object to vague.  I think

15   the word was enabled.  I'd ask for that to be clarified.

16        THE COURT:  Overruled.  He's echoing what she

17   established was the purpose or her reason for founding of

18   Cause of America.

19   A.   Can you ask the question again?

20   Q.  (By MR. BREESE) So we established that Cause of America

21   isn't -- you answered yes, that Cause of America is to enable

22   the grassroots organizations across the country focused on

23   election integrity concerns, and my question is an example of

24   one of those grassroots organizations that Cause of America

25   enables would be -- or enabled would be USEIP, correct?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    213

1    A.  I would say theoretically.  I'm not sure that Cause of

2    America ever directly enabled USEIP, but from a -- in concept,

3    I think you're correct.

4    Q.  And just -- I'm just trying to establish kind of the

5    connection between these two potential organizations.  But

6    essentially Cause of America is assisting with the

7    collaboration and synergy of grassroots organizations across

8    the country, correct?

9            MR. REISCH:  Objection, relevance, lack of

10   foundation, leading.

11           THE COURT:  Well, overruled.  I'm assuming he's

12   calling her as an adverse witness, and he's entitled to lead.

13           MR. BREESE:  I am, Your Honor.

14           THE COURT:  I'll allow some limited time, but I want

15   you to get to the point, if there is one, on the connection

16   between these two groups.

17   A.  Can you ask the question again?

18   Q.  (By MR. BREESE) I'll just actually move on to another

19   question.  Would you agree that Cause of America, this group

20   that you also cofounded, similar to USEIP has a mission to

21   expose the truth when it comes to election integrity?

22   A.  I don't believe the mission was ever stated that way.

23   Q.  How would you state Cause of America's mission?

24   A.  To enable the grassroots.

25   Q.  So there's no finding the truth with Cause of America as

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    214

1    USEIP did?

2    A.  It was -- so these are two completely separate

3    organizations.  There was no link between the two of them, and

4    they did have different purposes in the sense that USEIP was a

5    collection of -- or association of individuals across counties

6    working hands on in the states, specific activities within the

7    state, looking at data within the state.  Cause of America

8    broadly was connections across -- and my understanding at the

9    time of its founding, and, again, I haven't been there in

10   quite some time, so I can't speak to what they do.  But when

11   we said enable the grassroots, it was if the grassroots need

12   resources, expertise, knowledge, access to things, that -- to

13   enable their efforts for election integrity.  That Cause of

14   America may be able to provide some of those resources in a

15   truly enabling fashion.  So it's -- they were doing very

16   different things.

17   Q.  I appreciate that.  That answered my next three questions.

18   So kind of back to USEIP's goal, to expose the truth, the goal

19   is to expose the truth to the world, correct?

20   A.  Yes.  I said that in my deposition, and I think that's --

21   you know, in concept that's a true statement.

22   Q.  To the masses?

23   A.  To the world, yes.

24   Q.  So you describe USEIP as a free association made up of

25   individuals who voluntarily use their skills, talents, and

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    215

1    passions to engage in civic duty, correct?

2    A.  That's right.

3         THE COURT REPORTER:  Can you slow down, please.

4         MR. BREESE:  Yes, I apologize.

5    Q.  (By MR. BREESE) Because different individuals involved

6    with USEIP possess different skills, right?

7    A.  Yes.

8    Q.  In fact, it was the different skill sets that led you and

9    the other founder of USEIP to come together and collaborate,

10    correct?

11    A.  I think we came together and collaborated.  Then realized

12    that we had different and complementary skill sets, and that

13    propelled us to keep collaborating.

14    Q.  And we already discussed this, but one of the skills you

15    had was your background in organizational change management,

16    right?

17    A.  Yes.

18    Q.  As well as your writing and communications skills,

19    correct?

20    A.  Yes.

21    Q.  And I'd imagine that writing and communication is

22    certainly helpful for the expose-the-truth leg of USEIP's

23    mission, right?

24         THE COURT REPORTER:  I'm sorry.  You haven't slowed

25    at all.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1   07/15/2024   216

1          MR. BREESE:  I apologize.

2          THE COURT:  Let me tell everybody.  If you've ever

3    tried to do this, it's very complicated.  And because I

4    sometimes speak fast, I can tell you you're speaking about

5    260 words a minute.  I know that because I do that on

6    occasion, and then I get yelled at by Ms. Mitchell as well.

7    So just try and take a deep breath.  You're reading questions,

8    which prompts you to speak more quickly.  So just slow down

9    your reading.  Ms. Epp, you can get going too, so just try and

10   take a breath before you answer and give some natural pauses,

11   and that will help our court reporter.

12         MR. BREESE:  I appreciate it, Your Honor.  I'm going

13   to try this slower.

14   Q.  (By MR. BREESE) I believe that I asked the skill of

15   writing and communication, one of the skills that you bring to

16   USEIP, is certainly helpful for the expose-the-truth leg of

17   USEIP's mission, right?

18   A.  Inasmuch as expose the truth is referring to

19   communications, yes.

20   Q.  And you've used that skill of writing and communication

21   through the drafting and publishing of numerous written

22   materials for USEIP, correct?

23   A.  That's correct.

24   Q.  And one of the materials you drafted was a county and

25   local organizing playbook, right?

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    217

1    A.  That's correct.

2    Q.  If you could turn to Exhibit 1, I would like to discuss

3    this with you.  Is it fair to say that one of the purposes of

4    this playbook was to provide resources to groups in other

5    states that were also organizing in the fight against election

6    fraud?

7    A.  When you say provide resources, I would slightly push back

8    because this was to share our experiences and knowledge.

9    There weren't really resources.  There's an index of resources

10   in the playbook, but those resources are not in the playbook.

11   There's an index of them, not the resources themselves.

12   Q.  So share knowledge, that's knowledge -- that's knowledge

13   gained from USEIP's activities that had taken place preceding

14   this playbook being disseminated, correct?

15   A.  Correct.

16   Q.  And the resources and knowledge that you provide in this

17   document was gathered through a collaboration of different --

18   excuse me -- let me ask this question again.  The resources

19   and information that you provide in this document, it was

20   collected from those involved in USEIP's efforts in different

21   counties in Colorado, correct?

22   A.  That's correct.

23   Q.  Including USEIP's canvassing efforts, right?

24   A.  Can you ask the first part of the question again?

25   Q.  Sure.  Some of the information in this playbook that you

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    218

1    drafted, it involved information gathered from USEIP

2    volunteers that were involved in canvassing as well, correct?

3    A.   That's correct.

4    Q.   And this playbook was at least at some point published on

5    the USEIP website, right?

6    A.   That's correct.

7    Q.   And Mr. Smith testified to this, but the release or

8    dissemination of this playbook was in conjunction with a cyber

9    symposium hosted in North Dakota in late August 2021, correct?

10   A.   Its development was developed in regards to that event,

11   yes.

12   Q.   And then it was disseminated at that event, correct?

13   A.   It was completed, printed in South Dakota, and

14   disseminated at the event, yes.

15   Q.   And then moving to page 1 at the bottom, and we've already

16   gone over this, but -- or Mr. Smith has already touched on

17   this but this dedication page, Colonel Shawn Smith that you

18   reference there is obviously one of your codefendants,

19   correct?

20   A.   Correct.

21   Q.   And then Michael Lindell, your cofounder of Cause of

22   America, correct?

23          MR. REISCH:  Objection, leading.  Sorry.  Objection,

24   relevance, Your Honor.

25          THE COURT:  Overruled.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    219

1    A.  Can you ask the question again?

2    Q.  (By MR. BREESE) When you refer to Mike Lindell in the

3    dedication portion, that's Mike Lindell, your cofounder of

4    Cause of America, correct?

5    A.  That's correct.

6    Q.  Who is Dr. Frank?

7    A.  Dr. Frank is a math -- a physicist and a math teacher, I

8    believe, who did a data analysis after the 2020 election.

9    Q.  Has USEIP collaborated with Dr. Frank in any fashion?

10         MR. REISCH:  Objection, relevance.

11         THE COURT:  Overruled.

12    A.  Not that I recall directly.

13    Q.  (By MR. BREESE) You're one of the super moms, right?  The

14    super moms in Colorado?

15    A.  Yes.  We never called ourselves that.  That's a term that

16    we used specifically for this playbook and never again.  But,

17    yes, it's referring to me, as well as others.

18    Q.  Who called you the super moms?

19    A.  Dr. Frank called people across the country super moms.

20    Q.  Okay.  And Ms. Kasun is also one of the super moms,

21    correct, as referenced here?

22    A.  As referenced here.

23    Q.  Let's move to the next page of the playbook.  The first

24    sentence there says the U.S. integrity plan began in response

25    to the November 2020 fraudulent election, correct?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    220

1   A.  That's correct.

2   Q.  And as we've previously discussed, one of the purposes of

3   this playbook is to provide resources to groups in other

4   states that were organizing in the fight against election

5   fraud, correct?

6   A.  Can you repeat that question?

7   Q.  Sure.  One of the purposes of the playbook is to provide

8   resources to groups in other states that were also organizing

9   in the fight against election fraud, correct?

10  A.  As I said before, to share knowledge with an index to let

11  them know what resources were available, but the playbook

12  itself was not sharing resources.

13  Q.  But you'd agree that it was sharing knowledge in the fight

14  against election fraud, correct?

15       MR. REISCH:  Your Honor, I'm going to object.  The

16  document speaks for itself.  The document is drafted after the

17  canvassing, that it is not relevant as relates to the elements

18  that they must prove in their cause of action.

19       THE COURT:  Well, I'm going to overrule it, but agree

20  that we're kind of skating on the relevant thin ice here.  If

21  you can tie this in somehow, that would be more helpful.

22       MR. BREESE:  May I respond briefly, Your Honor?

23       THE COURT:  Yes.  Because the issue is canvassing

24  that took place earlier when this was not disseminated or

25  really in effect, so the relevance has some limitation.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1   07/15/2024   221

1          MR. BREESE:  And we'll get into it a little bit more,

2    Your Honor, as we work through the playbook, and I don't

3    intend to go through every single line, but I do believe that

4    the playbook as Ms. Epp has testified is from information that

5    -- it establishes and defines information that was gathered

6    through USEIP's activities.  So it is backwards looking at

7    what USEIP was actually doing before the playbook was actually

8    finalized and disseminated.

9          THE COURT:  I'll give you a limited rope, but I want

10   you to get to some relevant matters fairly rapidly.

11         MR. BREESE:  Sure.

12   Q.  (By MR. BREESE) So we're still on this same page.  Just

13   throughout this playbook the word "we" is used a lot, and when

14   you say we, it's referring to the United States integrity

15   plan, correct?

16   A.  It's referring to activists in Colorado.

17   Q.  It's not referring to just the United States Election

18   Integrity Plan?

19   A.  No.

20   Q.  What other groups?

21   A.  Well, so there are -- so Stand for the Constitution --

22         MR. REISCH:  Your Honor, I object.  Relevance.  It

23   has nothing to do with the allegations in the complaint.

24         THE COURT:  Well, I'll allow a limited basis, but,

25   again, Counsel, this just really isn't that germane to what

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    222

1    we're doing here today.

2            Go ahead.  You may answer.

3    A.  Can you repeat the question?

4    Q.  (By MR. BREESE) I asked you what other groups when the

5    word we is used?

6    A.  So there were many groups that were doing many things

7    around election integrity in the State of Colorado.  Stand for

8    the Constitution came up.  That's one of them.  The reason

9    Mesa County is in the playbook is because some members of

10   Stand for the Constitution were at the cyber symposium.  And

11   there was a mom with me from Weld County.  I was there from

12   Douglas County.  Ms. Kasun was there from Summit County.

13   There were people there from Jefferson County and El Paso

14   County.

15           And then there was like eight people from Mesa

16   County, and it was coming from Colorado, and they were there

17   in the room, and it felt weird not to include them.  So that's

18   why -- that's why Mesa County is in the playbook at all.  And

19   so it's not -- it wasn't just USEIP.  When I said we in this

20   playbook, it was referring to people in Colorado, because the

21   audience of this playbook is people outside of the State of

22   Colorado.

23   Q.  Okay.  I appreciate that.  If you could turn to page 6,

24   and I believe it's not the sixth page of the -- it's got six

25   at the bottom right.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    223

1    A.  I'm there.

2    Q.  One of the information that's being shared throughout this

3    playbook is how to build a team, correct?

4    A.  That's correct.

5    Q.  And this team -- and there would be teams that USEIP used

6    for their canvassing efforts, correct?

7    A.  I disagree with your characterization.

8    Q.  Why do you disagree?

9    A.  Because the canvassing was initiated by people in the

10   counties and what teams were there, were the counties that

11   were the teams that were doing canvassing.  USEIP was not

12   using them.

13   Q.  So there were not teams within each county that were

14   focused specifically on canvassing?

15   A.  Specifically and exclusively?

16   Q.  Specifically on canvassing.

17   A.  I believe there were teams in each county that were -- in

18   some counties -- not each county -- that were focused on

19   canvassing, as well as other things.

20   Q.  And you -- Mr. Smith testified earlier about being a

21   member of the core team.  Would you agree that you also were a

22   member of the core team?

23   A.  Yes.

24   Q.  And these teams that you just described, they would report

25   data to the core team, correct?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    224

1    A.    That's incorrect.

2    Q.    To the analytics team?

3    A.    I don't have personal knowledge about how that worked.    I

4    wasn't involved in data at all and the reporting of canvassing

5    from counties to the data team, to any team.    They did not

6    report to the core team, though.

