1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLORADO

3    Civil Action No. 22-cv-00581-CNS-NRN

4

     COLORADO MONTANA WYOMING STATE AREA
5    CONFERENCE OF THE NAACP, et al.,         (Pages 304 - 563)

6           Plaintiffs,

7           vs.

8    SHAWN SMITH, et al.,

9           Defendants.

10   ---------------------------------------------------------------
                      REPORTER'S TRANSCRIPT
11                     Bench Trial - Day 2
     ---------------------------------------------------------------
12
        Proceedings before the HONORABLE CHARLOTTE N. SWEENEY, Judge,
13     United States District Court for the District of Colorado,
       commencing on the 16th day of July, 2024, in Courtroom A-702,
14             United States Courthouse, Denver, Colorado.

15                         APPEARANCES

16   For the Plaintiffs:
     AMY E. ERICKSON and BRIAN A. DILLON and KRISTIN M. STOCK,
17   Lathrop GPM LLP, 80 South Eighth St., Ste. 500, Minneapolis,
     MN 55402
18   COURTNEY M. HOSTETLER, Free Speech for People, 48 North
     Pleasant St., Ste. 304, Amherst, MA 01002
19   CASEY C. BREESE, Lathrop GPM LLP, 675 15th St., Ste. 2650,
     Denver, CO 80202
20
     For Defendant Smith:
21   R. SCOTT REISCH and JESSICA L. HAYS, Reisch Law Firm, LLC,
     1490 W. 121st Ave., Ste. 202, Denver, CO 80234
22   For Defendant Kasun:
     MICHAEL J. WYNNE and CAMERON C. POWELL, Gregor Wynne Arney
23   PLLC, 4265 San Felipe St., Ste. 700, Houston, TX 77027
     For Defendant Epp:
24   PRO SE

25      Sarah K. Mitchell, RPR, CRR, 901 19th Street, Room A252,
                  Denver, CO 80294, 303-335-2108
             Proceedings reported by mechanical stenography;
                 transcription produced via computer.

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024  305

1                          I N D E X

2
       PLAINTIFFS' WITNESSES                              PAGE

3
       ASHLEY EPP
4        Cross-Examination By Mr. Reisch                  306
         Recross-Examination By Mr. Reisch                317
5        Redirect Examination By Mr. Breese               320
         Recross-Examination By Mr. Wynne                 344
6      CHRISTOPHER PERRY BEALL
         Direct Examination By Ms. Erickson               352
7        Cross-Examination By Mr. Reisch                  399
         Cross-Examination By Mr. Powell                  430
8        Cross-Examination By Ms. Epp                     435
         Redirect Examination By Ms. Erickson             460
9      YVETTE ROBERTS
         Direct Examination By Ms. Hostetler              465
10       Cross-Examination By Mr. Powell                  479
         Cross-Examination By Mr. Reisch                  493
11       Cross-Examination By Ms. Epp                     511
         Redirect Examination By Ms. Hostetler            514
12     BETH HENDRIX NIELAND
         Direct Examination By Ms. Stock                  516
13       Cross-Examination By Mr. Reisch                  532

14


15                        EXHIBITS               RECEIVED

16                  20                             341

17                  25, pages 47-48               329

18                  41                             526

19                  50                             389

20

21

22

23

24

25

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    306

1                *        *        *        *        *

2       (The proceedings commenced at 8:40 a.m.)

3            THE COURT:  Mr. Wynne, this is the second time you've

4    been late coming back from something, so let's not make it a

5    third.

6            MR. WYNNE:  Yes.  My apologies, Your Honor.

7            THE COURT:  Ms. Epp, you may return to the stand.

8       (Plaintiffs' witness, ASHLEY EPP, resumed the

9       witness stand.)

10           MS. EPP:  For the part of this where I'm clarifying

11   and cross-examining myself, am I allowed to refer to

12   pre-prepared notes just for that specific part?

13           THE COURT:  What I would say is if your notes are of

14   you being questioned, yes, but not a statement that you

15   prepared in advance of your testimony.

16           MS. EPP:  Okay.  I'll go off the cuff just to be on

17   the safe side.

18           THE COURT:  Okay.  Mr. Reisch, I believe we were up

19   to you for questions.

20           MR. REISCH:  Yes.

21                         CROSS-EXAMINATION

22   BY MR. REISCH:

23   Q.  Good morning, Ms. Epp.

24   A.  Good morning.

25   Q.  I will try to be very brief, all right?

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    307

1    A.  Okay.

2    Q.  Obviously you know you've been sued for violating the

3    Voting Rights Act.  You're familiar with that, correct?

4    A.  Yes.

5    Q.  And would it be fair to say that you never attempted to

6    intimidate, threaten, or coerce a voter?

7    A.  That's correct.

8    Q.  Okay.  Would it also be fair to say that at no time you

9    attempted to intimidate, threaten, or coerce any person for

10   voting or attempting to vote?

11   A.  That's correct.

12   Q.  Okay.  You've also been charged under the Ku Klux Klan

13   Act, and that alleges a conspiracy, right?

14   A.  That's correct.

15   Q.  Now, a conspiracy is an agreement between two or more

16   people to commit an illegal act, correct?

17   A.  Correct.

18   Q.  Okay.  Would it also be fair to say that you did not

19   conspire with your codefendants for the purpose to force,

20   intimidate, or threaten any individual entitled to vote --

21          MR. BREESE:  Objection, Your Honor.  This line of

22   questioning calls for a legal conclusion.

23          THE COURT:  Well, sustained.  Why don't you reword

24   that?

25   Q.  (By MR. REISCH) You know what a conspiracy is, correct?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    308

1    A.  Yes.

2    Q.  You never conspired with your codefendants to commit an

3    illegal act, did you?

4            MR. BREESE:  Same objection, Your Honor.

5            THE COURT:  I'm going to allow it based on her

6    understanding of the word conspiracy.

7            MR. BREESE:  I object to lack of foundation.

8            THE COURT:  Overruled.

9    Q.  (By MR. REISCH) You may answer.

10   A.  Can you ask the question again?

11   Q.  Sure.  You know what a conspiracy is, right?

12   A.  Yes.

13   Q.  It's an agreement to commit an illegal act, right?  And

14   you've been charged with a conspiracy alleging that you

15   engaged in activity related to voter activities, correct?

16   A.  Correct.

17   Q.  Did you ever conspire with your two codefendants to

18   intimidate or threaten anybody as it related to their voter

19   activity?

20   A.  I did not.

21   Q.  You never canvassed in Mesa County, correct?

22   A.  That's correct.

23   Q.  You had contacts throughout the state while you were

24   working as a -- I believe as a core member, with a small C is

25   I think what it's referred to, as a core member, which you had

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    309

1    captains throughout the state, correct?

2    A.   That's correct.

3    Q.   But these captains around the state didn't necessarily

4    engage or coordinate voter canvassing as relates to USEIP,

5    correct?

6    A.   That's correct.

7         MR. REISCH:  That's all I have, Your Honor.  Thank

8    you.

9         THE COURT:  All right.  Okay.  Ms. Epp, you may

10   proceed as best you can, and then when you're done, I have a

11   few questions for you.

12        MS. EPP:  I don't have the ability to put up

13   exhibits, but can we go to the playbook, Exhibit 1.

14        THE COURT:  Sure.  I'll just be looking at a hard

15   copy while you are, so you can direct me to whatever page

16   you're referring to.

17        MS. EPP:  Okay.  It's page 3 at the bottom.

18        THE COURT:  All right.

19        MS. EPP:  And beginning in the middle of the second

20   paragraph, USEIP is an association of like-minded people

21   working together to effect change locally.  We don't raise

22   funds, and we don't accept donations for any of the work we

23   are doing.  No one owns USEIP, and we don't want your money

24   either.  We want you, no, not to join USEIP.  I mean, we are

25   awesome, but that's not our goal.  We want you to bring your

22-cv-00581-CNS-NRN   Bench Trial - Day 2   07/16/2024   310

1    skills, talents, and God-given passions to the movement to

2    restore our republic.

3         So just to clarify, there were a lot of discussions

4    about the playbook yesterday.  It's a knowledge-sharing

5    document.  There are tips, top tips throughout the playbook.

6    We can see those on page 7 at the bottom.  On page 11 at the

7    top is where the top tips are, it's 11 at the bottom, on

8    page 14, and throughout.  So these are tips based on our

9    experiences for activists in other states.

10        The other thing I wanted to clarify about the

11   playbook, Mr. Wynne asked me about the printing of it.  When

12   we were in South Dakota we printed hard copies for the people

13   on the dedication page, and one or two -- I can't recall if we

14   had one or two -- additional copies to share -- to show to the

15   people who were there.  And so during that event, there was a

16   basement room where the people like me, not cyber experts and

17   folks that were there on the stage at the event, but people

18   who were attending the event, we, you know, connected, shared

19   what we were doing, and all that kind of stuff.  We showed the

20   printed copies, and if people wanted access to it, we sent it

21   to them.

22        Mr. Breese mentioned that we put it on the website,

23   and we did, and the press release associated with it, which I

24   thought was an exhibit, but apparently is not, pretty much

25   just restates the opening of the playbook with one additional

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    311

 1    line that says these resources are provided to you free of

 2    charge.  You're not allowed to use -- you are not allowed to

 3    monetize them.  Please don't monetize them.  This was a

 4    knowledge-sharing document to share our experiences with

 5    people in other states.  It was not intended for audiences in

 6    Colorado.  It was not a playbook for intimidation.  It was

 7    sharing our experiences.  So that's the first part that I just

 8    wanted to clarify.

 9         The second is as it pertains to the topic of

10    misinformation, this has come up.  A couple of my articles are

11    now admitted.  In plaintiffs' opening statement they talked

12    about intentionally spreading misinformation.  William

13    Randolph Hurst said, I believe -- I might butcher it a little

14    bit -- but news is printing something that somebody else

15    doesn't want printed.  Everything else -- all else is

16    advertising, I believe is the quote.

17         For my part, and I believe for my codefendants as

18    well, we explored many avenues.  We disputed much

19    disinformation, misinformation that confirmed our biases and

20    came from our allies but was untrue.  I still do this as a

21    journalist.  As recently as December in the Fourteenth

22    Amendment trial, there was a moment where there was a message

23    spreading around the State of Colorado that Jena Griswold has

24    removed Trump from the ballot, and that she was forced to put

25    him back on the ballot.  That was untrue.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024   312

 1          That was inconsistent with the process in our state

 2   and inconsistent with what happened.  And there was a period

 3   of time where I felt like I was playing Whac-A-Mole with very

 4   large conservative accounts because disinformation does

 5   actually hurt us.  And so to say that we're intentionally

 6   spreading misinformation implies that we're committed to some

 7   narrative and haven't done our research, and that's

 8   fundamentally untrue.

 9          The final thing that I wanted to clarify is yesterday

10   I brought up the concept of independence, and it -- as I was

11   thinking about it last night, I think it might have been kind

12   of random and not very important.  It's very specific to my

13   intent.  When it comes to public audits, in an effort to

14   preserve the public trust, we have to test our independence.

15   The three aspects that are consistent with I would say most,

16   if not all times that the public trust is violated in the SEC

17   audit space are familiarity, self-interest, and self-review.

18          Familiarity, relationships are too cozy between

19   parties.  Self-interest, a vested interest in the outcome of

20   the audit activities.  And self-review, auditing your own

21   work.  From my perspective, all three are at play when it

22   comes to our elections.  I've been trained on this for many

23   years.  Had to -- from 2003 to 2017 had to test on

24   independence every single year.  Those were red flags for me

25   that informed my intent.  That's all I have.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    313

1          THE COURT:  All right.  Let me -- I wanted to go back

2     to your canvassing in Mesa County.  Or, sorry, not Mesa

3     County.  The three canvassing episodes or experiences you had,

4     two in El Paso and one in Douglas.  And the training session

5     for that you said lasted about two hours?

6          THE WITNESS:  Yeah.

7          THE COURT:  Who led that training session?

8          THE WITNESS:  Tamara Nation.

9          THE COURT:  And she is part of the core group,

10    correct?

11         THE WITNESS:  Yes.

12         THE COURT:  All right.  And did she use any documents

13    in training?

14         THE WITNESS:  The training -- training PowerPoint

15    presentation.

16         THE COURT:  Okay.

17         THE WITNESS:  There was a video embedded within that

18    presentation.  There was also role-playing that we did before

19    we went out to canvass.

20         THE COURT:  Okay.  And I think you've said, but I

21    wanted to clarify, the training that she offered was

22    consistent with the tips in the playbook.  It wasn't utilized

23    -- the playbook wasn't utilized, but some of those tips were

24    passed along?

25         THE WITNESS:  So the tips are specific -- can I refer

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2     07/16/2024     314

1    to it?

2              THE COURT:  Sure.

3              THE WITNESS:  So the voter verification part of the

4    playbook is an appendix at the back.  There are some areas

5    where voter verification is referenced.  I just don't know if

6    it's in the tips, so that's what I'm looking for.

7              THE COURT:  Okay.

8              THE WITNESS:  So, no, all the tips are specific to

9    organizing.

10             THE COURT:  Okay.  All right.  So as you're there,

11   you must be near page 15.  On these references that are in the

12   appendix, are these links, meaning whoever had this could link

13   those, or they needed to contact you to ask for them?

14             THE WITNESS:  No.  It says -- if you look at the line

15   above data and analytics, it says reach out if you want to go

16   deeper.  These are not links.  It was just an index.

17             THE COURT:  Did anybody -- did you hear about any

18   complaints in El Paso or Douglas County --

19             THE WITNESS:  No.

20             THE COURT:  -- about the canvassers at all?

21             THE WITNESS:  No.

22             THE COURT:  I wanted to then turn to your frequent

23   meetings.  I think you actually testified you talked to county

24   captains almost every day during this time period, correct?

25             THE WITNESS:  Not collectively, but individuals

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024   315

1    across the state, yes.

2         THE COURT:  Okay.  And in terms of voter verification

3    efforts, is there a percentage you can assign to how much time

4    you spent talking to county captains about that?

5         THE WITNESS:  It would be very small, and the

6    interaction would be me connecting them with whoever was -- I

7    can't recall any specific conversations about canvassing, but

8    if it was, I wouldn't be advising them on canvassing.  I would

9    be connecting them with the teams and people that were doing

10   that work.

11        THE COURT:  And who would that be?

12        THE WITNESS:  Tamara, perhaps Mr. Smith, perhaps

13   Mr. Young, depending on the context.

14        THE COURT:  Okay.  In terms of Mesa County, did you

15   ever have any conversation with the Mesa County captain about

16   their canvassing efforts?

17        THE WITNESS:  I'm sure I did.  I met Cory Anderson,

18   who was the Mesa County -- what I would call the Mesa County

19   captain, which is, of course, as I said yesterday, point of

20   contact.  They were canvassing earlier than we were, and so I

21   believe I had learned about canvassing from Mesa County.

22        THE COURT:  All right.  And as I understood

23   Mr. Smith's testimony, Mesa County was not utilizing the same

24   really database as you all were utilizing, nor was it being

25   trained by your group.  Is that fair to say?

                              Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    316

 1          THE WITNESS:  That's correct, and consistent with my

 2   understanding.  I don't have -- I don't have personal

 3   knowledge of the data they were using.

 4          THE COURT:  Do you know who trained any of the

 5   canvassers in Mesa County?

 6          THE WITNESS:  I don't.  I would -- I believe

 7   Dr. Frank was somewhat involved in it, but I don't know for

 8   sure.

 9          THE COURT:  And I believe this was generally covered,

10   but in terms of your own canvassing, did you ever have any

11   negative experiences with any of the individuals you

12   approached during your canvassing?

13          THE WITNESS:  No.  Most of it was transactional.  You

14   know, is this correct?  Yes.  Thank you very much.  Oh, thank

15   you.  That was most of it.  There were some where -- like,

16   there was one woman that wanted us to pray for her daughter.

17   And, you know, Mr. Smith testified to people chasing them with

18   candy, that kind of stuff.  The one -- the one that was an

19   outlier that was not, you know, transactional or, you know,

20   more on the lovely side would have been the woman that I

21   mentioned, and that was the reason that we were speculating

22   about the shirt and everything is that was our very first

23   walk.  So it was kind of, you know, realtime feedback, learn

24   what's going on, figure out how we can make this as -- as

25   effective as possible.

                         Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    317

1           THE COURT:  In light of your conversations about the

2   shirt, did you advise canvassers thereafter on what to wear or

3   not to wear?

4           THE WITNESS:  Neutral clothing I believe is in the

5   playbook.  That was pretty much the extent of it.  Don't wear

6   political stuff.  This isn't a political thing.  Neutral

7   clothing was in there before we canvassed, and this woman had

8   worn the shirt anyway.  So that was kind of maybe that's it.

9   So, yeah, that was the extent of that.

10           THE COURT:  All right.  Those are all the questions I

11   had.  Does any party have any questions based on mine?

12           MR. WYNNE:  No, Your Honor.

13           THE COURT:  All right.

14           MR. REISCH:  Just briefly, Your Honor.

15           THE COURT:  Mr. Reisch.

16                        RECROSS-EXAMINATION

17   BY MR. REISCH:

18   Q.  You were asked questions about Mesa County.  You weren't

19   necessarily familiar, but your understanding was they were

20   using different data than what USEIP was relying upon in your

21   canvassing, correct?

22   A.  Correct.

23   Q.  All right.  They weren't relying on any USEIP training

24   manuals as far as you know, correct?

25   A.  Correct.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    318

1    Q.  And the other reason that you all didn't share data is

2    that they were not asking the same questions that you all were

3    asking for voter verification, correct?

4    A.  That's my understanding.  I have no personal knowledge of

5    what questions they asked.

6    Q.  Okay.  The Court asked you questions about your own

7    canvassing experience, and you said for the most part it was

8    quite lovely, correct?

9    A.  Yes.

10   Q.  And the one outlier, as you called it, you said that a

11   woman acted a little standoffish, I think is maybe the best

12   way to describe it?

13   A.  Seemed more skeptical of why we were there, and she

14   appeared to live alone, an older lady, kind of -- she actually

15   lived in a complex close to my mother-in-law and kind of

16   reminded me of my mother-in-law, and that was kind of what I

17   felt, was some older lady living alone.  You know, people come

18   to their door.  She just seemed like who are you and what are

19   you doing, but it wasn't contentious in any way.

20   Q.  But she didn't ask you to leave?

21   A.  No.

22   Q.  Did she ask (sic) the questions that you politely asked?

23   A.  She answered our questions and added more information.

24   Q.  All right.  And you said one of the canvassers with you

25   had a shirt, I believe your testimony yesterday was 1776?

                              Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    319

1   A.   Yes.

2   Q.   Referring to the birth of the United States of America,

3   I'm assuming?

4   A.   Correct.

5   Q.   All right.  And it was only speculation that that may have

6   had something to do with it, correct?

7   A.   Correct.

8   Q.   It could have been she was having a bad day, correct?

9   A.   Correct.

10  Q.   She could have just gotten up?

11  A.   Correct.

12  Q.   You could have interrupted her favorite TV show?

13  A.   Correct.

14  Q.   There's lots of things.  So when you all say that, well,

15  maybe it was the shirt, that was just complete speculation on

16  your part?

17  A.   It was complete speculation, and it was with the intent of

18  getting the process right, and it was the only outlier on that

19  walk, and that was my first walk.

20  Q.   Okay.  And when you were speculating about that, but you

21  also let people know neutral clothing, this is not a political

22  canvassing, you're not pushing a side, you're just verifying

23  voter roll information, correct?

24  A.   Correct.

25          MR. REISCH:  Thank you, Your Honor.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    320

1          THE COURT:  Anything further from any party?

2          MR. BREESE:  Some redirect, Your Honor.

3          THE COURT:  All right.

4                    REDIRECT EXAMINATION

5    BY MR. BREESE:

6    Q.  Good morning, Ms. Epp.

7    A.  Good morning.

8    Q.  Could you turn in your binder to Exhibit 25, page 47.

9    While you're turning, we had some discussion yesterday about

10   your involvement in --

11   A.  I'm sorry.  Did you say 47?

12   Q.  Yes.

13   A.  Okay.

14   Q.  Your involvement in Basecamp communications, right?

15   A.  Yes.

16   Q.  And you were a member of the core team, correct, as

17   referenced in Basecamp?

18   A.  Correct.

19   Q.  And you were communicating on Basecamp with other members

20   of the core team throughout the time period that USEIP was

21   canvassing in 2021, correct?

22   A.  Correct.

23   Q.  So April 12th, 2021, that would have been a time period

24   where it's reasonable to assume that you were communicating on

25   Basecamp?

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    321

1   A.  Correct.

2           MR. REISCH:  Your Honor, I'm going to object.  I

3   think this is beyond the scope of cross and even the Court's

4   questions.

5           THE COURT:  Let me have you address that.  Did

6   somebody approach this in --

7           MR. BREESE:  To be honest, Your Honor, this is more

8   in response to the questions that you just raised about

9   information sharing with Mesa County.

10          THE COURT:  All right.  I'll allow a limited.

11  Overruled.

12          THE WITNESS:  I was not asked about this exhibit,

13  though.

14          THE COURT:  I understand that, but it does address

15  one of my questions about what Mesa County was utilizing.

16          THE WITNESS:  Okay.

17          THE COURT:  Although I'm not sure there's foundation.

18  I don't see Ms. Epp's name on this.

19          MR. BREESE:  And I said -- I believe that I had said

20  page -- what page did I -- I'd like to direct your attention

21  to 47.  I'm looking at page 48 and going to look at 48, as

22  well, Your Honor.

23          THE COURT:  Okay.  Go ahead.

24  Q.  (By MR. BREESE) And if you just glance through those

25  pages, it appears that this is a -- if you look at the top of

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    322

1    page 47, it appears that it's discussing draft voter

2    verification procedures.  Does that look correct to you?

3    A.  That looks correct.

4    Q.  And Shawn would be your codefendant Shawn Smith, correct?

5    A.  I believe so.

6    Q.  Okay.  And if you look to the next page, it seems as if

7    there's a reference multiple times to a voter verification

8    PowerPoint, correct?

9    A.  Correct.  I believe that's referring to the training

10   document.

11   Q.  And I believe that's the training document that we have in

12   evidence already, correct?

13   A.  I can't be sure, because there were -- there's the

14   training documents, and then there's the data and analytics,

15   and I don't know what they were talking about.

16   Q.  Okay.  Because I believe Mr. Smith testified there were

17   multiple iterations of the voter verification PowerPoint,

18   correct?

19   A.  Yes.  There's also a data and analytics guide that deals

20   with all of the data-type information, so I don't know which

21   document that they're referring to.

22        MR. BREESE:  I'd ask the Court admit pages -- just

23   specifically pages 47 and 48 into evidence, Your Honor.

24        MR. WYNNE:  Objection, hearsay and lack of personal

25   knowledge.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    323

1           THE COURT:  All right.  Mr. Reisch?

2           MR. REISCH:  I would join in that lack of foundation,

3    Your Honor.

4           THE COURT:  All right.  48 has Ms. Epp's name on it.

5    47 does not.  My concern is given the testimony about whether

6    these are chains, how they're interrelated, I have no idea if

7    Ms. Epp was on this chain, saw 47.  It seems like Mr. Smith

8    would have been the perfect witness to do this with, but

9    Ms. Epp, I don't have any basis to conclude she's on page 47.

10          MR. BREESE:  I believe, Your Honor, that page 47

11   seems to begin with the header draft voter verification

12   procedures, and the messages following that seem to all be a

13   continuing conversation.  I don't think that there's anything

14   to suggest that page 48 -- in fact, if you look at underneath

15   Shawn's message, it moves over to file, dot, dot, dot, which I

16   believe is following each message, so I believe this is a

17   continuous message all that took place on the same day.  Each

18   of these dates say April 12th.

19          THE COURT:  Well, why don't you try to lay that

20   foundation with her so I could determine that.

21   Q.  (By MR. BREESE) Can you confirm looking at pages 47 and 48

22   that each of the dates of these messages are April 12th of

23   2021?

24   A.  That is what's on the paper, except for the last date is

25   April 13th.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    324

1    Q.  And in Basecamp, were there any instances where you and

2    Mr. Smith would be discussing things with one another on -- in

3    separate message boards or the various groups that you had?

4    A.  Yes.

5    Q.  And what would those be?  What groups would those be?  I

6    believe that you -- your testimony yesterday was that you were

7    essentially in the Douglas County group, correct?

8    A.  Yes.

9    Q.  And you also were in the core team group, correct?

10   A.  Yes.  And many others.

11   Q.  What other groups?

12   A.  Some other county groups.  There were groups in there on

13   -- there was like a media group, a marketing group.  There

14   were -- as we mentioned, there was the data and analytics

15   group.  I don't believe I was in that one.  There were many,

16   many different groups.  Dozens.

17   Q.  I believe if you look at the top of page 48, and you can

18   read that message to yourself, in comparing that to page --

19   the bottom of page 47, does that not seem like to you a direct

20   response to what Mr. Smith stated at the bottom of page 47?

21   Or asked another way, is it not fair to say that you both are

22   discussing the modification of the voter verification

23   PowerPoint that's referenced in this chain of messages?

24   A.  I don't know if that's what we're discussing, because at

25   the top of 47 it's talking about an affidavit document.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    325

1   Q.  There's a discussion from Mr. Smith about grammatical

2   changes on the bottom of 47, correct?

3   A.  Correct.

4   Q.  And then there's also discussion of revisions of documents

5   from you on the top of page 48, correct?

6   A.  On the top of page 48 there's a discussion of revisions of

7   documents from me?  I don't see that.

8   Q.  You don't see where you say, Do you remember which slides

9   you modded?  What's modded?  Modified, correct?

10  A.  I believe that's Shawn saying that, not me.

11  Q.  So if you're reading -- so your response -- apologies.  So

12  your name precedes the messages that are -- that we see in

13  these documents?

14  A.  Correct.  So if you look back at 47, you can see Shawn,

15  April 12th, notified 14 people team, and then he signs it.

16  And the next one down is Jeff, so the names are above the

17  content.  At the top of that document where it says slides you

18  modded, that's Shawn speaking, not me.

19  Q.  So when you say definitely mask the PII, what's PII?

20  A.  Personally identifiable information.

21  Q.  And there was instances where there was discussions in

22  Basecamp about how the voter verification document that

23  Mr. Smith was creating had personally identifiable information

24  in that document, correct?

25          MR. REISCH:  Your Honor, I'm going to object as to

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2     07/16/2024     326

1    hearsay, lack of foundation.

2            MR. WYNNE:  I'm going to object as to overbroad.

3    This is about a 250-page document.  He hasn't laid the

4    foundation that she's reviewed every page.

5            THE COURT:  Well, I'm going to overrule it and let

6    her answer that one question, were there discussions.  So why

7    don't you re-ask it.

8            MR. BREESE:  Appreciate it, Your Honor.

9    Q.   (By MR. BREESE) Were there discussions amongst you and

10   Mr. Smith in Basecamp about modification of the voter

11   verification materials that were being created?

12   A.   I'm sure there were.  Based on this exhibit, I don't

13   believe that that's what this is saying, though.

14   Q.   So the message related to your response talking about

15   slides that you modded is not in reference to the voter

16   verification materials?

17   A.   His might be.  My response about definitely mask the PII

18   is in response to the second sentence of Shawn, if this is

19   continuous, which I think it probably is at this point.  Also,

20   the voter list data looks real.  Any problem with me changing

21   ID name, address, et cetera, to mask the real people?  I'm not

22   sure where this brief will go.  So within the voter

23   verification document I believe there was a list, and masking

24   the PII was into that.  But I don't even know if I had

25   reviewed it at that point.  I was responding to the voter data

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    327

 1   looks real, and I was saying if that's real data with real

 2   people's names on it, we don't know where this is going to go,

 3   definitely mask it.

 4   Q.  But mask the data within the voter verification document

 5   that's previously being discussed, correct?

 6   A.  The voter list data, yes.  I assume that it's talking

 7   about within the document, yes.

 8   Q.  And I apologize, but what document are you referring to?

 9   You say voter list data.  We're talking about people's

10   personal identifiable information within the voter

11   verification PowerPoint, correct?

12   A.  That is how it appears.  And as you can tell, they're

13   talking about changing it to -- later I think it says Jane and

14   John Doe.

15   Q.  To not have that personally identifiable information

16   within the document, correct?

17   A.  Because it was a training manual.  It was intended to show

18   this is what the voter data list is going to look like.  Don't

19   have it be real people, because we're sharing this with all 64

20   counties, and we don't know what they're going to do with it.

21   Q.  So the document you're referencing, just to confirm one

22   more time, moving up to 47, is this voter verification

23   PowerPoint that's referenced multiple times within that

24   page 47, correct?

25   A.  I think that's accurate.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2      07/16/2024    328

1          MR. BREESE:  So, Your Honor, now I'd like to move to

2    admit these two pages into evidence.

3          MR. WYNNE:  Your Honor, may I take the witness on

4    voir dire?

5          THE COURT:  For what purpose?

6          MR. WYNNE:  There were some terms that I'd like to

7    have explained a little more closely, including Basecamp, and

8    I'd like to probe into how many e-mails she receives a day and

9    whether it's possible that things like this on Basecamp,

10   because she's in is a number of platforms, never crossed her

11   eyes until now.

12         THE COURT:  Well, that has nothing to do with whether

13   this is admissible or not.  You may do that on -- I'll give

14   you a chance to cross her on that information.

15         MR. WYNNE:  Thank you.

16         THE COURT:  Mr. Reisch.

17         MR. REISCH:  Your Honor, same objection.  Hearsay,

18   lack of foundation, and more importantly, relevance.  I don't

19   see how this has anything to do with alleged voter

20   intimidation that they have alleged in their complaint.

21         THE COURT:  All right.  Well, I'm going to overrule

22   the objections and admit pages 47 and 48.  One, I find it

23   relevant; but, two, now it goes to credibility in the sense

24   that there was testimony that there was no procedure shared

25   with Mesa County.  This does confirm that.  She has testified

                          Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    329

1   that the two pages are connected and run together.  So I'm

2   admitting pages 47, 48.  You may proceed.

3          (Exhibit 25, pages 47 and 48 received.)

4             MR. WYNNE:  Your Honor, for the record, I'd like to

5   join in the objection to the second offer.  I don't think I

6   did that.

7             THE COURT:  All right.

8             MS. EPP:  And, Your Honor, 47 was admitted yesterday.

9             THE COURT:  All right.

10  Q.  (By MR. BREESE) Did you provide some testimony regarding

11  other activities beyond canvassing that USEIP participates in;

12  is that accurate?

13  A.  Can you ask that again?

14  Q.  You've provided testimony that canvassing is not the only

15  thing that USEIP is involved in, correct?

16  A.  That's correct.

17  Q.  So I'm going to focus strictly just on 2021, because we

18  confirmed yesterday that canvassing began sometime around

19  April of 2021, right?

20  A.  Right.

21  Q.  And the canvassing --

22  A.  Canvassing in Mesa County was going on in April of 2021.

23  Canvassing for USEIP was May.

24  Q.  Okay.

25  A.  In my understanding.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    330

1    Q.   USEIP, to your understanding, began canvassing sometime in

2    May?

3    A.   Correct.

4    Q.   And continued, at least with data that's in the canvassing

5    report, through August of 2021, correct?

6    A.   I can't be certain, because, as I mentioned yesterday,

7    there were, you know, different groups cleaning up, and I

8    wasn't involved in all of that, but I'm aware that it was

9    happening in September and October, but the majority of

10   canvassing, certainly my canvassing was done -- I think I was

11   finished canvassing in early July.

12   Q.   Okay.  Because we confirmed that it appeared that there

13   were some canvassing that was going on in Boulder County in at

14   least early October?

15   A.   At least discussions of additional canvassing, yes.

16   Q.   So during that time period, what were other USEIP

17   volunteers working -- what were some of the other activities?

18   A.   So during the period of April 12th, I was not deeply

19   involved in canvassing.  I was focused on legislative efforts

20   and specifically working with Representative Richard Holtorf

21   on different election -- election measures that they were

22   going to try and bring as bills.  And so, you know, a lot of

23   this was kind of peripherally going on for me.  Other counties

24   were meeting with their county clerks and county commissioners

25   sharing information about vulnerabilities, sharing what was

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    331

1  going on in other states.  There were a lot of meet-ups and

2  kind of connecting teams, gathering and, you know, building

3  teams, sharing -- sharing knowledge in counties.  I'm trying

4  to think of other activities, but there was, you know, 64

5  counties.  There was at least one person that I was aware of

6  in each county working on election integrity matters.  Less

7  than ten of those counties were canvassing.

8  Q.  So you say was it approximately ten counties that USEIP

9  did make efforts to canvass in?

10  A.  I don't believe I would characterize it as USEIP made

11  efforts to canvass in.  I would characterize it as ten or less

12  counties -- and I'm guessing a little bit, but if it's more

13  than that, it's one or two more.  It's not more, and I think

14  it's less -- that were -- that had decided to pursue

15  canvassing.

16  Q.  Do you have any idea in terms of head count how many USEIP

17  volunteers were involved in USEIP's canvassing efforts during

18  this time period that we're talking about?

19  A.  I do not, because the number of people would be determined

20  -- you know, the people involved would be in the counties, and

21  I really have no idea.

22  Q.  Based on -- what the canvassing report -- I think it said

23  that there was, at least the data that's presented in that,

24  around 9,000, 9,500-ish doors that were knocked on.

25  A.  I believe that's accurate, close to accurate.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    332

1   Q.  And I believe the safety -- the safety -- or excuse me --

2   the training materials provide for -- at least it was

3   recommended two to three people to go in groups as they were

4   canvassing, right?

5   A.  Correct.

6   Q.  So it's fair to say there were hundreds of volunteers for

7   USEIP that were canvassing, correct?

8   A.  Absolutely.

9   Q.  Thousands?

10  A.  I don't know that I would say thousand -- or thousands.

11  And I wouldn't say for canvassing thousands.  I would say for

12  USEIP maybe a thousand.  Maybe, you know, a few more.  But

13  that was not all canvassing.  That's people, you know, broadly

14  involved around the state.

15  Q.  But -- sorry.  So hundreds of people were certainly

16  canvassing, correct?  Hundreds of volunteers for USEIP were

17  certainly canvassing?

18  A.  I can't be certain, but I would assume -- not, you know,

19  900.  Maybe 100, 150, something around there, but I'm

20  guessing.

21  Q.  You think 150 people knocked on 9,500 doors possibly?

22  A.  Possibly.

23  Q.  Is it fair to say that the majority of volunteers during

24  this time period volunteering for USEIP were involved with

25  their canvassing efforts as compared to other activities?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    333

1    A.  Can you repeat that question?

2    Q.  Sure.  Is it fair to say that the majority of volunteers,

3    so just talking about estimated head counts, were during this

4    April to October 2021 time period involved in USEIP's

5    canvassing as compared to other activities?

6    A.  I would disagree with that.

7    Q.  Why would you disagree with that?

8    A.  Because there's 64 counties and people working in all of

9    them, and less than ten counties were canvassing.  Canvassing

10   was one aspect of what USEIP was doing, and all counties were

11   active in some way.

12   Q.  Was canvassing USEIP's main focus during the April to

13   October time period?

14   A.  It wasn't my main focus.

15   Q.  But USEIP as a collective?

16   A.  I think it depends county to county.  I would not say it

17   was USEIP's main focus.  USEIP's main focus was find the

18   truth, expose the truth, and restore election integrity, and

19   that looked different in every county.

20   Q.  Has USEIP produced any report that is similarly robust to

21   the canvassing report?

22   A.  No.

23   Q.  So is it fair to say that the canvassing report is the

24   largest document that USEIP has produced?

25   A.  Largest in terms of number of pages, yes.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2      07/16/2024    334

1    Q.  And in terms of effort that went into producing a

2    finalized product to disseminate at least to some sort of

3    audience?

4    A.  That I disagree with, because the canvassing report was

5    developed largely by Jeff Young with the input of a few other

6    people.  The playbook, for example, included many different

7    counties providing input to it.  So in terms of collective

8    effort, I would say a much greater collective effort was on

9    the playbook versus the canvassing report.

10   Q.  And I would, just based on your previous testimony, just

11   want to ask a couple questions about the playbook.

12          MR. BREESE:  And, Your Honor, I won't belabor the

13   point here.

14   Q.  (By MR. BREESE) But you referenced on page 3 -- you read

15   two paragraphs.  Just let me know when you're there.  It's

16   under the about this guide section.

17          MR. WYNNE:  I'm sorry.  I'd ask if counsel could

18   identify the Bates page.

19          MR. BREESE:  Yes.

20          MS. EPP:  In the playbook.

21          MR. BREESE:  My book doesn't have the Bates.  It's

22   three in the bottom right of the corner of the actual page

23   numbers.

24   Q.  (By MR. BREESE) In that third sentence in the second

25   paragraph, we want you to bring your skills, talents, and

                         Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    335

1    God-given passions to the movement to restore our republic.

2    Did I read that correctly?

3    A.  Correct.

4    Q.  And then I believe another sentence that you read up in

5    the first paragraph is that USEIP is an association of

6    like-minded people working together to effect change locally,

7    correct?

8    A.  Correct.

9    Q.  So it's a group of like-minded people working together,

10   and the movement is to restore the republic, correct?

11   A.  It's an association.  You said group.  I said association.

12   Q.  Apologies.  It's an association of like-minded people

13   working together, and the movement and to restore the

14   republic, correct?

