```
 1                IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF COLORADO

 3   Civil Action No. 22-cv-00581-CNS-NRN

 4
     COLORADO MONTANA WYOMING STATE AREA
 5   CONFERENCE OF THE NAACP, et al.,          (Pages 564 - 819)

 6          Plaintiffs,

 7          vs.

 8   SHAWN SMITH, et al.,

 9          Defendants.

10   --------------------------------------------------------------
                       REPORTER'S TRANSCRIPT
11                    Bench Trial - Day 3
     --------------------------------------------------------------
12
     Proceedings before the HONORABLE CHARLOTTE N. SWEENEY, Judge,
13    United States District Court for the District of Colorado,
     commencing on the 17th day of July, 2024, in Courtroom A-702,
14          United States Courthouse, Denver, Colorado.

15                          APPEARANCES

16   For the Plaintiffs:
     AMY E. ERICKSON and BRIAN A. DILLON and KRISTIN M. STOCK,
17   Lathrop GPM LLP, 80 South Eighth St., Ste. 500, Minneapolis,
     MN 55402
18   COURTNEY M. HOSTETLER, Free Speech for People, 48 North
     Pleasant St., Ste. 304, Amherst, MA 01002
19   CASEY C. BREESE, Lathrop GPM LLP, 675 15th St., Ste. 2650,
     Denver, CO 80202
20
     For Defendant Smith:
21   R. SCOTT REISCH and JESSICA L. HAYS, Reisch Law Firm, LLC,
     1490 W. 121st Ave., Ste. 202, Denver, CO 80234
22   For Defendant Kasun:
     MICHAEL J. WYNNE and CAMERON C. POWELL, Gregor Wynne Arney
23   PLLC, 4265 San Felipe St., Ste. 700, Houston, TX 77027
     For Defendant Epp:
24   PRO SE

25      Sarah K. Mitchell, RPR, CRR, 901 19th Street, Room A252,
                    Denver, CO 80294, 303-335-2108
            Proceedings reported by mechanical stenography;
                 transcription produced via computer.
```

22-cv-00581-CNS-NRN   Bench Trial - Day 3     07/17/2024   565

1                         I N D E X

2
   PLAINTIFFS' WITNESSES                                PAGE
3
   BETH HENDRIX NIELAND
4      Cross-Examination By Mr. Powell                   566
       Cross-Examination By Ms. Epp                      611
5      Redirect Examination By Ms. Stock                 657
   HOLLY KASUN
6      Direct Examination By Ms. Stock                   667
       Cross-Examination By Mr. Wynne                    684
7      Cross-Examination By Ms. Epp                      711
       Redirect Examination By Ms. Stock                 715
8      Recross-Examination By Mr. Wynne                  719
   ATIBA ELLIS
9      Direct Examination By Ms. Erickson                737
       Cross-Examination By Mr. Wynne                    763
10     Cross-Examination By Mr. Reisch                   777
       Redirect Examination By Ms. Erickson              793
11

12


13           EXHIBITS              RECEIVED

14           43                       628

15           65                       658

16           73                       741

17           102                      638

18           105                      628

19           106                      629

20           107                      605

21           109                      638

22

23

24

25


                 Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    566

1                *         *         *         *         *

2      (The proceedings commenced at 8:31 a.m.)

3           THE COURT:  Good morning.  Please have a seat.  We'll

4   pick up where we left off yesterday.  I believe, Mr. Powell,

5   you were up.

6           MR. POWELL:  Yes, Your Honor.

7           THE COURT:  All right.  Good morning, Ms. Hendrix.

8   Just to remind you, you're still under oath.

9      (Plaintiffs' witness, BETH HENDRIX NIELAND,

10        resumed the witness stand.)

11          THE WITNESS:  Yes, thank you.

12                       CROSS-EXAMINATION

13  BY MR. POWELL:

14  Q.  Good morning, Ms. Hendrix.

15  A.  Good morning.

16  Q.  Do you recall, Ms. Hendrix, when The League decided to

17  file this lawsuit against Holly Kasun?

18  A.  We filed a lawsuit against USEIP and its three founders,

19  including Ms. Kasun, yes.

20  Q.  Okay.  Do you recall when that was?

21  A.  I believe it was March of '22.

22  Q.  Okay.  And that decision was made by The League, The

23  League board; is that right?

24  A.  That's correct.

25  Q.  Okay.  And at that time -- excuse me -- at that time you

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    567

1    didn't have evidence that Holly Kasun was personally engaged

2    in any of the conduct that you had alleged in your complaint,

3    right?  It was mostly about USEIP; is that right?

4    A.  Yes.  But as a cofounder, I believe she has

5    accountability.

6    Q.  And what do you understand her to have been a cofounder

7    of?

8    A.  USEIP.

9    Q.  And what is that?

10   A.  The United States Election Integrity Plan.

11   Q.  Okay.  And what sort of entity is that in your mind?

12   A.  An organization of volunteers.

13   Q.  Did you understand that -- it to have a

14   command-and-control structure?

15   A.  I don't know what you mean by that.

16   Q.  Well, that there are people above other people telling

17   them what to do and having control over their work?

18   A.  Yes, I would say so.

19   Q.  Okay.  What is the evidence for that?

20   A.  The fact that they called themselves cofounders.

21   Q.  And that means they have control over all the others?

22   A.  It means they should be accountable to all the others,

23   yes.

24   Q.  That's an assumption?

25   A.  That is my belief.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3   07/17/2024   568

1    Q.   That's a value statement, that they should be accountable?

2    A.   I believe that leaders of an organization are accountable.

3    Q.   I see.  And if it's a grassroots organization of coequal

4    citizen volunteers, is anyone accountable?

5    A.   I still believe that the founders are accountable.

6    Q.   Got it.  Is there any evidence that USEIP canvassers

7    canvassed a member of your organization?

8    A.   Yes.

9    Q.   Okay.  And who is that?  Who was that canvasser?

10   A.   I don't know.

11   Q.   What is the evidence that a USEIP canvasser canvassed a

12   member of your organization?

13   A.   I received an e-mail as a response to the blast e-mail I

14   sent out.

15   Q.   And someone said USEIP visited me?

16   A.   That's correct.

17   Q.   And how did they identify USEIP?

18   A.   I believe that their -- they were wearing a badge that

19   said USEIP.

20   Q.   You believe?

21   A.   Yes.

22   Q.   Why do you believe that?

23   A.   I believe that's what the e-mail said.

24   Q.   Do we have that e-mail here?

25   A.   Yes.

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    569

1   Q.  Okay.  Do you know who it was from?

2   A.  Jean Hoffman.

3   Q.  Did you have any evidence that Holly Kasun did any

4   canvassing?

5   A.  No.

6   Q.  Did you have any evidence that she spoke to any voter?

7   A.  No.  I would assume so as a cofounder of USEIP.

8   Q.  You would assume that she spoke to a voter?

9   A.  Well, she spoke to the media, so therefore she was

10  speaking to voters.

11  Q.  Do you have any evidence of any voter who heard her speak

12  to the media?

13  A.  I did.  I'm a voter.

14  Q.  Are you a plaintiff?

15  A.  Yes.

16  Q.  Okay.  Are you a plaintiff in your personal capacity?

17  A.  No.

18  Q.  Okay.  Do you have any evidence that any voter read

19  something that Holly Kasun wrote?

20  A.  Widely published media reports.  I can certainly assume

21  that people have read her name in association with USEIP.  I

22  know I have.

23  Q.  But statements media members were making?

24  A.  Statements to media?

25  Q.  You're referring to statements that were in the media

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    570

1    about Holly Kasun or statements written by Holly Kasun?

2    A.  I suppose written about her.

3    Q.  Okay.  And that's where you got most of your information

4    is the media reports about her?

5    A.  That's correct.

6    Q.  Was there any information you got about her that did not

7    come from media report?

8    A.  No, I don't believe so.

9    Q.  Okay.  Did you know of any evidence that would indicate

10   Ms. Kasun exercised managerial control over anyone else in

11   USEIP?

12   A.  The fact that she's a cofounder.

13   Q.  Is that evidence of managerial control?

14   A.  I believe that being called a cofounder typically means

15   you have some managerial control.

16   Q.  Do you have evidence that she controlled any member of

17   USEIP?

18   A.  Control a member?

19   Q.  Controlled the work or supervised the work of any member

20   of USEIP?

21   A.  Well, as a cofounder, I would certainly assume that there

22   was oversight.

23   Q.  I hear the assumptions you're making.  I'm just asking if

24   you have any actual evidence or you did when you filed your

25   complaint?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    571

1    A.  The fact that she named herself as a cofounder.

2    Q.  So you think everything is wrapped up in the title

3    cofounder that someone can give themselves?

4    A.  Yes.

5    Q.  I see.  Do you have any evidence that she had the power to

6    terminate members of USEIP?

7    A.  I have no idea.

8    Q.  That she supervised anyone's work?

9    A.  As a cofounder, I would think she supervised others' work.

10   Q.  Do you have evidence of that?

11   A.  Outside of the fact that she calls herself a cofounder,

12   no.

13   Q.  I hear what you're saying.  Does the fact that she calls

14   herself a cofounder mean that she trained people in USEIP as

15   well?

16   A.  I would assume so.

17   Q.  But you don't know.  Do you know whether Holly Kasun asked

18   any residents to confirm their voter address?

19   A.  I don't.

20   Q.  Do you know if she asked any voter a question at their

21   door?

22   A.  I don't know that.

23   Q.  To your knowledge, did Ms. Kasun question any residents

24   about their participation in the 2020 election?

25   A.  I don't know.

22-cv-00581-CNS-NRN   Bench Trial - Day 3   07/17/2024   572

1   Q.   What about their method for voting?

2   A.   I don't know.

3   Q.   So it was media reports that told you that a group called

4   USEIP was sending canvassers who were sometimes armed to

5   interrogate voters about the voting record?

6   A.   Correct.

7   Q.   Do you know what the evidence was in the media reports for

8   the idea they were sometimes armed?

9   A.   I would say probably the playbook.

10  Q.   The playbook is evidence that someone was armed?

11  A.   Yes.

12  Q.   How so?

13  A.   They discussed security and how they were planning to line

14  up people with people who carried.

15  Q.   So that's a statement of possible intent.  Do you have

16  evidence anyone did carry?

17  A.   Media reports stating that at times volunteers were openly

18  armed.

19  Q.   So, again, media reports are the evidence for your case?

20  A.   Yes, as well as some eyewitness accounts.

21  Q.   Did you talk to a witness who saw a USEIP canvasser was

22  armed?

23  A.   No.

24  Q.   Who in your organization did?

25  A.   I don't know that anyone did.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3     07/17/2024    573

1    Q.  Okay.  How do you know that the people who did the

2    canvassing that you're objecting to are actually with USEIP as

3    opposed to other canvassing groups in the state at the time?

4            MS. STOCK:  Objection, asked and answered.

5            THE COURT:  Overruled.

6    A.  We didn't know of any other groups doing similar types of

7    canvassing.

8    Q.  (By MR. POWELL) So it seemed a reasonable assumption that

9    it was USEIP?

10   A.  Well, and if their badges -- I believe there were plenty

11   of times that their badges stated they were with USEIP.

12   Q.  Plenty of times in what context?  Are you talking about

13   complaints you got?

14   A.  I'm talking about complaints and media reports, yes.

15   Q.  Were the media present at the canvassing?

16   A.  I don't know.

17   Q.  Okay.  They didn't say they were present at the

18   canvassing, did they?

19   A.  I don't believe so, no.

20   Q.  Okay.  Do you have any -- or know of any evidence that

21   Holly Kasun asked residents about allegedly fraudulent

22   ballots?

23   A.  I don't know.

24   Q.  Do you know whether she accused residents of casting

25   fraudulent ballots?

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    574

1    A.   No, I don't know that.

2    Q.   Do you know if she took any photos of voters' residences

3    or parking lots?

4    A.   I don't.

5    Q.   Do you have any evidence that she threatened voters?

6    A.   No.

7    Q.   And I think I've heard you say you don't have evidence

8    that she asked people to do so and they did so at her

9    direction?

10            MS. STOCK:   Objection, asked and answered.

11            THE COURT:   Overruled.

12   A.   As a cofounder, I would assume she was involved in

13   volunteer oversight, yes.

14   Q.   (By MR. POWELL) Are you saying that you filed a complaint

15   based on assumptions?

16   A.   I filed a complaint -- or we filed a complaint based on

17   media reports and reports received by county clerks and the

18   Secretary of State, as well as feedback we got.

19   Q.   And those --

20   A.   And media reports.

21   Q.   How did those reports identify USEIP?  Just by saying that

22   it was them who did the canvassing?

23   A.   Yes.

24   Q.   I see.  Do you have any evidence that it was Holly Kasun

25   who was informing canvassers that she was attempting to line

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    575

1    up security?

2    A.  No.

3    Q.  Do you know whether she encouraged any gun-carrying

4    members to accompany unarmed agents and offer their contact

5    information to unarmed agents of USEIP?

6    A.  I don't know that.  As a cofounder and with that in the

7    playbook, I would assume she had some oversight over those

8    activities.

9    Q.  Do you know when the playbook was written?

10   A.  I believe it was August of '22.

11   Q.  That was well after the canvassing was finished, right?

12   A.  I don't know.  I believe canvassing was still going on.

13   Q.  You filed a complaint in March of '22, right?

14   A.  I believe that's correct.

15   Q.  Okay.  And so the playbook, if it was in March of -- or

16   August of '22, the canvassing that you were complaining about

17   had finished by then?

18   A.  As I said, I believe the canvassing continues today.

19   Q.  What's the basis for that belief?

20   A.  Continued media reports.

21   Q.  So media is, once again, the source of your information?

22   A.  Well, and as stated in earlier testimony, Ms. Epp filed

23   some sort of report in January stating that the organization

24   was active in all 64 counties.

25   Q.  You know the organization does more than canvassing, don't

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    576

1    you?

2    A.  I don't.

3    Q.  So your assumption was that the organization only existed

4    to do canvassing?

5    A.  Yes.

6    Q.  I see.  So is there any evidence that your organization

7    had when it filed the complaint that a volunteer carried a

8    weapon of any kind?

9    A.  Outside of the organization's playbook.

10   Q.  What is it in the playbook that made you think there were

11   weapons?  Are you talking about the chat room quotations?

12   A.  Those certainly, talk of tactical pins, as well as in the

13   playbook it talks about security and lining up volunteers who

14   don't carry with those who do.  Those are not the exact words,

15   but that's --

16   Q.  So is trying to make oneself secure, is that in your mind

17   an offensive act?

18   A.  When you're doing door to door knocking on people's doors,

19   yes, I find that offensive.

20   Q.  I mean offensive rather than defensive.  Do you have any

21   evidence that they were talking about tactical pins for some

22   reason other than self-protection?

23   A.  I don't know, but if you're knocking on peoples' doors, I

24   don't know why you would need self-protection.

25   Q.  Are you aware of the history of canvassers knocking on

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    577

1    doors and being harassed and threatened in this country?

2    A.  Then maybe they shouldn't do it.

3    Q.  I see.  So if it's risky, they shouldn't exercise their

4    rights of association?

5    A.  If they believe the risk is so great that they must carry

6    a weapon, I personally believe, yeah, that should be

7    reconsidered.

8    Q.  And so when you saw these chat room quotations in the

9    media, was there anything indicating to you that those

10   statements about security were actually written by human

11   beings as opposed to bots?

12   A.  I believe that there was prior testimony stating that the

13   playbook was written by the three cofounders.

14   Q.  Well, would you like to take a look at Exhibit 1, the

15   playbook and let me know what statements about weapons you're

16   referring to?

17   A.  I'm having trouble placing it now, but --

18   Q.  Are you referring to a statement that is written by the

19   author of the playbook, or are you referring to what we've

20   seen in other exhibits as screenshots from chat rooms?

21   A.  No.  I'm referring to a statement in the playbook.

22   Q.  I see.  Okay.

23   A.  I'm sorry.  I'm having trouble placing it, but in an

24   earlier copy there was a clear reference to security and

25   lining up security and connecting volunteers with other

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    578

1   volunteers who carried.

2   Q.  And you read this statement sometime after the playbook

3   was published and that concerned you?

4   A.  Yes.

5   Q.  Do you know if any registered voters read this statement

6   besides you?

7   A.  Well, I would assume that everyone involved with USEIP

8   did, and they're, I'm assuming, registered voters.

9   Q.  Do you think this intimidated USEIP voters?

10  A.  Probably not.  It certainly intimidated me.

11  Q.  I'm trying to understand.  This playbook is a private

12  document intended for USEIP members and other grassroots

13  organizations.  Are you aware of that?

14  A.  Yes.  But it was posted on their public-facing website.

15  Q.  Do you know if a registered voter read it?

16  A.  I'm a registered voter, and I read it.

17  Q.  Okay.  And the statement that you can't find intimidated

18  you?

19  A.  Yes.

20  Q.  I see.  People mentioning bringing security with them?

21  A.  Yes.

22  Q.  I see.  So of the information in the media reports and the

23  playbook that concerned you, did you investigate any of those

24  pieces of information to confirm whether they were true?

25  A.  No.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3     07/17/2024    579

1    Q.  Do you recall the media reports saying that USEIP was

2    doing canvassing statewide?

3    A.  I saw media reports stating that the -- all the counties

4    on the -- in CD4, the eastern part of the state had been

5    covered.  Jeffco, many more beyond the four --

6    Q.  Uh-huh.

7    A.  -- discussed here.

8    Q.  And was it your understanding that -- that the canvassers

9    were targeting vulnerable voters?

10   A.  Yes.

11   Q.  Why did you believe that?

12   A.  Well, it seemed that they were targeting registered

13   Democrats in conservative counties, and there seemed to be a

14   lot of people with last names that could be considered ethnic.

15   Q.  When you say it seemed, what are you referring to?  Seemed

16   from what?

17   A.  From the various media reports, folks that had reported

18   being visited often had names that sounded ethnic.

19   Q.  You're talking about people interviewed for media reports?

20   A.  Yes.

21   Q.  Do you understand that the people that were interviewed

22   were a random sample of everyone who was canvassed?

23   A.  I don't know that, but...

24   Q.  Isn't it possible that a few people were interviewed, and

25   it's not actually representative of the larger group?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    580

1    A.  Yes, I suppose that's possible.

2    Q.  Did you consider that before you filed your complaint

3    saying that they were targeting?

4    A.  No.  I still believe they were targeting.

5    Q.  But that's just a belief?

6    A.  Yes.

7    Q.  Okay.  Did you believe they were targeting minority

8    voters?

9    A.  Yes.

10   Q.  For the same reason?

11   A.  Yes.

12   Q.  Because of the media reports quoting some people with

13   ethnic-sounding names?

14   A.  Yes.

15   Q.  I see.  And Democrat voters, how did you identify them as

16   being targeted?

17   A.  A media report interviewed a prominent Democrat I believe

18   in -- I can't remember the county, but she felt she had been

19   targeted.

20   Q.  So you agreed with that assessment?

21   A.  I believe her feelings to be valid.

22   Q.  Did you also believe when you filed the complaint that

23   USEIP volunteers in particular were canvassing high-density

24   housing and targeting those?

25   A.  I don't know that they were targeting those, but I did

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    581

1  hear reports of large apartment complexes being canvassed.

2  Q.  Does your organization conduct canvassing?

3  A.  I feel certain we have in the past.  We have not during my

4  tenure.

5  Q.  Do you know if the national League of Women Voters does

6  canvassing in Colorado?

7  A.  I don't believe they do, no.

8  Q.  Do you have any familiarity with the kinds of questions

9  canvassers ask?

10  A.  It's my understanding they varied from volunteer to

11  volunteer.  Some were more aggressive.

12  Q.  And is that based on media reports?

13  A.  Yes.

14  Q.  In what way were they more aggressive, according to the

15  media reports?

16          MR. REISCH:  Your Honor, I'm going to object,

17  hearsay.

18          THE COURT:  Overruled.  The defendants have now

19  opened the door to these media reports, not for the truth of

20  them, but for what this witness did in reliance on them.

21          You may answer.

22  Q.  (By MR. POWELL) In what way were some allegedly more

23  aggressive?

24  A.  Volunteers coming in with a clear bias as to election

25  fraud, stating that, you know, election fraud happened,

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    582

 1  happened possibly here at this address, and were generally

 2  intimidating.  We also had reports that some were very

 3  courteous and polite.

 4  Q.  To your knowledge, did your organization ever have any

 5  evidence that any of the canvassers believed Holly Kasun

 6  wished them to act on her behalf?

 7  A.  That's difficult to answer.  Again, as a cofounder, I

 8  would think that she would want volunteers to carry out the

 9  mission of the organization that she helped to create.

10  Q.  Well, moving away from assumptions about what cofounding

11  means, I want to talk about an actual canvasser, a human

12  being, and Holly Kasun, a human being.  And I want to

13  understand if you have any evidence whether they had an

14  agreement that the canvasser was going to act on Holly Kasun's

15  behalf?

16          MS. STOCK:  Objection, foundation.

17          THE COURT:  I'll allow her to answer, if she knows.

18  A.  I do not know.

19  Q.  (By MR. POWELL) Do you know if you had any evidence that

20  there was a canvasser from USEIP who agreed to act at the

21  direction of Holly Kasun?

22  A.  Well, I believe all volunteers with USEIP were acting at

23  the direction of the three cofounders.

24  Q.  Does that mean that you believe that the three cofounders

25  were giving explicit directions every time a volunteer acted,

22-cv-00581-CNS-NRN  Bench Trial - Day 3    07/17/2024    583

1    that the volunteers never acted of their own volition on

2    anything?

3    A.  No.  Of course the volunteers acted on their own volition.

4    That's part of volunteer management.  But the cofounders laid

5    out the mission and purpose of the organization, and the

6    volunteers were there to carry that out.

7    Q.  That's your understanding?

8    A.  Yes.

9    Q.  I see.  So that sounds like a command-and-control

10   organization where somebody's in charge; is that right?

11   A.  Yes.

12   Q.  Okay.  I believe you said yesterday that when you filed

13   the complaint, it was because you wanted to stop intimidating

14   speech and actions of the defendants in USEIP; is that right?

15   A.  Yes.

16   Q.  Can you tell me what the intimidating speech of Holly

17   Kasun was?

18   A.  I don't know.  I believe that as a cofounder of the

19   organization, volunteers were carrying out the mission and

20   were at times intimidating.

21   Q.  You believe that because the media reports suggested that

22   to you?

23   A.  Yes.

24   Q.  What were the activities of Holly Kasun you were trying to

25   stop?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    584

1    A.   Organizing volunteers to canvass and intimidate voters.

2    Q.   So you've referred to USEIP intimidating voters.  How many

3    voters are we talking about that we actually know it was a

4    USEIP volunteer interacting with an intimidated voter, do you

5    know?

6    A.   Well, yes, we received a report also via phone call to a

7    board member who stated --

8              MR. REISCH:  Objection, hearsay.

9              THE COURT:  Overruled.  You may answer.

10   A.   -- that she had received a visit from USEIP agents who she

11   felt were trying to be intimidating.

12   Q.   (By MR. POWELL) The board member thought this?

13   A.   No.  The member told my board member this.

14   Q.   And did your board member tell you how the member

15   understood that it was a USEIP volunteer?

16   A.   From their badge and their introduction.

17   Q.   What county was this?

18   A.   Weld.

19   Q.   Okay.  Did anyone ever provide The League with evidence

20   that a canvasser was armed, such as a photograph?

21   A.   No.

22   Q.   A surveillance video?

23   A.   No.

24   Q.   Eyewitness testimony?

25   A.   Outside of the playbook, no.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    585

1   Q.  Was it your understanding that if you brought the

2   litigation, that you could have the playbook suppressed so

3   that no one had to read USEIP's thoughts on security?

4           MS. STOCK:  Objection, calls for legal conclusion.

5           THE COURT:  Overruled.

6   A.  Would you repeat the question, please?

7   Q.  (By MR. POWELL) Was it your understanding and why you

8   brought this litigation that you wanted to suppress the

9   playbook, because you identified that a number of times as

10  something you believed to be intimidating.

11  A.  Among other things, yes.

12  Q.  So you would like it to be taken offline and never

13  available to anyone to see?

14  A.  As a part of canvassing actions by USEIP, yes.

15  Q.  Do you know when USEIP canvassing took place?

16  A.  Well, I believe that it started in the spring of '21 and

17  continues today.

18  Q.  Do you believe it continues because USEIP still continues?

19  A.  Correct.

20  Q.  But you don't know of them doing any canvassing?

21  A.  I don't.

22  Q.  So you don't actually know when the canvassing ended by

23  USEIP?

24  A.  No.

25  Q.  Okay.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    586

1    A.  But I don't believe it has.

2    Q.  So if the playbook was released after the canvassing was

3    finished, would that have the same intimidating effect on

4    canvassed voters?

5              MS. STOCK:  Objection, calls for legal conclusion.

6              THE COURT:  Sustained as to how it's worded

7    currently.

8    Q.  (By MR. POWELL) If the canvassing had been completed

9    before the playbook was issued, do you think that the playbook

10   would have the same impact on any voter who happened to read

11   it who was canvassed?

12   A.  Yes.

13   Q.  Okay.  Do you know if any voters read the playbook after

14   they were canvassed?

15   A.  I don't.

16   Q.  Was one of the reasons that you wanted to bring suit

17   against the defendants to stop what you call misinformation?

18   A.  Yes.

19   Q.  And can you tell me what misinformation by Holly Kasun you

20   believe was potentially intimidating to a voter?

21   A.  I believe that USEIP and its three cofounders have been

22   continuing to state that the 2020 election was stolen and

23   rigged.

24   Q.  And they should be stopped from saying that?

25   A.  I believe that is not true.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    587

1    Q.  So should they be stopped from saying that?

2    A.  I believe that it's spreading misinformation and therefore

3    sowing doubt in our election systems needlessly.

4    Q.  Did you understand that doubt to be something that would

5    interfere with somebody's ability to vote?

6    A.  Yes.

7    Q.  Why is that?

8    A.  Because if someone doesn't believe that the election is

9    valid, why would they vote?

10           THE COURT:  Sorry.  Hold on a minute.  Whose phone is

11   it?

12           THE WITNESS:  I apologize.  I believe it's mine.

13           MR. REISCH:  With the Court's permission, I can pick

14   it up and put it in her bag.

15           THE COURT:  Why don't we have Ms. Erickson do it.

16           THE WITNESS:  Apologies.

17           THE COURT:  Maybe, Ms. Erickson, you might take the

18   purse.  In case it rings again, you can do the same thing

19   quickly.

20           You may continue, Mr. Powell.

21   Q.  (By MR. POWELL) So it was your thought that contributing

22   doubt about an election was something that needed to be

23   stopped?

24   A.  I believe that sowing misinformation creates doubt.

25   Q.  Okay.  Aside from the media reports, did you receive any

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    588

1   information about what the canvassers were saying to the

2   residents that were canvassed?

3   A.  Yes.

4   Q.  And what was that source?

5   A.  Various e-mail reports.

6   Q.  From whom?

7   A.  Members and nonmembers.  When we sent out the -- my e-mail

8   in September --

9   Q.  Are you talking about Yvette Roberts and Deborah Powell or

10  other people?

11  A.  No, other people.

12  Q.  Do you know their names?

13  A.  Jean Hoffman.

14  Q.  Okay.

15  A.  And we did have a verbal report from another member.

16  Q.  Ms. Hendrix, do you have Exhibit 41 available in front of

17  you?

18  A.  Yes.

19  Q.  So you didn't personally or through your organization

20  perform an investigation of the claims that social media and

21  media reports were making; is that right?

22  A.  Outside of sending out the e-mail that's listed as

23  Exhibit 41.

24  Q.  This was a part of your investigation?

25  A.  Sure.

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    589

1   Q.  This is something you sent out about to 2,200 of your

2   members or subscribers?

3   A.  Both our members and nonmembers, yes.

4   Q.  So anyone who's a subscriber can get the e-mail, but they

5   don't have to be a member?

6   A.  That's correct.

7   Q.  So in this document dated September 4th, 2021, you say

8   below the logo of the League of Women Voters of Colorado, The

9   United States Election Integrity Plan, USEIP, is an

10  organization that is continuing to claim voter fraud in the

11  2020 election.  They have volunteers in Colorado who are going

12  door to door in an attempt to find evidence of voter fraud.

13  And your understanding of why they were going door to door is

14  from the media reports?

15         MS. STOCK:  Objection, reading from a document that's

16  not been admitted into evidence.

17         THE COURT:  Overruled.

18         MR. POWELL:  If this is not in evidence, can we move

19  it, Your Honor?

20         THE COURT:  It's already in evidence.

21         You may answer.

22  A.  I'm sorry.  Would you repeat the question, please?

23         (The requested portion of the transcript was read.)

24  A.  Yes.

25  Q.  (By MR. POWELL) Now, your next sentence says, These

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    590

1   actions may be intimidating to voters; is that right?

2   A.  Yes.

3   Q.  Prior to your sending this, had any of your members

4   reached out to you to report USEIP activities?

5   A.  No.

6   Q.  Did you think if you informed them that they had been

7   intimidated, that someone might step forward and agree?

8   A.  No.

9   Q.  Why did you think it was important to tell them that

10  actions may be intimidating?

11  A.  I suppose to provide a basis for the e-mail.  We want to

12  know if people are intimidating voters.

13  Q.  And then the next clause you say, Voter intimidation is a

14  federal crime; is that right?

15  A.  Yes.

16  Q.  Did you think that by making that statement you might

17  scare recipients of the e-mail who are afraid of criminals?

18  A.  No.

19  Q.  You didn't think that might be scary to them to understand

20  that they might be subject to criminal activity?

21  A.  To whom are you referring?

22  Q.  The recipients of your e-mail.

23  A.  No.

24  Q.  You didn't think this was alarmist in any way?

25  A.  It's based on media reports of canvassers intimidating

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3   07/17/2024   591

1    voters.

2    Q.   I hear that it's based on media reports.  Is it based on

3    any facts that you were personally aware of or your

4    organization was aware of?

5            MS. STOCK:  Objection, asked and answered.

6            THE COURT:  Overruled.  I'll allow her to answer.

7    A.   Media reports.

8    Q.   (By MR. POWELL) Did The League contribute to media reports

9    by talking to reporters?

10   A.   It's possible.  I don't recall.

11   Q.   Well, let's look at Exhibit 109.

12   A.   Yes.

13   Q.   Do you recognize that e-mail?

14   A.   Yes.

15   Q.   Do you recall receiving that e-mail?

16   A.   Not offhand, but I believe I did receive it.

17   Q.   Who is Marjorie Gray?

18           THE COURT:  Counsel, what exhibit are you on?

19           MR. POWELL:  109.

20           THE COURT:  Okay.  Sorry.  Go ahead.

21   A.   Marjorie Gray is a leader of our league in Chaffee County.

22   Q.   (By MR. POWELL) And do you recall what she wrote you there

23   about whether you wanted the article to go into the local

24   media?

25   A.   It's -- I don't recall receiving this e-mail, but I am not

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    592

 1   doubting I did.

 2   Q.  Do you recall speaking to or e-mailing with reporters of

 3   CNN?

 4   A.  Yes.

 5   Q.  And did you talk to that reporter?

 6   A.  I'm sorry.  I can't recall.

 7   Q.  What about Reuters-Thomson?

 8   A.  Also, I can't recall.  It's possible.

 9   Q.  Now, you sent a second e-mail about -- titled Voter

10   Intimidation Notice on September 8th; is that correct?

11   A.  I don't know.

12   Q.  Let's look at Exhibit 48.  Does that refresh your memory?

13   A.  Yes.

14   Q.  Why did you send a second e-mail?

15   A.  This was in a newsletter that we sent out.

16   Q.  Okay.  Did anyone respond to it?

17   A.  We received responses to the e-mail and the newsletter.

18   I'm sorry, I can't discern which responses came from what.

19   Q.  Do you recall getting a response from Tara Menza?

20   A.  Yes.

21   Q.  She was one of the ones who said USEIP was very polite and

22   not intimidating?

23   A.  That's correct.

24   Q.  Do you recall getting an e-mail from Joani Walton?

25   A.  No.  But I get a lot of e-mails.

                          Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    593

1   Q.  I'd ask you to look at Exhibit 76, Ms. Hendrix, and then

2   turn to the second page.  Do you recall this e-mail?

3   A.  Vaguely, yes.

4   Q.  Do you remember what she's telling you about your e-mail?

5          MS. STOCK:  Objection, hearsay.

6          THE COURT:  Well --

7          MR. REISCH:  I believe this is a stipulated exhibit,

8   already in evidence.

9          THE COURT:  All right.  The exhibit is in, so he can

10   ask her anything he wants about the document.

11          Why don't you restate it?

12   Q.  (By MR. POWELL) Well, let me ask you to read the first few

13   sentences of the e-mail.  If you could read the first few

14   sentences.

15   A.  Sure.  Sorry.  Dear League of Women Voters of Colorado, I

16   was insulted and disappointed by your post about some

17   volunteers going door to door.  I found your posts to be very

18   ignorant and on the verge of threatening.  I am thankful that

19   someone is doing this job of checking the voter rolls.

20   Q.  Do you recall that e-mail?

21   A.  Yes.

22   Q.  Do you recall hearing from Amanda Carlson?

23   A.  Yes.

24   Q.  And do you remember what she told you in her e-mail?

25   A.  I just remember that she was very adamant.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    594

1   Q.  About?

2   A.  About I guess irregularities in the election system and

3   was -- she was not really listening to what I was having to

4   say.

5   Q.  Do you remember an e-mail that you received from Matthew

6   Menza?

7   A.  Yes.

8   Q.  And was he supportive of the canvassing effort?

9   A.  No.

10          MS. STOCK:  Objection, hearsay.

11          THE COURT:  Overruled.

12   Q.  (By MR. POWELL) He was not supportive of canvassing?

13   A.  No, I don't believe that's true.  I believe he was

14   supportive of the canvassing and not supportive of The

15   League's actions.

16   Q.  So you've heard from Tara and Matthew Menza, Amanda

17   Carlson, Joani Walton.  That didn't affect your view that the

18   canvassing was objectively intimidating to hear them say they

19   didn't believe it was?

20   A.  No.

21   Q.  Do you recall reading articles among your media reports

22   from the Colorado Times Recorder?

23   A.  Yes.

24   Q.  Is that where you learned that some USEIP members had gone

25   to the Capitol building on January 6th?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3   07/17/2024   595

1   A.  I can't confirm that it was the Times Recorder.  It was

2   definitely a media report.

3   Q.  Had you heard of the Colorado Times Recorder before you

4   read those articles?

5   A.  I believe so.

6   Q.  In what capacity?

7   A.  Just as a media outlet in Colorado.

8   Q.  Do you know if it's a news organization with multiple

9   employees or a personal blog?

10   A.  I don't know.  I'm figuring it's a professional media.

11   Q.  Why do you figure that?

12   A.  General presentation.

13   Q.  The website looks good?

14   A.  Yes.  And I believe that they're a legitimate media

15   outlet.

16   Q.  Did you take steps to confirm that belief at any point?

17   A.  What kind of steps?  No.

18   Q.  Well, do you know if they employ fact-checkers?

19   A.  I don't.

20   Q.  Do you know if it requires its reporters to be trained

21   journalists?

22   A.  I don't.

23   Q.  Do you know if they adhere to any journalistic ethics?

24   A.  I wouldn't certainly assume so, but I don't know.

25   Q.  But somehow you found that their report was credible?

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    596

1   A.  Yes.

2   Q.  Because why?

3   A.  Because it was backing up reports made by other media

4   outlets.

5   Q.  Is it possible that these media outlets are reporting on

6   what each other had reported?

7   A.  I don't believe so.

8   Q.  Did you have any indication that they were doing original

9   journalism or reporting on what was already in the media?

10          MS. STOCK:  Objection, foundation.

11          THE COURT:  Well, I'll overrule it.  You can answer,

12   if you know.

13   A.  I don't.

14          MR. POWELL:  I'm sorry.  Can you read back the

15   question that I asked?

16          (The requested portion of the transcript was read.)

17   A.  That was -- I mean, it was my impression that it was

18   original journalism.

19   Q.  (By MR. POWELL) And why is that?

20   A.  It was an impression.

21   Q.  So you filed a lawsuit based on an impression?

22   A.  No.  I filed a lawsuit -- we filed a lawsuit based on

23   multiple media reports, as well as eyewitness reports, as well

24   as the organization's own statements and playbook.

25   Q.  Now, two days after you e-mailed your subscribers, do you

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    597

1  recall getting an e-mail from the Colorado Times Recorder

2  reporter Erik Maulbetsch?

3  A.  Yes.

4  Q.  Did you receive more than one e-mail from him?

5  A.  Possibly.

6  Q.  Did you speak to him by phone or in person?

7  A.  I spoke to him by phone, yes, as well as via Zoom.

8  Q.  And he told you about the investigation that he was doing?

9          MS. STOCK:  Objection, hearsay.

10          THE COURT:  Well, overruled.

11  A.  Yes.

12  Q.  (By MR. POWELL) Do you recall him telling you that he had

13  been researching USEIP for some time and had a fair amount of

14  evidence of voter intimidation and suppression?

15  A.  I would say something along those lines, yes.

16  Q.  Did he tell you what that evidence was that he had?

17  A.  I don't recall.

18  Q.  His articles said that -- claimed that some USEIP members

19  might have had criminal records?

