**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-00581-CNS-NRN

Colorado Montana Wyoming
State Area Conference of the NAACP,
League of Women Voters of Colorado, and
Mi Familia Vota,

    Plaintiffs,

v.

United States Election Integrity Plan, Shawn Smith,
Ashley Epp, and Holly Kasun,

    Defendants.

_____

**HOLLY KASUN'S BILL OF COSTS AND OPPOSED MOTION FOR
ATTORNEYS' FEES AND EXPENSES**
_____

    Defendant Holly Kasun submits her Bill of Costs, which is attached as Exhibit 1 to this filing, and Opposed Motion for Attorneys' Fees and Costs. Kasun incorporates by reference Shawn Smith's Motion for Award of Costs and Fees and all exhibits thereto [Dkt. 191] as well as Ashley Epp's Motion for Award of Costs and Fees and all exhibits thereto [Dkt. 193], which recite the governing law and the years-long failure of Plaintiffs to present evidence beyond (1) the "media reports" that the League of Women Voters of Colorado admitted were the source of all allegations in the Complaint, (2) conjecture, and (3) inflammatory language misdirected at these defendants, such that the "canvassing" that Plaintiffs knew nothing about became "interrogating" (and remained so through contrary discovery), the protected political speech of what amounted to a peaceful civics projects was made to sound dangerous, and discussions of self-protection by people not

even involved in the litigation was assumed to have been *Defendants' plan to commit unprovoked violence.*

Defendant Smith ably states that the standard for an award of attorneys' fees is whether the "claim was frivolous, unreasonable, or groundless, or if the plaintiff continued to litigate after it clearly became so." Smith Motion at 3 (citation omitted). Smith points out that caselaw stating that "the purpose of the fee shifting provision is to protect defendants from burdensome litigation having no legal or factual basis." *Id*. at 3 (citation omitted). As in a very similar anti-SLAPP suit, Defendants whom Plaintiffs tried to silence via lawsuit are entitled to fees

> for "claims that were meritless at the inception of the case and those that only were revealed to be meritless as the litigation developed." *Shapiro v. Ryneck*, 250 F.Supp.3d 775, 780 (D. Colo. 2017). A claim is frivolous, unreasonable, or groundless "when a party utterly fails to produce any evidence in support of material issues." *Twilley v. Integris Baptist Medical Center, Inc.*, 16 Fed.Appx. 923, 926 (10th Cir. 2001). This standard is satisfied when a plaintiff fails to produce evidence beyond mere speculation and conjecture, yet "continue[s] to litigate after it became clear during discovery that [their] claims lacked evidentiary support." *Id*; *See also, Yalowizer v. Town of Ranchester*, *Wyoming*, 18 Fed.Appx. 745, 753-54 (10th Cir. 2001) (granting an award of attorney's fees to prevailing defendant in a 42 U.S.C. § 1983 case.

Smith Motion at 4-5.

At the TRO stage, at summary judgment, and most memorably at trial, Plaintiffs failed to produce any evidence in support of the material issues here: (1) intimidation; (2) agency; (3) conspiracy; (4) recklessness. They produced nothing "beyond mere speculation and conjecture".

Plaintiffs knew or should have known their claims, built entirely on speculation, conjecture, and feverish language were meritless. As Defendant Smith points out, Plaintiffs admitted they did virtually no investigation before filing the Complaint, and we

saw no improvement by trial, at which it quickly became apparent that Plaintiffs' case relied on conjecture, assumptions, and speculation. We can still see the groundlessness and exaggeration of Plaintiffs' claim in the argument they made for the TRO, whose elements they never abandoned.

> "The Defendants in this case are carrying out a campaign to intimidate voters. Armed with badges and weapons, they travel door-to-door to the homes of some of Colorado's most vulnerable voters, demanding to know if they participated in the 2020 election, pressing them for information on how they cast their votes," interrogating them about so-called fraudulent ballots, and taking photographs of their homes. This well-funded and sophisticated conspiracy has a clear purpose: to strike fear in the hearts of certain Colorado voters so that they do not turn out at the polls in 2022. Defendants have made it clear to certain voters that intimidation and threats will follow them home from the polling place; that voting now carries the risk that armed vigilantes may come to their homes; and that they should be afraid to vote. It is a brazen, unapologetic, and malignant strain of voter intimidation—and it must be immediately stopped."

