## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Colorado Montana Wyoming State Area )
Conference of the NAACP, League of )
Women Voters of Colorado, and Mi Familia )
Vota,                                    )     Civil Action No. 1:22-cv-00581-CNS-
                                         )     NRN
      Plaintiffs,              )
                                         )
v.                                       )
                                         )
United States Election Integrity Plan, Shawn )
Smith, Ashley Epp, and Holly Kasun,      )
                                         )
      Defendants.              )
                                         )

---

### PLAINTIFFS' RESPONSE TO DEFENDANT HOLLY KASUN'S MOTION FOR ATTORNEYS' FEES AND COSTS (ECF NO. 195[1])

---

      Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, and Mi Familia Vota ("Plaintiffs") submit this Response in opposition to Defendant Holly Kasun's Motion for Attorney's Fees and Costs. Plaintiffs filed a separate response to Defendant Kasun's Bill of Costs on August 1, 2024.[2]

### INTRODUCTION

---

[1] When filing her Bill of Costs and Motion for Attorney's Fees and Costs (ECF No. 195) in ECF, Ms. Kasun categorized the document as a Bill of Costs but not a motion. That categorization only permits Plaintiffs to file an objection to the Bill of Costs, but not a response to the Motion. In order to file this response to Ms. Kasun's Motion, Plaintiffs have categorized this memorandum as an objection. To be clear, this memorandum is a response in opposition to Ms. Kasun's Motion for Attorneys' Fees and Costs and not an objection to the Bill of Costs.

[2] Plaintiffs incorporate herein by reference their Response to Defendant Shawn Smith's Motion for Attorneys' Fees and Costs and their Response to Defendant Ashley Epp's Motion for Attorneys' Fees and Costs.

In support of their motions for an award of attorneys' fees and costs Defendants hang their hats on one thing—the declaration and testimony of Yvette Roberts. Specifically, Defendants claim that Ms. Roberts' testimony was "coerced" by Plaintiffs and/or their counsel and that, accordingly, Plaintiffs' claims were frivolous. Defendants' contention is wholly without merit. First, Ms. Robert's own trial testimony confirms unambiguously that no one coerced her testimony, and that the declaration she submitted was true and accurate. Second, Ms. Robert's testimony was by no means the only evidence Plaintiffs submitted in support of their claims. As set forth in more detail below, Plaintiffs presented testimony, evidence, and argument at trial that—while ultimately not sufficient to support a finding of liability by the Court—was, in fact, evidence that Defendants, as the founders and leaders of USEIP, participated in a canvassing campaign that was objectively intimidating.[3]

Defendants seek attorneys' fees and costs under the Voting Rights Act (52 U.S.C. § 10310(e)) and the KKK Act (42 U.S.C. § 1988(b)) and under 28 U.S.C. § 1927. Attorneys' fees and costs are awarded to prevailing defendants under Section 10310(e) and Section 1988(b) only where the defendant can demonstrate that pursuit of the plaintiff's claims was frivolous, unreasonable, or vexatious. To reward a prevailing defendant with attorneys' fees under circumstances short of this high bar would chill plaintiffs' pursuit of civil rights claims, which is directly at odds with the intent of the attorney fee recovery provisions included in these statutes. Likewise, an award of attorneys' fees under Section 1927 is permissible only when the evidence demonstrates an extreme disregard for the orderly process of justice. Defendants have not and

---

[3] Plaintiffs' acknowledgement in this response that the district court did not find sufficient evidence to support a finding of liability does not constitute an admission or agreement with the district court's decision, and Plaintiffs are challenging the order on appeal.

cannot demonstrate that Plaintiffs' claims were frivolous or that Plaintiffs' counsel acted with an extreme disregard for the orderly process of justice. Accordingly, Defendants' motions for attorneys' fees and costs should be denied. Finally, Defendant Kasun's requests for the "attorneys' fees" she allegedly incurred while proceeding as a *pro se* Defendant should be denied because: (1) the law does not support an award of attorneys' fees to *pro se* parties; and (2) Defendant Kasun's calculation of attorneys' fees and costs is unsupported and unreasonable.

Defendants' motions for attorneys' fees and costs should be denied.

## ARGUMENT

### I. Defendants are Not Entitled to Attorneys' Fees Under the Voting Rights Act (52 U.S.C. § 10310(e)) or the KKK Act (42 U.S.C. § 1988(b)).

Under the traditional "American Rule," each party is required to bear their own attorneys' fees absent explicit statutory authority to the contrary. *Key Tronic Corp. v. United States*, 511 U.S. 809, 819 (1994); *Etherton v. Owners Ins. Co.*, 82 F.Supp.3d 1190, 1196 (D. Colo. 2015) (reasoning that the court's "'basic point of reference' when considering an award of attorney's fees is the bedrock principle known as the 'American Rule': Each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise"). A party seeking an award of fees must move the court under Fed. R. Civ. P. 54(d)(2), citing the specific statute or rule entitling the party to the requested award. Fed. R. Civ. P. 54(d)(2)(ii).

Here, Defendants seek an award of attorneys' fees under the Voting Rights Act, 52 U.S.C. § 10310(e) and the KKK Act, 42 U.S.C. § 1988(b). Under the Voting Rights Act, "[i]n any action or proceeding to enforce the voting guarantees under the fourteenth or fifteenth amendment, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fees, reasonable expert fees, and other reasonable litigation expenses as part of the

costs." 52 U.S.C. § 10310(e). Likewise, under the KKK Act, "[i]n any action to enforce a provision of section . . . 1985 . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs . . . ." 42 U.S.C. § 1988(b).

To qualify as a prevailing party under the Voting Rights Act or KKK Act, as would warrant an award of attorney's fees and costs, "a party must obtain actual relief on the merits of his claims in a manner that 'materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.'" *Navajo Nation v. Arizona Independent Redistricting Com'n*, 286 F.Supp.2d 1087, 1092 (D. Ariz. 2003) (quoting *Barrios v. Cal. Interscholastic Fed'n*, 277 F.3d 1128, 1134 (9th Cir. 2002)); *see also Premachandra v. Mitts*, 548 F.Supp. 117, 121 (E.D. Mo. 1982); *Hines v. Marion Cty. Election Bd.*, 166 F.R.D. 402 (S.D. Ind. 1995). Because the legal relationship between the parties was not materially altered by the Court's order, Defendants are not prevailing parties and therefore are not entitled to attorneys' fees under the applicable statutes.