7    Q.    So what was the core team's function?

8    A.    Oh, like -- I think like Shawn said, it was the people who

9    showed up, and we were kind of figuring out what we were doing

10    as we were going.    We were laying the ground as we were

11    running on it, and none of us had ever done this in a civic

12    capacity.    We're all professionals.    I'm going fast.    I'm

13    sorry.    I'll slow down.    We're all professionals and have

14    professional skill sets, but we had operated within the

15    confines of corporations or the military in the case of

16    Shawn Smith.    And so we were figuring it out as we went, and

17    that was kind of what the core team was from my perspective.

18    Q.    Did the core team communicate with the county captains?

19    A.    I communicated with the county captains.    I don't know

20    that Ms. Kasun ever did.    I think Mr. Smith did some county

21    captains, but the person who really kind of communicated with

22    the county captains on a regular basis was me.

23    Q.    Just one second, please.    And to your knowledge, would the

24    county captains be communicating with the team of volunteers

25    that were canvassing under the USEIP organizational

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    225

1    designation?

2            MR. REISCH:  Objection, foundation and lack of

3    personal knowledge.

4            THE COURT:  Sustained.

5    Q.  (By MR. BREESE) What's your understanding of the interplay

6    between the core team, county captains, and anybody that the

7    county captains were overseeing under USEIP?

8    A.  That's a very compound question.  He's asking me for the

9    interplay between three or four different groups.  Can we

10   break it down?

11           THE COURT:  Well, why don't you ask her about her,

12   because she's already said she's the one who communicated with

13   the captains.  So why don't you rephrase it targeting her

14   knowledge of her communications.

15   Q.  (By MR. BREESE) So we established earlier that you

16   communicated with county captains, correct?

17   A.  Correct.

18   Q.  And that was in your capacity as a -- on the core team of

19   USEIP, correct?

20   A.  It was in my capacity as what I viewed as change

21   management.  I had set out to build a change network and to

22   help people figure out how to organize locally for change for

23   maximum impact.  That was why I did it.  It wasn't because I

24   was part of some team.

25   Q.  And you had discussions with county captains about

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    226

1    canvassing efforts, correct?

2    A.  I'm sure I did.  I had conversations with captains all the

3    time, mostly by phone.  There was a weekly call, and, you

4    know, on those weekly calls it was kind of knowledge sharing

5    about what people were doing.  So there would have been

6    discussions of canvassing by the counties that were

7    canvassing, because that was the purpose of the call was to

8    share knowledge and connect dots about what was happening in

9    the various counties.

10   Q.  USEIP recruited, correct?

11   A.  Define recruited.

12   Q.  How do you define recruiting?

13   A.  How do I define recruiting?

14   Q.  Uh-huh.

15   A.  Actively seeking.  I would define recruiting in a

16   corporate standpoint, which would be attempting to identify

17   employees, which is why I respond to the word choice, because

18   we weren't attempting to identify employees.  We were

19   attempting to help make people effective when they decide they

20   want to get involved.  We didn't go out and seek to find

21   people.  We wanted to make people effective once they kind of

22   raised their hands and wanted to do something.

23   Q.  Did USEIP host events?

24   A.  We hosted the marches.  Well, this was before USEIP was

25   named USEIP or anything, but that was what I would consider an

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    227

1    event.  Other than that, I don't believe we hosted any events.

2    We did -- you know, people did speak at events.  We gave, as

3    Mr. Smith talked about, a presentation which was about voting

4    system vulnerabilities, not about canvassing, at the

5    April 24th Republican study council meeting because -- at the

6    request of Senator Lundberg.  We gave a presentation at an

7    event.  I don't recall us hosting events other than the very

8    early marches.  And even then it wasn't USEIP.

9    Q.  So your testimony today would be that USEIP did not

10   recruit in any fashion?

11   A.  Again, it depends on what the word that we're talking

12   recruit is.  Did we promote our efforts?  Did we have a form

13   that people that wanted to find out more or get involved with

14   election integrity, like, could fill out and then get plugged

15   in?  Yeah, we had that.  Did we have recruiters that went out

16   and found talent?  No.

17   Q.  If you look at page 7 of the playbook --

18   A.  Is that the number at the bottom?

19   Q.  Yes.  In the middle you say --

20   A.  Oh, it's not actually.

21   Q.  I apologize .

22   A.  Okay.  Now it is.  Okay.  Go ahead.

23   Q.  In the middle you say, But we are not in a time of peace,

24   correct?

25   A.  That's correct.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    228

1    Q.  And then in the last sentence of that you said, The secret

2    our enemy doesn't want you to know is that pretty much

3    everybody agrees on the Bill of Rights.  Did I read that

4    correctly?

5    A.  I think that is correct.

6    Q.  And the enemy is individuals that you believed to be

7    involved in election fraud?

8    A.  No.

9    Q.  Who is the enemy?

10   A.  I consider the enemy to be the uniparty.

11   Q.  And what's the uniparty?

12   A.  The group of -- a group of people with power and authority

13   that appear to be on opposite sides of things, but actually

14   work together to protect the status quo.

15   Q.  Do you believe the uniparty is involved in election fraud?

16   A.  Absolutely.

17   Q.  So my question was would you consider the enemy those that

18   are involved in election fraud?

19   A.  I'm sorry.  I thought you were referring to individual

20   voters.

21   Q.  My question was would you consider the enemy to be those

22   involved in election fraud?

23        MR. REISCH:  Your Honor, I'm going to object as to

24   relevance, argumentative, speculation.

25        THE COURT:  Overruled.  I'll let her answer.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    229

1   A.  Do I believe that the enemy is those involved in election

2   fraud?  Yes, in part, because I believe it's much broader than

3   that.

4   Q.  (By MR. BREESE) So you believe that USEIP was operating

5   its door-to-door canvassing efforts during a time that you

6   described in this document as not a time of peace, correct?

7   A.  Correct.

8   Q.  And then this document goes on to provide some tips on how

9   to organize, correct?  Because I believe the header is

10  organizing for connection?

11  A.  Correct.

12  Q.  And then just to clarify, if you move to the next page on

13  page 8, under the recruiting header, that second sentence

14  starts, We initially recruited for our first two months almost

15  exclusively at in-person rallies using a notepad and

16  collecting e-mails and phone numbers, correct?

17  A.  Correct.

18  Q.  And moving to the next page to number nine at the bottom,

19  this playbook discusses the importance of vetting volunteers,

20  correct?

21  A.  Correct.

22  Q.  And I believe one of the important -- or one of the

23  reasons that the playbook discusses this, one of the lessons

24  learned is because USEIP had volunteers participating at

25  events that had a criminal history of sexual misconduct,

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    230

1    correct?

2            MR. REISCH:  Your Honor, I'm going to object as to

3    relevance.

4            THE COURT:  Let me get a response.  What is the

5    relevance?

6            MR. BREESE:  I'm discussing their process of

7    onboarding and vetting volunteers that participated in their

8    canvassing efforts.

9            THE COURT:  How is that relevant to this case?

10           MR. BREESE:  Because it touches on the process by

11   which USEIP gathered individuals to then train them to go out

12   and exercise this campaign of door-to-door canvassing.  I can

13   move it along quicker, Your Honor.

14           THE COURT:  Well, please do, because she's indicated

15   they simply worked with people in the county who had already

16   -- who wanted to do canvassing, that they didn't recruit

17   canvassing -- canvassers.

18           THE WITNESS:  That's correct.

19           MR. WYNNE:  I'm going to join in the relevancy

20   objection.  There's no foundation that some type of security

21   clearance was required in this instance, and without that I

22   don't think the question has a foundation.

23           THE COURT:  Let's move on.

24           MR. BREESE:  I can move on, Your Honor.

25   Q.  (By MR. BREESE) If we move to -- and you briefly touched

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1      07/15/2024    231

1   on this, but you talked about most of this is information

2   sharing, but there were some documents and references to

3   documents at the end of this playbook, correct?

4   A.  Can you point me --

5   Q.  Page 15 at the bottom.

6   A.  Yes.  This is the index I was talking about.

7   Q.  That label under voter verification, that's referring to

8   the canvassing efforts, correct, that process?

9   A.  Voter verification refers to the canvassing efforts, yes.

10  Q.  And in this playbook you're offering to provide some of

11  these materials to the reader, correct?

12  A.  Upon request.

13  Q.  Upon request.  And why upon request?

14  A.  We weren't publishing all of our materials out to the

15  world, but if other states -- again, the audience of the

16  playbook was individuals in other states, and if they wanted

17  to dig deeper into one area of this, it also referenced that

18  this index is an appendix.  Voter verification information was

19  an index to the playbook itself.  The playbook itself was not

20  recruiting people to canvassing.  The playbook was tips and

21  tricks and knowledge sharing for organizing.

22  Q.  And did people reach out for these types of materials?

23  A.  Not to me.

24  Q.  To your knowledge, did they reach out to anybody else?

25  A.  Not to my knowledge.  I'm not saying they didn't.  I just

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    232

1    don't have any knowledge.

2    Q.  Okay.  And moving to -- let's see -- just to confirm for

3    the record, the playbook did provide an overview starting on

4    page 20 of the voter verification process that was utilized by

5    USEIP, correct?

6    A.  So if I recall correctly, this was added after the

7    symposium.  So the original playbook was -- it would have

8    ended at the appendix, and then when we went to publish it on

9    the website, we added in this voter verification piece, but it

10   wasn't in the original printed version that was given out at

11   the symposium.  It wasn't part of the original intent, I

12   should say.

13   Q.  But this version, as you believe you just testified to,

14   was posted on USEIP's public website, correct?

15   A.  Correct.

16   Q.  Okay.  So we talked a little bit earlier about your Ashe

17   in America blog.  When did you begin this blog?

18   A.  Oh, I want to say late -- I really -- I really don't know.

19   I want to say late 2019, maybe early 2020.  I was writing on

20   Medium before that, and then I moved over from Medium to

21   having my own site, and I just don't recall when that change

22   actually occurred.

23   Q.  What's Medium?

24   A.  A blogging platform.

25   Q.  Okay.  You said 2019 or 2020?

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    233

1    A.  I believe so.

2    Q.  Okay.  So it predates the founding of USEIP, correct?

3    A.  That's correct, yes.

4    Q.  And we touched on this earlier, but you talk about

5    politics, Colorado politics, national politics, local

6    politics, right?

7    A.  Among other things, yes.

8    Q.  What are some of those other things?

9    A.  I talk about --

10         MR. REISCH:  Objection, relevance.

11         THE COURT:  I'll allow it.  Go ahead and answer.

12   A.  I talk about corporate matters.  I do -- are we talking

13   about Ashe in America in the timeframe of canvassing or now?

14   Q.  (By MR. BREESE) Since its inception.

15   A.  So up to and including now?

16   Q.  Sure.

17   A.  So what's used -- so AsheinAmerica.com versus

18   AsheinAmerica.substack -- are we talking about me as a blogger

19   or the specific platform?

20   Q.  Describe the difference if you don't mind.

21   A.  Well, I blog on -- I write on many different platforms, so

22   I'm trying to understand are you asking me as a writer, or are

23   you asking me specifically about this platform?

24   Q.  Understood.  I'm asking specifically about the Ashe in

25   America blog.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    234

1    A.   The Ashe in America blog, you asked what are some of the

2    other topics; is that correct?

3    Q.   Correct.

4    A.   Mental health was on there.  And it's been a long time,

5    but not just politics, but news I would say, other matters of

6    news and public interest.  Religion as well.

7    Q.   And you were blogging throughout the year 2021, correct,

8    on the Ashe in America blog?

9    A.   That's correct.

10   Q.   How much would you say that you blogged?

11   A.   Oh, it was super inconsistent.  Sometimes it would be, you

12   know, two, three times a week.  Sometimes it would go a month

13   or more before I did.  It was just whenever -- I had a

14   full-time job, mom of three boys, so it was a pure hobby at

15   that point.

16   Q.   And I apologize.  Did you say that you've since now

17   monetized this since moving to Substack?

18   A.   AsheinAmerica.com?

19   Q.   Correct.

20   A.   AsheinAmerica.com is not monetized.

21   Q.   The Ashe in America blog is now monetized?

22   A.   The AsheinAmerica.substack.com is monetized, yes.

23   Q.   And that's through advertisements?

24   A.   No.  It's through subscribers.

25   Q.   Understood.  So your blog was up and running through 2021

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    235

1    while USEIP was canvassing, correct?

2    A.  That's correct.

3    Q.  And you blogged about USEIP at least in some parts after

4    USEIP's canvassing, correct?

5    A.  I would need you to refresh -- there's one exhibit I

6    believe that discusses USEIP canvassing, but it is basically

7    publishing a letter that somebody else wrote about USEIP

8    canvassing.

9    Q.  But you would agree that on your Ashe in America blogs you

10   did reference USEIP's efforts, correct?

11   A.  I referenced USEIP canvassing quite a bit.  I referenced

12   -- I referenced USEIP quite a bit.  I referenced USEIP

13   canvassing very limited.  Just once that I can remember.

14   Q.  Just once?

15   A.  Exhibit 15, I believe, is the one.

16   Q.  And in many blogs you discuss what you constitute as

17   government officials perpetuating election fraud, correct?

18   A.  Can you point to where I said that?

19   Q.  Do you not discuss government officials and election fraud

20   pretty regularly throughout --

21   A.  Well, you're putting words in my mouth, so I'd like to

22   know if I actually said that before I affirm that I said it.

23   Q.  Do you generally discuss government officials and --

24   government officials and election fraud throughout your blogs?

25   A.  Yes.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    236

1  Q.  And I believe you discussed in some capacity how this

2  election fraud can be described as an interstate conspiracy,

3  correct?