15   A.  So we want you to bring your skills, talents, and

16   God-given passions to the movement to restore our republic.

17   We were not specifically asking them to join USEIP.  We were

18   asking them to engage in self-governance locally, and, again,

19   this is people outside of Colorado.

20   Q.  I understand that, but you're talking specifically about

21   -- I'm asking about USEIP specifically, and I'm not asking

22   questions about the recruiting or anything along those lines.

23   I'm asking more about the mindset of the individuals that were

24   involved with USEIP.

25   A.  But you're asking me about the specific language.

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    336

1          THE COURT:  Hold on.  Hold on.  Before you answer, if

2     you see somebody stand up to object, let's let them talk

3     first.

4          Go ahead, Mr. Reisch.

5          MR. REISCH:  Your Honor, counsel indicated he wants

6     to ask about the mindset of USEIP.  I object as to relevance.

7     This has nothing to do with -- the Court said yesterday this

8     has nothing to do about politics.  This has nothing to do

9     about political hyperbole.  This has to do about alleged voter

10    intimidation.  Mindset doesn't cut it.

11         THE COURT:  Well, I'm going to sustain it because I

12    don't know what individuals you're talking about, so maybe you

13    can re-clarify it.

14         MR. BREESE:  I'm talking about -- okay.  And I'm

15    simply asking questions just in response to Ms. Epp's previous

16    testimony about these specific paragraphs.

17    Q.  (By MR. BREESE) Was USEIP involved in a movement to

18    restore the republic?

19    A.  Sure.

20    Q.  And USEIP was made up of like-minded people that wanted to

21    move forward with that movement?

22         MR. REISCH:  Objection, relevance.

23         THE COURT:  Overruled.

24    A.  Here where like-minded is written, it means people focused

25    on election integrity, so, yes, in that sense.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    337

1  Q.  (By MR. BREESE) Because as the first page states, the

2  republic had been stolen, correct?

3          MR. REISCH:  Objection, argumentative, relevance.

4          THE COURT:  Overruled.  You can answer.

5  A.  From my perspective.

6  Q.  (By MR. BREESE) And in your discussions with other

7  volunteers of USEIP, did -- were there other volunteers that

8  shared in this perspective?

9          MR. REISCH:  Objection, speculation, lack of

10 foundation as to which member.

11         THE COURT:  Sustained.

12 Q.  (By MR. BREESE) Did you have discussions -- specific

13 discussions with any volunteers about sharing in this

14 perspective that you just offered to the Court?

15         MR. REISCH:  Objection, hearsay, lack of foundation,

16 speculation.

17         MS. EPP:  It's also vague and ambiguous.

18         THE COURT:  You can answer, if you can.

19         MS. EPP:  Can we make it more specific, because it's

20 a very vague question.

21         THE COURT:  Why don't you just do your best with the

22 question, and he can redirect.

23         THE WITNESS:  Can you repeat it?

24         MR. BREESE:  Can the court reporter please read my

25 last question.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    338

1              (The requested portion of the transcript was read.)

2    A.    I don't -- I can't recall any specific conversations, but

3    it wouldn't surprise me if I did.

4    Q.    (By MR. BREESE) And this opinion that you had yourself,

5    this was something that you believed prior to canvassing that

6    began in May of 2021, correct?

7              MR. REISCH:    Objection, relevance.

8              THE COURT:    Overruled.

9    A.    Can you be more specific about what you mean by

10   perspective?

11   Q.    (By MR. BREESE) The perspective that you testified to that

12   the republic had been stolen.

13   A.    Going back to the tea party days, sure, yeah.

14   Q.    So the answer to the question is yes?

15   A.    Yes.

16   Q.    Okay.  I'm going to ask some specific questions about your

17   canvassing in Douglas County.  Did you ask individuals -- give

18   me one second.  When you were canvassing, did you ask any

19   individuals about future policy changes that USEIP wanted to

20   see happen?

21   A.    Did I -- can you repeat the first part of that?

22   Q.    Sure.  When you were canvassing in Douglas County or El

23   Paso County, at any point while canvassing did you have any

24   discussions with homeowners about future policy changes that

25   you USEIP was interested in seeing happen?

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    339

1    A.  Never.

2    Q.  Did you have any discussions about encouraging citizens to

3    take any future action?

4    A.  Never.

5    Q.  Did you request any contributions for USEIP's cause?

6    A.  Never.

7    Q.  So all the information that you were requesting from

8    voters was information -- it wasn't future-thinking, right?

9    A.  It was specifically asking them to verify the record.

10   Q.  Okay.  And to your understanding, at least to the extent

11   you know, was this consistent with other canvassing efforts

12   from USEIP?

13   A.  In terms of asking people questions?

14   Q.  Correct.

15   A.  Yes.  It's explicit in the training materials.  People

16   were -- in the materials themselves.  People were trained on

17   it during the training.  There was role playing to, you know,

18   ensure that we were -- because it's a little bit uncomfortable

19   to go up and knock, so we did the back-and-forth.  And I am

20   not aware of any instances where anybody strayed from the

21   script.

22   Q.  Mr. Wynne asked you a line of questioning yesterday about

23   having been charged -- or excuse me -- not being charged in

24   conjunction with your participation in the events for

25   January 6th, correct?

22-cv-00581-CNS-NRN   Bench Trial - Day 2       07/16/2024    340

1   A.  Correct.

2   Q.  And I believe you testified that, no, you'd not been

3   charged, correct?

4   A.  That's correct.

5   Q.  He also asked you questions about your knowledge of any

6   other individual associated with the USEIP, if they had been

7   charged with any crimes related to their participation in the

8   events on January 6th, correct?

9   A.  Correct.

10  Q.  And you testified also that, no, you don't believe that

11  any individual has been charged?

12  A.  I have no personal knowledge that any individual has been

13  charged.

14  Q.  And you blogged about an investigation related to

15  January 6th, though, correct?

16          MR. REISCH:  Objection, relevance.

17          THE COURT:  Overruled.  I'll allow it briefly.

18  A.  I blogged about my personal experiences, yes.

19  Q.  (By MR. BREESE) Can you turn to Exhibit 20.  And is

20  Exhibit 20 a blog that you posted on May 10th of 2021?

21  A.  Yes.

22  Q.  And is this that blog that you just referenced?

23  A.  Yes.

24  Q.  You wrote this blog, correct?

25  A.  Correct.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2     07/16/2024    341

1          MR. BREESE:  I'd ask the Court to admit this exhibit

2   into evidence, Your Honor.

3          THE COURT:  Any objection?

4          MR. WYNNE:  No objection.

5          MR. REISCH:  Objection, hearsay and relevance, Your

6   Honor.  403 -- 401, 403.

7          THE COURT:  Overruled.  I'll allow Exhibit 20.

8      (Exhibit 20 received.)

9   Q.  (By MR. BREESE) If you could actually move to -- I just

10  want to ask a couple questions about this.  The bottom of --

11  it's USEIP_305.  You testified yesterday that you don't recall

12  USEIP having a Parler account at all, correct?

13  A.  That's correct.  I was wrong.

14  Q.  So your testimony yesterday was inaccurate?

15  A.  Yeah, I completely forgot.  Again, Parler was taken down

16  January of 2021.  I don't recall ever having a USEIP Parler

17  account, but I guess we did.  I was wrong.

18  Q.  And this account was actually taken down at the same time

19  that your Ashe in America account was taken down on Parler,

20  correct?

21  A.  I think that's inaccurate, because it says the USEIP

22  account works, so I think the USEIP account was not taken

23  down.  Mine was taken down.  Just based on this.

24  Q.  So it was your Ashe in America account that was taken down

25  off of Parler?

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    342

1    A.   Yes.

2    Q.   So the USEIP account seemed to still work as of the date

3    of this blog, May 10th, 2021?

4    A.   According to this, and this -- on that screen grab, this

5    is my communications with Parler support.  So, yeah, I totally

6    forgot about it, I guess.  Yeah.

7    Q.   So it's fair to say that -- so do you have any

8    recollection of your USEIP account?

9    A.   I really don't.

10   Q.   So just briefly -- give me one second.  So in this blog,

11   you discuss a visit that you received from two individuals

12   with I believe the Joint Terrorism Task Force related to

13   events on January 6th, correct?

14   A.   That's correct.

15   Q.   And I believe in the blog you described them as asking you

16   basic questions about travel dates and hotels during that D.C.

17   visit, correct?

18   A.   That's correct.

19   Q.   And they had some information about you, such as pictures

20   while you were in D.C., right?

21   A.   They had two pictures.  They had one picture of me at the

22   Lincoln Memorial, which was taken from my Parler account, so

23   me standing in front of Abraham Lincoln.  And then the second

24   picture was me running down a set of stairs with a bullhorn.

25   There's no context as to where it is.  It's on a sidewalk

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    343

1    holding a bullhorn.

2    Q.  And so that wasn't from your Parler account, that second

3    photo you just discussed?

4    A.  No.  That was I imagine an investigative photo.  It looked

5    like it was taken from a surveillance camera in D.C.

6    Q.  And you testified -- or excuse me -- you didn't testify,

7    but you wrote in this blog about how you were familiar with

8    what you described as mass surveillance in D.C., correct?

9    A.  In D.C. there absolutely is mass surveillance.  Our Uber

10   driver as we entered the D.C. limits pulled his mask up and

11   told everybody else to pull their masks up because he would

12   get in trouble if people didn't have their masks up because

13   the cameras would catch it.

14   Q.  And so it wasn't the most surprising thing in the world to

15   you that they had a second photo of you?

16   A.  No.

17   Q.  And you asked them if you were in trouble, right?

18            MR. REISCH:  Your Honor, this documents speaks for

19   itself.  Relevance.

20            THE COURT:  Overruled, but let's get to the point.

21            MR. BREESE:  Sure.  I have just a couple more

22   questions.

23   Q.  (By MR. BREESE) You asked them if you were in trouble,

24   correct?

25   A.  I did.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    344

1    Q.  And they said no, correct?

2    A.  They said no, and that I was -- I believe they said not at

3    this time, or we're not charging you at this time or looking

4    at you at this time.  I don't remember exactly how it was.

5    But they were asking me questions about who I was with, what

6    communications we used, and they never came to my door again.

7    Q.  And you described this event as -- you said it feels like

8    intimidation, right?

9    A.  It was incredibly intimidating to have armed JTTF agents

10   show up at my door for my attendance at a peaceful protest.

11              MR. BREESE:  I have no further questions, Your Honor.

12              THE COURT:  All right.  Mr. Wynne, you have limited?

13              MR. WYNNE:  Yes, Your Honor.

14              THE COURT:  All right.

15                          RECROSS-EXAMINATION

16   BY MR. WYNNE:

17   Q.  When I hear the word Basecamp, I think of kind of a

18   military term or sort of a base camp before you summit Mount

19   Everest or some 14-footer here.  What's your understanding of

20   the term Basecamp?

21   A.  It's project management software.

22   Q.  Is it a platform?  So project management software.  Could

23   you give other examples of software or platforms that serve

24   the same purpose?

25   A.  Slack, Microsoft Teams.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    345

1   Q.  What does it mean to have administrative privileges with

2   any of those sort of -- I think you said -- is it data

3   management platforms?

4   A.  Project management.

5   Q.  What does it mean to have administrative privileges?

6   A.  Back-end privileges.  It means that you can -- you're not

7   just in the -- you're not just a user.  That you're actually

8   able to effect the back end, set categories, manage access,

9   those kinds of things.

10  Q.  So, for instance, my law firm has a platform for entering

11  client data or billing.  There's one person who has

12  administrative privileges.  It helps reduce the chaos of

13  different people going in and confusing matters or who gets

14  billed for what or --

15       MR. BREESE:  Objection, Your Honor, leading, the

16  attorney is testifying.

17       THE COURT:  Well, overruled.  But we don't need the

18  background.  I think she understands how to describe what an

19  administrator is.

20  Q.  (By MR. WYNNE) Is this what I've described something

21  similar?

22  A.  Yes.

23  Q.  So was there anything in this instance peculiar or

24  sinister about you're having administrative privileges?

25  A.  No.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN  Bench Trial - Day 2    07/16/2024    346

1  Q.  What was the purpose of your carrying out that function?

2  A.  I set up groups.  I dealt with some access-type things,

3  and that meant like adding people to different groups and

4  changing their privileges.

5  Q.  Okay.  For the canvassing, I think you mentioned that it

6  was based on the voters listed in the Secretary of State

7  records to confirm the accuracy of those records; is that

8  right?

9  A.  Can you repeat the question?

10  Q.  The scope of people who were to be canvassed were people

11  who had voted?

12  A.  Correct.

13  Q.  So people who had not voted would not be on the walk lists

14  to be canvassed?

15  A.  Correct.

16  Q.  You mentioned legislative efforts that were your focus at

17  some point rather than canvassing.  Could you describe what

18  those efforts were?

19  A.  Efforts other than canvassing?

20  Q.  Yeah, what particular legislative efforts were you focused

21  upon?

22  A.  In the -- so in February of 2021 I was contacted by

23  Representative Richard Holtorf and asked what kinds of things

24  would we want to see in legislation.  Working with -- I think

25  I talked to Shawn a little bit about what those things might

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    347

1    be.  Other people as well.  I can't recall who.  But we put

2    together a multipage list of different priorities from a

3    legislative standpoint to address.  Representative Holtorf

4    eventually did pursue some of those in legislation, although

5    they died in the kill committee, which is -- I'm sorry -- the

6    military administration committee.

7    Q.  So to that extent, were you involved in, say, petitioning

8    your representatives or participating or trying to participate

9    in the democratic process?

10   A.  Absolutely.  And I've covered and advocated in every

11   legislative session since.

12   Q.  Would that also, do you feel, constitute part of your

13   right to exercise your right to free speech and association?

14   A.  Absolutely.

15   Q.  I'd like to turn very briefly to Exhibit Number 1

16   regarding the membership and the lack of structure of USEIP.

17   I'd direct your attention to page 6, the third paragraph.  I'd

18   like you to read it, the first sentence.

19   A.  We also attended everyone's events, GOP, Libertarians, FEC

20   United, women's groups, tea party groups, and any other groups

21   where we might find some common ground.  The key is to meet

22   people, talk to other leaders, collaborate, share ideas, share

23   intel, and row in the same direction.  The power of our

24   collective scale is formidable.

25   Q.  Okay.  So did -- did you and others, your friends and

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    348

1    associates, attend other -- the events of other groups with

2    other primary interests perhaps, but who shared an interest at

3    least in a couple of things?

4    A.  Yes.

5    Q.  So why did you include this up front on page 6, which is

6    really kind of close to the beginning of this organizing

7    playbook?

8    A.  I'd say included specifically in the building your team

9    section of the playbook because that was -- that was the

10   purpose of, you know, connecting and finding -- one of the

11   hypotheses that we had at the founding of USEIP was that every

12   group, every conservative group, Republican group,

13   Libertarians, others were going to create an election

14   integrity committee, and instead of recreating the wheel

15   however many times that is, a lot, multiple groups across

16   multiple counties, we set up to connect them, get people

17   talking to each other, share knowledge.

18   Q.  Did these other organizations also share knowledge?

19   A.  Absolutely.

20   Q.  To the best of your knowledge, were individuals, say,

21   members to the extent that that matters, of multiple groups,

22   maybe these groups and others?

23   A.  Yes.

24   Q.  And you mentioned women's groups.  If a member of the

25   League of Women Voters had -- at least were aligned with these

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    349

1    kinds of interests or were just curious, would you have

2    welcomed them into the USEIP meetings?

3    A.   Absolutely.  We did have members of the League of Women

4    Voters in USEIP.

5    Q.   What about Mi Familia Vota?

6    A.   Absolutely.

7    Q.   And the NAACP chapter for these surrounding states?

8    A.   We did have associates of NAACP in USEIP.

9        THE COURT:  Mr. Wynne, you've far exceeded the scope

10   of what you were permitted to ask questions on, which were my

11   questions to Ms. Epp.  You've already done your examination.

12   You are way out of scope here.

13       MR. WYNNE:  Okay.  My apologies.  I thought counsel

14   had introduced -- talked about Exhibit 1.  My apologies, and I

15   will pass the witness.

16       THE COURT:  All right.  Ms. Epp, I have a follow-up,

17   because in direct response to a question Mr. Reisch asked, you

18   said Mesa County was not using the training manuals.  But as

19   we saw in Exhibit 25 at page 47, Mr. Smith apparently sent the

20   training manual to Mesa County.  So I want you to explain

21   based on that what your knowledge is of what Mesa County was

22   using to assist their canvassers.

23       THE WITNESS:  Sure.  So let me just get there.  So

24   this is a first draft of voter verification procedures.  It

25   wasn't a full training document, and I don't recall being a

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024   350

1    part of this conversation.  Obviously I responded to the

2    definitely mask PII.  At the time of this, I was dealing with

3    a corporate client around cloud technology.  We were building

4    a regulatory paper to go to the Central Bank of Ireland, and

5    PII and cloud technology was a big part of that.  So my -- my

6    assumption is when I said -- when I saw mask the real people,

7    being in the regulatory environment, my, you know, reaction

8    was to say definitely, mask the PII, because I was reviewing

9    all of those regulations in my professional life at that time.

10          As it pertains to sharing information, we were

11   sharing information.  I don't recall ever knowing that

12   Mr. Smith shared procedures with Mesa County at this -- at

13   this time.  I will say that in that same sentence it says I

14   don't know what they have.  If they use this, we'll get

15   feedback to improve.  If they don't, we'll get whatever better

16   procedures they're using.  Objective is consistent, accurate,

17   safe, legal, fast voter verification collection of coherent,

18   admissible data.  It was knowledge sharing back and forth is

19   what we were doing.  I don't recall it being shared at that

20   time.

21          THE COURT:  All right.  And do you recall any

22   conversations with the Mesa County captain about their review

23   of your voter verification draft procedures?

24          THE WITNESS:  Not specifically.

25          THE COURT:  In general any?

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    351

1          THE WITNESS:  I recall talking with Cory about --

2     about canvassing.  There were other people in Mesa County that

3     were -- there was kind of some drama in Mesa County that has

4     nothing to do with canvassing, but the county captain before

5     Cory Anderson came in.  There was kind of a dispute there, and

6     I talked to him a bunch.  I think some of that drama might

7     have been about canvassing, but I can't recall entirely.

8          THE COURT:  All right.  Thank you.

9          Would plaintiffs call their next witness, please.

10         MS. ERICKSON:  Thank you, Your Honor.  We call Chris

11    Beall, Deputy Secretary of State.

12         THE COURT:  All right.  Good morning, sir.  If you

13    will stand in front of Ms. Dynes, she will administer the oath

14    to you.

15         THE COURTROOM DEPUTY:  Raise your right hand, please.

16                   CHRISTOPHER PERRY BEALL

17    was called as a witness and, having been duly sworn, was

18    examined and testified as follows:

19         THE COURTROOM DEPUTY:  If you could please have a

20    seat.  State your name and spell your last name, please.

21         THE WITNESS:  Christopher Perry Beall B-e-a-l-l.

22         THE COURT:  Ms. Erickson.

23         MS. ERICKSON:  Thank you, Your Honor.

24

25

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    352

1                           DIRECT EXAMINATION

2    BY MS. ERICKSON:

3    Q.  Good morning, Mr. Beall.  Could you please tell the Court

4    what is your current occupation?

5    A.  I am the Deputy Secretary of State for the State of

6    Colorado.

7    Q.  How long have you worked in the Secretary of State's

8    office?

9    A.  I've worked for the Secretary since March 8th, 2021.

10   Prior to that I was her outside counsel at the Attorney

11   General's Office.

12   Q.  Did you hold other positions prior to becoming the deputy

13   secretary of state?  Excuse me.  I guess you just discussed

14   that.  Can you talk first about your role in the Secretary of

15   State's Office after you joined in 2021?

16   A.  Certainly.  I am the number two in the office.  I am

17   responsible for all of the 150-ish classified personnel,

18   classified personnel employees within the Department of State.

19   I am the final decision agent -- final agency decisionmaker on

20   all contested administrative matters.  I issue -- I,

21   therefore, issue final agency orders on elections, campaign

22   finance, notaries, all the subject matters of our department.

23   I am also the Secretary's chief inhouse legal counsel.  I am

24   an attorney admitted to practice.  I engage in counsel to the

25   Secretary on legal matters, as well as the administration of

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2   07/16/2024   353

1    her duties as the chief state election officer.

2    Q.  Thank you.  And you mentioned that prior to joining the

3    Secretary of State's office you worked in the Colorado

4    Attorney General's Office, correct?

5    A.  I did.  The current Attorney General Philip Weiser

6    appointed me as one of his deputy attorneys general in January

7    of 2019.  My portfolio was as the deputy in charge of the

8    business and licensing division -- section, excuse me -- over

9    which -- in which there were 44 attorneys responsible for

10   advising administrative agencies within the State of Colorado.

11   Q.  And can you talk a little bit further about your role in

12   the Attorney General's Office as it related to the Secretary

13   of State's Office?

14   A.  I was designated as the Secretary's outside conflicts

15   counsel to provide her and her office with legal counsel for

16   and representation when her designated counsel had a conflict,

17   be that because they were also engaged representing the

18   governor, or they were engaged in matters in which there might

19   be perceived to be a conflict between the Secretary's position

20   and others in that role.  I was her chief legal counsel on

21   campaign finance matters, and I was also her legal advisor on

22   legislative matters.  In particular, amendments to the

23   election code.

24   Q.  Now, you mentioned that you're an attorney, correct?

25   A.  I did.

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    354

1    Q.  And when did you graduate from law school?

2    A.  I graduated from Duke Law School in 1997.

3    Q.  And after you graduated from Duke Law School, can you just

4    talk a little bit about your career path prior to joining the

5    Colorado Attorney General's Office.

6    A.  Certainly.  The deal with my wife who put me through law

7    school was that she got to choose where we ended up.  After

8    law school she chose Colorado.  I came and worked.  I did

9    summer clerkships for Davis Graham & Stubbs and Faegre &

10   Benson.  I clerked for the Honorable David Ebel and then

11   joined Faegre Benson as an associate in September '98.  I

12   initially started in the business litigation practice group,

13   but was moved to the intellectual property practice group two

14   years into my role at Faegre and was an intellectual property

15   litigator.

16          Eventually was elevated to partnership.  Two of my

17   colleagues, copartners left Faegre Benson in 2008.  We joined

18   a small First Amendment boutique firm.  The legal recession in

19   2009 meant that there was not enough work for us here in the

20   Rocky Mountain area, so I became a New York lawyer.  Our firm

21   had an office in New York, and from 2010 going forward I

22   practiced principally in New York as a copyright, trademark,

23   First Amendment litigator.

24   Q.  So it sounds like you have somewhat of an expertise in the

25   First Amendment; is that correct?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    355

1    A.  I think I do.  In addition to the paying work from

2    clients, I also did pro bono work as an election lawyer

3    throughout -- from 2004 going forward.  And certainly my work

4    in the First Amendment area meant that I had a substantial

5    amount of activity in the elections field.  I did represent

6    the ACLU and a group of organizations when the Democratic

7    National Convention was here in Colorado contesting

8    restrictions on their speech and assembly rights during the

9    Democratic National Convention.

10   Q.  One follow-up question on your role in the Secretary of

11   State's Office now in particular.  Do you have any oversight

12   over the Colorado Open Records requests that are made?

13   A.  Yes.  I am, as I said, the final agency decisionmaker.  To

14   the extent that there is any dispute over a CORA, Colorado

15   Open Records Act, request, it comes eventually to me.  The

16   CORA team reports up to me through a colleague who works in

17   our administrative division who is an attorney.  So I am

18   ultimately responsible for all CORA decisions.

19   Q.  I want to back up a little and talk sort of high level

20   about the Secretary of State's Office moving away from your

21   role specifically.  Can you generally describe the role of the

22   Secretary of State's Office as it relates to elections and

23   election administration?

24   A.  Yes.  The Secretary of State by statute is designated the

25   chief state election officer.  As a result, she is responsible

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    356

1    for enforcement of Title 1 of the Colorado Revised Statutes.

2    Title 1 is the election code.  The election code runs the

3    gamut from who is eligible to vote to who may run for office

4    to how elections are conducted to what money can be spent on

5    elections.  The Secretary's office has an elections division.

6    The elections division is staffed with career professionals

7    who administer the various components of the election code.

8    These activities include voter registration.

9            The Department of State is responsible for the

10   statewide voter registration database and system.  We refer to

11   it by the acronym SCORE.  The voter registration system is a

12   dynamic database that is accessed and used by all 64 counties.

13   In Colorado voter registration is a joint effort by county

14   clerks and their election staffs and the Department of State.

15   The voter registration rolls, the Secretary is charged with

16   maintaining accurate voter registration rolls, by statute

17   required to engage in list maintenance.  I could keep going,

18   but it feels like I might be going too far.

19   Q.  Thank you.  Is it fair to say that the Secretary of State

20   's Office oversees elections in the State of Colorado?

21   A.  It is fair to say.

22   Q.  And in that capacity, does the Secretary of State's Office

23   also work with other officials, government entities, across

24   the State of Colorado?

25   A.  Certainly.  I mentioned the county clerks' offices.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024   357

1    County clerks are by statute for certain elections the

2    designated election official in their county.  The Secretary

3    exercises supervision and authority over clerks and the

4    clerks' staff with regard to elections activities and election

5    systems.  The Secretary certainly also works with law

6    enforcement to ensure the security and safety of elections and

7    voters, and the Secretary works with the Attorney General.  By

8    statute, the Attorney General is required to advise the

9    Secretary with regard to interpretation and implementation of

10   the election code.

11   Q.  Is it fair to say that the Secretary of State has the

12   ultimate responsibility over Colorado's elections?

13   A.  Yes.

14   Q.  How many employees are in the Colorado Secretary of

15   State's Office?  And I apologize if you already answered this.

16   A.  I said 150-ish.  The reason why I'm hedging is the number

17   fluctuates, but it's -- we are budgetarily authorized for 153

18   FTEs.

19   Q.  Can you talk a little bit about the departments within the

20   Secretary of State's Office and just a brief overview of how

21   those employees break down?

22   A.  Sure.  The office is divided into four divisions.  I

23   mentioned the elections division, which actually is not the

24   largest division.  The largest division is our IT division in

25   large measure because we have our own software development

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    358

1  team.  The SCORE system and other systems are engineered --

2  written inhouse.  In addition to the IT and elections

3  division, we have the business and licensing division which is

4  responsible for various regulation, business entity formation,

5  charities, charity solicitation, notaries public, durable

6  medical equipment, royalty -- copyright royalties, all kinds

7  of things.  And then we also have an admin, administrative

8  division, in which our accounting, HR, and legal functions are

9  housed.

10 Q.  So it sounds to me like the primary divisions that have

11 oversight or job responsibilities that relate to elections

12 would be the election division, as well as the IT division?

13 A.  Yes.  Portions of the IT division.

14 Q.  And you mentioned that the SCORE is written inhouse.  I

15 think that's the term you used?

16 A.  I did use that, referred to it that way.  SCORE initially

17 was to be an off-the-shelf software application.  The

18 department in the mid-2000s encountered difficulty with the

19 software vendor and shifted and developed the program inhouse.

20 We maintain it ourselves now.

21 Q.  Without getting into the specifics of any particular

22 election, can you talk generally about what is the Secretary

23 of State's viewpoint currently, your office's viewpoint, about

24 the security of elections in the State of Colorado?

25 A.  I would want you to be more specific about security.  What

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024   359

1   do you mean by security of elections?

2   Q.   I mean whether the administration of elections are safe

3   and secure.   Whether -- does the Secretary of State's Office

4   have concerns about whether Colorado elections are carried out

5   in a secure manner?

6   A.   No.   The Secretary and myself personally and our office

7   are quite confident that Colorado elections are reliable, that

8   they provide for an accurate result of the expression of

9   voters' will, and that they do so in a manner that is highly

10  transparent, and that voters are able to see that their vote,

11  when they vote, has been accurately counted, and that the

12  results have been accurately tabulated, and that the ultimate

13  outcome of an election reflects the majority of those who

14  participated in the election.

15        You'll note that I have not used the word secure,

16  because I don't know what that term means.   If you mean by

17  security that voters are physically safe, absolutely.   The

18  secretary has gone to great lengths to work on the security,

19  the physical security of voters and election officials.   If by

20  security you mean that the systems by which the voters' will

21  is determined is protected from tampering or outside

22  influence, I also agree that we'd go to extraordinary lengths

23  to protect the systems from tampering.   And so I believe that

24  in that regard the systems and the processes are secure, but

25  I'd want you to be more specific.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    360

1    Q.  I think you've answered the question that I asked.  Now,

2    Colorado -- in Colorado, any individual voter can vote via a

3    mail ballot, correct?

4    A.  Yes.  Well, every registered voter and registered voter

5    who is an active registered voter is sent a mail ballot at the

6    address where the clerk's office believes they live.  There

7    are registered voters who are inactive, and therefore they

8    continue to be registered voters, but they do not receive a

9    mail ballot.  They become inactive when the clerk's office or

10   our office receives an indication that they have moved,

11   whether that be because mail is returned or we receive

12   information from the USPS from the National Change of Address,

13   NCOA.  But in any event, every active registered voter in

14   Colorado is mailed a mail ballot.

15   Q.  So with respect to actually casting a vote via a mail

16   ballot, can you describe that process?  What can a voter do

17   with the ballot once it's been filled out?

18   A.  A voter can put the ballot in the return envelope and post

19   it through United States Postal Service.  The voter can also

20   drop off the mail ballot in any drop box in any county now.

21   And the voter can also return the ballot to a clerk's office,

22   again in any county.  So either by mail or in person a voter

23   can return the mail ballot.  In Colorado, our experience has

24   been that -- well, depending on which election, a general or a

25   coordinated -- coordinateds are off year -- the rate of

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    361

1    participation is between 95 and 98 percent of Colorado voters

2    vote the mail ballot that they were issued.

3            Of the remaining who vote in person, most of those

4    voters are voting a generated ballot, a paper ballot at the

5    polling place where they vote.  A small percentage vote on

6    ballot marking devices, which are tablets, primarily for the

7    disabled, that generate a ballot that the voter can review,

8    and then the paper that is generated from the ballot marking

9    device is collected from the -- placed in the ballot box.

10   Q.  So it sounds like it's fair to say that the overwhelming

11   majority of eligible registered voters in Colorado vote from

12   their homes and then either mail their ballot back or drop it

13   at a drop box?

14   A.  The overwhelming majority.

15   Q.  I'd like to talk -- to move into talking specifically

16   about the 2020 election.  Can you talk a little bit about the

17   aftermath of the 2020 election from the viewpoint of the

18   Secretary of State's Office?

19   A.  The aftermath, which gets tied up into the events at the

20   Capitol on January 6th, was that despite the fact that the

21   results in Colorado had been audited through our audit

22   processes in which no discrepancies were found, or at least no

23   -- no machine-caused discrepancies were found, and canvassed,

24   there were substantial numbers of people who were claiming

25   that the election results, particularly in Colorado, did not

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    362

1    reflect the will of the people, and this led to calls for

2    audits of the 2020 election results in Colorado.

3          At the same time, the Secretary was observing what

4    was happening in Maricopa County in Arizona and concluded

5    based on what she was seeing there that she needed to ensure

6    that were any county clerks to engage in an additional audit

7    of the ballots in their counties, that they would have to do

8    so through reputable, appropriate auditors.  That private

9    auditing -- in Maricopa County it was conducted by an outfit

10   known as Cyber Ninjas -- was not appropriate in Colorado, and

11   she therefore issued an election order and an emergency rule

12   that prohibited third-party, non-county clerk,

13   non-governmental audits of election results.

14   Q.  Okay.  I want to break that down a little bit.  So you

15   mentioned -- first of all, you used the word canvassed when

16   you were talking about reviewing results, I believe.  Did you

17   use that word?

18   A.  I did.  I did.  I used the words audit and canvass, and

19   those are two different things.

20   Q.  Can you describe each of those things, please.

21   A.  The canvass is statutorily called for after the audit.

22   The canvass is the approach by each county to ascertain

23   whether the number of ballots that were tabulated equals the

24   number of ballots that were issued.  So it is the canvass of

25   the number of ballots.  The audit is a review of a sample.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    363

1    The number of ballots selected is the function of the margin

2    of victory for certain races.

3              But a selected group of ballots are reviewed by a new

4    group of election judges and compared with the results that

5    were initially tabulated.  This comparison is done for all

6    races on the selected ballots.  In this manner we are

7    attempting to identify occasions when the tabulation of

8    specific votes within the ballots -- so canvass is about

9    ballots, audit is about votes within the ballots -- whether

10   any of those votes were inaccurately tabulated.

11   Q.  And when you were describing the canvass and the audit

12   that was being done, you mentioned -- and I may misstate this,

13   but I think you mentioned that there were no technological

14   discrepancies?

15   A.  I said discrepancies.

16   Q.  Okay.  Were there any discrepancies in the Secretary of

17   State's Office's view in the 2020 election?

18   A.  The audit results -- first off, for the canvass, no.  The

19   canvass -- all 64 canvass boards certified their canvasses and

20   certified the results.  For the audit boards, and all of the

21   audit reports from each county are posted on our website,

22   there were certain counties where a discrepancy was identified

23   where the vote that the audit board saw on a ballot was not

24   the same as the vote that the original tabulation was.

25              In each of those very small number of instances, it

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2     07/16/2024    364

1    was ascertained that the reason for this was because either

2    the audit board pulled the wrong ballot, or there was a

3    disagreement about the voter's intent.  The voter may have

4    circled an oval instead of filling it in, crossed it out.

5    This sort of difference of opinion is something that is a

6    human judgment.  In any event, in no instance did any of the

7    audits reveal that the machines, the scanners that had scanned

8    each of the ballots, mistakenly tabulated the ballots.  There

9    was no machine error.  There was potentially small numbers,

10   very small -- in the single digits -- of human error.

11   Q.  You mentioned Maricopa County.  Can you describe briefly

12   what you understood to be happening in Maricopa County?

13           MR. WYNNE:  Your Honor, I believe I'm going to

14   object, relevance.  I believe that's in Arizona.

15           MR. REISCH:  Join.  Relevance.

16           THE COURT:  Let's make this quick, just a brief

17   explanation.  Overruled.

18   A.  What I understood was in Maricopa County there were people

19   who were -- I think it was the state senate, Arizona state

20   senate -- funding or calling for and conducting a review of

21   the ballots that were cast in Maricopa County to try to

22   ascertain whether the result in the presidential race in

23   Maricopa County was accurate.

24   Q.  (By MS. ERICKSON) Following the 2020 election, was the

25   Secretary of State's Office aware of allegations in Colorado

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    365

1    that the election results were fraudulent?

2    A.  Yes.

3    Q.  And what was your knowledge or your understanding of those

4    allegations?

5         MR. REISCH:  I would object as to hearsay, lack of

6    foundation.

7         THE COURT:  Sustained as to foundation.  If you can

8    lay a little foundation for why he would know.

9         MS. ERICKSON:  Absolutely.

10   Q.  (By MS. ERICKSON) The Secretary -- as you've testified

11   previously, the Secretary of State's Office oversees elections

12   in Colorado, correct?

13   A.  Correct.

14   Q.  And you also testified that following the 2020 election,

15   there were concerns about -- that there were allegations of

16   fraud made relative to the 2020 election, correct?

17   A.  I did say that, and that is accurate.  There were

18   individuals in Colorado who communicated with the Secretary's

19   office and said that the outcome was not accurate.

20   Q.  And what did you understand based on what was communicated

21   to you or what you saw stated publicly to be the concerns?

22        MR. REISCH:  Objection, hearsay, lack of foundation.

23        THE COURT:  Overruled.

24   A.  The communications that had come to the office were

25   assertions that the Dominion Voting Systems equipment had,

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    366

1    quote, flipped votes from President Trump to Joe Biden.

2    Q.   (By MS. ERICKSON) Any other concerns that you are aware

3    of?

4    A.   Later there became concerns about the number of voters who

5    voted, assertions by individuals -- actually, from outside

6    Colorado -- who asserted that more people had voted than were

7    present in a county.  Contentions that the amount of votes

8    received were implausible.

9    Q.   Did the Secretary of State's Office undertake any

10    investigation or analysis related to concerns that were lodged

11    with your office?

12    A.   We certainly analyzed.  I won't say that we conducted an

13    investigation.  What we analyzed were the assertions that some

14    individuals were making that there were more voters' votes

15    than there were people in counties, and we assessed those

16    assertions based on the data that we have, and we concluded

17    that those assertions simply are wrong.

18    Q.   So to your knowledge, were there any proven instances of

19    election fraud or voter fraud in the 2020 election?  And just

20    in Colorado specifically.

21          MR. REISCH:  Your Honor, I'm going to object.  Lack

22    of foundation, hearsay.  I need some specificity here .  I

23    mean, this is just a broad conclusion.  It calls for a legal

24    conclusion as well.

25          THE COURT:  Overruled.  You may answer.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    367

1   A.  I actually am going to agree with your adversary.  I need

2   you to specify election fraud versus voter fraud.

3   Q.  (By MS. ERICKSON) So let's take one at a time.  First, to

4   your knowledge, were there any demonstrable or proven

5   instances of election fraud related to the 2020 election?

6   A.  No.  And I understand election fraud to mean systemic

7   fraud, or at least systemic failure of the system to generate

8   an accurate expression of the voters' will.