20  A.  The playbook said that as well, yes.

21  Q.  Did that alarm you?

22  A.  Yes.

23  Q.  Did you confirm if it was true?

24  A.  I didn't feel the need to do that since the organization's

25  playbook stated that some of its volunteers were sexual -- had

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    598

 1    been convicted of sexual crimes.

 2    Q.  Did Mr. Maulbetsch send any evidence to you?

 3    A.  No.

 4    Q.  Do you recall if he told you he had personally witnessed

 5    any USEIP canvassers interrogating any residents?

 6    A.  I don't recall.

 7    Q.  Did he tell you where USEIP members had canvassed?

 8    A.  I don't recall, but I also don't recall asking him.

 9    Q.  Did he show you any of the notes he had used in writing

10    his stories?

11    A.  No.

12    Q.  So do you know whether he took realtime contemporaneous

13    notes of his interviews with people or if he wrote everything

14    up later?

15    A.  I don't know.

16    Q.  You knew he identified himself as a progressive

17    investigative reporter?

18    A.  No.  I considered him to be an investigative reporter.  I

19    didn't know about the progressive part.

20    Q.  Can I have you take a look at Exhibit 65, Ms. Hendrix.

21    A.  Okay.

22    Q.  Do you remember reading this article?

23    A.  Yes.

24    Q.  Did you discuss the contents of the article with

25    Mr. Maulbetsch before it happened?

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    599

1    A.   Before what happened?

2    Q.   Before this was published.

3    A.   No.

4    Q.   Did you discuss it with him after it was published?

5    A.   I believe so, yes.

6    Q.   Is this the allegation that you got that the canvassers

7    were calling themselves with an official sounding name?

8    A.   I don't recall if it was this article.

9    Q.   Can you turn to page 5 and let me know if you recall that

10   screenshot there.

11   A.   From Charity M.?

12   Q.   Yes.

13   A.   Yes, I see it.

14   Q.   Are you aware of how Mr. Maulbetsch came by this

15   screenshot?

16   A.   No.

17   Q.   You don't recall that he got into the Basecamp group of

18   USEIP?

19   A.   No.

20   Q.   Let me ask you to turn to Exhibit 70.  Have you found it?

21   A.   Yes.

22   Q.   Is this one of the articles that you relied upon in your

23   understanding of USEIP?

24   A.   I don't believe so, no.

25   Q.   Let me ask the same question about the article at

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3     07/17/2024    600

1   Exhibit 78.

2   A.  No.  I don't know that I've ever seen this article.

3   Q.  Let me ask you to turn to Exhibit 80.  Do you recognize

4   this e-mail?

5   A.  Yes.

6   Q.  Who is it from?

7   A.  Andy Sullivan, a correspondent with Reuters news.

8   Q.  And what is -- in this e-mail what is he asking you to do

9   or asking you for?

10  A.  He is looking for voters who received a visit from USEIP

11  and if they'd be willing to talk about their experience.

12  Q.  And can you read the last paragraph?

13  A.  We've gotten a lot of secondhand reports of this sort of

14  activity, but have yet to speak with someone who has been

15  subject to it.  It would be a big help for our story.

16  Q.  Do you understand why he would want to go beyond

17  secondhand reports to actually speak to someone?

18          MS. STOCK:  Objection, foundation.  Testifying to

19  someone else's knowledge.

20          THE COURT:  Sustained.

21  Q.  (By MR. POWELL) Do you recall responding to this e-mail?

22  A.  I believe I responded and said we're not giving out names.

23          MR. POWELL:  I'd like to move this in evidence, Your

24  Honor.

25          THE COURT:  It's already in evidence.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    601

1              THE COURTROOM DEPUTY:  Yes.

2              MR. POWELL:  Thank you.

3    Q.  (By MR. POWELL) Please turn to Exhibit 82.  Do you

4    recognize this article?

5    A.  I do not.

6    Q.  That appears to be from the ACLU of Pennsylvania?

7    A.  It appears that way.

8    Q.  And it's titled Rights of Canvassers in Pennsylvania?

9    A.  Yes.

10   Q.  But this is not a source of information for you?

11   A.  No.

12   Q.  Let me ask you to turn to Exhibit 102.  Do you recall this

13   e-mail?

14   A.  I believe so.

15   Q.  Do you recall speaking with this reporter before this

16   e-mail?  Before she sent this e-mail, do you recall having the

17   conversation she's referring to?

18   A.  I don't.  I'm not saying it didn't happen.  I just don't

19   recall it.

20   Q.  Did you think that the fact that several journalists

21   reported several facts made it more likely those facts were

22   true?

23   A.  Yes.

24   Q.  Did it occur to you that the later media reports could

25   have gotten their information from the earlier reports?

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    602

1              MS. STOCK:  Objection, asked and answered.

2              THE COURT:  Overruled.

3    A.  No.

4    Q.  (By MR. POWELL) That didn't occur to you?

5    A.  No.

6    Q.  So it didn't occur to you that they might not have been

7    doing independent verification, but tagging along?

8              MS. STOCK:  Objection, asked and answered.

9              THE COURT:  Well, sustained.

10   Q.  (By MR. POWELL) Do you have a way today of distinguishing

11   the reports you got from the media from rumors?

12   A.  Are you saying do I know that the media wasn't just

13   publishing rumors?

14   Q.  No.  I want to know if there's some way that you have to

15   distinguish what you read from rumors.

16   A.  Well, I don't believe that the articles about USEIP were

17   presented as rumors.

18   Q.  That's not my question.  I'm asking if you have any way to

19   differentiate them from rumors given that you did no

20   independent investigation.

21             MS. STOCK:  Objection, misstates her prior testimony.

22             THE COURT:  Overruled.  I'll allow her to answer.

23   A.  Do I know how to discern rumor from media report?

24   Q.  (By MR. POWELL) That's not exactly my question, but you

25   can answer that one to start.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3     07/17/2024    603

1    A.  I believe so.

2    Q.  How is that?

3    A.  Well, I believe that if rumors are printed in the media,

4    they're stated to be rumors and not stated as fact.

5    Q.  If the reporter knows it's a rumor?

6           MS. STOCK:  Objection, foundation.

7           THE COURT:  Sustained.

8    Q.  (By MR. POWELL) It was media reports you relied on to say

9    in your press release -- do you recall that press release?

10   A.  Yes.

11   Q.  That the defendants were employees of Mike Lindell, and

12   that he was possibly funding these activities, right?

13   A.  Yes.

14   Q.  Do you know whether he was funding the defendants'

15   activities?

16   A.  No.  That's why we said possibly.

17   Q.  You had no personal knowledge of his funding?

18          MS. STOCK:  Objection, asked and answered.

19          THE COURT:  Overruled.

20   A.  I know that he funded Cause of America where both Ms. Epp

21   and Mr. Smith were employed.

22   Q.  (By MR. POWELL) And is it your understanding they were

23   employed with Cause of America in order to do canvassing?

24   A.  I don't know why.

25   Q.  Let me have you turn to Exhibit 107.  Do you recall this

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    604

1    e-mail?

2    A.  Not offhand.

3    Q.  At the bottom of the thread do you see the e-mail from

4    Isabelle Chapman to League of Women Voters Colorado Operations

5    Manager, CNN inquiry as the subject?

6    A.  Yes.

7    Q.  Do you recall reading that e-mail?

8    A.  No, but, again, I just don't recall.  I'm not saying it

9    didn't happen.

10   Q.  Do you recall speaking with Ms. Chapman, the journalist?

11   A.  I do not.

12   Q.  Do you recall telling Ms. Baker of the League of Women

13   Voters at the top of the thread to, quote, please give her my

14   cell number and tell her I'm unavailable until tomorrow

15   afternoon?

16   A.  I don't recall that, but I clearly e-mailed that to Laura

17   Baker.

18   Q.  Do you have any doubt that this is an e-mail thread that

19   you looked at at some point?

20   A.  No, I do not have any doubt.

21   Q.  Okay.

22        MR. POWELL:  Your Honor, I'm not sure this is in

23   evidence.  I'd like to move it in.

24        THE COURT:  Any objection?

25        MS. STOCK:  Hearsay.

                    Sarah K. Mitchell, RPR, CRR

1           THE COURT:  Overruled.  I'll admit Exhibit 107.

2      (Exhibit 107 received.)

3  Q.  (By MR. POWELL) As far as you know you didn't speak with

4  Ms. Chapman further?

5  A.  I don't recall.

6  Q.  And you also concluded based on media reports that USEIP

7  was associated with QAnon; is that right?

8  A.  Yes.

9  Q.  What does it mean to be associated with QAnon?

10  A.  I don't really know.

11  Q.  Does that mean to speak about it?

12  A.  I suppose to speak about it and possibly hold the values

13  of.

14  Q.  Was it important to you in this litigation there might be

15  some association --

16  A.  No.

17  Q.  -- between the defendants and QAnon?

18  A.  No.

19  Q.  Now, you didn't speak to the Colorado Montana Wyoming

20  State Area Conference of the NAACP prior to filing the

21  complaint, right?

22  A.  No.

23  Q.  Did you send them any evidence backing up the complaint?

24  A.  I don't recall.

25  Q.  Do you recall if they sent you any information?

22-cv-00581-CNS-NRN  Bench Trial - Day 3  07/17/2024  606

1   A.  I don't recall.

2   Q.  You did speak with the executive director of Mi Familia

3   Vota; is that right?

4   A.  That's correct.

5   Q.  In January of 2022?

6   A.  Yes.

7   Q.  And he said he wanted to partner on this filing of the

8   complaint?

9   A.  Yes.

10  Q.  Did Mi Familia Vota send you any evidence that they had

11  gathered that would support the complaint?

12  A.  Not that I recall.

13  Q.  Did you send the executive director Mr. Hernandez any

14  evidence?

15  A.  It's possible, but not that I recall.

16  Q.  Let me ask you to turn to Exhibit 105, Ms. Hendrix.  We've

17  spoken about this document, I believe.  Does that look

18  familiar to you?

19  A.  Yes.

20  Q.  What is it?

21  A.  It's an e-mail notifying our membership that we had filed

22  this litigation.

23  Q.  Did you participate in its drafting?

24  A.  Yes.

25  Q.  Were you the primary draftsperson or did you supervise

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    607

1    someone?

2    A.   I believe I was the primary drafter.

3    Q.   Now, your complaint says that USEIP volunteers visited

4    residents' homes; is that right?

5    A.   Yes.

6    Q.   Why does this press release's subheader say group claiming

7    election fraud is reportedly visiting residents' home.   Is

8    that because you didn't have evidence of actual visits, just

9    reported visits in the media?

10   A.   I don't know.   I drafted the e-mail.   I did not draft the

11   press release.

12   Q.   Did you approve the press release?

13   A.   Yes.

14   Q.   So you did read it?

15   A.   Yes.

16   Q.   All right.   Let me ask you to look at the second page,

17   third paragraph.   It's actually the second full paragraph,

18   starts this lawsuit alleges.

19   A.   Yes.

20   Q.   Let me just read this to you and recall if -- let me know

21   if you recall reading this.   This lawsuit alleges that members

22   of USEIP have been going door to door throughout Colorado

23   apparently targeting neighborhoods with diverse populations.

24   Do you recall why you wrote apparently or approved the word

25   apparently?

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    608

 1          MS. STOCK:  Objection, misstates prior testimony.

 2   Ms. Hendrix didn't draft the press release.

 3          THE COURT:  Sustained.

 4   Q.  (By MR. POWELL) I asked if you as well recall approving

 5   the word apparently.

 6   A.  I approved the press release as a whole.

 7   Q.  Okay.  Do you know why you approved the word apparently

 8   targeting neighborhoods?  It seemed apparent?  Is that the

 9   evidence you had at the time?

10   A.  Yes.

11   Q.  That was based on media reports?

12   A.  Yes, as well as responses we had received from my e-mail.

13   Q.  Now, the next sentence of this paragraph says, While

14   incidents have been documented statewide -- where were these

15   incidents documented?

16          MS. STOCK:  Objection, foundation.

17          THE COURT:  Overruled.

18   A.  Pueblo, Jeffco, the majority of the counties on the

19   eastern side of the state, and according to Ms. Epp's report,

20   all 64 counties.

21   Q.  (By MR. POWELL) All 64 counties were what?

22   A.  USEIP is active in all 64 counties.

23   Q.  And you took that to mean they were canvassing in all 64

24   counties?

25   A.  Yes.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    609

1  Q.  You recognize that canvassing requires volunteers to come

2  forward to agree to canvass, right?

3  A.  Yes.

4  Q.  Did it occur to you that not every county could maybe

5  amass that number of volunteers?

6  A.  Then why would they say they're active in all counties?

7  Q.  Could it be because they do things other than canvassing,

8  such as organizing people or educating people?

9  A.  Yes.

10 Q.  So that might be a reason they're active in all 64

11 counties that doesn't include canvassing?

12 A.  That's possible.  It's my understanding that USEIP was

13 formed to canvass, to contact individual voters looking for

14 voter fraud.

15 Q.  So what is the basis of the statement that they were

16 canvassing statewide?

17 A.  What I just said.

18 Q.  Your assumption?

19 A.  No.  We have heard reports from USEIP itself that it's in

20 all 64 counties.

21 Q.  Canvassing in all 64 counties?

22 A.  Active in all 64 counties, and it's my understanding that

23 USEIP was formed to canvass.

24 Q.  It's still an assumption you're making, isn't it?

25         MS. STOCK:  Objection, asked and answered.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    610

1              THE COURT:  Overruled.

2    Q.  (By MR. POWELL) You're assuming because they were formed

3    for a particular reason, that that reason actually was

4    effective in all 64 counties in the state?

5    A.  Yes.

6    Q.  I see.  What was the evidence you had that USEIP was in

7    Mesa County?

8    A.  Media reports.  It's my understanding USEIP was founded

9    out of Mesa County.

10   Q.  Now, you said that the founders were Ms. Epp and

11   Ms. Kasun, right?

12   A.  And Mr. Smith is what I understand.

13   Q.  Did you believe them to be residents of Mesa County?

14   A.  I don't know where they live.

15   Q.  I see.  But you thought they went to Mesa County and

16   founded the organization?

17   A.  I don't know.  It's -- it was my understanding that

18   original efforts were out of Mesa County.

19   Q.  Are you aware there were other canvassing organizations in

20   Mesa County?

21   A.  No.

22   Q.  Voter Integrity Project?

23   A.  No.

24   Q.  Did you hear of one called Stand for the Constitution?

25   A.  Only since this trial started.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    611

1    Q.  Did you believe that the defendants were working on a

2    canvassing project with Sherrona Bishop of Mesa County?

3    A.  I don't know.

4              MR. POWELL:  That's all I have, Your Honor.

5              THE COURT:  Ms. Epp.

6              MS. EPP:  Your Honor, I have quite a bit.  Can I have

7    a quick bio break before we get started?

8              THE COURT:  Sure.  Let's see, why don't we go ahead

9    and take our morning break a little early.  Why don't we break

10    until ten after ten.  We'll be in recess.

11              THE COURTROOM DEPUTY:  All rise.  Court is in recess.

12        (Break was taken from 9:47 a.m. to 10:10 a.m.)

13              THE COURT:  Please have a seat.

14              Ms. Epp, you may proceed.

15                          CROSS-EXAMINATION

16    BY MS. EPP:

17    Q.  Good morning, Ms. Hendrix.

18    A.  Good morning.

19    Q.  You testified that you brought this case because of the

20    information you received from your national organization and

21    Free Speech For People, as well as because of news reports

22    stating that voters were intimidated; is that correct?

23    A.  Correct.

24    Q.  Do you recall when you decided to file this case?

25              MS. STOCK:  Objection, asked and answered.

                          Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    612

1          THE COURT:  Overruled.  She has answered it, but

2     we've got a new pro se defendant asking questions, so I'll

3     give her a little leniency.

4          Go ahead.

5     A.  I can't remember the exact date.  I believe it was March

6     of 2022.

7     Q.  (By MS. EPP) And that's when you filed this case.  I'm

8     asking you when you decided to bring this case.

9     A.  I would say within a week before filing.

10    Q.  Okay.  Do you recall sending an e-mail to -- I believe

11    it's Tony Larson, and I'm not asking you about the substance

12    of the e-mail.  I'm asking you about sending an e-mail to Tony

13    Larson regarding potential litigation on August 26th of 2021.

14    A.  I don't remember offhand.

15    Q.  Okay.  Can I refresh your memory?  Can you turn to

16    Exhibit 96, please.  And it will be the very first line on the

17    very first page.

18    A.  Okay.

19    Q.  Do you recall this e-mail?

20    A.  I don't.

21    Q.  You don't dispute the e-mail?

22    A.  No.

23    Q.  And prior to sending that e-mail, you had no prior

24    knowledge of USEIP or their canvassing; is that correct?

25    A.  I am sorry.  I don't know in terms of the timing when I --

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    613

 1  when I learned of USEIP.  I must have learned of USEIP before

 2  sending this e-mail.

 3  Q.  And so around that time you learned of USEIP from your

 4  national organization and Free Speech For People, correct?

 5  A.  Yes.

 6  Q.  And so before that, before you learned of free -- learned

 7  of USEIP from your national organization and Free Speech For

 8  People, you had no knowledge of USEIP activities prior to

 9  that, correct?

10  A.  I believe that's true, yes.

11          THE COURT:  I'm going to remind you to slow down.

12          MS. EPP:  I'm sorry.

13  Q.  (By MS. EPP) One of your colleagues requested a board vote

14  on whether to bring this case following this e-mail; is that

15  accurate?

16  A.  Yes.  It would -- a decision like this would definitely

17  require a board vote.

18  Q.  And that board vote to pursue this litigation took place

19  on August 31st, 2021.  Does that sound correct?

20  A.  I'm sorry.  I don't know.

21  Q.  Same with Exhibit 96.  Can you look at line 5, please,

22  first page.

23  A.  Okay.

24  Q.  And can you read the privileged description.  It's the

25  very last column.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    614

1        MS. STOCK:  Objection to the extent she's seeking

2  information that's protected by the attorney-client privilege.

3        THE COURT:  Overruled.  This is the privilege log, so

4  any information on here is not privileged by definition, so

5  you may answer.

6  A.  You're asking me to read --

7  Q.  (By MS. EPP) Yes, please.

8  A.  E-mail from K. Sheek requesting board votes regarding

9  potential litigation.

10  Q.  And did that board vote take place?

11  A.  Yes.  I'm not sure of the date, but yes.

12  Q.  And you retained counsel for this lawsuit to pursue this

13  lawsuit on September 23rd of 2021; is that correct?

14  A.  That sounds correct.

15  Q.  Four days after that board vote, which took place

16  August 31st, 2021, you sent an e-mail to your 2,200 members --

17  I think you said members and subscribers; is that accurate?

18  A.  Yes.

19  Q.  And this is the e-mail that you referenced yesterday in

20  your testimony where you claimed to have had one member

21  respond that she had been intimidated, correct?

22  A.  Correct.

23  Q.  You don't have personal knowledge of that one voter,

24  because you didn't speak to her, right?

25  A.  That's correct.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    615

1    Q.   She spoke to one of your board members?

2    A.   I believe two of my board members, but yes.

3    Q.   Okay.  There's no documentation about those conversations

4    or that member's experience, correct?

5    A.   I don't believe so.  She didn't want to come forward.

6    Q.   So the only evidence of one of your members claiming to be

7    intimidated is your testimony based on what one of your board

8    members told you, correct?

9    A.   That's correct.

10   Q.   There is documentation, however, of the responses that you

11   received in support of USEIP activity; is that correct?

12   A.   I'm sorry.  Would you repeat that?

13   Q.   There is documentation of the responses that you received

14   in support of USEIP activity?

15   A.   Yes.

16   Q.   Do you know Tara Menza?

17   A.   I don't know her, but I've received e-mails from her.

18   Q.   So you don't know if Ms. Menza at the time of those

19   e-mails was a member of The League?

20   A.   I believe she was.

21   Q.   Do you know if at any point she was a board member of The

22   League?

23   A.   Not of the state league, no.

24   Q.   Do you recall Ms. Menza e-mailing you about her

25   experiences with canvassing?

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024   616

1    A.  Yes.

2         MS. EPP:  Okay.  Can we pull up Exhibit 84?  And this

3    is admitted.

4         THE COURTROOM DEPUTY:  I'm sorry.  When you say we,

5    what table are you going to?  Plaintiffs are doing it?  Okay.

6    Thank you.

7    Q.  (By MS. EPP) Do you recall receiving this e-mail?

8    A.  Yes.

9    Q.  And can you read the first -- the first kind of three and

10   a quarter lines up to the first period in the fourth line?

11   A.  Hi, Beth.  I received an e-mail from you about people

12   coming door to door intimidating voters.  I received a knock

13   on my door a few weeks ago by someone from my community who

14   was -- who asked me about voting back in November.

15   Q.  And the next sentence as well.

16   A.  The person was very polite and not intimidating at all.

17   Q.  Did you speak with Ms. Menza after receiving this e-mail?

18   A.  No.  I believe I responded to her e-mail.

19   Q.  You responded to this e-mail?

20   A.  I'm not 100 percent sure.

21   Q.  Did you produce this e-mail in discovery?

22   A.  Yes.

23   Q.  You did?

24   A.  Yes.

25   Q.  So this e-mail was not turned over to us in discovery, so

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3   07/17/2024   617

1   it's your testimony that you produced it, but your counsel

2   didn't turn it over?

3   A.  I don't know.

4   Q.  In addition to Ms. Menza, you heard from Amanda Carlson

5   September of 2021?

6   A.  Yes.

7   Q.  At the time of this exchange, Ms. Carlson was a member of

8   The League and of USEIP; is that correct?

9   A.  She stated she was a member of USEIP.  I don't actually

10  know if she was a member of The League.

11  Q.  Okay.  Can we pull up -- I just lost the number.  I

12  apologize -- Ms. Carlson's --

13          MR. REISCH:  I think it's 85.

14          MS. EPP:  85, thank you.

15  Q.  (By MS. EPP) Can we go to the next page.  So the second

16  page of this exhibit, Ms. Hendrix, at the bottom, Amanda

17  Carlson e-mails you September 7th.  Can you read the first

18  line?

19  A.  I'm a member of the Election Integrity Group, and I

20  certainly would not be a part of any group that intimidates

21  anyone.

22  Q.  Can you read the last -- I believe it's the last two

23  sentences starting with I am a retired.

24  A.  There we go.  Sorry.  I am a retired software engineer and

25  have many questions and no answers.  I would love to chat with

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    618

 1    you about this as it sounds like you should have the answers

 2    since you are asserting there's no fraud.  Please contact me

 3    back so we can set up a time to talk.

 4    Q.  Thank you.  And then you responded to Ms. Carlson.  It's

 5    the exchange above.  Can you read the first -- the first

 6    couple lines of that as well?

 7    A.  Hi, Amanda.  Thanks for reaching out.  We've heard from a

 8    few people who have received visits by USEIP volunteers who

 9    have stated they did not feel intimidated at all and that the

10    USEIP volunteers were very polite.  We've heard reports of

11    other volunteers being openly armed which has been found to be

12    quite intimidating.

13    Q.  And those reports of people being openly armed, that's

14    what -- you've testified that those were news reports,

15    correct?

16    A.  Correct.

17    Q.  Not reports to The League?

18    A.  Correct.

19    Q.  Thank you.  And can -- in the next line it says, I do

20    understand that USEIP volunteers, including yourself, are

21    doing what they're doing in support of free and fair

22    elections; is that accurate?

23    A.  Yes.

24    Q.  Thank you.  We're still on September 7th in the timeline.

25    This will be Exhibit 76, if you could please pull it up.  Do

                         Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    619

1    you recall receiving an e-mail from Joani Walton?

2    A.  Yes.

3    Q.  And can you go to Exhibit 76 and wait for them to get it

4    up.  Thank you.  Can we go to the second page, please.  Are

5    you there?

6    A.  Yes.

7    Q.  You're on the second page?

8    A.  Yes.

9    Q.  Can you read the first -- just we'll do the first two

10   sentences after the introduction.

11   A.  From Joani?

12   Q.  Yes.

13   A.  I was insulted and disappointed by your post about some

14   volunteers going door to door.  I did already read this this

15   morning, for the record.

16   Q.  That's correct.

17   A.  I found your posts to be very ignorant and on the verge of

18   threatening.  I am thankful that someone is doing this job of

19   checking the voter rolls.

20   Q.  And then Ms. Walton gives you her experience with her

21   daughter moving out of state, notifying the state of her

22   change of status in voter, and then continuing to receive

23   ballots.  Is that an accurate representation of what's here?

24   A.  Yes.

25   Q.  Can we go back to the first page, please.  I'm going to

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3      07/17/2024   620

1    ask you to read just a couple sentences of your response.  And

2    the first one, the first sentence of the third paragraph, so

3    that's the paragraph that starts with the United States

4    Election Integrity Plan.

5    A.   The United States Election Integrity Plan is apparently

6    targeting certain people based on publicly available voter

7    data.  USEIP volunteers are apparently often armed when going

8    door to door to inquire as to how people voted in the 2020

9    election.

10   Q.   So you told a voter that USEIP volunteers were apparently

11   openly armed and inquiring as to how people voted.  And what

12   evidence did you have to support those claims that you

13   confidently and authoritatively said to a concerned League

14   member?

15   A.   Media reports.

16   Q.   And that's it, correct?

17   A.   Yes.  And I said apparently.

18   Q.   You said apparently often armed, correct?

19   A.   Uh-huh.

20   Q.   Okay.  Read the next sentence.

21   A.   That is really unfortunate what you and your daughter

22   experienced following her move out of state with ballots

23   continuing to be mailed despite her repeated notification, but

24   no crime was committed in their continued mailing.

25   Q.   Were you in the courtroom yesterday when Mr. Beall was

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3     07/17/2024     621

1   testifying?

2   A.  Yes.

3   Q.  Can you please read the third bullet down in your

4   response.

5   A.  Citizenship status is checked by election officials to

6   expunge noncitizens.

7   Q.  And the next bullet says that Colorado is a member of

8   ERIC, correct?

9   A.  Correct.

10  Q.  You heard Mr. Beall testify yesterday to an incident that

11  happened in 2022 about a technical issue with the ERIC system,

12  correct?

13  A.  Yes.

14  Q.  That issue led to 30,000 postcards being sent to Colorado

15  residents encouraging them to register to vote, and according

16  to Mr. Beall's testimony only three of those 30,000 recipients

17  of those postcards were citizens.  Do you recall that?

18  A.  Yes.

19  Q.  Based on your updated knowledge, is the response that you

20  gave to Ms. Walton about citizenship information

21  misinformation?

22  A.  No.

23  Q.  Why?

24  A.  Because those postcards that were mistakenly sent by the

25  Secretary of State's Office did not -- were not

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    622

 1   register-to-vote postcards.  No one registered to vote based

 2   on those postcards.

 3   Q.  You can't be certain of that.  Mr. Beall didn't testify to

 4   that.  Mr. Beall testified that those postcards were sent out

 5   encouraging people to register to vote.  That's the testimony.

 6   Do you recall that?

 7   A.  Yes.

 8   Q.  Thank you.  I'll move on.  I'd like to move into the -- so

 9   the Joani Walton, Amanda Carlson responses, those were the

10   responses you received after sending your blast e-mail,

11   correct?

12   A.  Yes.

13   Q.  The first blast e-mail on September 4th, correct?

14   A.  Yes.  They were some of the responses, yes.

15   Q.  Were there others?

16   A.  I believe so, yes.

17   Q.  Okay.  In the time up to September 7th, which we've gone

18   through September 7th as it pertains to your members' reports

19   -- the record reflects those too.  So up to that point, those

20   were the responses that you received; is that accurate?

21   A.  I don't know for sure.  I would need to look back.

22   Q.  Are there -- I'm sorry.  Did you have something else?

23   A.  No.

24   Q.  Are there reports that you received that you did not

25   produce --

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    623

1    A.  No.

2    Q.  -- as discovery?  Okay.  And the lone exception -- sorry.

3    I'll go back.  These responses -- Joani Walton, Amanda Carlson

4    -- were entirely supportive of USEIP; is that correct?

5    A.  Yes.

6    Q.  And up to the point of September 7th, the lone exception

7    is the one member that you didn't talk to, but one of your

8    board members or possibly two of your board members did talk

9    to, but neither -- neither you nor the board member

10   memorialized that conversation, correct?

11   A.  Well, we did receive, as I stated earlier, an e-mail from

12   Jean Hoffman saying she and her husband had received a report

13   -- or received a visit.

14   Q.  Okay.  I'm not aware of that e-mail.  I don't believe it's

15   in the record, just for the Court.  The next day after

16   receiving the responses that you received on September 7th --

17   both Ms. Walton and Ms. Carlson were on September 7th.  The

18   next day you sent your blast e-mail again on September 8th; is

19   that correct?

20   A.  I believe that was a newsletter, but yes.

21   Q.  Same language --

22   A.  Yes.

23   Q.  -- correct?

24   A.  Yes.

25            MS. EPP:  Okay.  And then on -- and for the record,

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    624

1    that's Exhibit 108, Your Honor, which is admitted.

2         THE COURT:  All right.

3    Q.  (By MS. EPP) And then you sent the same language to your

4    recipient audience again on September 10th; is that correct?

5    A.  I don't know.

6    Q.  Can you go to Exhibit 110, please?

7         MS. EPP:  That's also admitted, Your Honor.

8    A.  Okay.  This looks like a newsletter.

9    Q.  (By MS. EPP) So the same language --

10   A.  Uh-huh.

11   Q.  -- was sent September 7th -- or September 4th,

12   September 8th, and September 10th, correct?

13   A.  I'm not sure.  I would need to see them all side by side,

14   but --

15   Q.  Okay.  Well, let's do that.  You looked at the

16   September 4th notice yesterday, right?  So you know that that

17   one happened, correct?

18   A.  Sure.

19   Q.  Okay.  And we've just looked at September 10th.  We can

20   say that one happened.  Let's go to 108.  Can you confirm that

21   that is September 8th and the same language?

22   A.  Yes.  I'm a little confused, because it seems to just be a

23   duplicate.

24   Q.  It has a different date, though, correct?

25   A.  Yeah, I agree.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    625

1    Q.  So it was -- so based on the record of what we can see,

2    the same language was sent September 4th, September 8th, and

3    September 10th, correct?

4    A.  It looks that way, yes.

5    Q.  And do all of these communications -- so the e-mail blast

6    that you sent and your newsletter, is that the same audience

7    of 2,200 people?

8    A.  Yes.

9    Q.  Okay.

10    A.  It's 2,200 members.  More nonmembers.

11    Q.  So it's more than 2,200 people.  It's a broader list, but

12    2,200 of them are members?

13    A.  That's correct.

14    Q.  How big is the entire distribution?

15    A.  About 4,500.

16    Q.  Thank you.  After the two newsletters, September 8th and

17    September 10th, you received the e-mail from Matt Menza on

18    September 14th; is that accurate?

19    A.  Likely.

20    Q.  Okay.  Do you -- would you like to refresh your memory as

21    to date?  The dates are really important to me, so that's why

22    I'm belaboring this.

23    A.  Sure.

24    Q.  That's 111.  Can you confirm that was September 14th?

25    A.  Yes.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    626

1   Q.  And, of course, with the exception of Ms. Menza's e-mail

2   -- and actually, according to your testimony including

3   Ms. Menza's e-mail, you turned over all of these complaints

4   and responses during discovery, correct?

5   A.  Yes.

6   Q.  How would you describe your relationship with Secretary of

7   State Jena Griswold?

8   A.  I don't -- I wouldn't say she and I have a relationship.

9   Q.  Do you have her phone number?

10  A.  No.

11  Q.  Okay.  Are you aware that Ms. Griswold sent a press

12  release about canvassing on September 9th of 2021?

13  A.  Yes.

14  Q.  So right in between your two newsletters, Ms. Griswold

15  sent a press release about canvassing to a much broader

16  audience than your 4,500 people; is that correct?

17  A.  I don't know what her audience is, but, yes, she sent it.

18  Q.  I think -- so not to assume, but I think we can assume

19  that the Secretary of State's audience is broader than 4,500

20  people in a state of 3.8 million voters, wouldn't you agree?

21          MS. STOCK:  Objection, foundation, and Ms. Epp is

22  testifying.

23          THE COURT:  Well, overruled.  I'll allow her to

24  answer the question.

25  A.  I don't know.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    627

1    Q.  (By MS. EPP) Okay.  So since your communications had

2    yielded with the exception of the one voter that we don't have

3    a record of, your communications weren't yielding the desired

4    outcome of identifying witnesses for this lawsuit, correct?

5    A.  I don't know that we had a goal.  We were looking to see

6    if anyone responded.

7    Q.  Okay.  But you were looking to pursue litigation as early

8    as August 26th, correct?

9    A.  Yes.

10    Q.  Okay.  Let's move on to March 9th of 2022 and your filing

11    of this lawsuit, and specifically the press release upon

12    filing of this lawsuit.  Do you recall filing that press

13    release?

14    A.  Yes.

15    Q.  Can you --

16         MS. EPP:  And I don't believe this exhibit is

17    admitted yet.  I'd like to lay the foundation for it, Your

18    Honor.

19    Q.  (By MS. EPP) Can you look at 105, Ms. Hendrix?

20    A.  Yes.

21    Q.  You testified earlier that you drafted this?

22    A.  I drafted the e-mail, but not the press release.

23    Q.  But you reviewed and approved the press release, correct?

24    A.  Yes.

25         MS. EPP:  Your Honor, I'd ask to move 105 into

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    628

 1   evidence.

 2           THE COURT:  Is there any objection?

 3           MS. STOCK:  Relevance, hearsay.

 4           THE COURT:  Overruled.  Exhibit 105 is admitted.

 5       (Exhibit 105 received.)

 6   Q.  (By MS. EPP) So in response to this press release, you got

 7   a couple positive responses supportive of your efforts,

 8   correct?

 9   A.  Yes.

10   Q.  On March 10th -- can you look at Exhibit 43?  This is also

11   not in evidence yet.  On the bottom of 43 you can see the date

12   March 10th, so the day after you issued your press release you

13   received an e-mail from Ann-Marie Fleming?

14   A.  Yes.

15   Q.  Do you recall this e-mail?

16   A.  Yes.

17           MS. EPP:  Move to admit Exhibit 43, Your Honor.

18           MS. STOCK:  Objection, hearsay.

19           THE COURT:  Overruled on hearsay.  I'll admit

20   Exhibit 43.

21       (Exhibit 43 received.)

22   Q.  (By MS. EPP) And Ms. Hendrix (sic) said, So glad you are

23   challenging these people, correct?

24   A.  No.  Ms. Fleming said that.

25   Q.  I meant to say Ms. Fleming.  My bad.  So Ms. Fleming said,

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    629

1  So glad you're challenging these people, correct?

2  A.  Yes.

3  Q.  And then on March 12th of 2022 -- this is Exhibit 106 --

4  e-mail from Deborah McKee.  Do you recall seeing this e-mail?

5  A.  Did you say 106?

6  Q.  Oh, I'm sorry.  I thought you were there.  Yes, 106.

7  A.  I don't remember offhand, but I'm not doubting this.

8  Q.  Okay.  This exhibit is in evidence because you produced it

9  during discovery.  You don't have any doubt to --

10  A.  No.

11        MS. EPP:  I move to admit 106, Your Honor.

12        THE COURT:  Any objection?

13        MS. STOCK:  No, Your Honor.

14        THE COURT:  Exhibit 106 is admitted.

15    (Exhibit 106 received.)

16  Q.  (By MS. EPP) And this is an e-mail from Deborah McKee.

17  Can you read what she said?

18  A.  She said, Excellent.  I have my 2022 annual fund donation

19  notice and will be sending a donation to LWVCO.

20  Q.  So in response to your communications in September 2021,

21  the documented responses were entirely in support of USEIP,

22  correct?

23        MS. STOCK:  Objection, misstates the exhibit.

24        MS. EPP:  I'm not speaking to the exhibit.  I'm

25  asking a question.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    630

1    A.  Would you repeat that, please?

2    Q.  (By MS. EPP) In response to your communications in

3    September of 2021, September 4th, September 8th,

4    September 10th, the responses you received were entirely

5    supportive of USEIP as pertains to the record recognizing

6    there was the one board member that had a conversation, yes?

7          MS. STOCK:  Objection, misstates prior testimony.

8          THE COURT:  Overruled.  I'll allow her to answer.

9    A.  No.  We did receive an e-mail from a Jean Hoffman saying

10   that she had received a visit.

11   Q.  (By MS. EPP) Okay.  And that e-mail, for the record, is

12   not in evidence.  And so in response to this Exhibit 106, not

13   only did you receive the Ann-Marie Fleming communication in 43

14   saying so glad you're challenging these people, you also had a

15   commitment for funds based on your press release for your

16   lawsuit, correct?

17          MS. STOCK:  Objection, misstates prior testimony.

18          THE COURT:  Overruled.

19   Q.  (By MS. EPP) You can answer.

20   A.  Apparently.  That said, I do not remember receiving a

21   donation from Ms. McKee.  It doesn't mean she didn't do it,

22   but it was not substantial.

23   Q.  And you didn't produce any financial records during

24   discovery, correct?