[Dkt. 6, p. 2.]

First, Plaintiffs were never able to show how hearsay media reports and their own speculation *caused* their decision to prematurely divert resources to combat anything Holly Kasun actually did or said. That is, knowing how little they knew that was realistically provable, Plaintiffs never had a good-faith, plausible claim of standing.

Second, though Plaintiffs did not allege Holly Kasun engaged in any *conduct* that could have been intimidating (and she did no canvassing and could not be directly tied through an agency relationship or otherwise to anyone who actually did canvass), Plaintiffs pressed the groundless claim that Holly Kasun's mere speech could have reasonably intimidated a voter – and necessarily, after *Counterman v. Colorado*, 600 U. S. 66 (2023) came out, that her speech was reckless. This entire line of argument appeared to rest on nothing more than an equation that misinformation (as Plaintiffs defined it) constituted *per se* intimidation.

Third, Plaintiffs pressed a causation-free theory that Kasun was somehow liable in the absence of any evidence any voter was aware of her speech here. We heard from no voter who heard or even read at a distance any allegedly intimidating words of Holly Kasun. Unlike in Plaintiffs' patchwork theory of intimidation, the anti-intimidation caselaw all involves voters who were aware of the allegedly intimidating conduct toward them; there was a clear victim. When someone stood over a voter at a polling booth, or threatened them with violence, arrest, or eviction, or sent them a threatening robocall, we could see that a voter was aware of the defendant's activity.

Plaintiffs tried a very different, and dangerous, strategy: they dug up quotes from obscure corners of the internet, which no voter is alleged to have even seen, and then presumptuously asked the Court to assume voters somehow knew of this research by Plaintiffs' lawyers, as clearly as a voter could have seen a sheriff standing over them at the polling booth. In short, this was a trial by Internet, including by media reports. Plaintiffs had no evidence Ms. Kasun had said or done anything remotely intimidating to an identifiable voter, or that she tried to do so.

Fourth, Plaintiffs knew all along that they had no evidence to make Ms. Kasun liable for *others'* speech or actions: Plaintiffs did not even deign to bring to court a single individual to testify to any agency relationship Ms. Kasun had with them, nor did they produce any evidence whatsoever of a conspiracy with either the specific intent required by the KKK Act to deprive any voter of their rights or the required agreement with others to do so. Instead, Plaintiffs simply invited us to assume, at every turn, that because the Defendants had "founded" the free association called USEIP, they controlled and were responsible for the actions of everyone in it *and* had entered an agreement to conspire

for unlawful ends. Beth Hendrix made this argument again and again from the stand. It is frivolous.

The perfect metaphor for Plaintiffs' prosecution, of what was always an evidence-free case, to unreasonable degrees, is the Plaintiff's production of the deeply flawed declaration and testimony of Yvette Roberts. In concert with Plaintiffs' lawyers, Ms. Roberts was made to say things about canvassers who visited her home that contradicted her clear, written recollection at the time, things that were not only not plausible, but that she admitted had come from the Plaintiffs' lawyers themselves. Setting aside any ethics issues, the unskillful collaboration between Plaintiffs' attorneys and Ms. Roberts is a failing of a major order.

Plaintiffs knew from Ms. Roberts' own email to the Secretary of State, when her memory was fresh, that she did not identify her canvassers as being with USEIP but an organization "Colorado Election something". Yet to avoid summary judgment, Plaintiffs helped Ms. Roberts to draft, and submitted, a totally contrary claim. Similarly, in the hands of Plaintiffs' lawyers, the "homemade" badges Ms. Roberts reported to the Secretary of State at the time became "official-looking". At best, Plaintiff did not competently steward Ms. Roberts' testimony or avoid influencing Ms. Roberts' recollection or how she expressed it. There are best practices for avoiding that kind of error with an affiant, and Plaintiffs, in their desperation to defeat a motion for summary judgment that exposed their lack of evidence, did not avail themselves of such practices. Defendant Kasun has paid a great price for that failure, in time and expense and lost income, but it should not all be hers to bear alone.