For the reasons more fully set forth below, the Court should deny Defendant's motion for an award of attorneys' fees and costs under Section 10310(e) and Section 1988(b).

> **a. Defendants' Request for an Award of Attorneys' Fees is Fundamentally at Odds with the Purpose of the Attorneys' Fees Recovery Provisions of the Voting Rights Act and KKK Act.**

When Congress adopted Section 10310(e) of the Voting Rights Act in 1975, the Senate Judiciary Committee issued a report stating that the purpose of providing the district courts with discretion to award attorneys' fees to a prevailing party under the Act is to *promote* the enforcement of federally protected voting rights laws by private litigants:

> Such a provision is appropriate in voting rights cases because there, as in employment and public accommodations cases, and other civil rights cases,

4

> Congress depends heavily upon private citizens to enforce the fundamental rights involved. Fee awards are a necessary means of enabling private citizens to vindicate these Federal rights.

S. Rep. No. 94-285, at 40 (1975). The Senate Report made clear that this analysis was equally applicable to 42 U.S.C. § 1988(b). *See id.*

In cases brought under the Voting Rights Act or the KKK Act, courts have consistently recognized that the fundamental purpose of their attorney fee recovery provisions is to *incentivize* the private enforcement of federal voting rights. *See, e.g., King v. Ill State Bd. of Election*, 410 F.3d 404, 412-13 (7th Cir. 2005) (explaining that under Sections 10310(e) and 1988, "Congress hoped to encourage private citizens to initiate court action to correct violations of the Nation's civil rights statutes . . . and . . . to insure that those who violate the Nation's fundamental laws do not proceed with impunity" (internal quotations omitted)); *Emery v. Hunt*, 132 F.Supp.2d 803, 805 (D.S.D. 2001) (stating that Congress intended both Sections 10310(e) and 1988 to "discourage violations of the rights of our citizens" and "make it more likely that citizens would assert constitutional rights"); *Donnell v. United* States, 682 F.2d 240 (D.C. 1982) ("The purpose of [Section 10310(e)], as well as section 1988, a similar provision for awarding attorneys' fees to prevailing parties in civil rights cases generally, is the familiar one of encouraging private litigants to act as 'private attorneys general' in seeking to vindicate civil rights laws."); *Dennis v. Chang*, 611 F.2d 1302, 1306 (9th Cir. 1980) ("Congress' purpose in authorizing fee awards was to encourage compliance with and enforcement of the civil rights laws"); *Northcross v. Bd. of Ed. Of Memphis City Schools*, 611 F.2d 624, 635 (6th Cir. 1979) (reasoning that "a major purpose of [Section 1988] was to encourage the bringing of suits in new and undeveloped areas of civil rights

law, and it would be anomalous indeed if we were to deny fees for the very reason the statute was passed").

As courts have recognized, awarding attorneys' fees to Defendants in cases brought under the Voting Rights Act or KKK Act (presuming Defendants are prevailing parties) would run contrary to the fundamental purpose of the attorneys' fees provisions in these statutes, as confirmed by their legislative history, and would serve the opposite purpose of chilling civil rights litigation. *See, e.g., Coates v. Bechtel*, 811 F.2d 1045, 1049 (7th Cir. 1987) ("If prevailing defendants were routinely awarded attorneys' fees under §1988, civil rights plaintiffs would be extremely reluctant to initiate litigation for fear of being charged with a fee award vastly exceeding the expected recovery, and in some cases their ability to pay, thereby vitiating the underlying purpose of § 1988."); *Lamboy-Ortiz v. Ortiz-Velez,* 630 F.3d 228, 236 (5th Cir. 2010) ("Congress granted parties the prospect of a reasonable attorney's fee under 42 U.S.C. § 1988 to encourage the prosecution of legitimate civil rights claims; to award fees to prevailing defendants when the history of a case does not justify it undercuts that goal and chills civil rights litigation."). Awarding fees to defendants was not the intent of Congress when it adopted Sections 10310(e) and 1988(b). *See, e.g.,* S. Rep. No. 94-285, at 40 (1975).

Because Defendants' request for attorneys' fees is contrary to the intent of the statutes at issue, it is not surprising that Defendants have not a cited a single voting rights case in which the plaintiff was ordered to pay attorneys' fees incurred by a prevailing defendant. Plaintiffs are also aware of no such case. In fact, courts have routinely denied prevailing defendants' requests for an award of attorneys' fees under the relevant statutes. *See, e.g., Lopez v. Merced County, CA*, No. 2008 WL 4467383 (denying a request for defendants' attorneys' fees under Section 10310(e));

*Tancredi v. Metropolitan Life Ins. Co.*, 378 F.3d 220, (2d Cir. 2004) (denying a request for defendants' attorneys' fees under Section 1988(b), even though hindsight provides that plaintiffs' allegations were "very weak," but not completely without foundation); *Hughes v. Rowe*, 449 U.S. 5, 15 (1980) (vacating award of attorneys' fees where allegations, although properly dismissed for failure to state a claim "deserved and received the careful consideration" of both the district court and the court of appeals" and therefore were not groundless); *Howard v. Augusta-Richmond County*, 615 Fed. Appx. 651 (11th Cir. 2015) (holding that the district court abused its discretion in awarding attorneys' fees to prevailing defendants under Section 10310(e) and Section 1988(b)).

### b. Plaintiffs' Position Was Neither Frivolous, Unreasonable, Nor Vexatious.

Because the fundamental purpose of Sections 10310(e) and 1988(b) is to *encourage* the prosecution of voting rights and other civil rights claims, the "standard for awarding attorney's fees to prevailing defendants . . . is difficult to meet and rightly so." *Lamboy-Ortiz v. Ortiz-Velez*, 630 F.3d 228 (5th Cir. 2010); *see also Figures v. Board of Public Utilities*, 967 F.2d 357, 362 (10th Cir. 1992) ("The Case law has enunciated stringent standards that must be met before a court may award attorney's fees to a prevailing defendant pursuant to 42 U.S.C. § 1988.") (affirming the denial of an award of attorneys' fees to prevailing defendants). While a plaintiff who prevails under Section 10310(e) or Section 1988(b) is entitled to attorneys' fees unless special circumstances would render the award unjust, prevailing defendants are only entitled to attorneys' fees where the underlying claims were frivolous, unreasonable, or groundless. *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421 (1978); *Fox v. Vice*, 563 U.S. 826, 836 (2011) (applying the standard set forth in *Christiansburg* to Section 1988 and noting that while civil rights statutes also authorize fees awards to defendants, they do so under different standards because of the "quite

different considerations"); *Shelby Cty. v. Holder*, 43 F.Supp.3d 47, 68 (D.D.C. 2014) (applying the standard set forth in *Christiansburg* to Section 10310(e)); *see also Lampkin v. Bryan*, 479 F.Supp. 172, 174 (N.D. Miss. 1979) (quoting S. Rep. No. 94-1011 (1976) ("[U]nder §1988 an unsuccessful plaintiff 'could only be assessed his opponent's fee only where it is shown that his suit was clearly frivolous, vexatious, or brought for harassment purposes'") (denying a request for attorneys' fees against a plaintiff who failed to sustain her case).