4           MR. REISCH:  Your Honor, I'm going to object to

5  relevance.  We have no timeframe as it relates to the question

6  before the witness.

7           THE COURT:  I assume he's still on the Ashe in

8  America blog, but --

9           MR. BREESE:  I am, Your Honor.

10          MS. EPP:  But he did move to the Substack, though, so

11  it is a little bit confusing.

12          THE COURT:  What timeframe -- which blog do you want

13  her to speak to?

14          MR. BREESE:  Well, I'm going to ask her about all of

15  them, but I'm talking generally about the 2021 to early '22

16  time period before you moved over to Substack.

17  A.  Okay.  Can you ask me your question again?

18  Q.  (By MR. BREESE) Sure.  I had asked you if you generally

19  have discussed in your blogs government officials and election

20  fraud.  You said that you have.

21  A.  Yes.

22  Q.  And I asked you if you've discussed how this election

23  fraud that you blog about could be described as an interstate

24  conspiracy.

25  A.  I specifically referred to interstate conspiracy as it

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    237

1    pertains to Mesa County, Colorado, and Maricopa County,

2    Arizona, having the same sources and methods that appeared

3    through their audit and forensic investigative activities.

4    Q.  So the answer would be yes?

5    A.  Yes.

6    Q.  And one of USEIP's goals, as you stated, is to expose the

7    truth, right?

8    A.  Correct.

9    Q.  And part of that exposing the truth or maybe the restoring

10   election integrity leg of USEIP's mission would be to hold

11   those in government responsible for election fraud, correct?

12          MR. REISCH:  Objection, relevance.

13          MS. EPP:  It's also compound.

14          THE COURT:  Well, I'm going to sustain the objection

15   and plead with you to get to something that pertains to voter

16   intimidation.  I understand the backdrop here, but we're not

17   on anything that's even remotely close to what the claim in

18   this case is.

19          MR. BREESE:  Okay.

20   Q.  (By MR. BREESE) I will turn your attention to -- look

21   through my notes real quickly -- if you could turn to

22   Exhibit 17.

23   A.  I have 16, and then 18 and 19 in this binder.  I'm there.

24   Q.  And this is a blog that you posted on -- I believe the

25   date says September 27th of 2021, correct?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024   238

1  A.  That's correct.

2  Q.  In looking through this, is this an accurate

3  representation of that blog that was posted on the Ashe in

4  America website?

5  A.  Yes.

6      MR. BREESE:  Your Honor, I'd ask that Exhibit 17 be

7  admitted into evidence.

8      MS. EPP:  I would object on relevance.

9      MR. WYNNE:  Your Honor, I will object as to Defendant

10 Kasun solely for the purposes of the record since it is

11 hearsay.

12     THE COURT:  Mr. Reisch?

13     MR. REISCH:  I would join on relevance, hearsay, lack

14 of foundation.

15     THE COURT:  All right.  Well, let me just move the

16 foundation along.  Did you write this blog?

17     THE WITNESS:  Yes.

18     THE COURT:  The exhibit is admitted.  You may

19 proceed.

20     (Exhibit 17 received.)

21 Q.  (By MR. BREESE) And I believe that in this exhibit -- you

22 just were previously discussing the results of a Maricopa

23 County audit and a Mesa County audit, correct?

24 A.  Maricopa County audit and Mesa County examination of

25 forensic images.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    239

1   Q.  And this is the blog where -- this is the blog you were

2   discussing, correct?

3   A.  I don't know what you mean by that.

4   Q.  You just -- I'll ask another question.

5   A.  When you said this is the blog you were discussing, what

6   -- I don't know what that means.  Discussing when?

7   Q.  This is the blog that you were previously discussing that

8   had your analysis of the Maricopa and Mesa County audit --

9   A.  Oh, the interstate -- when I used that term, yes, that's

10  correct.  Sorry.  I didn't understand what you meant.

11  Q.  And moving to page 11 -- excuse me -- page 12, so it says

12  USEIP_142 at the bottom.

13  A.  Okay.

14  Q.  And we talked earlier about how you blog -- you blogged

15  before about USEIP, and this is one example, correct?  I

16  believe this is a hyperlink to a press release, that red

17  underline, correct?

18  A.  Yes.  Again, I object on relevance.  This has nothing to

19  do with canvassing or voter intimidation.

20          THE COURT:  I understand.  I'm going to overrule the

21  objection and allow him to continue.

22  A.  Yes.

23  Q.  (By MR. BREESE) So just to be clear for the record, when

24  you state here that you released a press release -- when

25  somebody that were to be reading this blog online, if they

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1   07/15/2024   240

1   were to click that press release, it would take them to the

2   USEIP website, correct?

3   A.  That's correct.

4   Q.  Okay.  And it's fair to say that in this blog you were

5   also analyzing and commenting on the results of those two

6   audits in Maricopa County and Mesa County, correct?

7   A.  Correct.

8   Q.  And moving to page 15, so it's 15 of 19.  It says 145.

9   A.  I'm there.

10  Q.  There's a big section that says, So what can you do about

11  it, correct?

12  A.  Correct.

13  Q.  So you're talking about what can the reader do, you know,

14  in response to these two audit results, correct?

15  A.  I would say it's in response to -- usually when I'm

16  writing, the subheaders are a thread.  So, yes, it's in

17  response to the rest of the article that's been presented and

18  the rest of the article.

19  Q.  Which is what you say is proof of an interstate conspiracy

20  to defraud the American people, correct?

21  A.  I believe it is.

22       MR. REISCH:  Objection, relevance.  I mean, this has

23  nothing to do, Your Honor, with elements they have to prove of

24  their cause of action.

25       THE COURT:  I agree.  I'm just waiting for somehow

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    241

1   this to be tied in, and I've warned you several times, but it

2   doesn't come.

3          MR. BREESE:  I appreciate it, Your Honor, but part of

4   our case is the rhetoric that defendants used in public

5   documents was that of an aggressive or in some ways a violent

6   nature.  So I'm getting to the point here.  I have two further

7   questions on this particular document, and then I will move

8   on.

9          THE COURT:  All right.  Let's go quickly.

10          MR. REISCH:  And I will just note, these blogs are

11   after the alleged canvassing, so I don't think they have

12   relevance.

13          THE COURT:  I understand.  Let's move on.

14          MR. BREESE:  Could the court reporter please read my

15   last sentence -- or question back?

16      (The requested portion was read back.)

17   Q.  (By MR. BREESE) And then down at the bottom portion of the

18   blog you say, It's time for pitchforks and angry mostly

19   peaceful crowds, correct?

20   A.  Yes.

21   Q.  You also say, Keep fighting and calling, writing,

22   pressuring, correct?

23   A.  Correct.

24   Q.  I believe in another blog you refer to tarring and

25   feathering, correct?

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    242

1    A.  Can you point to where that is?

2    Q.  You don't recall that?

3    A.  I'm sure I probably said it, but I'd like for you to show

4    me where I said it.

5    Q.  So in your opening statement you said that you used

6    language that some people would consider offensive, correct?

7    A.  I do.

8    Q.  Is that one of your intentions in blogging?

9    A.  No.  I present the truth as I see it.  And when it comes

10   to this issue -- we talked about me working for

11   PricewaterhouseCoopers.  That's an SEC audit firm.  I was

12   trained every single year and had to test on independence,

13   about obstruction, and crimes related to people in positions

14   of power and authority.  When we got to this point at the

15   point that I was writing this, absolutely, I was not trying to

16   offend anyone.  I was trying to present how strong I thought

17   this issue was.

18   Q.  I appreciate that.

19            THE COURT:  Counsel, let's use this as a break.  It's

20   3:10.  Let's come back no later than 3:25.

21            MR. BREESE:  Thank you, Your Honor.

22            THE COURT:  We'll be in recess for 15 minutes.

23            THE COURTROOM DEPUTY:  All rise.  Court is in recess.

24       (Break was taken from 3:10 p.m. to 3:30 p.m.)

25            THE COURT:  Please have a seat.  Let's continue.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    243

1   Q.  (By MR. BREESE) Hello, Ms. Epp.

2   A.  Hello.

3   Q.  Do you recall filing a few documents with the Court on

4   January 9th of this year?

5   A.  Can you tell me what they were?

6   Q.  There was a motion for continuance in this case, right?

7   A.  Yes.

8   Q.  And you were in support of the motion for continuance,

9   correct?

10  A.  That's correct.

11  Q.  Do you recall filing a document where you discuss USEIP's

12  current activities?

13  A.  Yes.

14  Q.  And is it true that USEIP associates are actively engaged

15  currently in all 64 counties in Colorado?

16          MR. REISCH:  Your Honor, I'm going to object as to

17  relevance given the time period in which is at issue.

18          THE COURT:  Overruled.  Go ahead.

19  A.  Do we have the document?

20  Q.  (By MR. BREESE) Sure.  We can bring that up.

21  A.  That would be helpful.

22  Q.  To refresh your recollection.  If you can just read that

23  full paragraph in the middle.

24  A.  Do you want me to read it out loud?

25  Q.  No, you don't need to.  Just to refresh your recollection.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024   244

1    A.  That's correct.

2    Q.  So I believe my question was is it true that USEIP

3    associates are actively engaged in all 64 counties?

4         MR. REISCH:  Objection, relevance, given the date of

5    the filing.

6         THE COURT:  I've already overruled it.  You may

7    answer.

8    A.  To my knowledge, yes.

9    Q.  (By MR. BREESE) So USEIP began its activity when it was

10   founded on November 21st of 2020, correct?

11   A.  Well, again, it wasn't called USEIP at that point, and

12   that was the date that Holly bought a Basecamp license.

13   Q.  Do you remember when it was first called USEIP?

14   A.  I don't.  I want to say it was late December, but it could

15   have been in January.  I'm not entirely sure.

16   Q.  So pretty shortly after it was founded, right?

17   A.  Within a couple of months.

18   Q.  And USEIP has been active in some capacity since that time

19   period until the present day, correct?

20   A.  That's correct.

21   Q.  And there is an upcoming presidential election, correct?

22   A.  That's correct.

23   Q.  And USEIP's canvassing efforts began after the 2020

24   presidential election, correct?

25   A.  That's correct.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    245

1    Q.  Is there anything stopping USEIP from canvassing after the

2    upcoming presidential election?

3             MR. REISCH:  Objection, relevance, Your Honor.

4             THE COURT:  Overruled.  I'm assuming it goes to

5    standing and the plaintiffs' request for relief in this case;

6    is that correct?

7             MR. BREESE:  Yes, Your Honor.

8             THE COURT:  Overruled.  Please answer.

9    A.  So in this argument here with regard to if USEIP's active

10   in all 64 counties, that is not with respect to canvassing.

11   It's with respect to USEIP, which is significantly greater

12   than just canvassing.  Canvassing was one activity that was

13   taken by groups of people around the state.  But when we say

14   active in all 64 counties, it could be one person.  It could

15   be 150.  And they could be doing canvassing.  They could be

16   doing meetings with their county clerks, research, all sorts

17   of activities, legislative endeavors, all sorts of things that

18   USEIP activists did.  So when you ask are they actively

19   engaged in all counties, I would say yes.  Are they planning

20   on canvassing in 2024, not to my knowledge.

21   Q.  (By MR. BREESE) That wasn't my question.  My question was

22   is there anything -- you've described USEIP as a free

23   association of people, correct?

24   A.  Uh-huh.

25   Q.  Is there anything stopping volunteers for USEIP from

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    246

1    canvassing after the 2024 election results are released?

2    A.  No, including this litigation.  This litigation wouldn't

3    stop it.  We have no control over what they do.

4    Q.  I didn't understand the reference to the litigation.  My

5    question is just simply is there anything stopping USEIP

6    volunteers from canvassing after the 2024 election?

7    A.  Nothing, including the hypothetical future relief

8    requested.

9    Q.  Appreciate that.  So could you turn to Exhibit -- excuse

10    me -- Exhibit 15.

11    A.  I'm there.

12    Q.  And this is a blog that was posted to the Ashe in America

13    website, correct?

14    A.  That's correct.

15    Q.  And did you write this blog?

16    A.  Yes.

17    Q.  And it looks like this blog was posted March 23rd, 2022,

18    correct?

19    A.  That's correct.

20         MR. BREESE:  And I'd ask the Court admit this blog

21    into evidence.

22         MR. WYNNE:  Objection, hearsay as to Ms. Kasun.

23         MR. REISCH:  Objection, hearsay, relevance, given the

24    date of the blog.

25         THE COURT:  Overruled.  I'll admit Exhibit 15.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    247

1        (Exhibit 15 received.)

2    Q.   (By MR. BREESE) And turning to the first page -- excuse me

3    -- I guess it's the second page, USEIP_118 at the bottom.

4    A.   Yes, I'm there.

5    Q.   And this is similar to the last blog that we looked at,

6    this where it says USEIP press release, correct?  Do you see

7    that?

8    A.   Yes.

9    Q.   And it's in red, right?

10   A.   Yes.  It's a hyperlink.

11   Q.   So it's a hyperlink to the USEIP website, correct?  And

12   this was a hyperlink I believe based on the text, after the

13   Colorado canvassing report, correct?

14   A.   No.  This is to the Mesa County report.

15   Q.   So this was linking to a press release about the Mesa

16   County report?

17   A.   Yes.  This is talking about the Mesa County report which

18   had dropped on the Tuesday prior, according to the paragraph

19   before this.  This is not about the canvassing report.  It's

20   about the Mesa County report.