9   Q.  And then the same question for voter fraud.  Were there

10  any proven or demonstrable instances of voter fraud in the

11  2020 election?

12  A.  There have been, I'm not going to know the exact number,

13  but something like 20 prosecutions for individuals who the

14  prosecution alleged were not either eligible to vote or voted

15  more than once.  These are occasions that were referred to

16  those district attorneys by the county clerks as a result of

17  our election process.  Every county clerk is required to refer

18  to their local DA any instance in which the clerk identifies

19  that there is someone who has turned in a ballot whose

20  signature doesn't match, if they've returned a mail ballot, or

21  who has otherwise attempted to vote more than once.

22        Because of our SCORE system, we have realtime

23  awareness of every vote that has been received by any clerk

24  anywhere in the state, so that when a voter attempts to turn

25  in a second ballot, for example, by going to a different

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    368

1    county and attempting to obtain a statewide ballot, that will

2    be seen and ultimately reported.  There are something like 20

3    prosecutions from 2020.  I have no idea how many demonstrable

4    cases there were.  We do not collect from the clerks the count

5    of how many referrals they've been made.  But it's an

6    ascertainable number.  We just don't have it.

7    Q.  But is it fair to say that the Secretary of State's Office

8    and the county clerk's office have processes in place to

9    detect both election fraud and voter fraud?

10   A.  Yes.  The auditing that we do, the logic and accuracy

11   tests that we do before the election should detect election

12   fraud or failures in the election system, and the county

13   clerk's review of the returned ballots will detect, has

14   detected instances of voter fraud.

15   Q.  Did the Secretary of State's Office face criticism

16   following the 2020 election?

17   A.  Yes.

18   Q.  And can you talk a little bit about that?

19   A.  The secretary was accused by one of the plaintiffs (sic),

20   among others, of being the chief person responsible for the

21   election fraud, as he indicated, in Colorado.  So she was

22   accused by many, not just Colonel Smith, of engaging in

23   systemic violations of election law, and we had many people

24   come to public hearings that I was the hearing officer for and

25   say that the election system is rigged and that the election

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    369

1   system can't be trusted and that they wished for the election

2   process to be conducted in a manner that is not how the

3   general assembly has directed us to conduct the election.

4   Q.   Did the Secretary of State's Office take any action in

5   response to those criticisms or concerns?

6   A.   Well, we certainly take action in the effort to provide to

7   the public accurate information about how the processes work

8   and how the system is reliable and that we provide as much

9   transparency as we possibly can.  We -- so we have taken

10  public education efforts to address those criticisms.  We have

11  analyzed proposals from legislators, as well as members of the

12  public, about changes to the election processes.  None of

13  those legislative proposals have been enacted.

14          We also have made proposals of our own to ensure the

15  security of the election processes, resistance to outside

16  tampering by requiring security measures around the systems,

17  placing limitations on who can touch the systems -- the

18  machines, and requiring sort of space around -- and securing

19  video cameras, seals, all kinds of measures to protect the

20  machines from being tampered with.

21  Q.   Have you heard of a group that goes by the name United

22  States Election Integrity Plan?

23  A.   Yes, I have.

24  Q.   How did you first hear about --

25          THE COURT:  Ms. Erickson, before you switch topics,

22-cv-00581-CNS-NRN   Bench Trial - Day 2   07/16/2024   370

 1   let's go ahead and take our morning break.  Let's come back at

 2   10:40.  Let me just say two times now folks from the defense

 3   side have just walked out of the courtroom.  This isn't a

 4   movie theater.  You're in here until there's a break, so

 5   please don't get up and wander about or leave the courtroom.

 6   If you're in the gallery, you're free to do that, but not at

 7   counsel table.  We'll be in recess until 10:40.

 8           THE COURTROOM DEPUTY:  All rise.  Court is in recess.

 9       (Break was taken from 10:18 a.m. to 10:41 a.m.)

10           THE COURT:  Please be seated, and you can continue.

11           MS. ERICKSON:  Thank you, Your Honor.

12   Q.  (By MS. ERICKSON) I think this might be a repeat of what I

13   asked right before the break, but just to start back, have you

14   heard of United States Election Integrity Plan?

15   A.  Yes.

16   Q.  And how did you first hear about United States Election

17   Integrity Plan?

18   A.  I believe I heard of it and our staff heard of it in

19   connection with meetings that were being organized by USEIP

20   and others with county clerks around accusations of systemic

21   problems in the election system and accusations that the vote

22   in 2020 was rigged.

23   Q.  And can you put a timeframe on when you first heard about

24   United States Election Integrity Plan?

25   A.  The spring of '21.  I think actually my awareness was a

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    371

1    little late, because I didn't join the Secretary's office

2    until March of '21.  I know that our staff was aware of USEIP

3    earlier than I was, but I don't know exactly when they became

4    aware.

5    Q.  What is your understanding of the nature of -- and I'll

6    refer to them as USEIP as well.  What is your understanding of

7    the nature of USEIP as a group or an organization?

8    A.  I understand it to be an organization that was founded by

9    some of the plaintiffs (sic), as well as others, to advocate

10   and investigate election integrity.  The phrase I think in

11   their mind refers to the unreliability of --

12          MR. REISCH:  Objection, speculation.

13          THE COURT:  Overruled.  You can answer.

14   A.  Of the unreliability of election results.  I'm aware of

15   the efforts to conduct canvassing of residents in Colorado.

16   I'm aware of attempts to meet with county clerks to try to

17   persuade county clerks to abandon the voting processes that

18   are used in Colorado.

19   Q.  (By MS. ERICKSON) I want to focus in first on --

20   previously in your testimony you mentioned that the defendants

21   -- or USEIP had concerns about Dominion; is that correct?

22   A.  I did.

23   Q.  So can you describe a little bit about what you understood

24   about those concerns?

25          MR. REISCH:  Objection, hearsay, relevance.

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    372

1           THE COURT:  Well, sustained.  Maybe you can reword

2      it.

3      Q.  (By MS. ERICKSON) You just testified, as I understood, to

4      what the secretary of state's office's understanding is of

5      USEIP's efforts.

6      A.  Yes.

7      Q.  Can you describe your understanding as it relates to

8      concerns about election integrity?

9      A.  Yes.  The understanding I have is that USEIP and the

10     individuals involved and the individuals that spoke on their

11     behalf was that the voting system equipment could not be

12     trusted.  That the voting system equipment -- and in this

13     context, 62 of Colorado's counties use Dominion Voting Systems

14     machines, some computers and software, and USEIP alleged that

15     Dominion's systems could not be trusted.

16     Q.  At some point did you understand that USEIP's efforts

17     shifted focus or that another focus of theirs was on

18     canvassing voters?

19     A.  Yes.

20     Q.  And what did you understand about those efforts in

21     particular?

22     A.  What I saw was calls to action, efforts to organize

23     meetings, and publication of a playbook and other material on

24     the web, on the Internet, calling for people to participate in

25     an effort across the state to canvass, in their word,

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    373

1   participation in the 2020 election.  It was -- I saw this

2   happening as it was building in the summer of '21, and then

3   our office started receiving calls, and ultimately we received

4   two e-mails that I believe have been produced in this case

5   that made complaints about what USEIP was doing, or at least

6   what was attributed to USEIP, and we looked into those

7   complaints.

8   Q.  So setting aside the complaints for now, and I will want

9   to talk about that later, but can you talk a little bit, if

10  you know, about what the nature of the defendants' canvassing

11  efforts was?

12  A.  What I saw from their calls to action was effort to

13  recruit people to door-knock on select residences in various

14  places to question people at their homes about how they had

15  voted.

16  Q.  And in order to do that, did defendants obtain information

17  from the Secretary of State's Office?

18  A.  Mr. -- Colonel Smith did.  Colonel Smith is a current

19  subscriber to the public data that is available from our

20  office that includes voter registration lists.

21  Q.  And can you describe for the Court what is included in

22  that information?

23  A.  Well, the subscription allows -- we produce data from

24  SCORE that will be a variety of reports.  Among them are the

25  complete voter -- public voter registration file that will

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    374

1    list the information about all registered voters in Colorado,

2    including if they have voted, where they voted, if they voted

3    in a partisan race -- a partisan primary, whether they

4    returned a certain party's primary ballot.  That complete

5    voter file is one set of data.

6            There are other sets of data that include things like

7    the cure list.  So when a voter's mail ballot is held because

8    a signature didn't match, the voter has an opportunity to cure

9    by providing information about themselves, and participants in

10   elections do a lot of work to chase those ballots, voters to

11   cure.

12           There's also information -- a data report on list

13   maintenance.  So during the 60 days leading up to an election,

14   statutorily there's a freeze on any deletions, any

15   cancellations of voter registration, and after the election is

16   over, counties and our office are permitted by law to engage

17   in list maintenance, deletion of voter registration.  By that

18   statute that can only happen after a voter has not voted in

19   two general elections, so it has to go through two cycles,

20   which is the reason why we have inactive voters.  But if two

21   -- if a voter has been inactive and not voted in two general

22   election cycles, then counties may pursue the process of

23   deletion.  There's a report on that.  I'm not sure what else,

24   if you had a specific question I could answer.

25   Q.  No, that should be sufficient.  I think you've answered my

22-cv-00581-CNS-NRN    Bench Trial - Day 2      07/16/2024    375

1    question.  Thank you.  We've talked about USEIP and your

2    office's interactions with USEIP.  Has the Secretary of

3    State's Office also had interactions with Defendants Epp,

4    Kasun, or Smith specifically?

5    A.  Yes.  All three of them have made various CORA requests.

6    Q.  Let's talk about that.  I'm going to -- oh, I apologize.

7    A.  I paused.  You didn't interrupt.  I believe each of them

8    have also testified at public hearings on rules.

9    Q.  So I'd like to just talk about them each individually for

10   a minute.  Can you talk specifically about Defendant Epp.

11   What interactions has she had with your office in specific?

12   A.  Ms. Epp -- Epps -- has made a series of CORA requests.  I

13   can't give you the first -- the day of the first, but the most

14   recent was in January, February of this year.  And I believe

15   Ms. Epps (sic) also appeared remotely, but maybe in person at

16   a -- at least two hearings on rulemaking.

17   Q.  And how about Defendant Kasun?  What interactions has your

18   office had with Defendant Kasun?

19   A.  Also CORA requests.  I believe we only have CORA requests

20   from Ms. Kasun more recently, as in during the timeframe of

21   this case from '23 to '24.  And I believe Ms. Kasun also

22   testified at a rulemaking hearing.

23   Q.  And then Defendant Smith, you've testified already that he

24   obtained records from your office, public records on the voter

25   rolls.  Any other interactions that you have had with

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    376

1    Defendant Smith?  Your office, excuse me.

2    A.   The office has received, the Secretary has received

3    written comments from Colonel Smith with regard to rulemaking,

4    you know, e-mail correspondence with Ratio Invictus, which I

5    understand to be Colonel Smith's e-mail handle -- undefeated

6    reason -- that is contesting decisions I've made over CORA

7    production and CORA policy.  And he's a subscriber to the bulk

8    data.

9    Q.   You've -- sorry.  One second.  Is the Secretary of State's

10   Office familiar with public statements that Defendants Epp,

11   Kasun, or Smith have made concerning USEIP or election

12   integrity?

13   A.   Yes.

14   Q.   And can you describe specifically what statements made by

15   the defendants that you have heard?  And maybe I'll break that

16   down.

17   A.   Please.

18   Q.   Why don't you talk first about Defendant Epp.  Let's go

19   through each of them.

20   A.   I believe Ms. Epps has a blog or a website in which she

21   posts commentary, and there have been occasions where essays

22   of hers have accused the Secretary of corruption and

23   malfeasance, as well as accused the voting processes in

24   Colorado of not being reliable and other commentary.  I'm not

25   aware of any other public statements by Ms. Epps.  I don't

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    377

1    think we have occasions where we've seen like video clips.

2    Q.  How about Ms. Kasun?  Is your office familiar with

3    statements that she has made concerning USEIP's efforts or

4    otherwise related to elections in Colorado?

5    A.  I don't believe so.  I believe that all we have from

6    Ms. Kasun is the CORA requests, but I couldn't be sure.

7    Q.  What about Defendant Smith, what public statements have

8    you seen by him or heard by him concerning your office,

9    election integrity, or USEIP's efforts?

10   A.  So Colonel Smith was involved in what I understand to be

11   the early days of the USEIP efforts in the spring of '21.  I

12   understand that he was involved with then Mesa County Clerk

13   Tina Peters, and made public statements through his social

14   media accounts concerning the Secretary's actions against or

15   concerning Clerk Peters.  And I'm also aware, because they

16   were provided to us, of video clips of Colonel Smith making

17   statements about the Secretary, about the election, calling

18   for the Secretary to be hung, and calling for those involved

19   in what he characterized as election fraud to be -- to be

20   killed.

21   Q.  Have you seen the video of Mr. Smith making those

22   comments?

23   A.  I've seen video clips from the -- from an event at a

24   church in Castle Rock, I believe.  I believe the church's name

25   is The Rock.  And -- so yes.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    378

1    Q.  What was your office's reaction to that video?

2              MR. REISCH:  Objection, relevance.

3              THE COURT:  Overruled.

4    A.  The Secretary was very concerned.  She directed me to make

5    a request to Executive Director Stan Hilkey of the Colorado

6    Department of Public Safety to provide security protection for

7    the Secretary in regards to her physical safety.  At that time

8    the legislature had not yet enacted legislation to provide the

9    Secretary with public Colorado State Patrol security coverage.

10             In addition, I submitted the clip to the U.S.

11   Department of Justice's Elections Threats Task Force that was

12   stood up by Attorney General Merrick Garland in August of '21

13   in response to Attorney General Garland's direction to state

14   elections officials to provide his office with any evidence of

15   threats against election officials or election workers.

16             I also provided the clip to the Colorado State

17   Patrol.  And we provided the clip to the district attorney in

18   the Boulder judicial district, which I think is the 20th,

19   because the Secretary resides in Boulder, and to the extent

20   that she is a victim, she was a victim in Boulder.

21   Q.  (By MS. ERICKSON) So would you -- did you consider that

22   video a threat against the Secretary of State?

23   A.  I did.

24             MR. REISCH:  Objection, calls for legal conclusion.

25             THE COURT:  Overruled.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024   379

1    A.  I did.

2    Q.  (By MS. ERICKSON) Were any other threats made against the

3    Secretary of State's Office in the aftermath of the 2020

4    election?

5          MR. REISCH:  Objection, relevance.

6          THE COURT:  Overruled.

7    A.  Thousands.

8    Q.  (By MS. ERICKSON) And did any other threats come from the

9    defendants?

10   A.  I'm not aware of any threats from either Ms. Epps or

11   Ms. Kasun.  I am aware of public statements where Colonel

12   Smith has repeated his call for, in his words, due process

13   against the Secretary.  I understand that those -- that call

14   for, quote, due process is code for --

15         MR. REISCH:  Objection, lack of foundation,

16   speculation.

17         THE COURT:  Sustained.

18   Q.  (By MS. ERICKSON) Were you concerned that the public

19   statements made by defendants could cause further threats

20   against the Secretary of State's Office?

21         MR. REISCH:  Objection.  What he thinks is of no

22   relevance.

23         THE COURT:  Overruled.

24   A.  I was very concerned.  In fact, that was the explicit

25   request to Executive Director Hilkey, that I believed the

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    380

 1    video clip that showed the chanting and reaction of the

 2    audience at the church in Castle Rock to illustrate the impact

 3    that Colonel Smith's statement -- words -- was having on the

 4    people in that audience and was likely to cause more threats.

 5    I believe also that history has proven me right, that we have

 6    seen a --

 7              MR. REISCH:  Your Honor, objection, relevance,

 8    nonresponsive.

 9              THE COURT:  Overruled.

10    A.   -- substantial increase in threats against the Secretary.

11    We now have a security service that monitors threats against

12    the Secretary, and they are extraordinary.

13    Q.   (By MS. ERICKSON) You mentioned that security measures

14    were put in place for the Secretary of State; is that correct?

15    A.   That is correct.

16    Q.   And in your view, were some of those security measures put

17    in place as a direct result of defendants' words or actions?

18    A.   I haven't testified as to any threats by Ms. Epps or

19    Ms. Kasun, but yes as to Colonel Smith, yes.

20    Q.   To your knowledge, did anyone on your staff that you

21    oversee fear for their safety as a result of defendants' words

22    and actions?

23              MR. REISCH:  Objection, lack of foundation, hearsay,

24    relevance.

25              THE COURT:  Overruled.

                         Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    381

1    A.  Yes.  Principally in our elections division, but also in

2    our IT division, I have had conversations with individuals who

3    have expressed to me their terror at being exposed as working

4    on elections in Colorado as a result of statements that are

5    from both Colonel Smith and others.

6    Q.  (By MS. ERICKSON) Are those individuals who work in your

7    office also eligible registered voters?

8    A.  Yes.

9         MR. REISCH:  Objection, lack of foundation and

10   hearsay.

11        THE COURT:  Sustained as to lack of foundation.  You

12   may follow up.

13   Q.  (By MS. ERICKSON) Mr. Beall, are you familiar with the

14   voter registration status of the individuals who work in your

15   office?

16   A.  I am.

17        MR. REISCH:  Objection, hearsay.

18        THE COURT:  Overruled.

19   A.  I am as a result of my role as the appointing authority in

20   the office.  Appointing authority is a defined term within the

21   classified system.  We require any individual who is going to

22   touch elections, whether that's -- wherever they work in the

23   department, to sign an understanding that they will not engage

24   in any partisan political activity, and that they will

25   maintain their status as registered voters.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    382

1    Q.   (By MS. ERICKSON) To your knowledge, are -- were any of

2    those individuals who are eligible registered voters, did any

3    of them fear for their safety?

4            MR. REISCH:  Objection, lack of foundation, hearsay.

5    They've never been identified, and to be done here today, Your

6    Honor, is inappropriate.

7            THE COURT:  Well, what is your response to the

8    hearsay objection?

9            MS. ERICKSON:  I'm not asking him to testify to

10   specific conversations that he had with individuals in the

11   office.  I'm asking him whether in his knowledge he's aware of

12   anyone who feared for their safety.

13           THE COURT:  And what's the reason?  What's the

14   relevance of that?

15           MS. ERICKSON:  The relevance is those individuals are

16   eligible voters in Colorado as well, and we have evidence per

17   his testimony that defendants were making specific threats

18   against people in the Secretary of State's Office, including

19   the Secretary of State herself, but also against election

20   workers more broadly.

21           THE COURT:  Are you saying that's part of your claim

22   of voter intimidation?

23           MS. ERICKSON:  I mean, yes.  I think it would be part

24   of our claim.  If any registered eligible voter in Colorado

25   has been intimidated by defendants' conduct, then that

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    383

1    certainly goes to our claims under both the Voting Rights Act

2    and the KKK Act.

3            THE COURT:  Have you identified that as part of your

4    claim in any pleading whatsoever, particularly the pretrial

5    order?

6            MS. ERICKSON:  I mean, we have not specifically

7    identified individuals in the Secretary of State's Office, but

8    certainly the Secretary of State's Office has been on our

9    Rule 26 disclosures, on our witness list since the first time

10   we submitted our initial disclosures in this case.

11           THE COURT:  All right.  Well, based on the pretrial

12   order, that currently is -- that's not been part of your

13   claim, as I read it.  If you want to direct me to somewhere in

14   the pretrial order that would be broad enough to encompass

15   that as part of your claim, otherwise I'll sustain the

16   objection.

17           MR. REISCH:  Thank you.

18   Q.  (By MS. ERICKSON) Were any security measures put in place

19   to address concerns from your office about safety and

20   security?

21           MR. REISCH:  Once again, objection, relevance.  None

22   of the individuals at the Secretary of State's Office are

23   identified as their, quote, victims in accordance with the

24   Court's orders and pretrial orders, as well as discovery.

25           THE COURT:  Overruled.  I think her question is

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    384

1  broader than that.  Overruled.

2  A.  Yes, we did.

3  Q.  (By MS. ERICKSON) I'd like to turn your attention now, if

4  you could take a look at what's been marked as Exhibit 50.

5  There should be a binder sitting right next to you.

6  A.  50, I have it.

7  Q.  If you could just take a look at -- just flip through this

8  document and familiarize yourself with it.

9  A.  Got it.

10        MR. REISCH:  I'm sorry, which number?

11        MS. ERICKSON:  50, 5-0.

12        MR. REISCH:  Thank you.

13  Q.  (By MS. ERICKSON) Are you familiar with the documents that

14  are in front of you?

15  A.  Yes.

16  Q.  And are these records that were produced by your office in

17  response to Colorado Open Records, or CORA, requests?

18  A.  Yes.

19  Q.  And that request was made by plaintiffs; is that correct?

20  A.  I believe it was.

21  Q.  And you testified previously that you have some oversight

22  or responsibility over CORA requests, correct?

23  A.  I do.

24        MS. ERICKSON:  Your Honor, I would offer Exhibit 50

25  into evidence.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    385

1            THE COURT:  Any objection?

2            MR. POWELL:  No, Your Honor.

3            THE COURT:  All right.  Exhibit 50 is admitted.

4            MR. REISCH:  Your Honor, I -- are we offering only

5    page 1 or the attachments that go with it?

6            MS. ERICKSON:  I'm offering Exhibit 50.

7            MR. REISCH:  Then I'm going to object as hearsay as

8    to the remaining pages.  Lack of foundation.

9            THE COURT:  And what's the response to the hearsay

10   objection?

11           MS. ERICKSON:  Your Honor, one, we're not offering

12   this document for the truth of the matter asserted.  We'll be

13   offering this document for the secretary of state's response

14   to USEIP's efforts.  I will also say that even if it was

15   hearsay, these are business records under the business records

16   exception and could get in that way.

17           MR. REISCH:  Even if the foundation was laid they're

18   business records, there's still hearsay within hearsay.  This

19   witness is not an author of the attachments after that.  Like

20   I say, it's a hearsay-within-hearsay issue, and not being

21   offered for the truth of the matter asserted is not an

22   exception to the rules of hearsay.  And an appropriate

23   foundation, business record as well as the hearsay within

24   that, has not been established.  Thank you.

25           THE COURT:  Well, I'm going to sustain for foundation

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    386

 1   for the moment.  Could you lay a little more foundation as to

 2   what this exhibit is and what the attachments are?

 3            MS. ERICKSON:  Yes, absolutely.

 4            THE COURT:  And what this witness knows about it.

 5            MS. ERICKSON:  Yes.

 6   Q.  (By MS. ERICKSON) Mr. Beall, are you familiar -- from

 7   looking at page 1 of this exhibit, are you familiar with the

 8   document that's reflected on page 1?

 9   A.  Yes.  It's a printout of a news release that the Secretary

10   issued on September 9th, 2021, in connection with what we had

11   at that point understood was USEIP's canvassing efforts.

12   Q.  And your name is listed on the top of this press release;

13   is that correct?

14   A.  It is.  I reviewed it.

15   Q.  That was my next question.  You participated in preparing

16   this document?

17   A.  As did the Secretary, but yes.

18   Q.  And in what way did you participate in reviewing --

19   A.  Our public information officer and comms director Annie

20   Orloff drafted it.  She did so in consultation with myself and

21   my colleague Melissa Kessler, who was at that time a legal

22   advisor within the office.  And we presented the draft, Annie

23   presented the draft to the secretary.  The secretary had

24   questions.  We answered her questions, and we published this

25   release.

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    387

1    Q.  Now, I'll turn your attention to the remainder of the

2    document.  There are a number of pages here which look to me

3    to be e-mails; is that fair?

4    A.  It is fair that they are e-mails.

5    Q.  And it looks like to me like these are e-mails -- there's

6    e-mails between a number of individuals.  You mentioned

7    Ms. Kessler.  It looks like she's listed on these e-mails,

8    correct?

9    A.  She is in this -- the first thread, and I don't see her in

10   the second thread because of the redactions, but I know she

11   was involved in the second thread.

12   Q.  Are you familiar with these particular e-mails?

13   A.  I am.

14   Q.  How did you become familiar with these particular e-mails?

15   A.  I was asked to review and approve the redactions in

16   response to the CORA requests.  I think it was Ms. Breese

17   (sic) that made the request.

18   Q.  And did you also have discussions or do you also have

19   knowledge of the substance reflected in these e-mails?

20   A.  Absolutely.  Ms. Kessler directly reported to me, and she

21   and I had conversations about the substance of what was coming

22   in.  The bottom of each of these threads is an e-mail from a

23   citizen or a person, and she and I discussed what steps we

24   should take in response to receiving the e-mails from

25   Ms. Roberts and Ms. Powell.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    388

1    Q.  So just to home in on that, you referenced Ms. Roberts and

2    Ms. Powell were both citizens reflected in this document.  Did

3    you have discussions with Ms. Kessler or others in your office

4    about these e-mails when they were submitted?

5    A.  Yes.

6    Q.  And you also are familiar with these records from when you

7    reviewed the CORA requests and produced these documents; is

8    that fair?

9    A.  Yes, in '23, I believe.

10              MS. ERICKSON:  Your Honor, I would offer Exhibit 50.

11              THE COURT:  Same objection, I assume?

12              MR. REISCH:  Yes, Your Honor.  This witness provided

13   nothing that he's drafted these documents.  There are many

14   people that are in this string that are not on the witness

15   list.  The only one that would be is Ms. Roberts, so she can

16   be subject to cross-examination.  But the appropriate

17   foundation has not been laid, and it's hearsay.  It's not

18   admissible.

19              THE COURT:  I'm overruling the objection.  I'm not

20   allowing the documents to prove the truth of the matters

21   asserted in the letters to the Secretary of State's Office,

22   and plaintiffs' counsel should be aware I'm not admitting for

23   the truth that these matters actually happened.  I'm admitting

24   them solely for the purpose of the effect on the reader, which

25   is the Secretary of State's Office.

                        Sarah K. Mitchell, RPR, CRR

  
22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    389

1           MS. ERICKSON:  Understood.

2           THE COURT:  You may proceed.

3           MS. ERICKSON:  Thank you, Your Honor.

4       (Exhibit 50 received.)

5    Q.   (By MS. ERICKSON) I'm going to back up a little bit before

6    we turn to talk about the documents and turn back to USEIP and

7    defendants' efforts.  Did the Secretary of State's Office have

8    concerns about the efforts of USEIP?

9    A.   Yes, we did.

10   Q.   And what were those specific concerns?

11   A.   Our concern was that the use of untrained partisan

12   motivated canvassers who may or may not have been armed would

13   be threatening to the people they encountered, and that the

14   secretary wished to ensure that people who might be

15   encountered, might be -- have their doors knocked on, would

16   know their rights, would know that they have a constitutional

17   right to the secrecy of their vote, and that they had no

18   obligation to disclose anything but certainly how they voted.

19   Q.   What steps did the Secretary of State's office take to

20   address or combat USEIP's and defendants' efforts?

21   A.   We engaged in an effort of public education to -- so this

22   news release was part of an effort to communicate primarily

23   through news media about voters' rights and to get the message

24   out that you don't have to tell someone how you voted.

25   Q.   And when you say this news release, are you referring to

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    390

1    page 1 of Exhibit 50?

2    A.  I am.

3    Q.  And was this news release put out in direct response to

4    concerns about USEIP and defendants?

5    A.  Yes.

6    Q.  I'd like to take a look at some of the specific things in

7    this news release.  The news release it looks like

8    specifically notes that an individual is not required to

9    answer questions about voting history, registration status, or

10   how a voter voted.  That's reflected in paragraphs 1 and 2.

11   A.  That's correct.

12   Q.  Was the Secretary of State's Office concerned that USEIP

13   was asking these questions at voters' doors?

14   A.  Yes.

15   Q.  And why did you have those concerns?

16   A.  We had had the reports that are part of the e-mails, and

17   we were aware of controversy in the public sphere about what

18   USEIP was doing.  I had seen the playbook for USEIP and was

19   concerned that the questions that USEIP was proposing to ask

20   would be intrusive and would potentially lead to confusion

21   among the public about their rights.

22   Q.  The news release also -- it specifically notes that any

23   claim that door-to-door canvassing is official business of the

24   Colorado Secretary of State's Office or the State of Colorado

25   is false.  No state or local election office in Colorado is

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    391

1   conducting door-to-door voter participation surveys.  Was the

2   Secretary of State's Office concerned that USEIP and

3   defendants were representing to people at their doors that

4   they were acting on behalf of the Secretary of State's Office?

5          MR. REISCH:  I'm going to object, speculation, lack

6   of foundation.

7          THE COURT:  Overruled.

8   A.  Yes, we were concerned.  We had had actual phone calls

9   from clerks' offices in El Paso and Mesa.

10         MR. REISCH:  Objection, hearsay, lack of foundation.

11         THE COURT:  Overruled.

12  Q.  (By MS. ERICKSON) The news release also notes that if you

13  feel harassed or threatened, please reach out to local law

14  enforcement or the Department of Justice.  At the time this

15  press release was released, had the Secretary of State's

16  Office received reports that voters were feeling harassed or

17  threatened?

18  A.  Yes.

19  Q.  From whom were reports received?

20  A.  We received the two e-mails that are part of this exhibit.

21  We received phone calls from election staff in El Paso and

22  Mesa.  We received -- I mean, we were aware of news coverage

23  of USEIP's efforts, and I was aware of the recruiting that

24  USEIP was doing on the Internet and through social media.

25  Q.  I'd like to -- I understand that a report was received by

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    392

1    your office from a woman named Yvette Roberts; is that

2    correct?

3    A.   That's correct.

4    Q.   And what was the nature of the report that Ms. Roberts

5    made to the Secretary of State's Office?

6              MR. REISCH:  Objection, hearsay.  The document speaks

7    for itself, and Ms. Roberts is supposed to be here.

8              THE COURT:  Overruled for the same reason as last

9    time.  Go ahead.

10   A.   The nature of her report was that she had been encountered

11   at her home, and that she felt that the encounter was

12   inappropriate.

13   Q.   (By MS. ERICKSON) What, if anything, did the Secretary of

14   State's Office do after receiving that specific report?

15   A.   I directed Ms. Kessler, who worked with Mr. Thornton, who

16   is the manager of the legal team within the elections

17   division, to reach out to Ms. Roberts and to speak with her.

18   I don't believe I ever got a written report of that, but what

19   I recall is --

20             MR. REISCH:  Objection, hearsay.

21             THE COURT:  Sustained on that basis.

22             MS. ERICKSON:  Can you -- I'm sorry.  Can you read

23   back the question that was asked?

24             THE COURT:  What, if anything, did the Secretary of

25   State's Office do after receiving the specific report?

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    393

1   Q.   (By MS. ERICKSON) Could you try again to answer that

2   question, please.

3   A.   Thank you.

4            MR. REISCH:   Same objection, hearsay.

5            THE COURT:   Overruled for now.

6   A.   We provided -- in addition to the effort to contact

7   Ms. Roberts, we provided this e-mail from Ms. Roberts to the

8   district attorney's office and the investigator at the

9   district attorney's office, James Cannon, whom we had been --

10  who had been identified to us as the appropriate party to

11  receive that information.  We also provided it to the U.S.

12  Department of Justice U.S. Attorney's Office civil rights

13  attorney here in Colorado.

14  Q.   (By MS. ERICKSON) Was the Secretary of State's Office

15  concerned based on what it heard from Ms. Roberts that it

16  amounted to voter intimidation?

17           MR. REISCH:   Objection, calls for legal conclusion,

18  speculation.

19           THE COURT:   Well, sustained as to -- well, I'm going

20  to sustain it on leading.  Let's try to get the witness to use

21  his own words.

22  Q.   (By MS. ERICKSON) What were the Secretary of State's

23  Office's specific concerns about the substance of the report

24  it received from Ms. Roberts?

25  A.   We were concerned that what Ms. Roberts was reporting

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2      07/16/2024    394

1    could be part of a sustained effort at voter intimidation, and

2    we, for purposes of referrals to law enforcement agencies,

3    wished for law enforcement agencies to look into it.

4    Q.  Did the Secretary of State's Office receive any additional

5    written communications from voters concerned about USEIP's

6    activities?

7    A.  We received the other e-mail that is in Exhibit 50, the

8    one at the end from Ms. Roberts.

9    Q.  I believe --

10   A.  Not Roberts.  I'm sorry.  It is from Powell.  Sorry.

11   Q.  Thank you.  And what was the nature of the report made by

12   Ms. Powell to the Secretary of State's Office?

13            MR. REISCH:  Objection, hearsay.

14            THE COURT:  Overruled.

15   A.  A similar report of what we understood to be a different

16   incident of contact with a canvasser that Ms. Powell felt was

17   intrusive and inappropriate, and I think she says threatening.

18   Q.  (By MS. ERICKSON) Again, with respect to Ms. Powell, what,

19   if anything, did the Secretary of State's Office do after

20   receiving the report?

21   A.  I believe we took the similar effort of trying to contact

22   Ms. Powell.  I do not know whether we were successful.  And we

23   also relayed Ms. Powell's report again to the district

24   attorney in Mesa County and to the U.S. Attorney's Office.

25   Q.  And what were the Secretary of State's Office's specific

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    395

1    concerns about the report that was received from Ms. Powell?

2    A.   The concern was that after the first contact in June, it

3    looked like this was continuing, and it looked like it might

4    continue to -- that might be building.  And we were concerned

5    that there was -- that this -- the first e-mail was not a

6    one-off.  That it was beginning to look like a pattern.

7    Q.   Were there -- other than the report from Ms. Roberts and

8    the report from Ms. Powell that we've discussed, did the

9    Secretary of State's Office receive any other reports from

10   voters regarding USEIP's or defendants' conduct?

11   A.   Not that I'm aware of.

12   Q.   What about any -- so we've talked about written reports.

13   Were there any reports received over the phone?

14   A.   Yes.

15   Q.   And --

16   A.   But they weren't from voters.  They were from county

17   clerks' offices that were reporting their contacts from

18   voters.

19   Q.   So can you tell me -- maybe you already said this.  I

20   apologize.  But what counties did those reports come from?

21   A.   El Paso County, the county around Colorado Springs; and

22   Mesa County, the county around Grand Junction.

23   Q.   To your knowledge, were reports received from any other

24   counties?

25   A.   Not to my knowledge.  It's conceivable, but not to my

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    396

1   knowledge.

2   Q.   And what was the nature of the concerns that were

3   expressed regarding the defendants' actions in those counties?

4        MR. REISCH:  Objection, hearsay, lack of foundation,

5   and it should be specific as to, in this case, my client

6   Mr. Smith.

7        MR. POWELL:  Your Honor, I'd like to add to that

8   objection, but also note that we keep talking about complaints

9   that come in, and then sometimes we talk about USEIP.  We

10  don't have anything that's connecting USEIP to these

11  complaints.

12       THE COURT:  That's not an objection.  That's a

13  speech, so that is overruled to the extent it was an

14  objection.  I want you to address the hearsay objection now

15  that we're talking about perhaps input received from another

16  state employee there's no documentary evidence of.

17       MS. ERICKSON:  Understood, Your Honor.  I mean, I

18  think that these -- that these reports fall within the

19  business records exception to the hearsay rule.  I mean, they

20  may not have been written and recorded, but they were

21  certainly received by the Secretary of State's Office.

22       THE COURT:  Well, the foundation hasn't been laid for

23  that -- for a business record here, so objection sustained

24  currently.

25       MS. ERICKSON:  Okay.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    397

1    Q.  (By MS. ERICKSON) So I think backing up, my first question

2    was were there any other reports received from the Secretary

3    of State's Office other than the two specific individuals we

4    discussed?

5    A.  We received information from county clerks' offices

6    reporting to us as is their -- they're required to, that they

7    had received contacts about canvassing efforts.

8         MR. REISCH:  Objection, hearsay.

9         THE COURT:  All right.  Well, she hasn't elicited it

10   yet, so overruled.

11   Q.  (By MS. ERICKSON) And how were those reports received?

12   A.  Phone calls.

13   Q.  And from what counties were those reports received?

14   A.  El Paso and Mesa.

15   Q.  And to whom were those calls made in your office?

16   A.  They were made either to Mr. Thornton, our legal manager,

17   or to Judd Choate, who is our elections director.

18   Q.  And do you have personal knowledge of those reports that

19   were made to your office?

20        MR. REISCH:  Objection, calls for a response based

21   upon hearsay.

22        THE COURT:  Overruled.

23   A.  I have personal knowledge from Mr. Thornton and Mr. Choate

24   who relayed the information they had received.

25   Q.  (By MS. ERICKSON) And how was that information relayed to

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    398

1    you?

2    A.   In person.  We spoke.

3    Q.   And what was the nature of the concerns that were reported

4    over the phone to your office?

5         MR. REISCH:  Objection, hearsay.

6         THE COURT:  All right.  Any additional response as to

7    why this is an exception to the hearsay rule?

8         MS. ERICKSON:  Your Honor, for the same reason I

9    stated before, I believe we laid the foundation these are

10   business records and reports received by the secretary of

11   state's office that were collected by individuals within

12   Mr. Beall's department.

13        THE COURT:  Let me ask a follow-up question.  Are any

14   of these reports documented in writing?

15        THE WITNESS:  No.

16        THE COURT:  All right.  The objection is sustained.

17   I just find these too remote.  If they were official business

18   records, there would be a written record of it.  This is now

19   three levels of hearsay, and I just find it's unreliable at

20   this point.