25   A.  I don't know.  If I was asked for them, I produced them,

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    631

1    and they're available on our publicly facing website as well.

2    Q.  Okay.  So let's move on to the media responses to your

3    efforts.  When did you have a personal interaction with Erik

4    Maulbetsch of the Colorado Times Recorder for the first time?

5    And that can be virtually, e-mail, phone call.  When was your

6    first interaction, do you recall?

7    A.  I would think in the August, September, October of 2021

8    timeframe.

9    Q.  Okay.  Can you look at Exhibit 123, please?

10            MS. EPP:  And this is admitted, Your Honor.

11   Q.  (By MS. EPP) Are you there?

12   A.  Yes.

13   Q.  Was this your first interaction with Erik Maulbetsch?

14   A.  I believe so.

15   Q.  Okay.  So shortly after you sent your blast e-mail on

16   September 4th, on September 6th you received this e-mail, and

17   he sent you some of his reporting, correct?

18   A.  Yes.

19   Q.  I'm not asking you about the substance of that reporting,

20   but I am curious if you know that all of those articles made

21   it into your complaint?

22   A.  I don't know.

23   Q.  You're not aware of that?  Okay.  Did you respond to

24   Mr. Maulbetsch's e-mail?

25   A.  I believe so.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    632

1    Q.  You responded by e-mail?

2    A.  I'm not 100 percent sure.

3    Q.  Okay.  There's no record of an e-mail response to

4    Mr. Maulbetsch.  You did -- when Mr. Powell was asking you

5    questions earlier, you testified that you spoke to

6    Mr. Maulbetsch by phone and via Zoom; is that correct?

7    A.  Yes.

8    Q.  So that implies you had at least two conversations with

9    him?

10    A.  Yes.

11    Q.  Was the first -- can you recall roughly when the first I

12    would imagine phone call was with Mr. Maulbetsch relative to

13    him reaching out via e-mail?  Was it the same day, within a

14    week?

15    A.  I'm sorry.  I don't know.

16    Q.  You don't know.  And the second -- was that the second

17    time, I'm assuming when you spoke to him by Zoom, was that

18    relatively close to the first time?  Did you talk to him right

19    on top of each other, or did you talk to him in a -- more

20    spread out, do you recall?

21        MS. STOCK:  Objection, compound question.

22        THE COURT:  Sustained.  Why don't we try and break

23    that down.

24    Q.  (By MS. EPP) So you don't recall the first time you spoke

25    to him by phone.  We know your first interaction was September

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024   633

1  6th.  You spoke to him by phone at some point and by Zoom at

2  some point.  Was that activity close together?

3  A.  I would guess within a couple-month period.

4  Q.  So you were speaking to Erik Maulbetsch from September 6th

5  over a couple of months a couple of times?

6  A.  I believe so.

7  Q.  Okay.  In addition to the articles he sent you on

8  September 6th, there is another article in your complaint from

9  Erik Maulbetsch dated October 1st of 2021.  Are you aware of

10 that article?

11 A.  I don't know.

12 Q.  That's the article Mr. Powell -- Exhibit 65, which is

13 admitted -- can you look at Exhibit 65?

14 A.  Okay.

15 Q.  And do you recall if you spoke to Erik Maulbetsch prior to

16 October 1st?

17 A.  I don't know the exact date.

18 Q.  But he published this article after e-mailing you,

19 correct, on September 6th?

20 A.  Yes.

21 Q.  Okay.  So you keep referring, Ms. Hendrix, to news

22 articles and media reports as the reason -- one of the reasons

23 that you decided to bring this case back in August, September

24 of 2021.  But you're heavily relying on the reporting of Erik

25 Maulbetsch from the Colorado Times Recorder; isn't that

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    634

1    correct?

2            MS. STOCK:  Objection, misstates prior testimony.

3            THE COURT:  Overruled.

4    A.  We used other journalists' articles as well.

5    Q.  (By MS. EPP) Used them where?

6    A.  Just for general background.

7            THE COURTROOM DEPUTY:  I'm sorry to interrupt.  You

8    said Exhibit 65 was admitted.  It has not been offered.  He

9    used it.  He didn't offer it.

10           MS. EPP:  I'm so sorry.

11           THE COURT:  It's fine for you to refer to it, but if

12   you want it in evidence, you need to lay the foundation with

13   her and then offer it.

14           MS. EPP:  I just wanted her to confirm the date of

15   it.

16           THE COURT:  Okay.

17   Q.  (By MS. EPP) In your complaint there are several news

18   articles cited.  The only news article cited that referred to

19   the defendants' activities, USEIP, and canvassing are from the

20   Colorado Times Recorder.  Are you aware of that?

21   A.  No.

22   Q.  Three of those four articles are written by Erik

23   Maulbetsch.  Are you aware of that?

24   A.  No.  I haven't looked at the complaint in a while.

25   Q.  Okay.  Yesterday you referred to Mr. Maulbetsch as a

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024   635

1   columnist before --

2   A.  Yeah, I corrected myself.

3   Q.  Before -- before changing your answer to investigative

4   journalist; is that correct?

5   A.  Yes.

6   Q.  You believe Erik Maulbetsch is an investigative

7   journalist?  Meaning, my definition of that, is he reports

8   straight news, rather than his opinions.  Is that your

9   understanding?

10  A.  Yes.

11          MS. STOCK:  Objection.

12          THE COURT:  I'll overrule it since she answered.

13  Q.  (By MS. EPP) Yesterday you testified that The League has

14  done a significant amount of work about mis-, dis-, and

15  malinformation, correct?

16  A.  Yes.

17  Q.  And I'm just going to refer to this bucket, those three

18  terms -- misinformation, disinformation, and malinformation --

19  for brevity, I'm going to refer to that as misinformation

20  okay?

21  A.  Sure.

22  Q.  When I say misinformation, I'm referring to all three

23  buckets.  You testified I believe yesterday that you educate

24  your members and voters on how to spot or recognize

25  misinformation; is that correct?

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    636

1    A.  Yes.  We provide resources.

2    Q.  Can you give a quick summary of how you spot and recognize

3    misinformation?

4    A.  Critical thinking skills, doing backup research if you

5    have questions, looking at sources.

6    Q.  Anything else?

7    A.  That's the nutshell.

8    Q.  And did you -- in evaluating Mr. Maulbetsch's reporting

9    before bringing this lawsuit, did you use your critical

10    thinking skills, backup -- what was the second one that you

11    said?  I can't read my handwriting.  Did you conduct backup

12    research or look at sources?

13    A.  I conducted -- we looked at other articles written by

14    people other than Mr. Maulbetsch, other media sources, yes.

15    Q.  You didn't include them in your complaint, though?

16    A.  As I said, I'm sorry, I can't remember what articles we

17    referred to in the complaint.

18    Q.  Okay.  And finishing up on this time period, this

19    September time period with regards to media responses to your

20    efforts, the day after you spoke with Mr. Maulbetsch you began

21    coordinating press activities for your narrative against USEIP

22    with members of your staff or members of The League; is that

23    correct?

24            MS. STOCK:  Objection, misstates prior testimony.

25            THE COURT:  Overruled.  I'll allow her to answer.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    637

1    A.  Would you repeat the question, please?

2    Q.  (By MS. EPP) Yes.  You -- one day after you heard from

3    Mr. Maulbetsch on September 6th, on September 7th of 2021, you

4    began coordinating press activities for your narrative against

5    USEIP with members of The League, correct?

6    A.  No.  Press activities?

7    Q.  Can you refer to Exhibit 109, please.

8    A.  Okay.

9    Q.  And this is the e-mail that Mr. Powell was discussing with

10   you from Marjorie Gray who I believe you referred to as the

11   Chaffee County -- is she the director of The League in Chaffee

12   County?  What's --

13   A.  President, I believe.

14   Q.  Okay.  And she's asking you do you want to put this in the

15   press, do you want the responses to come to you, should they

16   go to somebody else?  That's kind of the gist of it, right?

17   A.  Yes.

18   Q.  And do you dispute that that's coordinating press

19   activities?

20   A.  Well, I believe that I said to her, no, we don't want it

21   in the local paper.

22   Q.  Did you produce that exchange during discovery?

23   A.  I produced all exchanges, so perhaps I spoke to her -- if

24   I didn't send an e-mail response, perhaps I spoke to her on

25   the phone.  I don't recall.

                          Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024   638

1    Q.   Okay.

2          MS. EPP:  Your Honor, I would move to admit Exhibit

3    109.

4          THE COURT:  Any objection?

5          MS. STOCK:  Relevance.

6          THE COURT:  Overruled.  Exhibit 109 will be admitted.

7     (Exhibit 109 received.)

8    Q.  (By MS. EPP) Did you find that a coordinated approach to

9    press was a good idea because you were going to get a lot of

10   press inquiries about your narrative against USEIP?

11   A.   I don't -- I don't know what you mean by a coordinated

12   response.

13   Q.   Okay.  In response to your e-mail blast, in addition to

14   Mr. Maulbetsch, you were also contacted by a journalist from

15   the Christian Science Monitor, correct?

16   A.   I'm not sure.  I don't recall.

17   Q.   Can you look at 102?

18   A.   Okay.

19   Q.   And do you recall this now?

20   A.   Yes.

21          MS. EPP:  Your Honor, I would move 102.

22          THE COURT:  Any objection to 102?

23          MS. STOCK:  Objection as to relevance.

24          THE COURT:  Overruled.  I'll allow 102.

25     (Exhibit 102 received.)

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024   639

1   Q.  (By MS. EPP) And Ms. Matusek, Sarah Matusek,

2   M-a-t-u-s-e-k, she didn't have any knowledge of voter

3   intimidation, did she?  She was attempting to report on the

4   voter intimidation that you were sharing, correct?

5           MS. STOCK:  Objection, foundation, hearsay.

6           THE COURT:  Sustained as to foundation.

7   Q.  (By MS. EPP) Can you read the first line, just read the

8   second paragraph of this e-mail, please.

9   A.  As I mentioned, I'm beginning to report on grassroots

10  activism organized around election integrity efforts.  I'd

11  value scheduling around a 20-minute phone call with you to

12  learn what you're hearing about USEIP and other efforts in the

13  state that perpetuate election fraud conspiracy theories.

14  Q.  Did you talk to Ms. Matusek?

15  A.  I don't recall.

16  Q.  Did you respond to this e-mail?

17  A.  I don't recall.

18  Q.  Okay.  Did you receive any information from Ms. Matusek

19  that she was aware of voters being intimidated?

20          MS. STOCK:  Objection, hearsay, foundation.

21          THE COURT:  Overruled.  I'll allow her to answer

22  whether she did or didn't.

23  A.  I don't recall.

24  Q.  (By MS. EPP) But you certainly don't have any voters

25  identified by Ms. Matusek that were intimidated, correct?

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    640

1    A.  Correct.  I did not -- no.  No reporter came to me with

2    voters -- with intimidated voters.  They were looking for

3    names of intimidated voters, and the intimidated voter who was

4    one of our members did not want to be named.

5    Q.  So it's your testimony that no reporter came to you with

6    voters that were intimidated, correct?

7    A.  Did not come to me, no.

8    Q.  We can move quickly through the rest of these then.

9    According to your discovery documents -- actually, let me back

10   up.  We've established that the two inquiries from

11   Mr. Maulbetsch and Ms. Matusek were in response to your e-mail

12   blast in September 2021, correct?

13   A.  Yes.

14   Q.  And according to your discovery documents, you received an

15   another wave of press inquiries when you filed this lawsuit,

16   correct?

17   A.  Yes.

18   Q.  Okay.  And there was a lot of press, correct?

19   A.  Yes.

20   Q.  And that was in response to your press release, correct?

21   A.  Yes.  The press release was put out by the partner

22   organizations, as well as Free Speech For People, yes.

23   Q.  Correct.  You all put out a press release minutes after

24   you filed your lawsuit, correct?

25   A.  Correct.

                          Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    641

1   Q.  And just one -- so I'll go quickly through these, but I

2   want to get one more of these admitted.  You received an

3   e-mail from David Gilbert at Vice News on March 5th, 2022.  Do

4   you recall that?

5   A.  I believe so.

6   Q.  Can you look at 113?

7   A.  I see it.

8   Q.  Okay.  And this e-mail didn't come directly to you.  It

9   appears it came to League of Women Voters Colorado Operations

10  Manager; is that correct?

11  A.  Yes.

12  Q.  And why is that, do you think?

13  A.  I would assume it's a message received through our website

14  contact form.

15  Q.  Okay.  And he is reaching out in regards to your lawsuit,

16  correct?

17  A.  It appears that way, yes.

18  Q.  And can you read the -- in the second paragraph, the

19  second sentence, can you read that, please?

20  A.  I'm working on a report about the group and its efforts

21  around the country.

22  Q.  Continue, please.

23  A.  We'd like to see if there are any voters who spoke to you

24  who would be willing to speak with us about being approached

25  by this group.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    642

1    Q.  So it didn't appear he had any knowledge about voters

2    being approached, correct?

3            MS. STOCK:  Objection, foundation.

4            THE COURT:  Overruled.  I'll allow her to answer.

5    A.  I don't know that.

6    Q.  (By MS. EPP) What's your sense from reading the e-mail?

7    A.  Well, I mean, truthfully, I would assume that they did

8    have voters somewhere if they're reporting on this group and

9    its efforts around the country, but I don't know that.

10   Q.  So when he says We'd like to see if there are any voters

11   who spoke to you who would be willing to speak with us about

12   being approached by this group, you take that to mean that

13   he's aware of voters?

14   A.  I don't think it means that he doesn't have other voters

15   in pocket.

16   Q.  Okay.  So in response to your lawsuit filed on March 9th,

17   2022, and the press release issued on March 9th, 2022, you

18   received communication from Vice News, CNN, as established by

19   Mr. Powell, Reuters, as established by 104 -- apologies -- by

20   Mr. Powell, Exhibit 104.  And in particular with regards to

21   Reuters and Mr. Sullivan -- and this is Exhibit 104, if you'd

22   like to refer to it -- he says -- Mr. Sullivan says he has yet

23   to speak to anyone about -- that has been approached.

24   A.  That's what that says.

25   Q.  And just for the record, did you speak with any of these

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    643

1    reporters?

2    A.   I don't recall speaking with Mr. Sullivan.

3    Q.   Okay.  And Ms. Chapman?

4    A.   Was she the Christian Science Monitor?

5    Q.   CNN.  That's 107.

6    A.   I don't recall.

7    Q.   And Mr. Gilbert from Vice?

8    A.   Same.  I don't recall.  I don't believe I spoke with them,

9    but I don't recall.

10   Q.   Do you recall responding to their e-mails?

11   A.   I don't recall.  I didn't always respond if they were just

12   looking for voter names, because we were not supplying the

13   name of our intimidating (sic) voter.

14   Q.   So after issuing a press release --

15   A.   Intimidated voter, excuse me.

16   Q.   After issuing a press release about your lawsuit and the

17   allegations in your lawsuit, you received responses from Vice,

18   CNN, and Reuters, and it's your testimony that you might not

19   have responded?

20   A.   Yes.  It's possible I didn't respond.  We received media

21   requests from other outlets as well, and --

22   Q.   Did you produce those?

23   A.   I produced everything.

24        MS. EPP:  Okay.  For the record, the interactions

25   between Ms. Hendrix and any of these reporters are not in

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    644

1    evidence, nor are there any other e-mail reports from media.

2    A.  I'm not a hundred --

3            MS. STOCK:  Objection, Ms. Epp is testifying.

4            THE COURT:  Well, I don't know what the issue is

5    here, but I'd like you to move on.  I think you've established

6    what you wanted to establish, and I can't rule on what's been

7    produced or what hasn't been produced.

8            MS. EPP:  Okay.

9    Q.  (By MS. EPP) Ms. Hendrix, given your work with

10   misinformation, did you find it odd that representative news

11   outlets full of investigative journalists were unable to

12   identify a single voter that supported your allegations even

13   with Mr. Sullivan's October 17th, 2022 -- seven and a half

14   months after filing your case --

15           MS. STOCK:  Objection.  Go ahead.

16   Q.  (By MS. EPP) -- did you find it odd, given your work with

17   misinformation, that there was not a single voter that

18   corroborated your allegations at that time?

19           MS. STOCK:  Objection, foundation and -- foundation.

20           THE COURT:  And what's the other one?

21           MS. STOCK:  Foundation.

22           MS. EPP:  May I be heard, Your Honor?

23           THE COURT:  Well, no.  Overruled as to foundation.

24   A.  No.  I didn't particularly find it odd, because people who

25   are intimidated don't generally come forward.  They tend to

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    645

1    hide.

2    Q.   (By MS. EPP) But these are investigative journalists.  By

3    the time of seven and a half months after filing your lawsuit,

4    you have a reporter from Reuters, which is a news wire

5    essentially, coming to you and saying I have yet to speak with

6    a voter.  Did that trigger your critical thinking skills as

7    pertains to misinformation?

8            MS. STOCK:  Asked and answered.

9            THE COURT:  Overruled.

10   A.   No.  Again, I believe that people who are intimidated

11   don't tend to come forward.

12   Q.   (By MS. EPP) Did it trigger any -- you to do any backup

13   research as it pertained to your allegations?

14   A.   No.

15   Q.   Did it cause you to go back and look at the sources again?

16   A.   No.

17   Q.   And, again, the lone outlet referenced in your complaint

18   with regards to USEIP and the defendants' canvassing was

19   Colorado Times Recorder, correct?

20   A.   As I said, I haven't looked at the complaint in a while.

21   I don't know.

22   Q.   Okay.  Does the lack of corroborating stories and outlets

23   so long after your complaint, October 17th, 2022, by that

24   time, does the lack of corroborating stories not trigger your

25   misinformation skill set as it pertains to the integrity of

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    646

1    the Colorado Times Recorder?

2          MS. STOCK:  Objection, compound question,

3    argumentative.

4          THE COURT:  Overruled on that basis.  I'm going to

5    sustain an objection on relevance.  We've explored this ad

6    nauseam.  We are in day three of this trial, and we're not

7    even to the defendants' case.  It seems as if we are venturing

8    into a different area rather than the plaintiffs' case.  So

9    after this witness, we're going to talk about changing how

10   we're doing these witnesses, because although I like one

11   witness to be called, we are going into areas that have

12   nothing to do with the claim, that appear to have something to

13   do with an allegation of a frivolous claim, and that can be

14   done as part of the defendants' case.  So I'm going to --

15   we're going to talk about this after this witness, but we now

16   may call people twice, because I want to focus on the

17   plaintiffs' claims first, and should they be sufficient, we

18   will go to the defendants' defenses.

19         MS. EPP:  So I may be able to recall her?

20         THE COURT:  Yes.

21         MS. EPP:  Okay.

22   Q.  (By MS. EPP) Let's talk about your safety plan.  You

23   represented your safety plan as a diversion of resources,

24   correct?

25   A.  Yes.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    647

1    Q.  When did you write the safety plan?

2    A.  I believe before filing the lawsuit.

3    Q.  Directly before?

4    A.  Yes.

5    Q.  Okay.  Can you look at Exhibit 90, please.

6         MS. EPP:  And I believe this is in evidence.

7    A.  Yes.

8    Q.  (By MS. EPP) Where did you get the idea to sue Mike

9    Lindell?

10   A.  At the time we believed he was involved in funding the

11   operations of USEIP.

12   Q.  And why did you believe that?  Did it come from your

13   national organization?

14   A.  I'm sorry.  I don't recall.

15   Q.  Do you recall if it came from Free Speech For People?

16        MS. STOCK:  Objection, to the extent she's seeking

17   information that's protected by the attorney-client privilege.

18        THE COURT:  Sustained on that basis.

19        So, again, Ms. Hendrix, do not provide any

20   information provided to you by an attorney.  But if you can

21   answer otherwise, you may answer.

22   A.  That's it.

23   Q.  (By MS. EPP) Did you have personal knowledge of Mike

24   Lindell being involved with USEIP?

25   A.  I had read some sort of media reports that connected him.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3      07/17/2024    648

1    Q.  To USEIP?

2    A.  I believe so.

3    Q.  And do you recall what those media reports were?

4    A.  No.  The article prior where Mike Lindell referred to

5    himself as God, I don't know if there was a mention of USEIP

6    in that article.

7    Q.  Okay.  Yesterday you testified that you never had a good

8    reason -- or never had reason to put out a safety plan prior

9    to learning about USEIP; is that correct?

10   A.  Yes.

11   Q.  Is that because you hadn't filed litigation like this

12   before?

13   A.  Yes.

14   Q.  The safety plan does not mention USEIP or USEIP

15   canvassing; is that correct?

16   A.  That's correct.

17          MS. EPP:  Your Honor, I'd like to remind the Court

18   and preserve for the record that this document was cited as a

19   diversion of resources, and it was never produced in

20   discovery.  We didn't receive it until January 8th, 2024.

21          THE COURT:  I think I dealt with that in written

22   filings, so, yes, move on.

23          MS. EPP:  In an oral status hearing, Your Honor.

24   Q.  (By MS. EPP) Let's move on to the playbook.  You said to

25   Mr. Powell the playbook calls for arming canvassers.  You

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    649

1    reviewed the playbook, and that's not in it, correct?

2    A.   I believe that I saw in some version of the playbook a

3    reference to security and lining up volunteers with those that

4    had security, were carrying.

5    Q.   And as you visually kind of recall that in your mind, does

6    it look like the same document as what you referred to,

7    Exhibit 1?  You can look again, if you'd like.

8    A.   I believe so.  I believe so.

9    Q.   Okay.  You also stated that the USEIP -- you've also

10   testified prior that the USEIP playbook calls for

11   intimidation; is that correct?

12   A.   I testified that the playbook calls for intimidation?

13   Q.   In your deposition you said that the playbook calls for

14   intimidation.  Do you recall that?

15   A.   No.

16   Q.   Okay.

17           MS. EPP:  How do I -- do we pull in the deposition?

18           THE COURT:  What you would do is you -- whoever has

19   her original deposition will hand it to Ms. Dynes.  Assuming

20   she said that, we will direct her to the page, and you may

21   read it aloud.

22           MS. EPP:  I read it aloud?

23           THE COURT:  Or you can have her read it aloud, since

24   she'll be holding it.  I don't know if -- do you have a copy?

25           MS. EPP:  I have a copy, Your Honor.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    650

1    MR. WYNNE:  Your Honor, if it may be helpful, there's

2  an index in most of the backs of each deposition transcript

3  that may or may not save time.

4    THE COURT:  All right.  I think Ms. Epp might know

5  the page.

6    MS. EPP:  I do.  It's page 127, line 12.

7    THE COURT:  All right.  Ms. Hendrix, what day was

8  your deposition taken?  It should say on the cover.

9    THE WITNESS:  November 23rd, 2022.

10    THE COURT:  All right.  Ms. Epp has directed you to

11  page 127, line 12.

12  Q.  (By MS. EPP) And actually, you can begin at line 11.

13  A.  Correct.  I believe that all three as the founders and

14  leaders of USEIP, you know, their playbook calls for

15  intimidation, so...

16  Q.  So you stated -- you testified prior that the playbook

17  calls for intimidation; is that correct?

18  A.  Yes.

19  Q.  And you reviewed the playbook this morning when Mr. Powell

20  was asking you questions.  Can you identify where in the

21  playbook it calls for intimidation?

22  A.  The part I was referring to was the part about security.

23  I could not locate it.  It's possible it was in an earlier

24  version of the playbook.

25  Q.  Okay.  When Mr. Powell was asking you questions, you

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    651

1    mentioned a woman named Jean Hoffman; is that correct?

2    A.  Yes.

3    Q.  Is that the same as Jean Jaramillo or are they different?

4    A.  No.  I believe they're different people.

5    Q.  You mentioned Ms. Kasun speaking to the media, and you had

6    heard Ms. Kasun speaking to the media.  Do you recall that?

7    That you heard her speech in the media?

8    A.  I don't recall saying that.  I'm not doubting that.

9    Q.  Have you heard Ms. Kasun's speech in the media?

10   A.  I have -- I don't know.  I've seen photos of her, of the

11   three of you sitting on some sort of panel.

12   Q.  So you've seen a photo of us sitting on a panel, but you

13   haven't necessarily heard our speech in the media?

14   A.  I believe that I have heard quotes from Ms. Kasun in the

15   media, yes.

16   Q.  When you say heard quotes from, is that from another

17   source, or did you hear Ms. Kasun's voice or read Ms. Kasun's

18   words?

19   A.  I believe I read Ms. Kasun's words.

20   Q.  In the original reporting?

21   A.  In a media report.

22   Q.  Okay.  And was that before or after you decided to file

23   this lawsuit?

24   A.  I'm guessing before.

25   Q.  Okay.  Before you decided to file the lawsuit -- not

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    652

1    before you filed it, but before you decided, which was

2    sometime around the end of August 2021.  And your prior

3    testimony is that you didn't have knowledge of USEIP's

4    activities prior to that point, but you -- you're guessing

5    that you had heard Ms. Kasun's words prior to that point?

6    A.  I'm sorry.  Prior to what point?

7    Q.  Your decision to bring this lawsuit.  So let's go with the

8    date of September 23rd, 2021, when you had signed a retainer

9    agreement for this lawsuit.  Prior to that point had you heard

10   Ms. Kasun's words?

11   A.  I believe I had read some of Ms. Kasun's words, yes.

12   Q.  And was that by happenstance, or was it because somebody

13   involved with this lawsuit, some of your colleagues, had shown

14   them to you?

15        MS. STOCK:  Objection to the extent that calls for

16   information that's protected under the attorney-client

17   privilege.

18        THE COURT:  Sustained, if it involves an attorney.

19   If it's from some other source, you may discuss it.

20   A.  I believe I read some of Ms. Kasun's words in media

21   reports prior to filing the lawsuit.

22   Q.  (By MS. EPP) What about prior to deciding to file the

23   lawsuit on September 23rd, 2021?

24   A.  I believe so as part of our general research.

25   Q.  Research for this lawsuit?

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    653

1  A.  That's correct.

2  Q.  So it was in relation to this lawsuit that you heard

3  Ms. Kasun's speech, not prior to or outside of the context of

4  this lawsuit; is that correct?

5  A.  That's correct.

6  Q.  Okay.

7          MS. EPP:  I just need a minute, Your Honor.  I'm

8  almost done.

9          THE COURT:  All right.

10  Q.  (By MS. EPP) When League of Women Voters stated in 2016

11  that the election was rigged, was The League spreading

12  misinformation?

13  A.  As I stated, I wasn't with The League at that time.  I had

14  nothing to do with that press release.  No, I don't believe

15  that they were spreading disinformation.

16  Q.  And that's not my question.  I'm not asking you about your

17  personal knowledge about that statement.  I'm asking you with

18  your extensive work on mis-, dis-, and malinformation, and

19  your prior statement that the defendants' questioning of the

20  2020 election was dangerous misinformation and would -- I

21  didn't write it down -- something along the lines of dissuade

22  people from exercising their right to vote, correct?

23  A.  Yes.

24  Q.  Okay.  In 2016, when the League of Women Voters stated

25  that the election was rigged, using your critical thinking,

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3   07/17/2024   654

1   backup research, and looking at sources, do you believe that

2   The League was spreading misinformation or potentially

3   dissuading people from exercising their right to vote?

4        MS. STOCK:   Objection, relevance and misstates prior

5   testimony.

6        THE COURT:   Overruled.

7   A.   I don't believe so.   In that article they stated reasons

8   for why they said that, that the election was rigged.   It was

9   based on sharply increased voter laws and regulations,

10   stronger restrictions on voting access throughout -- in states

11   throughout the nation.

12   Q.   (By MS. EPP) Okay.   And you've done extensive work on

13   mis-, dis-, and malinformation.   A headline that the 2016

14   election was rigged, in your experience of educating voters on

15   how to spot misinformation, how to deal with it, that's not a

16   little bit concerning to you?

17   A.   I didn't write it.   I had nothing to do with it.

18   Q.   I'm not asking you about your involvement in it.   I'm

19   asking your -- your case assumes that our speech and our

20   questioning -- you've testified earlier that the defendants'

21   questioning of the election would dissuade voters from voting

22   and would be -- you know, must be stopped, correct?   You

23   wanted it to stop, correct?

24   A.   Yes.

25   Q.   Okay.   So when the League of Women Voters in 2016 used the

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    655

1    same language, why is that different?

2    A.  I don't believe it's the same language.  I believe that

3    their reasoning for saying the 2016 election was rigged was

4    very different than the reasons I believe you all think the

5    2020 election was rigged.

6    Q.  And do you believe that anybody that read that headline

7    was going to understand, dig in, look at all the source

8    information, and understand the intention behind it?

9         MS. STOCK:  Objection, foundation and calls for

10    speculation.

11         THE COURT:  Sustained.  And I find this of limited

12    relevance, so move on.

13         MS. EPP:  I'll move on.

14    Q.  (By MS. EPP) You testified earlier when Mr. Powell was

15    asking you questions, you testified that it was not important

16    to you whether or not the defendants were associated with

17    QAnon; is that accurate?

18    A.  Yes.

19    Q.  So why was it important to put it in the complaint?

20    A.  I don't recall.

21    Q.  Okay.  Earlier today you testified that you believe that

22    USEIP -- USEIP and canvassing -- I believe you stated that

23    USEIP was formed for canvassing.  That was your understanding?

24    A.  That's my belief.

25    Q.  Okay.  And in the -- you were in the courtroom yesterday

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    656

1   when Mr. Beall was testifying, correct?

2   A.  Yes.

3   Q.  So you heard Mr. Beall testify that we were giving public

4   comment, we were engaging with elected officials, correct?

5   A.  Yes.

6   Q.  And that's not canvassing, right?

7   A.  Correct.

8   Q.  Ms. Hendrix, you have no personal knowledge of USEIP

9   conduct, do you?

10  A.  Personal knowledge?  Outside of reading e-mails and

11  hearing reports through our board of members, no.

12  Q.  So outside of hearsay from other sources, you have no

13  knowledge, you, Beth Hendrix, of USEIP activity?

14  A.  I have not received a visit, no.

15  Q.  You have no personal knowledge of my activities, correct?

16  My conduct?

17  A.  Outside of that you're a cofounder.

18  Q.  And what is your personal knowledge that I'm a cofounder?

19  A.  Media reports.

20  Q.  So you read media reports that I'm a cofounder.  Did you

21  ever read my writing?

22  A.  Yes.

23  Q.  Prior to this lawsuit?

24  A.  Oh, not that I know of.

25  Q.  Did you ever watch my podcast prior to this lawsuit?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    657

1   A.  No.

2   Q.  Did I ever personally threaten you or attempt to stop you

3   from voting?

4   A.  No.

5   Q.  You have no personal knowledge of USEIP canvassers

6   carrying firearms, do you?

7           MS. STOCK:  Objection, asked and answered.

8           THE COURT:  Sustained on that one.

9   Q.  (By MS. EPP) You did testify yesterday that the goal of

10  this lawsuit was to make us stop our activities though,

11  correct?

12  A.  Yes.  Canvassing activities, yes.

13          MS. EPP:  I have nothing further, Your Honor.

14          THE COURT:  All right.  Any brief redirect?

15          MS. STOCK:  I have just very brief redirect, Your

16  Honor.

17          THE COURT:  All right.

18                      REDIRECT EXAMINATION

19  BY MS. STOCK:

20  Q.  Ms. Hendrix, can you please turn to Exhibit 65.

21  A.  Yes.

22  Q.  Do you recognize this document?

23  A.  Yes.

24  Q.  And have you reviewed this document previously?

25  A.  I believe so, but I'm not 100 percent sure.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024   658

1           MS. STOCK:  At this time I would move to admit

2    Exhibit 65.

3           MR. REISCH:  Objection, hearsay, lack of foundation.

4           THE COURT:  Overruled.  The document will be

5    admitted.  As I indicated, I believe the defendants have

6    opened up this line of questioning, not for the truth of the

7    reports contained in the article, but for this witness's

8    knowledge of what she relied on in filing the lawsuit.

9       (Exhibit 65 received.)

10   Q.  (By MS. STOCK) Ms. Hendrix, I believe that you have

11   testified about an individual that responded to an e-mail that

12   you sent out regarding USEIP's conduct.  Do you recall that

13   testimony?

14   A.  Yes.

15   Q.  And I believe you testified that she did not make -- want

16   to make her complaint public; is that correct?

17   A.  Yes.  I didn't receive an e-mail from her.  A board member

18   received a phone call.

19   Q.  And to your knowledge, are you aware of why she was

20   unwilling to make her complaint public?

21          MR. REISCH:  Objection, hearsay.

22          THE COURT:  Overruled.

23   A.  She was frightened.

24   Q.  (By MS. STOCK) I'd ask that you turn to Exhibit 84.

25   A.  Yes.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    659

 1    Q.  And do you see the sentence in the middle of the paragraph

 2    that starts with while chatting with them?

 3    A.  Yes.

 4    Q.  Can you please read that sentence?

 5    A.  While chatting with them, they said the highest number of

 6    anomalies were with registered Dems having votes cast for them

 7    when they said they didn't vote in the 2020 election.

 8    Q.  Have you heard testimony in this case from the defendants

 9    about the script that canvassers were to use?

10    A.  Yes.

11    Q.  Are you -- reading this sentence, does that align with the

12    script that has been discussed during these proceedings?

13    A.  No.

14    Q.  And the sentence seems to be a conclusion that's already

15    been drawn.  Is that fair to say?

16    A.  Yes.

17    Q.  And is this type of conversation with voters the type of

18    concern that you had about the canvassing efforts by the

19    defendants?

20    A.  Among others, yes.

21    Q.  And what is the date of this e-mail?

22    A.  Tuesday, September 7th, 2021.

23    Q.  And that precedes the filing of this lawsuit by about six

24    months?

25    A.  Yes.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    660

1   Q.  Is it unusual for you as the head of a fairly large

2   organization to be contacted by the media?

3   A.  No.

4   Q.  Have you been contacted in the media in the past regarding

5   other league activities or conduct?

6   A.  Yes.

7   Q.  You've been badgered this morning about your decision to

8   file this lawsuit.  Is that fair to say?

9   A.  Yes.

10  Q.  And is it your understanding that we are at trial to prove

11  the allegations in the complaint?

12  A.  Yes.

13  Q.  Have you been present for all of the testimony in this

14  case so far?

15  A.  I believe I missed a little bit of it, but the large

16  majority, yes.

17  Q.  Have you heard testimony about the canvassing activities

18  of USEIP?

19  A.  Yes.

20  Q.  Have you heard testimony from Mr. Smith that he may have

21  carried a firearm while canvassing?

22  A.  Yes.

23  Q.  Have you heard evidence about the methods that USEIP used

24  to canvass?

25  A.  Have I heard evidence?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    661

1   Q.  Have you heard testimony about the methods that USEIP used

2   to canvass?

3   A.  Yes.

4   Q.  Have you heard evidence about the training that was

5   involved -- let me rephrase.  Have you heard testimony

6   regarding the training that was conducted for USEIP

7   canvassers?

8   A.  Yes.

9   Q.  And you've reviewed the playbook in this matter?

10  A.  Yes.

11  Q.  Do you consider the rhetoric in the playbook to be

12  intimidating?

13          MR. REISCH:  Objection, speculation, lack of

14  foundation, and calls for a legal conclusion.

15          THE COURT:  Sustained.

16  Q.  (By MS. STOCK) Did The League file this lawsuit to garner

17  press?

18  A.  No.

19  Q.  Did The League file this lawsuit to raise money?

20  A.  No.

21  Q.  Why did The League file this lawsuit?

22  A.  To stop voter intimidation.

23  Q.  Was fundraising a factor in any way, shape, or form in the

24  filing of this lawsuit?

25  A.  No.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3     07/17/2024     662

 1          MS. STOCK:  I have no further questions.

 2          THE COURT:  All right.  Ms. Hendrix, I do not have

 3   any questions for you, so you are released.

 4          THE WITNESS:  Thank you.

 5          THE COURT:  Let's see, it's 11:25.  Are there any

 6   other witnesses in the courtroom who have not yet -- anybody

 7   at any table that needs to testify other than Ms. Kasun?

 8          MS. ERICKSON:  Mr. Hernandez is in the courtroom,

 9   Your Honor.

10          THE COURT:  Because he's next?

11          MS. ERICKSON:  Well, yes.  Yes.

12          THE COURT:  All right.  Mr. Hernandez, would you mind

13   stepping out, because we're going to talk about the facts of

14   the case, and since you're going to testify, I'd rather you

15   not hear them.  So Ms. Dynes will come get you just shortly.

16          MR. HERNANDEZ:  Okay.

17          THE COURT:  Ms. Erickson, after Mr. Hernandez who

18   will you be calling?

19          MS. ERICKSON:  Most likely Ms. Kasun, Your Honor.

20          THE COURT:  All right.  And then who's next?

21          MS. ERICKSON:  So part of the reason I'm hesitating,

22   Your Honor, is that one of our witnesses, Ms. Prescott, has

23   had some travel issues.  She, I believe, is in flight at the

24   moment, and so we're trying to just coordinate with her on

25   when it is she'll be arriving here.  So if she has not

                          Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3     07/17/2024    663

1    arrived, then we may have to call our expert Professor Ellis.