From the vantage point of trial testimony and documentary evidence, in the clear light of day, we can see that Plaintiffs never had any evidence for the great majority of their often-wild claims against the Defendants. Plaintiffs made claims that would constitute defamation in any other context, and those claims cost the Defendants dearly to disprove, such as each of these utterly empty allegations:

- Defendants' canvassing involved "interrogation" and fear and intimidation
- Defendants engaged in racial targeting, or targeted "vulnerable" voters, or targeted dense, multi-family housing, or targeted Democrats
- Defendants, or others in their association, discussed self-defense tools with no other intention but to commit unprovoked violence

But Plaintiffs' provided no more meaningful evidence of Plaintiffs' claims at trial than at summary judgment, no more at summary judgment than on the motions to dismiss, no more in the motion to dismiss than when they filed the TRO. From the very beginning through trial, Plaintiffs kept pressing their empty claims, claims so bereft of evidence that any song about them would be lifted from words the Executive Director of the League, the primary protagonist in this adventure, uttered several dozen times on the stand: *media reports*.

This was always a case built on media reports. A lawsuit based on nothing beyond media reports and confirmation bias is what we mean by the word "unreasonable". It is the definition of "groundless". It is, in a word, frivolous. And it "clearly became so" a long time ago.

WHEREFORE, Defendant Holly Kasun seeks recovery of the following:

1. $4,812.20. Costs as itemized in the Bill of Costs attached as Exhibit 1;

2. $73,720.47. Attorneys' fees and expenses for the firm of Gregor Wynne Arney, PLLC, trial counsel, which is the all-inclusive flat fee of $75,000.00, (see Exhibit

Case No. 1:22-cv-00581-CNS-NRN    Document 195    filed 08/01/24    USDC Colorado
pg 7 of 9

    2), less $811.53, as identified in the Bill of Costs for recoverable copying, printing, and photo enlargements and $234.00 per attorney for court admissions[1],

3. $4,376.33. Expenses incurred by Holly Kasun as a pro se litigant, (Exhibit 3), which is $8,022.00 as shown on Exhibit 3, less $3,645.67 for court fees and printing expenses incurred by Holly Kasun, recoverable as part of the Bill of Costs;

4. $85,565.88 in fees and $4,416.47 in expenses (a total of $89,982.35) paid to the Reisch Law Firm, which is approximately 1/3 of the total paid that firm in connection with this litigation, as shown in Exhibit 4.

5. $329,800.00. Fees for Holly Kasun as a pro se litigant, as shown and described in Exhibit 5, which includes an account of Ms. Kasun's work experience.

Defendant Holly Kasun includes as Exhibits 6 and 7 the curriculum vitae of Michael J. Wynne and Cameron Powell.

Finally, Defendant Holly Kasun seeks such other relief as to which she may be entitled.

---

[1] A redacted itemization of expenses incurred through Gregor Wynne Arney is attached as Exhibit 2(a) to document expenses included in the Bill of Costs. An unredacted copy of the entire invoice will be made available to the Court upon request.

Gregor Wynne Arney, PLLC

*/s/ Michael J. Wynne*
Michael J. Wynne, (TX # 00785289)
mwynne@gwafirm.com
Cameron Powell (CO # 00459020)
cpowell@gwafirm.com
GREGOR WYNNE ARNEY, PLLC
4265 San Felipe, Suite 700
Houston, Texas 77027
Telephone: (281) 450-7403

*ATTORNEYS FOR Defendant Holly Kasun*

## CERTIFICATE OF COMPLIANCE

I HEREBY CERTIFY that the foregoing document was prepared in Arial, 12-point font, as approved by Civ. Practice Standard 10.1.

*/s/ Michael J. Wynne*
Michael J. Wynne

## CERTIFICATE OF CONFERENCE

I certify that on this date, August 1, 2024, I have attempted to confer with lead counsel for plaintiffs but have not yet received a response. I have every reason to expect that this motion is opposed. If I hear otherwise, I will amend.

*/s/ Michael J. Wynne*
Michael J. Wynne

## CERTIFICATE OF SERVICE

I certify that on this date, August 1, 2024, I served a true and correct copy of the foregoing on all counsel and pro se parties by notice of electronic filing.

*/s/ Michael J. Wynne*
Michael J. Wynne

| | |
|---|---|
| STATE OF TEXAS | § |
| HARRIS COUNTY | § |

### DECLARATION OF MICHAEL J. WYNNE

My name is Michael J. Wynne. I am over 18 years of age, of sound mind, and capable of making this declaration. The facts stated within this Motion are, to my knowledge, true and correct.

Further Declarant Sayeth Not.

_____
Michael J. Wynne