"In determining whether the standard has been met by a prevailing defendant, the court must assess the claim at the time the complaint was filed and avoid the post-hoc reasoning that because a plaintiff did not ultimately prevail, the claim must have been frivolous or unfounded." *Tejada-Batista v. Fuentes-Agostini*, 267 F.Supp.2d 156, 159 (D. Puerto Rico 2003) (denying defendants' request for attorneys' fees and reasoning that: the complaint was not completely meritless and unfounded; plaintiff's claim survived a motion to dismiss and motion for summary judgment; and it was not until trial that the court was left without another option but to dismiss the case for lack of evidence); *Figures*, 967 F.2d at 362 ("It cannot be said that a plaintiff must anticipate adverse evidentiary rulings and dismiss a defendant prior to trial or risk being held liable for attorney's fees pursuant to § 1988. Even though these defendants were ultimately dismissed from this proceeding, it cannot be said that [plaintiff's] initiation or continuation of this action was frivolous, unreasonable, or without foundation."). Stated differently, "[t]he fact that a plaintiff may ultimately lose his case is not itself a sufficient justification for the assessment of fees." *Hughes v. Rowe*, 449 U.S. 5, 66 (1980). If the ultimate dismissal of a plaintiff's claims were sufficient justification for an award of fees to a prevailing defendant it would:

> discourage all but the most airtight claims, for seldom can a prospective plaintiff
> be sure of ultimate success . . . no matter how meritorious one's claims may appear

> at the outset, the course of litigation is rarely predictable. Decisive facts may not emerge until discovery or trial. The law may change or clarify in the midst of litigation. Even when the law or facts appear questionably or unfavorable at the outset, a party may have an entirely reasonably ground for bringing a suit.

*Christiansburg Garment Co.*, 434 U.S. at 422.

Here, Defendants have not and cannot demonstrate that Plaintiffs' position on the merits was frivolous, unreasonable, or vexatious. Defendants brought three dispositive motions in this case—a motion to dismiss (ECF No. 27), a motion for judgment on the pleadings (ECF No. 54), and a motion for summary judgment (ECF No. 70)—all of which were denied by this Court. (*See* ECF Nos. 39, 84). *See Sullivan v. Sch. Bd. of Pinellas Cnty.*, 773 F.2d 1182, 1189 (11th Cir. 1985) (quoting *Jones v. Tex. Tech. Univ.*, 656 F.2d 1137. 1145 (5th Cir. 1981) ("Critically, cases finding frivolity generally involve motions for summary judgment or motions for involuntary dismissal where the plaintiffs did not support their claims with any evidence. Where, however, plaintiffs introduce evidence to support their claims, 'findings of frivolity typically do not stand.'"). In each of these motions, Defendants repeatedly argued that the Plaintiff organizations lacked standing because no member of the organizations was identified as having been intimidated by Defendants' conduct. In denying Defendants' motions, the Court properly acknowledged the Plaintiff organizations were not obligated to identify a critical mass of members who had been intimidated, and instead could establish organizational standing by demonstrating they diverted resources because of Defendants' conduct. (*See, e.g.,* ECF No. 39.) This was always the theory of Plaintiffs' case. Further, as Beth Hendrix, the Executive Director of the League of Women Voters of Colorado, consistently testified, both during her deposition and at trial, members of the League of Women Voters of Colorado (LWVCO) did, in fact, express concerns about Defendants' intimidating conduct. (*See, e.g.*, Tr. Tran. 552:17-21 (Ms. Hendrix testified that the LWVCO

9

member that contacted the LWVCO Board "did not want to be identified due to fear of reprisal");
Tr. Trans. 658:10-23.)

On two separate occasions, Defendants attempted to bring counterclaims against Plaintiffs for abuse of process, arguing—as they do here—that Plaintiffs claims relied solely on the "claims of third-party journalist," were frivolous, and lacked factual support. (ECF Nos. 48, 134.) The Court dismissed the abuse of process claims with prejudice and subsequently denied Defendants' request to reopen the abuse of process claims before trial. (ECF No. 81.)

Further, contrary to Defendants' contentions, Plaintiffs relied on significantly more than news reports and Defendant Smith's purchase of voter rolls in filing their Complaint, opposing summary judgment, and at trial. (*See* ECF No. 191.) Among other things, Plaintiffs relied on the following facts, evidence, and argument:

- Defendants Epp and Kasun founded USEIP, and led the organization, along with Defendant Smith;

- USEIP's County & Local Organizing Playbook, which contains incendiary and violent rhetoric (Tr. Ex. 1);

- USEIP's Canvassing Report, which demonstrates that USEIP agents knocked on over 9,000 doors across Colorado (Tr. Ex. 5);

- Defendants' participation in the January 6 insurrection and use of rhetoric identical to that which incited violence on January 6;[4]

- Defendant Smith's admitted public statement that *anyone* proven to have been involved in election fraud deserves to die by hanging;

- Defendant Smith's testimony that he probably carried a firearm with him when he went door-to-door canvassing for evidence of fraud, and that other

---

[4] The Court denied Defendants pretrial motion to exclude evidence regarding their involvement in the January 6th insurrection—a pre-trial indication that the Court considered such evidence to be relevant and consequential.

volunteers may have carried firearms as well (ECF No. 72 (citing Smith Dep. 218:19; 219:3-7));

- USEIP Basecamp posts in which USEIP encouraged its canvassers to carry weapons (Tr. Ex. 25 at 63);

- Evidence that USEIP canvassers took photos of voters' homes;

- Defendants' testimony at trial that USEIP canvassers would fill out affidavits reporting purported irregularities for the purpose of providing the affidavits and other information to law enforcement (Tr. Trans. 120:5-14);