21   Q.   But it links to the USEIP website, correct?

22   A.   It links to a press release on the USEIP website, yes.

23   Q.   Okay.  And then turning to page 13, so it's USEIP_129 at

24   the bottom.

25   A.   Okay.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024   248

1   Q.  And just -- we don't need to go through the entirety of

2   this blog necessarily, but I believe this blog -- well, just

3   explain for the Court what the Mesa County report discussed.

4        MR. REISCH:  Objection, relevance.

5        THE COURT:  What is the relevance of the Mesa County

6   report?

7        MR. BREESE:  I'm getting to the fact that she has

8   commentary related to how USEIP will respond to that report,

9   so I'm just asking briefly what the report is.

10       THE COURT:  All right.  Objection sustained.  Let's

11  get to the part you think is arguably relevant.

12  Q.  (By MR. BREESE) Do you discuss in this report -- or excuse

13  me -- in this blog Matt Crane's response to USEIP's canvassing

14  efforts.

15  A.  Yes.

16  Q.  And what is the opinion you express in this blog of Matt

17  Crane's statements?

18       MR. REISCH:  Objection, hearsay, relevance, Your

19  Honor.

20       THE COURT:  Overruled.

21       THE WITNESS:  Am I allowed to review it?  Because I

22  don't remember what my opinion was.

23       THE COURT:  Yes, refresh your recollection.  Do you

24  have a page cite for her to speed this along?

25       MR. BREESE:  Well, I mean, she essentially lists --

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024   249

1    or excuse me -- details his report on pages 124 through 127.

2              THE WITNESS:  I'm ready now.

3              MR. BREESE:  So I would imagine everything is after

4    that.

5    A.   So this e-mail from Matt Crane was specific to a Senate

6    Bill 22153, and there is information in there that's relevant

7    to canvassing.  This senate bill was something that I

8    personally, as well as others in USEIP, were actively engaged

9    in lobbying against.  We had written to the General Assembly.

10   Matt Crane, who is the director of the Colorado County Clerk

11   and Recorders Association, wrote to the General Assembly about

12   the Mesa reports, which is why that's referenced, as well as

13   the Colorado canvassing report.  Within his -- his analysis,

14   at no point does he mention intimidation or whatsoever.  It's

15   just not there.  And he goes pretty hard at USEIP canvassing,

16   and there's nothing in here that affirms the plaintiffs'

17   allegations.

18   Q.   (By MR. BREESE) So you described his remarks as defamatory

19   and libelist, though, correct?

20   A.   I do, yes.

21   Q.   And why is that?

22   A.   Oh, we can go to the specific parts if you'd like.

23             MR. REISCH:  Your Honor --

24   Q.   (By MR. BREESE) Well, regardless --

25             THE COURT:  Hold on.  What's the objection?

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    250

1          MR. REISCH:  Objection, hearsay.  And, I mean, it's

2    not even in this blog, this report.  So we have hearsay within

3    hearsay within hearsay.  So I object under hearsay and

4    relevance.

5          THE COURT:  All right.  Overruled.  They're not

6    talking about Matt Crane's report for the truth of the matter

7    asserted.  I think what he's going for is the reaction on

8    Ms. Epp.  She may answer.

9          Go ahead.

10   A.  So you asked about the libelist and defamatory.  In Matt

11   Crane's response on USEIP_0127, the second paragraph, USEIP

12   members collected a list of approximately 750 deceased peoples

13   who they claim had cast a ballot in the 2020 election.  That

14   was not USEIP.  That was a different group of people that Matt

15   Crane attributed to USEIP.  Additionally, he goes in -- you

16   know, throughout his remarks and disparages the work of USEIP.

17   At this point you can tell there's -- at 0126 there is a list

18   of questions that Matt Crane has about the USEIP canvassing

19   report.  None of them are relevant to this case.

20   Q.  (By MR. BREESE) Well, I didn't ask you if you think

21   they're relevant or not.  I asked you what the defamatory and

22   libelist remarks were.

23   A.  Attributing other people's work to us.  Amateur and

24   inaccurate work like this undermines the public trust.  I

25   think that his -- he was -- he was describing our work as

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    251

1   amateur and inaccurate without having seen it, because it

2   hadn't been published yet.

3   Q.  And you take offense to that?

4   A.  Absolutely.

5   Q.  And on USEIP_129, you say, And I know the technical

6   experts at USEIP will have something to say.

7   A.  Uh-huh.

8   Q.  And is that in reference to the forthcoming canvassing

9   report?

10  A.  Let's see, will have something to say about Crane's

11  defamatory and libelist remarks.

12  Q.  What did you anticipate that USEIP will say?

13  A.  I don't recall.  This was over two years ago.

14  Q.  So you have no idea what you meant when you said that?

15  A.  I don't recall what I believed that they would say.

16  Q.  And then moving to the last page, is that a Jena Griswold

17  in jail Photoshopped image?

18  A.  It is.

19  Q.  And, We're getting closer, all.  I assume that means

20  getting closer to her getting prisoned?

21  A.  Getting closer to accountability, yes.

22  Q.  Okay.  Mr. Dillon spoke earlier with Mr. Smith about

23  Basecamp.  Do you recall that testimony?

24  A.  I recall that they had that conversation.  Specifics --

25  you're going to have to be more specific.

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    252

1    Q.  Do you recall them talking about Basecamp?

2    A.  Yes.

3    Q.  And you were active on Basecamp, correct?

4    A.  Yes.

5    Q.  What groups were you in on Basecamp?

6    A.  I was in Douglas County.  I was on the core team.  I was

7    in some other counties.  The town hall or town -- was it town

8    hall I think it was, which was the group Mr. Smith referenced

9    that we had to create another group for people that wanted to

10   talk about other things because it was clogging up the feeds.

11   There were hundreds of different rooms in there.  Those were

12   the ones in which I was probably the most active was Douglas

13   County and core team.  I think I was in -- I think I was in

14   one of the county voter verification rooms, but I don't know

15   that I was in the overall voter verification room where they

16   were designing the process and all of that kind of stuff.  I

17   don't believe I was.

18   Q.  Designing the process that the counties would then employ

19   in their canvassing efforts?

20   A.  Well, it was the counties coming together to design the

21   process to deploy in their canvassing efforts.

22   Q.  But there was one centralized room where this was

23   discussed in Basecamp?

24   A.  There were many county voter verification rooms.  I don't

25   know that it was the lone centralized room about voter

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    253

1    verification, no.

2    Q.  Well, tell me about the voter verification room you were

3    in.  Were there captains from other counties in this room?

4    A.  No.  No.  It was Douglas County specific.  It was for

5    organizing volunteers and things.  I'm trying to recall if it

6    was very active.  I don't recall a lot of activity in it,

7    because when I canvassed in Douglas County, I was called on

8    the phone and said, Hey, can you come, and I happened to be

9    able to come, so I did.  It was like a block from my house at

10   the library.

11   Q.  Before we go into more discussion on Basecamp, you've had

12   your blogs related to election fraud published on

13   FrankSpeech.com, correct?

14   A.  There were one or two blogs related specifically, if I

15   recall correctly, to Mesa County that were published on

16   FrankSpeech.  After I published them on AsheinAmerica.com,

17   they picked up on FrankSpeech.  I didn't -- I didn't write

18   specifically for FrankSpeech.

19   Q.  And you've appeared multiple times on podcasts, correct?

20   A.  Yes.

21   Q.  Discussing election fraud?

22   A.  Yes.

23        MR. REISCH:  Objection, relevance, Your Honor.

24        THE COURT:  I'm going to overrule it, but I'm going

25   to note the same thing.  We've got to make some connection to

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    254

1    claims in this case, which is missing at this point.

2    Q.   (By MR. BREESE) You're familiar with the application

3    Parler, correct?

4    A.   Yes.

5    Q.   And you ran the USEIP Parler account at some point,

6    correct?

7    A.   I don't believe we ever had a USEIP Parler account.

8    Q.   You did not run an account that had the name @USEIP on the

9    application Parler?

10    A.   I don't believe so.  Parler was taken -- deplatformed by

11    AWS in January of 2021, and USEIP didn't have any social media

12    before that, I don't believe.  If we did, we would have had

13    Telegram, but nothing else.

14    Q.   I'll come back to that.  And also you've drafted numerous

15    statements that were publicized on behalf of USEIP, correct?

16    A.   Two.

17    Q.   And were those statements to the Colorado Republican

18    Party?

19    A.   Actually, let me correct.  The two statements that I

20    drafted were not USEIP.  They were Colorado Election Integrity

21    Project, which was an early name within a couple of weeks of

22    the coming together and founding that we didn't continue

23    using.  Very, very early on wrote those statements, so I just

24    wanted to correct that you said it was USEIP.  The timing was

25    before USEIP was USEIP.  What was your question?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1     07/15/2024    255

1         MR. BREESE:  Could the court reporter please read

2    back my last question?

3         (The requested portion was read back.)

4    A.  I don't believe so.  I think there was one statement about

5    Ken Buck's Colorado Republican town hall, so it would have

6    been about the Republican Party, not to it, but the other

7    statements, if I recall them correctly, were to the

8    legislature, to officials and other officials with power and

9    authority.

10   Q.  (By MR. BREESE) So that one -- if you can turn to

11   Exhibit 11.

12   A.  Okay.

13   Q.  Is this the document that you were talking about that was

14   drafted in response to Ken Buck's livestream?

15   A.  Yes.

16   Q.  And you drafted this document?

17   A.  Yes.  I mean, I think I -- I think I was the lead writer

18   of it.  I'm sure others contributed to it.  This was

19   December of 2020, so I can't remember exactly how.  But I

20   don't believe it was just me on my own, but I was probably the

21   lead writer on it.

22   Q.  Other individuals might have been involved somewhat with

23   the drafting of this and the finalizing of it?

24   A.  Yeah.

25   Q.  Is this an accurate representation of that statement, to

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024   256

1   your knowledge?

2   A.  To my knowledge.

3           MR. BREESE:  Your Honor, I would move to admit

4   Exhibit 11.

5           MR. REISCH:  Foundation and hearsay, Your Honor, and

6   relevance.

7           MS. EPP:  There's definitely relevance as before.

8   This is long before canvassing and has nothing to do with

9   canvassing.

10          THE COURT:  I'm going to allow the exhibit in.

11  Exhibit 11 is admitted.

12      (Exhibit 11 received.)

13  Q.  (By MR. BREESE) And this document is -- I don't know if

14  signed is the wrong word, but it's signed by the Colorado

15  Integrity Project.  Is that a fair way to describe that?

16  A.  It is.

17  Q.  So you said that was before USEIP existed?

18  A.  It was before the name U.S. Election Integrity Plan had

19  been adopted by USEIP.

20  Q.  So where did that name come from?

21  A.  Well, it came -- Mr. Smith referenced there was a group

22  that said that they were going to sue us if we didn't

23  discontinue using our name, and they wanted us to stop --

24  basically stop using the acronym EIP, because they had I think

25  it was California EIP or something like that.  And we had free

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    257

1    association, no commerce, no fundraising.  I think that was

2    the biggest concern is it would compete with fundraising, and

3    we did no fundraising.  It wasn't an issue for us.  But to

4    avoid being sued, we changed project to plan.  This -- I don't

5    -- this isn't dated, so I don't recall when it was published,

6    but, you know, December-ish.

7    Q.  So is that not a logo at the top left that the USEIP

8    that's relevant to this case has used before?

9    A.  This logo was abandoned by middle of January of 2021, I

10   want to say.

11   Q.  This statement's posted or at least was posted at one time

12   on the USEIP website, correct?

13   A.  That's correct.  I think it's still there.

14   Q.  Can you just explain what you're referencing in this

15   statement?

16   A.  So Ken Buck held a livestream on December 2nd of 2020,

17   after there had been numerous reports and concerns about

18   different aspects of elections, data manipulation, voter roll

19   inflation, lots of different -- like I mentioned when I was

20   talking to Defendant Smith, there was so much chaos and lots

21   of, you know, information flying around.  We were trying to

22   figure out what was true.  We tuned in to Ken Buck's

23   livestream, which he was the GOP chair of Colorado at the

24   time, so it was a GOP event.  And this statement was in

25   response to that livestream.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1   07/15/2024   258

1  Q.  And who is the -- when you refer to you and your

2  throughout, who are you referring to?  Is it the Colorado

3  legislature?

4  A.  Can you give me a specific?

5  Q.  Sure.  If you look in the middle of it in bold, in the

6  middle of the document, you say, Your orchestrated,

7  coordinated, and manipulative narrative intended to gaslight

8  and pacify the people of Colorado is wholly rejected?

9          THE COURT:  All right.

10         MR. REISCH:  Objection, relevance.

11         THE COURT:  Counsel, can we approach, please?

12         MR. BREESE:  Sure.

13     (Bench conference held on the record:)

14         THE COURT:  This is the microphone, so if you're

15  speaking, speak one at a time into the microphone.  I don't

16  understand the relevance of what we're doing.  This is taking

17  a ton of time.  Most of this evidence is stipulated to.  I

18  don't think Ms. Epp denies the statements in any of these

19  documents.  The issue for this case is is she guilty of voter

20  intimidation, not sending out blogs, not talking about

21  election fraud.  What is the connection to your claim?

22         MR. BREESE:  The connection is with USEIP and Ms. Epp

23  and Mr. Smith established that they publicize a lot of things

24  related to election fraud, election integrity, that formulated

25  the reason and the basis for moving forward with their

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    259

1    canvassing.  We're going to argue the statements made on

2    behalf of USEIP three months or four months before they

3    started canvassing are certainly relevant to the motives

4    behind USEIP's canvassing efforts.  And also the publicized

5    nature of their statements and some of the rhetoric is

6    certainly relevant to whether voters could, in fact, have been

7    intimidated by USEIP volunteers.