21   Q.   (By MS. ERICKSON) To your knowledge, did Ms. Roberts or

22   Ms. Powell or any other voter report their concerns about

23   USEIP canvassers that appeared at their doorstop to law

24   enforcement?

25        MR. REISCH:  Objection, lack of foundation, hearsay,

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2     07/16/2024    399

1  and foundation as to USEIP, Your Honor.

2          THE COURT:  Overruled.  Let's let him answer the base

3  question of, to your knowledge, did they, and see where we

4  get.

5  A.  I do not have any knowledge of that.

6  Q.  (By MS. ERICKSON) Did the Secretary of State's Office

7  report concerns about USEIP to law enforcement?

8  A.  Yes.

9  Q.  And why?

10  A.  Because we were concerned that there was a coordinated

11  effort that might cross over into voter intimidation, and we

12  wished for appropriate law enforcement agencies to look into

13  it.

14          MS. ERICKSON:  Your Honor, I have no further

15  questions for Mr. Beall at this time.

16          THE COURT:  All right.  Have you all decided who's

17  going first?

18          MR. REISCH:  It looks like I am, Your Honor.

19          THE COURT:  All right.  Please proceed.

20          MR. REISCH:  Thank you.

21                        CROSS-EXAMINATION

22  BY MR. REISCH:

23  Q.  Good morning, sir.

24  A.  Good morning to you.

25  Q.  All right.  Now, you're the number two, as you described,

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024   400

 1  at the Secretary of State's Office?

 2  A.  That's correct.

 3  Q.  And you have some familiarity as it relates to election

 4  law.  Would that be a fair statement?

 5  A.  That's a fair statement.

 6  Q.  All right.  And kind of going back to where you finished,

 7  you -- you stated that the Secretary of State's Office was

 8  concerned about voter intimidation, correct?

 9  A.  Correct.

10  Q.  Okay.  And at some point prior to the issuance of Trial

11  Exhibit 50 to the public, just page 1, which is dated

12  September 9th, 2021 -- do you have that in front of you?  Or

13  we can put it up.  It may be easier to put it up on the

14  screen.

15  A.  I have it.

16  Q.  All right.  This is a press release that you all put out,

17  correct?

18  A.  That's correct.

19  Q.  And when I say you all, I'm referring to the Secretary of

20  State's Office.

21  A.  I understood that, yes.

22  Q.  All right.  And obviously when you put out a press

23  release, it goes to all the major news organizations in town,

24  which include any print, digital, and TV, correct?

25  A.  Correct.  As well as posted on our website.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    401

1    Q.   Okay.  And you do that so that you can put out -- put out

2    information, correct?

3    A.   Yeah, correct.

4    Q.   And when the Secretary of State speaks about election

5    issues, people will listen.  Would that be a fair statement?

6    A.   We hope they listen.

7    Q.   All right.  You don't know what the distribution base of

8    any defendants' website, blogs, anything like that is, do you,

9    sir?

10   A.   I do not.

11   Q.   Okay.  You don't know how many people were listening or

12   watching their particular statements, correct?

13   A.   I do not.

14   Q.   Okay.  Now, you stated that you all put this page 1 of

15   Trial Exhibit 50 out because of concerns as it relates to what

16   you described as unofficial door-to-door canvassing, correct?

17   A.   Yes.

18   Q.   Okay.  And you had talked about earlier in your testimony

19   that obviously one of the things that your office, the

20   Secretary of State's Office, is concerned about is that you

21   have an obligation to run elections, correct?

22   A.   We certainly have that obligation.

23   Q.   And your obligation then is to make sure that valid legal

24   voters are given an opportunity to vote, correct?

25   A.   Yes.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2     07/16/2024    402

1   Q.   And to make sure that the process works in the sense of

2   counting ballots, correct?

3   A.   Correct.

4   Q.   Reporting the results, correct?

5   A.   Yes.

6   Q.   Keeping the data as well?

7   A.   Yes.

8   Q.   Okay.  Per statute, things of that nature, right?

9   A.   Correct.  Yes.

10  Q.   And you also have an obligation -- you said that your data

11  can be disseminated to the public, correct?

12  A.   Correct.

13  Q.   In fact, you said that Mr. Smith subscribes and pays for

14  your voter lists, correct?

15  A.   Many things, but yes.

16  Q.   Okay.  But that voter list that people can subscribe to,

17  many organizations across the state get that, correct?

18  A.   Correct.

19  Q.   Political organizations?

20  A.   Absolutely.

21  Q.   Political action committees?

22  A.   I would expect so.

23  Q.   Concerned, you know, Democrat, Libertarian, Republican,

24  Green, whatever party, they probably subscribe to that as

25  well?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    403

1   A.   Yes.

2   Q.   Okay.  Because that's obviously information that people

3   want to have contact with potential voters, whether it's for

4   canvassing or for their own political purposes, true?

5   A.   True.

6   Q.   Okay.  And so if I were, say, with the party to elect

7   Scott to elected office, I could get that list and go around

8   and say, I want to take a look at these people and go ask for

9   them and say vote for Scott, right?

10  A.   Absolutely.

11  Q.   Okay.  And certainly going door to door and knocking on

12  people's doors, and if they engage in a voluntary conversation

13  with somebody, there's nothing wrong, illegal, or

14  inappropriate about that, correct, sir?

15  A.   Correct.

16  Q.   Okay.  The person on the other side of the door can always

17  close the door, correct?

18  A.   We assume so, yes.

19  Q.   You can tell them to get off my property?

20       MS. ERICKSON:   Objection, calls for speculation.

21       THE COURT:   Overruled.

22  Q.   (By MR. REISCH) The person at the door could say, I

23  appreciate you coming door to door, whether you're selling

24  chocolate or canvassing, but I don't -- I choose not to speak

25  with you, correct?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2     07/16/2024     404

1          MS. ERICKSON:  Objection, calls for speculation.

2          THE COURT:  Overruled.

3  A.  Every voter's circumstances may be different, but yes.  In

4  the abstract, you're correct.

5  Q.  (By MR. REISCH) All right.  And as you stated there in

6  paragraph 1 of Exhibit 50, if somebody comes to your door and

7  asks for your voting history, you are not required to answer,

8  correct?

9  A.  That is correct.

10  Q.  Okay.  But asking are these voters at this particular

11  address, that's not illegal, correct, sir?

12         MS. ERICKSON:  Objection, calls for a legal

13  conclusion.

14         THE COURT:  Well, I'm going to overrule it in this

15  context given his testimony on direct.  Go ahead.

16  A.  The reason for my hesitation, sir, is that certain voters

17  are confidential voters, and their addresses are confidential.

18  Q.  (By MR. REISCH) Okay.

19  A.  And for those confidential voters, it would be illegal to

20  require them to provide information.  But absent that, you're

21  correct.

22  Q.  Okay.  Just so we're clear, when you give out your voter

23  lists that people can subscribe to, the confidential voters,

24  those are redacted, that information?

25  A.  Correct.  It's the list of public -- the public list of

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    405

1   voters.

2   Q.  Okay.  Not the confidential which would be people that,

3   for example, like domestic violence reasons want to have their

4   -- and rightfully so -- have their --

5   A.  Or law enforcement.

6   Q.  Or law enforcement.  Or anyone that qualifies?

7   A.  That's correct.

8   Q.  So the people would get your list, they're not

9   confidential voters, they're public records.

10   A.  Correct.

11   Q.  So to clarify that, if someone went to someone that's not

12   a confidential household --

13   A.  Right.

14   Q.  -- and goes up and says, Hey, at this particular residence

15   of ABC 123 Street, does John Doe reside at this address, not

16   improper, correct, sir?

17   A.  Not a crime.

18   Q.  Assuming the person wants to answer that question, right?

19   A.  Right.

20   Q.  Correct, sir?

21   A.  Correct.  You used proper.  I used crime.  I'm not sure

22   which standard we're using.

23   Q.  Well, it's not a crime certainly?

24   A.  That's correct.

25   Q.  Let's -- my apologies for the wording.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    406

1   A.  One's mother might say it might not be a proper question,

2   but anyway.

3   Q.  That's true.  And so when you all put this out, your

4   information was to educate voters, correct?

5   A.  That's correct.

6   Q.  And that's referring to Trial Exhibit 50.  It wasn't to

7   say that if somebody came to your -- your residence, that they

8   were committing any official -- or illegal conduct, correct?

9   It was just educational purposes?

10  A.  There's certain aspects that would be a crime, but in the

11  abstract with regard to point number one in the press release,

12  it's not a crime.

13  Q.  Okay.

14  A.  And we were attempting to tell the public that it is their

15  right not to answer.

16  Q.  Okay.  And obviously nobody has to tell anybody how they

17  voted, correct, sir?

18  A.  That is absolutely correct.

19  Q.  I mean, one of the fundamental principles of our voting

20  system is that your vote is, in fact, private?

21  A.  Secret.

22  Q.  Secret, right.  And you don't have to share it with

23  anybody unless you choose to do so?

24  A.  That's right.

25  Q.  All right.  And then it says any door-to-door canvassing

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024      407

1   is official business of the Colorado Secretary of State's

2   Office or the State of Colorado is false, correct?

3   A.   That is what it says, yeah.

4   Q.   All right.

5   A.   Starts with, Any claim that, but you're correct.

6   Q.   Because at this point, or during basically April and

7   August of 2021, your office was not sending out official

8   canvassers from your office, correct, sir?

9   A.   We certainly weren't in that time period, and we haven't

10  since or before.

11  Q.   You haven't since or before, right?

12  A.   Correct.

13  Q.   The Secretary of State's Office, when you were referring

14  to canvassing as it relates to audits and canvassing --

15  A.   Yes.

16  Q.   -- that doesn't include for your office going door to

17  door.  That's just to look at -- I think you described it as

18  after the audits, you approach to see what tabulated -- if

19  there were any issues related to the audit.

20  A.   So the statutorily mandated board of canvassers is a board

21  comprised of the clerk and two others, or in some counties

22  five, that canvass the results, the number of votes.  They

23  don't canvass voters.  They canvass the number of votes.

24  Q.   Okay.  I'm glad we cleared that up, because your office,

25  the Secretary of State's Office, is not sending people out

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    408

1    door to door to confirm that people actually reside at a

2    particular address, correct?

3    A.  We are not sending people out to do that.

4    Q.  Okay.  Never have, don't plan on it in the future.

5    A.  Don't plan on it and never have.

6    Q.  All right.  And then obviously you say if somebody feels

7    harassed or threatened, please reach out to your local law

8    enforcement, correct?

9    A.  That's what it says.

10    Q.  I mean, that would be for anybody.  If an unwanted

11    solicitor comes to your door and won't leave, they would --

12    you have the right to call the police and ask them to leave,

13    correct, sir?

14    A.  I believe that's the case.

15    Q.  Okay.  Now -- and obviously -- you obviously practice

16    election law.  You did sounds like some free speech work for

17    the ACLU at some point, so obviously you understand probably

18    better than most the First Amendment?

19    A.  I hope I do.  I teach it at the University of Denver Sturm

20    College of Law.

21    Q.  Fine institution, if I say so myself.  And obviously

22    you're also familiar with the *Counterman v. Colorado* case, are

23    you not, sir?

24    A.  Oh, yes, I am.

25    Q.  Okay.  And the United States Supreme Court goes through a

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2     07/16/2024    409

1    very extensive analysis of free speech, correct?

2    A.  It overturned a long-standing body of law in Colorado that

3    was the law of the land at the time of this press release.

4    Q.  Correct.  And you stated that you contacted not only the

5    United States Attorney's Office, local district attorneys.

6    You wanted to have something done, right, or at least

7    investigated as it relates to Mr. Smith, did you not?

8    A.  Yes.

9    Q.  Okay.  And no charges were ever filed against Mr. Smith

10   for him exercising his First Amendment rights, did he, sir?

11   A.  Well, your question is a tautology, but no, no questions

12   have been charged -- or charges have been filed so far as I'm

13   aware.

14   Q.  Because --

15   A.  It would not be a crime to exercise your First Amendment

16   rights.

17   Q.  Correct.  And there's free speech, right, and true threats

18   are --

19   A.  So the Supreme Court has told us.

20   Q.  Yes.  It has to be a true threat, right?  You're familiar

21   with not only *Counterman*, but *Elonis*?

22   A.  Yes.

23   Q.  *Twitty* that just happens to come from this jurisdiction as

24   well?

25   A.  Yes.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2     07/16/2024   410

1  Q.  It was announced the same day as *Elonis*.  It must be a

2  true threat.  It has to be subjective as to what that

3  particular individual is saying, correct, sir?

4  A.  Now you're attempting to opine on the law that I think is

5  the judge's -- whether it is subjective -- whether the Supreme

6  Court's *Counterman* decision requires a showing of subjective

7  awareness of the threatening nature of the communication is a

8  matter that the Colorado Supreme Court has not yet opined on.

9  Q.  Well, the United States Supreme Court has, and they stated

10  that *Elonis* stated it's a subjective test, and *Counterman* got

11  rid of the reasonable man or reasonable man standard under

12  *Counterman*, correct, sir?

13        MS. ERICKSON:  Your Honor, I'm going to object based

14  on relevance grounds, and also Mr. Beall is not identified as

15  an expert or testifying as an expert.

16        THE COURT:  Sustained.

17        MR. REISCH:  Thank you, Your Honor.

18  Q.  (By MR. REISCH) All right.  You also are kind of the chief

19  legal advisor to the Secretary of State.  Did I understand

20  that correctly?

21  A.  Yes.

22  Q.  All right.  And your advice is obviously to, you know,

23  consult as it relates and advise as it relates to election

24  issues, true?

25  A.  True.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    411

1    Q.  You were her -- the Secretary of State's chief advisor in

2    *Griswold v. Anderson*; is that right?

3    A.  She had many advisors, but, yes, I was among them.

4    Q.  And your opinion was that, for example, Mr. Trump should

5    not be on the ballot, correct?

6    A.  That was not my opinion, but --

7            MS. ERICKSON:  Objection, relevance, and I'm also

8    going to object just to the extent it calls for

9    attorney-client privileged communications.

10           THE COURT:  Sustained as to both.

11   Q.  (By MR. REISCH) Well, let's talk about communications.

12   You stated that you talked to the United States Attorney's

13   Office.  You were concerned about activities of Mr. Smith,

14   correct?

15   A.  I did say that, and I was concerned.

16   Q.  All right.  You say you were concerned.  You went to the

17   United States Attorney's Office.  They didn't prosecute --

18   they said there's no crime that's been committed, no charges,

19   correct?

20           MS. ERICKSON:  Objection, foundation.

21   A.  They say nothing.

22           THE COURT:  Well, let me rule on the objection first.

23           THE WITNESS:  Sorry.

24           THE COURT:  Sustained.  You may try and lay some

25   foundation.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    412

1  Q.  (By MR. REISCH) Okay.  You sent requests to the United

2  States Attorney's Office to investigate Mr. Smith's language,

3  correct?

4  A.  Correct, or actually his conduct.

5  Q.  His conduct based upon language, correct?

6  A.  His appearance at the Rock Church, as well as other

7  publications he had made.

8  Q.  Okay.  And the United States attorney, to your knowledge,

9  never charged Mr. Smith with anything, correct?

10 A.  Certainly there are no public charges that have been filed

11 that I'm aware of.

12 Q.  You sent information to the district attorney in the 20th

13 Judicial District, which includes Boulder, Fort Collins?

14 A.  Yeah.

15 Q.  No charges have been filed, correct?

16 A.  That's correct.

17 Q.  Okay.  And is it at that point that your office started

18 coordinating with Free Speech For People to bring this

19 lawsuit?

20       MS. ERICKSON:  Objection, foundation.

21       THE COURT:  Well, overruled.  I'll let him answer.

22 A.  Your question has a number of premises that I disagree

23 with.  The answer is no.

24 Q.  (By MR. REISCH) Okay.  When were you first contacted with

25 -- from Free Speech For People to be involved in this

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    413

1    litigation or assist in this litigation?

2            MS. ERICKSON:  Objection, foundation.  Assumes facts

3    not in evidence.

4            THE COURT:  Well, sustained.  Can you lay some

5    foundation?  I don't even know what you're talking about, so

6    it's not having much effect on me.

7            MR. REISCH:  Sure.

8    Q.  (By MR. REISCH) Sir, did you or someone from your office

9    that you have knowledge of have communications with Free

10   Speech For People to bring litigation, civil litigation

11   against the defendants in this particular case?

12   A.  No.

13   Q.  Did you have e-mail communication with Free Speech For

14   People to bring a civil suit against the defendants in this

15   particular case?

16   A.  I have a vague recollection of an e-mail letting us know.

17   I can't remember whether the e-mail was before the case was

18   filed or after it was filed, but it was in the nature of

19   simply for your awareness.  It was not a request to

20   participate.

21   Q.  Okay.  Did -- to your knowledge, did the Secretary of

22   State, Ms. Griswold, did she communicate with Free Speech For

23   People about litigation against these three defendants?

24   A.  To my knowledge, no.

25   Q.  Okay.  And you stated that you received two complaints via

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2     07/16/2024     414

1    e-mail, correct?

2    A.   Correct.

3    Q.   Okay.  And they're both from Mesa County, correct?

4    A.   They were.

5    Q.   Okay.  And you don't know if either of those individuals

6    were members of Mi Familia Vota, correct?

7    A.   Who is the "they" in your question?

8    Q.   The people making the complaints.

9    A.   No.  I have no awareness of whether either of those two

10   are members of Mi Familia Vota.

11   Q.   Ms. Roberts, she may be a member of League of Women

12   Voters; is that right?

13              MS. ERICKSON:  Objection, foundation.

14              MR. REISCH:  If he knows.

15              THE COURT:  Sustained.

16   Q.   (By MR. REISCH) You're not aware of any of those

17   individuals being associated with --

18   A.   I'm not aware of Ms. Roberts' or Ms. Powell's

19   associations.

20   Q.   Thank you.  Let's jump back here a little bit.  You stated

21   that at one point there was a lot of activity as it related to

22   election issues, correct?  After the 2020 vote?

23              MS. ERICKSON:  Objection, vague.

24              THE COURT:  Well, sustained.  Can you direct him

25   further?

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    415

1           MR. REISCH:  Sure.

2    Q.  (By MR. REISCH) I believe on direct testimony, sir, you

3    testified that after the 2020 election there were -- the

4    Secretary of State's Office received numerous inquiries,

5    comments regarding the integrity of the election in 2020; is

6    that right?

7    A.  That's correct.

8    Q.  Okay.  And that's where you made the distinction between

9    voter fraud and election fraud, correct?

10   A.  Correct.

11   Q.  Voter fraud is something where somebody signs a ballot for

12   somebody else and submitting that ballot to be voted, correct?

13   A.  Yes.  My distinction is about individual versus system,

14   but yes.

15   Q.  Correct.  So the voter fraud is -- and it's more likely to

16   be picked up, for example, I think you stated where people,

17   their signatures don't match, right?

18   A.  Yes.

19   Q.  And then you went into the cure process where, for

20   example, let's say in a close election, both sides will say we

21   have these ballots that are not going to be counted because

22   there's an issue with the ballot, correct?

23   A.  Correct.

24   Q.  So both parties or representatives from the parties on the

25   election can go to those voters and ask to see if they can

22-cv-00581-CNS-NRN   Bench Trial - Day 2     07/16/2024   416

1   clarify or have them correct the signature; is that right?

2   A.  We have one of those going on on the Western Slope right

3   now.

4   Q.  Okay.

5   A.  Yes.

6   Q.  But they're going to the voter and asking them --

7   A.  Yes.

8   Q.  -- to basically verify their information?

9   A.  And then sometimes we get calls from the voters expressing

10  upset at how many times they're getting contacted, but yes.

11  Q.  Okay.  Because if it's a close election, every vote

12  counts?

13  A.  Yes.

14  Q.  And you want to make sure that it's obviously fair,

15  accurate, correct?

16  A.  Yes.

17  Q.  All right.  And then you distinguished between election

18  fraud where you said there's some sort of systemic failure in

19  the voting systems and things like that, or the process?

20  A.  Yes.  I would characterize election fraud as a claim that

21  a process did not generate a reliable outcome.

22  Q.  Okay.  And obviously that's dealing more with like you

23  said -- I think you said in your testimony -- machines, the

24  counting of the votes, security of the machines, things like

25  that?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    417

 1   A.  Correct, yes.

 2   Q.  And obviously the Secretary of State's Office wants to

 3   make sure that everything is, you know, as accurate as

 4   possible, correct?

 5   A.  Correct.

 6   Q.  As safe as possible?

 7   A.  Safe for the voters and reliable for the outcome, yes.

 8   Q.  Okay.  And to make sure, for example, there is no sort of

 9   tampering with the machinery and things of that nature,

10   correct?

11   A.  Correct.

12   Q.  Okay.  And oftentimes you hire people to test your

13   machines to see if there's flaws with your security measures,

14   correct?

15   A.  So they are not our machines.  They are the county's

16   machines.  But, yes, we require the counties to use machines,

17   computers and the software that have been certified through

18   testing both by the federal voting systems testing lab and by

19   our office.  We have a voting systems team that does its own

20   testing of both the hardware and the software.  But yes, we

21   test.

22   Q.  And there's a company called Synack that also does some

23   testing for you all as well?  And when I say you all, the

24   Secretary of State's Office.

25   A.  I'm not familiar with that name.  There is a company, but

                      Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    418

1   that's not the name.

2   Q.  Okay.  And they do penetration testing?

3   A.  Oh, that's a whole different issue.  Yes, we have engaged

4   software firms to attempt to penetrate our defenses around the

5   voting system -- the SCORE system and received reports around

6   their penetration efforts.

7   Q.  Okay.  And obviously that's to see if people can attack

8   the machines?

9   A.  Well, the SCORE is not on voting system equipment in the

10  counties.  The counties have access to SCORE.  The database,

11  the whole system is housed within our infrastructure.

12  Q.  Okay.  I can come back to that in a bit.  Let's -- you

13  said that in the spring of 2021 you became aware of

14  individuals of USEIP to advocate and investigate election

15  integrity, correct?

16  A.  That's what I understood.

17  Q.  The reliability of the election and the results?

18  A.  Yes.

19  Q.  And you became aware of it because -- you found out

20  because there was canvassing going on?

21  A.  No.  We found out because there were efforts to meet with

22  clerks to advocate for the clerks to change the way they were

23  conducting elections.

24  Q.  Okay.  And obviously those individuals have a right to go

25  to the clerk who is a public official, correct?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    419

1    A.  Absolutely.

2    Q.  And you weren't at these meetings.  Is that fair to say?

3    A.  No.

4    Q.  All right.  But you stated that the conversations were

5    generally regarding changing the way the elections were

6    counted, tabulated.  Is that fair to say?

7    A.  Yes.

8    Q.  All right.  Changing the equipment that you all currently

9    use; is that right?

10   A.  Changing the equipment that the general assembly has

11   required us, as in counties, to use, yes.

12   Q.  So at some point these clerks said, Hey, let me let the

13   secretary of state know about these individuals, they want to

14   change the process; is that right?

15   A.  Yes.

16   Q.  All right.  You also stated that at some point you saw

17   various calls to action related to USEIP, right?

18   A.  I did.

19   Q.  Okay.  You said you saw this playbook; is that right?

20   A.  Yes.

21   Q.  I think you have in front of you Trial Exhibit 1, which

22   was previously admitted via stipulation.

23   A.  Yes.

24   Q.  All right.  And this is what -- the document that you say

25   that you saw sometime in the summer of 2021?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    420

1    A.  I don't know if this is the document I saw.  I saw a

2    document that looks like this.

3    Q.  Okay.

4    A.  There may have been earlier versions of this.  I don't

5    know.

6    Q.  All right.  Well, why don't you take a moment to quickly

7    peruse that and see if that refreshes your recollection as to

8    if that was the document that you saw.

9    A.  I'm not going to be able to vouch for --

10   Q.  All right.

11   A.  -- all 25 pages of it, but it's close enough.

12   Q.  All right.  It appears to be the document or a similar

13   document that you may have seen sometime in the summer of

14   2021, right?

15   A.  Yes.

16   Q.  Okay.  And in this particular document, Trial Exhibit 1,

17   it has a date dated August of 2021?

18   A.  It does.

19   Q.  Does that seem about the time that you would have seen

20   that?

21   A.  I believe -- my recollection is I saw a document after we

22   had gotten both of the e-mails that we've seen before.

23   Q.  Okay.

24   A.  And I believe the last e-mail was July 29th, I think.

25   Q.  Okay.  All right.  And do you remember who provided the

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    421

1   copy of Trial Exhibit 1 to you or a link to it or anything

2   like that?

3   A.  I found it on the web.

4   Q.  So you were searching for it?

5   A.  I had seen a news report that referred to a document, a

6   playbook, and I think I did a Google search for something,

7   probably USEIP election playbook.

8   Q.  Okay.  And this -- you obviously weren't involved or

9   consulted with this, correct?

10  A.  Oh, God, no.

11  Q.  Okay.  And do you -- well, this playbook was basically to

12  show what they had learned through the canvassing process.

13  Are you aware of that?

14        MS. ERICKSON:  Objection, foundation.

15        THE COURT:  Overruled.  I'll allow him to answer, if

16  he's aware.

17  A.  I understood this playbook to be instructions for how to

18  conduct a canvass, or what USEIP was doing, not a report on

19  what it had done.  But that could just be because I didn't

20  read it closely.

21  Q.  (By MR. REISCH) And you haven't seen any training

22  materials that were prepared by USEIP in the course of your

23  investigation of USEIP?

24  A.  I wouldn't call it an investigation, but, no, I have not

25  seen any training materials from the USEIP apart from what I

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    422

1    understood to be their playbook.

2    Q.    Okay.  So, you know, you would agree if someone were just

3    going to canvass, whether it be for a political party, a

4    political candidate, what have you, obviously you'd want to be

5    obviously polite and courteous, would you not?

6    A.    I would hope so, yes.

7    Q.    Because you're trying to get information, so it's better

8    to be nice, right?

9    A.    Well, you're positing me in the shoes of USEIP, so -- but

10   to the extent that you're asking would it be appropriate for a

11   person to be polite if they wanted to get information, I

12   learned that long ago.

13   Q.    Yeah.  You'd want to perhaps identify yourself, correct?

14   A.    Probably.

15   Q.    Okay.  See if someone would be willing to voluntarily

16   answer some questions, correct?

17   A.    Sure, yes.

18   Q.    And if they wouldn't voluntarily answer questions and

19   refused to do so, it would be the polite thing to do to leave,

20   correct?

21            MS. ERICKSON:  Objection, relevance, Your Honor.

22            THE COURT:  Overruled.

23   A.    It would be the polite thing to do.

24   Q.    (By MR. REISCH) Okay.  You certainly -- and then obviously

25   if you were trying to collect data -- I mean, you're not a

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    423

1   social scientist, but if you were collecting data for some

2   sort of analysis, you want to make sure your questioning --

3   questions were all the same for a reliable data source,

4   correct?

5   A.  I would want a lot more than more than just consistency of

6   questioning, but that is one thing I would want.

7   Q.  That is one thing, right?

8   A.  Yes.

9   Q.  You would want large samples, correct?

10  A.  I would want unbiased participants, or at least the survey

11  takers to be unbiased.  I would want documentation of who had

12  refused.  I would want all kinds of survey sampling data that

13  I used to do in my life as a trademark litigator.

14  Q.  Okay.  And so if all those things were done, I mean, like

15  I said, just because somebody -- I mean, if somebody is in

16  canvassing for a political party, or if they're a member of

17  NAACP, Mi Familia Vota, League of Women Voters, do you

18  consider them biased?

19  A.  Yes.

20  Q.  Okay.  So if they were to go out and ask questions of

21  somebody other than their constituents, their sampling would

22  perhaps be not valid?

23  A.  Suspect.

24  Q.  Suspect.

25  A.  Yes.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN  Bench Trial - Day 2    07/16/2024    424

1   Q.  Okay.  And what if you were given the questions they were

2   asked?

3   A.  What if I were given --

4   Q.  You knew the questions they were asked.  They didn't

5   deviate from those at any time.

6   A.  I would still regard the results of the survey as

7   unreliable.

8   Q.  Okay.  That's fine.  You stated that Mr. Smith appeared --

9   made contact.  He made written statements on rulemaking,

10  correct?

11  A.  Yes, he did.

12  Q.  Okay.  We talked about the CORA requests?

13  A.  Yes.

14  Q.  You were asked briefly about the video you saw of

15  Mr. Smith as it relates to the church in Castle Rock.  Do you

16  recall that?

17  A.  I recall being asked, and I recall the video.

18  Q.  Okay.  And that was the one that concerned you, correct?

19  A.  Yes.

20  Q.  To your knowledge, do you know that Ms. Griswold still has

21  that video up on her Facebook page?

22  A.  I do not know that.

23  Q.  Okay.

24  A.  And by her Facebook page, do you mean her personal page?

25  Q.  The Jena Griswold page, yes.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    425

1   A.  Jena Griswold Facebook personal page?

2   Q.  Yes.

3   A.  I have no contact with that page.

4   Q.  Okay.  And in that video, obviously there's no mention of

5   Ms. Griswold specifically, correct?

6   A.  I believe that -- well, I don't know of the video that

7   you're referring to, because I haven't looked at it, so I

8   don't know how it's been edited, so, no, I don't know.

9   Q.  Okay.  Let's talk about -- you were asked questions about

10  Exhibit 50.  You're not on any of these e-mail strings,

11  correct, sir?  Let's go to Exhibit 50, second page.

12  A.  I am not in any of the unredacted portions of the e-mails

13  that are behind the first page of Exhibit 50, that is correct.

14  Q.  All right.  Let's go to page 1, 2, 3, 4 -- let's go to I

15  believe it's page 5, the e-mail as it relates to Y. Roberts.

16  A.  Yeah.

17  Q.  Dated June 23rd, 2021.  Do you see that, sir?

18  A.  I see it.

19  Q.  And this e-mail was sent to the Secretary of State's

20  Office, correct?

21  A.  Sent to public.elections, which is our generic e-mail

22  address for our elections division.

23  Q.  States she's a registered voter, right?  Do you see that

24  in the first sentence?

25  A.  Yes, I see it.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    426

1   Q.  And that two people had come to their door, right?

2   A.  It does say that.

3   Q.  And that they wore homemade badges, right?

4   A.  It says that, yes.

5   Q.  And it says reading Colorado election, right?

6   A.  This is how we received it, so I have no idea what is

7   missing there, but you're right.  It says homemade badges

8   reading Colorado election, dot, dot, dot.  We didn't put the

9   dots in.  That's how we got it.

10  Q.  Sure.  And during this time period you were aware of many

11  groups or organizations canvassing around the state, were you

12  not?

13  A.  I was not.

14  Q.  You were not?

15  A.  Aware of many groups?  I was aware of many people.  I

16  understood them all to be involved with USEIP, but I don't

17  know.

18  Q.  Okay.  And if we heard testimony that there were other

19  groups, you weren't aware of any other groups?

20  A.  I was not aware.

21  Q.  And so your assumption was that somebody being with

22  Colorado election, dot, dot, dot, somehow transformed into

23  USEIP?

24  A.  No, that wasn't my assumption.  My assumption was that

25  they wore homemade badges reading Colorado election was an

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2   07/16/2024   427

1    effort to cause Ms. Roberts to believe they were associated

2    with our office.

3    Q.  Okay.  But Colorado election is what she put in there,

4    correct, sir?

5    A.  It is.  She says Colorado election, dot, dot, dot,

6    something or other, which I take to mean she couldn't remember

7    what the rest of the badge said.

8    Q.  But USEIP does not include Colorado in it, does it, sir?

9    A.  It does not.

10   Q.  Okay.  And then basically she was asked questions and she

11   told them to leave, correct?

12   A.  She did.  She said she told them to leave.

13   Q.  And they left, correct?

14   A.  That's what she says.

15   Q.  Okay.  Once again, if you go to the e-mail a couple pages

16   back as it relates to Ms. Powell?

17   A.  Got it.

18   Q.  Dated July 29th?

19   A.  Yeah.

20   Q.  Once again, Ms. Powell stated she's in Grand Junction?

21   A.  She does say that.

22   Q.  Grand Junction includes Mesa County, does it not, sir?

23   A.  Grand Junction is entirely within Mesa County, but yes.

24   Q.  And she said that some people -- I'm sorry -- that some

25   gentlemen came to their door and that they had something on

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    428

1   their T-shirt that said concerned citizens or something to

2   that effect.

3   A.  That is what it says.

4   Q.  Okay.  Obviously this person is making this e-mail because

5   she's concerned, because it says suspicious activity, correct?

6   A.  It does say that.

7   Q.  Okay.  And obviously trying to be as accurate as possible

8   at the time, correct?

9   A.  I would hope so, but I don't know.

10  Q.  Okay.  And she said they had on their shirts concerned

11  citizens or something to that effect, correct?

12  A.  That's what it says.

13  Q.  No mention in that entire e-mail of USEIP, correct?

14  A.  Correct.

15  Q.  No mention of United States Election Integrity project,

16  correct?

17  A.  Correct.

18          MR. REISCH:  If I can have just a moment, Your Honor.

19          THE COURT:  Sure.

20  Q.  (By MR. REISCH) Sir, just a clarification.  The statement

21  by Mr. Smith in Castle Rock, that was in February of 2022,

22  just to narrow down dates.  Do you agree with that?

23          MS. ERICKSON:  Objection, foundation.

24          THE COURT:  Overruled.  I'll allow him to answer.

25  A.  I believe it is.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2     07/16/2024     429

1    Q.  (By MR. REISCH) You're also aware that any canvassing that

2    USEIP was doing was sometime between May and August of 2021,

3    correct?

4             MS. ERICKSON:  Objection, foundation.

5             THE COURT:  Overruled.  I'll allow him to answer, if

6    he knows.

7    A.  I'm aware that USEIP published a report in April of '22.

8    I believe their canvassing ended at some point in '21, but I

9    don't know when.

10            MR. REISCH:  Don't know the exact dates, correct.

11   All right.  Thank you for your time, sir.  Have a good day.

12            THE COURT:  All right.  Mr. Wynne -- or who's --

13            MR. WYNNE:  Mr. Powell will be handling this.

14            THE COURT:  Mr. Powell, how long is your cross, do

15   you think?

16            MR. POWELL:  Your Honor, it's probably not more than

17   30 minutes.

18            THE COURT:  All right.  Let me check with

19   Ms. Mitchell.  Are you okay to continue for that?

20            THE COURT REPORTER:  Yes.

21            THE COURT:  Are you comfortable continuing?

22            THE WITNESS:  Absolutely, Your Honor.

23            THE COURT:  Let's go for it.  You need to go to the

24   restroom?

25            MS. KASUN:  Yeah.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    430

1          THE COURT:  I'll excuse you for that.  We're going to

2    keep plugging on, if you don't mind.

3          MR. BREESE:  Your Honor, I'm going to do the same.

4          THE COURT:  Hold on.  Three of us are leaving now?

5    All right.  Let's just take -- let's just sit here, but we're

6    going to take a five-minute break until you all get back.

7          MR. WYNNE:  Thank you.

8        (Break was taken from 12:07 p.m. to 12:10 p.m.)

9          THE COURT:  You may proceed.

10          MR. POWELL:  As visitors to Colorado, we're taking

11    the admonition to drink water very seriously.

12                        CROSS-EXAMINATION

13    BY MR. POWELL:

14    Q.  Deputy Secretary Beall, thank you as a native Coloradoan

15    for your testimony.  Very helpful.

16    A.  You're welcome.

17    Q.  Now, the press release in Exhibit 50 you said was based on

18    concerns about USEIP's activities and that included your

19    assumption that USEIP was the only group doing canvassing at

20    the time?

21    A.  Yes.

22    Q.  Okay.  Did that concern include any statements that Holly

23    Kasun had made?

24    A.  Not that I'm aware of.

25    Q.  Did the concern that animated this press release include

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    431

1    any concern about Holly Kasun's activities or conduct?

2    A.  I don't believe we were aware of Ms. Kasun at that time.

3    Q.  And it didn't include concerns about Mr. Smith's

4    statements that happened in the future.  Did it include

5    concerns about statements that he had made up to that point?

6    A.  Yes.

7    Q.  Did it include concerns of canvassing by any of these

8    defendants who had actually canvassed?

9    A.  I'm not aware of what these defendants have done, so the

10   premise of your question is something I can't answer.

11   Q.  So can you summarize for me what activities that you knew

12   to be happening from USEIP this press release was based on?

13   A.  What we knew to be happening that was identified to USEIP

14   was their call and their efforts to recruit through social

15   media posts, as well as on their website, I think.  Canvassing

16   efforts and the fact that we had received complaints

17   acknowledge that those complaints had not identified USEIP,

18   but the nature of the complaints coincided with what we

19   understood USEIP was doing.

20   Q.  But the press release doesn't mention USEIP; is that

21   right?

22   A.  It does not.

23   Q.  Does it mention any defendant?

24   A.  It does not.

25   Q.  Did the Secretary of State know what questions were being

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    432

1    asked by the canvassers that it was hearing about?

2    A.  Do you mean the Secretary of State personally or do you

3    mean the office?

4    Q.  The office.

5    A.  We were aware of what was on the website from USEIP, and I

6    believe the playbook refers to questions, but I could be

7    wrong.  What we believed at the time was that the questioning

8    asked voters how they had voted, if they had voted, where they

9    had voted, and asked an open-ended question about whether they

10   had any concerns.