2              THE COURT:  All right.  And remind me what

3    Ms. Prescott is testifying about?

4              MS. ERICKSON:  She's our NAACP representative, Your

5    Honor.

6              THE COURT:  Okay.  All right.  And I think after

7    lunch what I would like is an offer as to what your expert is

8    going to testify if called.  I don't at this point

9    particularly believe the testimony will be helpful to the

10   trier of fact, which is me, but I want to give you a chance to

11   make that proffer.

12             MS. ERICKSON:  Okay.

13             THE COURT:  So let's do that right after lunch.

14   Based on the limited allegations here, I don't know that I

15   need that sort of scope of testimony, and if allowed, it will

16   be limited to address the exact types of intimidation alleged

17   here.

18             All right.  And then let me talk to both sides about

19   this notion that you're just calling people once, because we

20   are drifting into other matters that pertain to defenses and

21   beyond.  Honestly, it looks like sometimes the defendants are

22   trying to revive counterclaims during the middle of a trial,

23   which obviously will not be entertained, but I don't need that

24   testimony at this point.

25             So what I would like is the plaintiffs to call

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3      07/17/2024    664

1   witnesses who are going to establish their case.  The

2   defendants to cross-examine them as to that scope.  If you

3   need to recall them later, you may do so.  Does anyone have

4   any questions about that?

5          MS. EPP:  I would just say, Your Honor, I thought we

6   were -- doing direct and cross, which was my intention.  I'm

7   trying to preserve the record.

8          THE COURT:  I completely understand that.  My concern

9   at this point is I assume there's going to be a Rule 52

10   motion, and some of this just may not be necessary.  So in the

11   interest of saving time, I want the details about plaintiffs'

12   claims solely, and then we will see how we're proceeding.  And

13   should additional matters need to be addressed through

14   defendants' case, they can.

15          So what I'm saying, and particularly for you, Ms.

16   Epp, is I do want you to thoroughly cross-examine the

17   plaintiffs' witnesses in which they're presenting their

18   claims.  But to the extent you have other matters you want to

19   discuss, so, for instance, this whole line of testimony about

20   what Ms. Hendrix knew about the complaint or at the time of

21   the complaint, that has some relevance, but is drifting into

22   other matters that may not be germane to whether the

23   plaintiffs have proved voter intimidation, and that's really

24   what I'd like to focus on as I've mentioned since the start of

25   the case.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    665

1        MS. EPP:  Can I say, Your Honor, that Ms. Hendrix was

2   the most extensive examination.  Everything else I plan to do

3   is very limited.

4        THE COURT:  All right.  Well, that sounds good.

5   Let's go ahead and call Mr. Hernandez.  Hopefully he will be

6   less time-consuming than Ms. Hendrix.  I am growing concerned

7   about the time of this trial.

8        MS. ERICKSON:  Your Honor, given your comments, and

9   just I could use a quick restroom break, may we have just a

10  few minutes to discuss amongst counsel our next witness?

11       THE COURT:  Sure.  All right.  Why don't we take a

12  ten-minute break.  My intention is to go to about 12:30, 12:40

13  today, so that will give Ms. Mitchell a break anyway.  So

14  let's take a ten-minute break until 11:35.

15       THE COURTROOM DEPUTY:  All rise.  Court is in recess.

16     (Break was taken from 11:26 a.m. to 11:36 a.m.)

17       THE COURT:  Please have a seat.  Plaintiff, do you

18  want to call your next witness?

19       MR. DILLON:  So we have taken your comments under

20  advisement, and what we would suggest -- how we would suggest

21  we proceed, Ms. Kasun is the only defendant who has yet to

22  testify, but we would propose we call her now, get her

23  testimony in.  We could then make an offer of proof as to the

24  remaining witnesses that we would intend to call.  And if Your

25  Honor wants to entertain a Rule 52 motion at that time to

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    666

1    decide if we need to hear from those witnesses, we could do

2    that then.

3           THE COURT:  Do the defendants have any objection to

4    that proposal?

5           MR. REISCH:  Your Honor, no, because I would

6    anticipate as our own offer of proof is that the two witnesses

7    from the NAACP and Mi Familia Vota would say that they have no

8    information, they have no complaints made from any of their

9    members, they have no personal knowledge of any of their

10   members being intimidated in any way by anyone from USEIP

11   directly or anyone of these defendants.  So unless --

12          THE COURT:  I don't need a speech.  I just need a do

13   you object?

14          MR. REISCH:  No.

15          THE COURT:  All right.  Mr. Wynne?

16          MR. WYNNE:  Some of the concerns raised and in

17   consideration of an appellate record, I do object.

18          THE COURT:  And what would you propose?

19          MR. WYNNE:  I am not sure that an objection is the

20   appropriate vehicle, but our expectation based on the e-mails

21   we've been receiving and our preparation has been that the

22   witnesses who have been identified would be called.  To that

23   extent, I'm not prepared to argue a Rule 52 if I'm asked to do

24   so, and I would like for the purposes of the record to get

25   some testimony from the representatives of the other

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    667

1    organizations, unless they're willing to stipulate to

2    something along the lines of what Mr. Reisch recited, which I

3    expect will be unacceptable.  There's no objection to calling

4    Ms. Kasun now, though.  That's the only issue.

5           THE COURT:  Well, let's proceed, and then the

6    plaintiffs can decide what they wish to do.  You can't be

7    forced to call a witness, so it's up to you on who you call

8    after Ms. Kasun.  So we'll just address it then.  And given

9    that, Ms. Epp, I don't really need you to state an opinion, so

10    that's why I'm not asking for one.

11           Let's hear from our next witness.

12           MS. STOCK:  At this time the plaintiffs call

13    Ms. Kasun.

14           THE COURT:  All right.

15           THE COURTROOM DEPUTY:  Raise your right hand.

16                         HOLLY KASUN

17    was called as a witness and, having been duly sworn, was

18    examined and testified as follows:

19           THE COURTROOM DEPUTY:  Please have a seat, and then

20    all you have to do is state your name.

21           THE WITNESS:  Holly Kasun.

22                      DIRECT EXAMINATION

23    BY MS. STOCK:

24    Q.  Good morning, Ms. Kasun.  Where do you reside?

25    A.  Summit County, Colorado.

                         Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3     07/17/2024    668

1   Q.  You are a founding member of the United States Election

2   Integrity Plan, correct?

3   A.  Correct.

4   Q.  And USEIP was founded in November of 2020, correct?

5   A.  Around there, yeah.  We just said it was the end of

6   November, early December.

7   Q.  Let's talk a bit about your involvement in USEIP.  In

8   addition to being a cofounder of USEIP, you were also a

9   volunteer, correct?

10  A.  Correct.

11  Q.  You were a -- or let me rephrase.  You are a part of the

12  core team; is that correct?

13  A.  Small C core team, yes.

14  Q.  How frequently did you attend USEIP meetings?

15  A.  About once a week, once every two weeks.

16  Q.  And what sorts of topics were addressed at those meetings?

17        MR. REISCH:  Your Honor, I'm going to object to

18  foundation.  That's a very broad subject.

19        THE COURT:  Overruled.  You can answer.

20  A.  A variety of topics.  We would talk about what was

21  happening in counties.  I would talk about press.  Shawn would

22  talk about technical types of information, results of his

23  research.  Ashe would talk about other groups that were

24  networking with USEIP.  That was the nature of the

25  conversations.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    669

1    Q.   (By MS. STOCK) When you say you were talking about press,

2    can you be more specific as to the types of matters you

3    discussed?

4    A.   Well, it evolved over time, because at the very beginning

5    I wasn't -- I wasn't handling press, because the nature of

6    USEIP at that -- at the beginning was much like a startup.

7    I'm a startup founder, so that's the nature of the

8    organization, and in those early days, it's very chaotic.

9    People are coming and going.  I mean, chaotic not in terms of

10   panic, but just it's not extremely organized.  There are no

11   processes, procedures.  It's people just doing the things that

12   they want to do.  And so early on in the process -- in terms

13   of press early on, it wasn't structured.  There was no press

14   person.  As the organization matured, I took on the role of

15   press to -- you know, that's what I do for a living, part of

16   what I do.  And so I just applied my professional skills to

17   USEIP in terms of press.

18   Q.   And at one point you became a spokesperson for USEIP.  Is

19   that fair to say?

20   A.   That's right.

21   Q.   You created USEIP's website, correct?

22   A.   Yes.

23   Q.   And you maintained USEIP's website?

24   A.   I did with volunteers as well.  There were a number of

25   people that were contributing to the website.

                         Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    670

1    Q.  You designed USEIP's logo?

2    A.  Yes.

3    Q.  And you created communication plans for USEIP; is that

4    correct?

5    A.  Yes.

6    Q.  Can you describe what a communication plan entails?

7    A.  So it was basically -- a communication plan comes from

8    corporate America.  What you do is you identify all of the

9    platforms that you're able to communicate on and maintain.

10   And you figure out the purpose of those outlets, whether it's

11   -- for example, I'll make it more tangible, social media, your

12   website, what role PR is going to play.  You take a

13   comprehensive view of all types of communication.  You analyze

14   what that looks like.  And once you have your domain,

15   basically your media footprint established, then you start

16   figuring out how each one of those platforms is going to be

17   used and what purpose do they serve.

18          For example, for Nike, a Twitter -- a Twitter feed

19   might not accept or be equipped to handle customer complaints,

20   and you would kind of figure out, well, where do we channel,

21   you know, free-form customer complaints, that kind of thing.

22   So you kind of figure out the features and functionality of

23   that media footprint.  And then you start looking -- getting

24   more tactical in terms of how you're going to use those --

25   those outlets in terms of what messaging you're going to

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    671

 1    produce and which platforms are going to be maintained.

 2    Q.  One way you contributed to USEIP was training volunteers

 3    regarding the press.  Is that fair to say?

 4    A.  Correct.

 5    Q.  And you at times helped USEIP volunteers, I believe you've

 6    testified, become press ready?

 7    A.  Yes.

 8    Q.  And you provided press training for Shawn Smith and

 9    Ms. Epp; is that correct?

10    A.  Yes.  And others.

11    Q.  In fact, you were in charge of providing press training

12    for anybody who was speaking on behalf USEIP?

13    A.  Correct.

14    Q.  And you helped USEIP volunteers place stories in local

15    newspapers, correct?

16    A.  Correct, if they came to me and asked.  I didn't tell them

17    to take a story to the press and go to their local paper with

18    the story.  That was not how the press operated through USEIP.

19    So if, for example, a volunteer wanted an op ed in their local

20    paper, and they didn't know how to do it, they didn't know how

21    to approach their local newspaper and ask for an op ed to be

22    published.  I would instruct them on how to do it.

23    Q.  Let's talk a bit about the communication plans.  You

24    discussed more generally what a communication plan is, and I

25    believe you mentioned being concerned about a media footprint.

                      Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    672

1    Can you discuss what sort of media footprint you were hoping

2    to make on behalf of USEIP?

3    A.  The media footprint I was concerned about making was

4    mostly what could we maintain as volunteers.  It's a rule of

5    thumb from the corporate world where I come from working in

6    media is that you don't want to be everywhere.  You don't want

7    to spin up every single possible social media platform, for

8    example, because it's really difficult to maintain.  So it was

9    much more strategic in terms of what we could maintain and

10   what was the functionality of the press outlets or platforms

11   that were available to us.

12   Q.  Is it fair to say you were strategic about what

13   information you put out on USEIP's behalf?

14   A.  Yes.

15   Q.  And is it fair to say you were strategic about the sorts

16   of media outlets in which you put out messaging on USEIP's

17   behalf?

18   A.  Could you repeat the question?

19   Q.  Is it fair to say that you were strategic in selecting the

20   media outlets through which you put out USEIP's messaging?

21   A.  When you say outlets, are you talking like newspapers and

22   communications outlets, or are you talking about Twitter

23   versus Facebook versus --

24   Q.  Let's talk about -- can you identify specific newspapers

25   that you conducted interviews with on behalf of USEIP?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    673

1  A.  I can't give you a totally comprehensive list, but I would

2  receive inbound inquiries for press, and I would write press

3  releases with my media contact information for USEIP, and I

4  would distribute those press releases on the website, just

5  post them, so if anybody visited the website they could read

6  the press release and download it.  So oftentimes, you know,

7  reporters would come to the website and download the press --

8  press releases.  And I also did e-mail -- I built

9  relationships with media outlets and would send them press

10  releases that were relevant to the types of news that they

11  covered and basically their beat and their audience.

12          So I can give you -- I've spoken to CNN, The New York

13  Times, the New York Post, Vice, the Epic Times.  I've spoken

14  to the Colorado Times Recorder.  I have spoken to the Denver

15  Post.  KDVR is a radio show.  I mean, the list goes on and on.

16  I was not exclusively looking at any specific like genre, I

17  guess you could say, of media outlet.  Just depended on what

18  the news was.

19  Q.  Do you recall making an appearance on the KOA radio show?

20  A.  I do.

21  Q.  Do you recall when that was?

22  A.  It was after canvassing was over.  I believe it was late

23  March of 2022.

24  Q.  What was your purpose for participating in that interview?

25  A.  They requested an interview.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    674

1   Q.  And do you recall some of the topics that were discussed

2   during that interview?

3   A.  I do.

4   Q.  What were some of those topics?

5   A.  The premise of the interview was to talk about the

6   Colorado report.

7   Q.  And so did you discuss USEIP's canvassing activities?

8   A.  I spoke about the result of USEIP's canvass activities,

9   which were summarized in the Colorado report.

10  Q.  Did you discuss how USEIP's canvassing activities were

11  conducted?

12  A.  No.  Not to my recollection.

13  Q.  Do you recall if you discussed the questions that were

14  asked of voters during canvassing activities?

15  A.  I'm sorry.  Could you repeat that question?

16  Q.  Do you recall if during the interview with KOA that you

17  discussed the specific questions that were asked during

18  canvassing efforts by USEIP volunteers?

19  A.  I don't recall.

20  Q.  Would it be helpful to have your recollection refreshed?

21  A.  Yes, please.

22          MS. STOCK:  Hashini, can you please pull up clip

23  number two.  And this is Exhibit No. 61.

24          MR. REISCH:  Your Honor -- Your Honor?

25          THE COURT:  Yes.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3      07/17/2024    675

1       MR. REISCH:  I believe that she would have to listen

2    to it not in open court because it's not admitted and then be

3    asked questions about refreshing recollection.

4       MR. WYNNE:  Look, I'll tell you what.  Could I have a

5    moment to confer with co-counsel?

6       THE COURT:  Sure.

7       MR. WYNNE:  After conferring, I do think the most

8    prudent course, because I don't know what it is, is to join in

9    the objection and suggest perhaps we wait until later in the

10   questioning.  I do object to foundation.

11      MS. STOCK:  If I may be heard, Your Honor?

12      THE COURT:  Yes.

13      MS. STOCK:  I don't intend to offer the exhibit.  I

14   only intend to refresh Ms. Kasun's recollection.  I'm also

15   happy to lay a foundation.

16      THE COURT:  All right.  Why don't you lay the

17   foundation and reoffer it.  I understand you're not -- you're

18   offering it for -- to refresh her recollection, and normally

19   it's a document that she could read silently.  In the interest

20   of time, if there is a foundation, I will just let you play it

21   and see if it refreshes her recollection.

22   Q.  (By MS. STOCK) Ms. Kasun, I believe you previously

23   testified that you recall giving an interview on the KOA radio

24   show on March of 2022; is that correct?

25   A.  Yes.


                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    676

1    Q.  Were you aware that that interview was being recorded?

2    A.  Yes.  It was a radio interview.

3    Q.  Were you aware that that interview was played live on the

4    radio as you were giving your interview?

5    A.  I didn't know if it was taped or live.

6    Q.  Was it your understanding at some point that your

7    interview would appear or be played on the radio station?

8    A.  Potentially.  I mean, the thing is with interviews, you're

9    never sure if the story is going to be published, and the same

10   thing with radio interviews.  I didn't know if it was taped or

11   live, so I didn't know if it was going to be played or not.

12   Q.  At the time you gave the interview, you were aware that

13   there was a possibility it could be played live on the radio.

14   Is that fair to say?

15   A.  Yes.

16          MS. STOCK:  At this time I would seek to refresh

17   Ms. Kasun's recollection.

18          THE COURT:  Let's play -- how long is the clip?

19          MS. STOCK:  Well, I don't intend to -- it's eight

20   minutes, I suppose depending upon her testimony, but I don't

21   intend to play the entire video, just clips.

22          THE COURT:  The clip you're going to, is it

23   refreshing her recollection on that last question you just

24   asked?

25          MS. STOCK:  Yes.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    677

1              THE COURT:  Then let's play that, but then stop the

2    clip.

3         (Audio played.)

4    Q.   (By MS. STOCK) Ms. Kasun, does that refresh your

5    recollection regarding whether you spoke with the KOA radio

6    station regarding the questions that were asked during USEIP's

7    canvassing efforts?

8    A.   I'm sorry.  Could you repeat the question?

9    Q.   Sure.  Does that clip refresh your recollection as to

10   whether you spoke on the KOA radio show regarding the

11   questions that were asked of voters during USEIP's canvassing

12   efforts?

13   A.   Yes.

14   Q.   You also stated during that interview that we definitely

15   know we found anomalies.  Do you recall stating that?

16   A.   Yes.

17   Q.   For example, you explained that some voters did not cast a

18   ballot in the election, and then Secretary of State's own

19   public records showed that a ballot was cast in a voter's

20   name.  Do you recall using that as an example of an anomaly

21   that you found?

22   A.   That came from the Colorado report, yes.

23   Q.   And you also stated that USEIP found lost votes.  Do you

24   recall stating that?

25   A.   I don't recall that.

                    Sarah K. Mitchell, RPR, CRR

1   Q.  Would it help if I refreshed your recollection regarding

2   whether you made that statement?

3   A.  Yes, please.

4       (Audio played.)

5   Q.  (By MS. STOCK) Ms. Kasun, does that refresh your

6   recollection as to whether you discussed USEIP's finding of

7   lost votes during its canvassing efforts?

8   A.  Yes.  And, again, that came from the Colorado report.

9   Q.  And lastly, during this interview you explained that these

10  anomalies affect local races, and it impacts every Colorado

11  voter.  Do you recall stating that?

12  A.  Yes.

13  Q.  Are these the types of topics that you usually addressed

14  during interviews that you gave on USEIP's behalf?

15  A.  Are these the topics?

16  Q.  Yes.

17  A.  No, not across the board.  This was one of many

18  interviews.  Given the fact that USEIP did more than

19  canvassing, I gave interviews on numerous types of topics

20  surrounding elections.  So at this time in November -- or

21  sorry -- March of 2022, that was right after the Colorado

22  report had been published.  So in that timeframe, this would

23  be a typical topic that I would be talking about, but other

24  than that -- it depended from interview to interview what I

25  talked about.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3     07/17/2024    679

1    Q.  Upon the Colorado report being published, is it fair to

2    say you gave numerous interviews regarding the contents of

3    that report?

4    A.  Yes.

5    Q.  And what was your intention in providing interviews on the

6    topic of the Colorado report and USEIP's canvassing efforts?

7    A.  I was responding to inbound press inquiries, and the

8    interviewers -- or the news outlets wanted to talk about the

9    Colorado report, so I was granting that interview.

10   Q.  And you aimed to share the contents of that report during

11   interviews.  Is that fair to say?

12   A.  If they asked me the questions about the contents of the

13   report, yes.

14   Q.  Let's talk briefly about USEIP's canvassing efforts.  Your

15   role was to publicize the conclusions learned from these

16   efforts; is that correct?

17   A.  To -- yes.  To talk about the Colorado canvassing report

18   results.

19   Q.  And you wrote press releases about the Colorado report; is

20   that correct?

21   A.  Yes.

22   Q.  Your job was to ensure that the public was aware of the

23   canvassing efforts undertaken by USEIP; is that correct?

24   A.  Could you repeat the question?

25   Q.  Your role was to ensure that the public was aware of the

22-cv-00581-CNS-NRN   Bench Trial - Day 3   07/17/2024   680

1    canvassing efforts undertaken by USEIP, correct?

2         MR. WYNNE:  I'm going to object to vague as to

3    timeframe.

4         THE COURT:  Sustained.  You can -- would you add a

5    timeframe to make it more clear?

6    Q.  (By MS. STOCK) Sure.  As of -- well, let me ask it this

7    way.  In 2021 did you conduct any interviews regarding the

8    canvassing activities of USEIP?

9    A.  Not to my recollection.

10   Q.  And in 2022 did you conduct any interviews regarding the

11   canvassing efforts of USEIP?

12   A.  To my recollection, only after the Colorado report was

13   published.

14   Q.  And in 2022 your goal was to ensure that the public was

15   aware of the conclusions of -- that USEIP drew from its

16   canvassing efforts; is that correct?

17   A.  No.  I would say that was the journalist's aim.  My job

18   was to answer their questions to the best of my ability to

19   conduct the interview.

20   Q.  Previously you discussed that you put together

21   communication plans on USEIP's behalf, correct?

22   A.  Correct.

23   Q.  And I believe you testified about being strategic about a

24   media footprint for USEIP; is that correct?

25   A.  Correct.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    681

1    Q.  And as part of your communication plans, you intended to

2    broadcast the conclusions that USEIP had reached.  Isn't that

3    fair to say?

4    A.  Broadcast as in disseminate?

5    Q.  Disseminate to the general public.

6    A.  Not -- yes.  Yes.

7    Q.  I mean, USEIP did not conduct canvassing efforts to keep

8    those results to itself, correct?

9    A.  Well, the canvassing effort was -- I'm not quite sure how

10   to answer that.

11   Q.  I can rephrase the question.

12   A.  Okay.

13   Q.  USEIP did not conduct canvassing efforts for the purpose

14   of not sharing the results of the canvassing efforts; is that

15   fair?

16   A.  That's not fair to say.  We conducted the canvassing for

17   -- to get an understanding, to isolate the problem as we saw

18   it potentially, and to verify, you know, the theories that we

19   had about what could or could not be true with the data from

20   the Secretary of State's voter lists.  The decision to make

21   the canvassing report, which is what we're talking about, came

22   later.  That was not part of the inception of and the purpose

23   of canvassing.

24   Q.  The canvassing report produced by USEIP was disseminated

25   to county and state officials in the State of Colorado,

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3      07/17/2024    682

1    correct?

2    A.   Correct.  We disseminated that -- the Colorado report to

3    all House and -- Colorado House and Senate members, all

4    Colorado county clerks, and I believe -- and anybody else who

5    wanted to see the report.

6    Q.   And you posted the report on your USEIP website, correct?

7    A.   Correct.

8    Q.   Just very briefly, you've heard a lot of testimony in this

9    matter regarding the platform Basecamp.  Did you communicate

10   with other members of USEIP on the Basecamp platform?

11   A.   I did.

12   Q.   And at one point you purchased a license for the use of

13   Basecamp, correct?

14   A.   Yes.

15   Q.   And you had administration privileges on the Basecamp

16   platform for USEIP; is that correct?

17   A.   Correct.

18   Q.   I'd also like to briefly discuss the playbook.  You're

19   familiar with the county and local organizing playbook that's

20   been discussed during this matter, correct?

21   A.   Yes.

22   Q.   And you took part in creating this playbook by editing it

23   before it was finalized, correct?

24   A.   I took part in editing it for grammar, style, punctuation,

25   not any of the content, and I did that after it was printed.

                         Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024   683

 1    As we heard Ms. Epp talk about, she printed, what, maybe five

 2    or six copies to give out at the cyber symposium.  And then

 3    after the cyber symposium, that's when I took a scan through

 4    it, because I was going to publish a digital copy, and so

 5    there's some formatting things that you do to publish it

 6    online.

 7    Q.  And when reviewing that playbook, did you suggest any

 8    revisions?

 9    A.  No.

10    Q.  And while reviewing that playbook, if you disagreed with

11    any of the content, would you have suggested revisions?

12    A.  No.  It wasn't my project.  It wasn't -- it was Ashe's

13    work.

14    Q.  And if you'd turn to Exhibit 1, can you just read what the

15    document is titled?  Actually, I'll withdraw my question, but

16    I do ask that you turn to Exhibit 1.

17    A.  Okay.

18    Q.  And on the first page, do you see on the bottom it says

19    United States Election Integrity Plan?

20    A.  On page what?

21    Q.  Page 1, the first page.

22    A.  Yes.  Yes.

23    Q.  And as a founder you understand that putting out this

24    document, it has USEIP's name on it; is that correct?

25    A.  Yes.

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    684

1          MS. STOCK:  If I may just have one moment, Your

2    Honor, to review my notes?

3          THE COURT:  Sure.

4          MS. STOCK:  I have no further questions.

5          THE COURT:  All right.  Mr. Wynne or Powell.

6          MR. WYNNE:  Yes.  It will be me, Your Honor.

7          THE COURT:  All right.

8          MR. WYNNE:  I didn't expect to get here so fast.  May

9    I inquire whether there's an outlet over here for a computer?

10   There doesn't seem to be one.

11         THE COURT:  There should be an outlet.

12         MR. WYNNE:  I'm looking to plug in my laptop.

13                        CROSS-EXAMINATION

14   BY MR. WYNNE:

15   Q.  While Mr. Powell is doing that, I'll ask you, Ms. Kasun,

16   we know each other obviously.  When did we meet in person?

17   A.  In person, a week ago.  Within the last week.

18   Q.  Well, isn't it true that we first met at the pretrial

19   conference less than a month ago?

20   A.  Sorry?

21   Q.  We met for the first time at the pretrial conference in

22   this room less than a month ago?

23   A.  Oh, that's right.  Yes.  Sorry.

24   Q.  It's been a pleasure --

25   A.  I forgot you were there.  I even forgot that that

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3       07/17/2024    685

1    happened.

2    Q.  I'm easily forgettable.  Don't worry about it.  I'll get

3    you some points quickly.  Because this structure of how you

4    were called, you didn't get an opportunity to tell the Court a

5    little bit about yourself, including where you're from,

6    family, your educational background, and your early sort of

7    work history leading up to this point.  Would you please

8    describe that, and I'd ask for license to have her do that as

9    a narrative in the interest of time.

10   A.   Okay.  I'm -- I was born in Minnesota, Stillwater,

11   Minnesota.  I come from a family of entrepreneurs, engineers,

12   artists, and athletes.  My educational background is I was a

13   swimmer at the University of Wisconsin-Madison.  I got my

14   undergraduate degree in political science.  I took some time

15   off in between undergrad and grad school, and I went back to

16   Madison to earn my master's in journalism and business.  My

17   early career started when I was maybe seven years old, and I

18   know that sounds odd, but my father was an entrepreneur, and

19   he had a consumer electronics business when I was growing up,

20   and the work that he did had to do with printers.  And the

21   backbone of his business was direct mail.  He was an early

22   pioneer in direct mail.  And so I remember being a kid with my

23   sister and my dad on Saturday mornings sitting in front of

24   Scooby-Doo with our legs touching, and we would stuff direct

25   mail envelopes to build his business.  And I got an appetite

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    686

1   for helping out with my family business and learning about it

2   from a very young age.

3        And in between swimming, I also worked for him in

4   various capacities.  I've worked on assembly lines assembling

5   printers.  I understand consumer electronics very well.  And

6   then I got more into the business side of how his company

7   worked.  And my educational background, getting my master's in

8   journalism and business at Madison came in really handy,

9   because the things I studied as a journalism major, it was

10  communications, but the business side of my degree I learned

11  how to do research.  Madison at the time was one of the top

12  five business schools in the U.S., and the focus was research.

13       So I learned both from the advertising and journalism

14  side and the business side how to design quantitative and

15  qualitative studies, what the difference is between those

16  types of studies, how to look at data.  I'm terrible at math,

17  so I struggled with stats, you know, generating and analyzing

18  stats like Mr. Young does.  I can do it.  It's ugly.  It takes

19  me a long time, but I can do it.  And I learned both, you

20  know, how to do qualitative studies, which is where you talk

21  to people and, you know, glean insights from -- make

22  conversation, asking directed questions and learning how to

23  interpret what somebody says and driving that into insights on

24  the study.

25       And then from the quantitative side, it is survey

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3      07/17/2024    687

1   design and different types of questions and methodologies from

2   how to glean quantitative data that can be analyzed.  So

3   having that background and working with my dad in direct mail,

4   I went back to work for him for a while and bring his business

5   into the, you know, modern age.  He's sort of a Luddite when

6   it comes to tech.  And I developed his business going from

7   very analog types of marketing into, you know, more modern

8   types of marketing, and I developed -- I worked on developing

9   software and hardware that works with printers and printing

10  technology.

11          And from there I went to work for Nike in Oregon, and

12  at that time it was very novel to have a marketing person who

13  had the technical skills and kind of the digital chops that I

14  had.  So I was immediately put into the tech development part

15  of Nike where I helped develop Nike ID, which is, you know,

16  the customizable shoes that you can do online.  Very cutting

17  edge at the time.  Nobody had done it.  I helped develop Nike

18  Plus, which is I think -- you guys are probably familiar with

19  it.  It wasn't a small product launch, and, you know, it

20  really developed their company.

21          I was then promoted to work in Europe to lead the

22  development of Nikestore.com at their European headquarters.

23  At the time digital commerce had not hit Europe like it had in

24  the United States, and so I was also working on Nikestore.com

25  in the U.S., so I was leading with a leadership team there of

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    688

 1    about, you know, six or seven.

 2              THE COURT:  Go ahead.

 3              MS. STOCK:  Objection, relevance.

 4              THE COURT:  Sustained.  Let's go back to directing

 5    some questions.  This has gone on quite a bit.

 6    Q.  (By MR. WYNNE) Okay.  You -- when did you leave or stop

 7    working for, let's say, Nike right now, to try to speed it

 8    along.

 9    A.  Okay.  I can just -- I can quickly go through.

10    Q.  Quick employment history.

11    A.  Quick employment history, I worked for Nike, Addidas,

12    Quicksilver, Callaway, Intel, Microsoft.  You name it, I've

13    worked for them.  I've worked in advertising and marketing for

14    over 25 years at the highest levels of corporate America.

15    Q.  Okay.  And then when did you get interested in -- first,

16    let me ask, did you at any time start applying your skill --

17    your cumulative skill base and similar interests to our

18    election system in the United States?

19    A.  When did I do that?

20    Q.  Did you do it, first?

21    A.  Well, there's one piece that is relevant here is that

22    after I left corporate America, I became a tech entrepreneur

23    in Silicon Valley, and I founded two startups, and that's

24    where I really started going full flight with all of my

25    skills.  Now, how it applies to USEIP, I was -- fast-forward

                         Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    689

1    to 2020.  I was an election judge in Boulder County, Colorado.

2    Q.  Let me try to ask specific questions just to speed it

3    along despite your history.

4    A.  Okay.

5    Q.  In connection with your learning about technology and

6    dealing with technology, did you make any observations

7    concerning the impact of advances in technology, you know, on

8    our sort of daily understanding of things like -- bring it

9    into this case -- voting?

10   A.  Yes.  I made a number of conclusions about that after I

11   was an election judge.  I mean, working in a voting center and

12   also working as a poll watcher, I had a comprehensive inside

13   view of the voter experience, both the front end and the back

14   end.

15   Q.  What were those observations?  Some of those observations?

16   A.  Some of those observations, one is that the folks working

17   in election centers, both the volunteers and some of the hired

18   employees, were woefully inexperienced and untrained with

19   using and administering technology -- using technology to

20   administer our elections.  I noticed security issues, blatant

21   security issues with the hardware and the software in an

22   election center.  And then once I started digging a little bit

23   further and understanding the comprehensive nature of our

24   election systems, we think it's, you know, a person gets a

25   ballot, they mark it off, it goes into a box, it gets counted

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    690

 1    --

 2    Q.   Let me try to break it off there.

 3    A.   Okay.

 4    Q.   Is it fair to say that you took what you learned about

 5    technology and its impact on various parts of our society and

 6    tried to apply that knowledge or make observations of a public

 7    sphere, that you took that knowledge --

 8    A.   Yes, I did.

 9    Q.   Now, when you went in and made these observations, did you

10    look through the lens of Make America Great Again or Donald

11    Trump or the Republican Party or election denial, anything

12    like that?  Did you look through that lens, or how were you

13    looking at it?

14    A.   No.  I had no agenda whatsoever.  I was so curious about

15    how -- how our election system worked.  I mean, I was

16    absolutely eyes wide open.  I was just really excited to find

17    out about how it worked.

18    Q.   Okay.  Can you give me any other examples based on your

19    observation of any vulnerabilities that might be introduced

20    into our election system that don't make the big news, any

21    vulnerabilities, benign or whatever, that are introduced by

22    the technological development that you observed?

23              MS. STOCK:  Objection, leading, compound question,

24    relevance.

25              THE COURT:  Sustained on relevance.

                         Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    691

1              MR. WYNNE:  Your Honor, if I may be addressed, that

2    does go to intent, directly to intent, which is a count -- KKK

3    branding in this case of this woman -- intent.

4              THE COURT:  I'll give you a very short rope, but I

5    would encourage you to listen to what I have said about what

6    claim I think is even at issue in this case.

7              MR. WYNNE:  Sure.  Will they drop Count 2

8    voluntarily?

9              THE COURT:  We're not addressing that at this point.

10   I've given you a limited rope.  Please proceed in an

11   expeditious manner.  We're just on and on.

12   Q.  (By MR. WYNNE) I think where I was is what concerned you

13   about the electoral system, how it's done and technology as

14   you've described, that led you to get involved in something

15   like USEIP?

16   A.  The quickest way to answer that is from my experience in

17   Silicon Valley.  There everybody walks around with a tech

18   business plan in their back pocket.  Everybody wants to be a

19   tech founder.  And one of the biggest problems that people

20   have when they try to do a startup is -- and when they're

21   unsuccessful in getting funding or their business doesn't get

22   off the ground is when they have technology that's in search

23   of a problem.  And what that means is the technology is --

24   that they are proposing is not applicable and does not solve

25   the problems that they propose the technology solves.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3      07/17/2024    692

1            And so with our election system, it's that exact same

2    issue.  The injection of technology across our election system

3    is meant to increase efficiency, but it's at the cost of

4    accuracy and transparency and the ability for the average

5    voter, the electorate, citizens to be involved in our election

6    process.  Not voting.  That's not what I'm talking about.

7    It's administering, helping with conducting our elections.

8    Q.  Okay.  And I think you said the word hypothesis that you

9    wanted to test, which conjures up the scientific method.

10   Would you explain what you meant by that?

11           MS. STOCK:  Objection, relevance.

12           THE COURT:  Overruled.  I'll allow her to answer.

13   A.  Could you repeat the question?  I'm sorry.

14   Q.  (By MR. WYNNE) You mentioned hypothesis I think in the

15   context it's used in the scientific method we were all taught

16   in grade school.  Can you explain hypothesis and what the

17   hypothesis, if there was one, was in this project or exercise?

18   A.  Well, at the time there -- so at the time, and I'll frame

19   it up -- it was after the 2020 election.  There was so much

20   information being flung around in the media, public

21   statements.  There was, you know -- it was -- it was a

22   spectrum.  I mean, you had some wild claims like the Kraken,

23   and then you had other folks who were saying absolutely there

24   was no issue whatsoever.  This was the safest and most secure

25   election in the history of America.  There's never it was the

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    693

1    most accurate election in America.  It was the safest and most

2    secure.  Now, when I think about secure, I think cyber,

3    digital, that type of security, and so --

4    Q.  Let me try to move this along.

5    A.  Yeah.

6    Q.  Was it that frame of mind that you took into the

7    canvassing portion of USEIP?  I understand USEIP has other --

8    A.  Yeah, it was -- it was -- the hypothesis was to find out

9    what is true.  We had to isolate the problem, because -- and

10   we wanted to use data to do.

11   Q.  Okay.

12   A.  If there was a problem.

13   Q.  You spoke in -- opposing counsel asked you about the

14   report of canvassing that I think was issued in early 2022.

15   Who was the intended audience, to the best of your knowledge,

16   for that report?

17   A.  It was elected officials.  It was -- primarily, and the

18   public.  But it was meant to educate and to inform lawmakers

19   who could make change in our election system.

20   Q.  And was one of the issues whether all of the functions in

21   our election system should be centralized or whether they

22   should remain localized?  Was that one of the things that you

23   were potentially looking at?

24   A.  That's one of my personal opinions.  I think the

25   centralization of our elections is the excuse for injecting

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3   07/17/2024   694

1   technology into the overall election system where it isn't

2   necessary.

3   Q.  Let me ask you that.  Does that tend, based on your

4   experience with the private and public sector, to introduce

5   potential both benign vulnerabilities, as well as malicious

6   vulnerabilities?

7   A.  Absolutely.  Especially given the complexity of not only

8   the machines, computers, printers, tabulators.  The fact that

9   they're networked and they all work together.

10  Q.  Let me ask you this.  Does it also introduce the

11  opportunity of vulnerability from pranksters?

12  A.  Sure.  Somebody could pull all the electrical cords out of

13  the wall sockets in a voting center and shut it down and have

14  emergency procedures.

15  Q.  The report, was it distributed to all members of the

16  legislature regardless of party, or to whom was it

17  distributed?

18  A.  Every single one.

19  Q.  And county clerks as well?

20  A.  Yes.

21  Q.  Was it the intent to intimidate anyone -- in early 2022,

22  say, March or April, to intimidate anyone from voting in the

23  next election?

24  A.  No.

25  Q.  And the next election at that point would have been the

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    695

1    midterms in -- well, actually the primaries for the midterms

2    in 2022, right?