- Ms. Hendrix's deposition testimony that a LWVCO member was visited by two USEIP representatives who questioned her about her voting record, especially in regard to the 2020 election. The member reported that USEIP representatives were wearing lanyards with laminated nametags that she felt were trying to look governmental. In addition, the LWVCO member reported that USEIP representatives took a picture of her home (ECF No. 72 at 5);

- Ms. Hendrix's trial testimony that a member of LWVCO reported to the LWVCO Board that she had received a visit from USEIP agents who she felt were trying to be intimidating (Tr. Trans. 584:2-11);

- Ms. Hendrix's trial testimony that she is a Colorado voter and is intimidated by the USEIP canvassing activity at issue in this case (Tr. Trans. 578:9-19);

- Ms. Robert's declaration and testimony that she was visited at her home in Mesa County by representatives of USEIP, including detailed testimony about why their behavior and questions were intimidating,[5] and testimony that she had

---

[5] For example, Ms. Roberts explained that she was on alert and concerned not only because the canvassers were, as she described them, a "strong man . . . strange people," but also because "he said he was investigating things," (Tr. Trans. 472:1-8), wore badges, gave off the appearance they were officials, and informed them that their documents had been given to them by the state. (Tr. Trans. 467:1-6, 468:1-9.) But they didn't provide her with any documentation confirming who they were or how to contact them. (Tr. Trans. 473:12-17.) Ms. Roberts testified he asked her specific questions that would reveal that she lived alone, demanded information about her citizenship and the citizenship of others in her household. (Tr. Trans. 471:19-12.) Ms. Roberts felt scared, realizing when they left that she "just told that guy a whole lot of stuff I didn't want to," and was afraid that by chasing them off her property she would face repercussions. (Tr. Trans. 469:4-21.) Ms. Roberts also testified that she had been visited by canvassers and solicitors before, but had never before felt intimidated by them. (Tr. Trans. 476:18.)

never before felt intimidated by canvassers or solicitors. (Tr. Trans. 476:18 - 477:1).

Defendants have also argued the declaration and/or testimony of Yvette Roberts was improper or coerced by Plaintiffs or their counsel. This baseless argument is categorically denied by Plaintiffs, their counsel, and Ms. Robert's herself. In fact, when questioned on this issue at trial, Ms. Roberts denied any improper influence by counsel and adopted her declaration as her own:

Q: Is the declaration that you submitted accurate to the best of your knowledge?

A: Yes.

Q: Did anyone from the plaintiff group tell you what to say either in that declaration or today?

A: No.

(Tr. Trans. 514: 4-9.)

At trial, Defendants also argued the canvassers who visited Ms. Robert's home in Mesa County could not have been affiliated with USEIP, claiming that USEIP did not canvass in Mesa County. This argument is contradicted by numerous pieces of evidence in the record.

For example, Defendant Smith testified at trial that USEIP relied exclusively on state data when conducting their canvassing efforts, whereas other groups canvassing in Mesa County were relying on county data. (Tr. Trans. 107:5-25.) Ms. Robert's repeatedly testified at trial that the canvassers who came to her home in Mesa County informed her that they were using *state* data (not county) data, which is circumstantial evidence that the Mesa County canvassers were, in fact, affiliated with USEIP (and not the other group Defendants contend—with no evidence other than Defendants' self-serving testimony—was canvassing in Mesa County). (Tr. Trans. 467:23-25 ("[H]e informed me that he has this information and that the state had sent it"); Tr. Tan. 470:10-

15 (Q: How do you know that the document that he had were from the state? A: That's what he told me."). Ms. Robert's testimony on this issue is also consistent with the complaint she filed with the Colorado Secretary of State's Office immediately after she ended the intimidating visit from the canvassers, in which she confirmed that the canvassers told her that they were relying on data that "came from the state." (Tr. Ex. 50.)

Further, Ms. Epp testified that the other group canvassing in Mesa County did so in April 2021, whereas USEIP began canvassing in May 2021. (Tr. Trans. 329:22) Ms. Roberts was visited in June 2021. (Tr. Trans. 466:5-15). Ms. Epp and Mr. Smith also admitted that USEIP had a Mesa County "Captain" who had access to USEIP's Basecamp and USEIP training materials. (Tr. Trans. 190:6-15, 191:25-193:12; 194:6-13; 315:17-21.) Ms. Roberts' testimony about how the pair of canvassers approached her door—one standing forward and taking charge of the questions, the other standing back—is also consistent with how USEIP instructed its agents to behave. (*Compare* Tr. Trans. 469:23-470:6 *with* Tr. Trans. 160: 13-17 (discussing the fact that one canvasser would remain on the sidewalk while the other approached the house).)

Deputy Secretary of State Christopher Beall testified that the Colorado Secretary of State's Office understood Ms. Roberts' complaint to be "in relation to USEIP canvassing." (Tr. Trans. 435:15-18.)

Additionally, the records produced by Jeff Young—an architect of USEIP's canvassing efforts—include multiple references to canvassing efforts in Mesa County. (*See, e.g.*, Tr. Ex. 25 at 47 ("Getting ready to begin VV in Mesa County.").)

Finally, Ms. Robert's name and address appears in documents produced by Jeff Young in response to a subpoena for USEIP documents this case. Had Plaintiffs been able to cross examine

Mr. Young at trial, they would have introduced this evidence and, if necessary, impeached Mr. Young. (*See* **Exhibit A**.)

In short, even if the Court ultimately found that the evidence presented at trial was insufficient to support a finding of liability on Plaintiffs' claims under the Voting Rights Act and KKK Act, Defendants have not and cannot demonstrate that Plaintiffs' claims were frivolous, unreasonable, or vexatious. *See Sullivan*, 773 F.2d at 1189.

**II.     An Award of Attorneys' Fees Under 28 U.S.C. § 1927 is Unwarranted.**

Section 1927 is an "extreme standard" and fees should be awarded under the statute "'only in instances evidencing a serious and standard disregard for the orderly process of justice.'" *Baca v. Berry*, 806 F.3d 1262, 1268 (10th Cir. 2015) (citing *AeroTech, Inc. v. Estes*, 110 F.3d 1523, 1528 (10th Cir. 1997)). "[C]ourts must 'strictly construe[]' the statute to guard against 'dampen[ing] the legitimate zeal of an attorney in representing his client." *Id.* (citing *Braley v. Campbell*, 832 F.2d 1504, 1512 (10th Cir. 1987)). The statute permits sanctions only when an attorney "so multiplies the proceedings in any case unreasonably and vexatiously." 28 U.S.C. § 1927.