8         THE COURT:  I find this connection so very slim.  Any

9    comments?

10         MR. WYNNE:  I have nothing to add to Your Honor's

11    comments.

12         THE COURT:  All right.  I need you to move.  You

13    haven't even established that she engaged in canvassing or

14    talked to a single person.  I want to know what Ms. Epp did,

15    not -- I have dismissed the organization.  It's not on trial

16    here.  We're talking about three individuals and their actions

17    for voter intimidation.  You've got to tie this to Ms. Epp and

18    what she is doing to intimidate voters, not express her

19    opinion about the election.  Do you understand the difference?

20         MR. BREESE:  I respectfully disagree, but I do

21    understand what the Court is saying.

22         THE COURT:  Well, given that, let's try to proceed to

23    that so we stop wasting so much time.  I imagine -- is there

24    any dispute about any of these documents you sent?  No.  So

25    you could point them out, let me read them.  I think I know

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1   07/15/2024   260

1   the flavor of all of them, by what I've seen.  That's not the

2   issue we're here to litigate.

3          MR. BREESE:  This document in particular wasn't

4   stipulated, but I appreciate it, Your Honor.  I'll move

5   forward.

6          THE COURT:  Let me ask you, Mr. Reisch, while you're

7   up here.  We noticed your client has some soft of a cord that

8   looks like a microphone.  Obviously we're concerned about

9   that.  I don't know what it is.

10          MR. REISCH:  Your Honor, he wore that in my office

11   the other day.  I believe it's he just keeps it around his

12   neck.  It's like you put in headphones like for a phone call.

13   I can confirm that.

14          THE COURT:  Confirm that he's not recording.

15          MR. REISCH:  No, no, no.  No way.

16          THE COURT:  Okay.

17          MR. REISCH:  Should I inquire and then give the

18   thumbs up?

19          THE COURT:  Sure.  Or if you see an issue, tell me.

20          MR. REISCH:  If there's an issue.  Obviously the

21   Court's admonition is on the door, no recordings.  We even

22   told that to the people in the gallery.

23          MR. BREESE:  Your Honor, actually one quick thing

24   before we move away from here.  I think part of our case also

25   is that Ms. Epp, Ms. Kasun, and Mr. Smith, despite their clear

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    261

1   efforts, they can't be absolved of everything that USEIP

2   volunteers were doing when it came to canvassing.

3           So part of our case is that if volunteers from the

4   organization that they created and the canvassing that they

5   began and orchestrated through -- I mean, we've established

6   Basecamp posts -- there is -- at least our argument there is

7   some sort of centralized system here -- they can't be absolved

8   of liability for the volunteers that they tasked to go out

9   there and to get information for their canvassing reports.

10  That is part of our argument, so I'm only saying this because

11  the Court did just state that we are talking specifically

12  about what Ms. Kasun did and Ms. Epp did and what Mr. Smith

13  did.

14          THE COURT:  Okay.  But as of yet you don't have any

15  evidence that they did anything with canvassing.  Do you have

16  a canvasser who's going to testify?

17          MR. BREESE:  We do.

18          THE COURT:  And are they going to attribute to what

19  they were saying to one of these three individuals?

20          MS. EPP:  Not on the witness list there's not a

21  canvasser who's going to testify.

22          MR. BREESE:  To one of these three specific

23  individuals, I don't believe so, no.

24          THE COURT:  Who is the canvasser on the witness list?

25          MR. BREESE:  Her name is Yvette Roberts.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1      07/15/2024    262

1          MR. REISCH:  She's not a canvasser.

2          THE COURT:  You're saying canvasser.

3          MR. BREESE:  Sorry, sorry.  You're saying canvasser.

4    I apologize.  So can you repeat the question?

5          THE COURT:  Do you have any canvasser on the witness

6    list who's going to tie their conduct to any statement made by

7    these three defendants or the association?

8          MR. BREESE:  We have three -- we have the defendants

9    that are witnesses that have established the entire

10   organization, have established the canvassing -- the

11   canvassing techniques and trained these volunteers.  And then

12   we will have a witness --

13         THE COURT:  But let me stop you right there.  That's

14   not what the evidence has shown.  I'm concerned that you're

15   not listening to the evidence that's come in, because you've

16   got three shots at this, and we're on number two.  Nobody's

17   said anything like that to support that part of your claim.

18         MR. BREESE:  To support they have been intimidated?

19         THE COURT:  No.  That they are the ones drafting --

20   encouraging canvassers, to the extent you have one, to go out

21   and intimidate voters.

22         MR. BREESE:  Your Honor, that's not what the law

23   requires us to show.  The law asks us to ask the Court to

24   determine if the efforts and the canvassing itself is

25   objectively intimidating, which is different than the specific

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1     07/15/2024    263

 1    intent --

 2              THE COURT:  You have two witnesses so far saying they

 3    have nothing to do with canvassing, that it was run by the

 4    counties on their own, that what they did was post a resource

 5    site essentially, and encouraged them to get data and use the

 6    Colorado Secretary of State.  You don't have any organized

 7    canvassing effort by these three individuals or this

 8    association yet.

 9              MR. BREESE:  Well, we will show evidence that

10    connects all of these dots, Your Honor.  I think the notion

11    that there's no connection between the defendants, USEIP, and

12    the volunteers that were out getting the information that they

13    were needing to then disseminate to prove their conclusions --

14              THE COURT:  What is the evidence?  Who's it coming in

15    through?

16              MR. BREESE:  The evidence is in the playbook that

17    establishes the organizational structure which canvassing is

18    one part of.  In addition to that, the Basecamp posts

19    establish a centralized discussion, you know, forum by which

20    they all discussed canvassing.  They discussed the specifics

21    related to canvassing.

22              THE COURT:  Okay.  But you have Mr. Smith barely on

23    two of those posts.  You don't even have Ms. Epp on any of

24    those posts yet.

25              MR. BREESE:  I'm getting there.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1     07/15/2024   264

1          THE COURT:  The playbook was enacted well after the

2   canvassing at issue in this case.  I am just alerting you that

3   what you've got here is very slim, and I'm encouraging you to

4   focus on something that establishes what you need to

5   establish, which I think you're misconstruing the burden.

6   It's higher than what you think it is.

7          MR. BREESE:  I appreciate it, Your Honor.  And I'm

8   about to move into, you know, the connection, at least from

9   our perspective, between Ms. Epp and the canvassers

10  themselves.

11         THE COURT:  Okay.  Good.

12         MR. BREESE:  And the organization behind that.

13         MR. REISCH:  There's no canvassers that are going to

14  be called to testify, and their one witness who says -- from

15  Mesa County, Yvette --

16         THE COURT:  Roberts.

17         MR. REISCH:  -- Roberts -- sorry -- she can't say who

18  came to her door.  So I would ask for an offer of proof here

19  as to how they think they're going to tie this in that

20  Mr. Smith, Ms. Epp --

21         THE COURT:  Well, I've given him notice.  We'll deal

22  with this on a Rule 50, because I'm telling you that's going

23  to be a serious substantive motion.

24         MR. BREESE:  He's correct.  We won't have a canvasser

25  that's going to state that they went out to intimidate voters.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    265

1    I'm not going to deceive the Court.  But we do have

2    individuals who establish an organized canvassing campaign,

3    and we believe that we will show that that canvassing campaign

4    is objectively intimidating, which I believe is our burden,

5    unless I'm mistaken, Your Honor.

6         THE COURT:  Okay.  I guess what I'm telling you is I

7    haven't seen any objective intimidation yet through the

8    materials you're covering in elaborate detail, so that's why

9    I'm encouraging you to move along thinking there might be

10   something else that helps you, because what you're on

11   currently isn't helping you.

12        MR. BREESE:  Okay.

13        THE COURT:  That's just a word of advice.

14        MR. BREESE:  I appreciate it.

15      (The following proceedings were held in open

16      court:)

17        MR. BREESE:  I don't recall what my last question

18   was, so do you mind reading that back?

19      (The requested portion was read back.)

20        THE COURT:  I think you were highlighting --

21   Q.  (By MR. BREESE) I think I was asking who the audience of

22   the document was when you say your.

23   A.  Do you want me to answer that?

24   Q.  Please.

25   A.  It's the line right before it to these Colorado officials.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    266

1   Q.  I think I already asked this.  I apologize.  This is --

2   this document was posted on the USEIP website, correct?

3   A.  Correct.

4   Q.  Okay.  So we were in a discussion involving Basecamp.  Can

5   you explain for the Court from your perspective what Basecamp

6   was as applied to USEIP?

7   A.  Basecamp is a project management tool that we used within

8   USEIP for organizing.  There was -- so there's a calendar, a

9   document repository.  It's like a Microsoft Teams, but a

10  different -- different brand.

11  Q.  And actually, I'm going to back up for a second.  I'm

12  going to address the Court's concerns as stated.  You

13  participated in actual canvassing, correct?

14  A.  I did.

15  Q.  And I believe you canvassed three times, right?

16  A.  Correct.

17  Q.  El Paso County once --

18  A.  Twice.

19  Q.  Twice.  And then in Douglas County once?

20  A.  That's correct.

21  Q.  And you attended a training session before canvassing in

22  Douglas County, correct?

23  A.  That's correct.  That's what I was referring to when I

24  said I headed to the library.  That was training.

25  Q.  And at this training session, I believe you testified in

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    267

 1  your deposition that it took about two hours, correct?

 2  A.  Yes.

 3  Q.  You described the training session as a therapy session

 4  for those attending, right?

 5  A.  I did.

 6  Q.  And it's because people, as you stated, were worked up

 7  about election integrity concerns, correct?

 8  A.  I believe what I said was that people just needed to talk.

 9  There was -- and I think if -- I don't know if we can pull up

10  my remarks from my deposition, but I believe I said it was

11  things going on with the election.  There was news breaking

12  every day.  There was a lot of chaos and messages coming out

13  from a lot of different places.  And when people gather

14  together in person, we had scheduled training for 45 minutes.

15  It took an hour because there was people that just needed to

16  talk.

17  Q.  And was this -- if you canvassed three times, once in

18  Douglas County, twice El Paso, this was the only canvassing

19  session -- or I guess you describe it as a walk, correct?

20  A.  What do you mean by the only?

21  Q.  I didn't finish my -- I'll start over.  You described each

22  session or canvassing event as a walk, right?

23  A.  Three walks, yes.

24  Q.  You said three walks?

25  A.  I went on three walks.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    268

1   Q.  You went on three walks.  So the walk in Douglas County,

2   that was the only walk where you attended a training session

3   prior to, correct?

4   A.  That's correct.  That was my first walk.

5   Q.  And at this training session, did you guys review -- or

6   how many people were at this training session?

7   A.  Nine, I want to say, give or take one.

8   Q.  And were you -- you were not a Douglas County captain,

9   correct?

10  A.  No.

11  Q.  And who was that?

12  A.  Douglas County captains were Mike Dovel, May Sands, Shawn

13  -- I can't remember her last name, but it was a she, spelled

14  the same way as Mr. Smith but a female, and I'm forgetting

15  one.  Jim Gilchrist.

16  Q.  And you said there was nine people that were there?

17  A.  There were.

18  Q.  Who led the training session?

19  A.  The training session was led by Tamara Nation, who was the

20  corporate trainer that did the USEIP training approach.

21  Q.  Did she review those materials that were reviewed with

22  Mr. Smith for the training?

23  A.  It was a much more completed version.  There were images

24  in it.  There was -- you would click and play a video about --

25  well, I can't entirely recall what the video was about --

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024   269

1   demeanor probably.  That's what's ringing a bell.  But there

2   were more assets within the training document than what we saw

3   on the screens in here, but the gist and the spirit of it was

4   essentially the same.

5   Q.  What types of images?

6   A.  So, well, the one that's coming to mind is a woman named

7   Laura where you could click on it and it would play a video of

8   her, but the way it showed up on the page on the slide was

9   just a picture of her.

10  Q.  Any other images that you can recall?

11  A.  I feel like there were, but I can't say exactly what they

12  were.

13  Q.  And so you had training prior to your walk in Douglas

14  County, but not in your walk in El Paso County, correct?

15  A.  No.  I had already been trained.

16  Q.  And did all of the individuals that were on the El Paso

17  County walks, did they -- had they previously been trained as

18  well?

19  A.  I don't know.  I imagine that they had, but I didn't ask

20  each one of them, so I don't know.

21  Q.  But there was no training session hosted in conjunction

22  with those particular walks?

23  A.  No.  Those walks were set up as walks for people that had

24  already been trained, so I would assume they had been already

25  trained.  But like Mr. Smith testified to, when he showed up

22-cv-00581-CNS-NRN    Bench Trial - Day 1        07/15/2024    270

1    to a walk, there were a few people that hadn't been trained,

2    so he quickly took them through a training because they hadn't

3    been trained.

4    Q.  And when you walked in Douglas, I believe you testified

5    that -- or you testified in your deposition that you walked in

6    groups of three, correct?

7    A.  In Douglas County, that's correct.

8    Q.  And how many -- I believe you testified that you canvassed

9    approximately 40 to 50 homes in El Paso County; is that

10   correct?

11   A.  Over the course of the two walks, I mean, that feels

12   right.  It's definitely a guess, but it's close.

13   Q.  And in total in Douglas County you canvassed approximately

14   20 apartments?