11   Q.  Thank you.  The Secretary of State did not sue any of

12   these defendants under any federal or state intimidation

13   statutes?

14   A.  No.

15   Q.  To your knowledge, did the U.S. Department of Justice?

16   A.  Not to my knowledge.

17   Q.  Even though, as you said earlier, Mr. Smith's statement

18   was likely to cause more threats?

19   A.  Well, that was later in February, and the answer is I am

20   unaware because the U.S. Attorney's Office does not tell us

21   what they're doing.  They speak through their court filings.

22   I'm not aware of any court filing along those lines.

23   Q.  Do you know if it's the Secretary of State's position that

24   misinformation about elections is tantamount to intimidation?

25   A.  I believe she has said that certain kinds of

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    433

1   misinformation about elections is tantamount to intimidation,

2   yes.

3   Q.  Is criticism of elections tantamount to intimidation?

4   A.  Criticism that is aimed at dissuading a person from

5   exercising their right to vote, yes, that is intimidation.

6   Q.  Do you believe the act of canvassing by private

7   individuals is by definition potentially intimidating?

8   A.  Not by definition.  I think there are occasions when it

9   will be entirely friendly, but there are also occasions where

10  it could be intimidating.

11  Q.  I think you mentioned earlier you didn't see any training

12  materials that USEIP had given its --

13  A.  No, not at that time.

14  Q.  You also had testified that you had -- that the office had

15  a concern that there were untrained canvassers out there doing

16  canvassing?

17  A.  I -- yes.  The office had a concern that the canvassers

18  were biased, intent on an outcome, and unlikely to abide by

19  standard survey techniques when conducting their questions.

20  Q.  Did you ever see one of the scripts that USEIP canvassers

21  used?

22  A.  No.

23  Q.  Do you know what counties USEIP canvassed in?

24  A.  I have no direct knowledge where USEIP canvassed.  I've

25  seen in their report that they list four counties.  I have not

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024   434

1   seen their underlying work papers.  So far as I know, they

2   have not published the actual work papers from all of the

3   canvassing that they conducted.

4   Q.  Did the Secretary of State's Office receive any evidence

5   that a USEIP canvasser identified as such had misrepresented

6   themselves or their identity?

7   A.  No.

8   Q.  Did you get any evidence about what canvassers' name tags

9   looked like?

10  A.  We got only what you have seen, these two e-mails.

11  Q.  Okay.

12          MR. POWELL:  I have no further questions, Your Honor.

13          THE COURT:  That was shorter than I thought.

14          Ms. Epp, do you have any sense of how long your

15  questioning will take?

16          MS. EPP:  I have four or five areas I want to

17  explore.

18          THE COURT:  Let's go ahead and take a lunch break.

19  It's 12:15.  Let's plan on coming back around 1:15.  All

20  right.  We'll be in recess.

21          THE COURTROOM DEPUTY:  All rise.  Court is in recess.

22      (Break was taken from 12:17 p.m. to 1:17 p.m.)

23          THE COURT:  Ms. Epp, you may proceed.

24

25

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    435

1                            CROSS-EXAMINATION

2   BY MS. EPP:

3   Q.  Good afternoon, Mr. Beall.

4   A.  Good afternoon, Ms. Epp, and I apologize for mangling your

5   name.

6   Q.  That's okay.  I get asked if I'm related to the

7   representative quite often.  I'm not, for the record.

8   A.  I'm not related to the actress either.

9   Q.  You stated that you are, and I'm paraphrasing, the

10  official in the Secretary of State's Office with oversight

11  over CORA; is that right?

12  A.  Yes.

13  Q.  The CORA buck stops with you; is that right?

14  A.  It stops with me, until a Court overrules me.

15  Q.  And I believe you stated that your office believes that

16  the activities mentioned by the two complaints for Mesa County

17  were in relation to USEIP canvassing; is that correct?

18  A.  We did at the time, yes.

19  Q.  Okay.  Can we go back to Exhibit 50, please.  Can we go to

20  the complaint, the Yvette Roberts' complaint.

21          THE COURT:  I think it's page 5.

22  Q.  (By MS. EPP) And my colleagues established that

23  Ms. Roberts' complaint does not mention USEIP; is that

24  correct?

25  A.  It doesn't.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    436

1   Q.   What is the date on that?

2   A.   The e-mail says June 23rd, 2021, 12:22 p.m.

3   Q.   And can we go to the last page, Deborah Powell's

4   complaint.   And my colleagues also established that this

5   complaint does not mention USEIP; is that correct?

6   A.   That's correct.

7   Q.   And what is the date on that?

8   A.   Thursday, July 29th, 2021, 12:11 p.m.

9   Q.   Okay.   Can we go to the second page in the exhibit,

10  please.   So we're going to look at the second and third pages

11  of this exhibit, the exchange with Ms. Kessler with the U.S.

12  Attorney's Office.   Do these exchanges mention USEIP?

13  A.   They do not.

14  Q.   Okay.   Can you read out the dates of the -- just the

15  specific e-mails?

16  A.   Which one in the thread, the top one?

17  Q.   The top one first.

18  A.   The top one is from Mr. Teitelbaum to Ms. Kessler, Friday,

19  August 13th, 2021, 2:34:38 p.m.

20  Q.   And the next one, from Ms. Kessler to Mr. Teitelbaum?

21  A.   Ms. Kessler e-mailed Mr. Teitelbaum on Monday, August 2nd,

22  2021, at 9:34 p.m.   She was working late.

23  Q.   And the next one, Aaron Teitelbaum to Ms. Kessler?

24  A.   Mr. Teitelbaum is responding to Ms. Kessler on Friday,

25  July 30th, 2021, at 4:20 p.m.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    437

1   Q.  Okay.  And can we go to the next page, please.  And from

2   Ms. Weber to Ms. Kessler?

3   A.  Ms. Weber to Ms. Kessler was Friday, July 30th, 2021, at

4   4:02 p.m.

5   Q.  And it's also your testimony that you're familiar with the

6   exchange underneath the redactions in this document; is that

7   correct?

8   A.  That's correct.

9   Q.  Is it your understanding that these redactions are related

10  to the communications between members of the Secretary of

11  State's office and other government entities at various levels

12  investigating these two complaints?

13  A.  It's my understanding, but I could refresh my

14  recollection, that all of the redactions are internal to the

15  Department of State, not to external agencies.  But they are

16  e-mail exchanges by my staff about what to do with

17  Ms. Roberts' e-mail.

18  Q.  Okay.  You -- and I'm summarizing again.  You also

19  testified I believe that as part of your duties as Deputy

20  Secretary of State that you have oversight of the staff in the

21  Secretary of State's Office; is that accurate?

22  A.  That is accurate.

23  Q.  Does that include oversight of Matt Domboski?

24  A.  Yes, derivatively.  At the time he worked in elections.

25  He reported up through the election director, and the election

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    438

1    director reports to me.

2    Q.  Can we go to Exhibit 86 now.

3          MS. EPP:  And this has been stipulated, Your Honor.

4          THE COURT:  All right.

5    Q.  (By MS. EPP) Mr. Beall, for your awareness, Exhibit 86 is

6    documents received from open records requested from Mesa

7    County.  I'd like to go to the second-to-last page in the

8    exhibit, and if you could review that e-mail and make yourself

9    familiar with it.

10    A.  Okay.  I'm at -- I see what's on the screen, and I also

11    have the paper copy in the binder.

12    Q.  This is not it.  The second-to-the-last page.

13          MS. EPP:  Does anybody have a copy of Exhibit 86 I

14    can refer to?  It will be -- this one doesn't have page

15    numbers on it.  Try page 8.  That's the one.

16    Q.  (By MS. EPP) So it starts with Matt Domboski at the top?

17    A.  I see that, yes.

18    Q.  Are you familiar with this e-mail?

19    A.  Yes.

20          MS. EPP:  Your Honor, I would move to admit

21    Exhibit 86.

22          THE COURT:  Did you say it was already in, it was

23    stipulated?

24          MS. EPP:  Does stipulated mean admitted?  I thought I

25    still had to get it admitted.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    439

1          THE COURTROOM DEPUTY:  We admitted it at the

2    beginning of the trial.

3          THE COURT:  At the beginning anything stipulated to I

4    went ahead and admitted into evidence, so you don't need to

5    readmit it.  You can just refer to it.

6          MS. EPP:  So all of my questions were unnecessary.  I

7    apologize, Your Honor.

8          THE COURT:  That's all right.  I didn't understand

9    that's what you were doing.

10   Q.  (By MS. EPP) And can you read the date on this e-mail?

11   A.  Mr. Domboski to a group of people including Ms. Kessler,

12   July 30th, 2021, 9:50 a.m.

13   Q.  And can we go back to page 1 of the exhibit.  So the first

14   e-mail on this exhibit is the attorney general's office

15   e-mailing the Mesa County district attorney.  Do you see that?

16   A.  I do.

17   Q.  That's on July 6th, 2021?

18   A.  Yes.

19   Q.  The second is Ms. Drake e-mailing Ms. Kessler and copying

20   James Cannon from the Mesa County District Attorney's Office

21   also on July 6th?

22   A.  Yes.

23   Q.  And are you familiar with these e-mails?  Have you seen

24   them before?

25   A.  I think I've seen them in connection with this case.  I

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    440

 1    don't remember seeing them before this case.

 2    Q.    Okay.  Can we go to the next page, please.  The next

 3    e-mail that we see is James Cannon speaking to Dan Rubinstein,

 4    District Attorney of Mesa County, and it says, Hello, Melissa,

 5    but the to line is Mr. Rubinstein.  Can you read that e-mail,

 6    please?

 7    A.    Certainly.  Hello, Melissa.  I am checking in with you.  I

 8    have not seen any info come over on this yet.  I can tell you

 9    I found a report in our local records where it appears that

10    Grand Junction police have already investigated this as a

11    suspicious incident, but were unable to prove any crime.

12    However, I am happy to review whatever other information you

13    may have on this allegation.

14    Q.    Okay.

15    A.    Feel free to call with any questions.  I'm sorry.

16    Q.    I'm sorry.  I didn't mean to interrupt you.  And so you

17    see the part where it says we were unable to prove any crime?

18    A.    I do see that.

19    Q.    And voter intimidation is a crime, correct?

20          MS. ERICKSON:  Objection, foundation.

21          THE COURT:  Overruled.  I'll allow him to answer, if

22    he knows.

23    A.    Yes, it is a crime.

24    Q.    (By MS. EPP) Okay.  Can we go to the next page, please.

25    So the next e-mail I want you to look at is at the bottom of

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    441

1   this page, Melissa Kessler to James Cannon.  Can you read the

2   date on that?

3   A.  Wednesday, July 21st, 2021, at 10:54:23 a.m. Mountain

4   Daylight Time, from Melissa Kessler to James Cannon with

5   parties to several.

6   Q.  And that's July 21st.  The prior e-mail was July 6th,

7   correct?

8   A.  I believe that's right, yeah.

9   Q.  And can you see where Ms. Kessler says I apologize for not

10  sending over sooner?

11  A.  I do see that.  I'm confused by the chronology of the

12  thread, but I do see that.

13  Q.  Okay.  Understood.  Can we go to the next one, please.

14  The next one is from Melissa Kessler to James Cannon.  This is

15  I believe when the Deborah Powell complaint came in.  Can you

16  read the date on that?

17  A.  I'm reading Melissa Kessler to James Cannon, Dan

18  Rubinstein, and copies to many -- or three -- two -- Friday,

19  July 30th, 2021, at 12:38:05 p.m. Mountain Daylight Time.

20  Q.  Thank you.  And this was where I believe your testimony

21  was that you were starting to see a pattern and got more

22  concerned, and this leads in I believe to the -- if we can go

23  to the next page -- I think that's the Matt Dombowski one --

24  there we go.  And at this point, can you -- can you read this

25  e-mail from Mr. Domboski?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    442

1    A.   Read the entire e-mail out loud?

2    Q.   Let's go with -- let's read the first three paragraphs.

3    A.   Okay.  Hi, Melissa.  We received an e-mail from a Deborah

4    Powell regarding individuals who were knocking on doors in

5    Grand Junction asking residents if they voted in the last

6    election.  See e-mail below.  We previously received reports

7    of this happening in Mesa County, although not from this

8    particular person.  This activity raises a concern regarding

9    voter intimidation which is on the DOJ's radar.  This alleged

10   activity appears to be an act of voter intimidation which our

11   office could refer to the DOJ for potential prosecution.

12         The DOJ in their guidance -- hyperlinked -- on

13   postelection audits and voter intimidation highlighted recent

14   court cases -- I'm sorry -- in which the activity mentioned

15   may have constituted voter intimidation under the Voting

16   Rights Act of 1965, and the National Voter Registration Act of

17   1993, and Section 131 of the Civil Rights Act of 1957.  In

18   addition, the DOJ highlighted a similar scenario where there

19   were proposals to canvass precincts in an urban county to

20   contact individuals face-to-face in order to see whether the

21   individuals were qualified voters who had, in fact, actually

22   voted.  The DOJ then proceeds to stress that these sorts of

23   activities raise voter intimidation concerns.

24   Q.   Thank you.  So during the period from the time

25   Ms. Roberts' complaint was received by your office to

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    443

1    July 30th, from my layman's perspective, it appears that you

2    guys did everything right.  You investigated the complaints.

3    You talked to the local jurisdictions.  Then you escalated to

4    the U.S. Attorney's Office.  Would you say that's accurate?

5    A.  Yes.

6    Q.  So why are these documents redacted?

7    A.  We're looking at unredacted documents from the DA's

8    office.  Are you asking me why there were redactions in the

9    documents that were produced to you that were Exhibit 50?

10   Q.  I believe they're the same, but do you not -- do you

11   dispute that these -- this would be the thread that Melissa

12   Kessler e-mailed to the U.S. Attorney's Office?  Is there some

13   other thread that wasn't produced?

14            MS. ERICKSON:  Objection, foundation.

15            THE COURT:  Overruled.  I'll allow him to answer, if

16   he knows.

17   A.  I am unaware of any other thread.  Your question was

18   compound.  And with regard to what was produced to you, we

19   produced what was -- what was located.  Mr. Domboski's memo,

20   e-mail memo here is certainly something I would have indicated

21   should be redacted.  It is a legal analysis -- Mr. Domboski is

22   an attorney -- and was being provided to the staff as a legal

23   assessment.  I do not know whether the material in Exhibit 50

24   was -- is the same.

25   Q.  (By MS. EPP) Okay.  Can you point to me somewhere in this

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    444

1   exchange between your office, the district attorney's office,

2   the U.S. Attorney's Office, where USEIP is mentioned?

3   A.  I don't believe I need to.  If your question is is USEIP

4   mentioned, the documents speak for themselves, but I don't

5   think USEIP is mentioned.

6   Q.  But it's your testimony that your office was concerned

7   that USEIP was conducting the canvassing, and in all of the

8   exchanges with the other agencies you didn't mention USEIP?

9   Or your office -- you, the Secretary of State's Office, didn't

10  mention USEIP?

11  A.  I believe in Ms. Kessler's e-mail there's a hyperlink to a

12  news report, but now you're challenging my memory.  Because I

13  believe I remember Ms. Kessler apologizing for the title of a

14  message -- the title of a news story, and I can't find it now.

15  In any event, there are hyperlinks in these documents.  I

16  don't know where the hyperlinks go.

17  Q.  Okay.  But in your office's interactions, you're reaching

18  out to District Attorney Dan Rubinstein, no mention of USEIP,

19  no question of, Hey, did you know this was happening?  Who was

20  doing it?  None of that.  No mention whatsoever of USEIP.

21          MS. ERICKSON:  Objection, compound.

22          THE COURT:  Well, sustained.  Can you reword that a

23  little less lengthy?

24          MS. EPP:  Sure.  In fact, I'll move on, Your Honor.

25  Q.  (By MS. EPP) Let's go back to -- and I don't think we need

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2     07/16/2024    445

1    to pull up the exhibit.  Just to confirm, Yvette Roberts'
2    complaint was on June 23rd, 2021, correct?
3    A.   Yes.
4    Q.   And Deborah Powell's complaint was July 29th, 2021,
5    correct?
6    A.   Correct.
7    Q.   Why did you wait until September 9th to issue a press
8    release?
9    A.   That is a good question.  I can't speak for what was going
10   on at the time, but there was -- I should try to remember what
11   was going on at the time.  The short answer is I don't know.
12   What I believe is this is in August, and we may have had
13   scheduling problems.  I just don't remember why.
14   Q.   So is it possible it was because the League of Women
15   Voters issued a press release about USEIP and challenging us
16   on September 4th?
17   A.   It is deeply not possible.
18   Q.   Why is that?
19   A.   We don't take action based on activities of third-party
20   organizations.
21   Q.   So it's a coincidence?
22   A.   Yes.
23   Q.   Okay.  So it's a coincidence that the investigative record
24   from June 23rd, 2021, to July 30th, 2021, when it was
25   escalated to the U.S. Attorney's Office, there was additional

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    446

1    communications going to the U.S. Attorney's Office through

2    August 13th, I believe is the last date on Exhibit 86, no

3    mention of USEIP, no press releases, no concerns to get out to

4    the public this really intimidating conduct is happening until

5    after the League of Women Voters issued their press release.

6    That's a coincidence?

7            MS. ERICKSON:  Objection, compound.

8            THE COURT:  Well, sustained as to that.  I see what

9    you're trying to do, but there's several pieces to that that

10   he would want to answer separately, so maybe you can try again

11   with a little less -- separate questions.

12           MS. EPP:  Okay.  This is a lot harder than it looks,

13   Your Honor.

14   Q.  (By MS. EPP) Why did you issue a press release after your

15   office found no evidence of voter intimidation?

16           MS. ERICKSON:  Objection, misstates prior testimony.

17           THE COURT:  Sustained.

18   Q.  (By MS. EPP) Did your office find evidence of voter

19   intimidation?

20   A.  No.

21   Q.  Why did you issue a press release after finding no

22   evidence of voter intimidation?

23   A.  Because we believed there was a risk of voter

24   intimidation, and we wished also to alert the public to their

25   rights.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    447

1   Q.  And you believed that risk was because of USEIP?

2   A.  At the time, yes.

3   Q.  But at no point you mentioned USEIP?

4   A.  No.  We don't make a habit of identifying targets.

5   Q.  What do you mean by targets?

6   A.  Targets of investigation.  We let law enforcement decide

7   who their targets are going to be.  We don't suggest who the

8   targets should be.

9   Q.  Did the Mesa County District Attorney's Office or any

10  investigative agency in Mesa County in your office's

11  communications with them in the record or otherwise, did they

12  mention USEIP?

13  A.  Not that I'm aware of.

14  Q.  Does the Secretary of State's Office regulate canvassing?

15  A.  You need to be more specific.

16  Q.  Canvassing from any entity; campaigns, candidates,

17  political action committees, news organizations, ballot

18  measures.

19  A.  I'm waiting for you to finish.  That's all.

20  Q.  I'm done.

21  A.  Yes.  We regulate canvassing with regard to petitions.

22  Petitions circulators and petition circulator entities are

23  regulated by the office and require a license.  But if you're

24  asking whether we regulate political organizations and their

25  political speech in the context of door-knocking, no.

22-cv-00581-CNS-NRN   Bench Trial - Day 2     07/16/2024   448

1    Q.  And candidates?

2    A.  I would put them under political organizations, but, yes,

3    we don't regulate -- well, step back.  We regulate candidates'

4    campaign finance activity which can include and routinely does

5    include the material that is handed out during door-knocking

6    interactions.  We regulate that for the disclaimers, the

7    disclosures on their content, but we don't regulate

8    specifically the manner of distributing the material.

9    Q.  What about for, like, news organizations for exit polling

10   kind of stuff?  If they were to canvass, would that be

11   something that you would regulate?

12   A.  We would regulate it in the context of where they appear,

13   where they stand at voter service and polling centers, VSPCs.

14   They would not be permitted to be within 1100 feet around the

15   VSPC.  But otherwise, no, we would not regulate.

16   Q.  Okay.  To your knowledge, was any election official

17   prevented from discharging their official duties as a result

18   of the defendants' speech or conduct?

19   A.  No.

20   Q.  You also testified that you require, I believe -- this is

21   how I understood it -- that you require your employees within

22   the Secretary of State's office to maintain their voter

23   registration?

24   A.  We ask them to.  We ask them to sign an acknowledgment

25   that they are required to.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    449

1    Q.  And if a member of the Secretary of State's Office had a

2    position on not voting, would they have that right?

3    A.  Oh, absolutely.  They also have a right not to work for

4    us.

5    Q.  Would that be reason for them not to work for you?

6    A.  We would need to have a conversation about why -- if they

7    were working in elections and they were a conscientious

8    objector to voting, we'd want to know why, and we'd want to

9    take that under consideration.

10    Q.  What if they weren't working in elections but in another

11    part of the Secretary of State's Office?

12    A.  We have no interest in -- this policy applies only with

13    regard to employees who are touching elections.  So more than

14    the elections division, because more than just the elections

15    division touches elections, but not everyone.

16    Q.  Okay.  And understanding that your knowledge of this will

17    probably be limited because of the nature of voting, but do

18    you have reason to believe that any member of the Secretary of

19    State's Office, employee of the Secretary of State's Office

20    did not vote as a result of the defendants' speech or conduct?

21    A.  I have no knowledge.

22    Q.  Do you believe canvassing is inherently intimidating in

23    your opinion?

24    A.  I believe certain kinds of canvassing done in certain ways

25    is inherently intimidating, yes.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024   450

1  Q.  You testified that you were concerned I believe at the

2  time that you issued the press release, if I'm recalling it

3  correctly, of people showing up at people's houses armed?

4  A.  Yes.

5  Q.  Did Ms. Roberts mention armed canvassers?

6  A.  Let me find it.  No, she did not.

7  Q.  Did Ms. Powell?

8  A.  She did not.  She mentioned people in a car presumably

9  outside her house, but she didn't mention whether they were

10 armed.

11 Q.  So where did your concern about people being armed come

12 from?

13 A.  I recall that there was commentary that I'm recalling from

14 the USEIP website about whether or not volunteers could

15 provide security for USEIP's canvassers, and there was a

16 specific ask for individuals who are licensed to carry a

17 weapon concealed.

18 Q.  This is the first time I'm hearing that.  And you said

19 that was on the USEIP website?

20 A.  That's my recollection.

21 Q.  Sorry, one more question on the redactions of the e-mails.

22 Did somebody specifically ask for those redactions to be done

23 on that exchange prior to fulfilling the CORA request, and did

24 those -- well, I'll let you answer that first.

25 A.  I'm going to -- I'm going to invoke attorney-client

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    451

1  privilege with regard to the consultations within the office

2  as to the nature of the redactions.

3  Q.  I didn't ask about the nature of the redactions.  I just

4  asked if somebody asked for them.

5  A.  Yeah, and that requires me to answer the substance of your

6  question.  Did someone ask to redact I'm not going to answer.

7         MR. REISCH:  Your Honor, I would object.  I think

8  it's been established that the redactions in Exhibit 50, I

9  believe, contains the same e-mail in 86, so I believe that any

10  invocation of attorney-client basically has been waived by its

11  release.

12         THE COURT:  Well, I haven't compared them that way.

13  If you want to go to 86 and have him -- and show me that,

14  Ms. Epp, you may.

15         MS. EPP:  I can move on.

16         MS. ERICKSON:  Your Honor -- she's moving on.

17  Q.  (By MS. EPP) You testified that you and the Secretary of

18  State have no concerns about the cyber security of Colorado

19  elections; is that accurate?

20  A.  That is not accurate.  We have substantial concern.  We

21  believe that the cyber security of the election systems and

22  processes is well defended, but under no circumstances should

23  I be seen to be saying that we don't have concern.

24  Q.  Okay.  And do you have cyber credentials?

25  A.  Do I have cyber credentials?  No.  I hire people who do.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    452

1   Q.  And is one of those people Trevor Timmons?

2   A.  No longer.  He was our chief information officer.

3   Q.  At the time of USEIP canvassing and at the time of the

4   2020 election?

5   A.  Yes.  At the time of the '20 election he was our CIO.

6   Q.  And when you -- you testified that you came into the

7   office in March of 2021; is that correct?

8   A.  I came into the office in March of '21.  I had been the

9   secretary's outside counsel since before the '20 election into

10  -- in 2019.

11  Q.  And not getting into privileged conversations, but what

12  did that entail, being outside counsel during the time of the

13  2020 election?

14  A.  It entailed that I was a deputy attorney general in the

15  attorney general's office, and Attorney General Weiser had

16  assigned me to provide legal counsel to the Secretary.  I was

17  -- the phrase outside simply means I wasn't employed in the

18  Department of State.

19  Q.  So as part of your duties in that capacity, would you be

20  aware of members of the secretary's office commissioning

21  reports about the cyber security of elections?

22  A.  No.

23  Q.  Colorado elections?

24  A.  At that time -- as an outside counsel, I was not aware.  I

25  subsequently became aware of Mr. Timmons' commissioning of --

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024   453

1   I think you're getting to the penetration test.

2   Q.  Which my colleague referred to as the Synack report, which

3   was the vendor.  So you were aware of the report?

4   A.  Not at -- I became aware after the fact.

5   Q.  Okay.  And so you're aware that that report has found

6   critical vulnerabilities in Colorado elections?

7   A.  I'm aware that it asserted that it had found critical

8   vulnerabilities in 2017, and I am aware that the deputy took

9   steps in response to that.  This was a penetration test that

10  Secretary Williams had directed and that Trevor Timmons

11  managed, and that based on the penetration testing that was

12  aimed at the SCORE server, our office took a variety of cyber

13  security measures to enhance the protection of the servers

14  where the SCORE database is housed.

15  Q.  Okay.  Thank you for that.  I want to talk about SCORE as

16  soon as I find my notes.  You testified that SCORE is an

17  inhouse technology solution; is that correct?

18  A.  I testified that it was -- the software was written

19  inhouse, yes.

20  Q.  And are you familiar with -- and I believe it was this

21  past year -- 30,000 registration cards going to ineligible

22  voters?

23  A.  It had nothing to do with SCORE.

24  Q.  You are familiar with that happening?

25  A.  They weren't registration cards.  They didn't necessarily

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024   454

1   go to ineligible voters, but I'm very aware of what I think

2   you're attempting to refer to.

3   Q.  Okay.  And do you know what caused that?

4          MS. ERICKSON:  Objection, foundation.

5          THE COURT:  Overruled.  He can answer, if he knows.

6   A.  The question what caused that, you haven't specified what

7   that is.

8   Q.  (By MS. EPP) 30,000 register -- the 30,000 communications

9   that went out to people they shouldn't have gone to, what was

10  the core reason for that?

11         MS. ERICKSON:  Your Honor, I'm also just going to

12  object on relevance grounds.  I'm not sure where we're going

13  here.

14         THE COURT:  Ms. Epp, what is the relevance?

15         MS. EPP:  I believe it was a technical challenge that

16  caused this to happen, and he's testified that the SCORE

17  system in the Colorado registration system is -- I'm

18  paraphrasing -- but secure.

19         THE COURT:  I'll allow it because I think plaintiffs

20  opened the door to this line of questioning, but I do want you

21  to clarify what he's talking about, because I don't know what

22  the 30,000 is, so perhaps just ask him so we get

23  clarification.

24  Q.  (By MS. EPP) In the 2022 election there was reporting, and

25  I believe the secretary's office confirmed, that 30,000

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2      07/16/2024    455

1    communications about the elections went out to people that

2    should not have received them as eligible voters.

3    A.  Is there a question?

4    Q.  Voter registration cards.  What caused those voter

5    registration cards to go out?

6    A.  They weren't voter registration cards.

7    Q.  What were they?

8    A.  Again, you've mischaracterized what the evidence is.  In

9    fact, I don't believe there's evidence.

10          THE WITNESS:  But, Your Honor, may I speak at liberty

11    to explain what happened?

12          THE COURT:  Well, I've encouraged Ms. Epp to ask a

13    question to allow that.  She does not have to and has not yet,

14    but it's up to her.  Your counsel can redirect if she does

15    not.

16          THE WITNESS:  Understood.

17    Q.  (By MS. EPP) You stated they were not voter registration

18    cards?

19    A.  They were not.

20    Q.  Can you testify as to what they were?

21    A.  Yes.  They were postcards to individuals that the

22    organization ERIC, Electronic Registration Information Center,

23    had identified to us as potentially eligible but unregistered,

24    otherwise known as EBU -- eligible but unregistered --

25    residents of Colorado.  ERIC provided us with an export from

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    456

1  ERIC's analysis of individuals that ERIC thought should be

2  contacted about whether they wished to register.

3         This is part of the ERIC membership obligations that

4  every state that participates in ERIC agrees to, and as a

5  result, we received the list from ERIC, and we compared the

6  list to the Department of Motor Vehicle -- Division of Motor

7  Vehicles and Department of Revenue's data to attempt to remove

8  from ERIC's list those individuals that DMV had identified as

9  being noncitizens at the time of their transactions with DMV.

10        Our effort to remove individuals who DMV had

11 identified as noncitizens was ineffective because of data

12 coding mismatches between ERIC's data and DMV data, resulting

13 in 30,000 of 51,000 postcards.  The postcards were not

14 registration cards.  They were merely postcards that indicated

15 that the individual is not registered and encouraged them to

16 register.  Those 30,000 people were then contacted with

17 subsequently another postcard that indicated that they were

18 likely not eligible to vote.  Subsequent to that second

19 postcard mailing, we identified that none of those individuals

20 registered to vote or voted illegally.  Three were, in fact,

21 citizens and were entitled to vote.

22 Q.  Three of 30,000?

23 A.  Yes.

24 Q.  So three out of the 30,000 postcards I believe encouraging

25 them to register to vote, is that an accurate

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    457

1    characterization?

2    A.  Yes.  In fact, I believe those three had already

3    registered, but I could be mistaken about that.

4    Q.  So the remainder of the 30,000 were not eligible?

5    A.  Yes.

6    Q.  Okay.  And I apologize.  I was conflating SCORE and ERIC,

7    and that's on me.  Speaking of ERIC, what -- is there a

8    connection between ERIC and SCORE?

9    A.  Specify for me what you mean by connection.

10    Q.  Is there any -- sorry.  Is there any technical --

11    technology connection?

12    A.  No.

13    Q.  Do you conduct any audits of ERIC's data?

14         MS. ERICKSON:  I'm just -- objection, relevance.

15         THE COURT:  Well, I'll overrule it, but we are

16    getting a little far out of bounds here.

17    A.  Do we audit ERIC data?  We receive data from ERIC that we

18    review before we do anything with it.  So in that sense, yes,

19    we audit the data that ERIC provides to us.

20    Q.  (By MS. EPP) And how does that evaluation occur?  How do

21    you validate that the information you're getting from ERIC is

22    accurate?

23    A.  We are -- ERIC provides us with death records, change of

24    address information, and -- no, ERIC doesn't have noncitizen

25    data.  We cross-reference the data that we receive from ERIC

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    458

1    against data that we have received from CDPHE, so Colorado

2    Department of Public Health and Environment, for vital record

3    death information.  We cross-reference with Department of

4    Corrections for incarceration information.  We cross-reference

5    with Department of Revenue for citizenship and address

6    information.  We cross-reference with Social Security

7    Administration in order to conduct list maintenance

8    activities.

9    Q.  And you just testified as part of that answer that ERIC

10   does not have noncitizen data; is that correct?

11   A.  I believe that is the case.

12   Q.  So what were the 30,000 minus the three that you stated

13   you believe were citizens -- were those 30,000 --

14   A.  I said they don't have citizenship data.  I didn't say

15   they didn't include individuals who are not citizens.

16   Q.  Understood.  Okay.  I misunderstood you.  How does the

17   secretary's office check for citizenship in voter registration

18   specifically?

19   A.  We rely on the Department of Revenue's DMV records in

20   which during transactions with the individual for the REAL ID

21   program, the individual is required to present one of a list

22   of six, I think, documents that would otherwise demonstrate

23   citizenship.

24        THE COURT:  Ms. Epp, we seem to have drifted into a

25   fishing expedition, so I'm going to ask you to move on.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    459

1          MS. EPP:  Yes, Your Honor.  The relevance is that

2    this witness has testified that our concerns were unfounded.

3          THE COURT:  I think you've established what you need

4    to, so let's move on.

5          MS. EPP:  Okay.  Let me just check.  I think I might

6    be close to done.

7    Q.  (By MS. EPP) Does the Secretary of State's Office maintain

8    all voter data inhouse or do you rely on vendors?

9    A.  I am hesitating over the word maintain.  County clerks

10   have access to and are partners in the process of updating

11   voter records.  They are users of the system.  But if your

12   question is do we have third-party commercial vendors or

13   noncommercial vendors, no.

14   Q.  Okay.  And just one more question on SCORE.  Do third

15   parties have access to SCORE or just the secretary's office?

16   A.  Again, third parties -- do you include counties in that?

17   Q.  Nongovernmental.

18   A.  Okay.  Nongovernmental organizations are entitled to ask

19   for data output from SCORE, but they don't have access to

20   SCORE.

21   Q.  So is there sharing and collaboration but no direct

22   access?  Is that a fair characterization?

23   A.  I wouldn't even say sharing or collaboration.

24   Nongovernmental organizations, for example, the Republican

25   party and the Democratic party, ask for data exports, and we

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    460

1    provide them.

2    Q.  You testified earlier with regard to Ms. Roberts'

3    complaint that you took her statement -- can we pull that back

4    up, Ms. Roberts' complaint -- the statement they wore homemade

5    badges reading Colorado election something or other, and I

6    believe you testified that you -- you took that to mean that

7    the people at her door were representing themselves as

8    somebody from your office; is that correct?

9    A.  I took that to be a risk.  I don't know what they were

10   representing themselves, but I was concerned that they might

11   be trying to represent themselves as connected to our office.

12   Q.  Do members of your office wear homemade badges?

13   A.  I certainly hope they do not.

14          MS. EPP:  That's all I have, Your Honor.

15          THE COURT:  All right.  Thank you.

16          Any redirect, Ms. Erickson?

17          MS. ERICKSON:  Yes, Your Honor.

18                    REDIRECT EXAMINATION

19   BY MS. ERICKSON:

20   Q.  Mr. Beall, you just had a long exchange with Ms. Epp about

21   ERIC and some postcards that were mailed out.  When did all of

22   that activity occur?

23   A.  The ERIC postcard was mailed in September of '22.

24   Q.  If you could just turn back to Exhibit 50, please.

25   A.  I have it.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    461

1    Q.  I'd like to follow up on one part of the press release

2    that was sent out, on the first page, and specifically I'd

3    like to ask you about number four under your press release.

4    Number four says you have the right to request the name and

5    credentials of door-to-door solicitors, as well as the

6    organization they represent.  Why is this included in your

7    press release?

8    A.  Because there was -- in our internal discussions, it was

9    clear that we weren't -- that the people -- Ms. Roberts and

10   Yvette Powell -- Yvette Roberts, Deborah Powell -- were not

11   sure who had been contacting them, and the news reports that

12   we had seen that similarly suggested people were unsure of who

13   was -- who was making the contacts, and so we wanted to

14   include that you can ask who a solicitor -- what organization

15   they represent.  I would note this is actually required for

16   petition circulators.

17   Q.  Is it required for other canvassers as well?

18   A.  No.  Well, I don't know what is or is not required.  We

19   don't require it.

20   Q.  You testified earlier in talking about the complaint -- or

21   I guess -- excuse me.  Let me start over.  You testified

22   earlier that your office didn't find any evidence of voter

23   intimidation, I believe.  Can you -- can you expand on that

24   and explain what you meant when you said that in conversation

25   with Ms. Epp?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    462

1    A.   What we -- what I meant was we referred to these incidents

2    and the issue of door-to-door canvassing across the state to

3    law enforcement because we are not a law enforcement agency,

4    and it is not within our purview to make assessments of

5    whether or not voter intimidation has occurred.  It is within

6    our purview to pass along to appropriate agencies the

7    possibility that it has occurred, and it's not our job to

8    develop evidence of voter intimidation.  It is our job to be

9    good partners with law enforcement and to pass along the

10   information that we have received, which we did.

11   Q.   In your view, is there a difference between canvassing --

12   the canvassing that you understood to be conducted by USEIP

13   and canvassing that you typically see conducted by campaigns

14   for political candidates or parties or in support of ballot

15   initiatives, et cetera?

16   A.   Absolutely.  So the canvassing that I am familiar with,

17   that once upon a time before I signed the acknowledgment with

18   the Secretary that I wouldn't engage in partisan activities,

19   involved door-knocking where the individuals would speak to

20   residents about candidates or issues of concern about things

21   that were coming up on the ballot, attempts of persuasion

22   about what they will do.  I've never heard of a survey

23   conducted eight months after the fact attempting to look back

24   and ask somebody what they have done and how they did it eight

25   months after the fact.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    463

1    Q.  You testified that canvassing is not by definition

2    intimidating, I believe.  Are there circumstances in which it

3    could be?

4    A.  Absolutely.

5    Q.  And what are those circumstances?

6    A.  Persistent questioning.  As your adversary asked, impolite

7    questioning that demands that an individual who might be --

8    who might be misunderstood -- or mistaken about their rights

9    and cause them to reveal information about their sacred right

10   to maintain the secrecy of their vote, that would be

11   intimidating in and of itself.  Were you to layer onto this

12   assertions that the election had been rigged and that the --

13   the effort was to demonstrate the Colorado elections can't be

14   trusted --

15        MR. REISCH:  Your Honor, I'm going to object.

16   Misstates the evidence.  There's no evidence that anybody in

17   the canvassing that is a defendant in this case represented

18   anything that it was stolen.