3    A.    Yes, it was around that time.  I'm not a Republican.  I

4    don't know when those things -- or Democrat or whatever.

5    Q.    The ballots, all right, in general election of 2020, do

6    you have any idea how many items were on that ballot?  Not

7    only President, Vice President, every Congressman.  What else

8    was on that ballot?

9             MS. STOCK:  Objection, relevance.

10             THE COURT:  What is the relevance?

11             MR. WYNNE:  The relevance is the alleged intimidation

12    relating to political aims of going door to door because those

13    ballots are going to relate to the local election, bond

14    election, a lot of other things that this organization did

15    intend to cure that had nothing to do with the nation's

16    political debate.

17             THE COURT:  I'll allow the answer.  Overruled.

18    A.    Yes.  There were numerous -- numerous issues on the ballot

19    all the way from local races, ballot measures, as you said,

20    bills.

21    Q.    (By MR. WYNNE) So let me ask you this.  Did, in fact, in

22    studying your data -- in pursuing your hypothesis, did USEIP,

23    to the best of your knowledge, in fact, find what you've

24    called anomalies, including but not limited to instances where

25    a house was supposed to be, but it was actually a vacant lot?

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    696

1    A.  Yes.

2    Q.  Could you give me a couple examples?

3    A.  I only know anecdotally, because I never canvassed.  And

4    in reviewing the evidentiary record in this and the canvassing

5    report -- could you repeat the question?  I'm sorry.  I'm

6    trying to be succinct in my answer.

7    Q.  Yeah, I'm trying to find if there are any examples of

8    errors in the Secretary of State's records that were found out

9    --

10   A.  Yes.

11   Q.  -- indeed during the course of this effort.

12   A.  Yes.  There were ballots that were cast when an affiant,

13   somebody that was canvassed, said did not vote.  They were

14   surprised at that information.  There were ballots that --

15   votes -- people thought that they had voted, and there was no

16   ballot or vote on the record, on their public record in their

17   history.  There were ballots cast from empty lots.  And I know

18   Ashe testified to this.  There's some leeway in that.

19   Q.  What about Arby's, were people voting from Arby's?

20   A.  Yeah, there is an Arby's incident, yeah.

21   Q.  Based on your education, skill and training, is there

22   something, a public good or something good that comes out in

23   correcting those kind of records?

24   A.  Absolutely.  And there were numerous folks who were

25   canvassed who were actually really happy that they were

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    697

1    alerted to a problem with their record.  They never felt like

2    they were accused of doing anything wrong.  They --

3          MS. STOCK:  Objection, hearsay.  She testified she

4    hasn't canvassed.

5          THE COURT:  Sustained.

6    Q.  (By MR. WYNNE) To the best of your knowledge -- well, let

7    me circle back to the question.  You heard Chris Beall, the

8    Deputy Attorney General (sic), testify yesterday because

9    you're a party to this case, right?

10   A.  Correct.

11   Q.  And what -- tell me if I'm correct that his position, to

12   the best of my recollection, is that all this information is

13   ERIC, we should rely on ERIC, and USEIP is stepping out of

14   line by trying to look at this stuff.  Is that about what

15   summarized it?

16   A.  Correct.

17         MS. STOCK:  Objection, misstates prior testimony,

18   leading.

19         THE COURT:  Sustained.  And it's not relevant what

20   she thinks of Mr. Beall's testimony.  Please focus on her.

21   Q.  (By MR. WYNNE) Based on what you've observed, is it fair

22   to say that it's not necessarily -- not necessarily the best

23   thing, for lack of a proper word, for us to rely solely on

24   ERIC?

25         MS. STOCK:  Objection, relevance, leading.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3      07/17/2024    698

1            THE COURT:  Overruled.

2  A.   Correct.  Because ERIC is a private organization, and they

3  are outside of being required to submit to public records

4  requests.  And they -- private companies, as I know, I've

5  owned one, you have certain privileges for intellectual

6  property.  And so ERIC considers all of their data.  Even

7  though it is fed to the government and sometimes is government

8  data that's brought in to ERIC, there's no auditing

9  possibility with that -- with that data and that company.

10  Q.   (By MR. WYNNE) And just because it goes into ERIC doesn't

11  mean that it comes out of ERIC and everything's cleaned up,

12  right?

13  A.   Correct.

14            MS. STOCK:  Objection, leading, relevance.

15            THE COURT:  Sustained.  It's sustained.  Please just

16  ask this witness a non-leading question.

17  Q.   (By MR. WYNNE) What I'm trying to get to is there's some

18  good things in your opinion or not that came out of this

19  effort that don't make the headlines; is that --

20  A.   Correct.

21            MS. STOCK:  Objection, leading.

22            THE COURT:  That is still leading.  Sustained.

23  Q.   (By MR. WYNNE) How do you feel about this endeavor and

24  whether or not any good came from it?

25  A.   I feel that was the aim is to make positive change and to

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    699

 1    help -- help voters, help the Government, help them get -- as

 2    I did with my own father's business, is bring them in to the

 3    modern era understanding how technology works with the voting

 4    systems and alert them to potential issues and to help the

 5    system to make it better.

 6    Q.  Along those lines, there was a discussion about PII.  What

 7    does that stand for?

 8    A.  Personally identifiable information.

 9    Q.  Do you have any concerns about PII in connection with

10    USEIP's canvassing effort?

11    A.  No.  Because all of the data that we used was publicly

12    available from the Secretary of State's voting records.  We

13    would -- as Mr. Beall testified yesterday, we didn't -- we

14    were not provided access to any PII of any voter.

15    Q.  Nor did you seek any PII, correct?

16    A.  No.

17           MS. STOCK:  Objection, leading.

18    Q.  (By MR. WYNNE) Did you seek any PII?

19    A.  No.

20    Q.  Did you take any measures to make sure, in fact, that you

21    didn't acquire any PII that you shouldn't have?

22    A.  Yes, we did take measures, because we -- during

23    canvassing, there's -- you know, this has been testified to

24    over and over again.  We only asked questions of voters during

25    canvassing that related to the public record that we had from

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    700

1    the Secretary of State.  We did not ask any other questions

2    outside of what we could verify through the public record.

3    Q.  Okay.  And, in fact, did you hear yesterday about the

4    organization's response to an adverse reaction wherein it went

5    to a policy of neutral clothing because somebody was wearing a

6    1776 T-shirt?  Were you aware of that before?

7    A.  No.

8            MS. STOCK:  Objection, leading.

9            THE COURT:  Overruled.

10   Q.  (By MR. WYNNE) You said somewhere that USEIP was active in

11   all 64 counties.  Is that literally true?

12   A.  I don't know.

13   Q.  Okay.  Is it an aspiration?

14   A.  I would say yes.

15   Q.  You worked at some point for Cause of America?

16   A.  I did.

17   Q.  When was that?

18   A.  I started I believe in November of 2021.

19   Q.  And was Mike Lindell in any way associated with USEIP?

20   A.  No.

21   Q.  So November 2021 is after the canvassing was over, right?

22   A.  Correct.  The canvassing ended in August of 2021.

23   Q.  And you've heard something about something might have

24   trickled over.  What's your understanding of what, if

25   anything, might have trickled over into September -- past

22-cv-00581-CNS-NRN   Bench Trial - Day 3   07/17/2024   701

1    September 1st of 2021?

2    A.  It would be the curing of the data.  That's what was the

3    trickling over.  So when we talk about canvassing, it's the

4    entire process, but the door-knocking ended, as far as I know,

5    in August of 2021.

6    Q.  Okay.  And Mike Lindell, where did you meet him?

7    A.  The first time I met him was at the cyber symposium in

8    August of '21.

9    Q.  Okay.  Was that just sort of a meet-and-greet?

10   A.  It was a photo op, and I was on a panel talking about

11   independent journalism, and he was sitting to my side.

12   Q.  Okay.  At some point you agreed to work for essentially

13   Mr. Lindell, right?

14   A.  Correct.

15   Q.  And when was that?

16   A.  When did I decide to work for him?

17   Q.  Yeah.

18   A.  I think it was November, October, November 2021.

19   Q.  What was your job?

20   A.  My job was to set up Cause of America for him.  It was

21   basically a startup, so I did my startup thing.

22   Q.  Okay.  Was there anything sort of overtly political about

23   your job assignment?

24            MS. STOCK:  Objection, relevance.

25            THE COURT:  Sustained.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    702

1    Q.   (By MR. WYNNE) When did you leave that employment?

2    A.   In July of 2022.

3    Q.   Why?

4    A.   I was fired.

5    Q.   Did that disappoint you?

6    A.   No.

7    Q.   Are you associated with QAnon?

8    A.   I don't know what QAnon is.

9    Q.   With regard to the clip from KOA, the radio broadcast

10   sometime in 2022, clips of which were played, how you voted,

11   you were referring not to who you voted for, but what was it?

12   A.   The method by which --

13         MS. STOCK:  Objection.

14         THE COURT:  Sorry, let me rule on the objection.

15         MS. STOCK:  Objection, leading.

16         THE COURT:  Overruled.

17   A.   The method by which a voter cast their ballot, whether

18   they returned it via mail or they voted in person or a drop

19   box.

20   Q.   (By MR. WYNNE) Why would you have been interested in that

21   issue?

22         MS. STOCK:  Objection, relevance.

23         THE COURT:  Overruled.

24   A.   It was a data point that was on the Secretary of State's

25   voter roll, and I -- when you're collecting that kind of data,

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    703

1    you try to collect as many data points as you can.  And given

2    the fact that the data set was limited, we asked the question.

3    It was something that we could verify.  And eventually what

4    you do when you have those data points is it could come in to

5    further analysis of the data.

6    Q.  (By MR. WYNNE) Well, you -- you did not canvass yourself.

7    Let me ask you whether or not that particular question was on

8    the script distributed with the walk lists or provided in

9    training.  Do you know?

10   A.  I don't.

11   Q.  I guess the script would speak for itself or not?

12   A.  Yes.  The script would, and it's been testified to already

13   that the script may have been modified numerous times

14   depending -- because the overall canvassing process evolved

15   especially in the early days.

16   Q.  Okay.  I'll turn to Basecamp.  What is your understanding

17   of Basecamp?  What is that?  What was that?

18            MS. STOCK:  Objection, asked and answered.

19            THE COURT:  He hasn't necessarily asked this witness,

20   but I don't believe there's a dispute about Basecamp, and we

21   have covered this with a couple other witnesses.  Is she going

22   to offer something new?

23            MR. WYNNE:  I'd like to ask her understanding of what

24   administrative privileges mean in Basecamp, and she's a

25   separate individual.

                         Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    704

1        THE COURT:  Well, let's ask that question, because we

2  all know what Basecamp is.

3  Q.  (By MR. WYNNE) What's your understanding of what

4  administrative privileges in the context of Basecamp, that's

5  your own individual understanding as a party today?

6  A.  Administrative privileges allows you to basically set up

7  the platform, the structure of it.  And you can admit people.

8  You can see back-end analytics.  You can restrict what

9  information people see.  You can -- it's a software -- it's

10  basically a software project management -- software

11  development project management tool, and so we bent it to work

12  for -- bent the functionality to work for USEIP.

13  Q.  Was that functionality consistent with the functionality

14  you observed in the private sector in the various roles you've

15  described?

16  A.  Yes.

17        MS. STOCK:  Objection, relevance.

18        THE COURT:  Overruled.

19  A.  Yes.

20  Q.  (By MR. WYNNE) If someone wanted to join the USEIP site on

21  Basecamp, was there any type of political screening, to the

22  best of your knowledge, that took place?

23  A.  No.

24  Q.  So anyone could join?

25  A.  Yeah.  There's a vetting process, but political

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    705

1   affiliation had nothing to do with the questions.

2   Q.  Idealogical affiliation as well?

3   A.  That was not part of the screening.

4   Q.  If someone who did not share -- well, let me -- did you,

5   Ms. Epp and Shawn here, you do not all subscribe to the same

6   opinion on all issues.  Is that fair to say?

7   A.  Correct.

8           MS. STOCK:  Objection, relevance.

9           THE COURT:  Overruled.

10  Q.  (By MR. WYNNE) If someone were to have joined Basecamp,

11  been interested in volunteering to be part of the neighborhood

12  canvassing process, but did not subscribe to some of

13  traditionally understood to be conservative points of view,

14  would you have welcomed them?

15  A.  Yes.

16  Q.  Why?

17  A.  Because elections are a nonpartisan issue.  It affects all

18  Americans.

19  Q.  So there was no idealogical screening of volunteers?

20  A.  No.

21  Q.  Did that notion even come into your head?

22  A.  No.

23  Q.  The phrase to speak truth to the world, do you remember

24  that slogan being highlighted yesterday?

25  A.  I don't recall.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    706

1    Q.  Were you a super mom?

2    A.  No.

3    Q.  Were you trying to usurp a government function?

4    A.  No.

5    Q.  Did you intend to take the law into your own hands?

6    A.  No.

7    Q.  Was there any type of systematic plan, to the best of your

8    knowledge, for canvassers to carry firearms?

9    A.  No.

10   Q.  The various mentions throughout this trial of security and

11   taking security measures, what did you understand those

12   measures to relate to, that is to protect canvassees or to

13   protect canvassers?

14           MS. STOCK:  Objection, leading.

15           THE COURT:  Sustained.

16   Q.  (By MR. WYNNE) Okay.  What was the purpose of the safety

17   measures in your mind right now as an individual defendant in

18   this case?

19   A.  During canvassing?

20   Q.  Yes.

21   A.  It was for personal protection.

22   Q.  Personal protection of the canvassers?

23   A.  Yes.

24   Q.  And, in fact, at least once that broke down because

25   somebody was bitten by a dog, right?

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    707

 1            MS. STOCK:  Objection, relevance.

 2            THE COURT:  Overruled.

 3    A.  Somebody --

 4    Q.  (By MR. WYNNE) Somebody was bitten by a dog, so the

 5    security measures that were put in place broke down at least

 6    once?

 7            MS. STOCK:  Objection.

 8    A.  I think so, yeah.

 9            THE COURT:  What's the objection?

10            MS. STOCK:  Objection, foundation.

11            THE COURT:  Overruled.  You can answer, if you know.

12    A.  I said yes.

13    Q.  (By MR. WYNNE) What was the general attire, to your

14    knowledge, worn by canvassers?

15            MS. STOCK:  Objection, personal knowledge.

16            THE COURT:  Sustained.

17    Q.  (By MR. WYNNE) Are you familiar based on your work with

18    USEIP of clothing worn by canvassers when they were

19    canvassing?  Are you aware?

20    A.  Yes.

21    Q.  And can you tell us in general what type of attire they

22    were wearing?

23    A.  Good walking shoes, casual clothes, whatever was

24    comfortable.  There were no uniforms.  There was no matching

25    colors.  As Shawn said, it was just basic everyday clothing.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    708

1    Q.  We've heard testimony that affidavits were provided in

2    various states to countywide officials including the district

3    attorney.  To the best of your knowledge, is that correct?

4    A.  Yes.

5    Q.  Now, district attorney, was it your intention to report

6    for purposes of potential criminal prosecution any canvassee

7    who opened the door and reported an anomaly?

8    A.  No, that was not the intent at all.

9    Q.  You're speaking on behalf of yourself, and to the best of

10   your knowledge anyone associated with USEIP, again, to the

11   best of your knowledge?

12   A.  Yes.

13   Q.  Then why include the district attorney?

14   A.  Well, first of all, it was a person who could investigate

15   because they have investigative powers.  Secondly, they're an

16   independent body.

17   Q.  Independent from whom?

18   A.  The county clerks and the Secretary of State.  You know,

19   if we're finding anomalies and potentially criticizing, you

20   know, some of the systems and processes and procedures that

21   county clerks and the Secretary of State, you know,

22   dogmatically defended without even addressing any issues that

23   were brought up by citizens, it seemed like, you know, whether

24   -- you know, they had a vested interest in not investigating,

25   and so we thought that it would go -- it would potentially be

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    709

1    a better avenue for investigation.

2    Q.  Okay.  You heard about -- you're familiar with the

3    Secretary of State press release on September 2021 that was

4    discussed through various witnesses yesterday?

5    A.  Correct.

6              MS. STOCK:  Objection, relevance.

7              THE COURT:  Overruled.  I don't know yet.

8              MR. WYNNE:  This is a document in evidence, Your

9    Honor.

10   Q.  (By MR. WYNNE) But let me -- let me ask you this.  Is --

11   to the best of your understanding, is there any mechanism

12   identified in a communication with the Secretary of State that

13   would allow an individual voter to opt out?

14             MS. STOCK:  Objection, foundation, relevance.

15             MR. WYNNE:  This is their exhibit.

16             THE COURT:  I understand that, but I agree with the

17   questions about relevance and foundation.  That being said,

18   I'll overrule and allow you to answer.

19   A.  Could you repeat the question, please?

20   Q.  (By MR. WYNNE) Are you familiar of a provision in any

21   Secretary of State press release informing any voter that

22   although records may be public, that they could opt out to

23   make them confidential as to themselves?

24   A.  Yes.

25   Q.  What does that mean to you?

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    710

1    A.  What that means is you can make your publicly available

2    voter record private, and so it would not be published.  It

3    wouldn't -- yeah.

4    Q.  Okay.  In connection with your work on this case as a

5    named plaintiff who's been sued under the KKK Act and 11(b),

6    have you looked into whether Ms. Roberts or Ms. Powell

7    exercised that opt-out?

8    A.  They did not.  I did look into it, and they did not.

9         MR. WYNNE:  Okay.  I pass the witness.

10        THE COURT:  Let's take a break for lunch.  We'll come

11   back.  Let's come back right at two.  At that time we'll

12   revisit kind of order of witnesses and what the plaintiffs

13   have decided to do.

14        Mr. Wynne, I would encourage you to talk to the other

15   defendants about your prior position on the issue, but we'll

16   revisit that when we return at two.

17        MR. WYNNE:  Certainly.

18        THE COURT:  We'll be in recess.

19        THE COURTROOM DEPUTY:  All rise.  Court is in recess.

20     (Break was taken from 12:55 p.m. to 2:02 p.m.)

21        THE COURT:  Okay.  Do we want to visit about our

22   plans, or do you want to just go -- continue with testimony?

23   Have the plaintiffs discussed?

24        MS. ERICKSON:  Well, Your Honor, I believe we still

25   need to finish with -- well, I guess I don't know what the

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024   711

1   defendants' plan is with respect to additional examination of

2   Ms. Kasun.  Our plan, Your Honor, is to -- per our previous

3   discussion, to make an offer of proof as to the remaining

4   witnesses --

5           THE COURT:  Okay.

6           MS. ERICKSON:  -- that we would have called and then

7   rest our case.

8           THE COURT:  Let's -- let's go ahead then and finish

9   Ms. Kasun, and then I'll get defendants' position.

10          So Ms. Kasun, if you can return to the stand.

11          And, Ms. Epp, would you like to proceed.

12                       CROSS-EXAMINATION

13  BY MS. EPP:

14  Q.  Ms. Kasun, you testified that you did press for USEIP; is

15  that correct?

16  A.  Yes.

17  Q.  And that involved -- that involved, as you testified,

18  relationship management, setting up certain channels; is that

19  accurate?

20  A.  Correct.

21  Q.  Did that include social media as well?

22  A.  Yes.

23  Q.  And did you establish -- did you set up social media?

24  A.  I did.

25  Q.  And where?  What platforms did you set up social media?

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    712

1   A.   I believe we had a Parler account at one point for a short

2   while, and I believe we had a Twitter account.  I did not set

3   up a Facebook feed or I believe any other social media.  There

4   might have been a Truth Social.  But Twitter and Parler are

5   the ones that I recall setting up officially.  Other people

6   did set up USEIP-type social media -- what would we even call

7   it -- feeds.

8   Q.   Okay.  But you established the USEIP Twitter account and

9   the USEIP Parler account.  Did you also run them?

10  A.   I did.

11  Q.   Moving on, we heard audio clips of a radio interview that

12  you gave earlier in these proceedings.  Do you recall that?

13  A.   I do.

14  Q.   Okay.  And that was Plaintiffs' Exhibit 61.  Is that

15  correct?

16  A.   Plaintiffs' Exhibit -- the KOA?

17  Q.   The KOA.

18  A.   I believe so.

19  Q.   It's Plaintiffs' Exhibit 61.  Did you review the

20  plaintiffs' findings of fact and conclusions of law --

21  proposed findings of fact and conclusions of law prior to

22  trial?

23  A.   Did I read them?

24  Q.   Did you read them?

25  A.   Yes.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    713

1    Q.  On page 5 of that document, number 26, it says, quote, as

2    a spokesperson for USEIP, Defendant Kasun has touted USEIP's

3    campaign in Colorado.  She gave interviews on KOA, Lindell TV,

4    and Real America's Voice, Plaintiffs' Exhibit 61, 68, 69.  In

5    one interview in which she described alleged voter fraud and

6    USEIP's efforts to address the same, she told listeners that,

7    quote, we showed you the crime, so what are we going to do

8    about it, end quote.  And then introduced someone to talk

9    about USEIP's door-knocking campaign, Plaintiffs' Exhibit 61.

10   Did you make those statements in that interview?

11   A.  No.

12   Q.  Are you familiar with those statements?

13   A.  Yes.

14   Q.  Can you tell us what those statements are?

15   A.  That wasn't me.  In the media the plaintiffs have the

16   wrong person, and they misattributed that inflammatory quote

17   to me.

18   Q.  They misattributed the quote to you.  Do you know who?

19   A.  Yes.  It came from a video that was filmed in Mesa County.

20   I was never there at that filming.  The person who said that

21   quote is Sherrona Bishop.  I'm not Sherrona Bishop.

22   Q.  So the quote is misattributed to you, and the exhibit is

23   also misattributed to the wrong video, correct?  Or to the

24   wrong native audio clip?

25   A.  I'm not sure about that.  When I checked -- when I read

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    714

 1   that, that statement, I knew I didn't say it, and I went back,

 2   and I don't remember the numbers, but I definitely know that

 3   that quote came from a video where I was misidentified and

 4   misquoted.

 5          MS. EPP:  Okay.  I'd like the record to show that

 6   that video was originally Plaintiffs' Exhibit 16.  It's not in

 7   evidence in this case, but the quote has been attributed to

 8   Plaintiffs' 61 in the findings of fact and conclusions of law.

 9          MS. STOCK:  Objection, argument by counsel -- or by

10   Ms. Epp.

11          THE COURT:  I'll overrule it.  This is in the record,

12   but the plaintiff didn't choose to put that into evidence

13   during their case, so it really has no import as of this

14   moment.

15          MS. EPP:  Understood.  Nothing further.

16          THE COURT:  All right.  Thank you.

17          Any redirect?

18          MR. REISCH:  Just for the record, we have no

19   questions, but I would reserve the right to recall her if

20   necessary in my defense case.  Thank you.

21          THE COURT:  Okay.  I don't know why I assumed you

22   didn't have any questions.  I'm sorry.  You usually do.  I

23   don't even know what happened there.  Okay.  Having no

24   questions, do you have any redirect?

25          MR. WYNNE:  No, Your Honor.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024   715

 1              THE COURT:  All right.  Thank you.  You are excused.

 2   Thank you.

 3              MS. STOCK:  Your Honor, do I get to ask a few

 4   questions?

 5              THE COURT:  Oh, I thought you already did this.

 6              MS. STOCK:  No.  Well, I crossed Ms. Kasun.

 7              MR. WYNNE:  Your Honor, they called her to the stand,

 8   so technically it is their redirect.

 9              THE COURT:  I'm sorry.  I'm just ahead of myself.

10   I'm thinking we're in your case.  All right.  Yes, you may do

11   some redirect.

12              MS. STOCK:  Brief questioning.

13              THE COURT:  All right.

14                        REDIRECT EXAMINATION

15   BY MS. STOCK:

16   Q.  Ms. Kasun, you testified previously that you supplied

17   affidavits from voters to the district attorneys; is that

18   correct?

19   A.  I've never submitted affidavits to the district attorney.

20   If I said that, I made a mistake.  What I was saying is I knew

21   that people -- some people did -- had done that.

22   Q.  And who were those individuals that did that?

23   A.  Shawn Smith.

24   Q.  And those affidavits are sworn statements by voters,

25   correct?

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3     07/17/2024     716

1   A.  Correct, to my knowledge.

2   Q.  And in those affidavits voters would detail alleged

3   anomalies regarding perhaps their voting or a ballot coming

4   from their address.  Is that fair to say?

5   A.  Not exactly.  The affidavits were either filled out by

6   somebody who was canvassed or the canvasser, and the anomaly

7   would have been to the voting record per the answers in the

8   canvassing visit.

9   Q.  Is it fair to say that the affidavit would contain

10  information that the individual who signed it believed to be

11  an anomaly in the voting process?

12  A.  Yeah, I think that's fair.

13  Q.  And I believe you testified the intention of providing

14  those affidavits to district attorneys was to inform them

15  about anomalies in voting.  Is that fair to say?

16  A.  Yes.

17  Q.  And in order for them to investigate the anomalies

18  provided in the affidavits, law enforcement would need to

19  contact those voters?

20  A.  I don't know how they conduct their investigations.

21  Q.  In order to learn more about the alleged anomalies

22  identified in the affidavits, they would have to do some

23  investigation.  Is that fair to say?

24  A.  They would have to do some investigation, yes.

25  Q.  And that investigation would likely include reaching out

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    717

1  to an individual who signed a sworn statement.  Is that fair

2  to say?

3  A.  It may.

4      MR. WYNNE:  I'm going to object, speculation and

5  already answered.

6      THE COURT:  Overruled.

7  A.  They may.  They -- given the fact that the affidavits were

8  given to the DAs to investigate the voter rolls or potentially

9  the Secretary of State or county clerk, I don't know if they

10 would definitely go to that voter or not.  Again, I don't know

11 how they conduct their investigations.

12 Q.  (By MS. STOCK) I believe that you testified at one point

13 USEIP vetted volunteers who joined; is that correct?

14 A.  In my deposition?

15 Q.  I believe previously in your testimony on direct

16 examination earlier today.

17 A.  Vetted volunteers to enter Basecamp.  And -- oh, yeah, and

18 -- to enter Basecamp.

19 Q.  Was there any sort of vetting process for individuals who

20 wished to participate in the canvassing efforts of USEIP?

21 A.  I don't know, because that was handled by the county

22 captains, and I didn't canvass.  I don't know.

23 Q.  Once someone was a member, did USEIP have the ability to

24 remove them from the organization?

25 A.  Inasmuch as we would -- yes.  I mean, as an administrator

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    718

1    of Basecamp, I had the ability to restrict their access to

2    Basecamp and their access to information or access to

3    Basecamp, but I couldn't -- we wouldn't have stopped -- they

4    could still say they were part of USEIP if they so identified.

5    It was a free association of people, so the only way of,

6    quote/unquote, kicking somebody out would be to restrict their

7    access to Basecamp.

8    Q.  You testified about what USEIP canvassers wore during

9    canvassing.  Do you recall that?

10   A.  Correct.

11   Q.  You also testified that canvassers did not ask any other

12   questions that were off the script.  Do you recall saying

13   that?

14          MR. WYNNE:  I'm going to object.  That does

15   mischaracterize her testimony.

16          THE COURT:  I'm going to sustain because I don't

17   remember that exact language being used.  Perhaps you can

18   rephrase.

19   Q.  (By MS. STOCK) Do you recall testifying about the

20   questions that canvassers asked during the canvassing process?

21   A.  In my deposition or today?

22   Q.  Today.

23   A.  I need my memory refreshed.

24   Q.  Do you recall discussing in that KOA interview we reviewed

25   earlier today, discussing the questions that canvassers asked

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3     07/17/2024     719

1   voters during their canvassing efforts?

2   A.  In the KOA interview, yes, I remember saying that, or

3   talking about it.

4   Q.  Your knowledge is based on what you've heard from other

5   USEIP members, correct?

6   A.  Yes.  And reviewing the training materials, especially in

7   preparation for this case.

8   Q.  You didn't accompany any other USEIP canvassers when they

9   were canvassing.  Is that fair to say?

10  A.  I never canvassed.  I never went with anybody.  I never

11  knocked on a single door.

12  Q.  So you have no personal knowledge about what canvassers

13  were wearing or what they were saying to voters.  Isn't that

14  fair to say?

15  A.  Correct.  I was never on the canvassing trip.

16          MS. STOCK:  I have no further questions.

17          THE COURT:  All right.  Any limited redirect based on

18  what -- if she raised a different topic that you wanted to

19  address?

20                    RECROSS-EXAMINATION

21  BY MR. WYNNE:

22  Q.  Was it your -- your understanding based on what you have

23  learned in preparation for this case and elsewhere that

24  canvassers wore casual clothing?

25          MS. STOCK:  Objection, lack of foundation.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    720

1              THE COURT:  Overruled.

2   A.  Yes.  I saw pictures of our canvassers wearing casual

3   clothes.  I think the blown-up pictures that we -- a few of

4   them are of the canvassers.  That's in evidence.

5              MS. STOCK:  She's referencing documents that I don't

6   believe we've -- have been admitted.

7              THE COURT:  Let me -- you don't need to answer.  Your

8   attorney can answer.

9   Q.  (By MR. WYNNE) The question simply is there was suggestion

10  that you had no direct knowledge.  In getting ready for this

11  case in every respect, has it come to your attention that

12  canvassers wore casual clothing, generally what they looked

13  like, and generally their demeanor, that is in getting ready

14  for this case --

15  A.  Correct.

16  Q.  -- as a defendant?

17  A.  Yes.

18             MR. WYNNE:  No further questions.

19             THE COURT:  I just have one question for you,

20  Ms. Kasun, to close a loop.  With respect to the vetting

21  process you're referring to regarding Basecamp, what was that

22  process?

23             THE WITNESS:  The vetting process was if people -- if

24  volunteers wanted to get involved with USEIP, there was an

25  online form that they could fill out just so we could get some

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    721

 1    information from them, and then a personal phone call would be

 2    made to those people.  We would introduce ourselves to them.

 3    They would introduce themselves to us.  And we would talk

 4    about what types of activity they might want to get involved

 5    in, where they lived, that sort of thing.  And then there is a

 6    disclaimer on the bottom of that interest form that was a

 7    release that we would do a basic background check on the --

 8    you know, the person who wanted to be a volunteer, and we

 9    would do just a basic background check.

10            THE COURT:  All right.  Why were you doing a

11    background check?

12            THE WITNESS:  Just for precautionary reasons.  You

13    know, it -- just wanted to make sure that we were safe and

14    conscientious.

15            THE COURT:  Okay.  All right.  You are excused.

16            THE WITNESS:  Thank you.

17            THE COURT:  Thank you.  All right.  Ms. Wilkinson

18    (sic), would you like to proceed with your proffer?

19            MS. ERICKSON:  Me?  Erickson.

20            THE COURT:  Sorry, yes.  I'm reading something else

21    that has the name Wilkinson.  Let me just say why I'm having

22    you do this is because under Rule 52(c), when all of the

23    evidence has been presented about a particular issue, the

24    Court may entertain that motion.  I was specifically guiding

25    the parties to address the voter intimidation issue because

22-cv-00581-CNS-NRN   Bench Trial - Day 3     07/17/2024    722

1    resolution of that issue may or may not save us some time by

2    looking at other evidence.  So in my opinion -- and I would

3    like confirmation from the parties, particularly the

4    plaintiffs, that you believe, at least with respect to your

5    evidence on voter intimidation, that you have submitted what

6    you intended to produce.

7        MS. ERICKSON:  Your Honor, on the voter intimidation

8    piece, I guess the two remaining witnesses that we would have

9    that would present evidence as to those issues would be Jeff

10   Young, as well as Professor Ellis.  And as I said previously,

11   I would be happy to make an offer of proof as to both of those

12   witnesses at this time, if you would like.

13       THE COURT:  Why don't you go ahead and do that.

14       MS. ERICKSON:  Does the Court have a preference as to

15   where I start?

16       THE COURT:  Let's start with Mr. Young first.

17       MS. ERICKSON:  Your Honor, if plaintiffs called

18   Mr. Young to testify today, we would expect that Mr. Young

19   would testify that he joined USEIP in late 2020 or early 2021,

20   and that he was the individual who developed the methodology

21   that USEIP used to canvass voters.  Mr. Young will testify

22   that the goal of canvassing was to prove anomalies in the

23   Secretary of State's data.  He will also testify that the

24   variable used to prove those anomalies and to determine which

25   voters to canvass was what he dubbed the voter opportunity

Sarah K. Mitchell, RPR, CRR

1    score.

2          To determine the voter opportunity score, Mr. Young

3    looked at the voter history from the Secretary of State's

4    voter history file, and specifically he looked at the age of

5    the person to determine how many elections they could have

6    voted in, and then looked at how much elections they were

7    actually involved in.  From there Mr. Young would testify that

8    he divided the number of elections they were involved in by

9    the number of elections they could have been involved in based

10   on their age, and then he assigned a voter -- an opportunity

11   score based on that number provided.  Those voter opportunity

12   scores were then used to determine which houses to canvass.

13         The theory behind the voter opportunity score, as

14   Mr. Young would testify, is that there had been phantom voters

15   added to the registration list for the purpose of defrauding

16   an election.  These are persons who would have voted -- excuse

17   me -- these are -- so let me rephrase that.  The theory behind

18   it is that phantom voters added to a registration list for the

19   purposes of defrauding elections would have voted very little

20   compared to all the opportunities that they had had to vote in

21   the past based on their age.

22         So, in other words, he would testify that one of the

23   theories was that these low voter opportunity score voters,

24   otherwise known as low propensity voters, who had not voted

25   consistently in past elections but then voted in 2020 might

                       Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3      07/17/2024    724

 1   be, quote/unquote, phantom voters.  And by phantom voters

 2   Mr. Young would testify that he means voters that either don't

 3   exist, or that don't live at the address on the voter roll,

 4   but who had a ballot cast fraudulently in their name.

 5          Mr. Young would also testify that as between ballots

 6   allegedly cast by low voter opportunity scores and ballots

 7   cast by high voter opportunity score voters, the low voter

 8   opportunity score voters or low propensity voters were more of

 9   a concern and a target of USEIP's canvassing efforts.  And the

10   motivation behind calculating the voter opportunity score was

11   that they had seen a number of news articles noting that

12   people who hadn't voted at all before 2020 all of a sudden

13   voted in the 2020 election.

14          We would expect Mr. Young to testify that the

15   methodology they used did not account for persons, for

16   example, who had recently become citizens.  In other words,

17   someone who became a U.S. citizen in 2019, for example, could

18   have voted for the first time in 2020, even if based on their

19   age they might have been eligible previously if they had been

20   a U.S. citizen.

21          Mr. Young would also testify that after selecting the

22   precincts to canvass based on the voter opportunity scores

23   they calculated, they then created walk lists for USEIP agents

24   to use when canvassing.  Mr. Young is expected to testify that

25   those walk lists were created by him and provided to the USEIP

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3   07/17/2024   725

 1   county captains in each of the counties in which canvassing

 2   was taking place.  Mr. Young is also expected to testify that

 3   the purpose of canvassing was not to educate voters.  It was

 4   not to encourage people to vote, and it was not to provide

 5   information about how to vote.  Instead, as we previously --

 6   as I previously discussed, it was to identify voters who were

 7   potentially fraudulent -- excuse me -- who had potentially

 8   submitted fraudulent ballots.

 9         We also expect Mr. Young to testify that there are --

10   that in some instances USEIP agents were specifically

11   targeting their canvassing efforts at residences in which

12   multiple ballots or a high volume of ballots had been cast.

13   There are specific discussions and references that Mr. Young

14   would be expected to testify to about houses in which five or

15   more ballots were cast.

16         Mr. Young is expected to testify on examination as

17   well that there are other reasons why multiple ballots could

18   have been cast by one residence other than fraudulent ballots

19   or phantom voters such as housing near campuses in which a

20   high volume of students might live or families in which, you

21   know, there were multiple generation households.

22         Mr. Young is also expected to testify that the

23   canvassers did go out and canvass the houses on the walk lists

24   that he provided, and that on those walks they collected

25   affidavits, including some of the affidavits that we've

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    726

1    previously seen in connection with this case, and that they

2    did, in fact, take photos of voters' residences, which

3    Mr. Young to this day has access to through various USEIP

4    databases or databases in which information related to USEIP

5    is stored.

6            Finally, Mr. Young is expected to testify that he is

7    the primary drafter of the USEIP Colorado canvassing report,

8    which is dated March 11th, 2022.  He's also expected to

9    testify that that canvassing report was the brain child of

10   himself, Ms. Epp, Ms. Kasun, and Mr. Smith.

11           And finally, he's expected to testify that the

12   intended audience of the report was, A, the public; and, B,

13   law enforcement.  With respect to law enforcement, he is

14   expected to testify that the goal was that law enforcement

15   would take notice of the fraudulent ballots that USEIP had set

16   out to uncover and had, in fact, in their view uncovered and

17   take action with respect to those fraudulent ballots.