The Court must find that the "sanctioned attorney multiplied the proceedings both 'unreasonably' and 'vexatiously.'" *Procter & Gamble Co. v. Amway Corp.*, 280 F.3d 519, 525 (5th Cir. 2002) (citing *FDIC v. Calhoun,* 34 F.3d 1291, 1297 (5th Cir.1994)); *Braley v. Campbell*, 832 F.2d 1504, 1511 (10th Cir. 1987). "An award under § 1927 is appropriate when 'an attorney acts recklessly or with indifference to the law; is cavalier or bent on misleading the court; intentionally acts without a plausible basis; or when the entire course of the proceedings is unwarranted." *Live Face on Web, LLC v. Integrity Sols. Grp., Inc.*, No. 16-cv-01627, 2020 WL

1304553, *2 (D. Colo. Mar. 19, 2020). "Reckless conduct differs significantly from mere negligence." *McFadden v. Town of Meeker Colorado*, 2018 WL 508080, *2 (D. Colo. Jan. 23, 2018) (citation omitted).

The cases in which courts have taken the extreme step of awarding attorneys' fees under 28 U.S.C. § 1927 are cases in which attorneys were found to have acted intentionally and without any plausible basis in fact or law, and take other extreme measures to prolong or expand the litigation. *Dreiling v. Peugeot Motors of Am., Inc.,* 768 F.2d 1159 (10th Cir. 1985); *Steinert v. Winn Grp., Inc.*, 440 F.3d 1214 (10th Cir. 2006); *Medtronic Navigations, Inc. v. BrainLab Medizinische Computersystems Gmbh*, No. 98-cv-01072, 2008 WL 410413 (D. Colo. Feb. 12, 2008).

Here, Defendants contend that Plaintiffs' attorneys unreasonably multiplied the proceedings after summary judgment, despite knowing that Plaintiffs' claims "lacked merit." (*See* ECF No. 191 at 13). But, as set forth herein, there is no basis for that contention and the conduct of Plaintiffs' attorneys does not come close to the "serious and standard disregard for the orderly process of justice" that would warrant an award of attorneys' fees under Section 1927. *See Baca*, 806 F.3d at 1268.

The allegation that "Plaintiffs had notice and knowledge that their lawsuit lacked evidentiary support and would be *meritless* at trial" is demonstrably false. (ECF No. 191 at 10 (emphasis added).) At both summary judgment and trial, Plaintiffs had evidentiary support for their claims. As more fully set forth above, *see infra* II(b), Plaintiffs presented evidence that Defendants Epp and Kasun founded USEIP, and that they, along with Defendant Smith, were leaders within the organization. Plaintiffs also presented evidence of the rhetoric that appears in

USEIP's Playbook, which was authored by Defendant Epp and reviewed by Defendant Kasun, and which is reminiscent of the violent rhetoric that incited violence at the U.S. Capitol on January 6. Further, Plaintiffs elicited testimony from Defendants demonstrating that they—in various capacities—recruited and trained USEIP agents, including in regard to USEIP's canvassing efforts. Plaintiffs also presented evidence from the Office of the Colorado Secretary of State, demonstrating that the Secretary received complaints from voters about USEIP's canvassing efforts and was so alarmed about USEIP's canvassing efforts that she felt compelled to issue a warning to voters. (*See* Tr. Ex. 50.)[6]

  In support of their claim for an award of attorneys' fees under 28 U.S.C. § 1927, Defendants argue that "Ms. Roberts testified at trial that her declaration for summary judgment was curated by Plaintiffs' attorneys." (ECF No. 191 at 10.) This is a false and misleading mischaracterization. Not only did Ms. Roberts say no such thing, she expressly testified to the contrary. In fact, at trial, on cross examination, Ms. Roberts was firm in her testimony that Plaintiffs' counsel did *not* tell her what to say in her declaration. Instead, Ms. Roberts testified as follows:

  Q: Sure. When you were being asked to fill out your affidavit, did plaintiffs'
  counsel tell you it had to be USEIP at your doorstep –"

  A: No.

  Q: Correct?

  A: No.

---

[6] It would be antithetical to the purpose of the Voting Rights and KKK Acts to subject Plaintiffs to paying defendants' attorney fees because they did not produce witnesses who were so intimidated that they feared coming forward. (Tr. Tran. 552:17-21; 658:10-23.) Such an outcome likely will chill *voters* from reporting intimidation to trusted community organizations.

Q: Did you come up with the name USEIP on your own?
A: No.

Q: Okay. They introduced you to that name; is that right?

A: Yes.
…
Q: When I say they, I'm referring to plaintiffs' counsel?

A: Yes.

Q: And you're not sure which one, but one of the seven counsel told you it was
USEIP?

A: No one told me that it was.

Q: Is the declaration that you submitted accurate to the best of your knowledge?

A: Yes.
. . .
Q: Did anyone from the plaintiff group tell you what to say either in that
declaration or today?

A: No.

(Tr. Trans. at 508:13-22; 509:4-8; 514:4-9). In other words, Ms. Roberts testified that: (1)

Plaintiffs' counsel did *not* tell her that it was or had to be USEIP that canvassed her home; and (2)

Plaintiff's counsel did *not* "tell [her] what to say either in that declaration or [at trial]." This

testimony alone confirms that Plaintiffs' counsel did not improperly influence her testimony.

Instead, Ms. Roberts confirmed the existence of facts based on her personal knowledge and

experience with USEIP, and her further investigations into the events at issue.

Moreover, Ms. Roberts' other testimony at trial (as well as other independent evidence

discussed above) is consistent with the conclusion that it was canvassers affiliated with USEIP that

visited her home. For example, Ms. Roberts' testimony about the questions she was asked by the canvassers who visited her home is consistent with Defendants' admissions at trial concerning the questions USEIP canvassers were asking at voters' doors. (Tr. Trans. 118:18 – 119: 15) In addition, as set forth in more detail above, Ms. Roberts was firm that the canvassers who visited her home told her that they were relying on state data, not county data. (Tr. Trans. 467:17-25.) Ms. Roberts' testimony about the canvassers' questions, and the fact they informed her they were using state data, coupled with Mr. Smith's testimony that other groups canvassing in Mesa County were using county data, lead to the conclusion that Ms. Roberts was visited by someone affiliated with USEIP. It would at least be an extraordinary and unexplained coincidence if a group other than USEIP was canvasing voters' doors *after the election*,[7] asking the same or similar questions, and relying on state data. Accordingly, there is nothing "curated" about Ms. Robert's testimony, which, by all accounts, is truthful, accurate, and consistent with the conclusion that USEIP visited her (even if she did not know the specific name of the organization until further investigation took place).