15   A.  That's right.

16   Q.  Is that apartments themselves or apartment buildings?

17   A.  No.  It was one apartment -- it was those apartment

18   complexes where you have multiple buildings -- it's a massive

19   apartment complex, so we probably hit four or five of the

20   individual buildings within that apartment complex, and then

21   20 apartments total.

22   Q.  And one interaction that you had while canvassing, I

23   believe in Douglas County, one of the canvassed individuals

24   was standoffish to you, correct?

25   A.  I testified to that in my deposition, yes.  She was an

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    271

1    older lady, and she answered our questions.  There was nothing

2    contentious, but everybody else was kind of warm and lovely,

3    and she kind of seemed like who are you and why are you at my

4    door.

5    Q.  I believe in your deposition you stated you thought it

6    might be because an individual you were canvassing with was

7    wearing a T-shirt that said 1776?

8    A.  There was a woman that had a T-shirt that said 1776 on it,

9    and we had a conversation speculating as to that was why this

10   one woman seemed different than everybody else.

11   Q.  And what's the connection between 1776 on a T-shirt and

12   somebody being potentially standoffish?

13          MR. REISCH:  Objection, speculation.

14          MR. WYNNE:  I object, relevance.

15          THE COURT:  Sustained as to speculation.

16   Q.  (By MR. BREESE) Well, what was your -- you testified

17   earlier to having a conversation about how you speculated that

18   it was 1776 that made that woman appear standoffish, correct?

19   A.  That me and the other canvassers discussed that, yes.

20   That that might be it, because we were attempting to figure

21   out why, and I think -- I think it was Mr. Dillon that talked

22   about our politically divisive environment and polarized

23   society.  1776 invokes images for people .  So I don't

24   understand the question as to why that would be uncertain.

25   Q.  No further questions on that topic.  Let's move back to

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024   272

1   Basecamp.  So you were on the core team, correct?

2   A.  Yes.

3   Q.  You attended core team -- you were within the core team

4   within Basecamp, correct?

5   A.  Correct.

6   Q.  What other individuals were on the core team in Basecamp?

7   A.  So the two codefendants in this case, Jeff Young, Melody

8   Peotter, P-e-o-t-t-e-r, Tamara Nation.  There were likely

9   others.  I think Charity McPike at some point was there.  It

10  was -- it was -- you know, it was a fluid thing, and as

11  Mr. Smith testified, it was kind of whoever kept showing up,

12  but that's it.  I mean, a good -- a good summary of

13  individuals.

14  Q.  So in the core team Basecamp there were meeting minutes

15  that were posted at times, correct?

16  A.  Uh-huh.

17  Q.  So does that imply that there was a phone call or a Zoom

18  call or something like that, and that's --

19  A.  It was a video -- sorry.

20  Q.  -- those meeting minutes?

21  A.  There was a videoconference once a week.

22  Q.  And then somebody was responsible for transcribing notes

23  from those, or at least drafting notes from those meetings?

24  A.  Yeah, I'm trying -- I don't remember how we did that, and

25  I don't think that there were meeting minutes for every single

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    273

1   meeting.  And, I mean, at some point I may have taken some.

2   It wasn't a terribly structured and organized thing, but, yes,

3   there were meeting minutes, and that would imply a meeting,

4   and somebody took meeting minutes.

5   Q.  How many core team meetings would you estimate that there

6   were from April of 2021 to August of 2021?

7          MR. REISCH:  Objection, relevance.

8          THE COURT:  Overruled.

9   A.  How many weeks is that?  I mean, it was once --

10  Q.  (By MR. BREESE) Estimate four months, four weeks, 16 weeks

11  approximately.

12  A.  They were once-a-week meetings.

13  Q.  And what other meetings -- did you participate in captain

14  meetings?

15  A.  There was one weekly county captains meeting.  The

16  majority of captain communication happened offline out of

17  Basecamp.  My personal communication, it was captains calling

18  me, me calling captains.  It wasn't, you know, a structured,

19  organized, centralized thing.  It was much more informal.  But

20  there was a weekly captain's call.  And, again, it was whoever

21  showed up.  Some counties never showed up.  There was still a

22  point of contact, which is that to the earlier question, USEIP

23  captain to me is point of contact.  That's what it means, and

24  that was from my experience running the change network.  It

25  was my point of contact in the different counties.  I believe

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1   07/15/2024   274

1    I'm the person that named it captain as well.

2           But there was one meeting each week, and I attended

3    them probably up until -- I want to say I didn't real attend

4    them when we were doing 22153.  There was a period -- it ebbed

5    and flowed as to when I would attend.  They would still go on

6    if I wasn't there, and, you know, other -- it was just a

7    knowledge share to check in each week to tell each other

8    what's going on.  Here's what we're doing.  You know, it's

9    canvassing.  Here's what we're doing.  We're talking to county

10   clerks this week.  We have a bunch of meetings.  We're down at

11   the legislature lobbying against 22153.  It was a lot of just

12   sharing what's going on in your county.

13   Q.  And you were listed -- and do you recall that in Basecamp

14   your name has admin afterwards?

15   A.  Uh-huh.

16   Q.  Is that in reference to the core team?

17   A.  It's in reference to Basecamp.  So that's the Basecamp

18   admin privileges.

19   Q.  So you were an administrator on Basecamp?

20   A.  Yes.

21   Q.  And what does that -- what privileges does that come with?

22   A.  Ability to see analytics, ability to escalate privileges,

23   demote privileges, ability to kick people out and block them.

24   I think people were -- up until we changed the process to

25   institute the background check, I think anybody could join

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    275

1   just through a link.  There wasn't a process to admit people.

2   There was the form, but if somebody had sent the link to

3   somebody, they would have been able to get in.  We tried to

4   gate keep it, but we didn't have a real formal structure.  And

5   after a while then we implemented the formal structure, so

6   access privilege is one of those things.  There's a whole --

7   and I haven't looked at it in years, so I'm kind of giving you

8   as I recall it.  But there's a lot of -- it's, you know, any

9   sort of administrative privileges in a technical back end.

10  Q.  So did that apply just to the groups that you were in, or

11  all of the groups underneath the USEIP umbrella with --

12  A.  The entire Basecamp.

13  Q.  So you had the ability to kick anybody out of Basecamp

14  whenever you wanted?

15  A.  I could have, yeah.

16  Q.  And you had the ability to bring people in to Basecamp

17  that were interested, correct?

18  A.  Yeah.

19  Q.  Who else shared those privileges?

20          MR. REISCH:  Your Honor, I'm going to object as to

21  relevance, how this goes to prove the cause of the claim.

22          THE COURT:  Overruled.  I'll allow it.  Please

23  answer.

24  A.  I believe Holly, Shawn, Jeff, Melody, probably core team,

25  I would say, a subset of core team.  I don't recall exactly.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    276

1    I know I had them.  I know Holly had them.  I'm not entirely

2    sure if Shawn had them.  But it would be listed as admin next

3    to your name.

4    Q.   (By MR. BREESE) And you were listed and at least your

5    signature on Basecamp was listed as Ashe, correct?

6    A.   Ashe --

7    Q.   Do you remember?

8    A.   My signature on Basecamp or are you talking about my user

9    name?

10   Q.   User name.

11   A.   Yes.

12   Q.   Okay.

13        MR. BREESE:  Your Honor, if you'll just give me a

14   second to go through this.  I want to make sure that I am only

15   looking at pages that are understanding the Court's

16   instruction previously.

17   Q.   (By MR. BREESE) So if you could turn to Exhibit 25 and

18   page 90.

19   A.   I'm there.

20   Q.   And we earlier described how you were listed as an admin

21   in Basecamp, correct?

22        MR. WYNNE:  Pardon me, Counsel.  I'd like to ask for

23   the same courtesy, because my copy doesn't have page numbers.

24        THE COURT:  If you can bring up on the screen page 90

25   of Exhibit 25.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    277

1              MR. REISCH:  And I apologize.  Was it 1-9 or 9-0?

2              THE COURT:  I think 9-0.

3    Q.  (MR. BREESE) Are you there on 90?

4    A.  Uh-huh.

5    Q.  Okay.  And looking at the bottom, looks like there was a

6    discussion on October 8th of 2021.  Were you active on

7    Basecamp on October 8th of 2021?

8    A.  I was.

9    Q.  And I believe I just asked you, but Ashe admin, that was

10   something that appeared above the messages that you sent in

11   Basecamp, correct?

12   A.  I think that's right.  I think it's above --

13   Q.  Above the message that you would have sent.

14   A.  The way the file is, it's really hard to tell, but I mean,

15   I think it appears --

16   Q.  And then --

17   A.  -- that way.

18   Q.  -- looking further up, that looks like that Shawn would

19   most likely be in reference to your codefendant, Mr. Shawn

20   Smith, correct?

21   A.  Above where it says Ashe Ashe?

22   Q.  Correct.

23   A.  Yes.

24   Q.  Okay.  So the message below could be attributed to him,

25   correct?

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    278

 1  A.  I believe that's right.

 2          MR. BREESE:  Your Honor, I'd ask that the Court admit

 3  this page specifically from Exhibit 25 into evidence.

 4          THE COURT:  Any objection?

 5          MR. WYNNE:  Yeah, I object maybe as to hearsay,

 6  because we've talked about two different Shawns, so we need

 7  clarity on which Shawn.  Remember, one male, one female.

 8          THE COURT:  Well, fortunately it says Shawn some guy

 9  weirdly, so I assume it's Shawn Smith.

10          Do you have an objection, Mr. Reisch?

11          MR. REISCH:  Your Honor, lack of foundation, hearsay,

12  and relevance.

13          THE COURT:  All right.  I'll allow page 90.  You may

14  ask her questions.

15      (Exhibit 25, page 90, received.)

16  Q.  (By MR. BREESE) So looking at this message, looking at

17  Shawn, some guy's message, he is discussing posting a message

18  to county VV teams.  I'm assuming VV is voter verification,

19  correct?

20  A.  Uh-huh.

21  Q.  So there were times in Basecamp that you or Mr. Smith or

22  somebody else would post messages into separate county

23  Basecamp rooms, correct?

24  A.  I think that's -- I would say yes, but I didn't have

25  access to all the county rooms.  And if you see my response

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    279

1    down below, I say I'll reach out to them individually for

2    counties doing voter verification.  I don't believe I was in

3    all of those rooms, which is why I would have reached out to

4    them individually.

5    Q.  So when you say reach out to them individually, would that

6    have been on Basecamp or on the phone?

7    A.  I would call them.

8    Q.  So were you regularly reaching out to the county captains

9    individually on the phone?

10   A.  I was talking to the county captains on the phones every

11   single day.  There's 64 of them, right?  So between 64

12   counties, you know, seven days a week, I was talking to them

13   pretty regularly.

14   Q.  But we're talking about specifically captains doing voter

15   verification, correct?

16   A.  I was in contact with all of the captains.  So county

17   captains doing voter verification would have been a subset of

18   that, yes.

19   Q.  So how many captains doing voter verification are you

20   discussing reaching out to individually in this instance?

21   A.  I think six is probably -- and I don't know -- so one of

22   the things about this document is it all says it's

23   October 8th.  I don't know that this is one thread of

24   information.  I don't know that this is one threaded

25   conversation or a bunch of messages on October 8th.  So when

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1   07/15/2024   280

1    it says the message above, I don't know if the message above

2    is the message that's actually above.  I can't be certain of

3    that because of the way that this document is structured.  But

4    if I was going to reach out to county captains -- and, in

5    fact, actually county captains doing voter verification on

6    October 8th probably would have been two.  I think it was --

7    maybe three.

8            It would have been Boulder, Susan Gonzales, who was

9    in Arapahoe, but she was doing leading some canvassing efforts

10   in Douglas.  So it would Boulder, Douglas, and I think Weld

11   might have been finishing up some precinct areas.  I can't be

12   certain.  But it would have been a very small group.  On

13   October 8th of 2021, it would have just been a few people

14   cleaning up things, and I'm not even sure that this actually

15   happened.

16   Q.  So you were in discussions with captains doing voter

17   verification after the canvassing report was released,

18   correct?

19   A.  I was in conversations with captains every day in 2021,

20   before and after.

21   Q.  Before the canvassing began in April, correct?

22   A.  Going back to when we first started calling them captains

23   in December of 2020.  So from then to when I kind of took a

24   step back from USEIP to do Cause of America in November of

25   2021, pretty much every day.  I don't -- I'd be surprised if

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    281

 1   there was, you know, more than one isolated day where I wasn't

 2   talking to some captain in some county.

 3   Q.  And looking above at Shawn's -- I'm assuming Mr. Smith's

 4   message, it looks like he's discussing canvass walk specifics

 5   and logistics.  Is that fair to say?

 6   A.  I would say you could infer that given the reference to

 7   schedule and VV, yes.

 8   Q.  And above that he says Ashe Ashe, will one of you post the

 9   message above to county VV teams or shall I?  Did I read that

10   correctly?

11   A.  That's correct.

12   Q.  And then the message above is discussing an unpleasant

13   experience in Boulder.  Do you recall that?

14   A.  I don't recall that.  I saw that as part of this, you

15   know, reading the exhibits for this trial, but I don't recall

16   the experience.

17   Q.  So you have no recollection of any unpleasant experience

18   while individuals were canvassing in Boulder?

19   A.  I don't.

20   Q.  But it does appear that you were on a message thread where

21   that was being discussed?