19        THE COURT:  Okay.  I've got your objection.  It's

20   overruled.  He's not talking about the individual defendants.

21   He's talking about what he would find in general disturbing

22   about canvassing.  You may continue.

23        THE WITNESS:  Thank you, Your Honor.

24   A.  What I would find intimidating about canvassing is efforts

25   to try to convince the person that they cannot rely on the

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    464

1    election system processes in Colorado in a manner in which

2    causes them to believe that their vote doesn't count.

3    Q.   (By MS. ERICKSON) Did you -- do you -- would you find such

4    statements to be intimidating if they were disseminated

5    publicly but not necessarily at voters' doorsteps?

6    A.   Yes.

7                MS. ERICKSON:  I have no further questions for

8    Mr. Beall.

9                THE COURT:  All right.  I don't have any questions

10    for you, so you are excused.

11                THE WITNESS:  Thank you, Your Honor.

12                THE COURT:  Thank you.  Plaintiff, would you call

13    your next witness.

14                MS. HOSTETLER:  Your Honor, we're going to call

15    Yvette Roberts.  I will go get her.

16                THE COURT:  All right.

17                            YVETTE ROBERTS

18    was called as a witness and, having been duly sworn, was

19    examined and testified as follows:

20                THE COURTROOM DEPUTY:  Thank you.  Please have a

21    seat.  If you could state your name and spell your last name,

22    please.

23                THE WITNESS:  My name is Yvette Roberts.

24                THE COURTROOM DEPUTY:  Spell your last name, please.

25                THE WITNESS:  Robert with an S.

                        Sarah K. Mitchell, RPR, CRR

1          THE COURT:  All right.  You may proceed.

2          Ms. Roberts, what is going to happen is there's

3    several attorneys in this case, so you will actually be

4    answering questions posed by several of them.

5          THE WITNESS:  Okay.

6          THE COURT:  After they ask questions, I might have a

7    few questions for you, so I don't anticipate your testimony

8    will be lengthy, but you might have several folks asking you

9    questions.

10          THE WITNESS:  Thank you.

11          THE COURT:  You may proceed, Ms. Hostetler.

12                      DIRECT EXAMINATION

13   BY MS. HOSTETLER:

14   Q.  Good afternoon, Ms. Roberts.  Thank you so much for

15   joining us.  Before we get started, I do just want to ask, and

16   going to remind myself of this, that we're going to try to

17   talk slowly for the record.  So I will try to remind you, and

18   others can remind me when I forget.  You've already stated

19   your name, so we'll move on from there.  Where do you live?

20   A.  Grand Junction, Colorado.

21   Q.  And how long have you lived in Grand Junction?

22   A.  Six years.

23   Q.  How long have you lived in Colorado?

24   A.  All my life.

25   Q.  What do you do for a living?

22-cv-00581-CNS-NRN     Bench Trial - Day 2     07/16/2024     466

1   A.  I have been a teacher and also in broadcast, radio, and

2   now I'm retired.

3   Q.  Congratulations.

4   A.  Thank you.

5   Q.  And thank you for your work as a teacher.  You were much

6   needed.  Do you recall making a complaint via the Secretary of

7   State's Office on June 23rd, 2021?

8   A.  Yes.

9   Q.  Could you tell me about the events that prompted you to

10  make this complaint?

11  A.  I had just had two people, a man and a woman, show up at

12  my door and explain to me that -- they introduced themselves.

13  I didn't catch their names.  They told me that they were

14  interested -- he told me -- I apologize -- that they were

15  wanting to --

16          MR. REISCH:  I'm going to object to hearsay, Your

17  Honor.

18          THE COURT:  Overruled.  You may go ahead.

19          THE WITNESS:  Yes.  Thank you.

20  A.  They were going to -- they were part of an investigation

21  in looking into the Colorado 2020 election, and then there was

22  some kind of a name like investigation or inquiry or something

23  of that, which I didn't think that I needed to remember.  So

24  at that point the gentleman -- I noticed that both of them,

25  they introduced themselves, and they had on some official

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    467

1    looking badges, and they -- they lacked an emblem, and also

2    the badges were professional looking.  I mean, you know, the

3    outsides.  But then it was clear that the printed material was

4    not as well done.  So I interpreted that as being an effort to

5    be official without really being official.  And then they --

6    the gentleman told me that --

7            MR. REISCH:  Objection, hearsay, foundation.

8            THE COURT:  Overruled, and you don't need to make it

9    each time.  You're just interrupting.  Your objection to

10   hearsay will persist throughout this testimony, but it's

11   unhelpful to interrupt her after every sentence.  You may

12   proceed.

13   A.   I'm sorry.  I don't know what --

14   Q.   (By MS. HOSTETLER) I can ask a question to keep things

15   going.  So you talked about the man and the woman came up to

16   your door.  Do you remember where they were standing?

17   A.   They were standing at my front door, and I was standing at

18   the top step of my porch.  So on my step I was almost eye to

19   eye with the gentleman, and I was really happy with that,

20   because it's for a short woman to have a face-to-face

21   conversation that close with a tall man, a tall stranger is a

22   little stressful.  So he proceeded to look down at his paper

23   clip -- clipboard is what I'm trying to say -- and he informed

24   me that he had this information and that the state had sent

25   it.  And I kind of glanced down.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    468

1           Of course, I couldn't see exactly what it was.  And

2    upside down too, that's not too easy to see.  So I sort of

3    figured he must have a voter roll.  Okay.  So fine and dandy.

4    And then he seemed to want to really with his -- his stance

5    and his way he was holding his clipboard to impress me that he

6    was official.  And I was thinking to myself, well, gosh, you

7    could have just gone down to the county and bought the voter

8    roll.  You didn't have to have the state send it to you, but

9    whatever, okay.

10          So he began to ask me questions about things like who

11   was in my household, and he didn't ask those directly, though.

12   He was asking things like are you the only registered voter in

13   your household, and I said yes.  And I said how many people

14   are in your household, and I kind of dodged that, because,

15   again, I'm a little old lady.  I don't want to tell any

16   strange man or woman on my doorstep that I live alone.  That's

17   not smart, okay?

18          So I kind of dodged questions where he was trying to

19   establish -- in my mind, I felt like he was establishing who I

20   lived with, whether they were voters, whether they were

21   citizens, that kind of thing.  And he went on, and I answered

22   things that I felt made me comfortable.  And then he finally

23   got around to asking me how I had submitted my ballot, and I

24   didn't think that was any of his business.  So I thought,

25   gosh, this has gone on long enough, and I asked them both to

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    469

1    leave.  And there was some discussion this way and that, and I

2    basically said I've had enough, please get off my property,

3    you're trespassing.

4           And then once I shut the door on those people, I made

5    sure they went all the way to the end of the drive and made a

6    turn to get completely out of sight almost.  You know, as long

7    as they were 20 feet past my mailbox, fine and dandy.  And I

8    shut the door, and I thought about that, and I went, oh, my

9    gosh.  Two things I thought.  One was I just told that guy a

10   whole lot of stuff I didn't want to.  I don't know exactly who

11   those people were.  He had told me in the beginning he was

12   somehow associated with the Republicans, and he sort of

13   flopped his fist off into the direction where I knew there was

14   a Republican campaign office at one time.  So I just sort of

15   assumed.

16          And then I thought about it, and I went I don't

17   actually know anything about those people, and I don't know

18   what kind of repercussions there would be for me just having

19   chased them off my property, and that was pretty scary.  And I

20   didn't want anybody else to go through that, so that's when I

21   went and filed the complaint.

22   Q.  Thank you.  I'm going to take you back a couple of steps,

23   and I would like to get to the complaint as well.  You

24   mentioned that the man I believe was standing on your front

25   step.  Where was the -- and there was a woman with him?

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    470

1    A.  Uh-huh.

2    Q.  Where was she standing during this?

3    A.  She was standing back and to the side, and she really

4    didn't have anything to say.  She didn't contribute in

5    anything.  She didn't make any noises.  She just was there,

6    and -- yeah.

7    Q.  And you mentioned that you were -- you were surprised that

8    they had -- and I hope I'm paraphrasing you right.  That you

9    were surprised that they hadn't just gotten the county

10   documents, that they had gone to the state.  How do you know

11   that he had documents from the state?

12   A.  I'm sorry?

13   Q.  How do you know that the documents that he had were from

14   the state?

15   A.  That's what he told me.

16   Q.  Do you remember what he said?

17   A.  The state sent this to us, and he said something else

18   about the state and the paperwork, the documents.  I'm -- so,

19   yeah, it was at least twice that he told me the state had sent

20   it.  And the way that that was phrased, it made it seem like,

21   And we are following up on it.

22   Q.  Understood.  Thank you.  And you mentioned they had --

23   they had badges?

24   A.  Uh-huh.  Yes.

25   Q.  Could you -- sorry.  I think you already told me.  Just

22-cv-00581-CNS-NRN  Bench Trial - Day 2    07/16/2024    471

1   for my sake, could you remind me what those badges looked like

2   to you?

3   A.  Something they got from an office supply store.  And there

4   were no emblems.  There was no identification.  There was

5   nothing on that that a regular kind of investigator I would

6   assume -- anybody who was trying to do something officially

7   would have normally had, in my mind.

8   Q.  And when they asked questions of you, or when the man

9   asked questions of you, did he have any information about you

10  already?

11  A.  Oh, yeah.

12  Q.  What information did he have?

13  A.  He knew my name.  He knew, of course, where I was living.

14  In my mind, I figured he was working off of a voter roll.  He

15  already had my phone number and my affiliation with political

16  parties, although he did not ask about that.

17  Q.  Did he ask about your citizenship or the citizenship of

18  anyone in your household?

19  A.  Yes.  And I told him that, well, everybody in my household

20  was a citizen, mainly because I have a dog that was born in

21  this country.  Again, you know, I did not want to tell him how

22  many people there were in my household, so I figured that was

23  a nice way to put it.

24  Q.  At some point during this encounter did you become

25  concerned?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    472

1   A.  Always when a little old lady meets a strange man at her

2   door, or strange people, there is an intimidation factor,

3   because one knows one is vulnerable, and so I had that

4   concern.  And then when he said he was investigating things,

5   then I had an additional concern, because I had read about

6   back East some groups that were doing something similar in an

7   effort apparently to intimidate people in the way they voted.

8   So I was on alert, yes.

9   Q.  And you mentioned that -- when you asked them to leave,

10  were they saying anything?  And I'm not asking you -- were

11  they talking as they left?

12  A.  They were.  I have no idea what they were saying, though,

13  because I wanted to emphasize I didn't want to have any more

14  interaction with them.  And I probably even told them that I

15  don't want to do this anymore.  I don't want to interact with

16  you.  I want you to leave now.

17  Q.  And sorry, to go back to the badges -- I know I'm popping

18  around.  I apologize.

19  A.  No.

20  Q.  In your affidavit in this case you mentioned that the

21  badges were official looking.  In your complaint to the

22  Secretary of State I believe you called them homemade, and I

23  think I'm getting these phrases right.

24  A.  Yes.

25  Q.  Could you explain those descriptions?  Do you see them as

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    473

1   being at odds with each other?

2   A.  Not really, because I was trying to be as succinct as I

3   could be in my letter to the Secretary of State.  So I thought

4   homemade would pretty much accurately describe what was

5   something that was kind of put together and not officially

6   issued.  Is that --

7   Q.  Yes.  Thank you.  And did they provide you with any

8   physical identification?  Did they give you a business card or

9   a pamphlet or anything like that?

10  A.  Not a bit.

11  Q.  Did you think -- sorry.

12  A.  And if I can add, that was part of why when I closed the

13  door I went, oh, this is not good, because I didn't actually

14  know where those people were from, and I didn't really realize

15  it until I had shut the door and thought to myself, I don't

16  have anything that they provided with me that gave me any clue

17  about who they were or who they were working with or anything.

18  Q.  Did they give you any way to verify who they were?

19  A.  No.  No.

20  Q.  Did they give you a way to contact their organization with

21  any concerns you might have?

22  A.  No.

23  Q.  So you had no way to contact them or follow up after they

24  left?

25  A.  Not a bit.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    474

1   Q.  And to the best of your knowledge, realizing you can't

2   speak for them, but to the best of your knowledge, they came

3   to your door because you voted in 2020?

4   A.  I believe so.

5           MR. REISCH:  Objection, speculation.

6           THE COURT:  The objection is sustained.  You may try

7   and reword it.

8   Q.  (By MS. HOSTETLER) Based on the questions that they asked

9   you, what was your understanding of how they came to your

10  door?

11  A.  It seemed that they had picked out my house, and I'm not

12  certain --

13          MR. REISCH:  Your Honor, I'm going to object,

14  speculation.

15          THE COURT:  Overruled.  I'll allow it.  You can keep

16  -- finish your answer.

17  A.  I was not certain whether they had just come down the road

18  -- when I first encountered them, they just came down the

19  road, and I happened to be the one that was home.  But then

20  later, as I said, they knew my name.  They had the roll and

21  were looking at this paper as to who I was.

22  Q.  (By MS. HOSTETLER) Did they ask you specific questions

23  about the 2020 elections?  Was that the election they were

24  asking about?

25  A.  Yes.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    475

1    Q.  And then did you make the complaint to the Secretary of

2    State on the same day?

3    A.  Yes.

4    Q.  And how -- how did you make that complaint?

5    A.  I e-mailed.

6    Q.  By e-mail, okay.  And why did you make that complaint?

7    A.  Because I didn't want anybody else to go through what I

8    had just gone through.  And I could -- they had the paperwork,

9    and they were headed down the street, so I assumed there may

10   be more people that they planned to do this to, and I didn't

11   think that was appropriate.

12   Q.  Did you make any other complaint that day?

13   A.  I actually filed a report with the sheriff's department.

14   I -- and it was a report, yeah.

15   Q.  Why did you file that report?

16   A.  Because that's what teachers do.  I'm sorry.  We are used

17   to documenting things, and I felt that I needed to let the

18   sheriff's department know that these were people who were

19   going around, strangers, asking people strange questions.  And

20   it was just a matter of getting information out, so if someone

21   else ran into this, then the sheriff's department would know

22   this was not just a one-off.

23   Q.  Do you recall if anyone from the Secretary of State's

24   Office followed up with you?

25   A.  Yes.  I heard from them, and they told me that they had

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    476

1    gotten my e-mail, but that was not something that was within

2    their jurisdiction, and that they would be passing it on to

3    the Attorney General's Office.

4    Q.  Do you recall if anyone from the Attorney General's Office

5    followed up with you?

6    A.  I believe what I was told is that they had received that

7    information and they would follow up on it.

8    Q.  Do you remember if they did?

9    A.  I never heard back from them, so I assume they were still

10   -- had the paperwork, and if something came up, they would let

11   me know.

12   Q.  What about the sheriff's office, did the sheriff's office

13   follow up with you?

14   A.  Well, no, not really, but I didn't expect them to.

15   Q.  Have you had visits from canvassers or solicitors before?

16   A.  Uh-huh, yes.

17   Q.  Have you ever felt intimidated by other canvassers?

18   A.  Not like that, no.

19   Q.  Ever made a report about any of the other canvassers or

20   solicitors?

21   A.  No.

22   Q.  What made this different?

23   A.  Because the solicitors usually have come to my door and

24   wanted to persuade me to buy new windows or doors or a roof.

25   They don't know my name.  They don't have my address.  They

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    477

1   are not asking me questions about my household.

2   Q.   When -- it sounded like they didn't -- you didn't get a

3   clear idea of who they were; is that correct?  In your

4   affidavit you wrote that you identified this group as USEIP.

5   Can you explain why you referred to them in that way?

6   A.   Kind of a process of elimination.  I had thought about it,

7   and there had been no talk, rumors, anything like that among

8   the local letters to the editor about this kind of thing.

9   There's an anonymous setup in the local paper that people can

10  comment, short comments about this, that, and the other, and

11  it's pretty free commentary, so lots of stuff comes up

12  politically in those things.  Nobody that I had any contact

13  with on Facebook, social media, any of that had said anything

14  at all about that.

15        So in my mind that meant this was not kind of a local

16  thing.  Yes, these were local people.  But it was from the way

17  they were asking questions and things, it seemed as though

18  they had had some kind of training, and they did have a list

19  that were asking the questions from, so that was organized.

20  So then after I had put together my letters and things like

21  that, I was contacted by...

22  Q.   And are you concerned that you'll get a visit from this

23  group if you vote in 2024?

24        MR. REISCH:  Objection, speculation.

25        MS. HOSTETLER:  Your Honor, this goes to her -- she

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    478

1    received this visit.  This goes to her concerns about the risk

2    that she now faces having experienced it once before.

3              THE COURT:  Well, I'm going to sustain the objection

4    as to how it's worded.  I'm not sure we've established this is

5    a group.  Perhaps you can reword this.

6    Q.  (By MS. HOSTETLER) Are you concerned that you would get

7    another visit like this if you vote in 2024?

8              MR. REISCH:  Objection, speculation, foundation.

9              THE COURT:  Overruled.

10   A.  If they did it once, I'm sure they probably might want to

11   do it again.

12   Q.  (By MS. HOSTETLER) What would your reaction to that be or

13   how does that make you feel?

14   A.  I would be unhappy, but it's not going to keep me from

15   voting, and it -- I would be much more cautious in dealing

16   with them.  It has been very difficult to not know who these

17   people were, what they had in mind, how they might retaliate.

18   Q.  Would you say that you were intimidated during this

19   encounter?

20             MR. REISCH:  Objection, leading.

21             THE COURT:  Overruled.  I'll allow it.

22   A.  I'm sorry.  Could you repeat?

23   Q.  (By MS. HOSTETLER) Did you feel intimidated during this

24   encounter?

25   A.  Yes.  And when I sent my letter off to the Secretary of

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    479

 1  State's Office, I titled it Grand Junction voter intimidation

 2  effort, because I felt like that's what I had gone through.

 3  Q.  You said you're going to vote in 2024 anyway?

 4  A.  Yeah.

 5  Q.  Why?

 6  A.  Because I used to be an American history teacher, and I

 7  told my students it matters what you vote, that you do vote

 8  every time.  And so for the entirety of my school teaching

 9  career, I voted every election, and I intend to do that.

10        MS. HOSTETLER:  Thank you, Ms. Roberts.  I don't have

11  anymore questions for you.

12        THE COURT:  All right.  Let me warn members of the

13  gallery, the laughing, the head nodding, the repeating

14  answers, if I see it again, you will be asked to leave, so

15  know that I am watching.  My clerks are watching.  This is

16  your last warning.

17        All right.  Who's proceeding next?

18        MR. POWELL:  Just one moment, Your Honor.

19        THE COURT:  You won.  I didn't see rock, paper,

20  scissors.  You won by default.

21        MR. POWELL:  Mine was implied, Your Honor.

22                        CROSS-EXAMINATION

23  BY MR. POWELL:

24  Q.  Good afternoon, Ms. Roberts.  I hope you're enjoying the

25  Western Slope and your last six years there.  I'm actually

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2     07/16/2024     480

1   from Rangely, Colorado.

2   A.  Okay.

3   Q.  So you said the canvassers visited on the same day that

4   you wrote your e-mail to the Secretary of State's public

5   e-mail address?

6   A.  Yes.

7   Q.  Okay.  And you said the name that you got from them was --

8   involved the word investigations or inquiries?

9   A.  That is actually what they told me they were doing.  I

10  don't know if that was -- they didn't say they were

11  representing that.

12  Q.  Okay.

13  A.  They just told me what they were doing.

14  Q.  Okay.  And following that, though, you said I didn't need

15  to remember it.  Were you referring to the name of whoever

16  they said they were with?

17  A.  They didn't say they were with anybody.

18  Q.  Okay.  What was it you said you didn't need to remember?

19  A.  I didn't feel I needed to remember their names or what was

20  a big part of that.  I had no idea that I would end up doing

21  this.

22  Q.  Some of the details didn't seem so important at the time?

23  A.  No.

24  Q.  So in your e-mail that you sent to the state, you said --

25  do you have Exhibit 88 in front of you?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    481

1   A.  If I do, I don't --

2           THE COURT:  Ms. Dynes will locate it for you.

3   Q.  (By MR. POWELL) So in the first paragraph, you said they

4   wore homemade badges reading Colorado election something or

5   other.  Is that your recollection now?

6   A.  Uh-huh.

7           THE COURT:  And, ma'am, if you can say yes or no.

8           THE WITNESS:  Yes.  I'm sorry.

9   Q.  (By MR. POWELL) Do you have any recollection of what the

10  something or other may have indicated or that's just lost to

11  memory?

12  A.  No.  It's not lost in memory.  It is the election

13  investigation.  That's -- those are the words that I

14  distinctly remember.  Colorado, election, 2020, something

15  equating, something equating, investigation, inquiry, they

16  were looking into it.

17  Q.  Uh-huh.

18  A.  Okay.

19  Q.  Did you run across any groups called Voter Integrity

20  Project?

21  A.  I'm not familiar with.

22  Q.  Okay.  What about a group called Stand for the

23  Constitution?

24  A.  I have heard of the organization.  I -- beyond that...

25  Q.  Were you aware that those two groups were doing

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    482

1    canvassing?

2    A.   I didn't --

3         MS. HOSTETLER:  Your Honor, objection, foundation.

4         THE COURT:  Overruled.  He's asked if she was aware.

5    A.   I -- no.

6    Q.   (By MR. POWELL) Thank you.  So you said that you didn't

7    know anything about them.  Did you ask them who they were with

8    before they left?

9    A.   At that point I just wanted to conclude the interview.

10   Q.   Okay.  So you didn't ask them any further questions about

11   who they were?  You didn't ask for a business card or a

12   pamphlet?

13   A.   They didn't have anything on them to provide me something.

14   Q.   You didn't -- how would you know if they had business

15   cards on them?

16   A.   He wasn't wearing that much.  But that's not the important

17   part.  I had had it.  I just simply wanted to conclude what

18   had happened, and in the heat of the moment --

19   Q.   You didn't get around to asking for ID?

20   A.   Nope.  I was not interviewing them.

21   Q.   Okay.  Were any of the people at your door in this room

22   today, for example, at these two tables?

23   A.   Not that I'm aware of.

24   Q.   I'll just mention this is Ms. Ashe Epp, a defendant.  This

25   is Ms. Holly Kasun.  This is Mr. Shawn Smith on the edge.  You

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    483

1    didn't see any of them at your door?

2    A.  No.  Not that I have -- recall.

3    Q.  So you wrote this down as soon as it happened in the

4    e-mail.  Did you write a draft before that somewhere where you

5    were sort of just trying to get the details down, or did you

6    go straight to your e-mail and open that up?

7    A.  I pretty much don't remember.

8    Q.  Okay.  And then was it the same day that you wrote a

9    police report?

10   A.  It was a follow up, and I don't recall.

11   Q.  In your experience with your memory, do you find that

12   details get more clear over time or less clear?

13   A.  Like anybody else, memories fade a bit, yes.

14   Q.  Would you say that your memory tends to get more

15   comprehensive in what you remember over time or that you lose

16   information over time?

17   A.  It can be both.

18   Q.  Okay.  In your e-mail here you mention that they were

19   holding a copy of the Mesa County registered voter roll.  Do

20   you mean that --

21          MS. HOSTETLER:  Your Honor, that misstates the

22   testimony.

23          THE COURT:  Sustained.

24   Q.  (By MR. POWELL) I'm sorry.  What was the objection?

25          MS. HOSTETLER:  Misstates testimony.

                          Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    484

1           MR. POWELL:  I'm reading from the e-mail.  Let me

2    just rephrase that.

3    Q.  (By MR. POWELL) In the e-mail of Exhibit 88 it says, I

4    just had two people at my door holding a copy of the Mesa

5    County registered voter roll.

6           MS. HOSTETLER:  Your Honor, objection, again.  88 is

7    actually not in evidence.  50 is, and I believe that this

8    e-mail is in 50, which has been entered into evidence.

9           MR. POWELL:  Well, I'm happy to refer to 50, if that

10   would be easier.  It's the same content.

11          THE COURT:  Well, let's refer to the admitted

12   exhibits.  So let's look at Exhibit 50.

13          MR. POWELL:  Exhibit 50, it is towards the end.

14          THE COURT:  I think it's page 6, Julie.

15   Q.  (By MR. POWELL) Do you see the first paragraph there?  So

16   when you say they had a copy of the Mesa County registered

17   voter roll, do you mean that it said it was from Mesa County

18   or had some insignia, or did you recognize that all the voters

19   on it were from Mesa County?  Or do you recall?

20   A.  I, because of the information that he was bringing forth

21   to me, felt that he was using a voter registration and --

22   roll.

23   Q.  And what?  I'm sorry.

24   A.  A voter registration roll.

25   Q.  Got you.  Thank you.  You said that I believe that the

                      Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    485

1    conversation with the tall man was somewhat stressful?

2    A.  Uh-huh, yes.

3    Q.  Because he was physically large?

4    A.  Any old lady who meets a strange man is gauging what that

5    person might be capable of.

6    Q.  Okay.  And at the time that they -- that you sent the

7    e-mail to the Secretary of State that you're looking at, did

8    you mention in that e-mail that they had asked if you were a

9    resident of Colorado?

10   A.  Would you repeat the question?

11   Q.  Did you ask -- did you record in your e-mail whether you

12   had been asked by the canvassers if you were a resident of

13   Colorado?

14   A.  I may have.

15   Q.  Do you see it in there?

16   A.  I do not.

17   Q.  Okay.  Do you see in your e-mail whether you indicated to

18   the Secretary of State they asked if you were a registered

19   voter?

20   A.  I see that they asked me if I was registered to -- a

21   registered voter at that address.

22   Q.  Okay.  Did you answer that question?

23   A.  Yes.

24   Q.  Okay.  You also mentioned that they asked who else was in

25   the house.  Is that in your e-mail to the Secretary of State?

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    486

1    A.  It may not be.

2    Q.  Okay.

3    A.  Again, it's e-mail.  I wanted to be short and succinct.

4    Q.  When did you first learn the name United States Election

5    Integrity Plan?

6    A.  In my encounters with the organization that contacted me.

7    Q.  Who was that?

8    A.  My -- the plaintiffs' --

9    Q.  Okay.

10   A.  -- lead counsel.

11   Q.  Is that a counsel that's here today?

12   A.  Yes.

13   Q.  And they confirmed for you that it was USEIP canvassers

14   who had visited your home?

15   A.  It seemed logical given all this, the situation of how I

16   had interpreted the behavior.

17   Q.  Tell me more about that.

18   A.  Just as I mentioned before, they were locals, as far as I

19   knew.  That's how they had introduced themselves.  They had

20   been trained a little bit, I think maybe, or they had at least

21   prepared.

22   Q.  And that made them seem more likely to be USEIP than not?

23   A.  It seemed that they would belong to some kind of an

24   organization like that.  I didn't know which organization it

25   was.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    487

1    Q.  I see.

2    A.  Or any organization that --

3    Q.  Do you recall writing a declaration for this case?

4    A.  Yes.

5    Q.  Exhibit 89 --

6            MS. HOSTETLER:  Objection, Your Honor, hearsay.

7            THE COURT:  Well, I don't know what we're doing with

8    it yet, so overruled.

9            MR. REISCH:  I believe it's a stipulated exhibit.

10           THE COURT:  So it's already been admitted?

11           MR. REISCH:  Maybe I misspoke.  I'm sorry.

12           THE COURTROOM DEPUTY:  No, Your Honor.

13           MR. REISCH:  My apologies.  It's not stipulated.

14           THE COURT:  Well, let's see what your intention is.

15   Q.  (By MR. POWELL) You had just said you weren't sure who

16   they were with, but you earlier said through a process of

17   elimination or because of the local nature and their training,

18   it seemed to make sense that they were with USEIP; is that

19   right?

20   A.  A group.  I didn't know which group at that time.  It

21   seems a logical conclusion.

22   Q.  So can you look at paragraph 5 of Exhibit 89?

23   A.  I'm still trying to get there.

24   Q.  Okay.

25   A.  I'm there.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    488

1    Q.   Okay.  I'll read it, and you let me know if I misread it.

2    After the 2020 election, a man and a woman affiliated with the

3    group United States Election Integrity Plan came to my home.

4    How was it that you were certain when you wrote this sentence?

5    A.   Oh, I am not there.

6    Q.   Exhibit 89, paragraph 5.

7    A.   Sorry.

8         THE COURTROOM DEPUTY:  Still don't have this in

9    evidence, right?

10        MR. POWELL:  Can I move it in evidence, Your Honor?

11        MS. HOSTETLER:  Your Honor, I object as hearsay.

12   She's here testifying.  He can ask her the questions that he

13   has.

14        THE COURT:  It's true.  You're just using it to

15   impeach her, I think.  So just have her -- you may read that

16   section to impeach her.  It's just as if it was a deposition

17   in my mind.

18   Q.   (By MR. POWELL) So do you see paragraph 5?

19   A.   Still working on it.

20   Q.   It's the very first page of Trial Exhibit 89.

21   A.   Okay.  Thank you.

22   Q.   So in this paragraph, it seems you confidently state they

23   were affiliated with the group United States Election

24   Integrity Plan; is that right?

25   A.   Again, I'm -- that was my conclusion based on the stuff

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    489

1   that I had learned.

2   Q.  From whom?

3   A.  From the -- my own experience of how they did things and

4   from what I had learned from the plaintiffs.

5   Q.  Did you type this up yourself?

6   A.  No.

7   Q.  Who typed this up?

8   A.  I'm not entirely certain who the person was.

9   Q.  Do you know what organization they were with?

10  A.  Yes.  It was with the plaintiffs' --

11  Q.  I see.

12  A.  -- group.

13  Q.  And the third page is a bit blurry.  Is that because you

14  signed it and then just faxed back the third page?

15  A.  What?

16  Q.  Page 3.

17  A.  It's blurry?

18  Q.  Does it not appear a little blurrier to you than page 2?

19  A.  And your regard to that?

20  Q.  I'm asking if you only faxed back this third page and not

21  all three of them.

22  A.  No.  All three of them I did.

23  Q.  I see.  When you wrote the e-mail to the Secretary of

24  State, did it not seem important at that time to include the

25  fact that you are part Native American?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2     07/16/2024    490

1   A.  I'm also part European.  I -- no.

2   Q.  Did it become important by the time that you wrote your

3   declaration?

4        MS. HOSTETLER:  Your Honor, objection, relevance.

5        THE COURT:  Overruled.

6   Q.  (By MR. POWELL) Paragraph 4, can you read that paragraph,

7   please?

8   A.  I identify as mixed race.

9        MS. HOSTETLER:  Your Honor, objection, improper

10   impeachment.  I don't believe she --

11        THE COURT:  Well, I don't think he meant for her to

12   read it out loud, but why don't you re-ask her question now

13   that she's refreshed her --

14   Q.  (By MR. POWELL) Can you tell me why it's important to put

15   your race -- racial characterizations in your declaration and

16   not in your e-mail?

17   A.  It was asked of me in this.  I did not volunteer in

18   talking with the other gentleman.

19   Q.  The attorney?

20   A.  The attorney.

21   Q.  The attorney asked you about your -- if you had any other

22   racial identity; is that right?

23   A.  I may have volunteered it just because I'm not ashamed of

24   it.  I don't --

25   Q.  Do you have reason to believe that people who visited your

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    491

1    home knew of your racial information?

2    A.  Probably not.

3    Q.  Do you believe your home was targeted because of your

4    racial identification?

5    A.  I have no idea.

6    Q.  Did any of the people who helped you prepare your

7    declaration discuss the idea of volunteers engaging in racial

8    targeting?

9    A.  No.

10   Q.  Now, you said the badges that they wore looked like they

11   came from an office supply store; is that right?

12   A.  Yes.

13   Q.  What did you mean by an office supply store badge?

14   A.  I'm sorry?

15   Q.  Tell me what that looks like.  Does it mean it's made of

16   plastic, or it has a frame for a name that you write in the

17   middle?

18   A.  Yes.

19   Q.  In handwriting?

20   A.  Not necessarily in handwriting, but --

21   Q.  Okay.

22   A.  -- a frame.

23   Q.  And so in your mind, that -- does that look homemade, or

24   does that look official?

25   A.   I think it was an attempt perhaps to look official.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    492

1   Q.  Do you think, if you could get inside their heads, they

2   were trying to look official?

3   A.  Perhaps.

4   Q.  But it didn't -- you said it didn't have any emblems on it

5   or insignia?

6   A.  No.  So it wasn't high quality.

7   Q.  In your e-mail of Exhibit 50, if you could just look at

8   the second page -- well, I'm sorry.  Yours is all on one page.

9   You have a sentence, the penultimate paragraph, the

10  second-to-last paragraph --

11          THE COURTROOM DEPUTY:  I'm sorry, what page?

12          MR. POWELL:  It's Exhibit 50.  It's just the same

13  page.  No, I think it's page 6 of Exhibit 50.  It is the

14  second page of that e-mail.

15          THE COURTROOM DEPUTY:  I'm sorry.  Which page?

16          MR. POWELL:  Well, if they were numbered.  One is the

17  press release.

18          THE COURT:  I think it's page 6 again.

19          THE COURTROOM DEPUTY:  Still page 6.  Okay.

20  Q.  (By MR. POWELL) So you see toward the end of your e-mail

21  --

22  A.  Uh-huh.

23  Q.  -- there's a paragraph that begins This is a right wing

24  community.  If these people or their group don't like slash

25  approve voters' responses, I think the chances are high they

                Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    493

1    will harass those voters in the traditional ways used here in

2    the past.  I have read that accurately?

3    A.  I believe so.

4    Q.  Anonymous vandalism, for example.  After these canvassers

5    left your home, did your home suffer any anonymous vandalism?

6    A.  I'm sorry?

7    Q.  Did you suffer any anonymous vandalism after these

8    canvassers left your home?

9    A.  No.

10   Q.  What about threats of violence?

11   A.  No.

12   Q.  And then the last thing you have here is threatening phone

13   calls.  Did you get any of those?

14   A.  No.

15        MR. POWELL:  That's all I have, Your Honor.

16        THE COURT:  All right.  Does either Mr. Reisch or

17   Ms. Epp want to go next?  All right.

18                    CROSS-EXAMINATION

19   BY MR. REISCH:

20   Q.  Good afternoon, ma'am.  How are you?

21   A.  I'm fine.  Thank you.

22   Q.  All right.  I'm going to try asking my questions slow for

23   the court reporter.

24   A.  Fine.

25   Q.  And I will not ask another one until you're done with your

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2     07/16/2024    494

1    answer, all right?

2    A.   Thank you.

3    Q.   All right.  So, ma'am, obviously you're here because of

4    the e-mail that you wrote on July -- I'm sorry, June -- let's

5    get to the exact date -- June 23rd, 2021.

6    A.   Yes.

7    Q.   We've talked about it.  I think you've looked at it as

8    well --

9    A.   Yes.

10   Q.   -- up there as well today.  All right.  Now, you state

11   that when these two people came to your door, correct?

12   A.   Uh-huh, yes.

13   Q.   It sounds like -- were you inside when they knocked on

14   your door, or were you already outside?  I wasn't clear.

15   A.   I was outside.  No, I'm sorry.  I was in my house.

16   Q.   So you were in the house.  And I think, as I understood

17   you, your house is there.  And then to go out on your front

18   porch, you go down a step so that therefore they were lower to

19   you, but you were more eye level with the gentleman there; is

20   that right?

21   A.   Yes.

22   Q.   Okay.  You described them obviously as one man and one

23   woman, correct?

24   A.   Yes.

25   Q.   Okay.  And you described them as a -- the man as a tall

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    495

1    older man?

2    A.  Yes.

3    Q.  I know it's all relative, but what did you consider to be

4    an older man?

5    A.  Younger than me.  I would say he was probably in his late

6    50s, early 60s.  Perhaps even mid-60s.

7    Q.  All right.  And the woman, what -- how would you describe

8    her as an estimation to age?

9    A.  Younger than he was.

10   Q.  All right.

11   A.  By probably five years or so.

12   Q.  All right.  So maybe someone in their mid-40s, 50s-ish?

13   A.  Mid-50s.

14   Q.  All right.  So mid-50s for the female.  All right.  And

15   did they have any particular -- I know you said that they both

16   had hats on, correct?

17   A.  Yes.

18   Q.  All right.  Could you tell if the man was balding or if he

19   had a full head of hair?

20   A.  He had a cap on, full coverage, so I have no idea.

21   Q.  Okay.  And the woman also had a hat on?

22   A.  Yes.

23   Q.  Did she have shoulder length, short length, long?

24   A.  She had short hair.

25   Q.  Short hair.  All right.  And do you remember what color

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2     07/16/2024    496

1   hair she had?

2   A.  Blond or gray.  I couldn't tell which.

3   Q.  Okay.  And as I understood it, the woman stood -- well,

4   let me back up.  You have your house, the front porch, and

5   then does your porch extend to the street?

6   A.  No.

7   Q.  Okay.  Please describe it for me, ma'am.

8   A.  It has a flower bed, brick, tall, mid thigh.  So they were

9   standing between that flower bed and my front step to go into

10  the front door.

11  Q.  So there's a flower bed before you get to the steps that

12  go up to your front door; is that right?  Am I describing that

13  correctly?