18           THE COURT:  All right.  And I assume he was deposed.

19   Is this where you're getting this information?

20           MS. ERICKSON:  Yes, Your Honor, that's correct.

21           THE COURT:  And your proffer as to your expert?

22           MS. ERICKSON:  Thank you, Your Honor.  Professor

23   Ellis is expected to testify that voter intimidation can be

24   both explicit and implicit, that it does not need to include

25   violence or threats of violence.  He's also expected to

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    727

1    testify that modern day voter intimidation has primarily taken

2    the form of voter vigilante groups.  In his view as an expert

3    and a scholar in this area, voter vigilante groups are groups

4    that have claimed that there is rampant voter fraud in

5    connection with elections and have used that claim to

6    privately police voters under the guise of protecting our

7    elections.  A second facet of modern day voter intimidation is

8    attacks on election systems and election officials which has

9    included a significant uptick of threats made against election

10   officials.

11        Professor Ellis would further testify that both of

12   these facets have the effect of intimidating voters or

13   otherwise dissuading voters from voting.  Of course, visits at

14   voters' homes can be intimidating, but attacks versus election

15   officials and election systems also serve to destabilize our

16   elections, cause people to be concerned that their vote won't

17   be counted, and otherwise dissuade them from voting.

18        Professor Ellis would also testify about the

19   disproportionate impact of this type of conduct on minority

20   voters who have historically been subject to targeted voter

21   intimidation.  Professor Ellis would testify that he reviewed

22   materials in this case, including the playbook, the canvassing

23   report, public statements by the defendants, defendants'

24   testimony via their depositions.

25        Professor Ellis will testify about the links between

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    728

1    defendants' conduct and the state -- excuse me -- let me start

2    over.  Professor Ellis is expected to testify about the links

3    between defendants' conduct and statements and historic voter

4    intimidation tactics in the country, such as the history of

5    lynching in connection with the exercise of the right to vote.

6    Finally, Professor Ellis would testify that in his view the

7    defendants have adopted tactics of modern voter vigilante

8    groups.

9         THE COURT:  All right.  Based on your proffer -- when

10   is Mr. Ellis -- or Professor Ellis available?

11        MS. ERICKSON:  He can be -- he is here.  He's not at

12   the courthouse presently, but he is nearby.

13        THE COURT:  All right.  Do you --

14        MS. ERICKSON:  And could be available.

15        THE COURT:  All right.  Do you believe I need to hear

16   from him before entertaining a Rule 52(c) motion?

17        MS. ERICKSON:  I think we've made our offer of proof,

18   Your Honor, and unless you would like to hear from him because

19   you think it would be informative as to your --

20        THE COURT:  My concern based on what you've said is

21   there is a component of his testimony that appears to go --

22   that appears to link the individual defendants 'conduct to

23   your voter intimidation claim, and that he's not just

24   providing kind of a global history and education about voter

25   intimidation, but that he is going to proffer an opinion that

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    729

1    the statements and conduct, at least in his mind as an expert,

2    did constitute intimidation.  So with that, I'm going to

3    suggest that I need to hear from him or I do not believe I

4    will have complete evidence on that issue from the plaintiffs'

5    perspective.

6        With respect to Mr. Young, I didn't hear anything in

7    your proffer that specifically would add to what these three

8    defendants are accused of doing in this case.  So that one I

9    am not concerned about, and I accept the proffer and have

10   considered that, but hearing it does not lead me to believe I

11   need to hear from him before ruling on this motion.  So what I

12   would suggest is we try and get Professor Ellis here.

13       MS. ERICKSON:  Understood.

14       THE COURT:  Quickly.

15       MR. WYNNE:  Your Honor, we believe there are several

16   misstatements made in the proffer, and I would ask if we could

17   get an opportunity to make a counter-proffer as to what we

18   would elicit from Mr. Young were he called.  Mr. Powell is

19   ready to go with the list.

20       THE COURT:  What is the purpose of that?

21       MR. WYNNE:  The purpose is to correct -- to correct

22   the record, including if there's any allegation of sufficiency

23   or a question of discretion should the Court rule in favor of

24   the motion I expect Mr. Reisch will make.

25       THE COURT:  All right.  Well, why don't you go ahead

22-cv-00581-CNS-NRN    Bench Trial - Day 3      07/17/2024    730

1    and do that quickly.

2            MS. ERICKSON:  May I -- or may one of us step out,

3    Your Honor, to contact --

4            THE COURT:  Yes, please do.  Thank you.

5            MR. POWELL:  Your Honor, we do not believe Mr. Young

6    would testify that the voter opportunity score dictated which

7    houses to canvass.  Rather, Mr. Young took segments of the

8    lowest voter opportunity scores and the highest and turned

9    that into his sample, and then that determined which precincts

10   to visit, and within a precinct, the walk list was determined

11   based on walkability.

12           In other words, trying to use the limited time of the

13   canvassers efficiently.  The purpose of the canvassing was not

14   primarily or even tertiarily to find phantom voters.  Now,

15   that's even by Jeff Young's purpose.  There is no evidence

16   that he would provide that it was USEIP's purpose to find

17   phantom voters.  Rather, that's one hypothesis he wished to

18   test.  It was not an animating purpose of USEIP.

19           Plaintiffs also represented that the low voter

20   opportunity score was more of a concern of USEIP.  That also

21   is not true.  Again, the voter opportunity score was never

22   used in isolation.  It was a slice of data about the bottom

23   20 percent that was combined with the top 20 percent to try to

24   get a random distribution.  Both were used, low and high.

25   Again, there was also no evidence that Mr. Young would provide

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    731

 1   that this was a concern of USEIP itself, let alone these

 2   defendants.

 3        The voter opportunity score was only one dataset --

 4   data point that was going to be used for comparative purposes.

 5   This may be a minor point, but Mr. Young was not concerned

 6   with the age of the voter.  He was concerned with when they

 7   had first registered, and therefore how many elections they

 8   could have voted in.  That's slightly different from what

 9   their age was.  An 80-year-old could have registered three

10   years ago, and that's all that mattered was that they

11   registered three years ago.  I don't think Mr. Young would

12   agree about any targeting of places where five or more ballots

13   were cast.  There's no evidence for that.

14        So, again, Mr. Young developed a technique that he

15   would refer to as stratified random sampling.  He first heard

16   about this in a book on statistics that he read, and he would

17   testify that it hadn't occurred to him to try the technique

18   here until he spoke with another gentleman who brought it up,

19   and that gentleman had significantly more experience with

20   statistics, and Mr. Young agreed that it would be an

21   interesting way to try to solve the problem of achieving a

22   random sample.

23        Mr. Young would testify that he did not canvass with

24   the intention of reversing any election results, nor did he

25   think that he could, because all of the election results were

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    732

1    already sealed, and he knew it would be impossible.  He did

2    produce the walk lists the canvassers used.  It had

3    information such as the voter ID from the Secretary of State's

4    voter rolls, first name, last name, the age in case there were

5    several residents with the same name, a phone number if the

6    voter wanted to follow up and be called, an address, and then

7    the party registration, all of which came from the Secretary

8    of State.

9            This information was provided on forms that had small

10   bubbles next to each item that the volunteers were filling in.

11   They would fill in the bubbles so that they could be easily

12   scanned into a system and saved as an image file and then

13   tabulated in an automated fashion.  He would testify that the

14   same number of houses were visited who had low voter

15   opportunity scores as high voter opportunity scores.  Again,

16   that's because that's the only way that he could have useful

17   data.  He had been mindful of the failures of many claims of

18   election issues around the country and did not want to be part

19   of the national embarrassment he associated that with.  So it

20   was very important to him to have a statistically valid sample

21   of the voter roll.

22           There was -- he would testify there was no way he

23   could have gotten a statistically valid sample with only low

24   voter opportunity scores.  In fact, that was a huge

25   disincentive to using low voter opportunity scores.  He was

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    733

1   concerned about his reputation if he did such a thing.  One of

2   the other reasons that he chose to use voter opportunity

3   scores, both low and high, was what he would term resources

4   constraints.  There were only so many houses that could

5   possibly be visited, and he was trying to determine a way to

6   find a random sample of a smaller number to visit.

7         The question that he was pursuing was what is the

8   rate of inaccuracy of a voter roll?  Or, alternatively, what

9   are the anomalies like?  One additional reason for using voter

10  opportunity scores was what he would call avoiding

11  oversampling any particular demographic by focusing on and

12  stratifying the propensity alone.  So to take the low end high

13  propensity would sort of average out any extremes.

14        He did not discuss any of his survey canvassing

15  designs with Ms. Kasun.  He would also testify that the

16  distribution of voters who were canvassed he calculated

17  actually to be similar to overall voters in the state, and he

18  did that before the canvassing began, which is what allowed

19  him to proceed with some confidence that he was going to use,

20  not only a random sample, but an unbiased and representative

21  sample.  He gave the walk list to the county captains, but he

22  didn't do a walk list for all 64 counties.  There were four

23  counties that were canvassed to completion and a few more that

24  were not.

25        The completed counties were Weld, Douglas, El Paso,

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    734

1    and Pueblo.  Those counties were selected because that's where

2    the captains were, and that's where a sufficient number of

3    volunteers to walk the streets were located.  There were

4    several counties where canvassing began but was not finished;

5    Boulder, Otero, and Broomfield being three of them.  They

6    didn't reach the minimum number for an adequate sample size

7    that would allow him to extrapolate any results meaningfully.

8    He would testify that he examined the median household income

9    rates of the various counties and discovered that the counties

10    in which canvassing was completed were among the highest in

11    Colorado.

12           The canvassers visited most houses listed on the walk

13    list excepting any middle voter opportunity scores and, of

14    course, anyone who wasn't registered in the first place.  If

15    he were asked his understanding of the questions the

16    canvassers were asked and why they were asked those particular

17    questions, he would point out that the forms that they carried

18    had places to fill in bubbles for the respondents' answers so

19    those could be scanned and, again, meaningfully interpreted at

20    large scale.  There was an actual disincentive to using

21    different questions or training people to ask anything else.

22           Mr. Young would also testify that he believes most

23    voter fraud is due to nongovernmental organizations.  It's not

24    partisan.  He believes that people that are in power

25    regardless of their affiliation want to continue their power.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    735

1   He doesn't believe it benefits either Democrats or Republicans

2   more.  He doesn't believe there's a pattern related to income,

3   race, color, or creed.  And he would define voter fraud as

4   something being done by voters and election fraud by people in

5   power.  That's all I have, Your Honor.

6          THE COURT:  All right.  Let's get an update from

7   Professor Ellis.

8          MS. ERICKSON:  Professor Ellis should be here in

9   about 15 minutes.  He's making his way quickly.

10          MS. EPP:  Your Honor, may I just make one statement?

11          THE COURT:  Yes.

12          MS. EPP:  With respect to Professor Ellis, I just

13   wanted to remind the Court that in June of 2023, it's Docket

14   96, Your Honor found improper legal conclusions and said that

15   Section 3 of the report would not be considered.

16          THE COURT:  All right.  Let's -- what we're going to

17   do is take a break until he gets here.  Again, having listened

18   to the proffer, I think it would be unfair to the plaintiffs

19   to entertain a Rule 52 motion before hearing from Professor

20   Ellis.  Mr. Young's testimony I do not find germane to the

21   issue of whether there's been voter intimidation.  One,

22   because all of the proffer pertained to his individual conduct

23   and did not loop in the three defendants except in general to

24   say that the canvassing plan was a brain child of this group,

25   but it appears the method of canvassing was his idea and his

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    736

1   technique.  I don't think that's been placed at issue enough

2   to warrant having to hear his testimony before ruling on the

3   ultimate issue of voter intimidation.  So that is why I took

4   the proffer on him.  But we will be in recess until Professor

5   Ellis arrives, and you can let Ms. Dynes know when he is here.

6           MS. ERICKSON:  Thank you, Your Honor.

7           THE COURT:  Anything further before we take a recess?

8           MR. WYNNE:  Not from us, Your Honor.

9           MR. REISCH:  On behalf of Mr. Smith, I would join and

10  adopt the proffer, for the record.

11          THE COURT:  All right.

12          MR. REISCH:  Thank you.

13          THE COURT:  Sounds good.  We'll be in recess.

14          THE COURTROOM DEPUTY:  All rise.  Court is in recess.

15      (Break was taken from 2:44 p.m. to 3:08 p.m.)

16          THE COURT:  Please have a seat, and we will hear from

17  Professor Ellis.  You may call your witness.

18          MS. ERICKSON:  Thank you, Your Honor.  Plaintiffs

19  call Professor Atiba Ellis.

20          THE COURT:  All right.

21                      ATIBA ELLIS

22  was called as a witness and, having been duly sworn, was

23  examined and testified as follows:

24          THE COURTROOM DEPUTY:  Thank you.  If you could

25  please have a seat, and state your name and spell your last

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3     07/17/2024    737

 1    name, please.

 2              THE WITNESS:  My name is Atiba Ellis, E-l-l-i-s.

 3                        DIRECT EXAMINATION

 4    BY MS. ERICKSON:

 5    Q.  Thank you for being here today, Professor Ellis.  You were

 6    retained by plaintiffs in this case, correct?

 7    A.  That is correct.

 8    Q.  Can you describe the expert opinion you were asked to

 9    provide in connection with this case?

10    A.  I was asked to provide an opinion on the matter here where

11    the defendants' conduct was raising questions around their --

12    whether -- I'm sorry.  Let me restart.  I was asked to render

13    a matter generally about the policies around voter

14    intimidation in the United States, about the history of voter

15    intimidation in the United States, and about the policies

16    behind the laws meant to serve as anti-intimidation voter

17    laws.  Further, I was asked to look at the defendants' alleged

18    conduct in this case and to provide an understanding about

19    that conduct in light of the history and the policy involved,

20    and in particular, I was asked to give an opinion about how

21    this conduct would impact persons of color.

22    Q.  And are you prepared to provide such an expert opinion

23    today?

24    A.  Yes, I am.

25    Q.  I'd like to talk a little bit about your qualifications.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024   738

1    What is your current occupation?

2    A.  I am a professor of law and the Laura B. Chisolm

3    Distinguished Research Scholar at Case Western Reserve

4    University School of Law.

5    Q.  And how long have you worked in that position?

6    A.  I have worked in that position since January 2023, so

7    about a year and a half.

8    Q.  And it sounds like you're an attorney.  When did you

9    graduate from law school?

10   A.  I graduated from Duke University School of Law in

11   May 2000.

12   Q.  And can you just provide a brief overview for the Court

13   about your professional history between law school and your

14   present position.

15   A.  Sure.  I graduated with a J.D. degree, as well as a

16   master's in history focusing on the American history of the

17   Jim Crow period as it relates to voting rights.  I then

18   clerked for two federal judges and then practiced law at Akin

19   Gump Strauss Hauer & Feld from late 2002 to May 2006.  I then

20   started my academic career at Howard University School of Law

21   from August 2006 to August 2009 where I joined the faculty of

22   the West Virginia University College of Law.  I was at WVU for

23   nine years.  And in summer of 2018 I moved to Marquette

24   University and joined as a tenured professor of law.  And then

25   after five years at Marquette I assumed my position at Case.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    739

1    Q.  What is your area of expertise?

2    A.  So I'm a scholar of voting rights and election law.  I

3    study in particular the dynamics of voter suppression in

4    United States using historical and critical lenses to

5    understand that history and how that history has effects even

6    today.

7    Q.  What type of training have you received to prepare you for

8    work in this area?

9    A.  So during law school I focused in constitutional law and

10   civil rights law, and additionally as -- and I should say in

11   particular, my master's thesis focused on the history of Jim

12   Crow voter suppression in Virginia tracing both the historical

13   and the legal dynamics of the poll tax during the Jim Crow

14   period.  And then once I was in practice, I did some pro bono

15   work related to voting rights and Section 5 of the Voting

16   Rights Act.  And then upon assuming my academic positions, I

17   wrote and I am still writing about voting rights and election

18   law.  My first article concerned voter identification laws.  I

19   have also looked at the dynamics around campaign finance, the

20   history of voter suppression, and related issues.

21   Q.  Do you also teach classes in the area of election law,

22   voting rights, voter intimidation?

23   A.  Yes, I do.  I annually -- I shouldn't say annually.  I

24   frequently teach election law specifically.  I also teach

25   civil rights law, and in both of these cases -- in both of

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    740

1    these courses we focus on the dynamics of discrimination, and

2    in particular discrimination related to voting, elections, and

3    political equality.

4    Q.   I would ask you -- there's some binders in front of you --

5    if you could please turn to what was marked as Exhibit 72, I

6    believe.

7    A.   You said 7 --

8    Q.   72.

9    A.   72.

10   Q.   Will you turn one more to 73, please.

11   A.   73.  Yes.

12   Q.   And feel free to spend a second and take a look at this

13   document if you need to.  What is this exhibit that we're

14   looking at?

15   A.   This exhibit is my curriculum vitae as of October 2022.

16   Q.   Did you prepare this document?

17   A.   Yes, I did.

18   Q.   And do you believe that it's a true and accurate

19   reflection of your qualifications?

20   A.   It is as of the time it was written.

21   Q.   Is there anything of note that has been added to your CV

22   since it was provided in connection with this case?

23   A.   Yes.  In particular I -- as I noted earlier I joined Case

24   Western University as the Laura B. Chisolm Distinguished

25   Research Scholar and professor of law, and that appointment

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    741

1    would supplement this document, as well as current academic

2    projects that I am working on.

3           MS. ERICKSON:  Your Honor, I'd offer Exhibit 73.

4           THE COURT:  Any objection?

5           MR. WYNNE:  As I formality I object.  Technically it

6    is hearsay.

7           THE COURT:  Any objection from the other defendants?

8           MR. REISCH:  Your Honor, I would object as to hearsay

9    and relevance, cumulative.  He's stated his qualifications.

10          MS. EPP:  No objection, Your Honor.

11          THE COURT:  I'm going to admit the exhibit.

12   Exhibit 73 is admitted.

13       (Exhibit 73 received.)

14          MS. ERICKSON:  Your Honor, I offer Professor Atiba

15   Ellis in the field of voting rights and voter intimidation in

16   the United States.

17          THE COURT:  Any objection to the Court recognizing

18   Mr. Ellis as an expert -- Professor Ellis as an expert in

19   those areas?

20          MR. WYNNE:  I'm going to assert a *Daubert* challenge

21   regarding his testimony as applied to this case.

22          THE COURT:  Well, the time to do that was long ago,

23   and I have already ruled on this issue, so that is overruled.

24          MR. REISCH:  Given the state of 702, I understand the

25   Court's ruling, but I would obviously -- will make any timely

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    742

1    objections as it relates to the Court's ruling in Docket

2    Number 96, please.

3              THE COURT:  All right.

4              MR. REISCH:  Thank you.

5              MS. EPP:  And for the record, I would object to

6    relevance in this case.

7              THE COURT:  All right.  Those objections are

8    overruled, and I find that Professor Ellis's testimony may

9    assist the trier of fact, namely, me, and will allow you to

10   proceed in eliciting those opinions.

11             MS. ERICKSON:  Thank you, Your Honor.

12   Q.  (By MS. ERICKSON) Professor Ellis, have you had an

13   opportunity to review materials related to this case?

14   A.  Yes, I have.

15   Q.  What materials have you reviewed?

16   A.  I reviewed the documents that the defendants had created

17   in terms of what was relevant to this case.  In particular,

18   the playbook that was created by defendants, as well as

19   certain statements from defendants, including their deposition

20   testimony and other related documents.

21   Q.  In forming your opinion that you'll be offering in

22   connection with this case, what information was important to

23   you?

24   A.  I focused on and found very important both the defendants'

25   stated intentions around the activities they were involved in,

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    743

1    their statements about what motivated their actions, and also

2    understanding the actions themselves.  So looking at their

3    approach in terms of their activities, that was all quite

4    relevant to me.

5    Q.  Did you compile any documents or work product while you're

6    doing your analysis in this case?

7    A.  I took notes as I read my -- as I read these documents,

8    and then I wrote the report.

9    Q.  I want to move in now to talking about your opinion in

10   this case.  What in your view is voter intimidation?

11   A.  Voter intimidation is any act that would serve to dissuade

12   an eligible voter to not wish to cast a vote.  It is a broad

13   term, and certainly definitions including the definition of

14   the Department of Justice as to this is very broad, and it can

15   be very direct or indirect.

16   Q.  Are there different types of voter intimidation?

17   A.  So, yes, I would say that probably the most important type

18   of voter intimidation and the thing that probably gets the

19   most legal attention is sort of de jure voter intimidation,

20   which is to say that there are arguments and still arguments

21   today about whether the government itself or certain laws

22   dissuade voters from participating in the political process.

23   But I think more relevant to this matter is the sort of de

24   facto or indirect voter intimidation that is not government or

25   authorities dissuading people from being involved in the

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3      07/17/2024    744

1   political process, but the actions of citizens towards other

2   citizens that would have the effect of dissuading people from

3   participating.

4   Q.  Can you briefly describe the history of voter intimidation

5   in the United States, beginning with the Reconstruction Era

6   through --

7   A.  So certainly -- and if I may take a little bit of a

8   liberty, I think that voter intimidation has been present in

9   the United States since the founding of the republic inasmuch

10  as there were formal legal barriers around who could and who

11  could not vote, and, of course, even though the definition of

12  citizenship in the late 18th and early 19th century is far

13  more narrow than we have it today, that even those that would

14  qualify as citizens, some of those were intimidated.

15          Indeed, there were studies -- one famous study,

16  *Democracy in America* by Alexis de Tocqueville, talks about

17  indirect voter intimidation and talks specifically about race.

18  That in Pennsylvania he documented how black voters were

19  chilled from participating in the political process because

20  they felt intimidated.  They felt that there were threats to

21  their jobs, their livelihood, that they may suffer violence,

22  and that those things prevented them from going to the polls.

23          And this is important in particular, because at the

24  time, Pennsylvania did not have any laws banning

25  African-Americans from voting.  It is this sort of indirect

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3      07/17/2024    745

1    voter intimidation, this sort of de facto voter intimidation

2    through violence, threats, threat to one's person, threat to

3    one's livelihood that played a role.  Now, certainly too

4    people who are enslaved couldn't vote.  Women largely couldn't

5    vote and the like, and that gets into sort of legal issues.

6          But to the point about Reconstruction, after the

7    Civil War and during Reconstruction it was a priority of

8    Congress to ensure that those who were formerly enslaved would

9    be able to participate fully in the political process.  And

10   certainly the Fourteenth Amendment and Section 2 contains

11   provisions designed to prevent states from disenfranchising

12   their citizens, and the Fifteenth Amendment makes explicit

13   that there will be no discrimination on the basis of race in

14   regards to voting.  And along with that Congress set up a

15   number of laws to hope to protect against that discrimination.

16         Now, despite that, voter intimidation continued to

17   persist.  Probably the most important part of the

18   Reconstruction period and thereafter in regards to voter

19   intimidation is the fact that terrorist organizations like the

20   Ku Klux Klan and other related organizations arose in large

21   part to exercise acts of terrorism, threat, violence in order

22   to intimidate African-American voters, and that that practice

23   appeared both as anything from widespread violence like cross

24   burnings and marches to more subtle threats like the use of

25   conspiracies and the use of indirect visits and discussions on

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    746

1    the job in order -- all conveying threats of, if you vote, if

2    you participate in the political process, you will not get to

3    enjoy your livelihood, and, in fact, your life may well be in

4    danger.

5         And along with that, the Klan and other organizations

6    would conspire with other state organizations and use that

7    combination in order to intimidate people from exercising

8    their political rights.  And, indeed, some Klan members used

9    not only disguises and masks and the like, but the claims of

10   acting on the part of constituted authority in order to

11   threaten and even vet voters with a menacing approach in order

12   to get them to not vote and not participate in the political

13   process.

14        Now, certainly during Reconstruction a lot of that

15   was held in check by the presence of the Union Army, but after

16   Reconstruction ended in 1877, and the Union Army departed,

17   that -- those sorts of acts and terrorism escalated, and all

18   this time, it's worth pointing out, that the ultimate sanction

19   of, as I mentioned lynchings and mass violence, took place,

20   both during Reconstruction and during Jim Crow.  We saw a

21   number of race riots, including the Colfax massacre in

22   Louisiana, and the Wilmington race riots and the like.  All of

23   these are in part acts of political violence meant to send the

24   message to African-Americans that they should not vote.

25        Now, it's worth noting that as we get to the 20th

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    747

1    century, these sorts of methods continue, but certainly the

2    sort of de jure, the legal forms of voter intimidation,

3    through poll taxes, literacy tests, intimidation of voters

4    rigorously, those grew in popularity, but the threats and the

5    acts of coercion and duress and terror also included.

6           Now, it's fair to say I've talked a lot about the

7    South, but this was pervasive throughout the United States.

8    Certainly this was also known to happen in the North, maybe

9    not the de jure voter intimidation, but the de facto voter

10   intimidation, and it certainly took place and has been noted

11   by historians across the United States.

12   Q.  To that point, can you talk specifically about the history

13   of voter intimidation in Colorado?

14   A.  Yes.  So in Colorado in particular historians have

15   documented the fact that the Ku Klux Klan itself came to

16   Colorado and sort of took root in the Colorado government

17   during the early part of the 20th century, and these

18   techniques of coercion and duress and terror that I've talked

19   about were certainly at the Klan's disposal during that time.

20   And it was well-documented that in the teens and in the '20s

21   the Klan had a stranglehold on Colorado politics.

22          Now, the direct hold of the Klan did tend to fade

23   over time, because, in part, the political process played its

24   role in terms of the fortunes of those Klan leaders fell, and

25   some of them ended up losing their elections.  But the terror

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3      07/17/2024    748

1   and the history that that created remained clear and present,

2   and, indeed, historians are in the 21st century debating

3   whether that effect is still present.

4   Q.  And what is your view on that issue?  Do you as a

5   historian and a legal scholar believe that the effects of the

6   Ku Klux Klan and other private voter intimidation groups,

7   historic groups, still is felt in states where they were once

8   active?

9   A.  I do believe that this is true.  I think that this legacy

10  and this -- these patterns of terror were well-known both in

11  their time and thereafter.  Indeed, I would suggest here that

12  these patterns repeat themselves.  Certainly the form might

13  change and the organizations might change, but the patterns of

14  coercion and duress and terror I think still resonate.  And

15  from my personal perspective, because at least one of my

16  scholarly perspectives is that I can't divorce from the

17  history that I understand, that I personally understand, and I

18  do believe that people of color understand that when they see

19  these kinds of threats and these kinds of patterns, it plugs

20  into their understanding of what their family and their

21  generations past understood in terms of the threat of being

22  engaged in the political process.

23  Q.  Are there particular groups of people who in your view

24  have been disproportionally impacted by voter intimidation?

25  A.  Yes.  I would say African-Americans, this history that I

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    749

1    have told, have been sort of the most directly impacted by

2    this history of voter intimidation.  This ties into the legacy

3    of slavery where African-Americans were not considered, not

4    only not citizens, but not full people in the United States.

5    That as colleagues Jim Gardner and Guy Charles pointed out,

6    these patterns of voter intimidation made African-Americans

7    not feel like complete people, and I think that those patterns

8    continue to target.

9              Now, this isn't to say that they're the only

10   minorities subject to this kind of intimidation.  I would say

11   that all people of color -- given the dynamics of race in

12   America and given the dynamics of how voter intimidation

13   practices tend to target communities of color, I would say

14   that Latinos and Asian-Americans and people of color are

15   subject to these dynamics more than the majority is.

16   Q.  So then you said they are subject to these dynamics.  So

17   following up on that, is it your view people of color still

18   today are disproportionately impacted by voter intimidation?

19   A.  Yes, it is.

20   Q.  And how so?

21   A.  I think that even though the history of Reconstruction and

22   the redemption and Jim Crow are in our past, that the dynamics

23   of validating and sort of holding a standard of worthiness for

24   being eligible to vote still play out today, and some of that

25   worthiness dynamic is about how communities of color get

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    750

 1   treated as more prone to being illegitimate voters or

 2   fraudulent voters or voters of that sort, and that the

 3   targeting of tactics around voter intimidation would tend to

 4   gravitate toward those communities because of this dynamic.

 5   Q.  So I think I heard you say two things.  One, voters of

 6   color are disproportionally impacted because they are more

 7   vulnerable to voter intimidation; is that fair?

 8   A.  I think that is fair.

 9   Q.  And it sounded like the second point you made is they're

10   more likely to be targeted by voter intimidation; is that

11   fair?

12   A.  Yes.

13   Q.  In your view is voter intimidation still an issue today in

14   the United States?

15   A.  Yes.  I think that there is still ongoing and present

16   history, if you will, despite the oxymoron.  This still goes

17   on in the 21st century, and we can point to specific instances

18   within our lifetimes of this.

19   Q.  So before we get into those specific instances, can you

20   just give us an overview of what modern day voter intimidation

21   looks like?

22   A.  Well, certainly it is different from the era of the Klan

23   and the mass marches and that sort, but there is still voter

24   intimidation that looks like the searching interrogation of

25   voters, particularly voters of color, when it comes to

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    751

1    approaching the polls, being faced with members of so-called

2    voter vigilante groups who might both stand at the polls and

3    claim they are policing the polls, while in open carry states

4    wearing armaments.  There might be, you know, frequent

5    challenges to a voter's eligibility that may be unfounded or

6    unnecessary.  And then certainly there is communication in

7    terms of coercion by deception, sort of the robocalls that

8    spread false information about voting and discussions about

9    disinformation about the safety and validity of elections.

10   All of these sorts of things are hallmarks of modern day voter

11   intimidation.

12   Q.  So you specifically mentioned this term voter vigilante

13   groups.  Can you talk a little bit more specifically about

14   what in your view that means?

15   A.  Well, a voter vigilante group is a group that seeks to

16   police elections without any governmental authorization or

17   authority, but who will use forms of coercion and threat in

18   order to preserve what they view is the purity of the ballot

19   box.

20   Q.  Can you provide some examples of these modern day voter

21   vigilante groups or even just modern voter intimidation?

22   A.  Sure.  I would say that even before we get to -- well,

23   specific voter vigilante groups, probably the most

24   well-documented is the group True the Vote, which engages in a

25   number of these activities that I've just described in terms

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    752

1   of sending observers to elections who may appear and appear

2   with, you know, projecting threat of violence by being armed

3   or by being otherwise organized to challenge voters, and

4   certainly they get involved in questioning the legitimacy of

5   elections and the like, and organizing groups that get

6   involved in those sorts of activities and mobilizing people

7   through spreading unfounded rumors about the legitimacy of the

8   electoral process.

9        Now, certainly these groups are outside of the

10  political mainstream, but even within the political

11  mainstream, there has been documented history of voter

12  intimidation.  For example, probably the most famous organized

13  and judicially-documented and adjudged form of voter

14  intimidation was on the part of the Republican Party itself.

15       The GOP in the early '70s sent groups including off

16  duty police officers and others to particular neighborhoods,

17  mainly minority neighborhoods, specifically African-American

18  neighborhoods in Jersey, to engage in sort of election

19  integrity presence and scheme, and by that I mean, these

20  groups were sent to show a presence in order to ensure that

21  voters were involved were legitimate and proper there.  And so

22  this scheme was found to be voter intimidation in violation of

23  the law by the federal courts, and the GOP entered into a

24  consent decree around this, and that decree was only lifted in

25  the late 2000 teens.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    753

1    Q.  I'd like to focus your attention on the aftermath of the

2    2020 election in particular.  Can you describe more

3    specifically what you have seen from these voter vigilante

4    groups in the aftermath of the 2020 election to the present?

5    A.  Well, certainly in the immediate follow-up from the

6    election there was -- in addition to the lawsuits and the

7    litigation around the validity of the election, there was

8    growing threats of violence around the election and

9    accusations that the election was a product of voter fraud or

10   election fraud, and that those involved in such fraud should

11   be directly opposed.  And that had resulted in, you know,

12   documented instances of threats and violence and duress and

13   coercion in various locales around the United States.

14           Certainly some of the documents that support this and

15   the data that support this include a study by the Brennan

16   Center For Justice at NYU that did a survey and documented

17   that nearly 20 percent of election workers had felt

18   threatened, you know, in the wake of the 2020 election.

19   Additionally, in the wake of the January 6th insurrection, we

20   had testimony in Congress from election workers about the

21   threats that they had suffered directly.  And, of course, we

22   have documented threats against state officials across -- you

23   know, in several states in the United States.

24   Q.  In your opinion, does this violent rhetoric or the threats

25   against election worker, election officials, state officials

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    754

1    that you just mentioned -- sorry.  Let me rephrase that

2    question.  In your opinion, do the threats you mentioned

3    against state officials and election officials have any impact

4    on voters?

5    A.   Yes, I think they do.

6    Q.   What is that impact?

7    A.   So I think the effect -- so to set the scene as elections

8    as being activities where instead of being able to simply go

9    in and cast your vote and carry out one's duty as a citizen --

10   excuse me -- that instead they become, you know, environments

11   where one could be subject to threat themselves.  So not just

12   the Secretary of State of a state or a poll worker, but that

13   voters themselves may end up getting caught up in this

14   violence.  I think that it also perpetuates the view that

15   those same activists that might be patrolling elections might

16   be more inclined to exercise violence given these calls for

17   rhetoric of violence and intimidation and opposition.  So this

18   sets a scheme.

19         And certainly in my research on this, you know, I've

20   read about an organization that decided not to be a polling

21   place anymore, a local school that decided not to be a polling

22   place precisely because they were worried that these kinds of

23   threats would spill over into the administration of elections,

24   and that certainly isn't about elected officials or chief

25   election officials or poll workers.  That's about voters

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3      07/17/2024    755

 1   themselves.

 2   Q.  So we've talked a lot about voter vigilante groups

 3   targeting election officials, state officials, et cetera.  Can

 4   you talk a little bit about what you've seen from these voter

 5   vigilante groups with respect to targeting voters

 6   specifically?

 7   A.  Well, I think these groups engage in this pattern of

 8   challenging voters directly, whether at the polling place,

 9   because certainly depending on what state you're talking about

10   there are avenues for basically challenges to be offered at

11   the ballot box.  And certainly the view that polling places or

12   ballot drop boxes or otherwise require supervision and

13   watching this kind of surveillance, if you will, could be

14   perceived as a direct threat to voters themselves.

15          And also there is ample opportunity, and it's been

16   documented that groups might engage in directly talking to or

17   interrogating voters, and if a voter feels interrogated by

18   other voters in terms of the exercise of their right to vote,

19   then they would feel intimidated in the election that they're

20   trying to vote in or feeling like a voting place or their

21   environment generally isn't safe, they may feel that they

22   can't participate further.

23   Q.  In your opinion, are there any challenges with addressing

24   or stopping voter intimidation?  And if so, can you address

25   those challenges?

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    756

1    A.   Sure.  I think that these types of activities are

2    infrequent in the sense that -- actually, I take the word

3    infrequent back, because what I want to say is they're

4    informal.  I misspoke.  I apologize.  They're informal.  They

5    are hard to see.  They often happen quickly, and they often

6    happen in an environment where they are difficult to document,

7    and so amassing evidence around patterns of voter intimidation

8    becomes difficult.

9          And the other thing I would point out is that we're

10   talking about coercion and threat, and such coercion and

11   threat may well chill persons who could otherwise report these

12   activities, and so the intimidation isn't just about casting a

13   ballot.  It may well be about documenting the activities they

14   suffered and thus creating evidence on which it could be acted

15   on.

16   Q.   Congress has adopted a number of laws aimed at addressing

17   voter intimidation, correct?

18   A.   Yes.

19   Q.   And can you just very briefly describe what those laws

20   are?

21   A.   So certainly during the Reconstruction Era, during that

22   era of conspiracies orchestrated by the Klan, Congress wanted

23   to outlaw such conspiracies and such collaboration amongst the

24   government and the Klan, and basically forbid people from

25   doing those activities.  So it passed what has been known as

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    757

1    the Ku Klux Klan Act of 1871, and it includes a number of

2    provisions meant to address this problem of conspiracies and

3    this problem of informal groups organizing to prevent citizens

4    from exercising their political rights and specifically the

5    right to vote, and it was designed to be quite broad.

6            Now, certainly Congress again in facing the Jim Crow

7    era version of this passed additional laws directly targeted

8    at voter intimidation, including several laws in the late '50s

9    and early '60s that authorized the government to act on these

10    sorts of things, that the Department of Justice could pursue

11    prosecutions.  But also in the Voting Rights Act of 1964

12    Congress passed Section 11 which includes provisions directly

13    targeted at voter intimidation, and it's worth noting that

14    these -- in recognizing the sort of fleeting and informal

15    nature of these acts, the Attorney General in discussing these

16    things noted that -- and this is documented in my report --

17    that these provisions are meant to be broad and meant to

18    encompass a lot of the behavior that is difficult to track and

19    prosecute.

20    Q.  Based on the documents and information you've reviewed in

21    connection with this case, what do you understand to be the

22    stated purpose of defendants and USEIP?

23    A.  So my understanding of their stated purpose is they viewed

24    there were irregularities in the 2020 election, and that their

25    stated purpose was to pursue and gather data around these

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3   07/17/2024   758

1   irregularities and to address them.

2   Q.   To your knowledge, have there been any substantiated

3   claims or irregularities or, taking it further, of fraud

4   related to the 2020 election?

5   A.   To be clear, these are irregularities or specifically the

6   claims of voter fraud, to put it in a sentence, that the 2020

7   presidential election was rigged and stolen, right?  And so

8   pursuing that was what I understand their purpose to be;

9   however, to answer your question, there is no documented court

10  case that has held that any part of the 2020 election was

11  fraudulent.