At trial, the Court heard direct examination testimony from Ms. Roberts that was consistent with the testimony in her declaration and cross-examination by Defendants and their counsel. The Court then evaluated Ms. Robert's testimony, including as to its credibility, and it concluded there was "no ill will in her testimony, and she seemed to be doing her best to recall the events as she knew them," but that her testimony was "wholly unhelpful to the plaintiffs" because she "did not suffer any threats of violence, threatening phone calls, vandalism during or after the event, and

---

[7] It is worth noting that it is extraordinarily rare for groups to conduct canvassing efforts *after* an election. Rather, most canvassing efforts are conducted in the time period leading up to the election and intended to encourage individuals to vote, rather than question them about their past voting practices.

that the single canvassing event would not affect her decision to vote in future elections." (Tr. Trans. 831:20-23; 833:9-13.)[8] After weighing the evidence presented up until that point in the trial, the Court then dismissed Plaintiffs' claims. This is the very purpose of a trial—parties have the opportunity to present witnesses, and the other side has the opportunity to cross-examine witnesses—exactly what occurred here. While the Court concluded that there is "insufficient evidence to proceed any further in this matter," this does not mean that Plaintiffs or their counsel acted improperly by presenting Ms. Roberts' testimony or proceeding to trial in the first place. (Tr. Trans. 833:14-15.)

In order to recover an award of attorneys' fees under section 1927, "'there must be a causal connection between the objectional conduct of counsel and the multiplication of proceedings,' such that the conduct 'result[ed] in the proceedings that would not have been conducted otherwise.'" *Baca*, 806 F.3d at 1268 (citing omitted). Here, the alleged "objectional conduct" did not unreasonably or vexatiously multiply proceedings. To the contrary, Plaintiffs and their counsel followed the standard court process of defending against a summary judgment motion by presenting testimony from a witness and proceeding to trial when the motion was denied.

As Ms. Epp acknowledges in her motion, prior to trial, Plaintiffs on multiple occasions attempted to resolve this case. Plaintiffs never received a substantive or reasonable response to their settlement offers. After summary judgment, Plaintiffs simply proceeded in the normal course, consistent with the Court's scheduling order and pretrial procedures. In contrast, Defendants

---

[8] Plaintiffs acknowledge that the Court suggested in its order that it found at least some portions of Ms. Robert's testimony to not be credible, but maintain that—as set forth above—Ms. Robert's was clear that: (a) Plaintiffs' counsel did not tell her what to say in either her declaration or at trial; and (b) her declaration was true and accurate.

multiplied and extended the proceedings. Although Plaintiffs were prepared to proceed to trial shortly after summary judgment, the trial was continued at Defendant Epp and Kasun's request. Further, after the Court issued its summary judgment decision and through the first day of trial, Defendants collectively filed approximately 12 motions, which—among other things—sought to refile previously-dismissed counterclaims and reopen discovery, while Plaintiffs filed four—two seeking to appear remotely at hearings (ECF Nos. 88, 144), one motion in limine (ECF 141), and a Motion to Strike Certain Witnesses (ECF 168), which was granted by the Court. Finally, during trial, Plaintiffs abided by the Court's request to make offers of proof and, as a result, trial was expedited, not prolonged. Put simply, if anyone multiplied the proceedings after summary judgment it was Defendants, not Plaintiffs.

### III.    Defendant Kasun Is Not Entitled to Attorneys' Fees as a Pro Se Defendant.

Defendant Kasun argues that she should be awarded "attorneys' fees" in the amount of $329,800.00 for the time period in which she was proceeding as a *pro se* litigant and not paying an attorney. The glaring problem with this is that there are *not* attorneys' fees. By definition, she had *no* attorneys' fees during this time. Defendant Kasun provides no legal basis whatsoever for such request because none exists. Accordingly, Defendant Kasun's requests for attorneys' fees during the time that she proceeded as a *pro se* litigant should be summarily denied.  Because Defendant Kasun incorporates by reference the Motion for Award of Fees and Costs filed by her Co-Defendant, Ashley Epp, Plaintiffs address Ms. Epp's arguments herein, as applied to Ms. Kasun.

In support of her request for *pro se* attorneys' fees, Defendant Kasun, through her incorporation of Defendant Epp's motion, advances a novel theory that because she has

"substantially prevailed" in a case that consisted of "extraordinary circumstances," the Court should ignore the fact that she had no attorney during this time and award her attorneys' fees she did not incur, did not pay, and does not owe. In Defendant Epp's motion, she describes her "unimaginable disadvantage," her preparation for trial which included significant motion practice and drafting of an opening statement, cross-examinations questions, etc., and her pursuit of her defense "in a manner similar to what would be expected of a lawyer" as support for her argument that she should receive compensation in the form of an attorney fee award for attorneys' fees she did not incur. Defendant Kasun's unilateral decision to proceed without counsel for a time does not permit the Court to compensate her for non-existent attorneys' fees.

Indeed, the novel interpretation of "attorneys' fees" advanced by Defendant Kasun has been squarely rejected by the United States Supreme Court. In *Kay v. Ehrler*, the Court confirmed the "proposition that a *pro se* litigant who is *not* a lawyer is *not* entitled to attorney's fees" requested under 42 U.S.C. § 1985.[9] 499 U.S. 432 (1991). In *Kay*, the Court reasoned that the term attorneys' fees "assumes an agency relationship," and that requiring such agency relationship to exist prior to making such an award encourages "potential plaintiffs to obtain the assistance of competent counsel in vindicating their rights." *Id*. at 436-37. The precedent established in *Kay* has been applied by the 10th Circuit and other courts faced with similar issues. *See Debry v. Noble*, 1993 WL 300936, at *5 (10th Cir. Aug. 3, 1993 10th Circuit) ("In light of *Kay*, it is clear that Thurgood and Bartle [as *pro se* litigants] are not entitled to receive attorney's fees under § 1988"); *see also Roberston v. Biby*, 2017 WL 1153237, at * 3 (D. Kan. Mar. 28, 2017) ("It is settled that a

---

[9] In *Kay*, the issue before the Supreme Court was whether to grant an award of attorney's fees for a *pro se* litigant *who was an attorney himself*. Even in that instance, the Supreme Court denied an award of attorney's fees.