22   A.  It definitely does.

23   Q.  Okay.

24   A.  In October of 2021.  So, you know, canvassing was largely

25   over for me.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    282

1    Q.   Why do you say for you?

2    A.   Well, because, as I said, there were some small -- like in

3    a small handful of counties, there was still -- there was

4    still cleanup, trying to hit the statistical threshold, you

5    know, get the last few houses to be able to have enough to

6    make assertions, that kind of thing.  But there was also the

7    curing process.  So the canvass -- at the end of the

8    canvassing process after the walking was done was curing of

9    affidavits, and then, you know, taking them through to -- as

10   Mr. Smith talked about, to the authorities with the ability to

11   do something about what we had found.  That was all part of

12   canvassing.  I just wasn't involved in it.

13   Q.   But looking at Mr. Smith's message, I think it's probably

14   fair to assume that there was some active canvassing, actual

15   walks going on based on the nature of his message, correct?

16   A.   In Boulder, yes.

17   Q.   So USEIP canvassing did not end in August of 2021,

18   correct?

19   A.   The broad majority of it did.  As I said, there were --

20   and I don't think -- I don't know that this happened in

21   October.  It was certainly being discussed .  The last

22   canvassing that I know people were doing was end of -- end of

23   August, beginning of September, and it was, again, a small

24   group, Boulder, Weld, Douglas County, cleaning up, trying to,

25   you know, hit the last of a neighborhood, the last of a

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    283

1    precinct, get the project done.

2    Q.  Because it looks like there in the message Mr. Smith does

3    ask what everyone's doing the weekend of October 17th and

4    18th, correct?

5    A.  He does ask that.

6    Q.  So it seems fair to assume that this October 8th date is

7    probably correct?

8    A.  I didn't say October 8th wasn't correct.

9    Q.  I thought that earlier you had testified that you were

10   unsure about whether the dates were correct.

11   A.  No.  I was unsure if these are a consistent message thread

12   that's, you know, one message responding to the next message

13   responding to the next, a threaded conversation.  That's what

14   I can't confirm from this, but I never questioned the dates.

15   Q.  Okay.  I apologize.  So did canvassing take place the

16   weekend of October 17th or 18th?

17   A.  Not for me.

18   Q.  Okay.  To your knowledge, any USEIP canvassing?

19   A.  To my knowledge, no USEIP canvassing took place in

20   October.

21           MR. BREESE:  Your Honor, could you give me one

22   second?

23           THE COURT:  Sure.

24   Q.  (By MR. BREESE) A few more questions, Ms. Epp.  You

25   blogged about an experience you had where some government

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1      07/15/2024    284

1    officials came to your door to discuss your presence in

2    Washington D.C. on January 6th, correct?

3              MS. EPP:  Objection, relevance.

4              MR. REISCH:  Objection, relevance.

5              THE COURT:  What is the relevance, Counsel?

6              MR. BREESE:  These were blogs that were posted

7    publicly about Ms. Epp's -- we've already heard testimony

8    about her presence on January 6th.  I'm going to ask her some

9    questions related to people coming to her door and a blog that

10   she ended up posting about that.

11             THE COURT:  And how does it relate to voter

12   intimidation?

13             MR. BREESE:  Because she described the experience as

14   intimidating.

15             THE COURT:  Objection sustained.  I don't find any

16   relevance at all to that.

17             MR. BREESE:  I have no further questions, Your Honor.

18             THE COURT:  Mr. Wynne.

19                          CROSS-EXAMINATION

20   BY MR. WYNNE:

21   Q.  Ms. Epp, because of the somewhat unique way this has been

22   structured today with plaintiffs' counsel calling you, I'd

23   like you to briefly introduce yourself, tell us where you're

24   from, and provide some sort of educational sort of background.

25   A.  Sure.  I was born and raised in Atlanta, Georgia.  When I

22-cv-00581-CNS-NRN    Bench Trial - Day 1        07/15/2024    285

 1    was 16 I went to -- late 15, summer of my 15th year of life --

 2    or 16th year of life -- went to boarding school in Utah.

 3    After boarding school, I went to college at CU.  Graduated CU

 4    in 2001 with my journalism degree.  It was -- I graduated in

 5    December.  It was right after 9/11.  There were no jobs.  So I

 6    was waiting tables.  I was working retail.

 7            And then I started working at PricewaterhouseCoopers

 8    on contract as a technical writer for technology global

 9    website documentation, real, real boring technical

10    documentation for developers and whatnot.  Worked my way up

11    through from being a contractor in PricewaterhouseCoopers,

12    which, for the record, PricewaterhouseCoopers is a

13    professional services firm, SEC audit firm.  I was a

14    contractor until 2003.  I joined the firm as an employee as a

15    senior manager or as a manager in 2003.  Worked my way up to

16    being director of enterprise change programs.

17            And then in 2017, I stopped working at

18    PricewaterhouseCoopers.  Left because I wanted to get off the

19    road.  I missed a bunch of my kids' life.  I was traveling.  I

20    was in with a global role there doing communications and

21    change management.  I was traveling all over the world, which

22    was very cool, but I was missing a lot of my kids' lives.  So

23    I wanted to get off the road.  Worked at -- decided to leave

24    PwC and work at Slalom.  Slalom is a local-based consulting

25    firm.  So I was doing the same kinds of work, but I was

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    286

 1    working for local Colorado clients within the Denver business

 2    community.

 3            During that time -- the other thing I'll just say

 4    quickly about working for PricewaterhouseCoopers is that

 5    because we're talking about an SEC audit firm, the public

 6    trust is incredibly important.  As a result of that, every

 7    member of PricewaterhouseCoopers from the senior partner down

 8    to the secretary has to test on independence every single

 9    year.  Independence is understanding corruption, antitrust,

10    money laundering, and a big part of that is reading government

11    officials, reading people with power and authority within a

12    jurisdiction.  Because if you're doing an audit, and you're

13    being misled, you as the audit firm can be held accountable

14    for that.  So it's a very involved certification test, and you

15    have to pass the test or you lose your job, and then after you

16    pass the test, you have to sign and attest that you are not

17    going to violate independence.  So protecting the public trust

18    was a part of my kind of upbringing as a professional in the

19    SEC audit world.

20            When I went -- in 2012, we moved -- we were living in

21    Florida until 2012, and we moved here to Colorado -- moved

22    back to Colorado, I should say.  I met my husband here in

23    2000.  I met my husband in Boulder while I was in school.  And

24    we moved to New York, and then -- right after 9/11, so, again,

25    no jobs.  Then we moved to Florida, lived there, had all three

22-cv-00581-CNS-NRN   Bench Trial - Day 1     07/15/2024   287

1    of my kids in Florida.  In 2012 -- am I going too fast?  I'm

2    sorry.  I'm really sorry.  I just realized that because I'm

3    out of breath, and I'm like, I bet that's hard for you.  I'm

4    sorry.

5          We moved back to Colorado in 2012.  I worked for PwC

6    until 2017 out of the Denver office, and then in 2017 joined

7    Slalom Consulting.  Worked mostly on financial services

8    clients, but I worked across all of the industries that Slalom

9    served in the Denver business community and more broadly.  I

10   around 2018, '19 decided to take my people and change

11   experience and go deep and specialize in cloud technology and

12   really business transformation enabled by cloud.

13          As part of that, I went on a tour of duty, worked

14   with teams all over the nation to establish kind of the --

15   what we called the navigating your cloud journey, but it was

16   the people in business playbook for executing change

17   management.  Coauthored a white paper.  Published on AWS.

18   It's still up to this day.  And I did that until November of

19   2021 when I made the decision to work for Mike Lindell.

20   Q.  Okay.  I'm going to get to that.  I'm going to ask you

21   based on your description of auditing, and I'm going to use

22   the more sort of layperson phrase fact-checking, did your

23   experience fact-checking in these professional organizations

24   have any carryover at all to fact-checking the Secretary of

25   State's data points that were entered in data fields?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    288

1    A.  So I would clarify, I was not an auditor at PwC.  I did

2    work there and deeply understand the audit process.  One of my

3    projects while I was there was the change management for

4    outsourcing part of their audit process.  As part of that we

5    detailed the -- I think it was 393 steps in a corporate audit,

6    so I'm very familiar with auditing, but I myself am not an

7    auditor.  Because I worked for an SEC audit firm and may have

8    access to insider information, other things, I had to take

9    those tests.  So I wanted to clarify that.  I'm not an

10    auditor.

11        My experiences particularly as it pertains to

12    independence and the public trust, and certainly my

13    understanding of fact-checking from both journalism school, as

14    well as kind of being in the change management world, trying

15    to understand what's true, you know, a very kind of critical

16    examination to figure out what's true has been a hallmark of

17    my entire life, as part of that, yes.

18        And, in fact, one of the -- one of the reasons --

19    like distinctions between -- Mr. Breese asked me about 2016

20    versus 2020, one of the distinctions in 2016 is that there was

21    not massive obstruction to inquiry.  People were allowed to

22    question the election in 2016.  People were allowed to make

23    movies about it and launch investigations about it and publish

24    -- even, you know, parties in this case published their

25    opinions about elections being stolen in 2016.  In 2020 that

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    289

1    was not the case.  In 2020 we were demonized for it, silent

2    censored, and eventually dragged into court obviously to

3    address our election denialism and not our actual conduct.

4    Q.  Let me interject there in the interest of moving this

5    along.  I know this is a bit awkward because normally you

6    would get a chance to cross-examine yourself, which is kind of

7    a bizarre idea.  But let me ask you.  Now, in 2016 -- when did

8    you leave PricewaterhouseCoopers?

9    A.  2017, March, I believe.  March.

10   Q.  Okay.  So during the 2016 election between Hillary Clinton

11   and Donald Trump, you were employed by PricewaterhouseCoopers

12   full-time, right?

13   A.  That's correct.

14   Q.  So even if you had wanted, you really didn't have the

15   opportunity, I gather -- I don't have their employment manual

16   -- but to engage in the kind of political discourse in which

17   you had an opportunity to engage following the '20 election,

18   right?

19   A.  That's correct.  I was blogging on Medium, not terribly

20   political, but certainly social cultural commentary kind of

21   stuff.  But I was traveling all the time, so absolutely, I

22   wouldn't have had the ability to engage locally in civics the

23   way that I did after the 2020 election.

24   Q.  Okay.  Counsel mentioned that you -- you went to the

25   Capitol or were at the Capitol, that is of the United States,

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    290

 1   January 5th and 6th of 2021.  Do you recall that?

 2   A.  That's correct.

 3   Q.  And, again, what was your undergraduate degree?

 4   A.  Journalism.

 5   Q.  And would it be too far of a stretch to say that one of

 6   the purposes for your going there was to act as a journalist?

 7   A.  Yes.

 8   Q.  And you realize that the current Department of Justice has

 9   brought charges or sought charges against many persons who

10   also were at the Capitol January 6th of 2021, right?

11   A.  Yes.

12   Q.  Were any charges brought against you?

13   A.  No.

14   Q.  Were any charges, to the best of your knowledge, brought

15   against anyone who's a member of USEIP, either at the time or

16   afterwards?

17   A.  No.

18   Q.  All right.  Mike Lindell, that's the pillow guy, right?

19   A.  That's right.

20   Q.  And he's diversified?

21   A.  He's what?

22   Q.  He's diversified?

23   A.  He has diversified.

24   Q.  I'm trying to inject some humor at this late hour.  Not

25   just into sheets.  Why did you go to work for him?

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    291

1          MR. REISCH:  I'm going to object as to relevance.

2          THE COURT:  Overruled.  I'll allow it.

3   A.  It's a loaded question.  There is part of me that believed

4   it was a divine appointment to go and do something important,

5   to take my -- what I had dedicated my life to, the corporate

6   world, making a whole bunch of other people money and do it

7   for a noble purpose, do it for a mission that I believed in.

8   We had done USEIP, and built the change network of USEIP with

9   no funding, no fundraising, and no kind of bureaucratic

10  guardrails to -- you know, in corporate change projects, you

11  always run up against what you think is going to be most

12  effective, and then you have, you know, the different -- the

13  different people that will say, oh, no, we don't want to do

14  that, we don't want to invest in that, we don't want to go

15  down that route, and we didn't have any of that in USEIP.  It

16  is -- USEIP is, quite honestly, the change network -- and I've

17  built dozens of change networks in my career -- it is the

18  change network that I'm most professionally proud of because

19  it was truly influencing without authority and encouraging

20  people.

21  Q.  Let me interject there, and, again, my apologies to the

22  extent you're cross-examining yourself.  But Mike Lindell, the

23  name of the organization is Cause for America?

24  A.  Of.

25  Q.  Cause of America.  When did you accept employment with

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    292

1    Cause of America?

2    A.    It was actually right around the time of those posts we

3    were looking at.  The first or second week of October of 2021,

4    which is probably why I don't remember because I had other

5    things going on.

6    Q.    In October of 2021?

7    A.    Uh-huh.

8    Q.    So was Mike Lindell involved in the canvassing that we've

9    been talking about today?

10    A.    No.

11    Q.    Is Mike Lindell a defendant in this case?

12    A.    No.

13    Q.    Why did you leave employment with Mike Lindell?

14    A.    Cost is the reason that I was let go.

15    Q.    You talked earlier about preparing materials and

16    presenting them, quote, to the authorities.  What authorities

17    were you responding to in response to counsel's question?

18    A.    As it pertains to canvassing?

19    Q.    Canvassing, yeah.  I'm sorry.  We're getting back into

20    this case.

21    A.    Okay.  Can you ask the question again?

22    Q.    Yeah.  You mentioned providing the results of the

23    canvassing project, the civics project, as my co-counsel

24    referred to it, presenting those findings to among others the

25    authorities.  What authorities were they?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    293

1    A.  So I think it was -- and I wasn't involved in this.  I

2    have heard about it, so I guess it's hearsay, but I do --

3    Q.  Your understanding.

4    A.  My understanding is local DAs with jurisdiction to

5    investigate, and the Colorado AG.