14  A.  More or less.

15  Q.  Okay.  And they were down by the flower bed, not actually

16  up on your porch; is that correct?

17  A.  They were not on my porch.

18  Q.  Okay.  And your porch has how many steps, ma'am?

19  A.  Two.

20  Q.  Okay.  And the porch is -- when you step out, it has a

21  landing, I guess, for a couple of feet, or is it just a step?

22  A.  It's just steps.

23  Q.  Okay.  So they're down on the steps.  They never came up

24  the steps towards you, correct?

25  A.  No.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2      07/16/2024    497

1   Q.  And did they ring the doorbell, knock on the door, or did

2   you just happen to see that they were walking up to your door?

3   A.  I have no idea.  I don't remember whether they knocked or

4   rang the doorbell.

5   Q.  Okay.  Kind of a silly question, but do you have a Ring

6   doorbell?

7   A.  I'm sorry?

8   Q.  Do you have a Ring doorbell?

9   A.  I do.  No, not that kind.  Like, it rings when you push

10  the bell.

11  Q.  Sorry.  I asked the question.  You gave me the direct

12  answer.  A ring doorbell.  Yes, it rings.  But not a Ring

13  doorbell that records videos of interactions, correct?

14  A.  No.

15  Q.  And you had no other security system at your house?

16  A.  None other than the dog.

17  Q.  Other than the dog.  All right.  So at some point they

18  either knock on your door, you notice them, you meet them at

19  the door.  You never opened your door; is that correct?

20  A.  I did open it.

21  Q.  Okay.  But you remained in your house the entire time?

22  A.  On the front portion of my door, yes, or on my front step,

23  one or the other.

24  Q.  So you kind of opened your screen door, can I help you?

25  A.  I was not peeking out like that.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    498

1    Q.  You were not?

2    A.  No.  I was not peeking out of my house.  I was standing

3    there.

4    Q.  In the door.  All right.  And there's a screen door on

5    your front door?

6    A.  There's a glass door, a storm door.

7    Q.  All right.  And then you have another door that you can

8    close?

9    A.  Uh-huh.  Yes.

10    Q.  All right.  And I understand, particularly as you get a

11    little older, you get a little more cautious in life.  Would

12    that be fair to say?

13    A.  I'm sorry.  Can you repeat that?

14    Q.  Yes, ma'am.  As we all get a little older, we get a little

15    more cautious in life, do we not?

16    A.  I have always been cautious.

17    Q.  Okay.  And that particular day, that's why you didn't

18    invite them in for a cup of coffee.  You didn't know who these

19    people were, correct?

20    A.  Correct.

21    Q.  You had this conversation with them.  They asked you a

22    couple of questions, correct?

23    A.  Yes.

24    Q.  All right.  And we don't need to go through them.  I think

25    we've been there.  But you answered many, if not all of the

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    499

1    questions they asked?

2    A.  Yes.

3    Q.  Okay.  They never asked you how you voted, just where you

4    dropped your ballot off, correct?

5    A.  Yes.

6    Q.  Okay.  Because -- at that point when they asked how you

7    dropped your ballot off, you said, Hey, been lovely meeting

8    you today, but I'm going to ask you to leave, correct?

9    A.  Yes.

10   Q.  And they did, correct?

11   A.  Yes.

12   Q.  Okay.  They didn't use any obscenities as they walked away

13   from the house towards you, correct, ma'am?

14         MS. HOSTETLER:  Your Honor, mischaracterization of

15   testimony.  She testified earlier she didn't hear what they

16   were saying as they walked away.

17         THE COURT:  Overruled.  You can continue.

18   Q.  (By MR. REISCH) When you politely asked them to leave,

19   they politely left, correct, ma'am?

20   A.  They left.  They said things.  I have no idea what they

21   said.

22   Q.  Okay.  They didn't turn around and, you know, didn't give

23   you the bird or anything like that?

24   A.  No.

25   Q.  Then they continued to walk down the street, and you lost

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    500

1   sight of them; is that right?

2   A.   They walked to the end of my drive and turned to go in a

3   different direction than my house.

4   Q.   Okay.  And you had no idea where they went from there,

5   correct?

6   A.   None.  No.

7   Q.   Okay.  Now, you said this was a little different

8   experience than home solicitors that you've received over the

9   years for somebody maybe selling a solar system or a new set

10  of windows or gutters, right?

11  A.   Right.

12  Q.   Okay.  Because sometimes those gutter guys, they don't

13  always go away the first time you ask them to leave.  They ask

14  what they can do to make this deal happen today, do they not?

15  A.   I've never asked one to leave.

16  Q.   Okay.  They just told their spiel, and you -- and you said

17  yes or no thank you?

18  A.   Yeah, I said no, and they left.

19  Q.   Okay.  And when you have solicitors, your recollection,

20  were they usually people in their 50s and 60s, or were they

21  usually younger people?

22  A.   A variety.

23  Q.   Okay.  You didn't see these two people that came to your

24  house, these two unidentified people that came to your house,

25  they didn't have any weapons on them, correct?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    501

1    A.  Not that I could see.

2    Q.  Okay.  And, in fact, I think you stated in one of your

3    statements that obviously in June -- June in the summertime in

4    Grand Junction, it can get a little warm over there, can it

5    not?

6    A.  Yes.

7    Q.  The man was wearing I believe you described it as a polo

8    shirt, correct?

9    A.  Yes.

10   Q.  The woman, what was her attire?

11   A.  Shorts and a top.

12   Q.  All right.  And the man, he was wearing shorts as well?

13   A.  Yes.

14   Q.  Okay.  Didn't have a jacket on, anything like that?

15   A.  No.

16   Q.  Okay.  And when you were saying this is a right wing

17   community, that's what you were referring to as Mesa County;

18   is that correct?

19   A.  Yes.

20   Q.  You didn't know anything about these people, unaffiliated

21   people that came to your door as to their political

22   affiliation?

23   A.  The man waved his hand and mentioned he was with the

24   Republicans.

25   Q.  Okay.  He said he was with the Republican Party or what

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    502

1    did he say -- which Republican organization was he with?

2    A.   He basically just sort of mumbled Republicans.

3    Q.   Okay.  Did he say the Mesa County Republicans?

4    A.   No.

5    Q.   Okay.  Obviously you didn't put in your June 23rd, 2021,

6    e-mail, you never mentioned anything about he was with -- they

7    were with the Republicans, correct?

8    A.   No.

9    Q.   Okay.  And I know you were asked some questions about your

10   declaration that you made in this particular case, and when

11   did somebody from the plaintiffs first reach out to you?

12   A.   I don't remember what date it was.

13   Q.   You signed your declaration on December 22nd, 2022, in

14   response to a motion for summary judgment.  Do you recall

15   that, ma'am?

16   A.   Yes.

17   Q.   From the date that you signed your declaration, how far --

18   when did you speak with the plaintiffs' counsel from that

19   date?

20   A.   I don't recall.

21   Q.   Was it a week before?

22   A.   Yes.

23   Q.   Okay.  So it was a week before, right?

24   A.   It was a week had -- would you repeat?  I want to --

25   Q.   Sure.  You're doing it perfect.  If you don't understand,

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    503

1    ask me to -- I'll rephrase it.  I've been known to ask

2    horrifically phrased questions, all right?  You signed your

3    declaration December 22nd, 2022?

4    A.  Yes.

5    Q.  You think that it was about a week before you signed your

6    declaration that was the first time you spoke with somebody

7    from plaintiffs' counsel?

8    A.  It was not.

9    Q.  Okay.  When was the first time you spoke with somebody

10   from plaintiffs' counsel?

11   A.  Some months.  I truly did not write down the date.

12   Q.  Okay.  And was it a phone call that you had with these

13   people, or was it via e-mail, the exchange with these people?

14   A.  I'm not sure what you're asking.

15   Q.  Well, obviously your e-mail address was on your e-mail?

16   A.  Yes.

17   Q.  Your phone number was on your e-mail.  Did you receive a

18   call from plaintiffs' counsel?  At some point you did, right?

19   You spoke with them.  Who did you speak with?

20   A.  It -- I got kind of shuffled around, so I'm -- and, again,

21   I didn't know that I was going to need to remember a person's

22   name.

23   Q.  Understood.  So like you said, you signed your declaration

24   in December.  Is the first time you spoke with plaintiffs'

25   counsel, was it in November, a month before?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    504

1   A.  I have no idea.

2         THE COURT:  Counsel, it's September.  You established

3   earlier September, I think you said.

4         MR. REISCH:  No, December 22nd.

5         THE COURT:  The first time I thought you said

6   September.

7         MR. REISCH:  If I did, I misspoke.

8         THE COURT:  All right.

9   Q.  (By MR. REISCH) And just so we're clear, it's

10  December 22nd.  Do you agree with that, ma'am?

11  A.  I just --

12  Q.  Well, at some point -- how many conversations did you have

13  with plaintiffs' counsel about coming to be a potential

14  witness in this case?

15  A.  I don't recall.

16  Q.  Well, was it more than one?

17  A.  Probably.  I'm sure it was.

18  Q.  And right before you signed your declaration, it was

19  necessary for a motion for summary judgment, you had always

20  stated that the people that came to your door was the -- as

21  you stated in your e-mail on June 23rd, 2021, the Colorado

22  election or something, right?

23  A.  Yes.

24  Q.  You also -- shortly thereafter you made a police report

25  with the Grand Junction Police Department, correct?  You

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    505

1    testified to that?

2    A.  Yes.

3    Q.  Okay.  And you called that one in, right?

4    A.  Yes.

5    Q.  Okay.  And you told your concerns similar to what you put

6    in your e-mail; is that right?

7    A.  Yes.

8    Q.  Okay.  And you learned that nobody -- nothing illegal or

9    improper had taken place.  That's what you were told by the

10   police, correct?

11   A.  No.

12   Q.  Do you recall the police explaining to you that at this

13   point nothing was illegal?

14          MS. HOSTETLER:  Your Honor, objection.  That

15   misstates evidence.

16          THE COURT:  Overruled.  He's asking her.

17          You may answer, if you can.

18   A.  I'm sorry.  Would you repeat the question?

19   Q.  (By MR. REISCH) Yeah.  You called the Grand Junction

20   Police Department on June 24th of 2021; is that right?

21   A.  Yes.

22   Q.  All right.  It was 5:53 when -- that call you placed with

23   the Grand Junction Police Department.  Does that sound about

24   right?

25   A.  Yes.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    506

1    Q.  All right.  And you explained to them you would like to

2    report what you believed to be suspicious activity?

3    A.  Yes.

4    Q.  Okay.

5    A.  I filed a report.

6    Q.  Yep.  With them over dispatch line --

7    A.  Uh-huh.

8    Q.  -- correct?  And that it was explained that nothing could

9    be done at this point because no illegal activity had taken

10   place.  Do you recall that?

11   A.  Yes.

12   Q.  Okay.  And you stated that if anything else occurred, you

13   would immediately call back and let the police know, correct?

14   Correct, ma'am?

15   A.  I probably did.

16   Q.  Okay.  And when you spoke with the individuals at the

17   Grand Junction Police Department, you never mentioned anything

18   there about them being associated with the Republican Party,

19   correct?

20   A.  That was -- no, I did not.

21   Q.  Okay.  And you were asked a couple of questions if you

22   were aware of other organizations doing canvassing in Mesa

23   County during June of 2021, correct?  Do you recall those

24   questions?

25   A.  Yes.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024   507

1  Q.  And you weren't aware of the names that other counsel had

2  asked you of, correct?

3  A.  No.

4  Q.  Okay.  Were you also aware that Colorado Concerned

5  Citizens was also canvassing in Mesa County in June of 2021?

6  A.  No one mentioned it to me, no.

7  Q.  Okay.  An organization Stand for the Constitution was also

8  canvassing during that same time period?

9  A.  I'm sorry?

10  Q.  And Stand for the Constitution was also an organization

11  conducting canvassing at that time in Mesa County?

12  A.  Was that a question?

13  Q.  Yeah.  Were you aware they were canvassing as well, ma'am?

14  A.  No.

15  Q.  All right.  So you stated that from the time of your

16  initial statement in June of 2021 until your declaration that

17  you dated December 22nd, 2022, you had come to the conclusion

18  that it was USEIP canvassers that came to your residence,

19  correct?

20  A.  Yes.

21  Q.  Okay.  And that conclusion, you said it just was -- I

22  think you said process of elimination?

23  A.  More or less.

24  Q.  Okay.  Well, when you were speaking with plaintiffs'

25  counsel and drafting up this affidavit, did they say any of

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    508

1   those other names we had mentioned of other organizations that

2   were canvassing in the area?

3   A.  I don't recall.

4   Q.  Okay.  So the process of elimination was that none of

5   those other organizations were being sued by the plaintiffs,

6   were they?

7   A.  Not that I'm aware of.

8   Q.  Okay.  And did they explain to you that the reason they

9   needed it to be certain to be USEIP is because all the

10  evidence they had said USEIP never conducted canvassing in

11  Mesa County?

12  A.  I'm sorry.  Would you resay that again?

13  Q.  Sure.  When you were being asked to fill out your

14  affidavit, did plaintiffs' counsel tell you it had to be USEIP

15  at your doorstep --

16  A.  No.

17  Q.  -- correct?

18  A.  No.

19  Q.  Did you come up with the name USEIP on your own?

20  A.  No.

21  Q.  Okay.  They introduced you to that name; is that right?

22  A.  Yes.

23  Q.  Okay.  And when I say they, I'm referring to plaintiffs'

24  counsel, correct?

25          MS. HOSTETLER:  Objection, hearsay.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    509

1           THE COURT:  Overruled.
2    Q.  (By MR. REISCH) Correct, ma'am?
3    A.  I'm sorry.  Would you repeat that?
4    Q.  When I say they, I'm referring to plaintiffs' counsel?
5    A.  Yes.
6    Q.  And you're not sure which one, but one of the seven
7    counsel told you it was USEIP?
8    A.  No one told me that it was.
9    Q.  Okay.  But you have no independent knowledge that the
10   people that came to your door on June 23rd, 2021, were a
11   member or associated with USEIP, do you, ma'am?  You have no
12   personal knowledge of that?
13   A.  No.
14   Q.  Okay.  But you signed your declaration, right, under the
15   pains and penalty of perjury, right?
16   A.  Yes.
17   Q.  Right above your signature, I declare under the pains and
18   penalty of perjury, that that was true, correct?
19   A.  I believed it to be.
20   Q.  Okay.  And as we've come to find out today through
21   cross-examination, that you have no personal knowledge that
22   the people that came to your door were a member of USEIP,
23   correct, ma'am?
24   A.  I'm sorry.  Would you repeat that?
25   Q.  Correct.  I will.  So as we sit here today, through

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2      07/16/2024    510

1    cross-examination, it's now come to be found out that you have

2    no personal knowledge that the people that came to your door,

3    that canvassed at your door June 23rd, 2021, were associated,

4    affiliated with in any way USEIP, correct, ma'am?

5    A.  Correct.

6    Q.  Okay.  So when you signed this under the pains and

7    penalties of perjury, it turns out not to be true, correct,

8    ma'am?

9    A.  As my understanding was at the time, I believed it to be

10   true.

11   Q.  Okay.  You believed it to be true because they told you it

12   needed to be true.  Otherwise their lawsuit fails, correct?

13          MS. HOSTETLER:  Objection, Your Honor, argumentative.

14   She's answered the question.

15          THE COURT:  Sustained.

16          MR. REISCH:  Just a moment, Your Honor.

17          THE COURT:  All right.

18          MR. REISCH:  Nothing further, Your Honor.  Thank you.

19          Thank you for your time, ma'am.  Have a safe trip

20   home.

21          THE COURT:  We're about due for a break.  Ms. Epp,

22   let me say two things.  I don't believe I need to hear one

23   word more from this witness.  That doesn't mean you're not

24   allowed to ask questions, but I'd like you to keep them brief.

25   I think we've gone over this ad nauseam.  Can you do that?

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    511

1           MS. EPP:  Five minutes or so.

2           THE COURT:  That doesn't mean you can talk faster.

3                          CROSS-EXAMINATION

4    BY MS. EPP:

5    Q.  Good afternoon, Ms. Roberts.  Since the visit you had at

6    your door on June 23rd, 2021, did you take any measures as a

7    result?  Did you put up a gate, fence, no soliciting signs, no

8    trespassing signs, anything like that?

9    A.  No.

10   Q.  The Secretary of State allows voters that don't want their

11   voter information to be public to become private voters.

12   After your encounter, did you become a private voter?

13   A.  I had not considered that.

14   Q.  So the answer is no?

15   A.  You're asking will I in the future?

16   Q.  I'm asking you if in response to all of this, your

17   experience, everything, have you taken the steps, it's

18   something you would proactively do with the Secretary of

19   State's Office, did you do that?

20   A.  I have not done that.

21   Q.  Okay.  And you mentioned a process of elimination based on

22   there wasn't anything about this canvassing effort in letters

23   to the editor, Facebook, social media.  You determined through

24   your own deduction it was not a local group; is that accurate?

25   A.  Yes.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024   512

1  Q.  Then I believe as part of that statement you said, Until I

2  was contacted by, and then you didn't finish that answer.  Can

3  you finish that answer now?  Who were you contacted by?

4  A.  Someone from the plaintiffs.

5  Q.  Okay.  And then just previously you stated that you

6  weren't sure when you were contacted by plaintiffs and that

7  you got shuffled around.  What did you mean by shuffled

8  around?

9  A.  I had been through the Secretary of State's Office, the

10 Attorney General's Office, the sheriff's office, and some

11 other contacts, and so I was just -- yeah, I kind of felt like

12 I was being shuffled around.

13 Q.  Fair.  That's a fair statement.  Thank you for that.  One

14 other question.  You said that when you filed your statement

15 with the Secretary of State's Office, you wanted to make sure

16 -- I'm summarizing, but let me know if I get it wrong -- that

17 you wanted to make sure that nobody else had to go through

18 what you went through.  And you said you had no idea you would

19 end up doing this?

20 A.  Yes.

21 Q.  Is that correct?

22 A.  Yes.

23 Q.  Okay.  Can we go quickly to your statement?  That would be

24 -- the original statement, 50, Exhibit 50.

25          THE COURT:  I think you're still on it, ma'am.  She's

22-cv-00581-CNS-NRN   Bench Trial - Day 2     07/16/2024    513

1    got it in front of her.

2            MS. EPP:  The problem, Your Honor, is I don't have it

3    in front of me.

4    Q.  (By MS. EPP) The very last line, so the second page of the

5    exhibit, or of this part of the exhibit, the last page of your

6    statement, can you read the last line?

7    A.  The very last line?

8    Q.  Just above your signature, or just above Yvette Roberts

9    and your phone number, that last sentence.

10   A.  I will press charges, et cetera.

11   Q.  Before that, the whole thing.  Apologies.

12   A.  Okay.  I'm interested in taking any legal action that can

13   prevent this behavior of knocking on voters' doors to check

14   the validity of their right to vote.  I will press charges,

15   et cetera.

16   Q.  And you testified you were shuffled around by the

17   investigative entities, not given the opportunity to press

18   charges, but it's not terribly surprising that you're here

19   today, is it, given your orientation on that day?

20   A.  Yes, it's not surprising.

21           MS. EPP:  Nothing further, Your Honor.

22           THE COURT:  All right.  Do you have redirect?

23           MS. HOSTETLER:  I have three questions.  Very short,

24   I promise.

25           THE COURT:  All right.  We'll do the three questions,

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    514

1    but you've now made a promise in front of all these witnesses.

2                      REDIRECT EXAMINATION

3    BY MS. HOSTETLER:

4    Q.  Is the declaration that you submitted accurate to the best

5    of your knowledge?

6    A.  Yes.

7    Q.  Did anyone from the plaintiff group tell you what to say

8    either in that declaration or today?

9    A.  No.

10   Q.  And where did the canvasser tell you that the voter rolls

11   came from?

12   A.  They didn't -- they said it was the state.  The state sent

13   it.

14          MS. HOSTETLER:  Thank you very much.  Three

15   questions.

16          THE COURT:  I just have one question for you.

17          THE WITNESS:  Yes.

18          THE COURT:  Do you recall what time of day the

19   canvassers came to your home?  Was it daylight or nighttime?

20          THE WITNESS:  It was during the day, and I would

21   guess that it was midday.

22          THE COURT:  All right.  Ms. Roberts, you are excused.

23   Thank you for coming down.  I know this was a big task.  It's

24   not easy for anybody to handle questions from one attorney,

25   much less a couple attorneys, so we appreciate your time.

                      Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    515

1           THE WITNESS:  Thank you.

2           THE COURT:  And you're excused.

3           With that, let's take a recess until a quarter till.

4    We'll do a 20-minute recess.

5           THE COURTROOM DEPUTY:  All rise.  Court is in recess.

6       (Break was taken from 3:24 p.m. to 3:46 p.m.)

7           THE COURT:  I'm now going to say something I haven't

8    had to say yet, but if you're in the gallery, please leave

9    your shoes on.  That's all I'll say about that.

10          Would plaintiffs call their next witness.

11          MS. STOCK:  Plaintiffs call Beth Hendrix.

12          THE COURT:  All right.  Can you -- would counsel

13   approach, maybe lead counsel, because I have a couple witness

14   questions.

15      (Bench conference held on the record:)

16          THE COURT:  Who do you have -- do you plan on calling

17   all the people on your list?

18          MS. ERICKSON:  We still have on our list to call a

19   representative each of plaintiffs' organizations, so Beth

20   Hendrix, Salvador Hernandez, and Portia Prescott.  And then

21   Jeff Young is still on our witness list, and our expert.

22          THE COURT:  And you're calling Mr. Young?

23          MS. ERICKSON:  I believe so, Your Honor, but that's

24   the plan as of right now.  We have not revisited that at this

25   point.  I'm sure we'll be discussing tonight like what the

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024   516

1   remaining strategy is for trial, but --

2        THE COURT:  Okay.  All right.  And the witness -- how

3   long do you anticipate Ms. Hendrix to be?

4        MS. ERICKSON:  I would say probably 45 minutes

5   maximum, and I think will likely be a little quicker than

6   that.

7        THE COURT:  Okay.  All right.  Thank you.

8      (The following proceedings were held in open

9      court:)

10        THE COURT:  All right.

11                    BETH HENDRIX NIELAND

12   was called as a witness and, having been duly sworn, was

13   examined and testified as follows:

14        THE COURTROOM DEPUTY:  Please have a seat.  State

15   your name and spell your last name once you're seated.

16        THE WITNESS:  My name is Beth Ann Hendrix Nieland,

17   N-i-e-l-a-n-d.  I do not use my married name for professional

18   purposes.

19                    DIRECT EXAMINATION

20   BY MS. STOCK:

21   Q.  Good afternoon, Ms. Hendrix.  Are you employed?

22   A.  I am.

23   Q.  Where?

24   A.  At the League of Women Voters of Colorado.

25   Q.  In what capacity are you employed there?

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    517

1   A.  I'm the executive director.

2   Q.  Can you briefly describe your educational background?

3   A.  I grew up in Southern California, went to college in

4   Northern California at Sonoma State University.  Moved out to

5   Colorado when I was 21.

6   Q.  Did you graduate with a degree from Sonoma State

7   University?

8   A.  Bachelor's.

9   Q.  Can you describe your work history?

10  A.  My degree is in arts management.  I'm supposed to be

11  running a museum.  I was working at the state historical

12  society from '90 to '96.  At that point I moved in to the

13  grant-making and foundation world where I worked from 1996

14  through 2014.  At that point I became the executive director

15  of Denver Sister Cities International.  I was there for five

16  years.  Now I've been at the League of Women Voters of

17  Colorado for about five and a half years.

18  Q.  And you testified that you are the executive director at

19  the League of Women Voters' Colorado chapter.  Can you discuss

20  the structure of the League of Women Voters?

21  A.  The League of Women Voters nationally is a trilevel

22  organization.  There's the national league, League of Women

23  Voters of the United States.  There are 50 state leagues, and

24  then each league has a varying number of local leagues at the

25  municipal, county, or regional level.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    518

1    Q.  For ease this afternoon I'm going to refer to the League

2    of Women Voters Colorado as the League, but that term is not

3    encompassing the national organization or individual chapters

4    at the local level.  Does that make sense to you?

5    A.  Yes.

6    Q.  When was the League founded?

7    A.  Nationally in 1920.  In the state in 1928.

8    Q.  Can you explain the mission of the League?

9    A.  The mission of the League of Women Voters is empowering

10   voters, defending democracy.

11   Q.  And where is the League located?

12   A.  We're at 14th and Grant, directly across the street from

13   the Colorado Capitol in Denver.

14   Q.  Can you describe the work performed by the League?

15   A.  We do an awful lot of nonpartisan voter education and

16   issues advocacy.  We have a volunteer advocacy group at the

17   state capitol during the legislative session.  Our nonpartisan

18   voter education goes year round.  We also do a lot of support

19   for our 19 local chapters.

20   Q.  Can you describe some of the voter education programming

21   that the League conducts?

22   A.  Sure.  Since 1936 we've been putting out information

23   annually on the issues on the state ballot.  We also provide a

24   number of educational webinars, meetings.  We have nine task

25   forces that work in issue area groups.  Each of our local

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    519

1    groups as well does nonpartisan voter education.

2    Q.  Can you address some of the topics that the League

3    addresses in voter education programming?

4    A.  It depends what's on the ballot.  Overall we talk about

5    voter rights, how to get registered, what -- how to vote, the

6    importance of voting, how to recognize mis-, dis-, and

7    malinformation, how to get your questions answered.

8    Q.  Does the League endorse political candidates?

9    A.  Never.

10   Q.  Does the League endorse any political parties?

11   A.  Never.

12   Q.  Does the League have members?

13   A.  Yes.

14   Q.  How many individual members belong to the League?

15   A.  About 2,200.

16   Q.  What are your duties and responsibilities as executive

17   director of the League?

18   A.  Overall administration and logistics, as well as

19   fundraising, communications.

20   Q.  Does the League have any employees?

21   A.  Yes.  We have a total of four employees, including myself.

22   Q.  Can you describe those employees' roles?

23   A.  Yes.  Again, I'm the executive director.  We have an

24   operations director, a communications and development

25   director, and a legislative liaison.

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    520

1   Q.  Can you describe what each of those roles, what sorts of

2   duties or responsibilities they are responsible for?

3   A.  The operations director does all of our bookkeeping, all

4   of our database management, general office logistics, as well

5   as some program support, communications and development,

6   weekly newsletters, as well as member and voting public

7   communications, as well as fundraising, grant writing,

8   fundraising requests from our membership and the general

9   public.  And the legislative liaison is responsible for

10  keeping our volunteer advocates together and in force and

11  trained and moving forward in the manner of the League.

12  Q.  And are each of these individuals paid employees of the

13  League?

14  A.  Yes.  Each of the four, yes.

15  Q.  Are you familiar with the organization named United States

16  Election Integrity Plan?

17  A.  Yes.

18  Q.  How did you become familiar with this organization?

19  A.  I believe that I first became aware of them through a call

20  from our lead counsel at our national office.

21  Q.  Do you know what involvement, if any, Ms. Kasun, Ms. Epp,

22  and Mr. Smith have with USEIP?

23  A.  It's my understanding they're the cofounders.

24  Q.  And how did you come to learn that information?

25  A.  I suppose through media reports.  There have been pretty

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    521

1   extensive media reports about this group's activities.

2   Q.  Are you familiar with the USEIP's voter verification

3   canvassing project?

4   A.  Yes.

5   Q.  And how did you learn about that?

6   A.  Through the phone call from our lead counsel, as well as

7   media reports.

8   Q.  What did you learn about how the canvassing was carried

9   out?

10  A.  I learned that --

11        MR. POWELL:  Your Honor, I'm going to object to

12  hearsay.

13        THE COURT:  Sustained.

14  Q.  (By MS. STOCK) You mentioned that you became familiar with

15  USEIP's voter verification canvassing project, correct?

16  A.  Yes.

17  Q.  And you mentioned that you learned about that from media

18  reports?

19  A.  Yes.

20  Q.  Can you describe what you mean by media reports?

21  A.  A number of articles in various local and some national

22  newspapers and media outlets.

23  Q.  Did you take any steps to learn more about USEIP after it

24  was initially brought to your attention?

25  A.  Yes.  Google searches.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    522

1   Q.  And did those Google searches yield any additional

2   information?

3   A.  Lots of -- lots of media reports.

4   Q.  During your research about USEIP, did you become familiar

5   with Ms. Epp?

6   A.  Yes.  I heard that name as a cofounder of the

7   organization.

8   Q.  And what did you learn about Ms. Epp?

9           MR. POWELL:  Your Honor, same objection for all of

10  this.  We're talking about media reports as the source of how

11  she's learned about the defendants.

12          THE COURT:  Sustained, unless you can establish some

13  other knowledge.

14  Q.  (By MS. STOCK) Have you reviewed USEIP's website?

15  A.  Yes.

16  Q.  Have you reviewed any materials put out by USEIP?

17  A.  Yes.  Their playbook and their canvassing report.

18  Q.  Have you read both of those materials?

19  A.  Yes.

20  Q.  Did you learn about USEIP's canvassing activities from

21  either of those documents?

22  A.  No.  I believe I knew about them, and during my quest to

23  find more I found those two documents.

24  Q.  During your research of USEIP, did you become familiar

25  with Mr. Smith?

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    523

1   A.  Yes.

2   Q.  Were you aware of any public statements that Mr. Smith has

3   made?

4   A.  Yes.

5           MR. POWELL:  Objection, Your Honor.  This is all

6   looking like a hearsay line of questioning.

7           THE COURT:  Overruled.

8   Q.  (By MS. STOCK) I believe you just testified, Ms. Hendrix,

9   that you became aware of public statements made by Mr. Smith.

10  Can you be more specific about what public statements come to

11  mind?

12  A.  Yes.  I saw a clip of the video taken at the Rock Church

13  in which Mr. Smith said that he believed that --

14          MR. REISCH:  Objection, hearsay.

15          THE COURT:  Overruled.  You may continue.

16  A.  -- that people convicted of treason deserve to hang.

17  Q.  (By MS. STOCK) And how did you come across that video?

18  A.  In a media report.

19  Q.  Considering the -- you've discussed the playbook and the

20  canvassing report that you reviewed.  Do you recall any

21  additional information you reviewed on USEIP's website?

22  A.  No, not specifically.  General loose information about how

23  the 2020 election was stolen.

24  Q.  Given your review of the playbook and the canvassing

25  report, what was your impression of those materials?

                          Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2      07/16/2024    524

1    A.  That they were created by people who do not believe in the

2    validity of our elections, and who were -- who are not

3    believing the evidence that has been put to disprove their

4    claims.

5    Q.  Do you have any concerns about the materials that you've

6    reviewed related to USEIP?

7    A.  Yes.  I believe that they are spreading misinformation.

8          MR. REISCH:  Objection, relevance, Your Honor.  Lack

9    of foundation and improper opinion.

10         THE COURT:  Overruled.  You can answer.

11   A.  I believe that they and their canvassers were and are

12   continuing to spread information that the 2020 election was

13   fraudulent when there has been no court-approved evidence of

14   that.

15   Q.  (By MS. STOCK) Why is that concerning to you?

16   A.  I believe that people baselessly claiming that the

17   election was stolen will cause people to doubt the validity of

18   our elections, will suppress the vote, and will keep people

19   from voting.

20   Q.  And what makes you concerned that those materials will

21   keep people from voting?

22   A.  I believe that some people, if they are -- read materials

23   that tell them that the 2020 election was fraudulent and that

24   fraudulent activities continue, that it will cause them to

25   lose faith in our elections and therefore not vote.

                      Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    525

1   Q.  Have the materials that you reviewed given you pause about

2   voting in upcoming election?

3   A.  No.

4   Q.  And why is that?

5   A.  I believe in the validity of our elections and the

6   accuracy of our elections.

7   Q.  Did your organization take any steps to notify the

8   League's members about USEIP's canvassing events?

9   A.  Yes.

10  Q.  And what did the League do?

11  A.  I sent an e-mail to our distro list asking people to

12  please contact me if they had received a visit by USEIP

13  canvassers.

14  Q.  Why did you send that e-mail?

15  A.  We wanted to see if people were feeling harassed and

16  intimidated.

17  Q.  I'd ask that you turn to a document that has been marked

18  as Exhibit 41 in the binder to your right.  Do you recognize

19  this document?

20  A.  I do.

21  Q.  What do you recognize this to be?

22  A.  The e-mail that I sent to our distro list.

23  Q.  What is the date of this e-mail?

24  A.  September 24th, 2021.

25          MS. STOCK:  Your Honor, I would offer to admit

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    526

1    Exhibit 41.

2        THE COURT:  Any objection?

3        MR. REISCH:  Objection, hearsay.

4        MR. POWELL:  Same, Your Honor.

5        THE COURT:  All right.

6        MS. STOCK:  May I be heard on the hearsay objection,

7    Your Honor?

8        THE COURT:  Yes.

9        MS. STOCK:  I don't seek to admit this for the truth

10   of the matter asserted.  I seek to admit the exhibit to

11   demonstrate that the League notified its members generally

12   about canvassing activities.

13       THE COURT:  All right.  With that limitation, I'll

14   accept Exhibit 41 into evidence.

15       (Exhibit 41 received.)

16   Q.  (By MS. STOCK) Ms. Hendrix, I believe you testified, but

17   can you clarify, you drafted this e-mail; is that correct?

18   A.  That's correct.

19   Q.  Did you receive any responses to this e-mail

20   communication?

21   A.  Yes, I did.

22   Q.  Generally, what was the nature of those responses?

23       MR. REISCH:  Objection, hearsay.

24       THE COURT:  I'm not sure.  Can you establish what

25   you're talking about?  Responses from whom?

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    527

1    Q.   (By MS. STOCK) Did you receive any responses from the

2    League membership as it relates to this e-mail communication?

3    A.   Yes.

4    Q.   Can you describe generally what the nature of that

5    correspondence was?

6    A.   There was one member who seems to have kind of chased off

7    the folks much as Ms. Roberts did, and there were several that

8    had received visits that they stated were very courteous and

9    nonintimidating.

10   Q.   Did your organization take any precautions as a result of

11   what you know about USEIP and the defendants?

12            MR. REISCH:   Objection, relevance.

13            THE COURT:   Overruled.

14   A.   Yes.   We -- ahead of putting out this e-mail and filing

15   suit we did draft a safety plan for staff, board, and

16   membership.

17   Q.   (By MS. STOCK) Why did you create a safety plan?

18   A.   Because of the violent rhetoric that has been used in

19   relation with USEIP.

20   Q.   And can you explain more about what you mean by violent

21   rhetoric?

22   A.   Calling for public hanging.

23   Q.   When you make that statement, are you referring to the

24   statements you previously discussed that were made public by

25   Shawn Smith?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN     Bench Trial - Day 2     07/16/2024     528

1   A.  Yes.

2   Q.  And who was the safety plan intended to be used by?

3   A.  Staff, board, and any member who felt intimidated.

4   Q.  I believe you testified to this already, but at some point

5   did you notify the League's membership about filing the

6   lawsuit?

7   A.  Yes.

8   Q.  After learning about USEIP's canvassing project, did the

9   League take any other steps in response?

10  A.  Yes.  We really upped our programming around recognition

11  of mis-, dis-, and malinformation.  We also began and

12  published a white paper on the safety and security of

13  Colorado's election system.

14  Q.  You mentioned publishing a white paper.  Can you describe

15  your involvement in that process?

16  A.  I began the process with a group of volunteers.  A few

17  months into the process as the paper was developing and I was

18  getting more and more busy, I handed that off to a board

19  member to take over leadership of that.  I continued to

20  provide some general oversight and advice.

21  Q.  Did other members of the League's staff contribute to that

22  white paper?

23  A.  Yes.  Both the communications and development director and

24  the operations director.

25  Q.  You also discussed creating some programming as a result

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    529

1    of your knowledge of USEIP's canvassing activities.  Can you

2    describe that programming?

3    A.  For a while -- I'm not sure exactly when -- when we began,

4    we really ramped up our education on mis-, dis-, and

5    malinformation available through the media and social media.

6    Q.  Can you describe some of the programming that you put out

7    over social media?

8    A.  General education, resources to recognize disinformation.

9    Q.  And were those materials put together by your staff?

10   A.  Sometimes, yes.  Not always.  Sometimes we passed on other

11   resources put together by experts in the field.

12   Q.  I believe you described programming related to

13   misinformation.  Is that typical programming for the League?

14   A.  Not -- I mean, more of late, especially since the 2020

15   election.

16   Q.  Prior to the 2020 election was that the type of

17   programming the League regularly spent time producing and

18   disseminating?

19   A.  I think there may have -- we may have touched on the work.

20   Following the 2016 election, I'm not sure.  I didn't start

21   with the League until December of 2018.  But I believe we

22   touched on it, but really, really ramped up the work.

23   Q.  Did the League expend any other resources in response to

24   the canvassing project conducted by USEIP?

25   A.  I'm sorry.  Would you repeat that?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    530

1   Q.  Did the League expend any other resources in response to

2   the canvassing project conducted by USEIP?

3   A.  Well, this lawsuit, and it's certainly taken up quite a

4   bit of my time.

5   Q.  Can you describe how your employers have had to divert

6   their time?

7        MR. REISCH:  Objection, lack of foundation,

8   relevance.

9        THE COURT:  Overruled.  You can answer.

10  A.  We get regular questions about this from our membership

11  and the general public.  I would say that's the majority.