12  Q.   Defendants' stated purpose notwithstanding, how would you

13  characterize defendants' campaign through USEIP?

14        MR. REISCH:  Your Honor, I'm going to object.  I

15  believe this is strictly what the Court was going to prohibit.

16        THE COURT:  Well, no.  I mean, I just reviewed my

17  order.  What I indicated is because this is a bench trial, I

18  will hear all of the opinions.  None were excluded.  I just

19  said I won't consider legal conclusions as to whether the

20  actions accused here by the defendants are the type of

21  activity that the laws were meant to prevent and whether

22  defendants violated any particular law.  That doesn't mean he

23  can't offer his opinions.  It's just that's within the Court's

24  consideration, and that decision will be left to my findings

25  after hearing the facts.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024   759

1           MR. REISCH:  Thank you.

2   Q.  (By MS. ERICKSON) Would you like me to repeat the

3   question?

4   A.  Please.

5   Q.  So defendants' stated purpose notwithstanding, how would

6   you characterize their campaign through United States Election

7   Integrity Plan based on the documents and evidence you've

8   reviewed in connection with this case?

9   A.  So the defendants stated that their campaign was in

10  essence a call -- a call to rise up and oppose the fact that

11  the 2020 election was stolen.  That their rhetoric pointed to

12  the fact -- pointed to their view, I should say, that the

13  election was, you know, improper or rigged, and that there

14  were people engaged in fraud around the election, and that

15  this had to be directly opposed, and it was, in essence,

16  asking people to stand up and -- you know, I believe the

17  phrase was take our republic back.

18  Q.  Would you characterize defendants as a voter vigilante

19  group?

20  A.  Well, given these calls to opposing the stolen election

21  and then what came off to me as rallying people to getting

22  organized and involved in that sort of activity, and given

23  what I read of their organizing from canvassing and

24  approaching the homes of Coloradoans, I think that that would

25  meet my view of what a voter vigilante group is.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    760

1  Q.  So I want to break that down a little bit further.  What

2  have you seen specifically in terms of defendants' rhetoric

3  that leads you to characterize them as a voter vigilante

4  group?

5  A.  Well, certainly Defendant Smith in a speech that has been

6  recorded and has been, you know, documented and is available

7  there talked about his view that anyone engaged in voter

8  fraud, I think in his words, that person should hang, and that

9  he called for a return to the old ways, and certainly this

10  speaks to the sort of heart of what my view is of vigilante,

11  right?  The use of coercion, duress, threats, violence in

12  order to reclaim the republic, to, in the words of other folks

13  who are involved in this, sort of reclaim that purity of the

14  ballot box.  And so in a sense, my view is that this is all

15  code for these calls to violence and these calls to threat.

16  Q.  Can you point to any statements that you have seen from

17  either Defendants Epp or Kasun that leads you to the same

18  conclusion?

19  A.  So I believe that there were statements around the

20  carrying of arms in the course of these canvassing activities

21  that also would lead me to this conclusion.  I mean, one of

22  the implications of my testimony is that the availability of

23  weapons and the perception of weapons and the opportunity to

24  brandish weapons also in and of itself is its own sort of

25  threat and can, you know, affect voters in this way as well.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3   07/17/2024   761

1   Q.  Are there any parallels between defendants' conduct and

2   the historical voter intimidation we've discussed today?

3   A.  Well, I think there are some parallels.  Now, to be clear,

4   and as I have said earlier, this is not the grand marches of

5   the Ku Klux Klan and the filling of the streets of Colorado

6   and elsewhere of a century ago.  But the canvassing on the

7   roads, the uses of badges that may say United States Election

8   Integrity Project, which an ordinary voter may or may not

9   realize is simply a private group, or they may confuse that

10  between a private group and an organized political entity,

11  there is a parallel there.  And certainly some of the

12  documents I looked at include news coverage of these sorts of

13  activities.  Some of the people there talked about feeling

14  harassed by these groups and in a word intimidated, at least

15  in the informal sense, and all of those things sort of

16  parallel those patterns of coercion and duress and threat that

17  I have said have been the hallmarks of the American history of

18  voter intimidation.

19  Q.  Why in your view is it particularly notable that the

20  canvassers wore badges that indicated United States Election

21  Integrity Plan or U.S. Election Integrity Plan?

22  A.  Well, I think a reasonable voter could perceive that sort

23  of badge as an indication of authority.  Certainly, police

24  officers, fire officials, other governmental officials wear

25  badges to identify themselves as acting in an official manner,

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    762

1    and the use of that kind of language might connote that

2    intention even if the wearer of that badge isn't specifically

3    stating that they're acting in a governmental capacity.  And

4    that kind of confusion might mislead and coerce someone to

5    doubt their ability to vote and to raise questions in their

6    own mind about why they're being asked about who they voted

7    for and questions of that sort.  It in my view can serve to

8    intimidate.

9    Q.  In your opinion, what is the likely effect of defendants'

10   conduct on Colorado voters in light of the history of voter

11   intimidation you've discussed today?

12   A.  So I think that taken together, this kind of behavior can

13   serve to make voters feel threatened as to the exercise of

14   their vote.  It can make voters feel intimidated and afraid

15   that their votes were legitimate, that if they do exercise

16   their votes again, that they might be subject to more of these

17   inquiries, and in a word it may make them afraid about their

18   vote.

19   Q.  In your opinion, could defendants' conduct have a chilling

20   effect on Colorado voters, or, in other words, make it less

21   likely for them to vote in the future?

22   A.  Yes, I think that may be the case.  I do think that a

23   voter may say, well, if I'm getting hassled about this, then

24   why should I get involved in voting at all, and then they

25   would not vote again.  So, yes, I do think this can have a

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024   763

 1   chilling effect.

 2            MS. ERICKSON:  Thank you, Professor Ellis.

 3            Your Honor, I don't have any further questions at

 4   this time.

 5            THE COURT:  All right.  Mr. Wynne.

 6                      CROSS-EXAMINATION

 7   BY MR. WYNNE:

 8   Q.  Good afternoon, Professor Ellis.

 9   A.  Good afternoon.

10   Q.  So you taught at Marquette University?

11   A.  I did.

12   Q.  Was my classmate, and Cameron's classmate, Andrea Cuthbert

13   dean there while you were there?

14   A.  Yes.

15   Q.  Just curious.  I know she was at some point.  And you

16   mentioned a Derrick Bell, good man, right?

17   A.  I didn't mention him today.

18   Q.  Derrick Bell in your report?

19   A.  I did in my report.

20   Q.  He was a professor at Harvard Law School?

21   A.  Yes.

22   Q.  I remember him.  Did you know Randall Kennedy as well?

23   A.  No, I don't.

24   Q.  I wanted to ask you, you know, your opinions are based on

25   defendants' alleged conduct.  If that conduct was not as

                      Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    764

1   alleged, would your opinion be similarly helpful to this

2   Court?

3   A.  I'm sorry.

4   Q.  Sure.

5   A.  Could you --

6   Q.  You've read the complaint in this case, right?

7   A.  Yes.

8   Q.  Okay.  And you've met with counsel for the plaintiffs to

9   some degree, right?

10  A.  Yes, I did.

11  Q.  Okay.  And they have made certain allegations against the

12  defendants, Mr. Shawn Smith, Ms. Kasun and Ms. Epp, right?

13  A.  Yes.

14  Q.  Okay.  And if those allegations could not be proven, that

15  if they could not make their case, then your -- based on the

16  facts, then your opinions as you've recited including that

17  they are carrying on a pattern from the Ku Klux Klan, those

18  opinions wouldn't be quite so helpful anymore, right?

19  A.  I didn't say they were carrying on a pattern from the Ku

20  Klux Klan, sir.

21  Q.  Okay.  Then what possible relevance is your testimony

22  about the Ku Klux Klan?

23          MS. ERICKSON:  Objection, Your Honor, argumentative.

24          THE COURT:  Well, sustained.  And that's for me to

25  determine what the relevance is.  Let's move on to another

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    765

1   question.

2   Q.  (By MR. WYNNE) Sir, have you ever met Mr. Smith?

3   A.  No, sir.

4   Q.  Have you ever met Ms. Kasun here?

5   A.  No, sir.

6   Q.  Have you ever met Ms. Epp?

7   A.  No, sir.

8   Q.  Okay.  This actually is Ms. Kasun.  Have you ever actually

9   watched any of the videos that you say that any of these

10  defendants published?

11  A.  I did watch Mr. Smith's video, sir.

12  Q.  You cite in your report -- your report is dated

13  November 11th, 2022.  Remember that?  Or at least it was

14  submitted to the Court.  Does that sound about right?

15  A.  Yes, sir.

16  Q.  So that's Veteran's Day of 2022.  You cite Attorney

17  General Katzenbach on page 22 of your report.  Do you recall

18  that?

19  A.  Sounds correct.

20  Q.  And Attorney General Katzenbach was attorney general for

21  Lyndon Johnson and the great state of Texas, right?  1965?

22  A.  Yes.

23  Q.  And you say -- you actually excerpt a piece of his

24  testimony, which I'll represent to you I've read every word

25  of.  You realize that your quote is six lines out of a long

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    766

1    piece of testimony?  Did you know that?

2    A.  Yes, sir.

3    Q.  Okay.  And I'm going to read it for you.  Under the VRA,

4    no subjective purpose need be shown in either civil or

5    criminal proceedings in order to prove intimidation under the

6    proposed bill, the Voting Rights Act.  Rather, the defendants

7    would be deemed to intend the natural consequences of their

8    acts.  This variance from the 1957 Act is intended to avoid

9    the imposition on the government of the onerous burden of

10   purpose which some district courts have wrongfully I believe

11   required under the present law.  You go on to say that

12   Congress adopted Attorney General Katzenbach's position

13   regarding law.  Do they adopt -- that is Congress -- adopt

14   this paragraph or that entire long speech?  Do you know?

15        MS. ERICKSON:  Objection, compound.  I guess I'm not

16   sure there was a question there.

17        MR. WYNNE:  I'm going to his credibility, Your Honor.

18        THE COURT:  Overruled.  There eventually was a

19   question at the end.

20   Q.  (By MR. WYNNE) You say that Congress adopted it.  Congress

21   passes law to adopting.  Did they enact this paragraph into

22   law or maybe the whole report that I told you I read and

23   presented in my thesis at Harvard?  Which did they do?

24        MS. ERICKSON:  Objection, argumentative.

25   Q.  (By MR. WYNNE) Do you know?

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    767

1          THE COURT:  Overruled.  I'll allow him to answer to

2     the extent he understands what he's being asked.

3     Q.  (By MR. WYNNE) You said Congress adopted.  What do you

4     mean?

5          THE COURT:  Let's stop with what you've got, and

6     let's see if he can answer them.  And then you can pose a new

7     question.

8     A.  The view I offered in my report was that Congress accepted

9     the attorney general's report favorably, and that this

10    excerpt, which I do realize is a small part of his broader

11    view and testimony on the Voting Rights Act and what it was

12    seeking to do, that Congress accepted this provision, and thus

13    it is -- this provision as to the issues I was raising is

14    helpful in terms of interpreting the policy around what

15    Congress adopted in the Voting Rights Act, and given the issue

16    at play here, Section 11.

17    Q.  (By MR. WYNNE) And as you also know having studied the

18    entire text that this reference is to eliminate the 1957 Act's

19    requiring of showing specific racial animus which had proven

20    to be during Mr. Robert Kennedy's term as assistant -- as

21    attorney general, right?

22    A.  Yes.  The Act, and particularly Section 11 does not speak

23    in terms of racial animus directly.  And, of course, given

24    this interpretation, the idea here is that any act by any

25    person engaged in voter intimidation should be taken for the

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    768

 1   effect that the act has, and that there is no specific

 2   intention around race or some other disfavored class that

 3   might be targeted.  The acts are to be taken, as you've stated

 4   in reading this section, for the effect that they have.

 5   Q.  So that's not a direct quote, but I'm going to move on.  I

 6   think we've covered it.  But along these lines, you know, this

 7   quote has been -- has been examined recently by the Supreme

 8   Court and in the *Counterman* case from last year, in fact, out

 9   of this district.  That has impacted the burden of proof under

10   these cases.  You're familiar with that, right?  The

11   *Counterman* case?

12        MS. ERICKSON:  Objection, Your Honor.  Counsel is

13   testifying.

14        THE COURT:  Overruled.  The question is are you

15   familiar with the *Counterman* case.

16   A.  I don't recall it right now, sir.

17   Q.  (By MR. WYNNE) And you're a professor of voting rights at

18   Case Western?  One of my partners has a degree from there.

19   I'm concerned.

20        THE COURT:  Mr. Wynne, you're muttering now, and I

21   can't understand you, and I'm quite sure the witness can't.

22   Did you just ask a question?

23        MR. WYNNE:  No, no, no.  I'm sorry.  I'm talking to

24   myself.  I apologize.

25   Q.  (By MR. WYNNE) Ms. Catherine Engelbrecht, do you know who

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    769

1   she is?

2   A.  I do not.

3   Q.  Okay.  I'll tell you she's the president and founder of

4   True the Vote.  You said a lot of pretty rough things about

5   True the Vote.  You don't even know who she is; is that fair?

6           MS. ERICKSON:  Objection, argumentative, Your Honor.

7           THE COURT:  Overruled.  It's cross-examination, so he

8   has a great deal of leeway here.

9   Q.  (By MR. WYNNE) Is that real fair to say those kinds of

10  things when you have no idea who she is?

11  A.  The fact that I don't recall who she is doesn't

12  necessarily impact the fact that based on my research and

13  exploring of media reports and scholarship around the work of

14  True the Vote, that my views around True the Vote were as I

15  stated.

16  Q.  So you've kept up with recent, say, the past two years

17  since I've been representing them, very big media reports

18  about True the Vote.  Is that what you're saying?

19          MS. ERICKSON:  Objection, relevance.

20          THE COURT:  Overruled.

21  A.  I'm saying that for the purposes of my report and the

22  research that I did about my report, and the looking back at

23  my scholarship that I note around what that group and other

24  groups did, and looking at the work of Professor Justin Levitt

25  who also wrote about these things, that that is a reflection

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    770

1   of my views based on that research.

2   Q.   (By MR. WYNNE) So you know that in September of 2022 a

3   number of national organizations filed a lawsuit through an

4   entity called Konnech against True the Vote and

5   Ms. Engelbrecht in the Southern District of Texas for various

6   similar type of claims.  You know that, right?  It received a

7   lot of publicity.

8   A.   That does sound familiar.

9   Q.   Okay.  And one of the judges there precipitously in

10  expectation of midterm elections put Ms. Engelbrecht and

11  Mr. Phillips in federal prison because they refused to release

12  the name of a confidential informant.  Did you know that?

13          MS. ERICKSON:  Objection, relevance, object to the

14  form of the question, compound.

15          THE COURT:  Sustained.  I don't see this as relevant.

16          MR. WYNNE:  What I'm trying to ask him is he said

17  some pretty derogatory things about True the Vote, and I'm

18  just going through the recent cases who got a lot of press and

19  establishing that he knows very little about True the Vote and

20  the nasty things he's just said about them associated with my

21  clients too.

22          THE COURT:  All right.  I have sustained the

23  objection.  I do not find this relevant, nor do I find that he

24  offered numerous statements about True the Vote.  He mentioned

25  True the Vote as an example of what he thought.  We're not

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    771

1    going through the cases against True the Vote.  They have no

2    relevance here, so please move on.

3           MR. WYNNE:  And, for the record, he did call it a

4    vigilante group outgrowth implicitly of the Ku Klux Klan.

5    That is derogatory.

6           THE COURT:  True the Vote is not on trial, Counselor.

7    Move on.  I have sustained the objection.

8    Q.  (By MR. WYNNE) In your report you cite nothing from

9    Ms. Kasun's or Ms. Epp's deposition transcript, do you?

10   A.  I don't recall that.

11   Q.  Okay.  You -- you do make a citation from Mr. Smith's

12   deposition.  Do you recall that?

13   A.  Yes.

14   Q.  And that citation actually includes an e-mail from a

15   person named Charity M. and a reference to lining up security,

16   and you quote that in your report, right?

17   A.  Yes.

18   Q.  Okay.  And would it surprise you to learn that that

19   reference actually -- that that actually refers to security

20   being provided, secured for the canvassers, not to be directed

21   toward any canvassees?

22   A.  I take you at your word about what that context was.  I

23   only had the document before me.

24   Q.  Right.  That's really the point.  That your opinions are

25   based on the documents that have been provided to you by the

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    772

1   plaintiffs, correct?

2   A.  Yes.

3   Q.  More specifically, plaintiffs' lawyers, right?

4   A.  Yes.

5   Q.  Okay.  And you have conducted none of your own independent

6   research to support the conclusions you've presented to the

7   Court today, right?

8           MS. ERICKSON:  Objection, misstates prior testimony.

9           THE COURT:  Overruled.  I'll allow him to answer.

10  A.  To the extent your inquiry is about the basis of my

11  opinion being based on what plaintiffs' counsel provided, that

12  is correct.

13  Q.  (By MR. WYNNE) Have you conducted any follow-up interviews

14  of your own?

15  A.  No.

16  Q.  Have you conducted any independent research targeted

17  specifically at the allegations in this case?

18  A.  No.

19  Q.  Have you reviewed the statistical methodology that was

20  presented by Jeff Young?

21  A.  No.

22  Q.  Do you have any background in statistics?

23  A.  No.

24  Q.  You mentioned badges as potential symbols of authority,

25  but might mislead someone.  Would that testimony change if one

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    773

1   of the persons allegedly intimidated testified that they

2   looked like they had been just sort of picked up at your local

3   office supply store?  Would that change your opinion?

4           MS. ERICKSON:  Objection, misstates prior testimony.

5           THE COURT:  Overruled.

6   A.  I can only say that that person would perceive that in the

7   way you hypothesized.

8   Q.  (By MR. WYNNE) Okay.  Regarding -- I want to circle back

9   to Mr. Smith's statement.  Have you watched the entire video?

10  A.  I -- given that I watched it over two and a half years

11  ago, I cannot recall exactly how much of the video I watched.

12  Q.  Do you recall that the video was taken in a crowd during a

13  speech before a limited audience in a church?

14  A.  I do recall that it was in a crowd.  I have no context

15  other than what I was able to view, and I did not know where

16  the locale was.

17  Q.  And you have no indication that Mr. Smith himself intended

18  to disseminate it to a large audience, correct?

19  A.  I have no knowledge about that.

20  Q.  And you acknowledge in the sort of political circus, if

21  you will, that there's quite a bit of hyperbole; is that fair?

22  A.  Politics being built on hyperbole, that is fair.

23  Q.  Yeah, but there are a lot of slogans that are not to be

24  taken literally, correct?

25  A.  There are lots of slogans that are not to be taken

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    774

1   literally, sure.

2   Q.  Rather, they're stated for rhetorical purposes, correct?

3        MS. ERICKSON:  I'm just going to object on foundation

4   grounds to the extent he's asking for the motivation behind

5   Mr. Smith's statements.

6        THE COURT:  Overruled.  I don't think he is.  So you

7   may proceed.

8   Q.  (By MR. WYNNE) Many political statements such as the one

9   attributed to Mr. Smith and Yes We Can, for that matter, or

10  ask what you can do for your country -- these are the ones

11  that are coming to mind -- these are to be taken rhetorically,

12  abhorrent or not.

13  A.  Rhetorically is a broad phrase, and I think that the

14  difference between Mr. Smith's statement and Yes We Can or ask

15  not what you can do for your country is that Mr. Smith's

16  statement iterates a threat.

17  Q.  Okay.  Now, I could Google and probably find a more apt

18  slogan to talk about.  I'm not going to do that, but what I'm

19  going to ask you, if one objectively situated as the former

20  Attorney General Katzenbach was referring to, if one situated

21  in that church listening to Shawn Smith, are you saying that

22  anyone in that audience might actually take Mr. Smith up on

23  his suggestion and go try to hang the Secretary of State?

24  A.  I can't read the minds of the people who were there.  All

25  I can say is that language of that sort seemed to echo the

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    775

1   language across American history where such activities were

2   taken to be calls to violence.

3   Q.   If I represent this is February 2022, would you agree

4   that's at least a half year past August of 2021 when

5   canvassing apparently ended.   Is my math right?

6          MS. ERICKSON:   Objection, foundation and misstates

7   the evidence.

8          THE COURT:   Overruled.   I'll allow him to ask.

9   Q.   (By MR. WYNNE) Do you understand Mr. Smith's statement,

10  which has become the subject of much testimony, was made five

11  or six months after the canvassing by USEIP had ended?

12         MS. ERICKSON:   Same objection, Your Honor.   Misstates

13  prior testimony and misstates the evidence.

14         THE COURT:   Overruled.

15  A.   By that math, it does sound like about six months.

16  Q.   (By MR. WYNNE) I'm going to circle back to my question

17  concerning the people in that room, and there's the classic

18  example that free speech does not extend to allow one to yell

19  fire in a dark crowded movie theater.   Remember that from I

20  guess the classes you teach, perhaps?

21  A.   Well, I'm not a First Amendment scholar, and certainly

22  that example in the First Amendment context is what it is, and

23  in my report I did note there was First Amendment concerns.

24  Q.   One of the concerns you had is that someone in the

25  audience would actually take Mr. Smith up on his suggestion

                      Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    776

1    and go try to hang the Secretary of State.  Is that what

2    you're saying?

3              MS. ERICKSON:  Objection, misstates prior testimony,

4    relevance.

5              THE COURT:  Sustained.  Sustained.  Let's ask a

6    different question.

7    Q.  (By MR. WYNNE) I'm asking this because you make some very

8    serious --

9              THE COURT:  Just ask a question.  I don't need you

10   commenting to me or to the witness why you're doing what

11   you're doing.  If an objection is sustained, please move on

12   and ask the next question.

13   Q.  (By MR. WYNNE) You mentioned some notes that you took as

14   you were preparing to prepare -- to prepare your report; is

15   that right?

16   A.  Yes.

17   Q.  Have you turned those reports over to plaintiffs' counsel?

18   A.  No.

19   Q.  Were you asked to turn them over to plaintiffs' counsel?

20   A.  No.

21   Q.  Have you kept them?

22   A.  I have not.  I mean, I certainly moved in the time between

23   when I wrote the report and here, and I do not recall where

24   they are right now.

25   Q.  Were you instructed to keep them?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    777

1    A.  I was given no instruction about my own notes.

2    Q.  Okay.  And your report is dated November 11th of 2022,

3    again, right?

4    A.  Yes.

5    Q.  Veteran's Day.  Let me ask you this.  Have you been

6    deposed in this case?

7    A.  No.

8    Q.  Do you know why not?

9    A.  I do not know.

10   Q.  Just a moment.  How much are you being paid for your

11   testimony -- in connection with your testimony today?

12   A.  If I recall correctly, the rate that plaintiffs' counsel

13   and I agreed to was $350 an hour.

14   Q.  Thank you.

15            THE COURT:  All right.  Mr. Reisch.

16            MR. REISCH:  Thank you very much, Your Honor.

17                         CROSS-EXAMINATION

18   BY MR. REISCH:

19   Q.  Good afternoon.

20   A.  Good afternoon, sir.

21   Q.  My name is Scott Reisch.  I represent Mr. Smith in this

22   particular case.  I want to go over a couple things, try not

23   to repeat ourselves based upon questions of previous counsel,

24   but there may be some duplication specifically as we talk

25   about your opinion as it relates to Mr. Smith, all right?

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    778

1   Now, you did note that you are not a -- you do not consider

2   yourself a First Amendment expert; is that correct, sir?

3   A.  Yes.

4   Q.  All right.  And obviously the realm of First Amendment

5   speech, there's a big body of law on that, would you agree

6   with me?

7   A.  Yes.

8   Q.  It changes quite a bit, correct?

9   A.  It does, indeed.

10  Q.  All right.  And, for example, it was brought up the

11  *Counterman* case which was decided by the United States Supreme

12  Court in June of 2023.  You said you weren't necessarily

13  familiar with that one; is that correct?

14  A.  Yes, sir.

15  Q.  All right.  Now, you were asked a couple of questions by

16  the plaintiffs in this particular case, and you talked about

17  indirect/direct coercion, things of that nature, and you spent

18  a lot of time focusing on the Reconstruction Era.  Do you

19  recall that testimony?

20  A.  Yes, sir.

21  Q.  And obviously that was a very dark time in American

22  history as it related to voter suppression.  I think we can

23  agree on that, correct, sir?

24  A.  Yes.

25  Q.  And there were things that were done, like you said, armed

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    779

1    people would stand outside the voting place and would not

2    allow people of color in to vote, correct?

3    A.  Yes.

4    Q.  Okay.  They would come up with things by saying, oh, you

5    can vote as long as you tell me how many beans are in the jar,

6    things like that, correct?

7    A.  Yes.  Examinations by the registrar of elections, that

8    sort of is the de jure voter intimidation that I talked about

9    earlier.

10   Q.  Okay.  And obviously completely inappropriate, correct,

11   sir?

12   A.  Yes.

13   Q.  All right.  Now, when you were talking about modern day

14   vigilanteism or intimidation, you referred to several groups

15   as voter vigilantes.  Did I understand that correctly?

16   A.  Yes.

17   Q.  Okay.  And one of the things you said was that if somebody

18   questioned the validity of an election, that that is somehow

19   -- could potentially reduce somebody's willingness to vote in

20   a future election.  Did I state that correctly?

21   A.  I think I said that, you know, words that question the

22   validity of the election could serve to coerce someone in a

23   context where that person's trying to intimidate.

24   Q.  Okay.  And doing something where -- trying to convince

25   somebody to vote or not to vote a particular way, is that

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    780

1    voter intimidation?

2    A.   Trying to persuade one to vote one way or the other, and I

3    avoid partisan terms, do I vote for purple or green --

4    Q.   Sure.

5    A.   -- that is political discourse that all people have the

6    right to engage in.

7    Q.   Okay.  And it's not uncommon when people say vote for this

8    person, they're going to be the best president ever versus the

9    worst president ever, that name calling back and forth, you

10   say that's political discourse, correct?

11   A.   Yes.

12   Q.   Okay.

13   A.   I'm no First Amendment expert, but that is the heart of

14   the protection that the First Amendment was meant to provide.

15   Q.   Okay.  And then if the election goes down and there are

16   people that disagree, right, I mean, the reason why we know

17   that sometimes votes can be close is we have recounts,

18   correct, sir?

19   A.   Yes, sir.

20   Q.   All right.  That's to make sure they get it right, would

21   you agree?

22   A.   If necessary, yes.

23   Q.   Okay.  And then if you can't, you know, you have an issue

24   as it relates to the recount or hanging chads and things of

25   that nature, then you go to court to make a determination; is

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    781

1    that right?

2    A.   Yes.  And at the end of the day, the courts resolve the

3    matter, and the result is accepted.

4    Q.   Okay.  But then if the court resolves it, say, for

5    example, *Bush v. Gore*, the United States Supreme Court said

6    stop the count, and therefore President Bush then became

7    president, correct, sir?  There was that legal determination?

8    A.   Yes.

9    Q.   And obviously one of the things as it relates to the

10   judicial aspect of voter litigation is that you can't tie this

11   stuff up in court endlessly.  Otherwise, the government would

12   never be able to do anything.  Would you agree that's one of

13   the bases for usually trying to get in court as quickly as

14   possible and resolve it, usually within a certain amount of

15   time?

16   A.   Yes.  There are deadlines built into -- if we're talking

17   about the presidency, you know, there's the Electoral Count

18   Act and such other acts that are all about wanting to resolve

19   disputes in an expeditious manner.  I would agree with that.

20   Q.   And sometimes states say if there's a voting dispute issue

21   it will go to a particular court in a particular jurisdiction.

22   A hearing must be held within, say, 15 or 30 days, and a

23   decision must be issued within 30 days as well.  Are you

24   familiar with those types of statutes as well?

25   A.   Yes.  I do know they exist, yes.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3     07/17/2024     782

1    Q.  And, once again, the reason for that is that that's so

2    there can be a determination, because basically there's always

3    going to be a winner and a loser.  Someone's going to be

4    happy, someone's not going to be happy, but the government

5    needs to move forward.  Would you agree with me on that?

6    A.  Yes.

7    Q.  But that doesn't necessarily stop people from saying, hey,

8    we'd like to look at the data and see if there is some

9    validity, because if there were errors maybe in equipment,

10   maybe in process, in procedure, maybe we can help make it

11   better.  That isn't necessarily trying to disenfranchise

12   voters, is it, sir, in your opinion?

13   A.  That in and of itself, no, it is not.

14   Q.  Because at that point if you have a dispute as to the

15   vote, you'd say, hey, can I get the data?  You'd have to

16   collect it, correct, sir?

17   A.  Yes.

18   Q.  You'd have to then kind of organize it, review it, analyze

19   it.  Would you agree with me, sir?

20   A.  Yes.

21   Q.  And then based upon that process, then you can prepare

22   your findings.  Would you agree with me?

23   A.  Yes.

24   Q.  And if you have your findings, and you wanted to submit it

25   to, say, the legislature or the county clerks so you can say,

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    783

1   hey, here's our information, you may consider it, you may

2   start your fire with it, you may rely upon it, but here it is,

3   that's not necessarily voter intimidation under your analysis,

4   is it, sir?

5   A.  It is not.

6   Q.  All right.  When you talked about tactics for voter

7   vigilante groups on direct examination, you were talking about

8   badges.  Do you recall that?

9   A.  Yes, sir.

10  Q.  When you wrote your report, what did you have in mind when

11  you thought of badges?

12  A.  Well, I had in mind the varieties of ways that people

13  could signal through apparel -- that might be a pin or what

14  have you -- what sort of message they wanted to connote and

15  convey --

16  Q.  Okay.

17  A.  -- in this space where we are talking about folks

18  canvassing door to door.

19  Q.  And just to -- I just want to make sure, you didn't think

20  somebody had gone out and got a bunch of metal badges that you

21  see sheriffs or something they put around their neck and make

22  it look really official or anything like that?  That wasn't in

23  your mind when you were writing your report?  Or was it?

24  A.  What was in my mind about the report is that the

25  paraphernalia might get confused between those things, right?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    784

 1   The official sheriff's department ID or badge or what have you

 2   versus an informal group.  I mean, the possibility of

 3   confusion between the official and unofficial was what was on

 4   my mind.

 5   Q.  Sir, you did not -- when you were preparing your report

 6   you didn't have the proposed training materials, drafts of

 7   training materials, things like that, that were presented to

 8   canvassers -- was that ever provided to you, sir?

 9   A.  I actually -- to the extent that that was part of the

10   manual, that was there.

11   Q.  Okay.  So where it says we're going to be canvassing, you

12   know, be polite, do you recall that as being one of the, I

13   guess --

14   A.  As you speak, it's calling to mind I do recall a

15   PowerPoint that had particular coaching notes, be polite and

16   respectful and those sorts of things.  I do recall that.

17   Q.  Okay.  And there's been testimony and there's been other

18   evidence that the badges were a lanyard with somebody's name

19   on it, so if there was a complaint, they would know who did

20   it, and so they -- everybody could say, hey, what did you do

21   or say?  Did you ever consider that as a possibility as

22   identification, if there is problem, that we can find out who

23   did it?

24           MS. ERICKSON:  Objection, compound, misstates prior

25   testimony.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    785

1           THE COURT:  Overruled.  You may answer.

2     A.  I'm sorry.  Could you repeat?

3     Q.  (By MR. REISCH) I will try.  Did you consider that when

4     these badges that were used by canvassers, that it was a --

5     something you get at a seminar or a CLE, you get a lanyard,

6     maybe a piece of plastic, they stick your name in it, it's

7     printed, and it says, you know, Scott Reisch, and maybe my

8     date or something along those lines, so that if somebody did,

9     in fact, say, hey, I had a problem, this guy, this Scott

10    Reisch guy came up to my door, and he was a real jerk, but at

11    least they'd know my name so if it came back, they'd know who

12    to talk to?

13          MS. ERICKSON:  Objection, compound.

14          THE COURT:  Overruled.

15    A.  I didn't consider that, no.

16          MR. REISCH:  I'm sorry, Your Honor, I'm trying not to

17    duplicate stuff, so that's why I'm trying to take my time but

18    trying to move as expeditiously as possible given the hour of

19    the day.

20          THE COURT:  That's fine.

21    Q.  (By MR. REISCH) Are you good to go?

22    A.  Yes, sir.

23    Q.  Sir, I do want to talk about the video that you reviewed

24    as it relates to Mr. Smith.  There were some questions asked

25    about a limited audience and things of that nature, but you

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3     07/17/2024     786

 1  recall that was in generally February of 2022, correct?

 2  A.  Yes, sir.

 3  Q.  All right.  And although you don't recall, because it's

 4  been some time, the exact language of that video, do you

 5  recall the language basically being that Mr. Smith stated that

 6  he had some evidence of election fraud.  Do you recall that

 7  statement?

 8  A.  That does sound familiar.

 9  Q.  Do you recall him stating that he believes in due process?

10  A.  I don't recall that.

11  Q.  Okay.  Do you recall that he says he believes in justice?

12  A.  That does sound familiar.

13  Q.  Okay.  Do you believe -- or do you recall him stating I am

14  not advocating violence in any way?

15  A.  I don't recall that, sir.

16  Q.  Okay.  And he said that if he had this information, and it

17  was presented -- obviously people are entitled to due process,

18  justice -- and that if there was widespread voter fraud, that

19  those persons should be potentially charged with treason.  Do

20  you recall that?

21          MS. ERICKSON:  Objection, misstates prior testimony.

22          THE COURT:  Well, overruled.  I'll allow him to

23  answer if he recalls anything like that.

24  A.  I'm sorry.  You're saying that there would be --

25  Q.  (By MR. REISCH) If there was widespread election fraud,

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    787

 1   that people involved should be tried for treason.  Do you

 2   recall that statement?

 3   A.  Those words do sound familiar.

 4   Q.  And that obviously one of the punishments under the United

 5   States Code for treason is, in fact, death.  That's one of the

 6   maximum penalties, correct, sir?

 7   A.  Yes.

 8   Q.  Okay.  And Mr. Smith never mentioned anyone in particular

 9   by name as it related to if there was voter fraud, if they

10   went through the process and got their due process, if they

11   were charged with treason, and if they were convicted, they

12   should be put to death.  There's nothing in there where he

13   specifically said, for example, the Secretary of State Jena

14   Griswold, correct?

15   A.  I don't recall that from that video, sir.

16   Q.  You don't recall that at all, or you don't recall --

17   you're agree with me that he never mentioned Ms. Griswold, the

18   Secretary of State?

19   A.  My recollection of the video is that he did not mention

20   the Secretary of State.

21   Q.  Okay.  Now, you don't follow Secretary of State Jena

22   Griswold on her Facebook page, do you, sir?

23   A.  No, sir.

24   Q.  How about her Twitter account?

25            MS. ERICKSON:  Objection, relevance.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3      07/17/2024    788

1           THE COURT:  Overruled.

2   A.  No, sir.

3   Q.  (By MR. REISCH) Okay.  And you thought your conclusion was

4   was that this speech by Mr. Smith could have had some chilling

5   effect on someone's ability to vote in the future; is that

6   right?

7   A.  Yes.  To the extent that the fraud talk, as you said,

8   right, is someone tried and convicted should be treated as a

9   traitor and could among other things be hung, my view is that

10  that kind of talk plugs into other rhetoric throughout history

11  that has been used and targeted at voters discriminately or

12  indiscriminately.

13  Q.  And if Secretary of State Jena Griswold put on her

14  personal Facebook page that video, would she be trying to

15  suppress voters?

16  A.  That's rather a leap, sir.

17  Q.  Well, if Mr. Smith says it and it's suppressing voters,

18  and she puts it up on her Facebook page, does that mean that

19  she is suppressing voters, sir?

20  A.  I think the fact that the transmitting and broadcasting of

21  these threats is problematic, and I agree with -- I agree with

22  myself that -- I stand by my view, sir, is what I'm saying,

23  that this kind of rhetoric is dangerous, and that it can

24  confuse voters and make them afraid to exercise their rights.

25  Q.  So we've heard some testimony, one of the lead plaintiffs

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    789

1    in this case, the League of Women Voters put out a statement,

2    the national office, and just to be clear, in 2016 that the

3    presidential election was rigged, was illegitimate.  Is that

4    also voter suppression, a statement like that, sir?

5    A.  That say that the election was rigged is, per se, voter

6    suppression?  I think that in my opinion that there's a

7    difference between making claims about the validity of the

8    election and making, you know, a threat.

9    Q.  Okay.

10   A.  As I said in prior -- the prior cross-examination.

11   Q.  So one is just political rhetoric, right?  I mean, the

12   election was rigged, it was fraudulent, there was Russian

13   interference.  That doesn't go to voter suppression in any way

14   according to you.  It's just good old-fashioned political

15   rhetoric?

16   A.  In the abstract, it is political rhetoric.

17   Q.  Okay.  And obviously I won't bore you with all the

18   details, but the *Counterman* case goes through the history of

19   political rhetoric and that sometimes sharp words are used,

20   and that's why they have to prove scienter.  You're familiar

21   with that, correct, sir?

22       MS. ERICKSON:  Objection, Your Honor, asked and

23   answered.