*pro se* litigant is not permitted to recover attorney fees under the Civil Rights Fee Awards Act, 42 U.S.C. § 1988").

While the robust volume of case law that explicitly forbids an award of attorney's fees for *pro se* litigants under 42 U.S.C. § 1988 does not exist for a request made under the Voting Rights Act, 52 U.S.C. § 10310, the same analysis applies here. *See Bly v. McLeod*, 605 F.2d 134, 138-39 (4th Cir. 1979) ("The subject matter of [attorney fee awards] has just been considered by us in the case of *Bonnes v. Long*, 599 F.2d 1316 (4th Cir. 1979), a claim under the Civil Rights Attorneys' Fees Award Act of 1976, 42 U.S.C. 1988.  1973L(e)[10] and 1988 are phrased in identical terms, and we apply the same rule of decision under both of them.")  Both statutes contain essentially identical language with regard to an award of attorney's fees to the "prevailing party" in an action brought under either statute. No controlling authority exists to distinguish either statute from the other with regards to a request for attorney's fees for a *pro se* litigant. Accordingly, no distinction should be applied in this instance, especially when the analysis in Defendant Epp's and Defendant Kasun's motion is so explicitly forbidden under 42 U.S.C. 1988.

There simply is no law or precedent that would justify an award of attorneys' fees to a *pro se* defendant who did not incur attorneys' fees. In fact, the law says otherwise. Put simply, if a party did not have an attorney, that party cannot be awarded attorneys' fees. Accordingly, the Court must deny Defendant Kasun's request insofar as it applies to the time period in which she proceeded in this action as a *pro se* litigant.

---

[10] Former 42 U.S.C. § 1973*l* was renumbered in 2014, as 52 U.S.C. § 10310.

**IV.     Defendant Kasun's Calculation for "Attorneys' Fees" and Expenses as a Pro Se Litigant Is Incoherent and Unreasonable.**

Defendant Kasun is not entitled to an award of attorneys' fees while acting as a *pro se* litigant, nor is she entitled to fees under Sections 10310(e), 1988(b), or 1927. However, even if the Court were to entertain such an award, Ms. Kasun's demand does not meet the mandatory standards for an award of attorneys' fees in the Tenth Circuit.

This Circuit requires a request for attorneys' fees to be reasonable and supported by "meticulous, contemporaneous time records that reveal . . . all hours for which compensation is requested and how those hours were allotted to specific tasks."[11] *Stroup v. United Airlines, Inc.*, 2018 WL 10613861 at * 2 (D. Colo. Dec. 5, 2018); *quoting Ramos v. Lamm*, 713 F.2d 546, 553-54 (10th Cir. 1983) (overruled on other grounds); *see also Santacruz v. Standley and Associates, Inc.*, 2011 WL 3366428, at * 1 (D. Colo. Aug. 4, 2011) (reasoning that the court must look to whether "billing entries are sufficiently detailed" to determine if requests are reasonable). Ms. Kasun's motion is neither.

Defendant Kasun requests $329,800.00 in attorney's fees for 1,649 hours that she allegedly spent on defense of her case at the rate of $200/hour. Exhibit 5 to Defendant Kasun's motion

---

[11] In calculating an award for a prevailing plaintiff, the Court typically will start by multiplying the number of hours "reasonably expended" by a "reasonable hourly rate." *Phelps v. Hamilton*, 120 F.3d 1126, 1131 (10th Cir. 1997). Even if Defendant Epps identified a reasonably hourly rate—which she did not—the Court has no way to determine whether her time was reasonably spent. It cannot be said, for example, that Ms. Epp "reasonably expended" time on duplicative and failed motions, duplicated work, or on dismissed counterclaims. *See Erickson v. City of Topeka, Kansas*, 239 F. Supp. 2d 1202 (explaining that prevailing plaintiff should omit "excessive, redundant, or otherwise unnecessary" hours from fee request, and the court has a "corresponding obligation to exclude hours not 'reasonably expended'" and may reduce the award if the sought fee includes hours that were "'unnecessary, irrelevant, and duplicative.'" (quoting *Carter v. Sedgwick County, Kan.*, 36 F.3d 952, 956 (10th Cir. 1994)).

provides a table that groups the alleged tasks she completed in a weekly format that is akin to "block-billing" by an attorney. There is no indication of the specific amount time allotted to any particular task, a requirement pursuant to Tenth Circuit precedent. Further, Defendant Kasun's Affidavit gives no indication that such entries were made contemporaneously with the work she allegedly completed as a *pro se* litigant. Surely, if such entries were made contemporaneously, they would not exist in the format that Defendant Kasun has provided as proof of work completed. Accordingly, Plaintiffs are left to assume that Defendant Kasun's Exhibit 5 is her "best guess" as to what she completed during the previous week, at best, or a post-trial attempt to reconstruct the work she believes she completed. Such estimates, as well as Defendant Kasun's block-billing, hinder the Court's, as well as Plaintiff's, ability to articulate what is "reasonable" and therefore compensable if Defendant Epp's theory is advanced by the Court.

While it is difficult to determine what amount of time Defendant Kasun spent on any particular task due to the format and content of Exhibit 5, even assuming that Defendant Kasun did spend the time alleged on the tasks described, the *amount of time* that Defendant Kasun alleges she spent, 1,649 hours, while acting as a *pro se* litigant is not reasonable. *See Ramos*, 713 F.2d 546 at 553 ("The district court must determine not just the actual hours expended by counsel, but which of those hours were reasonably expended in the litigation"). In analyzing the reasonableness of hours expended, "a court considers several factors, including . . . whether the amount of time spent on a particular task appears reasonable in light of the complexity of the case, the strategies pursued, and the responses necessitated by an opponent's maneuvering". *Stroup*, 2018WL10613861 at *2. In comparison to Defendant Kasun's claim that she worked 1,649 hours, *pro se* Defendant Epp states that she worked 372 hours (22% of the time allegedly recorded by Defendant Kasun) for a

*longer* period of time acting as a *pro se* litigant, including through trial. By another comparison, the total fees requested by Defendant Kasun for less than a 7-month time period as a *pro se* litigant are nearly equal to the fees requested by Defendant Smith's counsel ($361,453.00) for a representation exceeding 2½ years that, for a significant period of time, involved the representation of 3 separate defendants. Further, much of Defendant Kasun's time in the last 2 months of her *pro se* representation refers to "[o]nboarding legal counsel," which presumably refers to the counsel who represented Defendant Kasun at trial. This is no different than a client who hires a lawyer and "onboards" them to familiarize them with the facts of the case. In short, she wants to be paid for being a client. Not only is this clearly a duplicative request, it is not worthy of an award. *See Ramos*, 157 F.3d at 1250 ("Another factor the court should examine in determining the reasonableness of hours expended is the potential duplication of services.").