6    Q.  Okay.  Also the Colorado Secretary of State?

7    A.  Also the Secretary of State, yes.

8    Q.  Okay.  Now, certainly it's your understanding -- is it

9    your understanding that the data results, say, the anomalies

10   that somebody who voted from a location was actually a parking

11   -- a commercial parking lot or something, that USEIP intended

12   to have local district attorneys prosecute any canvassee, was

13   that your intention?

14   A.  No.

15        MR. BREESE:  Objection, Your Honor.  He's leading the

16   witness.

17        THE COURT:  Overruled.

18   A.  No.

19   Q.  (By MR. WYNNE) So in presenting this information to the

20   local district attorney -- it can initially be a little

21   confusing -- but I want to clarify you did not and USEIP did

22   not intend that anyone who voted in a precinct or at an

23   address other than one at which they lived, that you were

24   reporting them and asking the district attorney to prosecute

25   them, right?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024   294

1    A.  It never crossed my mind, no.

2    Q.  What did cross your mind?

3    A.  The storage unit -- the first time that I ever was on a

4    walk where there was an affidavit and a photo of this -- it

5    wasn't me that took it.  It was my -- the person I was walking

6    with -- but two 80-year-old voters were registered to vote at

7    a storage unit.  And there's great leniency in the State of

8    Colorado about where you can be registered to vote, but it has

9    to be the last place you laid your head, and you can't sleep

10   at a storage unit.  And so that was the first affidavit -- I

11   believe the first affidavit.

12        There weren't any on the Douglas County walk that did

13   -- but that was the first affidavit that I filled out.  Things

14   like that.  Empty lots.  People voting at Arby's.  How do you

15   get a mail-in ballot at Arby's?  How do you get a mail-in

16   ballot at Sam's Club?  These were things that were uncovered.

17   And that's the thing is I remember in my head the addresses,

18   like the visual visually seeing the structures, the anomalies

19   like, you know, storage units and whatnot .  I don't remember

20   the names of the voters at all, because it wasn't our focus,

21   and from my view, the focus was the addresses.

22   Q.  Okay.  So who was the intended audience, that is the

23   intended audience to read and absorb the results, the

24   conclusions gleaned from this exercise?  Who was the audience?

25   A.  I would say the primary audience is, as we discussed, the

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    295

1   people with jurisdiction to do something about it.  It's why

2   we did it, to effect change.  That was the purpose.  The

3   secondary audience would be Colorado voters.  Colorado voters

4   have the ability to lobby their government to make change, to

5   vote for solutions that may come up to make change, to talk to

6   their officials about elections and to make change in that

7   respect.  So I would say the primary audience was somebody

8   that could do something about what we found.  The secondary

9   audience is the Colorado voters.

10  Q.  All right.  Would the audience also include the Secretary

11  of State?

12  A.  Absolutely.  I would include her in the primary audience.

13  Q.  And there's -- there's been some distinction -- discussion

14  -- well, let me go back.  One more thing about district

15  attorneys.  Looking at -- there's various counties within the

16  State of Colorado, as there is in any state in the Union,

17  right?

18  A.  There's 64.

19  Q.  How many sort of countywide, to the best of your

20  knowledge, elected officials are there in any given county?

21  Having trouble counting?

22  A.  Well, there's the number of county commissioners varies

23  from county to county, so it's not an easy --

24      MR. BREESE:  Objection, Your Honor.  He's asking the

25  witness to speculate.

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    296

 1           THE COURT:  Well, why don't we rephrase it.

 2  Q.  (By MR. WYNNE) Based on your experience having gone to the

 3  University of Colorado, having lived here quite a while and

 4  being involved in elections, to the best of your understanding

 5  throughout the state, how many countywide officials are in any

 6  given county in Colorado?

 7  A.  I don't know.  I mean, can I give a specific county?

 8  Q.  No.  I'm just asking in general.  Let me ask it this way.

 9  Besides perhaps the county executive or judge, a district

10  attorney, and a county clerk, how many other countywide

11  officials who might be able to do something about it are there

12  in any given county?

13  A.  I'm sorry.  I thought you were asking total --

14           MR. BREESE:  Objection, lack of foundation,

15  relevance.

16           THE COURT:  Sustained as to lack of foundation.

17  Q.  (By MR. WYNNE) Do district attorneys' offices in Colorado

18  carry out any other function other than criminal

19  investigations?

20  A.  I believe so.

21  Q.  All right.  I'll move along.  You've heard the words voter

22  fraud and the words election fraud.  Do you draw a distinction

23  between those two terms?

24  A.  I do.

25  Q.  What is that distinction based on sort of your

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    297

1    understanding?

2    A.   I would describe voter fraud as a voter in the process of

3    casting a ballot, or two ballots, or a voter taking it upon

4    themselves to cast multiple ballots, cast somebody else's

5    ballot, impact the casting of a ballot.   Election fraud is --

6    and, again, in my view -- more of a coordinated effort to

7    impact the outcome of an election -- or to impact an election.

8    Q.   So the voter fraud is something that might be committed by

9    the voter relating to that voter's vote?

10   A.   Correct.

11   Q.   And election fraud does not necessarily relate to any

12   individual voter's vote or double vote; is that fair?

13   A.   Can you repeat it?

14   Q.   Yeah.   I think you've drawn the distinction, so let me

15   move to -- from voter fraud to election fraud.   Isn't it the

16   case that there can be various degrees of election fraud in

17   terms of trying to impact an election or the integrity of an

18   election?

19   A.   I think the answer is yes.   Can you define degrees for me?

20   Q.   Okay.   Let me go at it this way.   Over the course of the

21   past several years, certainly decades, have there been changes

22   in how our elections are being administered from a localized

23   to a centralized sort of function?

24   A.   Yes.

25   Q.   What are they?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024   298

1            MR. BREESE:  Objection, Your Honor.  Leading the

2    witness and lack of foundation.

3            THE COURT:  Well, sustained as to lack of foundation.

4    Q.  (By MR. WYNNE) Is one of the reasons that you've gotten

5    more highly involved in the question of election integrity

6    related to technological advances in elections?

7    A.  Yes.

8    Q.  Could you explain how that relates to your getting

9    involved, including in USEIP.

10   A.  Yes.  As I mentioned, at the time of the November

11   election, I was working as a technology consultant, cloud

12   technology consultant.  Our elections are complex technology

13   systems, but they are -- the hardware components are pretty

14   common.  It's Dell computers and modems and routers and the

15   things that we're familiar with in the technology landscape.

16   When -- for the November election in particular, I mentioned

17   that one of the reasons that was different than 2016 to 2020

18   was the obstruction.

19           The other reason that led me to get involved in 2020

20   that was different than 2016 was Edison zero, which is when

21   the election night reporting for the first time in history

22   went down on election night, went to zero and came back up

23   with the totals inverted.  That's a technology -- that's

24   something that happened technologically.  There are -- there

25   are a lot -- so every aspect of our elections are now enabled

                     Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    299

1    by technology.  Our voter rolls are centralized and digitized,

2    meaning we can undertake a citizen-led effort to verify the

3    voter rolls, and it can take us months and thousands of man

4    hours, and they can be re-corrupted instantaneously because

5    they're digital.

6         Our ballots are scanned into scanners, and as people

7    that want to verify the election, we're only able to see the

8    images, never the paper.  And then, of course, the counts are

9    electronic counts, and you have to have a pinkie promise of

10   trust with the source code and a pinkie promise of trust with

11   the vendor.  Not even the government, with a third-party

12   vendor.  These are all reds flags for me, from both a

13   corruption standpoint, obstruction and public corruption and

14   my experience testing every year for independence with the

15   SEC, as well as a technologist and being told safest and most

16   secure.  Cyber experts don't say that.  Cyber experts don't

17   ever make assertions like that, so saying them after the

18   election was a red flag.

19        MR. BREESE:  Objection, Your Honor.  Move to strike

20   that entire answer for lack of foundation.

21        THE COURT:  Overruled.

22   Q.  (By MR. WYNNE) Let me try to cut through some of the

23   political rhetoric.  Is it the case based on your experience,

24   including PricewaterhouseCoopers, that the introduction of

25   greater and greater means of sort of electronics and technical

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024   300

1    procedures, while it may be flashy and efficient, does it

2    introduce in your mind opportunities not only for malevolence,

3    but for human error and for things just to go wrong?

4        MR. BREESE:  Objection, Your Honor.  Calls for expert

5    conclusion or calls for expert testimony.

6        THE COURT:  Well, I'll allow her -- overruled.  I'll

7    allow her to answer, but then I want you to move on.  These

8    are bordering on expert opinions.

9    A.  I would say yes, from a technology standpoint.  I would

10   also say combined with the reliance upon technology is the

11   increasing centralization.  Centralization creates complexity,

12   and complexity breeds and hides corruption in my view.

13   Q.  (By MR. WYNNE) And I'm going to remove it from your own

14   expert testimony to ask you personally if that fact, the

15   outsourcing and simple complexity, getting to the point where

16   none of us can really understand it, is that one of the

17   motivating benign factors that motivated your interest in

18   fact-checking?

19   A.  Yes.

20   Q.  How many hard copies of the playbook were printed?

21   A.  I want to say six or seven.  I don't recall entirely.  A

22   small number, a small batch .

23   Q.  Do you advocate violence under any instance?

24   A.  Not ever.

25   Q.  Does USEIP or did it ever advocate violence?

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    301

1   A.   No.

2   Q.   Why was the -- why did the dedication on the playbook

3   include Dr. Frank and Mike Lindell?

4   A.   Because they were there at the cyber symposium that the

5   event -- that the playbook -- the event that the playbook was

6   prepared for.  That was actually the day that I met Mike

7   Lindell for the first time was after the playbook was

8   completed.  As I was handing it to him was actually when I met

9   him.

10  Q.   You -- you -- you used the phrase uniparty, which conjured

11  in my mind the unabomber, right?  They're kind of ominous.

12  Uniparty, what do you mean by that?

13  A.   I mean we're told that we have two political parties that

14  are oppositional to each other, but when it comes down to key

15  decisions about our society, like the response to 2020, the

16  two parties generally work together to protect the status quo

17  in opposition to the will of the people, in my opinion.

18  Q.   Okay.  So is what you're saying -- correct me if I'm wrong

19  -- that there are those who have a vested interest in the way

20  things are, and that it's those that you're referring to as

21  the quote, uniparty, those with a vested interest economically

22  in the way things are?

23          MR. BREESE:  Objection, leading.

24          THE COURT:  Sustained on that one.

25  Q.   (By MR. WYNNE) I'd ask you to break down the term uniparty

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    302

 1    a little bit more.

 2    A.   I would say power and authority on the two sides of the

 3    political aisle.  The people with power and authority on the

 4    two sides of the political aisle.  I think there's economic

 5    impacts in there, but I think it's much greater than

 6    economics.  I think it's about power and essentially about

 7    world view and the expansion of one specific world view

 8    whether the people want it or not.

 9    Q.   Correct me if I'm wrong, but what I think I hear you

10    saying is a fear of sort of creeping totalitarianism.

11            MR. BREESE:  Objection, leading.

12            THE COURT:  Well, sustained.  But also this isn't

13    exactly relevant.  For the same reasons I got on plaintiffs'

14    counsel, we're drifting into areas that simply do not matter

15    to this claim.

16            MR. WYNNE:  I was just trying to counter questions

17    regarding motivation.  Just a moment.

18    Q.   (By MR. WYNNE) Oh, the training.  Yeah, the training.  You

19    mentioned Tamara Nations -- is it Nation or Nations?

20    A.   Nation.

21    Q.   What qualification, to the best of your understanding, did

22    she have to conduct the training?

23    A.   If I recall correctly, about 20 years of corporate

24    training experience.

25    Q.   Where?  Do you recall?

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    303

1    A.  I don't recall.

2    Q.  Was there anything idealogical about the training?

3    A.  No.

4         MR. WYNNE:  No further questions.

5         THE COURT:  All right.  We're going to -- even though

6    you're in the middle of testimony, we're going to break there

7    since it's 5 o'clock.  We'll begin with Mr. Reisch, and then

8    after he goes, Ms. Epp, just so you know, you will be allowed

9    to address any of the questions you were asked that haven't

10   been covered by either of those counsel.  Then I will have a

11   few questions for you.  Because you're on the stand, I would

12   ask that you not talk about your testimony with anyone,

13   including Ms. Kasun or her counsel.

14        THE WITNESS:  Okay.

15        THE COURT:  We'll be in recess until tomorrow.  We'll

16   start at 8:30 again.

17        THE COURTROOM DEPUTY:  All rise.  Court is in recess.

18     (The proceedings were concluded at 5:00 p.m.)

19

20

21

22

23

24

25

Sarah K. Mitchell, RPR, CRR

1                     REPORTER'S CERTIFICATE

2

3          I, SARAH K. MITCHELL, Official Court Reporter for the

4    United States District Court for the District of Colorado, a

5    Registered Professional Reporter and Certified Realtime

6    Reporter, do hereby certify that I reported by machine

7    shorthand the proceedings contained herein at the time and

8    place aforementioned and that the foregoing pages constitute a

9    full, true and correct transcript.

10         Dated this 29th day of July, 2024.

11

12

13

14              _____ /s/ Sarah K. Mitchell _____

15                   SARAH K. MITCHELL
                    Official Court Reporter
16            Registered Professional Reporter
                 Certified Realtime Reporter
17

18

19

20

21

22

23

24

25


                     Sarah K. Mitchell, RPR, CRR