12  Q.  (By MS. STOCK) Can you describe -- when you say questions

13  from the general public, how do those typically come in to

14  your office?

15  A.  Phone calls or e-mails.  People concerned, hearing about

16  these activities through media reports.

17  Q.  Did you address any of those concerns that you received

18  from members of the public?

19  A.  What do you mean by address?

20  Q.  Did you take time to respond or reach out or contact any

21  of those individuals?

22  A.  If folks e-mailed me directly, yes, and I would respond

23  that if they felt their concern needed it, they should report

24  it to the Secretary of State or the Department of Justice or

25  the police.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    531

1    Q.  Were there other members of your staff that were

2    responsible for addressing or responding to comments from the

3    public?

4    A.  No.  I would say that more fell to me.  They would receive

5    the calls, but forward them to me.

6    Q.  Let's talk a bit more about the white paper that the

7    League produced.  Can you approximate how many hours you spent

8    contributing to that project?

9    A.  I would say 40 to 60.

10   Q.  And do you have an idea of the amount of time other staff

11   members at the League would have contributed to that project?

12   A.  Less than that.  Probably around ten hours for our

13   communications and development director.  Probably about the

14   same for operations.

15   Q.  You've discussed numerous programming or projects that the

16   League has conducted in response to USEIP's canvassing

17   projects.  Does the time that your employees spend on those

18   projects take away from time they would spend on other league

19   work?

20   A.  Yes.

21           MS. STOCK:  I have no further questions.

22           THE COURT:  All right.  Thank you.

23           Mr. Reisch.

24           MR. REISCH:  Thank you, Your Honor.

25

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    532

1                            CROSS-EXAMINATION

2    BY MR. REISCH:

3    Q.  Ma'am, in 2016 the League of Women Voters put out a

4    statement saying that the 2016 presidential election was

5    illegitimate, correct?

6    A.  I believe they said it was rigged.  I was not with the

7    League at that time, so I can't speak to that.

8    Q.  Okay.  So the 2016 presidential election, the organization

9    that you belong to, right, says that the 2016 election was

10   rigged, right?

11          MS. STOCK:  Objection, lacks foundation.  She just

12   testified she didn't work there at that time.

13          MR. REISCH:  She's aware of the statement, Your

14   Honor.

15          THE COURT:  I get the issue.  The objection is

16   overruled, but I want it kept to her knowledge.

17   Q.  (By MR. REISCH) Yes.  You're aware of that statement,

18   correct, ma'am?

19   A.  Yes.

20   Q.  And rigged means that there was some sort of voter fraud

21   or something took place that the votes weren't counted

22   correctly, correct?

23   A.  I believe the statement was more around voter suppression

24   actions at the governmental level, at the state level, various

25   states across the country tightening voter restriction.

                          Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024   533

1    Q.  Okay.  Your position was that it was rigged?

2    A.  It wasn't my position, sir.  I did not work there then.

3    Q.  Right.  The national organization in 2016 put out that

4    statement that it was rigged, right?

5    A.  That's correct.

6    Q.  Okay.  Do you consider that misinformation?

7    A.  No.

8    Q.  Okay.  Because the person that you wanted to vote -- or

9    your organization wanted to win didn't win, so rigged is okay

10   to use?

11   A.  That's not true, sir.

12         MS. STOCK:  Objection.

13         THE COURT:  Hold on.  When you see counsel stand,

14   that means she has an objection, so please let her make it.

15         Go ahead.

16         MS. STOCK:  Objection, lack of foundation.

17         THE COURT:  Well, sustained.  She wasn't at this

18   organization, so she doesn't know what the organization

19   thought or why they thought that.

20         MR. REISCH:  I understand, Your Honor.

21   Q.  (By MR. REISCH) All right.  The language that your

22   organization -- understanding you weren't there -- but the

23   language they used was that the vote in 2016 was rigged,

24   correct?

25   A.  Yes.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2     07/16/2024    534

1   Q.  Now, you're claiming that some of the language used by

2   people that don't believe the validity of the 2020 election,

3   they too believe that it is rigged, correct?

4   A.  Yes.

5   Q.  Do you not believe that people can disagree, sometimes

6   they have to disagree to disagree?

7   A.  Of course.  That's part of our democracy.

8   Q.  Correct.  And part of that democracy is also a fundamental

9   right under the Bill of Rights of freedom of speech, correct?

10  A.  To a certain extent, yes.

11  Q.  Yeah.  And you can say almost anything you want as long as

12  it's not a true threat, correct?

13          MS. STOCK:  Objection, calls for a legal conclusion.

14          THE COURT:  Sustained.

15          MR. REISCH:  I'm sorry?

16          THE COURT:  Sustained.

17          MR. REISCH:  All right.

18  Q.  (By MR. REISCH) You're familiar under the First Amendment

19  that political hyperbole has greater protection than just

20  general speech, correct?

21          MS. STOCK:  Objection, lacks -- or calls for a legal

22  conclusion.

23          THE COURT:  Overruled.  I'll allow her to answer, if

24  she knows anything about the First Amendment.

25  A.  I know a bit about the First Amendment.  I don't claim to

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    535

1    be a constitutional scholar.

2    Q.    (By MR. REISCH) Would you agree that political speech has

3    greater protection than just regular everyday speech?

4    A.    I don't know that to be true.

5    Q.    Okay.  Would you agree with me that people can believe,

6    say, the 2016 election was rigged or 2020 election was rigged

7    or maybe the next one will be rigged, but they can hold that

8    belief, correct?

9    A.    Yes.

10    Q.    And people should be allowed to have beliefs, even if you

11    or your organization doesn't believe in that belief that the

12    other people hold, correct?

13    A.    Yes.

14    Q.    That's called freedom?

15    A.    Yes.

16    Q.    Okay.  And in this particular case, you all said we don't

17    like what USEIP is doing and saying, and therefore you filed a

18    lawsuit, correct?

19    A.    No.  We didn't like the media reports coming out saying

20    that voters were intimidated.

21    Q.    Okay.  And let's just be clear.  The media reports, which

22    media report did you rely upon?

23    A.    Quite a number of articles.

24    Q.    Well, give me an example of one.

25    A.    I believe the Colorado Times Recorder put out a number of

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    536

1    articles.

2    Q.   Okay.

3    A.   I believe the Colorado Sun did.

4    Q.   Okay.

5    A.   I believe there were articles at the national level.

6    Q.   Okay.  Referencing USEIP, is that your understanding?

7    A.   Yes.

8    Q.   Okay.  And, for example, like Mr. Maulbetsch, that was the

9    Colorado -- well, what organization was he with, do you

10   remember?

11   A.   I'm sorry.  Who?

12   Q.   Erik Maulbetsch?

13   A.   Oh, I believe he is with the Times Recorder.

14   Q.   Okay.  And you talked to him, right?

15   A.   Yes.

16   Q.   Okay.  And you didn't go say, wow, can I get your sources

17   and go see who these people are that were supposedly

18   intimidated, were you, right?

19   A.   No.

20   Q.   Even in the course of this investigation you didn't call

21   up Mr. Maulbetsch and say, Hey, I need to find some people

22   that were actually intimidated.  Could I have those people

23   that he spoke with?  You didn't do that, did you, ma'am?

24   A.   No.

25   Q.   Okay.  And Mr. Maulbetsch, they're opinion pieces

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    537

1    masquerading as opinion articles, aren't they, ma'am?

2    A.  No, they're not.

3    Q.  He's a highly reputable Oscar -- or Pulitzer-prize winning

4    journalist, right?

5            MS. STOCK:  Objection, argumentative.

6            THE COURT:  Sustained.  I don't know.  Let's --

7    Q.  (By MR. REISCH) He's a blogger, isn't he, ma'am?

8    A.  No.  I believe he's a columnist.

9    Q.  A columnist.  And columnists, they present opinions,

10   correct, from their perspective?

11   A.  Okay.  I believe he's an investigative journalist.

12   Q.  Okay.  And does he tell you his political persuasions when

13   he says he's investigating an investigative journalist?

14           MS. STOCK:  Objection, foundation.

15           THE COURT:  Overruled.  You can answer.

16   Q.  (By MR. REISCH) Does he tell you his biases?

17   A.  No.  I mean, he -- he made it clear that he feels USEIP is

18   intimidating.

19   Q.  Okay.  And so he wrote a story that USEIP was

20   intimidating, right?

21           MS. STOCK:  Objection, hearsay.

22           MR. REISCH:  I'm not asking what was said, just that

23   he wrote a story.

24           THE COURT:  Overruled.

25   Q.  (By MR. REISCH) He wrote a story forming the conclusion --

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2     07/16/2024     538

1   A.  From voters.

2   Q.  -- that USEIP was intimidated -- intimidating?

3   A.  Was intimidating voters, yes.

4   Q.  He didn't identify those voters, did he, ma'am?

5   A.  I don't recall.

6   Q.  He didn't turn over to you his sources of these alleged

7   intimidated voters, did he, ma'am?

8   A.  No.

9   Q.  Okay.  You would think if you have some credibility, that

10  you would have somebody come and say I was the person that was

11  intimidated, and therefore I would like my story told,

12  correct?

13          MS. STOCK:  Objection, argumentative.

14          THE COURT:  Overruled.

15  A.  Would you repeat the question, please?

16  Q.  (By MR. REISCH) Sure.  You never asked for his sources of

17  alleged intimidated voters, correct?

18  A.  Correct.

19  Q.  And he never provided those names, correct?

20  A.  Correct.

21  Q.  Okay.  And none of these people that were supposedly

22  intimidated, in his commentary, opinion slash investigative

23  reporting, never came forward and identified themselves

24  either, did they?

25  A.  People were identified in news articles.  I'm not sure

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    539

1   they were in Mr. Maulbetsch's articles, but in articles about

2   USEIP, names were -- names of victims were included.

3   Q.  All right.  And so I'm assuming that those people will be

4   here to testify at some point?

5   A.  I don't know.

6   Q.  As to that -- as to their experience with individuals they

7   were absolutely certain were member representative of USEIP,

8   correct?

9   A.  I don't know.

10  Q.  Okay.  Now, you said that voters were intimidated, right?

11  A.  Yes.

12  Q.  And you're protecting their rights as an organization,

13  right?

14  A.  Yes.

15  Q.  Now, do you remember when we had a deposition, you and I

16  together, our counterclaim still existed, correct?  Do you

17  remember that?  We sued you for various slanderous, defamatory

18  statements against the defendants.  Do you recall that?

19          MS. STOCK:  Objection, relevance.

20          THE COURT:  What is the relevance?

21          MR. REISCH:  We're getting to intimidation, Your

22  Honor.

23          THE COURT:  Which intimidation?

24          MR. REISCH:  Well, it goes to this lawsuit, Your

25  Honor.  I'm laying a foundation as to why they filed this

22-cv-00581-CNS-NRN   Bench Trial - Day 2     07/16/2024   540

1   lawsuit against the defendants.

2          THE COURT:  I'll allow a limited line of inquiry in

3   this regard.  You may proceed.

4   Q.  (By MR. REISCH) Okay.  Do you recall that deposition,

5   ma'am?

6   A.  I do.

7   Q.  Okay.  And we still had a counterclaim at that particular

8   point.  Do you recall that?

9   A.  I don't remember the exact timing of when those

10  countersuits were dismissed.

11  Q.  Okay.  But at that point they still existed, and you

12  stated that you thought being sued was intimidation, correct?

13  You thought that --

14  A.  I think being countersued for defamation is definitely

15  intimidation.

16  Q.  That's intimidation, right?

17  A.  Uh-huh.

18  Q.  And being sued under the KKK Act, that could be classified

19  as intimidation as well, can't it, ma'am?

20  A.  No.  I think that it was their actions that caused them to

21  be sued under the KKK Act, not --

22  Q.  And it can have a chilling effect on people, can't it,

23  ma'am?

24  A.  I would hope so.  That was the point of the lawsuit.

25  Q.  That was the point of the lawsuit?

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    541

1    A.  Was to stop the actions.

2    Q.  Chill their First Amendment rights --

3    A.  No.  Stop intimidation.

4              MS. STOCK:  Objection.

5              THE COURT:  Let her finish her answer, please.

6              What's the objection?

7              MS. STOCK:  Misstates her prior testimony.

8              THE COURT:  Overruled.  You may complete your answer.

9    Q.  (By MR. REISCH) Were you done, ma'am?

10   A.  Would you repeat the question?

11   Q.  The point was to chill the defendants' First Amendment

12   right to canvass and have free speech, correct, ma'am?

13             MS. ERICKSON:  Objection, calls for legal conclusion.

14             THE COURT:  Overruled.  You may answer.

15   A.  To prevent canvassers from intimidating voters.

16   Q.  (By MR. REISCH) Ma'am, and you have no personal knowledge

17   of a member of USEIP, specifically these defendants,

18   specifically Mr. Smith, of intimidating a voter, do you,

19   ma'am?

20   A.  I have been intimidated by Mr. Smith's statements.

21   Q.  You have no personal knowledge of a voter being

22   intimidated by Mr. Smith, do you, ma'am?

23   A.  I am a voter.  I have been intimidated by Mr. Smith's

24   statements.

25   Q.  Well, let's talk about Mr. Smith's statements, all right?

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2     07/16/2024    542

1   You put out your press release, Trial Exhibit 41 that's been

2   admitted.  Do you remember that exhibit, ma'am?  Do you have

3   it?

4   A.  Yes.

5   Q.  Or we can pull it up on the screen, whatever is easier.

6   A.  41 is my e-mail?

7   Q.  Yes.  That was your blast e-mail, correct?

8   A.  Yes.

9   Q.  Okay.  And that's what you sent out because you were being

10  intimidated, right?

11  A.  No.  Because we heard that voters were being intimidated

12  by USEIP canvassing actions.

13  Q.  All right.  And the vote -- that was September 4th, that

14  you did this, correct?

15  A.  That's correct.

16  Q.  And what other source of information other than these

17  newspaper articles did you find out that voters were allegedly

18  being intimidated?

19  A.  I spoke to our lead counsel.

20  Q.  And who is that?

21  A.  Celina Stewart.

22  Q.  She's not based in Colorado, correct?

23  A.  That's correct.

24  Q.  She's based in Washington?

25  A.  That's correct.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2     07/16/2024    543

1  Q.  Okay.  And she had been in contact with people from the

2  plaintiffs' counsel, Free People, right?

3          MS. STOCK:  Objection.

4          MR. REISCH:  Voice for Free People or whatever they

5  call themselves.

6          MS. STOCK:  Objection, foundation.

7          THE COURT:  Sustained.

8  Q.  (By MR. REISCH) Okay.  Your general counsel -- you have

9  knowledge that your general counsel had been in contact with

10  the plaintiffs' counsel in this particular case; is that

11  right?

12          MS. STOCK:  Objection, foundation.

13          THE COURT:  Sustained.  Let's ask her first instead

14  of assuming she has the foundation.

15  Q.  (By MR. REISCH) You had conversations with the general

16  counsel as it relates to the USEIP lawsuit, correct?

17  A.  Yes.

18  Q.  Okay.  And your lawsuit, other lead counsel was going to

19  take charge of the matter; is that right?

20  A.  No.

21  Q.  You were told someone was going to file a lawsuit; is that

22  right?

23  A.  No.

24          THE COURT:  Are you asking her what her attorney told

25  her?  Is that what you're --

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2     07/16/2024    544

1            MR. REISCH:  No.  Not that.  Just that there was a

2     lawsuit that was going to be filed, Your Honor.

3            THE COURT:  Let's be careful and tread lightly on the

4     attorney-client privilege, and you need to watch that.  You

5     may proceed.

6     Q.  (By MR. REISCH) When did you learn that the lawsuit was

7     going to be filed against the defendants in this particular

8     case?

9            MS. STOCK:  Objection to the extent that it's calling

10    for information that's protected by the attorney-client

11    privilege.

12            THE COURT:  Well, it's sustained.  If you can answer

13    without disclosing information from your attorney, you may

14    answer.

15    A.  I mean, we -- we were not told by the national office that

16    a lawsuit was being filed.

17    Q.  (By MR. REISCH) Okay.  So you then sought permission to

18    file a lawsuit; is that correct?

19            MS. STOCK:  Objection, to the extent that it's

20    calling for information protected by the attorney-client

21    privilege.

22            THE COURT:  Sustained.  You can answer if it does not

23    invade that.

24            THE WITNESS:  I think it does.

25            THE COURT:  All right.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    545

1   Q.  (By MR. REISCH) Okay.  But you looked then for local

2   counsel to handle this lawsuit?

3            MS. STOCK:  Objection, foundation, and, again, calls

4   for information likely protected by the attorney-client

5   privilege.

6            THE COURT:  I don't know if it does or not, so I'll

7   overrule it.  And I think you now get the point of what may be

8   protected.  So if you can answer the question without

9   divulging attorney-client information, you can answer.

10  A.  What was the question, please?

11  Q.  (By MR. REISCH) Did you seek local counsel to file suit

12  against the defendants in this particular case when you read

13  these articles and other information?  Did you personally say

14  I need to get an attorney for the League of Women Voters?

15  A.  It was a group discussion amongst myself and my board.

16  Q.  Okay.  And your board minutes, that's amongst the board,

17  right?

18  A.  Yes.

19  Q.  Okay.  But at some point you said your organization said

20  we're going to file suit, charge ahead, correct?

21  A.  In so many words.

22  Q.  Okay.  You weren't -- League of Women Voters was not

23  responsible for retaining counsel, correct?

24  A.  Yes, we were.

25  Q.  You are paying for legal services?

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    546

1           MS. STOCK:  Objection, relevance, and, again, seeking
2   to uncover information protected by the attorney-client
3   privilege.
4           MR. REISCH:  Your Honor, it is relevant.  They said
5   that they've had a diversion of resources.  Litigation is very
6   expensive, and my understanding is that they've not paid a
7   single penny in legal resources.
8           THE COURT:  Well, I don't -- I don't know if she can
9   -- if you can answer without divulging attorney-client
10  protected information, you may answer.  If you can't, you may
11  not.
12          THE WITNESS:  I am unclear as to what's covered under
13  attorney-client privilege, so I'm uncomfortable answering
14  that.
15  Q.  (By MR. REISCH) Does the local office of the League of
16  Women Voters write a check for monthly attorneys' fees in this
17  case?
18          MS. STOCK:  Same objection.  Calls for information
19  protected by the attorney-client privilege.
20          THE COURT:  Overruled.  If she can answer from her
21  knowledge as being the executive director.
22  A.  No.
23  Q.  (By MR. REISCH) Okay.  And to your knowledge, you have no
24  knowledge as to who's paying legal fees for the seven
25  attorneys that are sitting over here, correct?

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    547

1    A.  Yes.

2    Q.  Yes, you have no knowledge, or yes, you know who's paying

3    for them?

4    A.  Yes, I have no knowledge.

5    Q.  Okay.  I mean, as the executive director, do you get

6    involved in major litigation?  Did that ever come up as a

7    concern to you of how are we going to pay national law firms

8    to have multiple attorneys -- I think at some point we've had

9    16 attorneys from their side enter.  That never crossed your

10   mind as any concern, expense as to your budget?

11   A.  Of course it did.

12           MS. STOCK:  Objection.  Counsel is testifying --

13           MR. REISCH:  It's cross-examination.

14           MS. STOCK:  -- as to number of attorneys that have

15   made appearances in this matter.

16           THE COURT:  Overruled.  She can answer to the extent

17   she knows.

18   A.  Would you repeat the question, please?

19   Q.  (By MR. REISCH) Sure.  As the executive director of the

20   Colorado League of Women Voters, did it cross your mind as to

21   budgetary constraints to hiring national law firms, to having

22   six, seven attorneys sitting in court, litigation, depositions

23   that's going to affect your bottom line?

24   A.  Yes.

25   Q.  But it hasn't, has it, ma'am?

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    548

1   A.  No.

2   Q.  You have an agreement with Free People, the organization,

3   they're funding this; is that correct?

4   A.  I don't know.

5   Q.  Okay.  So you're involved in major litigation, and you

6   have no idea who's paying your bills?

7           MS. STOCK:  Objection, asked and answered.

8           THE COURT:  Sustained.  We're now on the fourth time.

9   Q.  (By MR. REISCH) In fact, ma'am, you never gave two hoots

10  about filing any litigation in this particular case; isn't

11  that true?

12          MS. STOCK:  Objection, argumentative.

13          THE COURT:  Overruled.  It's cross-examination.  I'm

14  going to give him some leeway.

15  A.  No.  I was -- I was just fine with filing this lawsuit.

16  Q.  (By MR. REISCH) But you personally didn't go to the

17  national people and say, Hey, I heard about this.  I saw this

18  newspaper article.  We need to file a lawsuit.  You didn't do

19  that, did you, ma'am?

20  A.  No.

21  Q.  You were told by higher-ups in your organization, not

22  necessarily attorneys, but there was going to be a lawsuit

23  filed, and you're going to assist the attorneys, correct?

24  A.  No.

25  Q.  Okay.  You spoke with the executive director at Mi Familia

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    549

1    Vota and tried to recruit him to get involved in this

2    litigation, correct?

3    A.    I talked to him and asked if he was interested in

4    partnering, yes.

5    Q.    Okay.  You solicited the NAACP to get involved in this

6    litigation, didn't you?

7    A.    Yes, I did.

8    Q.    Okay.  You didn't provide them any newspaper articles, you

9    didn't provide anything other than you saying, Hey, this

10   litigation is coming down, and we're trying to get some people

11   together, right?

12   A.    I believe that is correct.

13   Q.    Okay.  And they all went along with it, right?

14   A.    Yes.

15   Q.    Okay.  And you, other than apparently yourself, have no

16   personal knowledge of anybody else coming to say they were

17   intimidated by Mr. Smith, correct?

18   A.    I don't know of anybody who said they've been intimidated

19   by Mr. Smith?

20   Q.    You have no personal knowledge of anyone that they

21   canvassed that said they were intimidated in the canvassing

22   process, correct, ma'am?

23   A.    In the canvassing process, correct.

24   Q.    Okay.  The statements that you referred to by Mr. Smith,

25   you have been here for the testimony, right?  You're a

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    550

1    representative, right?

2    A.  Yes.

3    Q.  You heard Mr. Beall from the Secretary of State saying we

4    forwarded this off to the Department of Justice, the U.S.

5    Attorney's Office just across the way.  We sent it to our good

6    friends at the Boulder District Attorney's Office -- at that

7    time it would have been Stan Garnett -- saying let's do this.

8    And nothing came of it, correct, ma'am?  You heard that

9    testimony, right?

10   A.  Yes.

11   Q.  No criminal prosecution, right?

12   A.  I don't know.

13   Q.  Okay.  Not even a little harassment charge, was it, ma'am?

14   A.  I don't know.

15   Q.  Okay.  Well, you heard there were no charges filed, right?

16   Because you heard of a thing called protected free speech, did

17   you not?

18   A.  I have heard of protected free speech.  I also know that

19   it's illegal to yell fire in a crowded movie theater.

20   Q.  Okay.  Well, and you're also not a constitutional scholar

21   when it comes to the First Amendment, are you, ma'am?

22   A.  No, I'm not.  Are you?

23   Q.  Well, actually I've had several true threat cases, ma'am,

24   so, yes, I do have some familiarity with it, and you can say

25   things that are unpopular, that other people don't like,

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    551

1    right, ma'am?

2            THE COURT:  Mr. Reisch, let's go to a question

3    instead of your testimony, please.

4    Q.  (By MR. REISCH) You agree, ma'am, that you don't have a

5    right not to be offended?  Would you agree with me?

6    A.  I'm sorry.  I don't understand that question.

7    Q.  Yes.  You as an individual may hear things that you don't

8    like in the world.  Sometimes that happens, right?

9    A.  You bet.

10   Q.  Okay.  You don't have a right not to be offended.  Would

11   you agree with me?

12   A.  I don't have a right not to be offended.

13   Q.  To not be offended.  You can't go around in a little

14   bubble saying I don't want anything to offend me, right?

15   A.  Sure.

16   Q.  Okay.  Because that's what our First Amendment allows for,

17   unpopular ideas, correct?

18   A.  To a certain extent.

19   Q.  Okay.  We're not going to go through that again, but you

20   agree with me the First Amendment, people can say things that

21   you and your organization may not like, correct?

22           MS. STOCK:  Objection, asked and answered.

23           THE COURT:  Sustained.

24   Q.  (By MR. REISCH) You said you sent out your blast e-mail to

25   2,200 individuals, correct, ma'am?

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2   07/16/2024   552

1   A.  Yes.  Possibly more.

2   Q.  Okay.  And you received one person, unidentified, that

3   said they thought maybe somebody had made them feel

4   uncomfortable, correct?

5   A.  Yes.

6   Q.  Okay.  And you received two people that stated that they

7   thought that they supported what USEIP was doing, correct?

8   A.  Yes.

9   Q.  The person that felt uncomfortable, they're not on this

10  witness list, are they, ma'am?

11  A.  I don't know.

12  Q.  Well, as a lead plaintiff in this case, did you not look

13  and see who -- hey, do we have a member that we can call since

14  we're bringing the lawsuit on behalf of our members, that

15  maybe we should put a member on the witness list?

16  A.  I'm not advising my attorneys.

17  Q.  You never thought that, hey, I'm suing on behalf of my

18  membership, I should have a member here?

19  A.  Sir, the member that -- that presented herself to our

20  board members did not want to be identified due to fear of

21  reprisal.

22  Q.  Okay.  Well, you said that, and you talked about the

23  statements by Mr. Smith, right?

24  A.  Uh-huh.

25  Q.  And that was -- you stated specifically what concerns you

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2        07/16/2024    553

1    was that if somebody was found guilty of treason, they should

2    be put to death, right?

3    A.  Yes.

4    Q.  You do know that under the federal United States Code

5    death is a possible penalty for the crime of treason, correct?

6            MS. STOCK:  Objection, calls for a legal conclusion.

7            THE COURT:  Overruled.  I'll allow her to answer.

8    A.  Yes.

9    Q.  (By MR. REISCH) Okay.  So if he states that he's for due

10   process, and if a crime is committed, and it rose to the level

11   of treason, that those people should receive the maximum

12   penalty, that's what has offended you, correct, ma'am?

13   A.  Yes.  Absolutely.

14   Q.  Would it offend you if somebody said, if somebody commits

15   a crime, and it is by law authorized to have the death

16   penalty, and that they're convicted, that they should receive

17   the maximum penalty, does that offend you?

18           MS. STOCK:  Objection, compound and speculative.

19           THE COURT:  Overruled.

20   A.  The death penalty is not an option here in the State of

21   Colorado.

22   Q.  (By MR. REISCH) That wasn't my question, ma'am.  My

23   question was would it offend you if somebody said, if you

24   commit a crime, and it's punishable by death, and that crime

25   is found to be committed with due process in a court of law,

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2     07/16/2024    554

1   and the Court imposes the maximum penalty of death, would that

2   offend you?

3   A.   Yes.

4   Q.   That would offend you because you don't believe anybody

5   should be given the ultimate punishment?

6   A.   I do not believe in capital punishment.

7   Q.   Okay.  When you -- you were asked -- well, part of your

8   investigation, you stated, at least when we spoke in a

9   deposition, that you had contacted several clerks and

10  recorders; is that right?

11  A.   My board members had, yes.

12  Q.   Okay.  And there were no documentation of these

13  conversations, reports with these clerks and recorders; is

14  that right?

15  A.   They're -- I believe there is in evidence an e-mail from

16  the then president of our Pueblo league who had spoken to the

17  Pueblo Clerk and Recorder.

18  Q.   Okay.  Well, none of these clerk and recorders'

19  conversations with your direct board members were

20  memorialized, correct?

21  A.   As I said, this local league leader memorialized it by

22  putting into an e-mail to me and the rest of my board.

23  Q.   Okay.  All right.  You've sat here through the testimony,

24  through all these entire proceedings, correct, ma'am?

25  A.   Not entire, but many, yes.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2     07/16/2024    555

1   Q.  You were here when the training manual was discussed about

2   questions that would be asked and how they would be asked.  Do

3   you recall hearing that?

4   A.  A bit, yes.

5   Q.  Okay.  You heard various witnesses testify about

6   canvassing, correct?

7   A.  Yes.

8   Q.  Okay.  Does your organization go out and do canvassing or

9   political door-knocking, so to speak?

10  A.  I'm sure that's been done in the past.  It has not been

11  done during my tenure.

12  Q.  Okay.  But your organization hasn't done any type of

13  canvassing after an election saying, you know, to say, oh, we

14  think the vote was suppressed, let's go find -- canvass

15  certain voters, right?  You've never done that?

16  A.  No.

17  Q.  You would agree that if you were to go canvass, you would

18  want to be polite, correct?

19  A.  Yes.

20  Q.  You would want to introduce yourself?

21  A.  Yes.

22  Q.  You would want to ask non-leading questions and see if

23  people were voluntarily willing to provide information,

24  correct?

25  A.  Yes.

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    556

1    Q.   And then you'd want to thoroughly document that

2    information, correct?

3    A.   Yes.

4    Q.   Okay.  Now, you said you read the playbook as it relates

5    to USEIP.  Did you ever read any of their results as it

6    related to the canvassing?

7    A.   I don't believe there were results printed in the

8    playbook.

9    Q.   Okay.  That wasn't my question.  Did you ever go to their

10   website and look at their final reports?

11   A.   Yes.

12   Q.   From their canvassing?

13   A.   Yes.

14   Q.   Okay.  And did you believe that that was some sort of

15   misinformation as well?

16   A.   Yes.

17   Q.   Okay.  What was misinformation about it, ma'am?

18   A.   Well, the entire report has been debunked.

19   Q.   The statistical analysis?

20   A.   Yes.

21   Q.   Who did the debunking, ma'am?

22   A.   I believe a number of people, including experts in the

23   Secretary of State's Office.

24   Q.   We're here under oath.  You're giving testimony that

25   something's been completely debunked.  Please tell me who you

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2      07/16/2024    557

 1  are relying upon to say their information, that their

 2  canvassing was debunked?

 3          MS. STOCK:  Objection, asked and answered.

 4          THE COURT:  Well, it has, but I'll let her answer

 5  again.  Overruled.

 6  A.  I don't know the names of the people that debunked it.

 7  Q.  (By MR. REISCH) And to your knowledge as lead plaintiff in

 8  this particular case, you don't anticipate a witness coming in

 9  and saying all of these reports have been debunked, right?  As

10  relates to canvassing, ma'am?

11  A.  Did I anticipate that people would say that it was

12  debunked?

13  Q.  As lead plaintiff in this case, are you aware of anyone on

14  your witness list that's going to come in and say these

15  reports from USEIP have been debunked?

16          MS. STOCK:  Objection, foundation.

17          THE COURT:  Overruled.  I'll let her answer, if she

18  knows.

19  A.  I don't know.

20  Q.  (By MR. REISCH) Going back to the clerk questions, no one

21  at these clerks' offices could say that any of these questions

22  or complaints that they thought received, no one could say

23  they were directly related to USEIP, correct, ma'am?

24          MS. STOCK:  Objection, foundation.

25          THE COURT:  Sustained.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    558

 1  Q.  (By MR. REISCH) The reports from -- your people went to

 2  the Weld County, correct, and spoke with the clerks?

 3  A.  Yes.

 4  Q.  La Plata County, correct?

 5  A.  Yes.

 6  Q.  Pueblo County, correct?

 7  A.  Yes.

 8  Q.  And I think we heard that if there was a complaint, that

 9  the clerk's office in each individual county was to collect

10  these complaints; is that right?

11  A.  I don't know if that was their job.

12  Q.  Okay.

13  A.  They received the complaints.

14  Q.  And they probably jotted that down somewhere?

15  A.  I don't know.

16  Q.  Okay.

17  A.  It's my understanding that the Pueblo County clerk did not

18  make a specific report.  He thought that the calls coming in

19  were kind of one-off weird calls.  By the time he realized

20  this was a pattern, you know, the information was kind of

21  gone.

22  Q.  Okay.  And La Plata County didn't send anything to your

23  offices either, correct?

24  A.  No.

25  Q.  And Weld County didn't send anything to your offices

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    559

1   either, correct?

2   A.   No.   I believe they spoke to a board member, and they

3   confirmed that they had received complaints.

4   Q.   That they could not identify a specific person who was

5   allegedly -- thought that they felt uncomfortable by a

6   specific USEIP individual, correct, ma'am?

7   A.   I don't know that they couldn't.  They didn't to me or the

8   board, but I would think that's a matter of privacy too.

9   Q.   You talked about resources.  You prepared a white paper;

10   is that right?

11   A.   That's correct.

12   Q.   Okay.  And part of your organization's advocacy is to

13   encourage people to vote, right?

14   A.   Yes.

15   Q.   To get out the vote, correct?

16   A.   Yes.

17   Q.   And as things come up, you change your strategy or your

18   marketing information; is that right?

19   A.   Sure.

20   Q.   Okay.  And in this particular case, you thought that there

21   was misinformation or disinformation was coming about, so you

22   wanted to let people know that there was trust in the voting

23   system, correct?

24   A.   Correct.

25   Q.   And that was your white paper, right?

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2      07/16/2024    560

1   A.  Yes.

2   Q.  And that was done by a staff member, correct?

3   A.  No.  It was done by a committee of volunteers.

4   Q.  A committee of volunteers.

5   A.  With oversight by myself.

6   Q.  All right.  So you didn't have to pay somebody additional

7   monies to come do this white paper, correct?

8   A.  Correct.

9   Q.  Okay.  And you had to have -- you answered questions or

10  other people answered questions about your e-mail that came

11  out, I think is what you said, correct?  As far as diversion

12  of resources?

13  A.  Yes.

14  Q.  Okay.  But those were done by salaried employees?

15  A.  Correct.

16  Q.  Or hourly employees?  And so they would have been paid

17  whether they were answering questions about your e-mail or any

18  other reason, correct?

19  A.  Yes.  However, we would have been providing nonpartisan

20  voter information as opposed to trying to alleviate concerns

21  about the validity of the 2020 election and Colorado's

22  systems.

23  Q.  And since you put out the e-mail on September 4th, 2021,

24  you have not received any threats specifically to putting out

25  this e-mail, correct?

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2     07/16/2024    561

1    A.  No.  Not threats.

2    Q.  You've not received any threats from any of the defendants

3    in this particular case, correct?

4    A.  No.

5    Q.  Okay.  And I think you all testified that you also had

6    created a safety plan; is that right?

7    A.  That's correct.

8    Q.  And obviously a safety plan in today's world, that's

9    something that should have been done before, right?

10   A.  We never had reason to.

11   Q.  And do you recall stating that you would characterize

12   Mr. Erik Maulbetsch's article as the -- one of the major

13   factors to engage in this litigation?

14   A.  I don't know which article you mean.

15   Q.  Well, articles I guess I should say.

16   A.  Among other journalist's articles, yes.

17   Q.  And you also said it was also information received from

18   the national League of Women Voters' main office?

19   A.  Yes.

20   Q.  Okay.  And information that you received from Free Speech

21   For People, correct?

22   A.  Yes.

23   Q.  Okay.  Do you recall saying that in deposition?

24   A.  No, but I don't doubt that I did.

25   Q.  Okay.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    562

1           MR. REISCH:  Can I have just a moment, Your Honor?  I

2    think we're done.

3           THE COURT:  Sure.

4    Q.  (By MR. REISCH) Ma'am, the statement that you say you

5    became aware of as relates to Mr. Smith, that was made in

6    February of 2022, correct?

7    A.  Okay.

8    Q.  You don't know the date?

9    A.  Not off the top of my head, no.

10   Q.  Okay.  This is apparently the one that was so alarming,

11   right?

12   A.  One of them, yeah.

13   Q.  Okay.  And how many months later was it that you filed the

14   lawsuit, if you recall?

15   A.  I believe it was one month, but I'm not sure on that.

16          MR. REISCH:  That's all the questions I have.  Thank

17   you, ma'am.

18          THE COURT:  Given the time, we're going to break

19   here, and we will start tomorrow.  Mr. Wynne or Mr. Powell?

20          MR. REISCH:  It will be Mr. Powell.

21          THE COURT:  We'll start with Mr. Powell in the

22   morning.  Just a reminder, you'll remain under oath, and

23   you'll be under oath tomorrow.  It's important that you do not

24   talk about your testimony with anybody until we're back in

25   court.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2     07/16/2024    563

1            THE WITNESS:  Understood.

2            THE COURT:  Any other matters we need to address

3    before we're in recess?  We'll be in recess until tomorrow at

4    8:30.

5            THE COURTROOM DEPUTY:  All rise.  Court is in recess.

6        (The proceedings were concluded at 4:53 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                        Sarah K. Mitchell, RPR, CRR

1                          REPORTER'S CERTIFICATE

2

3          I, SARAH K. MITCHELL, Official Court Reporter for the

4    United States District Court for the District of Colorado, a

5    Registered Professional Reporter and Certified Realtime

6    Reporter, do hereby certify that I reported by machine

7    shorthand the proceedings contained herein at the time and

8    place aforementioned and that the foregoing pages constitute a

9    full, true and correct transcript.

10         Dated this 29th day of July, 2024.

11

12

13

14              _____/s/ Sarah K. Mitchell_____

15                 SARAH K. MITCHELL
                   Official Court Reporter
16            Registered Professional Reporter
                Certified Realtime Reporter
17

18

19

20

21

22

23

24

25

                    Sarah K. Mitchell, RPR, CRR