24       THE COURT:  Well, overruled.  He's provided

25   additional details.  You may answer whether you're familiar.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    790

 1  A.  This does sound familiar.

 2  Q.  (By MR. REISCH) In your report you cite the DOJ manual in

 3  regards to voter intimidation cases.  Do you recall that, sir?

 4  A.  Yes, sir.

 5  Q.  And it relates to the operative words as they define

 6  intimidates, you're familiar with the definitions from the

 7  Department of Justice, sir?

 8  A.  Yes.

 9  Q.  You're familiar that they state the scienter elements

10  require proof that an actor intended to force voters to act

11  against their will by placing them in fear of losing something

12  of value.  You're familiar with that language from the DOJ

13  manual?

14  A.  I am.

15  Q.  Okay.  And that feared loss has to be something tangible,

16  such as money or economic benefits, or intangibles, such as

17  liberty or safety.  Would you agree with me, sir?

18  A.  Yes, sir.

19  Q.  Sir, I just -- you never met Mr. Smith before today.

20  Would that be fair to say?

21  A.  Yes, sir.

22  Q.  All right.  You may have learned from his deposition that

23  he served honorably in the United States Air Force for

24  25 years.  Are you aware of that?

25  A.  I do recall that, sir.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    791

1    Q.   Obtained the rank of Colonel.  Are you aware of that?

2    A.   Now that you've refreshed my recollection, that does sound

3    familiar.

4    Q.   But you never met him as far as sat down and had a beer,

5    fair?

6    A.   No, sir.  Just rode on an elevator.

7    Q.   I just want to be clear for the record, because maybe it's

8    just me or maybe it's the way you came off in your report, but

9    you're not accusing Mr. Smith of being a racist, are you?

10              MS. ERICKSON:  Objection, relevance, Your Honor.

11              THE COURT:  Overruled.

12   A.   No, sir.

13   Q.   (By MR. REISCH) Okay.  Because he has two stepchildren

14   that are of mixed race, African-American descent.  Did you

15   know that, sir?

16              MS. ERICKSON:  Objection, relevance, Your Honor.

17              THE COURT:  Sustained.

18   Q.   (By MR. REISCH) Do you know that his brother is half

19   black?

20              MS. ERICKSON:  Same objection, Your Honor.

21              MR. REISCH:  If I can have just one moment, Your

22   Honor.  That's all I have, Your Honor.  Thank you very much.

23              THE COURT:  Ms. Epp.

24              MS. EPP:  I have no questions, Your Honor.

25              THE COURT:  Thank you.  Any redirect?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    792

1           MS. ERICKSON:  Just a couple, Your Honor.  Your

2     Honor, before I ask a couple of questions, I did want to just

3     ask for permission to play the video of Mr. Smith's

4     statements, because I think repeatedly in the course of this

5     questioning and this case counsel has been representing what

6     has been said in that video, and I do not think some of the

7     representations that have been made have been accurate.  And

8     we're asking a witness who reviewed that video to comment on

9     counsel's statements about that video, and it feels to me like

10    at this point it should be played at the very least for this

11    witness, but also for the Court.

12          THE COURT:  Any objection?

13          MR. REISCH:  Actually, Your Honor, the appropriate

14    witness that should have been asked to authenticate it would

15    have been Mr. Smith when he testified.  The plaintiffs did not

16    offer it at that time.  This witness has been endorsed for

17    several years.  Part of his trial preparation should have been

18    perhaps to review the items where he thought that he was going

19    to be opining on, so I do object.

20          MR. WYNNE:  Your Honor, I object too.  I think this

21    is -- amounts to bolstering.  In addition, I think that this

22    is not directed at any particular question relevant to a

23    redirect examination.  It's within the Court's purview to

24    consider characterizations made by counsel in any particular

25    question, whether they were correct or incorrect.  And this is

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3     07/17/2024     793

1    already in evidence.  I don't think this is necessary in a

2    public forum at this time.

3            THE COURT:  All right.  I'm not going to allow that

4    request at this time.  We received direct testimony from

5    Mr. Smith during his examination about that video.  He would

6    be the best person to ask.  To the extent you want to correct

7    anything you believe was a misrepresentation about the video,

8    you could certainly ask this witness in redirect.

9            MS. ERICKSON:  May I go ahead, Your Honor?

10           THE COURT:  Yes, proceed.

11                      REDIRECT EXAMINATION

12   BY MS. ERICKSON:

13   Q.  Professor Ellis, you were asked about the timing of

14   Mr. Smith's comments as it relates to the timing of

15   defendants' canvassing efforts.  Do you recall that?

16   A.  Yes, ma'am.

17   Q.  Even if defendants' canvassing efforts had stopped at the

18   time Mr. Smith made the statements, would you still have

19   concerns about the effect of those statements on voters?

20   A.  I would.

21   Q.  And what concerns would you have?

22   A.  My concern at the end of the day is what we discussed

23   earlier.  That these statements create an atmosphere of threat

24   motivated by unfounded claims around voter fraud and the

25   rigging of the election, and that those who might be caught up

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    794

1    in or perceived as acting treasonously would be under the same

2    kinds of threats that have been at the heart of voter

3    intimidation across American history.  In other words, the --

4    actually, I don't want to sort of rant on.  I think I've hit

5    the heart of your question, which is that my concern is that

6    this is ultimately a call to violence, and that that violence

7    in order to effectively police and protect the election could

8    be reasonably perceived by a voter, and particularly by a

9    voter of color, as a danger to them.

10   Q.  You were also asked a number of questions on

11   cross-examination getting at the parallels between defendants'

12   canvassing efforts and political canvassing efforts.  Based on

13   what you know about defendants' conduct, do you see that

14   there's any fundamental difference between typical political

15   canvassing and what the defendants were doing?

16   A.  I think that typical political canvassing is about

17   persuasion and convincing.  It's sort of encouraging a

18   potential voter to be on the side of the person who is the

19   advocate.  What I know from the news reports and the testimony

20   that I've reviewed was that it came across as more

21   interrogation about the legitimacy of a voter's vote rather

22   than a persuasion campaign to win over someone to support

23   them.

24        MS. ERICKSON:  Your Honor, may I have just one

25   moment?

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3      07/17/2024    795

1          THE COURT:  Sure.

2          MS. ERICKSON:  I have no further questions for this

3   witness.

4          THE COURT:  All right.  And I do not have any

5   questions for you.  Thank you, Mr. Ellis.  You're excused.

6          THE WITNESS:  Thank you, Your Honor.

7          THE COURT:  Thank you for hurrying over when you were

8   called today.

9          All right.  Let me ask the plaintiffs' team, do you

10  have any further witnesses you'd like to call, or, with the

11  offer of proof, are you resting?

12         MS. ERICKSON:  One moment, Your Honor.

13         THE COURT:  All right.

14         MS. ERICKSON:  Your Honor, on the questions of voter

15  intimidation under the two statutes cited in our complaint we

16  don't have any further evidence to offer at this time.  If

17  there are outstanding questions from the Court about

18  plaintiffs' standing in this case, then we would have further

19  evidence to offer from our two other plaintiffs organizations

20  on the standing issue.  And certainly we can make proffers on

21  standing if the Court would like to hear it, but if you're at

22  a point where you want to entertain a motion on the liability

23  issue, we would defer to you.

24         THE COURT:  All right.  Let's -- do you have your

25  proffer on standing ready?

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN  Bench Trial - Day 3    07/17/2024    796

1    MS. ERICKSON:  Yes, Your Honor.

2    THE COURT:  Why don't you go ahead and make that so

3  it's in the record.

4    MR. BREESE:  Your Honor, Mr. Salvador Hernandez would

5  testify to the following.  He would testify that he acted as

6  the state director for Mi Familia Vota from 2019 until recent

7  months and at the time of the filing of the complaint and his

8  declaration supporting that complaint.  Mi Familia Vota is a

9  civic engagement organization that unites Latino, immigrant,

10  and allied communities to promote social and economic justice

11  through citizen workshops, voter registration, and voter

12  participation.

13    He would testify that Mi Familia Vota has chapters in

14  several states, including Colorado, and he was a state

15  director for the Colorado chapter located in Denver.  He would

16  further testify that Mi Familia Vota is a civic engagement

17  organization that unites Latino, immigrant, and allied

18  communities.  Oh, apologies I just read that.  He would also

19  testify that Mi Familia Vota is a nonpartisan organization and

20  does not support or oppose particular political candidates in

21  Colorado.  He would also testify that the organization works

22  with Coloradoans to conduct civic engagement, voter

23  engagement, educational programs, and through programing such

24  as voter registration events, phone banking, and door-to-door

25  canvassing.

Sarah K. Mitchell, RPR, CRR

1            He would further testify that the organization

2    conducts door-to-door canvassing as a part of its Get Out the

3    Vote work to encourage registered and eligible voters to vote

4    and to provide them with resources about voting, such as

5    polling place locations and hours.  In particular, Mi Familia

6    Vota focuses on supporting, educating, and encouraging

7    low-to-mid-propensity voters, and those low-protensity voters

8    are voters who have not participated in any or many prior

9    elections.

10           He would further testify that in particular Mi

11   Familia Vota works closely with new Latino voters, including

12   newly naturalized citizens and other Latino voters who have

13   not yet or have rarely exercised their right to vote.  To

14   educate and support these voters, the organization carries out

15   engagement efforts throughout the year culminating with the

16   Get Out the Vote door-to-door canvassing effort with the goal

17   of encouraging eligible registered voters to vote and to

18   provide them with educational information about that process.

19           He would also testify that Mi Familia Vota after

20   learning of USEIP's conduct has had to divert its financial

21   and human resources in multiple respects to address the

22   door-to-door intimidation campaign and will also have to

23   divert additional resources both before and after the 2024

24   election and future elections absent the injunction that the

25   plaintiffs seek.

                        Sarah K. Mitchell, RPR, CRR

 1          He would further testify that such diversion of

 2     resources includes revision of the scripts that Mi Familia

 3     Vota training individuals give to their volunteers when

 4     conducting canvassing.  Also, incorporating discussions in

 5     various training techniques for volunteer canvassers and its

 6     phone bankers on ways to deal with and respond to reports from

 7     canvassed residents on canvassers of groups or other

 8     individuals that may have intimidated these residents.

 9          He would also finally testify that Mi Familia Vota's

10     efforts have been undermined by defendants through this

11     diversion of resources which otherwise distracts from Mi

12     Familia Vota's mission as previously stated.  And that

13     concludes that offer.

14          THE COURT:  All right.

15          MS. HOSTETLER:  Good afternoon, Your Honor.

16          THE COURT:  Good afternoon.

17          MS. HOSTETLER:  I am speaking to the evidence that

18     Portia Prescott, who is the current president of NAACP

19     Colorado, would offer.  She would -- we proffer the testimony

20     would be that NAACP Colorado's standing as specifically the

21     injuries suffered by the organization as a result of the

22     defendants' canvassing activities and surrounding activities

23     would include diverting resources away from their typical

24     election-related efforts and thereby limiting the resources

25     they have available to do work on those core efforts, as well

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024   799

1    as diversion of resources away from their other nonelection

2    programs.

3         More specifically, she would testify that NAACP was

4    founded in 1909.  It is a civic engagement organization that

5    advocates for the political, educational, social, and economic

6    equality of rights of all persons and to eliminate race-based

7    discrimination.  NAACP Colorado is the regional chapter of the

8    national organization that represents voters in Colorado,

9    Montana, and Wyoming the full name being, the full name being

10   the Colorado Montana Wyoming State Area Conference of the

11   NAACP.  It is a nonpartisan membership-based organization.

12        She would represent that NAACP Colorado works on a

13   number of different project areas, including, but certainly

14   not limited to, voting rights and political representation.

15   In that area, though, they do work with voter outreach, Get

16   Out the Vote, other efforts to protect democracy, enhance

17   equity, and increase democratic participation and civic

18   engagement by voters in all three states, Colorado, Montana,

19   and Wyoming.

20        The organization has had to divert financial and

21   human resources to address the defendants' door-to-door

22   intimidation campaign and will have to divert additional

23   resources both before and after the 2024 election and future

24   elections to address the risk that is posed by the campaign

25   continuing.  In the midst of this election year, NAACP

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    800

 1   Colorado has scant financial and human resources.  They're

 2   stretched thin.  Ms. Prescott would speak to that and speak to

 3   the way that they have had to move those scant resources to

 4   address this post-election voter intimidation.

 5          As mentioned, they have a number of programs, some of

 6   which is engaged with helping voters become educated, learn

 7   their right to vote, make sure they know how to vote, and then

 8   also address Election Day intimidation.  Help people who are

 9   experiencing poll time intimidation find their way to a safer

10   poll, make sure people know their rights in terms of voting by

11   mail.  They have limited resources to do this, and these

12   resources are now stretched thin.  They need to figure out a

13   way to have resources set aside to handle intimidation that

14   might happen after the election.  They've had to redo their

15   materials related to it so that people are educated about

16   their rights if somebody does come to the door.

17          Ms. Prescott would be able to speak to her

18   experience, both as a black woman living in Colorado and as

19   the president of the NAACP, which speaks to the reason why her

20   organization has found it so important to divert these

21   resources in order to protect their members, as well as the

22   communities that they serve.

23          THE COURT:  All right.  Thank you.

24          All right.  So with that, the plaintiff has rested

25   for now, at least on the issue of whether or not there was

                     Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    801

 1    voter intimidation in this case under the two statutes

 2    alleged.  Are there any motions defendants would like to make?

 3             MR. REISCH:  Yes.  Thank you, Your Honor.  On behalf

 4    of Mr. Smith, we would make a motion for I think what we used

 5    to call directed verdicts, but now it's a findings and

 6    conclusions by the Court under Rule 52(c).  Your Honor, we

 7    would also incorporate by reference Docket Number 164, which

 8    was our trial brief, as well as 165, which are Defendant

 9    Smith's proposed findings of facts and conclusions of law so

10    that I don't have to go through each and every one of those

11    line by line.

12             Your Honor, the plaintiffs in this particular case

13    had the burden of moving forward.  They -- obviously you can

14    file a complaint, but when it comes to court, you actually

15    have to produce evidence.  You have to produce evidence that

16    would prove a prima facie case to each and every of the

17    elements under, first, the Voting Rights Act, 52 United States

18    Code 10307(b), that states that no person, whether acting

19    under color of law or otherwise, shall intimidate, threaten,

20    or coerce, or attempt to intimidate, threaten, or coerce any

21    person from voting or attempting to vote.  Obviously here, no

22    person, whether acting under the color of law or authority,

23    shall intimidate.

24             Our position here is that obviously there's been no

25    evidence that Mr. Smith engaged in conduct under the color of

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3      07/17/2024   802

 1  law or otherwise to intimidate, threaten, or coerce, nor did

 2  he attempt to intimidate, threaten, or coerce, any purpose --

 3  any person, I'm sorry -- for the purpose of attempting to

 4  vote.  And, Your Honor, what we have heard thus far, the

 5  evidence -- the plaintiffs have tried to prove the elements of

 6  their case, where they have failed is basically what it comes

 7  down to Yvette Roberts.  That is their witness.

 8        They have -- they called Mr. Smith.  They asked him

 9  questions.  We proceeded, went through our thing.  No

10  admissions or statements that he did anything as it relates to

11  intimidating.  In fact, I think the evidence is quite to the

12  contrary.  They took great steps to make sure that no one was

13  intimidated.  If you were going to intimidate somebody, and

14  you were going to be a rag-tag group, so to speak, of

15  vigilantes, you're not going to write a procedure and training

16  manual.  You're not going to try to make sure you get it

17  right.  You're not going to try to make sure that you not only

18  want to make sure everything is done correctly with the person

19  that you canvassed, but providing for the safety of the people

20  that are doing the canvassing.

21        You're not going to make sure that you consult with

22  the statisticians and they come up with a way to collect the

23  data, analyze the data, and then produce a report, as the

24  professor just testified to.  I asked him, regardless of

25  whether you believe if an election is valid or not, at some

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    803

1   point you've got to move on, but it doesn't mean you can't

2   start to look at if you can make change, which is what the

3   USEIP has stated they were looking to do.  And the professor

4   agreed with me.  You can go collect the data.  You can analyze

5   the data.  And if you treat everyone polite with dignity and

6   respect, and you take that data, you analyze it, you give it

7   to the people, and you say, please consider this, he said that

8   was not voter intimidation by his testimony.  And it was not,

9   Your Honor.  It was not.

10          Under the KKK Act, 42 United States Code 1985(3), you

11   have to show a conspiracy, an agreement between two or more

12   people to commit an illegal act, Your Honor.  I would offer to

13   the Court that there's been actually no evidence as it relates

14   that would even suffice for a showing, for a proffer, for

15   801(d)(2)(E) type of evidence to come in to evidence, Your

16   Honor, nor did they ask at any point.  But you have to show a

17   conspiracy for the purpose of which is to force, intimidate,

18   or threaten an individual legally entitled to vote who is

19   engaged in the lawful activity relating to voting in federal

20   elections.

21          This is where Yvette Roberts comes in.  This is their

22   crux of their case.  They had Yvette Roberts try to say that

23   some people came to her residence.  She was suspicious was her

24   testimony.  She kept the door open.  She described them as an

25   older couple in their 6os, mid-60s.  But clearly it was not

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3   07/17/2024   804

1    Shawn Smith, it was not Ms. Epp or Ms. Kasun.  She was sure

2    about that.

3              There was testimony that USEIP did not conduct any

4    canvassing in Mesa County where she resided.  They asked

5    questions, Did you vote -- the people that came to her

6    doorstep, Did you vote?  Did you turn your ballot in at a drop

7    box, in person, anything along those lines.  Never asked how

8    you voted.  Never asked, You going to vote in the next

9    election?  Never did anything.  And when she asked them to

10   leave, she said that they politely left.  That was it.  No

11   intimidation, no harassment, no -- nothing to indicate that

12   there was a purpose of which is to force, intimidate, or

13   threaten.  So no conspiracy to even do that if that's what

14   they're trying to say.

15             And I think the thing that perhaps is troubling to me

16   is that in the discovery, in everything that Ms. Roberts has

17   stated, she thought these people had a badge that said

18   Colorado something.  It was Colorado.  It was never United

19   States Election Integrity Project.  It was nothing along the

20   lines of the United States.  Nobody representing themselves as

21   the government or anything along those lines.  And it wasn't

22   until she acknowledged she was asked to sign an affidavit as

23   it relates to the motion for summary judgment, because we had

24   said there's no evidence.  Shawn Smith, USEIP did nothing in

25   Mesa County.  That's the only person that they have.  That's

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3      07/17/2024   805

1    it.

2           And then she says in her affidavit that I believe is

3    why the motion for summary judgment did not prevail was

4    because it created a question of fact whether that was USEIP,

5    and they stated it was USEIP.  She stated that it was personal

6    knowledge, personal knowledge.  And I was going back when I

7    was doing that, Your Honor, it's almost -- it's troubling.

8    Because let's face it, she did not -- she, Ms. Roberts -- she

9    didn't prepare that affidavit.

10          But under Rule 56(4), affidavits or declarations.  An

11   affidavit or declaration used to support or oppose a motion

12   must be made on personal knowledge -- personal knowledge --

13   set out facts that would be admissible in evidence and show

14   that the affiant or declarant is competent to testify on the

15   matter.

16          What troubles me, Your Honor, is it's clear she never

17   could conclude or opine early on when she said that somebody

18   came to her door in the afternoon.  I believe that e-mail she

19   sent to League of Women Voters was about 12:30, and by her own

20   testimony she said she called the police at five something,

21   and they said there's nothing that they can do.  There's

22   nothing illegal.  There's nothing wrong.  Once again, never

23   said United States election.  It was Colorado something by her

24   testimony.  And then she said, well, it had to have been them,

25   but she had no knowledge.  She couldn't explain how it got

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3      07/17/2024    806

1    there other than there was an affidavit.

2            And when I asked her, ma'am, is it clear, as you sit

3    here today under oath, that you have no personal knowledge

4    that it was USEIP, and she said, no, I don't.  I appreciate

5    her candor.  But she signed that previous affidavit.  And I'm

6    not saying that she was trying to do something nefarious on

7    her part.  She didn't draft that.  I think she's trying to

8    help, so to speak.  But the reality of it is it's concerning,

9    because that's not what the evidence purported to be, and it's

10   certainly not what came out on cross-examination, and that is

11   troubling.  Troubling to me, for sure.

12           And, Your Honor, I'm not going to go through

13   everything here, but the plaintiffs have failed.  They have

14   failed to prove the elements on a prima facie case of

15   intimidation.  We also heard the professor talk about in his

16   report the Department of Justice guidelines when it comes to

17   prosecuting intimidation, that somebody has to lose something

18   of value.  It's not speculation.  It's not it could happen.

19   It's not a possibility.  It's that it will happen or did

20   happen or will continue to happen in the future, and that is

21   simply not the evidence that took place here.

22           The evidence is that all of these people that

23   Mr. Smith canvassed, they did everything to do it right.  You

24   heard testimony from a very conscientious person, a rule

25   follower.  I won't go through everything, but I think it's

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    807

1    quite clear Mr. Smith is a rule follower.  I don't know if the

2    Court notices this, but he literally snaps to attention when

3    the Court comes in.  I want to tell him at ease, but that's

4    kind of the respect he -- that's the person he is.  I've seen

5    lots of people like that over the years from the military, and

6    it's a good thing, but it also shows if he's in, he's in 100

7    percent, for sure, Your Honor.

8            The statement that, like I said, the people are

9    somehow trying to attribute to Mr. Smith, that those

10    statements were intimidating, threatening, you heard his

11    testimony, Your Honor.  He said I'm not calling for violence.

12    I'm not asking for that.  He said, he testified that he

13    believes he had evidence of widespread election fraud, and

14    that he believed if people looked at this, they would be

15    convinced that this would be treasonous, and treason is

16    punishable by death.  Certainly if I was drafting that as an

17    attorney for him, I would -- let's just not even go there,

18    let's avoid it.  But if he wanted to say it, I'd have to say

19    it is protected speech.  It is the epitome.  It's not a true

20    threat.

21            It's not a true threat where, as the Court knows

22    under *Counterman*, *Elonis*, *Twitty*, you have to be able to show

23    that subjective intent, and here he says he never mentions

24    Ms. Griswold.  Everybody seems to think that it was directed

25    towards Ms. Griswold, but the reality of it, it's never -- her

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3     07/17/2024   808

1   name is never mentioned at all.  It is not a true threat, Your

2   Honor.  It is protected First Amendment speech.  And for those

3   reasons, I would ask the Court to dismiss all causes of action

4   filed by the plaintiff as it relates to Mr. Smith.  I would

5   also note, just as it relates to the last proffer, if the

6   Court would allow me.

7           THE COURT:  Let's limit it to a minute.  I don't need

8   Ms. Mitchell to quit on me.

9           MR. REISCH:  Your Honor, if standing becomes an issue

10  or what have you, I need to say there's lots of things from

11  the deposition that I disagree with as it related to the

12  proffer as to the diversion of resources for members in either

13  party, as relates to Mi Familia Vota and the NAACP Colorado,

14  because my proffer is that they testified that they had no

15  complaints.  They actually had people under Mi Familia Vota

16  who had good experience, assuming that was even USEIP, which

17  nobody could establish.  And the NAACP, the executive director

18  Ms. Portia, she had no complaints that she was aware of.  She

19  was asked because of Ms. Hendrix from the League of Women

20  Voters.  Thank you, Your Honor.

21          THE COURT:  Thank you.  Mr. Wynne, I'm going to try

22  and give you five minutes to make your motion, and you can

23  adopt some of Mr. Reisch's arguments if appropriate to help

24  save time.

25          MR. WYNNE:  Yes, I'll do that.  I will adopt all of

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3     07/17/2024   809

 1    his arguments and his motion on all grounds and replace just

 2    about every time he said Mr. Smith with Ms. Kasun.  As the

 3    record will reflect -- in fact, I know this is not the issue,

 4    but the record will reflect there's no standing that the

 5    plaintiffs have with regard to bringing the charges against

 6    Ms. Kasun.

 7          There's no standing reacting to hearsay and

 8    speculation by diverting resources.  There's no showing of

 9    intimidation recklessly committed for her mere speech or

10    association as opposed to conduct.  There's no causation of

11    connecting an actually identifiable USEIP's member's conduct

12    to an actual identifiable voter.  There's no agency presented

13    in this case for speech or the conduct of others, and

14    certainly there's no conspiracy.

15          To that end, as you might expect, we incorporate

16    Mr. Powell's opening statement for all purposes into this

17    motion as well.  In addition, I incorporate by reference

18    Ms. Kasun's trial brief, which is Docket Number 163, as well

19    as her proposed findings of fact and conclusions of law, which

20    is Exhibit 162, and suggest that what we've seen here is

21    another sort of glass between the First Amendment and Voting

22    Rights Act.

23          That's besides the point, but what I'd like to get to

24    is now that plaintiffs' lawyers' allegations have been

25    exposed, sort of stripped to the bone, if you will, which is

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    810

1   why we're at where we're at, what we're left with is something

2   that would require a far heightened standard, and it was

3   something that was alluded to, I believe, on Monday, elicited

4   by a question that said, well, there's still a danger that

5   USEIP -- I'm inserting here in brackets perhaps someone

6   similarly situated -- might do something that actually meets

7   the elements in the future.

8          And I feel -- and I feel that what they're requesting

9   here is a prior restraint on free speech.  That's chilling.

10  And if this Court were to enter findings and conclusions

11  granting plaintiffs what they wish, we are in on both sides

12  for a lot of lawsuits between now and November.  So without a

13  finding that these three individuals who have been through a

14  lot, branded with all kinds of labels, without a finding of

15  liability as to them, this case has to conclude.  It's been an

16  honor to appear before you.  Thank you for your opportunity.

17          THE COURT:  Thank you.

18          Ms. Epp.

19          MS. EPP:  Thank you, Your Honor.  As it pertains to

20  the plaintiffs' allegations and the matter of voter

21  suppression, I adopt the motions of both my colleagues, and I

22  incorporate my trial brief, which is Docket 160, and my

23  proposed findings of fact and conclusions of law, which is

24  Docket 161.

25          I agree with Mr. Reisch that Ms. Roberts'

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    811

1   December 2nd, 2022, sworn declaration appears to be the reason

2   that this case has continued since January of 2023.  She

3   testified yesterday that plaintiffs' counsel told her it was

4   USEIP that visited her.  Ms. Roberts and Ms. Erickson signed

5   that affidavit and filed it before this Court, and the Court

6   relied upon it, upon that sworn declaration in the January

7   denial of the defendants' motion for summary judgment.

8        Obviously, I'm not an attorney, Your Honor, but I'm

9   really struggling to understand how the matter of Ms. Roberts

10   and how that has been handled by the plaintiffs is consistent

11   with the spirit of the Federal Rules of Civil Procedure and

12   the spirit of the rules of the professional conduct, as well

13   as the letter of both.  I adopt, as I said, both of my

14   colleagues' arguments.

15        As it pertains to standing, given the plaintiffs'

16   proffer, I very much want Your Honor to hear the testimony of

17   the other two plaintiffs in this case as the proffer of these

18   two organizations as represented by plaintiffs today based on

19   the record and based on the depositions is another

20   misrepresentation before this Court.  That being said, I

21   recognize the hour and where we are in these proceedings, and

22   I leave it to you.  Thank you.

23        THE COURT:  All right.  Thank you.

24        All right.  Plaintiffs, I'm going to -- let me check

25   in with Ms. Mitchell.  I'm inclined to come back in the

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    812

1    morning for plaintiffs' argument, which I will limit to the

2    grand total of the defendants' argument of 15 minutes.  That

3    is -- that is what I'm inclined to do.  Would you like to do

4    that or would you like to do it tonight, in which case I will

5    check in with Ms. Mitchell?

6          MS. ERICKSON:  We're happy to proceed now, Your

7    Honor, if you would like us to.

8          THE COURT:  Then go ahead.

9          MS. ERICKSON:  Your Honor, preliminarily I would also

10   adopt our proposed findings of fact and conclusions of law

11   that were filed, as well as our trial brief, and ask the Court

12   to take those into consideration as well.  With respect to the

13   applicable law, I just want to point out that I think there

14   have been a couple of misstatements of the law in connection

15   with what defense counsel has argued today.

16         With respect to Section 11(b) of the Voting Rights

17   Act, plaintiffs need not show that the intimidation had or

18   will prevent a voter from voting.  Rather, any attempt to

19   intimidate, threaten, or coerce others from exercising the

20   right to vote, even if ultimately unsuccessful, would still

21   violate 11(b).  In other words, defendants do not -- or excuse

22   me -- plaintiffs do not need to parade intimidated voters

23   before this Court to prove their claim.  The question is

24   whether the conduct is objectively intimidating in the eyes of

25   an average voter.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3     07/17/2024    813

1              With respect to the KKK Act, to prevail on the claim

2     under this act, a plaintiff must show a conspiracy of two or

3     more to prevent by force, intimidation, or threat, any citizen

4     from giving his or her support or advocacy to a candidate for

5     federal office, and an act in furtherance of that conspiracy.

6              Section 1985(3) does not have an intent requirement.

7     Case law has been clear that the statutory provision dealing

8     with these categories of conspiratorial activity contains no

9     language requiring that the conspirators act with intent to

10    deprive their victims of the equal protection of the laws.

11             The Court has recognized that this case is about the

12    defendants' conduct and work in connection with United States

13    Election Integrity Plan.  Specifically, plaintiffs have called

14    attention to the canvassing campaign and have presented the

15    question and the issue before this Court of whether

16    defendants' actions were intimidating based on the evidence

17    received during the course of trial.

18             This case is about, again, whether their canvassing

19    activities when coupled with their other activities, including

20    their public rhetoric, was objectively intimidating to a

21    reasonable voter in the State of Colorado.  The First

22    Amendment, which has been referenced many times throughout the

23    course of this trial, does not offer protection for speech and

24    conduct that amounts to voter intimidation, nor is the First

25    Amendment a defense to a violation of the Voting Rights Act or

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3     07/17/2024    814

1    the KKK Act.

2         It is certainly no surprise that the defendants

3    refuse to admit that their canvassing campaign amounts to

4    voter intimidation, or that they attempted or -- and refused

5    to admit they have attempted to or, in fact, intimidated

6    voters, or that they have refused to admit that they conspired

7    to intimidate voters.  It is also no surprise that the

8    defendants have presented an incredibly sanitized version of

9    the canvassing activities they admittedly organized and

10   engaged in.

11        The reality, however, is that the other materials put

12   out by United States Election Integrity Plan reflect their

13   true intent and their true colors.  It is clear from the

14   canvassing -- excuse me -- it is clear from the playbook that

15   was put out, as well as the canvassing report that was put

16   out, that the defendants' conduct was intimidating.  That when

17   taken in light of their statements and the description of

18   their own activities, the defendants were not going door to

19   door with the sanitized version of the campaign that they

20   presented today.

21        In addition, defendants' own admissions regarding

22   their canvass activity and methods demonstrates that they went

23   to the doors and they interrogated voters about their past

24   voting activity.  This is fundamentally different than the

25   canvassing that we see in connection with political campaigns

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024   815

1    and the canvassing that we see in connection with ballot

2    initiatives, in connection with Get Out the Vote efforts, and

3    other methods that are designed to encourage people to

4    exercise their right to vote.

5          Instead, defendants' canvassing activity is about

6    asking questions about whether -- about how voters voted in

7    the past.  And, again, this is in connection with the purpose

8    of their campaign, which was to uncover fraudulent ballots.

9    So, of course, if you understand USEIP's activities in

10   context, they're showing up at people's doors to interrogate

11   them about their past voting activity, and the implication in

12   that is that those individuals have done something wrong with

13   respect to the ballots that they had cast.

14         This, our argument is, serves to chill voting

15   activity going forward.  If you voted in the 2020 election,

16   someone showed up at your door to question you about your past

17   voting activity in an intimidating manner, and then you go out

18   and vote again in the future with the fear that someone will

19   show up at your doorstep again, that is intimidating behavior.

20         Defendants' own admissions have also demonstrated

21   that they did, in fact, carry weapons while canvassing.  Their

22   methods have been corroborated in the playbook and the voter

23   verification training guides.  Again, the playbook is littered

24   with inflammatory rhetoric that could be objectively

25   intimidating in the context of their door-to-door activity,

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024   816

 1    particularly given the overlap with the rhetoric that we saw

 2    on January 6th that led to violence.

 3         In addition, the misinformation that was spread by

 4    defendants in the playbook and otherwise sows doubt in our

 5    election system and is a part of their intimidation campaign.

 6    Both the Secretary of State and Ms. Hendrix testified as to

 7    their concerns about misinformation and its impact on voters.

 8    In addition, plaintiffs' expert provided testimony with

 9    respect to the likely effect on voters of defendants'

10    door-to-door campaign.  Defendants have also admitted that

11    they participated heavily in training other canvassers, in

12    recruiting other canvassers, in sending hundreds of other

13    canvassers out into the communities.

14         The Secretary of State offered testimony on

15    complaints received.  The Secretary of State's Office also

16    testified they were not aware of any other groups that were

17    engaged in a canvassing campaign in order to check the results

18    of the election after the 2020 election.  They are familiar

19    with canvassing that happened in advance of the 2020 election,

20    but to their knowledge it was USEIP and individuals that they

21    trained and provided information to that were canvassing after

22    the fact.

23         In fact, the Secretary of State was so alarmed by the

24    testimony -- or excuse me -- by what they had learned about

25    USEIP's activities, that they set forth a press release to

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3       07/17/2024    817

 1    warn voters of the activity.  Ms. Roberts also testified that

 2    the methods used by USEIP were intimidating.  And to be clear,

 3    Ms. Roberts closed her testimony by stating that she believes

 4    her affidavit was true and accurate to the best of her

 5    knowledge.  Based on the information that she had received and

 6    come to understand, it was her belief that the people who had

 7    showed up at her door were affiliated with United States

 8    Election Integrity Plan.  Defendants are entitled to

 9    cross-examine her, and they did cross-examine her, but

10    Ms. Roberts ended her testimony by testifying that she

11    believed her affidavit was true and accurate.

12          The defendants are the founders, spokespeople, and

13    leaders of USEIP.  They are part of what they have called the

14    small C core group.  Defendants Smith and Epp also personally

15    participated in and led canvassing, and Defendant Kasun

16    promoted it.  As such, the defendants can and should be held

17    responsible for recruiting, organizing, training, and sending

18    volunteers out into the community to do their bidding.

19          This is the evidence we presented in opposition to

20    summary judgment which was denied, and this is the evidence

21    that was presented throughout the course of the trial.

22    Plaintiffs brought their claims in good faith, and we believe

23    that we have met the objective standard to establish voter

24    intimidation under both the Voting Rights Act and the KKK Act.

25          THE COURT:  All right.  Thank you, Ms. Erickson.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    818

1          MR. WYNNE:  May I have a 30-second reply?

2          THE COURT:  Exactly 30 seconds.

3          MR. WYNNE:  Dismissal at this stage is unusual.  I'm

4    going to say something that I hope might give the Court

5    comfort to the extent it is necessary, and that is this.

6    While the absence of testimony subjectively from a witness's

7    perspective, their intimidation that viewed as being

8    reasonably objectively intimidating may not be essential, that

9    is outcome determinative.  In this instance in light of the

10   scant proof, it certainly is probative.  Thank you.

11         THE COURT:  All right.  Thank you.  I needed no

12   comfort, and I'm not sure that provided any anyway.

13         Mr. Reisch.

14         MR. REISCH:  Your Honor, I would just want to add

15   that obviously had we not joined some of the testimony early

16   on, I believe the plaintiffs' case would have been very scant,

17   and we would -- we wouldn't even have half the evidence that

18   we have at this point.  So just remembering that, the burden

19   is with the prosecution -- or the plaintiff at this particular

20   juncture.  It hasn't shifted to us to disprove, and that's

21   kind of what they're asking to do.  Well, they didn't disprove

22   that it wasn't them, and I think we did, but they have the

23   burden of proof saying it was my client, not someone that

24   looked like him, not someone using his identity, but it was

25   him, Your Honor.  Thank you.

                         Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024   819

1              THE COURT:  I understand the burden of proof as well,

2    so that's neither needed, nor comforting.  So we will be in

3    recess until the morning.  I will take this under advisement,

4    and I will come back.  Because we've tortured Ms. Mitchell, we

5    will start tomorrow at 9 o'clock to give her an extra little

6    break.  So we will be in recess until tomorrow at nine.  Thank

7    you.

8              THE COURTROOM DEPUTY:  All rise.  Court is in recess.

9        (The proceedings were concluded at 5:28 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                        Sarah K. Mitchell, RPR, CRR

1                          REPORTER'S CERTIFICATE

2

3          I, SARAH K. MITCHELL, Official Court Reporter for the

4    United States District Court for the District of Colorado, a

5    Registered Professional Reporter and Certified Realtime

6    Reporter, do hereby certify that I reported by machine

7    shorthand the proceedings contained herein at the time and

8    place aforementioned and that the foregoing pages constitute a

9    full, true and correct transcript.

10         Dated this 30th day of July, 2024.

11

12

13

14              _____ /s/ Sarah K. Mitchell _____

15                     SARAH K. MITCHELL
                       Official Court Reporter
16              Registered Professional Reporter
                   Certified Realtime Reporter
17

18

19

20

21

22

23

24

25

                     Sarah K. Mitchell, RPR, CRR