Put simply, Defendant Kasun's block-billing makes it impossible to determine, specifically, how much time was spent on each task she requests fees for as a *pro se* litigant. And even taking her total hours as true, under no standard of measurement does Defendant Kasun's hours allegedly spent acting as a *pro se* litigant appear to be reasonable. Accordingly, Defendant Kasun's request should be denied.

**V.    Defendant Kasun's Request for Costs is Beyond what is Permissible.**

In addition to the costs that Defendant Kasun has asserted in her Bill of Costs, Defendant Kasun requests $4,376.33 for expenses incurred as a *pro se* litigant. These expenses appear on Exhibit 3 to Defendant Kasun's Motion and include the following: (1) travel costs, including parking fees, in conjunction with meeting with her former attorneys ; (2) Microsoft Office software subscription fees; (3) Basecamp software subscription fees; (4) Chat GPT software subscription

fees; (5) Federal Rules of Evidence guidelines; (6) unidentified office supplies; and (7) public records requests. Defendant Kasun fails to cite any legal authority that such costs/expenses should be awarded. "For items not reimbursable as attorney's fees under § 1988, the general costs statute, 28 U.S.C. § 1920, is controlling." *Ramos*, 713 F.2d at 560. Defendant Kasun has not asserted the above expenses in her Bill of Costs because they are not within the type of costs that one can request an award for. Accordingly, Defendant Kasun's request for an award of $4,376.33 in expenses as identified above and in her Exhibit 3 should be denied.

## VI.    Attorneys' Fees Incurred by Defendant Kasun for Gregor Wynne Arney, PLLC Cannot be Awarded.

Defendant Kasun requests an award of $73,720.47 for "[a]ttorneys' fees and expenses for the Gregory Wynne Arney, PLLC, trial counsel, which is the all-inclusive flat fee of $75,000.00 . . . less $811.53, as identified in the Bill of Costs for recoverable copying, printing, and photo enlargements and $234.00 per attorney for court admissions." Put simply, even after making significant efforts to piece together Defendant Kasun's motion, supporting exhibits, as well as the affidavit of Cameron Powell, it is nearly impossible to discern what forms the basis for this fee request. Exhibit 2 to Defendant Kasun's Motion has an invoice supposedly submitted to Defendant Kasun by Gregor Wynne Arney, PLLC (the "Wynne Firm") which apparently charged a $61,545.53 flat fee for attorney's fees and $13,454.47 for miscellaneous expenses. But there are no billing entries to show what type of work was completed by the Wynne Firm in any respect. While a footnote on Page 7 of the motion provides "[a]n unredacted copy of the entire invoice will be made available to the Court upon request," there is no indication whatsoever as to what has actually been redacted.

As stated above, to make an award of attorney's fees for Defendant Kasun, "[c]ounsel for the party claiming the fees has the burden of proving hours to the district court by submitting meticulous, contemporaneous time records that reveal, for each lawyer for whom fees are sought, all hours for which compensation is requested and how those hours were allotted to specific tasks." *Stroup* at 2018 WL 10613861 at * 2. Even in instances where a flat fee is charged, "a fee award based on a calculation of hours expenses is appropriate in civil rights cases." Ramos, 713 F.2d at 553, n. 1. While Plaintiffs assert that $75,000.00 for essentially one-month of legal work is unreasonable on its face, Defendant Kasun and the Wynne Firm have produced woefully inadequate support for this portion of Defendant Kasun's request for an award of fees as Plaintiffs and the Court are without any ability whatsoever to examine what work the Wynne Firm completed on Defendant Kasun's behalf. Defendant Kasun has cited no legal authority that the Wynne Firm's decision to charge Defendant Kasun a flat fee rather than an hourly fee arrangement absolves Defendant Kasun of the obligation to provide the information necessary for "reasonableness" to be analyzed and determined. Due to this failure, Plaintiffs assert that the Court should deny the request for an award of the Wynne Firm's $75,000 flat fee.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully requests that this Court deny Defendant Holly Kasun's motions for an award of attorneys' fees and costs.

Dated:  August 20, 2024                LATHROP GPM LLP


                                       By /s/Amy Erickson
                                       Casey Breese (#51448)
                                       Casey.breese@lathropgpm.com
                                       Jean Paul Bradshaw
                                       Jeanpaul.bradshaw@lathropgpm.com
                                       Kristin Stock
                                       Kristin.Stock@lathropgpm.com
                                       Brian A. Dillon
                                       Brian.dillon@lathropgpm.com
                                       Amy E. Erickson (#54710)
                                       Amy.erickson@lathropgpm.com
                                       1515 Wynkoop Street, Suite 600
                                       Denver, CO 80202
                                       Telephone: (720) 931-3200

                                       Courtney Hostetler
                                       chostetler@freespeechforpeople.org
                                       John Bonifaz
                                       jbonifaz@freespeechforpeople.org
                                       Ben Clements
                                       bclements@freespeechforpeople.org
                                       Amira Marcella Mattar
                                       amira@freespeechforpeople.org
                                       FREE SPEECH FOR PEOPLE
                                       48 N. Pleasant St.
                                       Amherst, MA 01002
                                       Telephone: (617) 249-3015

                                       *Attorneys for Plaintiffs Colorado Montana
                                       Wyoming State Area Conference of the NAACP,
                                       League of Women Voters of Colorado, and
                                       Mi Familia Vota*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 20th day of August 2024, I caused a copy of the foregoing

**Plaintiffs' Response to Defendant Holly Kasun's Motion for Attorneys' Fees and Costs** to be

filed with the Clerk of Court for the District of Colorado using the CM/ECF system which will

send a notice of electronic filing to all counsel of record.

By */s/Amy Erickson*
Attorneys for Plaintiffs

64222829v1